[ORAL ARGUMENT NOT YET SCHEDULED]

No. 26-5045

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOSÉ ESCOBAR MOLINA, et al.,

Plaintiffs-Appellees,

v.

DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-03417

# BRIEF FOR APPELLANTS


BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TIBERIUS DAVIS
DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

SHERI R. GLASER
LINDA Y. CHENG
*Office of Immigration Litigation*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 90530*
*(202) 514-6054*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

The following were plaintiffs in the district court and are appellees in this appeal:

- Jose Escobar Molina
- B.S.R.
- N.S.
- R.S.M.
- Casa, Inc.

The following were defendants in the district court and are appellants in this appeal:

- United States Department of Homeland Security
- Markwayne Mullin, Secretary of the United States Department of Homeland Security, in his official capacity[1]
- United States Department of Justice
- Todd W. Blanche, Attorney General of the United States, in his official

---

[1] Kristi L. Noem was named in the complaint below as the officeholder. She is automatically substituted by the current officeholder. Fed. R. App. P. 43(c)(2).

capacity[2]

- United States Immigration and Customs Enforcement
- Todd M. Lyons, Acting Director of United States Immigration and Customs Enforcement, in his official capacity[3]
- United States Customs and Border Protection
- Rodney S. Scott, Commissioner of United States Customs and Border Protection, in his official capacity
- United States Border Patrol
- Michael W. Banks, Chief of United States Border Patrol, in his official capacity
- United States Drug Enforcement and Administration
- Terrance C. Cole, Administrator of United States Drug Enforcement Administration, in his official capacity

The following is amicus for appellees:

- Lawyers Defending American Democracy

---

[2] Pamela J. Bondi was named in the complaint below as the officeholder. She is automatically substituted by the current officeholder. *See* Fed. R. App. P. 43(c)(2).

[3] Madison Sheahan was named in the complaint below as "Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, in her official capacity." She is automatically substituted by the current officeholder. *See* Fed. R. App. P. 43(c)(2).

The following were amici in the district court but no longer part of the case:

- Washington Teachers' Union
- D.C. Alliance for Charter Teachers and Staff Local 1927
- Individual Educators
- Legal Aid D.C.
- Busboys and Poets
- Chefs Stopping AAPI Hate
- Council Fire
- Immigrant Food
- MASA Group
- Thrift the District
- 8th Day Faith Community
- All Souls Church, Unitarian
- Cardinal McElroy, Roman Catholic Archbishop of Washington
- The Catholic University of America
- Christ Lutheran Church, Inc.
- Dumbarton United Methodist Church
- Episcopal Diocese of Washington

- The Festival Center
- First Congregational UCC
- Franciscan Action Network
- Luther Place Memorial Church
- Metropolitan Washington, D.C. Synod of the Evangelical Lutheran Church in America, Inc.
- Pax Christi USA
- Peace Fellowship Church
- Reverend Dr. Rose Herr Wayland, Sixth Presbyterian Church
- Reverend Rachel Cornwell, Dumbarton United Methodist Church
- Sacred Heart Roman Catholic Church
- Sixth Presbyterian Church
- St. Matthews Episcopal
- St. Stephen and the Incarnation Episcopal Church
- Washington, D.C. Congregation, Community of Christ
- Washington National Cathedral

**B. Rulings Under Review**

The rulings under review (issued by Judge Beryl A. Howell) include the following:

- The district court's order of December 2, 2025, at docket entry 67.
- The district court's memorandum opinion of December 2, 2025, at docket entry 68. It is available at 811 F. Supp. 3d 1.
- The district court's order of May 7, 2026, at docket entry 101.
- The district court's memorandum opinion of May 7, 2026, at docket entry 102. It is available at 2026 WL 1256234.

**C. Related Cases**

The case on review has not previously been before this Court. There are other related pending cases within the meaning of D.C. Circuit Rule 28(a)(1)(C):

- *Cruz Gamez v. Lyons*, No. 26-2090 (9th Cir.).
- *Ramirez Ovando v. Mullin*, No. 26-1027 (10th Cir.).

*/s/ Daniel F. Mummolo*
Daniel F. Mummolo

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ..............................................................3

STATEMENT OF THE ISSUES ..................................................................4

PERTINENT STATUTES AND REGULATIONS .......................................4

STATEMENT OF THE CASE .....................................................................5

A. Legal Background.....................................................................................5

B. Factual Background ..................................................................................6

C. Procedural Background ..........................................................................10

SUMMARY OF ARGUMENT......................................................................19

STANDARD OF REVIEW ...........................................................................23

ARGUMENT.................................................................................................24

I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ...........................................................................................25

A. Plaintiffs Lack Article III Standing..........................................25

B. The District Court Independently Lacked Jurisdiction Under The INA.........................................................................38

C. Plaintiffs Have No Cause Of Action Under The APA .............40

II. THE DISTRICT COURT ERRED IN PROVISIONALLY CERTIFYING A WARRANTLESS-ARREST CLASS...........................................................................47

A. Class Members Lack Standing..................................................48

B. The Class Does Not Satisfy Rule 23(a)......................................48

C. Plaintiffs Cannot Satisfy Rule 23(b) ........................................53

III. THE REMAINING FACTORS DISFAVOR A PRELIMINARY INJUNCTION ................................................54

A. Plaintiffs Do Not Face Irreparable Harm Without The Injunction ..................................................................54

B. The Equities Weigh Against A Preliminary Injunction..........57

IV. THE DISTRICT COURT'S INJUNCTION EXCEEDS THE LIMITS OF EQUITABLE RELIEF ................................58

A. The District Court Issued An Impermissible Follow-The-Law Injunction ....................................................59

B. The Lyons Memo Does Not Violate The Preliminary Injunction ..................................................................61

CONCLUSION....................................................................................66

ADDENDUM ......................................................................................1a

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Aguirre v. INS*,
553 F.2d 501 (5th Cir. 1977)....................34

*Ariz. All. for Retired Ams. v. Mayes*,
— F.4th —, 2026 WL 2277101 (9th Cir. Aug. 7, 2026) (en banc)....................37

*Au Yi Lau v. INS*,
445 F.2d 217 (D.C. Cir. 1971)....................5

*Bennett v. Spear*,
520 U.S. 154 (1997)....................41

*Black Lives Matter L.A. v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024)....................51

*Camarena v. Director, ICE*,
988 F.3d 1268 (11th Cir. 2021)....................39

*Castañon Nava v. DHS*,
806 F. Supp. 3d 823 (N.D. Ill. 2025)....................6-7

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026)....................23

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....................23, 54, 55, 56

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....................20, 26, 27, 29, 30, 31, 32, 33, 55, 56

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................2, 20, 26, 27, 29, 33

*Clevinger v. Advocacy Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025)....................23

*Contreras v. United States*,
672 F.2d 307 (2d Cir. 1982)....................34, 65

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) .......... 42

*Dickinson v. Trump*,
174 F.4th 634 (9th Cir. 2026) .......... 51

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) .......... 30, 60, 64

*E.F.L. v. Prim*,
986 F.3d 959 (7th Cir. 2021) .......... 39

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 31

*Florida v. Harris*,
568 U.S. 237 (2013) .......... 34, 36

*Friends of Animals v. Bernhardt*,
961 F.3d 1197 (D.C. Cir. 2020) .......... 42

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) .......... 51

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) .......... 43, 49, 50

*Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*,
446 U.S. 318 (1980) .......... 49

*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 36

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .......... 49

*Hardy v. District of Columbia*,
283 F.R.D. 20 (D.D.C. 2012) .......... 52

*Harris v. Med. Transp. Mgmt., Inc.*,
77 F.4th 746 (D.C. Cir. 2023) .......... 24

*Hartman v. Moore*,
547 U.S. 250 (2006)....................41

*Helmerich & Payne Int'l Drilling Co. v. Venezuela*,
153 F.4th 1316 (D.C. Cir. 2025)....................4

*Hinton v. District of Columbia*,
567 F. Supp. 3d 30 (D.D.C. 2021)....................49

*Hussen v. Noem*,
822 F. Supp. 3d 944 (D. Minn. 2026)....................62

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015)....................46

*INS v. Lopez-Mendoza*,
468 U.S. 1032 (1984)....................29

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019)....................23

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)....................58

*Kaley v. United States*,
571 U.S. 320 (2014)....................34

*Kansas v. Glover*,
589 U.S. 376 (2020)....................64

*L.G.M.L. v. Noem*,
800 F. Supp. 3d 100 (D.D.C. 2025)....................49

*Labrador v. Poe*,
601 U.S. —, 144 S. Ct. 921 (2024)....................55

*LaRoque v. Holder*,
679 F.3d 905 (D.C. Cir. 2012)....................36

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................25, 36

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)....................42, 43

*Maryland v. Pringle*,
540 U.S. 366 (2003)....................35

*McCarthy v. Kleindienst*,
741 F.2d 1406 (D.C. Cir. 1984)....................50

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)....................55

*Mullins v. Direct Digit., LLC*,
795 F.3d 654 (7th Cir. 2015)....................50

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................25, 28

*Nken v. Holder*,
556 U.S. 418 (2009)....................24, 57, 58

*Noem v. Perdomo*,
146 S. Ct. 1 (Mem) ....................20, 27, 57, 58

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)....................44

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
303 F. App'x 517 (9th Cir. 2008)....................42

*O'Shea v. Littleton*,
414 U.S. 488 (1974)....................48

*Peralta v. DHS*,
2026 WL 2069917 (S.D. Ohio July 17, 2026) ....................62

*Perdomo v. Noem*,
790 F. Supp. 3d 850 (C.D. Cal. 2025) ....................27

*Pub. Emps. for Env't Resp. v. Zeldin*,
174 F.4th 183 (D.C. Cir. 2026)....................37, 38

*Ramirez Ovando v. Noem*,
810 F. Supp. 3d 1209 (D. Colo. 2025) ....................................................................6

*Rauda v. Jennings*,
55 F.4th 773 (9th Cir. 2022) ...........................................................................39

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999)...........................................................................39, 40

*Romberio v. UnumProvident Corp.*,
385 F. App'x 423 (6th Cir. 2009).......................................................................52

*Schmidt v. Lessard*,
414 U.S. 473 (1974)...........................................................................................59

*Tazu v. Att'y Gen. of the U.S.*,
975 F.3d 292 (3d Cir. 2020) ...............................................................39, 40

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...........................................................................................25

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025).......................................................................48, 57

*United Farm Workers of Am. v. Mullin*,
No. 25-4047, 2026 U.S. App. LEXIS 25727 (9th Cir. Aug. 24, 2026) ......33, 55

*United States v. Meza-Campos*,
500 F.2d 33 (9th Cir. 1974)...............................................................34, 64

*United States v. Reyes*,
963 F.3d 482 (5th Cir. 2020)...........................................................................42

*United States v. Sagastume-Galicia*,
2020 U.S. Dist. LEXIS 70806, at *13 (D.D.C. Apr. 22, 2020).........................52

*United States v. Texas*,
599 U.S. 670 (2023)...........................................................................................31

*United States v. Vasquez-Benitez*,
919 F.3d 546 (D.C. Cir. 2019)..........................................................................51

*Wagner v. Taylor*,
836 F.2d 578 (D.C. Cir. 1987)....4, 47

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....42, 49, 50, 52

*Winter v. NRDC*,
555 U.S. 7 (2008)....24, 54

**<u>Statutes</u>**

5 U.S.C. § 551 ....40

5 U.S.C. § 704 ....40

8 U.S.C. § 1226 ....5

8 U.S.C. § 1252 ....39

8 U.S.C. § 1357 ....5, 28, 35, 41, 59

28 U.S.C. § 1292 ....4

28 U.S.C. § 1331 ....3

**<u>Regulations</u>**

8 C.F.R. § 236.1 ....5

8 C.F.R. § 287.5 ....5

8 C.F.R. § 287.8 ....5, 41, 59

**<u>Rules</u>**

Fed. R. Civ. P. 23 ....2, 48, 49, 53

Fed. R. Civ. P. 65 ....22, 59, 60

**<u>Other Authorities</u>**

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012)....64

Exec. Order No. 1433,
90 Fed. Reg. 39301 (Aug. 11, 2025) ....................................................44

*Newberg & Rubenstein on Class Actions* §3:1 (6th ed. June 2026 update) ....48

Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*,
7 J. on Telecomm. & High Tech. L. 127 (2009) ...............................................61

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DEA | Drug Enforcement Agency |
| DHS | Department of Homeland Security |
| Dkt. | Docket |
| ICE | Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix |

## INTRODUCTION

This case is the latest in a series of appeals across the country involving warrantless civil immigration arrests. Like the others, it arises from certification of an amorphous warrantless-arrest class and issuance of a sweeping, follow-the-law injunction governing how the Department of Homeland Security (Department or DHS), Immigration and Customs Enforcement (ICE), and other agencies and components conduct warrantless immigration arrests—all based on the remarkable premise that ICE maintains an unwritten policy of conducting warrantless arrests without probable cause. But neither Plaintiffs—four individual arrestees and an immigrant-advocacy organization—nor the district court ever established a lawful basis for the extraordinary relief awarded.

Plaintiffs satisfied none of the requirements for a preliminary injunction. They are unlikely to succeed on the merits because they lack standing to obtain prospective relief superintending all immigration arrests throughout the District of Columbia. The Immigration and Nationality Act (INA) independently forecloses district-court interference with the Executive's discretionary decisions about immigration enforcement. Nor have Plaintiffs identified a reviewable agency action under the Administrative

Procedure Act (APA). They introduced no credible evidence that the alleged unwritten policy exists. Rather, they and the district court conjured it from the challenged arrests of *four* aliens, stitched it together with hearsay and speculation, and ignored ICE's actual *written* policy prescribing the correct legal framework for warrantless arrests.

Intertwined with the district court's flawed merits analysis was another error: granting provisional certification of a boundless warrantless-arrest class. Challenges to warrantless arrests turn on the particular circumstances of each arrest, which are intensely factbound. Those individualized inquiries defeat numerosity, commonality, typicality, and the requirement that a single injunction provide relief to the class as a whole. *See* Fed. R. Civ. P. 23(a), (b)(2).

Plaintiffs have also failed to demonstrate irreparable harm. They face no "certainly impending" injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401-02 (2013) (citation omitted). Even the district court concluded that their asserted injuries consisted primarily of emotional distress and past physical injury, which do not suffice for prospective injunctive relief.

The remaining equitable factors similarly favor the government. By imposing operational restrictions and procedural requirements that neither

Congress nor the agencies ever adopted, the preliminary injunction substantially impairs the Executive's ability to administer federal immigration law. That intrusion additionally undermines the public's compelling interest in the uniform and vigorous enforcement of the Nation's immigration laws.

The district court's recent enforcement order amplified those errors. The enforcement order rests on the mistaken conclusion that a DHS memorandum, which faithfully reflects the statutory and regulatory framework for warrantless immigration arrests, violated the preliminary injunction. The district court then went a step further, barring ICE from relying on *any* part of the memorandum and subjecting all warrantless arrests in the District to ongoing judicial micromanagement.

This Court should accordingly vacate the preliminary injunction and reverse the grant of provisional class certification.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §1331. The district court entered a preliminary injunction and granted provisional class certification on December 2, 2025. (Dkt. 67-68). The government filed a timely notice of appeal. (Dkt. 73).

This Court has jurisdiction under 28 U.S.C. §1292(a)(1) to review a preliminary injunction. Because provisional class certification is "inextricably intertwined" and "close[ly] overlap[s]" with the preliminary injunction, "review of the former is necessary to ensure meaningful review of the latter." *See Helmerich & Payne Int'l Drilling Co. v. Venezuela*, 153 F.4th 1316, 1325-26 (D.C. Cir. 2025) (citation omitted); *Wagner v. Taylor*, 836 F.2d 578, 585-86 (D.C. Cir. 1987).

## STATEMENT OF THE ISSUES

1. Whether the district court improperly granted a preliminary injunction that prospectively regulates how federal immigration officers conduct warrantless arrests in the District of Columbia.

2. Whether the district court erred in provisionally certifying a warrantless-arrest class.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal Background

Immigration officers may "arrest any alien in the United States" without a warrant when there is "reason to believe that the alien so arrested is in the United States in violation of" federal immigration law "and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. §1357(a)(2). DHS regulations mirror those requirements. *See* 8 C.F.R. §287.8(c)(2)(i)-(ii). This Court has equated the "reason to believe" standard with probable cause. *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971). After a warrantless arrest, DHS policy instructs immigration officers to "document in the narrative section of" a Record of Deportable/Inadmissible Alien (Form I-213) "all factors considered in determining that the alien was likely to escape before a warrant could be obtained." (Dkt. 82-1 at 6).

Alternatively, if it is possible to obtain a warrant, designated immigration officers may issue a Form I-200 administrative warrant to arrest and detain an alien pending removal proceedings. *See* 8 U.S.C. §1226(a); 8 C.F.R. §§236.1(b)(1), 287.5(e)(2).

## B. Factual Background

### *1. ICE's policies have consistently required officers to develop probable cause before a warrantless arrest*

The formal written policies of ICE, a component of DHS, incorporate the requirements of 8 U.S.C. §1357(a)(2) and its implementing regulations. Until mid-2025, ICE's formal policy on warrantless arrests was contained in a Broadcast Statement of Policy that was issued in connection with a class-action settlement in *Castañon Nava v. DHS*, No. 18-cv-03757 (N.D. Ill.). (Dkt. 17-1 at 8). The Broadcast Statement of Policy gave officers examples of factors that can influence the "likelihood of escape" analysis when conducting warrantless arrests—including an immigration officer's "ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community," and "other specific circumstances." (Dkt. 17-1 at 8).

On June 11, 2025, the *Castañon Nava* settlement agreement expired, and ICE notified employees that they were no longer bound by it. *Castañon Nava v. DHS*, 806 F. Supp. 3d 823, 860 (N.D. Ill. 2025). The notice, which closely tracked the prior policy, reiterated that warrantless arrests must be based on probable cause and comply with §1357(a)(2). *See Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1218 (D. Colo. 2025). On October 22, 2025, in

response to an order from the *Castañon Nava* court, ICE re-adopted the prior Broadcast Statement of Policy. *Id.* at 1218-19.[4]

Acting ICE Director Todd Lyons published a memorandum titled "Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests" on January 28, 2026 (the Lyons Memo). (Dkt. 82-1). The Lyons Memo emphasizes that a warrantless arrest must comply with §1357(a)(2) and that the probable-cause determination "must be made before a warrantless arrest is effectuated." (Dkt. 82-1 at 4). Although §1357 does not define "likely to escape," the memo distinguishes that phrase from a post-arrest determination of flight risk. (Dkt. 82-1 at 5-6). "[L]ikely to escape" in the context of a warrantless arrest means the alien "is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained," not that the individual will likely fail to appear for removal proceedings. (Dkt. 82-1 at 4). The Lyons Memo provides a list of non-exclusive factors that can be considered in establishing likelihood

[4] Plaintiffs, (Dkt. 17 at 40), and the district court, (Dkt. 67 at 2), treated the *Castañon-Nava* Broadcast Statement of Policy as binding nationally. But the court there recently limited that policy's scope to the class in that case. *See Castañon Nava*, No. 18-cv-03757, Dkt. 342 at 3.

of escape and recognizes that solely being in the country illegally is insufficient. (Dkt. 82-1 at 4).

*2. Immigration officers conduct warrantless arrests of the named plaintiffs based on probable cause*

Beginning in 2025, immigration officers arrested the four individual named plaintiffs. The circumstances of those arrests are described below.

**José Escobar Molina**, a native and citizen of El Salvador, has lived in Washington, D.C. with temporary protected status since 2001. (Dkt. 17-2 ¶1). On August 21, 2025, immigration agents arrested Molina as he was walking from his apartment to his truck. (Dkt. 17-2 ¶5). Before the arrest, immigration agents learned that Molina's temporary protected status had expired. (Dkt. 50-2 ¶7). Molina was released the following day. (Dkt. 17-2 ¶14).

**B.S.R.**, a native and citizen of Honduras, has lived in Washington, D.C. since 2019. (Dkt. 17-3 ¶¶1-2). After B.S.R. overstayed his visa, immigration officers arrested him in January 2025 as part of a targeted enforcement operation. (Dkt. 63-2 ¶¶8-9). Immediately before the arrest, B.S.R. was traveling in a vehicle whose driver refused to comply with officers' instructions. (Dkt. 17-3 ¶3). Removal proceedings followed. (Dkt. 50-1 ¶21). During the pendency of his asylum application, he was placed in ICE's

Alternatives to Detention program, which required him to wear an ankle monitor and to attend regular check-ins. (Dkt. 50-1 ¶21); (Dkt. 17-3 ¶¶1-2, 10).

On August 18, 2025, immigration officers arrested B.S.R. after he entered a vehicle. (Dkt. 17-3 ¶12); (Dkt. 50-1 ¶21). Agents "specifically targeted" B.S.R. "based on information in law enforcement records," including records indicating past criminal charges for domestic violence and simple assault. (Dkt. 63-2 ¶¶8-9); (Dkt. 50-2 ¶8). B.S.R was released later that day. (Dkt. 17-3 ¶¶20-21). Removal proceedings against B.S.R. remain ongoing. (Dkt. 50-1 ¶21).

**N.S.**, a native and citizen of Venezuela, lives in Washington, D.C. with temporary protected status and has a pending application for asylum. (Dkt. 17-4 ¶1); (Dkt. 50-1 ¶22). Since November 2022, N.S. has attended annual check-ins with ICE. (Dtk. 17-4 ¶2).

On August 12, 2025, an immigration officer arrested N.S. outside of a Home Depot while he was sitting in the driver's seat of his car with the engine running. (Dkt. 17-4 ¶¶6, 12). That same day, ICE issued N.S. a Notice to Appear in immigration court. (Dkt. 50-1 ¶22). On September 9, 2025, ICE released N.S. after fitting him with an ankle monitor. (Dkt. 17-4 ¶23). Removal proceedings are currently pending. (Dkt. 17-4 ¶¶23-24).

**R.S.M.**, a native and citizen of El Salvador, has lived in Washington, D.C. since 2020 and has pending applications for asylum and a U visa. (Dkt. 17-5 ¶1). On August 26, 2025, immigration officers stopped R.S.M. while she was a passenger in a car with her husband. (Dkt. 17-5 ¶¶2-8). Despite officers' commands to roll down their windows, R.S.M.'s husband lowered his window only "a little bit." (Dkt. 17-5 ¶2). Both R.S.M. and her husband refused to comply with officers' repeated instructions to produce identification before ultimately doing so. (Dkt. 17-5 ¶3). The officers arrested R.S.M., fitted her with an ankle monitor, and released her the same day. (Dkt. 17-5 ¶¶8-12); (Dkt. 50-1 ¶23). ICE issued R.S.M. a Notice to Appear, and she is currently in removal proceedings. (Dkt. 50-1 ¶23).

The remaining named plaintiff, **CASA, Inc.**, a nonprofit immigrant advocacy group headquartered in Maryland, alleges that its "resources have been diverted to focus on providing emergency response services for" aliens in D.C. subjected to warrantless arrests without probable cause. (Dkt. 1 ¶6).

### C. Procedural Background

#### *1. Plaintiffs initiate this lawsuit*

On September 25, 2025, Plaintiffs brought this lawsuit. They alleged that the government maintained an unwritten "policy and practice of making

warrantless immigration arrests without … probable cause that the person being arrested is unlawfully present in the country and is likely to escape before a warrant can be obtained." (Dkt. 1 ¶28). Plaintiffs also asserted that they have "experience[d] significant physical and psychological harm from their arbitrary arrest and detention" and fear "experienc[ing] those harms again." (Dkt. 1 at 1). Asserting claims under the INA and APA, Plaintiffs sought, among other things, certification of three warrantless-arrest classes, declaratory and injunctive relief, and vacatur of the alleged unwritten policy. (Dkt. 1 at 30-34).

#### *2. Plaintiffs seek a preliminary injunction and class certification*

One week later, Plaintiffs moved for a preliminary injunction or, alternatively, a stay of agency action, (Dkt. 17), and class certification, (Dkt. 19). They argued that the arrests of the named plaintiffs confirmed the existence of an unlawful (and unwritten) "*arrest first, ask questions later*" warrantless-arrest policy that "has sown fear and alarm among D.C.'s Latino and immigrant communities." (Dkt. 17 at 10). To establish the alleged unwritten policy, Plaintiffs cited various news articles purporting to show that ICE and other administration officials sought to arrest more illegal aliens. One article, based on unverified accounts, reported that administration

officials instructed ICE to "ramp up the number of" arrests of illegal aliens by setting arrest quotas. (Dkt. 17-1 at 21-26). Another article disputed those accounts. (Dkt. 17-1 at 28-31). Yet another described President Trump's plan to "deploy National Guard troops in the nation's capital to combat … rampant violent crime." (Dkt. 17-1 at 34).

Plaintiffs similarly relied on generalized statements by administration officials calling for robust enforcement of federal immigration law. *See, e.g.*, (Dkt. 17 at 11) (statement by White House Deputy Chief of Staff encouraging deportation of more illegal aliens); (Dkt. 17-1 at 77) (X post by Border Patrol Chief explaining that "Border Patrol enforces immigration laws wherever the mission takes us"); (Dkt. 17-1 at 83) (Truth Social post stating that, if D.C. Metropolitan Police refused to cooperate with ICE, "CRIME would come roaring back" to D.C.).

In a separate motion, Plaintiffs asked the district court to certify the following proposed class under Federal Rule of Civil Procedure 23:

> **Warrantless Arrests Class:** All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

(Dkt. 19 at 5).

The preliminary-injunction motion sought to enjoin the government "from making warrantless immigration arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained." (Dkt. 17-28 at 2). Plaintiffs also urged the district court to impose reporting and documentation requirements untethered to Section 1357 or its implementing regulations. (Dkt. 17-28 at 2-3). And they further moved for provisional certification of the Warrantless Arrest Class. (Dkt. 17 at 41-42).

*3. Plaintiffs submit modified proposed orders*

After a hearing, the district court expressed concern about the scope of Plaintiffs' requested relief. The district court explained that the proposed injunction would transform the district court into "an immigration-related court" that "supervis[ed] arrests and stops" potentially nationwide. (Dkt. 61 at 50).

To address that concern, Plaintiffs submitted revised proposed orders for their motions for preliminary injunction and class certification. The preliminary-injunction order would have prohibited the government from enforcing its "policy and practice of making warrantless civil immigration arrests … without a pre-arrest individualized determination by the arresting

agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained." (Dkt. 62-1 at 2). The proposed order likewise retained largely the same extra-statutory reporting and documentation requirements as the original one but included new enforcement provisions. (Dkt. 62-1 at 2-4). It also would have provisionally certified a "Flight Risk Class," rather than the broader Warrantless Arrest Class, with the following definition:

> **Flight Risk Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

(Dkt. 62-1 at 2). Plaintiffs also sought final class certification of three warrantless-arrest classes instead of one. *See* (Dkt. 62-2).

*4. The district court grants a preliminary injunction and provisionally certifies a warrantless-arrest class*

On December 2, 2025, the district court issued a preliminary injunction and provisionally certified the warrantless-arrest class (i.e., the Flight Risk Class).

The district court concluded that the named plaintiffs had standing to assert their claims. According to the district court, the arrests of the *four* named plaintiffs—out of tens of thousands of illegal aliens in the District of

Columbia[5]—meant that the government is "engaging in a systemic policy and practice of making warrantless arrests without individualized determinations of flight risk." (Dkt. 68 at 34) (citation omitted). The district court further found that the named plaintiffs had "shown a substantial likelihood that they are among the group of individuals that defendants target for civil immigration arrests" and "cannot avoid repeating the quotidian conduct that led to their original arrests." (Dkt. 68 at 35-36). The district court also determined that CASA had associational standing. (Dkt. 68 at 41-42).

The district court then ruled that Plaintiffs had satisfied all the requirements for prospective injunctive relief. In the district court's view, Plaintiffs were likely to succeed on the merits because the INA did not strip federal courts "of jurisdiction to adjudicate [their] claims." (Dkt. 68 at 42). Invoking uncorroborated hearsay and assorted officials' public statements, the district court further asserted that ICE had probably developed an unwritten policy to conduct unlawful warrantless immigration arrests, which amounted to a final agency action and violated the APA. (Dkt. 68 at 50-63).

---

[5] *See* Am. Immigr. Council, *Immigrants in D.C.* (2020), https://perma.cc/Z4AE-MHJ8.

Beyond likelihood of success on the merits, the district court decided that Plaintiffs had "satisfactorily show[n] irreparable harm," based on "irreparable loss of personal liberty," shackling, and "overcrowded and frigid cells." (Dkt. 68 at 64-65). Although the district court recognized the government's interest in enforcing federal immigration law, the fact-specific nature of the probable-cause standard, and the risk that an injunction could subject the government "to a never-ending flurry of contempt proceedings," it concluded that the equities tipped in Plaintiffs' favor. (Dkt. 68 at 66-67). And the district court asserted that Plaintiffs' revised proposed order—which enjoined the enforcement of ICE's alleged unwritten "*policy and practice* of making warrantless civil immigration arrests" without probable cause of likelihood of escape, not "the warrantless arrests themselves"—resolved any overbreadth concerns. (Dkt. 68 at 68) (citation omitted).

Subsumed in the preliminary injunction was the provisional certification of the Flight Risk Class, which the district court redesignated as the "Unassessed Escape Risk Class," under Federal Rule of Civil Procedure 23. (Dkt. 67 at 1); (Dkt. 68 at 69-82). Despite acknowledging "the preliminary posture of the case," the district court found that the proposed class qualified for provisional certification under Rule 23. (Dkt. 68 at 69-82). The district

court deferred ruling on the motion for final class certification until "a later time." (Dkt. 68 at 70).

The district court then fashioned a classwide preliminary injunction with several requirements. The preliminary injunction bars the government from enforcing its purported "policy or practice of making warrantless civil immigration arrests in the District of Columbia without a pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained." (Dkt. 67 at 2). The district court further ordered any immigration officer who conducts a warrantless arrest in the District of Columbia to "document the facts and circumstances surrounding the warrantless civil immigration arrest in narrative form." (Dkt. 67 at 2). That documentation must state:

(i) "that the alien was arrested without a warrant";

(ii) "the location of the arrest and" the location type (e.g., business, residence, vehicle, public area);

(iii) "the alien's ties to the community, if known at the time of arrest, including family, home, or employment";

(iv) “specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained”;

(v) the “date and time of the arrest”; and

(vi) the “date and time the agent completed the documentation.”

(Dkt. 67 at 3). The injunction warns that any “use of boilerplate language may be deemed indicative of noncompliance.” (Dkt. 67 at 3). Every thirty days, the government must produce “the documentation describing … warrantless civil immigration arrests within th[e] District,” or “no later than seven days” for “specific individual warrantless arrests,” if requested by Plaintiffs’ counsel. (Dkt. 67 at 3). And Plaintiffs “may seek intervention from the” district court if they believe that “substantial noncompliance” with the preliminary injunction has occurred. (Dkt. 67 at 4). The district court denied Plaintiffs’ alternative request to stay agency action. (Dkt. 68 at 88).

*5. The district court issues an enforcement order*

On February 19, 2026, Plaintiffs moved to enforce the preliminary injunction and to seek extra-record discovery. According to Plaintiffs, a handful of I-213 forms demonstrated that the government was “continuing to enforce [its] policy and practice of not making a pre-arrest individualized

determination of probable cause as to escape risk when conducting warrantless civil immigration arrests." (Dkt. 78 at 10). After a hearing and at the district court's direction, the parties submitted supplemental briefing on the implications and accuracy of the Lyons Memo, which DHS had issued a few weeks earlier. *See* (Minute Order, Mar. 11, 2026).

On May 7, 2026, the district court granted the motion to enforce. (Dkt. 102). The district court concluded that the escape-risk analysis in the Lyons Memo was flawed because it did not "properly convey[]" to immigration officers that they must determine an alien's likelihood of remaining at the scene of the encounter or of being found at another clearly identifiable location before conducting a warrantless arrest. (Dkt. 102 at 23). The district court further ruled that the Lyons Memo did not address how community ties affect the escape-risk analysis, based on a few Form I-213s it reviewed. (Dkt. 102 at 25-29). The district court then prohibited reliance on the Lyons Memo in its entirety and granted Plaintiffs' request for extra-record discovery.

The government timely appealed. (Dkt. 73).

## SUMMARY OF ARGUMENT

**I.** This Court should vacate the preliminary injunction. Plaintiffs have not established a likelihood of success on the merits for multiple reasons. To

start, they lack standing to seek injunctive relief. The individual named plaintiffs have not demonstrated that another warrantless arrest—much less an *unlawful* one—is "real and immediate," *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), "certainly impending," *Clapper*, 568 U.S. at 401-02 (citation omitted), or even probable. Indeed, the Supreme Court recently stayed a similar injunction, with Justice Kavanaugh emphasizing serious defects in the plaintiffs' standing theory. *Noem v. Perdomo*, 146 S. Ct. 1, 2-3 (Mem) (2025) (Kavanaugh, J., concurring in the grant of the application for stay). The prospect of a future injury in this case is especially remote because probable cause likely supported the arrests of the individual named plaintiffs. Plaintiffs have also failed to allege any injury other than past harms inflicted from previous warrantless arrests, which are not fairly traceable to ICE's supposed policy. Because an administrative warrant has issued for at least one named plaintiff, any future arrest could stem from that warrant, rendering that plaintiff's need for prospective relief particularly speculative. And an injunction awarding prospective relief does nothing to redress retrospective

harm from completed arrests. For similar reasons, CASA lacks associational standing.

Other defects independently bar Plaintiffs' claims. The INA, which insulates ICE's discretionary decisions about how to initiate removal proceedings, deprives the district court of jurisdiction. Nor do Plaintiffs have a cause of action under the APA. The only policies in the record align with the governing statute and implementing regulations, and Plaintiffs have presented no credible evidence that a contrary unwritten policy exists.

**II.** The district court similarly erred in provisionally certifying a warrantless-arrest class (the Unassessed Escape Risk Class). There is no evidence that any particular member of the provisional class is likely to face a future warrantless arrest, defeating standing. Nor have Plaintiffs offered ascertainable class numbers. Given the intensely fact-specific nature of the probable-cause inquiry, Plaintiffs also fall short on commonality and typicality. The individualized circumstances of the named plaintiffs' own arrests likewise foreclose certification under Rule 23(b).

**III.** The remaining factors preclude injunctive relief as well. Because Plaintiffs lack Article III standing, they will not suffer irreparable harm without an injunction, and the district court incorrectly focused on

retrospective consequences arising from past detention, rather than any imminent and prospective injury attributable to the alleged policy. Many of the named plaintiffs are also in removal proceedings and do not face a likely warrantless rearrest.

The balance of the equities and public interest likewise tip decisively in the government's favor. Because the government has a legitimate and significant stake in enforcing federal immigration law, the preliminary injunction interferes with important immigration-enforcement functions and disserves the public interest. The additional administrative requirements imposed by the district court only exacerbate the harm to the government.

**IV.** Finally, the preliminary injunction, the core provision of which simply directs the government to comply with existing law, violates Rule 65(d)'s requirement to state an injunction's terms with particularity. *See* Fed. R. Civ. P. 65(d)(1). At the same time, the preliminary injunction bears little connection to the alleged injuries, sweeps far too broadly, and covers an agency that Plaintiffs do not even allege has conducted a single warrantless arrest.

The district court's recent enforcement order remarkably goes further still. Based on its meritless objection to two probable-cause considerations

discussed in the Lyons Memo, the district court concluded that the entire memorandum violated the preliminary injunction and prohibited immigration officers from relying on any portion of it. The district court then supplanted the guidance in the Lyons Memo—which merely summarizes and guides officers' application of the governing statutory and regulatory framework—with its own directives, dictating what probable-cause factors immigration officers may and must consider in the field.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction and "any weighing of the preliminary injunction factors for abuse of discretion." *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233 (D.C. Cir. 2025). But any legal conclusions on which the district court relies, including whether the movant has standing and "demonstrated irreparable injury," receive *de novo* review. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1228 (D.C. Cir. 2026).

Abuse-of-discretion review applies to a district court's certification of a class. *J.D. v. Azar*, 925 F.3d 1291, 1312 (D.C. Cir. 2019). But "[t]he district court's interpretation of Rule 23 is a question of law that" this Court reviews

*de novo*. *Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 757 (D.C. Cir. 2023).

## ARGUMENT

To obtain a preliminary injunction, the movant must show: (i) a substantial likelihood of success on the merits; (ii) irreparable harm in the absence of the injunction; (iii) that the balance of equities tips in favor of the movant; and (iv) that the injunction is in the public interest. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The district court entered a sweeping classwide preliminary injunction that subjects immigration enforcement throughout the District of Columbia to ongoing judicial management and satisfies none of the requirements for prospective equitable relief. The district court further erred in provisionally certifying a warrantless-arrest class and issuing an injunction that extends far beyond Plaintiffs' alleged injuries. The analysis of the Lyons Memo in the district court's enforcement order is equally mistaken. The Lyons Memo

faithfully reflects the governing legal standard for warrantless arrests, and the district court incorrectly barred ICE from relying on it.

This Court should accordingly vacate the preliminary injunction and reverse the grant of provisional class certification.

## I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Plaintiffs have failed to demonstrate a likelihood of success on the merits. Because they have alleged—at most—past harm and face no nonspeculative or immediate risk of future injury, they lack Article III standing to seek prospective relief. The INA independently strips the district court of jurisdiction over Plaintiffs' claims, and Plaintiffs have no cause of action under the APA.

### A. Plaintiffs Lack Article III Standing

"[T]he irreducible constitutional minimum of standing" is absent from Plaintiffs' claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing requires: (i) a "concrete, particularized, and actual or imminent" injury in fact; (ii) causation; and (iii) redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "At the preliminary injunction stage, … the plaintiff must make a 'clear showing'" of likelihood "to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted).

**1.** It is a bedrock principle of standing that abstract harm or "past wrongs" are "not enough" for an injury in fact when seeking prospective relief. *Lyons*, 461 U.S. at 101, 103. Rather, a plaintiff must be "'immediately in danger of sustaining some direct injury' as the result of the challenged official conduct." *Id.* at 102 (citation omitted); *see Clapper*, 568 U.S. at 401-02 (requiring a "certainly impending" future injury for Article III standing (citation omitted)). A "*possible* future injury" will not suffice. *Clapper*, 568 U.S. at 409 (citation omitted).

The Supreme Court's decision in *City of Los Angeles v. Lyons* is particularly instructive. *Lyons* involved a traffic stop that escalated into a physical seizure, during which Los Angeles police officers placed the plaintiff in a chokehold and injured his larynx. *Lyons*, 461 U.S. at 97-98. The plaintiff challenged the City's chokehold policy and requested, among other things, prospective injunctive relief "barring the use of the control holds." *Id.* at 98.

Although Lyons could pursue a damages claim, the Supreme Court concluded that he could not seek an injunction because he had not "establish[ed] a real and immediate threat" of a future illegal chokehold. *Id.* at 105, 107. Standing for injunctive relief, the Supreme Court explained, would require more than an allegation that the plaintiff "would have another

encounter with the police." *Id.* at 105-06. The plaintiff would also need "to make the incredible assertion" that either (i) "*all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter," or (ii) the City ordered police officers to deploy illegal chokeholds. *Id.* at 106.

The Supreme Court's recent grant of a stay pending appeal in *Noem v. Perdomo* further reinforces those principles. In *Perdomo*, the district court granted an injunction prohibiting immigration officers from "conducting detentive stops" without "reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law." *Perdomo v. Noem*, 790 F. Supp. 3d 850, 897 (C.D. Cal. 2025). The Supreme Court stayed that order. In his concurrence, Justice Kavanaugh—citing *Lyons* and *Clapper*—explained that the plaintiffs, who alleged only "past harm and fear of its recurrence," likely could not establish Article III standing to seek injunctive relief. *Perdomo*, 146 S. Ct. at 2 (Kavanaugh, J., concurring). Justice Kavanaugh further recognized that the plaintiffs' standing theory was "especially deficient" because, even if immigration officers relied on prohibited factors to "ma[ke] stops," they "might not rely *only* on those factors if and when they stop plaintiffs in the future." *Id.* at 3.

**2.** Against that backdrop, Plaintiffs have not made any showing—much less a "clear" one, *see Murthy*, 603 U.S. at 58 (citation omitted)—of likely future injury supporting an injunction. According to Plaintiffs, they have standing because ICE has allegedly developed a warrantless-arrest policy that (i) has subjected the individual named plaintiffs to unlawful treatment—arrest without probable cause—and (ii) "realistically threaten[s] … repeated injury." (Dkt. 54 at 12). Neither contention withstands scrutiny.

Plaintiffs' principal contention—that ICE's policy or practice of making warrantless arrests without probable cause has injured them—rests on a faulty premise. Section 1357, DHS regulations, and official ICE policies confirm that the alleged policy or practice does not exist. The Lyons Memo, for example, stresses that an immigration officer may execute a warrantless arrest only if "there is *probable cause* to believe that: (1) the subject is a removable alien; *and* (2) the subject is 'likely to escape' before a warrant for his arrest can be obtained." (Dkt. 82-1 at 4) (citing 8 U.S.C. §1357(a)(2)) (first emphasis added). That official written policy belies Plaintiffs' unsupported claim that ICE maintains an unwritten "*arrest first, ask questions later*" policy or practice. (Dkt. 17 at 13). And even if ICE had

implemented an unlawful warrantless-arrest policy[6] (it did not), and Plaintiffs had been unlawfully arrested consistent with that policy, Plaintiffs would have suffered—at most—"past wrongs" unaccompanied by a "real and immediate threat of" future harm. *See Lyons*, 461 U.S. at 103, 105.

The contention that future arrests "realistically threaten" Plaintiffs, (Dkt. 54 at 12), is equally unavailing. Plaintiffs allege that their prior warrantless arrests, which occurred during routine daily activities, have left them and their family members with generalized anxiety about another ICE encounter, (Dkt. 17-2 at 5), inflicted physical injuries from shackling, (Dkt. 17-4 at 9), and subjected some of them to ankle monitoring, (Dkt. 17-3 at 3). But the Supreme Court has repeatedly held that a cognizable injury in fact in this context requires "certainly impending" threatened harm, not just "nonparanoid fear." *E.g.*, *Clapper*, 568 U.S. at 401, 417. Plaintiffs therefore need to demonstrate that: (i) they "would have another encounter with" ICE agents; (ii) they would be subject to a warrantless arrest; and (iii) the

[6] Applying settled Fourth Amendment principles, even an unlawful arrest under Section 1357 does not bar continued detention when there is probable cause to believe that the individual is unlawfully in the United States. *See, e.g.*, *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) (holding that the "body" of the defendant "in a criminal or civil proceeding is never itself suppressible …, even if it is conceded that an unlawful arrest … occurred").

warrantless arrest would be without probable cause (iv) because of the alleged unwritten policy. *See Lyons*, 461 U.S. at 105-06.

Nothing in the record supports that strained thesis. For starters, Plaintiffs identify no basis to conclude that ICE will likely stop—let alone arrest—them again. All but one of them has failed to allege other encounters with ICE agents. Indeed, this case presents an even more attenuated theory of standing than the one the Supreme Court rejected in *Lyons* because, as the district court acknowledged, probable cause is a "particularized" inquiry that depends on the facts and circumstances of each encounter. *See* (Dkt. 68 at 30) (citation omitted); *see District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018). By contrast, the plaintiff in *Lyons* argued that the challenged chokehold practice was unlawful in *every* circumstance in which it was employed.

The individual circumstances of the named plaintiffs further confirm that any fear of a future unlawful warrantless rearrest is especially implausible. For instance, an administrative warrant has issued for R.S.M., who is currently in removal proceedings, meaning that any future arrest of her could arise from that warrant. *See* (Dkt. 99 at 7). Although Plaintiffs might fear being arrested again, the prospect that they would likely be subject to an

unlawful *warrantless* arrest is divorced from reality. In fact, only one of the named plaintiffs (B.S.R.) has alleged a subsequent arrest.

Plaintiffs also lack standing to challenge the application of the purported warrantless-arrest policy to other nonparties. *See* (Dkt. 68 at 21-24). As the Supreme Court has explained, "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *United States v. Texas*, 599 U.S. 670, 674 (2023) (citation omitted). A cognizable injury in fact likewise requires more than an "asserted right to have the Government act in accordance with law." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Thus, the allegations of the nonparties, even if accepted as true, say nothing about whether the named plaintiffs themselves face the certainly impending injury that Article III demands.

**3.** The district court found standing, asserting that "the likelihood of another arrest [is] 'real and immediate.'" (Dkt. 68 at 34) (citation omitted). That finding rested on three purported grounds for distinguishing *Lyons*, none of which is persuasive.

First, the district court reasoned that, unlike in *Lyons*, the government "ha[s] likely adopted a policy and practice of warrantless arrests without

probable cause." (Dkt. 68 at 34-35, 37). But the Lyons Memo and other written directives discussed above, which reiterate that immigration officers need probable cause to conduct a warrantless arrest, undermine that conclusion. And in *Lyons*, the Supreme Court presumed the existence of a policy authorizing chokeholds but *still held* that the alleged future injury was too speculative to establish an injury in fact. *See Lyons*, 461 U.S. at 105-06, 110.

Second, the district court concluded that Plaintiffs "are likely among those targeted" by ICE. (Dkt. 68 at 35-37). Plaintiffs, however, have failed to show that either (1) all ICE officers always conduct unlawful warrantless arrests during stops or (2) the Department requires warrantless arrests without probable cause. *See Lyons*, 461 U.S. at 106.

Third, the district court suggested that Plaintiffs are in danger of another warrantless arrest because "they cannot avoid repeating the quotidian conduct that led to their original arrests." (Dkt. 68 at 36-37). But that premise confuses temporal proximity with causation. Plaintiffs were not arrested *because* they engaged in "quotidian conduct," (Dkt. 68 at 36); ICE happened to encounter the named plaintiffs while they performed certain activities. Repeating those everyday activities does not make another warrantless arrest "certainly impending" any more than it increases the likelihood of another low-

probability event. *See Clapper*, 568 U.S. at 417; *Lyons*, 461 U.S. at 107 n.8. That is why even the district court had to concede that the individual named plaintiffs faced only an "increase[d]" chance of a future warrantless arrest without probable cause. *See* (Dkt. 68 at 35). And the individual named plaintiffs are just four among tens of thousands in the relevant population potentially subject to the challenged enforcement measures. *See* p. 15 & n.5, *supra*.

In finding standing, the district court collapsed the distinction between the continuing effects of a past injury and the realistic threat of a future one. The district court inexplicably concluded that Plaintiffs' vague alleged emotional harms and past physical injuries were ongoing and sufficient for standing. *E.g.*, (Dkt. 68 at 14, 22-23, 26 & n.18, 33-40); (Dkt. 17 at 22-24). But neither generalized feelings of apprehension nor past harm from a completed event—untethered to a real and immediate threat that the challenged conduct will recur—constitute a concrete, particularized, or imminent injury in fact sufficient to provide standing for prospective relief. *See Lyons*, 461 U.S. at 107 n.8 ("The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant."); *United Farm Workers of Am. v. Mullin*, No. 25-4047, 2026

U.S. App. LEXIS 25727, at *7 (9th Cir. Aug. 24, 2026) (lifting preliminary injunction in immigration-enforcement case because the plaintiffs alleged only "past harm").

**4.** Any prospect of future injury is also speculative because probable cause likely supported the arrests of the individual named plaintiffs. Probable cause "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014), and requires only "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Florida v. Harris*, 568 U.S. 237, 244 (2013) (citation omitted).

In the context of escape risk, neither Section 1357 nor its implementing regulations prescribes any particular methodology for determining whether an alien presents a likelihood of escape. Courts have allowed immigration officers to consider, among other things, an alien's "clear and undisputed" removability, *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982), an alien's admission of having been "picked up before," *Aguirre v. INS*, 553 F.2d 501, 502 (5th Cir. 1977), and an alien's appearing to be "extremely nervous" or "looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974). *See* (Dkt. 82-1 at 4-5).

With those principles in mind, the warrantless arrests of the individual named plaintiffs likely satisfied the probable-cause requirement. Immigration officers targeted Molina because his temporary protected status had expired, he was about to drive away in his truck, and records indicated that he had been charged with simple assault in 2019. (Dkt. 50-2 ¶7); (Dkt. 17-2 ¶5). The probable cause inquiry "depends on the totality of the circumstances," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), and here, the combination of Molina's immigration status, criminal history, and likelihood of fleeing from the scene of the encounter readily establishes probable cause.

B.S.R. had overstayed his B-2 visa and was sitting in a vehicle when encountered by immigration officers. (Dkt. 50-2 ¶8); (Dkt. 50-1 ¶21); (Dkt. 61 at 68-69); (Dkt. 17-3 ¶¶3-5, 12). Agency records also showed 2025 charges for domestic violence and simple assault. (Dkt. 50-2 ¶8). Thus, probable cause existed to arrest B.S.R. without a warrant. *See Pringle*, 540 U.S. at 371.

An immigration officer arrested N.S. outside of a Home Depot while he was sitting in the driver's seat of his car with the engine running. (Dkt. 17-4 ¶¶6, 12). N.S.'s ready means of "escape before a warrant [could] be obtained" meets the probable-cause threshold. *See* 8 U.S.C. §1357(a)(2).

Immigration officers stopped R.S.M. while she was a passenger in a car with her husband. (Dkt. 17-5 ¶¶2-8). When officers directed them to roll down their windows, R.S.M.'s husband lowered his window only "a little bit." (Dkt. 17-5 ¶2). Both R.S.M. and her husband initially refused to comply with officers' repeated instructions to produce identification. (Dkt. 17-5 ¶3). R.S.M.'s behavior supports a finding of probable cause. *See Harris*, 568 U.S. at 244.

**5.** Even if Plaintiffs could demonstrate an imminent injury, they cannot show that the injury is fairly traceable to the alleged warrantless-arrest policy or redressable by a federal court. *See Lujan*, 504 U.S. at 560-61. Plaintiffs have not established the existence of that policy, much less that it would cause their purported injuries. And ICE has issued an administrative warrant for at least one named plaintiff who is in removal proceedings, *see* (Dkt. 99 at 7), so any future arrest could stem from that warrant—not the alleged unwritten policy. The existence of any valid administrative warrant, whether already issued or issued during the litigation, could also render Plaintiffs' claims moot. *See LaRoque v. Holder*, 679 F.3d 905, 907 (D.C. Cir. 2012).

Nor is the preliminary injunction "tailored to" Plaintiffs' asserted injuries. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018). Supervising all

warrantless immigration arrests in the entire District extends far beyond the relief necessary to redress those alleged harms.

**6.** The district court's fallback theory that CASA has associational standing fares no better. *See* (Dkt. 68 at 41-42). Associational standing requires an organization to show that: (i) "its members would otherwise have standing to sue in their own right;" (ii) the interests it seeks to protect are germane to the organization's purpose; and" (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Pub. Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 187 (D.C. Cir. 2026) (citation omitted).

Plaintiffs concede that "[t]he question of CASA's members' standing" rises and falls "with the individual Plaintiffs' standing analysis." (Dkt. 54 at 18-19). As explained above, however, the individual named plaintiffs satisfy none of the standing requirements, foreclosing associational standing for CASA. *See* pp. 25-36, *supra*; *Zeldin*, 174 F.4th at 187; *Ariz. All. for Retired Ams. v. Mayes*, — F.4th —, 2026 WL 2277101, at *4 & n.1 (9th Cir. Aug. 7, 2026) (en banc) (no associational standing because the organization failed to "identif[y] a member" affected by the challenged voter-registration provision

"or who intended to engage in protected conduct arguably prohibited by the [provision]").

Nor does this lawsuit appear germane to CASA's organizational purpose. CASA defines its mission as "building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities." We Are CASA, https://perma.cc/5MZ3-3ET8 (last visited Aug. 25, 2026). A general commitment to communities that may include immigrants does not make every dispute over federal immigration—much less one involving warrantless immigration arrests of illegal immigrants—germane to CASA's purpose.

Additionally, both "the claim[s] asserted" and sweeping injunctive "relief requested," *see Zeldin*, 174 F.4th at 187, turn on inherently individualized questions—namely, the facts and circumstances of each warrantless arrest and whether probable cause existed. Resolving those questions "require[s] the participation of" the affected members and separately precludes associational standing. *See id.*

### B. The District Court Independently Lacked Jurisdiction Under The INA

Federal immigration law independently deprived the district court of jurisdiction over Plaintiffs' claims. Under Section 242(g) of the INA, "no court

shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," except on a "petition for review … filed with the court of appeals." 8 U.S.C. §1252(g), (a)(5), (b)(2). The Supreme Court has explained that Section 1252(g) "seems clearly designed to give some measure of protection" to those "discretionary determinations" and to prevent "separate rounds of judicial intervention outside the streamlined process that Congress has designed." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) (citation omitted).

Several courts of appeals have similarly held that Section 1252(g) applies to discretionary decisions to commence removal proceedings or execute removals. *See, e.g.*, *Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022); *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021); *Camarena v. Director, ICE*, 988 F.3d 1268, 1272, 1274 (11th Cir. 2021). That principle extends to arrests undertaken in carrying out those discretionary decisions. *See Tazu v. Att'y Gen. of the U.S.*, 975 F.3d 292, 298-99 (3d Cir. 2020). Plaintiffs' arrests reflect paradigmatic exercises of discretion by ICE both to "commence [removal] proceedings," 8 U.S.C. §1252(g), and to select the means of doing so,

*see Tazu*, 975 F.3d at 298. ICE's actions are therefore reviewable only through a petition for review filed in the court of appeals. *See id.*

Contrary to the district court's contention, *see* (Dkt. 68 at 49-50), the applicability of Section 1252(g) does not hinge on whether the Department issues a Notice to Appear before, during, or after the challenged arrest. Rather, Section 1252(g) asks whether the claims arise from a protected discretionary decision about immigration enforcement, which also includes the discretion "to abandon" a particular endeavor. *See Reno*, 525 U.S. at 483. Thus, the differing removal postures of the individual named plaintiffs at the time of their arrests—one already in removal proceedings, two later served with Notices to Appear, and one never placed in removal proceedings—do not alter the application of Section 1252(g) to their claims.

### C. Plaintiffs Have No Cause Of Action Under The APA

Plaintiffs also lack a valid cause of action under the APA. *Contra* (Dkt. 68 at 50-63). Congress generally confined judicial review under the APA to a "final agency action." 5 U.S.C. §704. The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §551(13). To be final, "the action must mark the 'consummation' of the agency's decisionmaking

process" and "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).

The district court concluded that ICE has an unwritten "policy or practice of conducting warrantless civil immigration arrests in the District without making individualized probable cause determinations as to each arrestee's risk of escape." (Dkt. 68 at 4). That purported policy fails to qualify as reviewable agency action under the APA for several independent reasons.

**1.** To begin, there is no unwritten agency policy or practice dictating that immigration officers should not follow the law. Indeed, the statute and Department regulations require individualized probable cause of likelihood of escape to conduct a warrantless arrest. 8 U.S.C. §1357(a)(2); 8 C.F.R. §287.8. Additionally, the Broadcast Statement of Policy and the Lyons Memo emphasize the legal requirements for and provide guidance on warrantless arrests. *See, e.g.*, (Dkt. 17-1 at 8); (Dkt. 82-4). Plaintiffs' and the district court's attempt to infer an unwritten policy that is contrary to the statute, the Department's own regulations, and multiple written directives inverts the "longstanding presumption of regularity" required when evaluating agency conduct. *See Hartman v. Moore*, 547 U.S. 250, 263 (2006).

But even a "pattern, practice, or policy" that is contrary to law does "not itself [make] a final agency action within the meaning of the APA." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 303 F. App'x 517, 519 (9th Cir. 2008). That is especially true where, as here, the alleged unwritten policy is contrary to written directives. *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355-56 (2011).

Likewise, Plaintiffs cannot cobble together a handful of anecdotal accounts into a single supposed agency action of their choosing to challenge. The Supreme Court has made clear that an amalgam of supposed unlawful practices, without more, does not amount to reviewable agency action. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). And multiple panels of this Court have agreed. *See Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) (recognizing that "a host of similar but discrete regulatory actions" cannot be packaged into a single agency action); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304, 309 (D.C. Cir. 2025) (similar). That rule is particularly relevant for law enforcement actions such as arrests, which are "necessarily fact-specific" and involve numerous individual actions. *United States v. Reyes*, 963 F.3d 482, 488 (5th Cir. 2020). Plaintiffs' attempt to dictate how officers engage in future

warrantless arrests also reflects an impermissible "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Indeed, the preliminary injunction seeks "*wholesale* improvement ... by court decree" of agency programs. *Id.* (citation omitted); *see Lujan*, 497 U.S. at 891.

In the district court's view, the contested warrantless arrests of *four* named plaintiffs out of tens of thousands of illegal aliens in the District of Columbia, *see* p. 15 & n.5, *supra*, justified wholesale supervision of ICE's warrantless-arrest practices in the entire District. But even assuming the challenged arrests were unlawful, countless examples involving aliens arrested based on probable cause of escape risk likely exist. *Cf. Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (rejecting class because one instance of discrimination could not allow for inference of a policy). If the district court's speculation sufficed to infer an unwritten policy contrary to an agency's written directives, the APA's final-agency-action requirement would lack any meaningful force.

**2.** For similar reasons, the postulated agency action would not be final. Plaintiffs do not point to any memorandum or other document demonstrating a deliberative process for this alleged policy. Nor does the administrative record support its existence. *See* (Dkt. 99-2). If anything, the only policy in

the record states the opposite of the one the district court imagined. And any purported unwritten decision to deviate from the actual policy is not final because on October 22, 2025, ICE published another statement re-adopting the prior Broadcast Statement of Policy. The Department issued a separate memorandum as recently as January 28, 2026, emphasizing the need for ICE officers to conduct warrantless arrests in accordance with the law. (Dkt. 82-1 at 4-5). It belies the record—and defies common sense—to conclude that the Department consummated a decision adopting an unwritten policy contrary to the law and elevated that policy above the Department's written directives.

Rather than grapple with those written directives, the district court tried to piece together the alleged policy from scattered statements by certain government officials. But those statements say nothing about—and bear no discernible connection to—a purported policy authorizing warrantless arrests without probable cause. For example, the district court cited an Executive Order issued by President Trump, which declared that "[c]rime is out of control in the District of Columbia" and that "special conditions of an emergency nature … require the use of the Metropolitan Police Department" to "maintain[] law and order in the Nation's seat of Government." *See* Exec. Order No. 1433, 90 Fed. Reg. 39301 (Aug. 11, 2025); (Dkt. 68 at 52). The

Executive Order does not even mention immigration or arrests, let alone instruct ICE to conduct warrantless arrests without probable cause.

The district court's invocation of an immigration "enforcement push," (Dkt. 68 at 52), by former Attorney General Bondi and a former acting Secretary of Homeland Security similarly fails to establish the alleged policy. The Attorney General's order referenced by the district court simply instructed the Mayor of the District of Columbia to "[a]ssist[] with locating, apprehending, and detaining aliens unlawfully present in the United States." Off. of Att'y Gen., Order No. 63-72-2025 (Aug. 15, 2025). The same goes for a directive issued by former Acting Secretary Huffman, which gave various law enforcement officials "authority to investigate and apprehend illegal aliens." (Dkt. 17-1 at 50). Nothing in those mandates supports the inference that ICE adopted a policy of conducting warrantless arrests without probable cause.

The centerpiece of the district court's supposed evidence was a series of purported statements by "DHS's leadership," (Dkt. 68 at 53), none of which bears the weight the district court placed on it. The district relied on statements by a Border Patrol official, a DHS spokesperson, and excerpts from an agency website that was not actively maintained due to lapses in federal funding. *See* (Dkt. 68 at 53-57). But the singular views reflected in

those statements, some of which merely conflate the reasonable-suspicion standard for investigative stops with the probable-cause standard for warrantless arrests, cannot bind the Department and do not demonstrate an unwritten Department policy. *See In re Murray Energy Corp.*, 788 F.3d 330, 335-36 (D.C. Cir. 2015) (holding that an agency's "public statements about its legal authority" did not "constitute final agency action subject to judicial review"). That conclusion applies with even greater force when the comments directly contradict the official Department written policies, which have consistently required immigrations officers to develop probable cause for warrantless arrests.

The various news articles discussed by Plaintiffs and the district court likewise fail to establish the alleged policy. One article referenced a statement by President Trump that the District of Columbia "will no longer be a sanctuary for illegal alien criminals." (Dkt. 17-1 at 43). Another reported that a DHS spokesperson had "highlighted the department's collaboration with the local police, the Park Police and other law enforcement agencies" and had described "[c]riminal aliens" as a "a public safety threat." (Dkt. 17-1 at 60); (Dkt. 68 at 1). Yet another, based on anecdotal and unverified accounts, argued that the President may be "fir[ing] top federal prosecutors who did not

help carry out his political agenda." (Dkt. 17-1 at 86); (Dkt. 68 at 5). None of those articles identified a policy to ignore federal law or ICE's written policies on warrantless arrests.

## II. THE DISTRICT COURT ERRED IN PROVISIONALLY CERTIFYING A WARRANTLESS-ARREST CLASS

The district court further erred when it provisionally certified the Unassessed Escape Risk Class. *See* (Dkt. 68 at 24). This Court has jurisdiction to review the provisional class-certification order because once jurisdiction to review the preliminary injunction order is invoked, "[r]eview quite properly extends to all matters inextricably bound up with the remedial decision." *Wagner*, 836 F.2d at 585 (citation omitted). And "effective review" of the preliminary injunction "would be seriously impaired" without review of the provisional class-certification order. *See id.* at 586.

The district court's certification of this broad class fails for several reasons. To start, the class members lack standing to seek prospective relief. Nor do Plaintiffs' claims qualify for class certification under Rule 23(a) of the Federal Rules of Civil Procedure. The individualized, factbound circumstances of the named plaintiffs similarly foreclose certification under Rule 23(b)(2). In concluding otherwise, the district court used class

certification to circumvent the limits on equitable relief that the Supreme Court recently reaffirmed. *See Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025).

### A. Class Members Lack Standing

The same defects that prevent the named plaintiffs from establishing standing impede the class members as well. *See* Argument §I.A, *supra*; *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."). Even the district court did not find that the named plaintiffs faced a certainly impending threat of an unlawful warrantless arrest—only an "increase[d]" chance of one. (Dkt. 68 at 35). And there is less reason to assume that some unknown class of individuals will encounter ICE in the future and be subject to warrantless arrests without a probable-cause assessment. The district court's flawed standing analysis also raises an ascertainability problem. *See* Fed. R. Civ. P. 23(b)(3); 1 *Newberg & Rubenstein on Class Actions* §3:1 (6th ed. June 2026 update).

### B. The Class Does Not Satisfy Rule 23(a)

Plaintiffs' proposed warrantless-arrest class does not qualify for provisional certification under Rule 23(a). "[P]laintiffs wishing to proceed

through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Under Rule 23, a district court may certify a class only if (1) the class is "so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class;" (3) the representatives are typical of the class; and (4) the representatives will adequately protect the class's interest. Fed. R. Civ. P. 23(a). A district court must conduct "a rigorous analysis" to ensure "that the prerequisites of Rule 23(a) have been satisfied." *Falcon*, 457 U.S. at 161. "Provisional class certification does not lessen the rigor of Rule 23." *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 117 (D.D.C. 2025).

**1.** The numerosity analysis "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980); *see* Fed. R. Civ. P. 23(a)(1). But "the lack of a magic number test does not excuse a plaintiff from … 'prov[ing] that there are *in fact* sufficiently numerous parties.'" *E.g.*, *Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 52 (D.D.C. 2021) (citing *Wal-Mart*, 564 U.S. at 350).

Plaintiffs' numerosity argument falters out of the gate. Their primary piece of evidence to support numerosity—an analysis of immigration arrests by the Associated Press—does not distinguish the number of lawful arrests from unlawful ones. *See* (Dkt. 68 at 7 & n.11). Given the fact-specific analysis required for a probable-cause finding, there is no "objective criteria" to determine the size of the class. *See Mullins v. Direct Digit., LLC*, 795 F.3d 654, 672 (7th Cir. 2015).

**2.** To establish commonality, Plaintiffs must demonstrate that "the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349-50 (citation omitted). Class members suffer the same injury only if their claims turn on a common contention "of such a nature that it is capable of classwide resolution." *Id.* at 350.

The district court based its commonality finding on the existence of ICE's alleged unwritten policy. As previously explained, however, the fact that there are *possible* individual, fact-specific violations of law does not establish a policy sufficient to create a common legal question amenable to classwide resolution. *See* Argument §I.C., *supra*; *Falcon*, 457 U.S. at 157 (1982); *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984). That point carries particular force in the context of probable cause—one of the most

intensely factbound inquiries known to law. Indeed, the Ninth Circuit recently vacated certification of a class alleging "deprivation of a state-created liberty interest in violation of the Fourth Amendment," explaining that adjudication of the claim would "appear to require individual fact-finding." *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258-62 (9th Cir. 2024). And this Court has similarly held that class certification is inappropriate when plaintiffs' claims arise from "multiple individual decisions made by multiple" actors, each requiring its own fact-specific analysis and on-the-spot judgment. *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006); *see also Dickinson v. Trump*, 174 F.4th 634, 646-47 (9th Cir. 2026) (similar).

The warrantless-arrest class further lacks commonality. The circumstances of each class member that colors an arresting officer's escape-risk analysis—for instance, "[t]he subject's behavior prior to and during the encounter," employment status, and other information presented to the immigration officer, *see* (Dkt. 82-1 at 4-5)—will undoubtedly vary. And courts must evaluate such individualized factors in assessing escape risk. (Dkt. 82-1 at 4-5) (describing escape-risk analysis); *compare United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019) (noting that, in part because defendant "ha[d] a wife, two children and a job as a dishwasher in the D.C.

area" for a long time period, the third bail-pending-trial factor likely favored release), *with United States v. Sagastume-Galicia*, 2020 U.S. Dist. LEXIS 70806, at *13 (D.D.C. Apr. 22, 2020) (defendant's employment status, "[c]ombined with defendant's history of physical violence and his inability to conform his conduct to court-ordered removal," favored detention). The significant variations among the individual named plaintiffs' own circumstances, as relevant to escape risk, further illustrate the point. Immigration officers arrested B.S.R. during a targeted operation. By contrast, R.S.M. was arrested after a consensual encounter. (Dkt. 50-1 ¶23).

**3.** Typicality is likewise absent. This requirement calls for "the named plaintiffs [to be] appropriate representatives [for] the class whose claims they wish to litigate." *Wal-Mart*, 564 U.S. at 349. Typicality tests whether "the class representatives have suffered injuries in the same general fashion as absent class members." *Hardy v. District of Columbia*, 283 F.R.D. 20, 24-25 (D.D.C. 2012).

The class representatives' previous arrests and alleged injuries confirm the absence of typicality in this case. Because probable cause turns on the totality of the circumstances, "individualized assessments are necessary." *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 432 (6th Cir. 2009)

(defeating typicality). As explained above, each of the named plaintiffs was arrested under different conditions, had varying problems with their immigration status, and exhibited unique facts that influenced officers' probable cause determinations. None of those circumstances is likely to be typical of other class members, much less hypothetical future ones.

### C. Plaintiffs Cannot Satisfy Rule 23(b)

Nor does the proposed class comply with Rule 23(b). The district court provisionally certified the warrantless-arrest class under Rule 23(b)(2), which provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if … the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief … is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, however, each class member's claims turn on a distinct set of circumstances ill-suited to classwide injunctive relief. And because an injunction requiring ICE to follow the law and produce records will not necessarily redress the injuries of future class members, a single, classwide injunction cannot provide relief to "the class as a whole." *See id.*

## III. THE REMAINING FACTORS DISFAVOR A PRELIMINARY INJUNCTION

Plaintiffs have also failed to satisfy the other requirements for a preliminary injunction. They are not "likely to suffer irreparable harm in the absence of preliminary relief," *Winter*, 555 U.S. at 20, and the balance of equities and public interest do not tip in their favor.

### A. Plaintiffs Do Not Face Irreparable Harm Without The Injunction

A plaintiff seeking a preliminary injunction must establish "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. The "high standard for irreparable injury" requires a two-fold showing. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. First, because an irreparable injury "must be both certain and great," Plaintiffs "must show 'the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* (citation omitted). Second, "the injury must be beyond remediation." *Id.* If Plaintiffs do not demonstrate an irreparable injury, this Court "can avoid delving into the

merits." *Labrador v. Poe*, 601 U.S. —, —, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring in grant of stay).

Plaintiffs do not clear that high bar. Most obviously, Plaintiffs lack an injury sufficient for standing, as discussed above, Argument §I.A, *supra*; by definition, then, no irreparable harm exists. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010). There is similarly no evidence that any unlawful warrantless arrest creates an "immediate threat that the plaintiff[s] will be wronged again," foreclosing prospective equitable relief. *See Lyons*, 461 U.S. at 111.

Instead of focusing on prospective harms from the alleged policy, the district court relied on past, downstream effects from completed arrests to find irreparable harm. It observed that Plaintiffs were "subjected to" warrantless "civil immigration arrests," "being shackled and detained," and purportedly "inhumane" detention conditions—all of which it labeled as "quintessential irreparable harm." (Dkt. 68 at 37, 64-66) (citations omitted). But those are paradigmatic *past* harms that do not suffice, as the Ninth Circuit recently reiterated in a similar context. *See United Farm Workers*, 2026 U.S. App. LEXIS 25727, at *7. There is no "imminence" to their recurrence that would justify "a clear and present need for equitable relief. *Chaplaincy of Full*

*Gospel Churches*, 454 F.3d at 297; *see* Argument §I.A.2-3, *supra*. Many of the named plaintiffs are currently in removal proceedings, and any future arrest could be under warrant. *See* (Dkt. 99 at 7); pp. 8-10, *supra*. And because a subsequent arrest would turn on its own facts and remain open to individualized legal challenge, the alleged harms are not "beyond remediation." *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Plaintiffs' asserted fear that they will encounter ICE again, *see* (Dkt. 17 at 37-38), likewise fails to amount to irreparable harm. Subjective, speculative apprehension of future injury is not a "certain and great harm" justifying preliminary relief. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted). Plaintiffs' fallback contention that unidentified non-parties harbor similar fears, (Dkt. 17 at 37-38), fares no better, resting on the conjectural expectations of individuals not before this Court.

Plaintiffs' failure to identify a policy requiring or authorizing unlawful warrantless arrests further undermines any claim of irreparable harm. As the Supreme Court made clear in *Lyons*, a court cannot find irreparable harm based on a "claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U.S. at 111. And ICE's policies have consistently required immigration officers to

have probable cause that an alien is likely to escape before conducting a warrantless arrest. *See* (Dkt. 17-1 at 8); (Dkt. 82-1 at 4-6).

### B. The Equities Weigh Against A Preliminary Injunction

Finally, neither the balance of equities nor the public interest weighs in Plaintiffs' favor. Where the government is a party, the balance of equities and public interest merge. *Nken*, 556 U.S. at 435.

"[A]ny time" the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *CASA*, 606 U.S. at 835 (citation omitted). That principle applies *a fortiori* in this case because the district court has decided to micromanage every immigration arrest throughout the entire District and to interfere with the Executive's enforcement authority. Indeed, the preliminary injunction dictates what probable-cause factors an immigration officer can consider in field and imposes intrusive, extra-statutory reporting requirements for warrantless arrests. *See* (Dkt. 67 at 2-3); *Perdomo*, 146 S. Ct. at 4 (Kavanaugh, J. concurring). The district court's recent enforcement order, which prohibits ICE from relying on the Lyons Memo, based on the mistaken conclusion that the Lyons Memo violated the preliminary injunction,

further heightens the harm to the government. *See* (Dkt. 101 at 1); (Dkt. 102 at 19-29).

The public interest, which supports effective administration of federal law within legal limits, similarly tips in the government's favor. *Nken*, 556 U.S. at 435; *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). The public has a strong interest in the government's rigorous enforcement of our Nation's immigration laws without unnecessary judicial intervention. *See Nken*, 556 U.S. at 436; *Perdomo*, 146 S. Ct. at 5-6 (Kavanaugh, J., concurring) ("The Judiciary does not set immigration policy or decide enforcement priorities."). By contrast, "[t]he interests of individuals who are illegally in the country in avoiding" arrest "is ultimately an interest in evading the law," which "is not an especially weighty legal interest." *Perdomo*, 146 S. Ct. at 5 (Kavanaugh, J., concurring).

## IV. THE DISTRICT COURT'S INJUNCTION EXCEEDS THE LIMITS OF EQUITABLE RELIEF

Beyond those errors, the district court's award of sweeping, district-wide relief amounted to an impermissible and overbroad follow-the-law injunction. The injunction's reporting and documentation requirements also conflict with Section 1357 and its implementing regulations. And in its recent enforcement order, the district court both misread the Lyons Memo and

erroneously concluded that the memorandum violated the preliminary injunction.

### A. The District Court Issued An Impermissible Follow-The-Law Injunction

Rule 65 of the Federal Rules of Civil Procedure provides that every injunction must "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). The Supreme Court has explained that Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

The district court issued a preliminary injunction that flouts those requirements. The injunction prohibits the government from "enforcing their policy or practice of making warrantless civil immigration arrests in the District of Columbia without a pre-arrest individualized determination … of probable cause that the person being arrested is likely to escape before a warrant can be obtained." (Dkt. 67 at 2). Even assuming the alleged policy existed, those terms add nothing to what the law already demands. *See* 8 U.S.C. §1357(a)(2); 8 C.F.R. §287.8(c)(2)(ii). A fact-specific, "individualized determination," based on the totality of the circumstances, inheres in the

probable-cause standard. And because probable cause is "a fluid concept … not readily, or even usefully, reduced to a neat set of legal rules," *Wesby*, 583 U.S. at 57 (citation omitted), the preliminary injunction fails to "describe in reasonable detail … the act or acts restrained or required," *see* Fed. R. Civ. P. 65(d)(1).

The injunction's defects carry over to its reporting and documentation requirements. No federal law or regulation instructs immigration officers to memorialize the facts and circumstances of a warrantless arrest "in narrative form," (Dkt. 67 at 2), or to structure probable-cause documentation in a court-prescribed format. And although the preliminary injunction remarkably prohibits any "use of boilerplate language," it rigidly prescribes both the content and format of probable-cause documentation. (Dkt. 67 at 2-3). The district court likewise offered no explanation for ordering the preparation of monthly reports on warrantless arrests and the production of those reports within seven days upon request. *See* (Dkt. 67 at 3).

The injunction also clashes with the statutory and regulatory framework governing warrantless arrests. Consistent with the flexible and fact-specific probable-cause standard, *see Wesby*, 583 U.S. at 57, neither Section 1357 nor its implementing regulations list a set of mandatory or prohibited factors to

assess escape risk, and courts are "poorly suited to design broad injunctive relief in this setting," *see* Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*, 7 J. on Telecomm. & High Tech. L. 127, 129 (2009). The preliminary injunction, which directs immigration officers to assign weight to certain factors and discount others, *see* (Dkt. 67 at 2-3), is antithetical to those principles.

The district court's inclusion of the Drug Enforcement Agency (DEA) in the preliminary injunction, *see* (Dkt. 67 at 2), further confirms the injunction's impermissible overbreadth. Plaintiffs' sole allegation involving DEA is that the agent who stopped N.S. in the Home Depot parking lot was wearing a vest with the letters "DEA." (Dkt. 1 ¶4). But that same officer displayed an ICE badge and hat. (Dkt. 1 ¶4). Plaintiffs identified no facts supporting the conclusion that a DEA agent ever conducted a warrantless immigration arrest. If anything, the pleadings support only one reasonable—and unremarkable—inference: that the vest, not the officer, was on loan.

### B. The Lyons Memo Does Not Violate The Preliminary Injunction

In its enforcement order, the district court effectively nullified the entire Lyons Memo, prohibiting ICE from "rely[ing] on the probable cause standard or analytical approach set forth in" it. (Dkt. 101 at 1). The district court took

this remarkable step because it found that the Lyons Memo "provides flawed guidance on escape risk" and "fails to address community ties." (Dkt. 102 at 20, 25) (alterations omitted). Both conclusions are mistaken.

**1.** Contrary to the district court's contention, the Lyons Memo correctly explains how immigration officers should assess escape risk in conducting warrantless arrests. In unmistakable terms, the Lyons Memo states that an alien is likely to escape "if an immigration officer determines he or she [i.e., the alien] is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." (Dkt. 82-1 at 4). That definition of "likely to escape" reflects the ordinary meaning of the phrase, which multiple federal courts across the country have endorsed. *See, e.g.*, *Hussen v. Noem*, 822 F. Supp. 3d 944, 981-82 (D. Minn. 2026); *Peralta v. DHS*, 2026 WL 2069917, at *16 (S.D. Ohio July 17, 2026).

Unable to identify any defect in the Lyons Memo's definition of "likely to escape," the district court instead faults abbreviated references to likelihood of escape elsewhere in the memorandum. According to the district court, the Lyons Memo accurately defined "likely to escape" at the outset, but *two* subsequent descriptions did not expressly reiterate that the inquiry includes whether an alien could be located at "another clearly identifiable location."

(Dkt. 102 at 20-21) (citation and emphasis omitted). The district court treated those isolated, "truncated" formulations as an implicit repudiation of the memorandum's operative definition of "likely to escape." (Dkt. 102 at 23). Thus, the district court asserted, the Lyons Memo did not "properly convey[] that definition to" immigration officers. (Dkt. 102 at 23).

That reading collapses under the slightest scrutiny. All agree that the Lyons Memo sets forth the correct definition of "likely to escape." Nothing in the memorandum's later references to likelihood of escape supersedes that definition. Rather, those subsequent descriptions confirm that the original definition applies. For instance, after defining "likely to escape," the Lyons Memo often uses the phrase "likely to escape before a warrant could be obtained," or similar shorthand. *See, e.g.*, (Dkt. 82-1 at 5-6). Those formulations omit not only the phrase "or another clearly identifiable location," but also the antecedent phrase "at the scene of the encounter." The district court offered no explanation why the omission of one phrase reflects a substantive revision, but the omission of another carries no interpretative significance. By the district court's reasoning, mere use of pronouns, rather than reiterating full names or titles, effectuates a fundamental alteration *sub*

*silentio*. Such a motivated, problem-seeking reading violates the presumption of regularity that the district court was obligated to apply.

The more straightforward reading, consistent with the settled principle that "text must be construed as a whole," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012), is that the later formulations presuppose the memorandum's operative definition—not implicitly displace it. And contrary to the district court's contention, the Lyons Memo properly instructs immigration officers to conduct the escape-risk analysis "while in the field." (Dkt. 82-1 at 6); *see, e.g.*, *Meza-Campos*, 500 F.2d at 34 (per curiam) (upholding on-the-scene determination of escape risk).

**2.** The district court also misconstrued the role of community ties in assessing escape risk. *See* (Dkt. 102 at 25-29). The preliminary injunction impermissibly compels immigration officers to consider—in all cases—an "alien's ties to the community." (Dkt. 67 at 3). But categorically requiring officers to ascertain community ties is incompatible with the individualized probable-cause inquiry. *See Wesby*, 583 U.S. at 57. Immigration officers generally need not affirmatively seek out facts that might negate probable cause before acting. *Cf. Kansas v. Glover*, 589 U.S. 376, 378 (2020) (absent negating evidence, reasonable inferences can allow for stop). And if an alien

is actively hiding or attempting to evade custody, an immigration officer may conclude a likelihood of escape exists without any assessment of community ties. *See Contreras*, 672 F.2d at 309.

In keeping with that understanding, the Lyons Memo explains that "[n]o single factor is determinative" of escape. (Dkt. 82-1 at 5). The Lyons Memo includes a list of non-exhaustive factors that may inform the escape-risk analysis—including an alien's ability to produce valid identity and work authorization documents, as well as an immigration officer's determination whether an alien may later "be located at the scene of the encounter or another clearly identifiable location." *See* (Dkt. 82-1 at 3-4). Those considerations naturally encompass the types of facts that bear on an alien's ties to the community, without elevating them to a mandatory component of every escape-risk determination. The district court's attempt to demand that officers mechanically investigate and record an undefined notion of community ties before conducting a warrantless arrest is at odds with Section 1357's text, governing precedent, and settled equitable principles. It will also impede ICE officers, who operate in fluid and rapidly evolving field situations, from enforcing federal immigration law.

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunction and reverse the grant of provisional class certification.

Respectfully submitted,


BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant*
*Attorney General*

TIBERIUS DAVIS
*Counsel to the Assistant*
*Attorney General*

SHERI R. GLASER
LINDA Y. CHENG
*Office of Immigration Litigation*

*/s/ Daniel F. Mummolo*
DANIEL F. MUMMOLO
*Counsel to the Assistant*
*Attorney General*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6054*
*daniel.f.mummolo@usdoj.gov*


AUGUST 2026

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains **12,993** words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using a CenturyExpd BT 14-point font.

*/s/ Daniel F. Mummolo*
Daniel F. Mummolo

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel F. Mummolo*
Daniel F. Mummolo

# ADDENDUM

## ADDENDUM OF AUTHORITIES

## TABLE OF CONTENTS

8 U.S.C. § 1357 ........................................................................................1a

8 C.F.R. § 287.8 ......................................................................................3a

**8 U.S.C. § 1357**
**Powers of immigration officers and employees**

**(a) Powers without warrant**

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

**(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

**(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

**(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

**(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary

delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

**(5)** to make arrests—

**(A)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

**(B)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

....

**8 C.F.R. § 287.8**
**Standards for enforcement activities**

…

(c) Conduct of arrests—

(1) Authority. Only designated immigration officers are authorized to make an arrest. The list of designated immigration officers may vary depending on the type of arrest as listed in § 287.5(c)(1) through (c)(5).

(2) General procedures.

(i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.

(ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

(iii) At the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so:

(A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and

(B) State that the person is under arrest and the reason for the arrest.

(iv) With respect to an alien arrested and administratively charged with being in the United States in violation of law, the arresting officer shall adhere to the procedures set forth in 8 CFR 287.3 if the arrest is made without a warrant.

(v) With respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable. It is the duty of the immigration officer to assure that the warnings are given in a language the subject understands, and that the subject acknowledges that the warnings are understood. The fact that a person has been advised of his or her rights shall be documented on appropriate Department forms and made a part of the arrest record.

(vi) Every person arrested and charged with a criminal violation of the laws of the United States shall be brought without unnecessary delay before a United States magistrate judge, a United States district judge or, if necessary, a judicial officer empowered in accordance with 18 U.S.C. 3041 to commit persons charged with such crimes. Accordingly, the immigration officer shall contact an Assistant United States Attorney to arrange for an initial appearance.

(vii) The use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement is prohibited.

....