ORAL ARGUMENT NOT YET SCHEDULED
**No. 26-5045**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOSÉ ESCOBAR MOLINA, et al.,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia

# BRIEF FOR APPELLEES

Jehan A. Patterson
Alexandra Widas
Hassan Ahmad
Sean Berman
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com
awidas@cov.com
hahmad@cov.com
sberman@cov.com

Aditi Shah
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 420
Washington, DC 20045
(202) 457-0800
ashah@acludc.org
smichelman@acludc.org

Adina Appelbaum
Ian Austin Rose
Samantha Hsieh
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
austin.rose@amicacenter.org
sam@amicacenter.org

Sirine Shebaya
Yulie Landan
Bridget Pranzatelli
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW, Suite 175
Washington, D.C. 20009
(213) 430-5521
sirine@niplg.org
yulie@nipnlg.org
bridget@nipnlg.org

Kathryn Huddleston
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
khuddleston@aclu.org

Madeleine Gates
Ryan Downer
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, #400
Washington, D.C. 20005
(202) 319-1000
madeleine_gates@washlaw.org
ryan_downer@washlaw.org

Ama Frimpong
Shana Khader
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
(240) 485-8844
afrimpong@wearecasa.org
skhader@wearecasa.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

### A. Parties and *Amici*

Appellees are José Escobar Molina, B.S.R., N.S., and R.S.M., individually and on behalf of all others similarly situated, and CASA, Inc. CASA, Inc. is a national 501(c)(3) non-profit membership organization. It has no parent corporation. It does not issue any stock, and therefore no publicly owned corporation holds ten percent or more of its stock.

Appellants are U.S. Department of Homeland Security; Markwayne Mullin, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. Department of Justice; Todd Blanche, in his official capacity as Attorney General of the United States; U.S. Immigration and Customs Enforcement; David Venturella, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. Customs and Border Protection; Rodney S. Scott, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Border Patrol; Rosario "Pete" Vasquez, in his official capacity as Chief of U.S. Border Patrol; U.S. Drug Enforcement Administration; and Terrence E. Cole, in his official capacity as Administrator of the U.S. Drug Enforcement Administration.[1]

---

[1] Mullin, Blanche, and Venturella are automatically substituted for former DHS Secretary Kristi Noem, former Attorney General Pamela Bondi, and former ICE Acting Director Todd Lyons, respectively, pursuant to Fed. R. App. P. 43(c)(2).

The following *amici curiae* filed briefs in support of Appellees in the district court: 8th Day Faith Community; African Communities Together; All Souls Church, Unitarian; Ayuda; Bread for the City; Busboys and Poets; Cardinal McElroy, Roman Catholic Archbishop of Washington; Chefs Stopping AAPI Hate; Christ Lutheran Church, Inc.; Children's Law Center; Council Fire; DC Affordable Law Firm; D.C. Alliance for Charter Teachers and Staff Local 1927; Dumbarton United Methodist Church; Episcopal Diocese of Washington; Erik Bruner-Yang; First Congregational UCC; Franciscan Action Network; Immigrant Food; Impact GC, LLP; individual educators at District of Columbia Public Schools; Legal Aid DC; Luther Place Memorial Church; MASA Group; Metropolitan Washington D.C. Synod of the Evangelical Lutheran Church in America, Inc.; Pax Christi USA; Peace Fellowship Church; Rev. Dr. Rose Herr Wayland, Sixth Presbyterian Church; Rev. Rachel Cornwell, Dumbarton United Methodist Church; Sacred Heart Roman Catholic Church; Sixth Presbyterian Church; St. Matthews Episcopal; St. Stephen and the Incarnation Episcopal Church; The Catholic University of America; The Festival Center; Thrift the District; Tzedek DC; Washington DC Congregation, Community of Christ; Washington National Cathedral; and Washington Teachers' Union.

In this Court, Federation for American Immigration Reform filed an amicus brief in support of Appellants. Lawyers Defending American Democracy filed a "Notice of intention to participate as amicus curiae" in support of Appellees.

As of this date, no other *amici* have appeared in the district court or this Court.

**B. Ruling Under Review**

The ruling under review is the December 2, 2025, order granting Appellees' motion for a preliminary injunction (Dkt. 67) and accompanying memorandum opinion (Dkt. 68) entered by the United States District Court for the District of Columbia (Howell, J.) in Civil Action No. 25-03417. The order and memorandum opinion are reported at *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1 (D.D.C. 2025).

Appellees dispute that either the portion of the order and memorandum opinion granting provisional class certification or the district court's May 7, 2026, order granting Appellees' motion to enforce the preliminary injunction and accompanying memorandum opinion are properly under review in this appeal.

**C. Related Cases**

This case has not previously been before this Court. Cases that are related to this appeal within the meaning of D.C. Circuit Rule 28(a)(1)(C) are *Cruz Gamez v. Lyons*, No. 26-2090 (9th Cir.) and *Ramirez Ovando v. Mullin*, No. 26-1027 (10th Cir.). Appellees are aware of no other related cases.

*/s/ Aditi Shah*
Aditi Shah

# TABLE OF CONTENTS

CERTIFICATES AND CORPORATE DISCLOSURE STATEMENT ................ iii

TABLE OF AUTHORITIES ................................................................ viii

GLOSSARY ..................................................................................... xvii

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

STATUTE AND REGULATION ..............................................................3

STATEMENT OF THE ISSUE ..................................................................3

STATEMENT OF THE CASE ....................................................................3

I. Legal Background ..............................................................................3

II. Factual Background ...........................................................................5

A. Defendants' Policy of Making Warrantless Immigration Arrests in D.C. Without Probable Cause as to Escape Likelihood. .........................5

B. Plaintiffs Are Subject to and Harmed by Defendants' Policy. ....................7

III. Procedural History ..........................................................................12

SUMMARY OF THE ARGUMENT ..........................................................14

STANDARD OF REVIEW ......................................................................16

ARGUMENT ..........................................................................................16

I. The Court Should Affirm the Preliminary Injunction. ..................................16

A. Plaintiffs Are Likely To Succeed on the Merits. ......................................16

1. Plaintiffs Have Standing ........................................................................16

2. The INA Does Not Bar Jurisdiction ........................................................28

3. Defendants' Policy Violates § 1357(a)(2) and the Regulation...........31

4. Defendants' Unlawful Policy Is Final Agency Action. ......................33

B. Plaintiffs Face Irreparable Harm Without an Injunction. .........................37

C. The Equities and Public Interest Favor Plaintiffs. ...................................39

D. The Injunction Is Properly Tailored and Complies with Rule 65(d). ....................40

II. The Provisional Class Certification Order Is Not Properly Before This Court and Is Correct in Any Event. ....................42

A. This Court Lacks Jurisdiction over the Class Certification Order. ....................42

B. The District Court Did Not Abuse Its Discretion in Provisionally Certifying the Class. ....................45

III. The Enforcement Order Is Not Properly Before This Court or, Alternatively, Should Be Affirmed. ....................50

A. This Court Lacks Jurisdiction over the Enforcement Order. ....................50

B. The Enforcement Order Properly Enforced the Preliminary Injunction. ....................53

CONCLUSION ....................55

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003).....18

*Advanced Energy United v. FERC*,
185 F.4th 186 (D.C. Cir. 2026).....26

*AFGE Local 2305 v. U.S. Dep't of Veterans Affs*,
177 F.4th 1 (1st Cir. 2026)......51, 52

*Ali v. Regan*,
111 F.4th 1264 (D.C. Cir. 2024)......26

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019).....38

*Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020).....26

*Araya v. JPMorgan Chase Bank*,
775 F.3d 409 (D.C. Cir. 2014).....51

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014).....44, 45

*Arevalo v. Hennessy*,
882 F.3d 763 (9th Cir. 2018).....38

*Arizona v. United States*,
567 U.S. 387 (2012).....3

*Au Yi Lau v. INS*,
445 F.2d 217 (D.C. Cir. 1971).....4, 31

*Barham v. Ramsey*,
434 F.3d 565 (D.C. Cir. 2006).....4, 31

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................................................................................34

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020)........................................................................35

*Black Lives Matter L.A. v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024) .....................................................................48

*Bost v. Ill. State Bd. of Elections*,
146 S. Ct. 513 (2026)....................................................................................21

*Camarena v. Dir., Immigr. & Customs Enf't*,
988 F.3d 1268 (11th Cir. 2021) .....................................................................30

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017)...........................................................................25

*Castañon-Nava v. DHS*, 175 F.4th 828
(7th Cir. 2026) ..............................................................................................5

*Castañon Nava v. DHS*,
806 F. Supp. 3d 823 (N.D. Ill. 2025)..........................................................4, 5

*Castañon Nava v. DHS*,
No. 18-cv-3757 (N.D. Ill. 2018)..................................................................4, 5

*Church v. City of Huntsville*,
30 F.3d 1332 (11th Cir. 1994) ................................................................ 20, 45

*Citizens for Const. Integrity v. Census Bureau*,
115 F.4th 618 (D.C. Cir. 2024) ......................................................................24

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................................ 17, 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................................................................................24

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .......................................................... 16, 18, 34

*Cmty. for Creative Non-Violence v. Pierce*,
814 F.2d 663 (D.C. Cir. 1987)..........................................................................17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..............................................................................................49

*Contreras v. United States*,
672 F.2d 307 (2d Cir. 1982) ..............................................................................32

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ..................................................................................... 33, 34

*Ctr. for Biological Diversity v. EPA*, 56 F.4th 55
(D.C. Cir. 2022)...................................................................................................25

*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*,
No. 26-5006, – F.4th – , 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026)......... 26, 27

*D.L. v. District of Columbia*,
302 F.R.D. 1 (D.D.C. 2013) ..............................................................................46

*D.L. v. District of Columbia*,
860 F.3d 713 (D.C. Cir. 2017).................................................................... 46, 50

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ............................................................................................17

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ................................................................................................29

*Deshawn E. v. Safir*,
156 F.3d 340 (2d Cir. 1998) ..............................................................................18

*E.F.L. v. Prim*,
986 F.3d 959 (7th Cir. 2021) ..............................................................................30

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
104 F.4th 287 (D.C. Cir. 2024) ....................................................................44

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................................................................27

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)....................................................................17

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006)....................................................................48

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ....................................................................48

*Gerstein v. Pugh*,
420 U.S. 103 (1975) ....................................................................48

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ....................................................................17

*Hall v. District of Columbia*,
867 F.3d 138 (D.C. Cir. 2017)....................................................................19

*Harris v. Med. Transp. Mgmt., Inc.*,
77 F.4th 746 (D.C. Cir. 2023) ....................................................................45

*Hatten-Gonzales v. Hyde*,
579 F.3d 1159 (10th Cir. 2009) ....................................................................51

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ....................................................................38

*Hisp. Affs. Project v. Acosta*,
901 F.3d 378 (D.C. Cir. 2018)....................................................................35

*In re DC Water & Sewer Auth.*,
561 F.3d 494 (D.C. Cir. 2009)....................................................................43

*In re District of Columbia*,
792 F.3d 96 (D.C. Cir. 2015)....................................................................50

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015)....................................................................35

*In re Navy Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012)....................................................................17

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019)........................................................ 46, 47, 49

*Jacksonville Port Auth. v. Adams*,
556 F.2d 52 (D.C. Cir. 1977)....................................................................39

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....................................................................39

*Kershner v. Mazurkiewicz*,
670 F.2d 440 (3d Cir. 1982) ....................................................................45

*Kong v. United States*,
62 F.4th 608 (1st Cir. 2023) ....................................................................29

*La Franca v. INS*,
413 F.2d 686 (2d Cir. 1969) ........................................................ 18, 54-55

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)................................................... 28, 37, 38, 40

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990) ....................................................................36

*Maryland v. Wilson*,
519 U.S. 408 (1997) ....................................................................24

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ....................................................................25

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949) ....................41

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .................... 17, 18, 21

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ....................21

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020)....................30

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ....................51

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025).................... 24

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ....................36

*Nutraceutical Corp. v. Lambert*,
586 U.S. 188 (2019) ....................44

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*,
983 F.3d 671 (4th Cir. 2020) ....................18

*Ozturk v. Hyde*,
136 F.4th 382 (2d Cir. 2025) .................... 29, 30

*POET Biorefining, LLC v. EPA*,
970 F.3d 392 (D.C. Cir. 2020)....................34

*Port Auth. Police Benevolent Ass'n v. Port Auth.*,
698 F.2d 150 (2d Cir.1983) ....................45

*Rauda v. Jennings*,
55 F.4th 773 (9th Cir. 2022) ....................30

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) .......................................................................... 28, 29

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ..........................................................................39

*Rubinstein v. Brownell*,
206 F.2d 449 (D.C. Cir. 1953) ..........................................................................38

*Shaw v. Smith*,
166 F.4th 61 (10th Cir. 2026) .......................................................................... 17, 20

*Shook v. El Paso Cnty.*,
386 F.3d 963 (10th Cir. 2004) ..........................................................................46

*Short v. Billings Cnty.*,
138 F.4th 1072 (8th Cir. 2025) ..........................................................................43

*Sibron v. New York*,
392 U.S. 40 (1968) ..........................................................................48

*Smith v. Barry*,
502 U.S. 244 (1992) .......................................................................... 43, 50

*Spann v. Colonial Vill., Inc.*,
899 F.2d 24 (D.C. Cir. 1990) ..........................................................................28

*Swint v. Chambers Cnty. Comm'n*,
514 U.S. 35 (1995) ..........................................................................44

*Tazu v. Att'y Gen.*,
975 F.3d 292 (3d Cir. 2020 ..........................................................................30

*Thompson v. District of Columbia*,
832 F.3d 339 (D.C. Cir. 2016) ..........................................................................22

*Trudel v. SunTrust Bank*,
924 F.3d 1281 (D.C. Cir. 2019) .......................................................................... 41, 46

*United States v. Abdi*,
2005 WL 6119695 (S.D. Ohio Sept. 12, 2005) ....................................................18

*United States v. Abdi*,
463 F.3d 547 (6th Cir. 2006) ..............................................................................18

*United States v. Armstrong*,
517 U.S. 456 (1996) ..........................................................................................36

*United States v. Bogle*,
855 F.2d 70 (11th Cir. 1988) ..............................................................................38

*United States v. Green*,
670 F.2d 1148 (D.C. Cir. 1981)...........................................................................19

*United States v. Harrison*,
168 F.3d 483, 1999 WL 26921 (4th Cir. 1999)....................................................32

*United States v. Jackson*,
415 F.3d 88 (D.C. Cir. 2005)...............................................................................31

*United States v. Khan*,
324 F. Supp. 2d 1177 (D. Colo. 2004) ...............................................................19

*United States v. Philip Morris USA, Inc.*,
566 F.3d 1095 (D.C. Cir. 2009)...........................................................................41

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
530 F.3d 925 (D.C. Cir. 2008)..............................................................................35

*Wagner v. Taylor*,
836 F.2d 578 (D.C. Cir. 1987)..............................................................................49

*Ware v. Jackson Cty.*,
150 F.3d 873 (8th Cir. 1998) ..............................................................................22

*Wilson v. United States*,
369 F.2d 198 (D.C. Cir. 1966)............................................................................. 37

*Yaffe v. Powers*,
454 F.2d 1362 (1st Cir.1972) ....................46

**Statutes** **Page(s)**

28 U.S.C. § 1292(a)(1) ....................3, 51

28 U.S.C. § 1292(b) ....................44

5 U.S.C. § 551(13) ....................33

5 U.S.C. § 551(4) ....................33

8 U.S.C. § 1252(g) ....................28

8 U.S.C. § 1357(a)(2) ....................1, 4

**Other Authorities** **Page(s)**

Exec. Order No. 14,333,
90 Fed. Reg. 39,301 (Aug. 11, 2025) ....................5

**Rules** **Page(s)**

Fed. R. App. P. 3(c)(1)(B) .................... 42, 50

Fed. R. Civ. P. 23(a) ....................46

Fed. R. Civ. P 23(f) ....................43

Fed. R. Civ. P. 65(d) ....................41

**Regulations** **Page(s)**

8 C.F.R. § 287.8(c)(2)(ii) ....................4

# GLOSSARY

| **Term or Abbreviation** | **Definition** |
|---|---|
| AFGE | American Federation of Government Employees |
| APA | Administrative Procedure Act |
| Br. | Defendants' opening brief on appeal |
| DEA | Drug Enforcement Administration |
| Decl. | Declaration |
| DHS | Department of Homeland Security |
| Dkt. | Docket entry in *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 25-cv-03417 (D.D.C.) |
| EPA | Environmental Protection Agency |
| ICE | Immigration and Customs Enforcement |
| INS | U.S. Immigration and Naturalization Service |
| NTA | Notice to Appear |
| Op. | District court's memorandum opinion accompanying preliminary injunction |
| TPS | Temporary Protected Status |

## INTRODUCTION

This appeal concerns the government's unlawful policy of making warrantless civil immigration arrests in Washington, D.C., without individualized probable cause determinations that the person is likely to escape before a warrant can be obtained, as required by the Immigration and Nationality Act ("INA").

Defendants instituted this unlawful policy in August 2025. Under it, armed federal agents arrest people whom they perceive to be Latino while they are engaged in routine activities—such as commuting to work, shopping for groceries, or seeking medical care—without a warrant and without making the two independent probable cause assessments Congress requires for a warrantless arrest: *both* (1) that the person is in the United States unlawfully *and* (2) that the person is likely to escape before a warrant can be obtained. 8 U.S.C. § 1357(a)(2).

Plaintiffs sought to preliminarily enjoin Defendants' policy that abandons the latter requirement entirely. The record contains more than two dozen unrebutted declarations documenting nearly forty warrantless arrests where agents made no individualized determination of escape likelihood. Agents did not ask about family ties, employment, residence, or other facts bearing on whether a person was likely to escape. Nor did the individuals who were arrested resist or attempt to flee. Defendants' own statements confirm the policy: High-ranking Department of Homeland Security ("DHS") officials repeatedly boasted that DHS uses reasonable

suspicion, not probable cause, to make immigration arrests. Based on this evidence, the district court entered a preliminary injunction and provisionally certified a class.

Defendants cannot overcome this record. They deny the policy's existence, but they rely on a policy that did not take effect until *after* the injunction was entered and that does not comply with the statute or injunction in any event. They ask this Court to disregard factual findings they do not—and cannot—show are clearly erroneous, and they fail to dispute the district court's findings regarding the arrests of class members who submitted declarations. Defendants' standing arguments are meritless because Plaintiffs do more than show past harm; they show a substantial risk the harm will recur due to Defendants' policy. Nor does the INA strip jurisdiction, because Plaintiffs challenge the manner of arrest, not any decision to commence proceedings, adjudicate cases, or execute removal orders.

Plaintiffs face irreparable harm—loss of liberty—without an injunction. The equities and public interest favor Plaintiffs because the injunction prohibits only Defendants' unlawful policy; it does not impede lawful arrests or contemplate judicial oversight of individual arrests.

Defendants' challenges to the provisional class certification order and order enforcing the preliminary injunction are not properly before this Court. Neither was designated in the notice of appeal and neither is immediately appealable. And, in any event, both rulings are correct.

This Court accordingly should affirm the injunction. It should not reach the class certification or enforcement orders, but if it does, it should affirm those too.

## JURISDICTIONAL STATEMENT

Under 28 U.S.C. § 1292(a)(1), the Court's jurisdiction extends only to Defendants' appeal of the preliminary injunction. As explained below, the Court lacks jurisdiction to review the class certification and enforcement orders.

## STATUTE AND REGULATION

The relevant statute and regulation are reproduced in Appellants' Addendum.

## STATEMENT OF THE ISSUE

The only issue properly before this Court is whether the district court abused its discretion in preliminarily enjoining Defendants from enforcing their policy of conducting warrantless civil immigration arrests in the District without making a pre-arrest individualized determination of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and its implementing regulation.

## STATEMENT OF THE CASE

### I. Legal Background

Civil immigration arrests generally require a warrant. *See Arizona v. United States*, 567 U.S. 387, 408 (2012). Without a warrant, an agent can make an arrest *only if* the agent has "reason to believe" the person is in the United States in violation

of an immigration law or regulation *and* "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). The implementing regulation requires the same, emphasizing that "[a] warrant … shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii). "[R]eason to believe" in § 1357(a)(2) is the equivalent of probable cause, *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971), and probable cause must be particularized to the person seized, *Barham v. Ramsey*, 434 F.3d 565, 573-74 (D.C. Cir. 2006).[2]

Both the unlawful presence and escape likelihood prongs in § 1357(a)(2) must independently be satisfied. As Defendants recognized in the "Broadcast Statement of Policy," which Immigration and Customs Enforcement ("ICE") issued pursuant to a settlement agreement in *Castañon Nava v. DHS*, No. 18-cv-3757 (N.D. Ill. 2018), "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient" to establish escape likelihood. Dkt. 17-1 (Widas Decl.) at 8-9. The Broadcast identified factors including, among others, a person's "ties to the community (such as a family, home, or employment) or lack thereof," as relevant to the escape likelihood determination. *Id.* at 8. But the Broadcast was "terminated" before the relevant period for this litigation, as ICE's Principal Legal Advisor "unequivocal[ly]" confirmed on June 11, 2025. *Castañon Nava v. DHS*, 806 F. Supp.

---

[2] All citations in this brief are cleaned up.

3d 823, 860 (N.D. Ill. 2025), *aff'd in part*, 175 F.4th 828 (7th Cir. 2026).[3]

In August 2025, Defendants instituted their policy of making warrantless immigration arrests in D.C. without assessing probable cause as to escape likelihood, in violation of the statute and regulation.

## II. Factual Background

### A. Defendants' Policy of Making Warrantless Immigration Arrests in D.C. Without Probable Cause as to Escape Likelihood.

On August 11, 2025, President Trump issued an Executive Order declaring an "emergency" in the District. Exec. Order No. 14,333, 90 Fed. Reg. 39,301 (Aug. 11, 2025). In announcing the purported emergency, the President repeatedly referenced immigration, declaring that D.C. "will no longer be a sanctuary for illegal alien criminals." Widas Decl. at 43. In January 2025, the administration imposed a quota of 75 immigration arrests per day for ICE field offices nationwide, including D.C., and in May 2025, Homeland Security Advisor Stephen Miller publicly announced "a goal of a minimum of 3,000 arrests for ICE every day" and indicated that number

---

[3] On October 7, 2025, the district court in *Nava* ordered ICE to "reissue the Broadcast to all ICE officers nationwide" with the instruction that it will remain in effect through February 2, 2026. 806 F. Supp. 3d at 863. Below, Defendants did not address this, leaving the "exact status of the Broadcast … unclear." Dkt. 68 ("Op.") 60. Now, for the first time, Defendants assert that on October 22, 2025, ICE reissued the Broadcast pursuant to the *Nava* court's order. Br. 6-7. As of April 3, 2026, the Broadcast does not apply nationwide and instead applies only to arrests within the ICE Chicago Field Office's area of responsibility. No. 18-cv-03757, Dkt. 342 at 3.

would get "higher each and every day." *Id.* at 21, 28.

A dramatic surge in civil immigration arrests followed the August declaration. Federal agents made over 943 immigration arrests in the District in twenty-nine days. *Id.* at 95-96. The DHS Secretary granted other federal agencies immigration enforcement powers, permitting untrained agents to conduct immigration arrests in the District. *Id.* at 50, 52-55. News reports described "dragnet-style arrest tactics" and "roving patrols arresting anybody that looked brown." *Id.* at 65. The arrests continued after the formal emergency period expired. *Id.* at 80-81, 83.

To carry out these mass arrests, Defendants implemented an "arrest first, ask questions later" policy, making warrantless immigration arrests without assessing probable cause as to escape likelihood. Dkt. 68 ("Op.") 5. The evidence below documenting dozens of warrantless arrests in D.C. shows a consistent pattern: agents stop people they perceive to be Latino while they are engaged in routine life activities and arrest them without a warrant and without knowledge of facts that could provide probable cause that the person is likely to escape before a warrant can be obtained.

The pattern accords with high-ranking DHS officials' repeated admissions that agents use "reasonable suspicion," not probable cause, to make arrests. *E.g.*, Widas Decl. at 95. The record below included multiple public statements made by senior DHS officers. Then-Chief Border Patrol Agent Gregory Bovino, for example,

stated that "[w]e need reasonable suspicion to make an immigration arrest[.] … You notice I did not say probable cause, nor did I say I need a warrant." Dkt. 34-1 (Second Widas Decl.) at 8. DHS's Assistant Secretary for Public Affairs similarly stated, "DHS law enforcement uses 'reasonable suspicion' to make arrests." Widas Decl. at 95. DHS's official social media account posted the same, *id.* at 104, and DHS issued a press release reinforcing Defendants' commitment to making arrests based on reasonable suspicion, Second Widas Decl. at 4.

### B. Plaintiffs Are Subject to and Harmed by Defendants' Policy.

The four individual Plaintiffs, twelve members of CASA, Inc. or their relatives, and nineteen other class members, among others, were arrested pursuant to Defendants' unlawful policy. Each appears Latino and, while engaged in routine activities, was arrested without a warrant and without probable cause as to escape likelihood. *See id.* at 9 (Bovino stating that Defendants consider "how [individuals] look" in determining who to stop). CASA, Inc. has also suffered significant organizational harm.

**Plaintiff José Escobar Molina** has lived in D.C. since 2000 and maintained valid Temporary Protected Status ("TPS") since 2001.[4] Dkt. 17-2 (Escobar Molina Decl.) ¶ 1. He lives with his partner and two U.S.-citizen sons. *Id.* ¶¶ 3-4. He has

[4] Although Defendants claim Escobar Molina's TPS "had expired," Br. 35, his timely renewal application was pending at the time of his arrest. Escobar Molina Decl. ¶ 1; Op. 8.

never been in removal proceedings. Op. 47. On August 21, 2025, while he was walking to his car to go to work, agents arrested him without a warrant and without asking about his community ties. *Id.* ¶¶ 6-8. He did not resist or attempt to flee. *Id.* ¶ 7. *After* they arrested him, the agents shouted "Shut up bitch! You're illegal" when he tried to explain he had documents showing his immigration status. *Id.* ¶¶ 6-7. Following a day and night detained in overcrowded conditions and with insufficient food, he was released after an officer finally recognized his valid TPS prohibits his detention. *Id.* ¶¶ 11-14. His arrest caused him to change certain habits to mitigate his risk of rearrest, including no longer going to the park with his sons, although he remains at risk as he continues to live and travel in D.C. *Id.* ¶¶ 18-21.

**Plaintiff B.S.R.** has lived in the U.S. since 2019. He lives with his parents, partner, and U.S.-citizen daughter. Dkt. 17-3 (B.S.R. Decl.) ¶ 1. He has been arrested by immigration agents in D.C. twice since January 2025, on January 28, 2025, and again on August 18, 2025. On August 18, he was arrested without a warrant alongside his father as they were about to drive to work. *Id.* ¶¶ 12-16. The agents did not ask B.S.R. about his community ties. *Id.* ¶¶ 14-15. He did not resist or attempt to flee; indeed, he showed the agents his ankle monitor from his prior arrest and told them he is applying for asylum. *Id.* ¶ 14. The agents said "we came for two people, so we have to arrest two people." *Id.* ¶ 16. He was released after spending approximately 14 hours in detention, where he was given only a single burrito and

bottle of water. *Id.* ¶¶ 18-20. Due to the substantial risk he would be rearrested, he moved to Maryland, although he continues to travel through D.C. for work. *Id.* ¶ 25.

**Plaintiff N.S.** entered the U.S. in 2022 and has lived in D.C. since 2024. Dkt. 17-4 (N.S. Decl.) ¶¶ 1, 4. He has a pending asylum application, filed to renew his TPS, and has never missed any of his check-ins with ICE. *Id.* ¶ 2. On August 12, 2025, N.S. was arrested without a warrant in the parking lot of Home Depot after he shopped there, when agents pulled him out of his parked car and handcuffed him. *Id.* ¶¶ 7-11. N.S. did not resist or attempt to flee. *Id.* ¶ 7. The agents did not ask about his community ties. *Id.* N.S. was in ICE detention for four weeks, during which time he was shackled and forced to urinate without a bathroom. *Id.* ¶¶ 20, 23. To mitigate his risk of rearrest, he has had his son drive him and stopped driving family members to school and other activities, although he remains at risk as he continues to live and travel in D.C. *Id.* ¶¶ 3-4, 26.

**Plaintiff R.S.M.** entered the U.S. in 2017 and lives in D.C. with her husband and two children. Dkt. 17-5 (R.S.M. Decl.) ¶ 1. She has a pending asylum case and her family has a pending U visa application arising from an armed robbery of her son. *Id.* On August 26, 2025, she and her husband were arrested without warrants while driving to work. *Id.* ¶¶ 2-5. Seven vehicles surrounded them and agents banged on the car windows, demanding they roll the windows down. *Id.* ¶ 2. R.S.M. did not resist or attempt to flee. *Id.* ¶ 5. The agents did not ask R.S.M. and her husband about

their community ties. *Id.* ¶ 6. R.S.M. was in detention for ten hours before being released. *Id.* ¶¶ 9, 12. The arrest caused R.S.M. to stop sleeping. *Id.* ¶ 16. To mitigate her risk of rearrest, she stopped going to work even though she was unsure how she would support her children with her husband detained, although she remains at risk as she continues to live in D.C. *Id.* ¶¶ 1, 16.

**At least twelve of Plaintiff CASA, Inc.'s members or their relatives** were also arrested pursuant to Defendants' unlawful policy. Member Elias was in a car accident while traveling to receive dialysis treatment when ICE agents arrived and arrested him without a warrant and without asking about his community ties. Dkt. 17-17 (Elias Decl.) ¶¶ 2-5. Elias did not resist or attempt to flee. *Id.* ¶ 5. Member Miguel was arrested without a warrant while leaving a grocery store; the agents did not ask about his community ties and he did not resist or attempt to flee. Dkt. 17-6 (CASA, Inc. Decl.) ¶ 34. Member Javier was arrested without a warrant outside a Metro station while traveling to work; the agents did not ask about his community ties and he did not resist or attempt to flee. Dkt. 17-20 (Javier Decl.) ¶¶ 4-6. All twelve individuals whose arrests were documented in unrebutted declarations were arrested without warrants, without resisting or attempting to flee, and without the agents obtaining any information pertinent to their likelihood of escape. *E.g.*, Op. 18-20; CASA, Inc. Decl. ¶¶ 25-36; Dkts. 17-10 (Antony Decl.); 17-19 (Franco Decl.); 17-21 (Julio Decl.); 17-22 (Luz Decl.); 17-24 (Mateo Decl.).

**At least nineteen other class members** were also arrested between August 11 and September 8, 2025, without warrants and without individualized assessments as to escape likelihood. Agents arrested W.G.M. while he was walking to his girlfriend's apartment without asking about his community ties. Dkt. 17-26 (W.G.M. Decl.) ¶¶ 3-6. Agents arrested Andrés while he was returning from work without asking about his community ties. Dkt. 17-9 (Andrés Decl.) ¶¶ 2-4. Neither W.G.M. nor Andrés resisted or attempted to flee. W.G.M. Decl. ¶ 3; Andrés Decl. ¶ 4. The other seventeen arrests also described in unrebutted declarations similarly occurred while the individuals were engaged in routine activities, involved no attempt to flee, and occurred without the agents obtaining any information relevant to the person's escape likelihood. *E.g.*, Op. 21-24; Dkts. 17-8 (Anamaria Decl.); 17-11 (B.R.G. Decl.); 17-13 (Camilo Decl.); 17-14 (Cristina Decl.); 17-27 (Y.R.M. Decl.).

In addition to the harm to its members, CASA, Inc. suffered direct organizational harm due to Defendants' policy. CASA, Inc.'s core mission is to provide long-term social, health, and related resources to immigrant communities. CASA, Inc. Decl. ¶ 8. Because of Defendants' policy, it had to divert much of its staff and resources "away from [its] core focus of providing services that stabilize and protect [its] members to providing rapid, emergency response." *Id.* ¶ 15. It faced a "forty-fold increase" in reports of immigration arrests to its hotline between August 14 and 29, 2025, compared to the rate of reports between January and August 14,

2025. *Id.* ¶ 14. It also faced increased costs in funding its hotline services due to the high demand under Defendants' policy, and one of its grants was reduced by 50% because staff and resource diversions forced it to miss its deliverables, impairing its ability to conduct its core functions. *Id.* ¶¶ 19-20. Defendants' policy also interfered with CASA, Inc.'s mission by chilling members from sharing information with staff out of fear "their immigrant status will be weaponized against them." *Id.* ¶ 21.

### III. Procedural History

On September 25, 2025, Plaintiffs filed this case challenging, under the Administrative Procedure Act ("APA"), Defendants' policy of making warrantless civil immigration arrests in D.C. without making the probable cause findings required by § 1357(a)(2).

On October 3, Plaintiffs moved for a preliminary injunction, to stay agency action, and for provisional class certification based on Defendants' policy of making warrantless arrests without assessing probable cause as to escape likelihood. The district court granted relief in relevant part on December 2. Dkt. 67 (PI Order). It provisionally certified a class of "[a]ll persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk." *Id.* at 1. It also preliminarily enjoined Defendants and their agents "from enforcing their policy or practice of making warrantless civil

immigration arrests in [D.C.] without a pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by [§ 1357(a)(2)] and 8 C.F.R. § 287.8(c)(2)(ii).” *Id.* at 2. The injunction further required Defendants to document each warrantless arrest in D.C., including the specific facts that supported the agent’s pre-arrest probable cause as to escape likelihood. *Id.* at 2-3.

After the order’s issuance, on January 28, 2026, then-Acting ICE Director Todd Lyons issued an internal memorandum purporting to provide guidance to ICE agents on assessing likelihood of escape before making warrantless arrests. Dkt. 78-1 at 53-57 (Lyons Memo at 1-5). The Lyons Memo gave inconsistent definitions of escape likelihood and listed seven factors it deemed to bear on the inquiry, none of which addressed community ties. *Id.*

On February 2, Defendants appealed. Their notice of appeal designated only the order and memorandum opinion “granting Plaintiffs’ motion for a preliminary injunction.” Dkt. 73. Because Defendants continued their unlawful policy in violation of the injunction, Plaintiffs moved to enforce the injunction on February 19. On May 7, the district court granted Plaintiffs’ motion, prohibiting Defendants and their agents from relying on the Lyons Memo (the “enforcement order”). Dkts. 101 (Order), 102 (Enforcement Op.). Defendants neither noticed an appeal of the enforcement order nor amended their notice to include it.

## SUMMARY OF THE ARGUMENT

This Court should affirm the preliminary injunction. It should not reach the class certification and enforcement orders, but if it does, it should affirm those too.

**1.** The district court properly exercised jurisdiction and correctly determined that Plaintiffs are likely to succeed on the merits.

Plaintiffs have standing to pursue injunctive relief. The record contains more than two dozen declarations documenting roughly forty arrests in the District, substantiating Defendants' policy of conducting warrantless arrests without making individualized probable cause determinations as to escape likelihood. In *none* of those arrests did the agents assess probable cause as to escape likelihood. The agents did not ask the individuals about their community ties. Nor did the individuals resist arrest. Plaintiffs also submitted numerous public statements by high-ranking DHS officials unequivocally declaring that DHS uses reasonable suspicion, not probable cause, to make arrests. Each individual Plaintiff was arrested pursuant to Defendants' policy and belongs to the group the policy targets: people who appear Latino, work in low-wage jobs, and live in or frequent neighborhoods with large numbers of Latino residents. The district court correctly determined that Plaintiffs face a substantial risk of future unlawful arrest pursuant to Defendants' policy.

CASA, Inc. has associational standing because (1) its members have standing for the same reasons as the individual Plaintiffs, (2) enjoining Defendants' unlawful

policy is germane to its purpose, and (3) its members need not participate in the lawsuit because Plaintiffs challenge a policy, not individual arrests. CASA, Inc. also independently has organizational standing: Defendants' unlawful policy has directly interfered with its mission and core services, including by forcing it to divert resources from long-term services to rapid response.

Defendants' contrary arguments do not confront that record. Instead, they rely on a post hoc policy (the Lyons Memo) and factual allegations regarding the individual Plaintiffs' arrests that do not come close to showing clear error.

Section 1252(g) of the INA does not apply. Plaintiffs challenge the manner of arrest, not any decision to commence proceedings, adjudicate cases, or execute removal orders. Indeed, Escobar Molina is not even in removal proceedings, and removal proceedings were initiated against N.S. and R.S.M. *after* their arrests.

The policy violates § 1357(a)(2) and is final agency action; its unwritten form is irrelevant. The policy reflects a definitive agency decision, has concrete legal consequences, and is amply established by public statements and dozens of unrebutted declarations.

**2.** Plaintiffs also satisfy the remaining preliminary injunction factors. Without an injunction, they face irreparable harm—an imminent risk of loss of liberty—due to the high likelihood they will be rearrested under Defendants' policy.

The equities and public interest likewise favor the injunction. Defendants are

not harmed by being barred from unlawful conduct. Nor does the injunction impose an impermissible "follow-the-law" command or micromanage arrests. Indeed, its requirements largely mirror Defendants' own prior policy.

**3.** The class certification order is not properly before this Court: Defendants did not designate it in the notice of appeal, and it is not immediately appealable except through a Rule 23(f) petition, which Defendants did not file. Regardless, the district court properly exercised its discretion in provisionally certifying the class.

**4.** The enforcement order likewise is not properly before this Court because Defendants never appealed it and it does not modify the preliminary injunction; it merely applies the injunction to the Lyons Memo. If reached, it should be affirmed.

## STANDARD OF REVIEW

On appeal of a preliminary injunction determination, this Court reviews a district court's legal conclusions *de novo*, its weighing of the preliminary injunction factors for abuse of discretion, and its factual findings for clear error. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1233-34 (D.C. Cir. 2025).

## ARGUMENT

### I. The Court Should Affirm the Preliminary Injunction.

#### A. Plaintiffs Are Likely To Succeed on the Merits.

##### 1. Plaintiffs Have Standing.

The district court correctly determined that Plaintiffs showed "a substantial

likelihood of standing," as required at the preliminary injunction stage. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). To establish standing, a plaintiff must show she "suffered an injury in fact that is fairly traceable to the defendants' allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023). For forward-looking injunctive relief, "future injuries … may suffice if … there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 106 & n.7 (1983) (policy authorizing the unlawful conduct and "realistic threat" of future application of the policy would establish standing).

***Injury in fact.*** Plaintiffs' injury is the objective, substantial risk that Defendants' agents will rearrest them under Defendants' unlawful policy. The injury is not subjective fear, but rather the realistic threat of unlawful rearrest. *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 667 (D.C. Cir. 1987).

This Court has held that "[t]he prospect of future injury becomes significantly less speculative where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury." *In re Navy Chaplaincy*, 697 F.3d 1171, 1176-77 (D.C. Cir. 2012). Other courts of appeals agree. *E.g.*, *Shaw v. Smith*, 166 F.4th 61, 75-77 (10th Cir. 2026) (plaintiffs demonstrated substantial risk they will face another traffic stop encounter under defendants' policy); *Melendres v.*

*Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (exposure to unlawful traffic stops policy rendered future injury "sufficiently likely"); *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671, 681 (4th Cir. 2020); *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003); *Deshawn E. v. Safir*, 156 F.3d 340, 344-45 (2d Cir. 1998).

The record below contains extensive evidence supporting the existence of Defendants' policy. The district court's finding that Defendants likely adopted this policy rests on the circumstances of Plaintiffs' and class members' arrests and Defendants' own public statements. Those factual findings are grounded in the record and may be set aside only if clearly erroneous. *Clevinger*, 134 F.4th at 1234.

More than two dozen unrebutted declarations document roughly forty arrests in which Defendants' agents made no individualized probable cause determination as to escape likelihood. *E.g.,* W.G.M. Decl.; Andrés Decl. In every arrest, agents failed to elicit facts bearing on escape likelihood, and no other circumstances supported probable cause for escape likelihood. Agents did not ask about the arrestees' community ties, how long they had lived here, their family, employment, or any other personal circumstances—facts relevant to the escape-likelihood determination. *See, e.g.*, *La Franca v. INS*, 413 F.2d 686, 689 (2d Cir. 1969) (being "the owner and operator of a bakery in Jersey City" lowered petitioner's likelihood of escape); *United States v. Abdi*, 2005 WL 6119695, at *6 (S.D. Ohio Sept. 12, 2005), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006) (no probable cause for

escape likelihood where defendant, *inter alia*, owned business and lived with his wife and two children); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (same where defendant worked two jobs, owned vehicle, paid rent, and did not previously experience legal trouble); Op. 57-59. Nor did any arrestee exhibit furtive conduct or attempt to flee.

Defendants' own statements—including one in direct response to the filing of this lawsuit—independently confirm the policy. DHS leadership repeatedly asserted in public forums that it uses "reasonable suspicion," not probable cause, to make immigration arrests. *E.g.*, Widas Decl. at 95. "[P]robable cause, of course, requires more than mere suspicion." *United States v. Green*, 670 F.2d 1148, 1151 (D.C. Cir. 1981); *see also Hall v. District of Columbia*, 867 F.3d 138, 152 (D.C. Cir. 2017) (reasonable suspicion "is a less demanding standard than probable cause in terms of both the reliability and the extensiveness of the information required"). These statements are unequivocal. Indeed, then-Chief Border Patrol Agent Bovino boasted that agents need only "reasonable suspicion" and not "probable cause" to make arrests. Second Widas Decl. at 8. Defendants made similar statements across DHS's official social media account, in media statements by DHS's Assistant Secretary for Public Affairs, and in official DHS press releases. Widas Decl. at 65, 95, 104; Second Widas Decl. at 4.

The policy's reach and Plaintiffs' characteristics make the threat of rearrest

concrete and realistic. Plaintiffs belong to the group Defendants' policy targets because they appear Latino, work in low-wage jobs, and live in or frequent neighborhoods with large numbers of Latino residents. They were arrested while engaging in unavoidable routine activities, and they all live and/or travel in D.C.

*First*, Plaintiffs belong to the group Defendants' policy targets: individuals who appear Latino, work in low-wage jobs, and live in or frequent neighborhoods with significant Latino populations. *See, e.g.*, *Shaw*, 166 F.4th at 76 (finding the likelihood of plaintiffs being stopped again "inordinately high because they are out-of-state drivers" and out-of-state drivers are stopped under the defendant's policy at disproportionately high rates); *Church v. City of Huntsville*, 30 F.3d 1332, 1337-39 (11th Cir. 1994) (plaintiffs who were homeless were "far more likely to have future encounters with the police" under policy targeting homeless individuals). Each individual Plaintiff has these characteristics. Escobar Molina Decl. ¶¶ 3-4; B.S.R. ¶¶ 11-12; N.S. Decl. ¶¶ 4-5; R.S.M. Decl. ¶¶ 1, 14.

*Second*, each individual Plaintiff was arrested while engaging in unavoidable, lawful, and quotidian activities of daily life. Courts have found a substantial risk of future injury when, "for reasons beyond the plaintiff's control, he or she is unable to avoid repeating the conduct that led to the original injury at the hands of the defendant." *Church*, 30 F.3d at 1338; *see also Shaw*, 166 F.4th at 76 (plaintiffs faced substantial risk of being stopped again by Kansas Highway Patrol "no matter how

carefully they try to follow traffic laws" because traffic stops "are routine and beyond the control of drivers"); *Melendres*, 695 F.3d at 998 (finding standing to challenge traffic stops policy where plaintiffs were exposed to policy while "going about … daily life"). B.S.R. has been arrested twice while performing work-related activities; Escobar Molina was arrested outside his home on his way to work; N.S. had just finished shopping at Home Depot when he was arrested; and R.S.M. was arrested on her way to work with her husband. *Supra* pp. 7-10.

Moreover, Plaintiffs took measures to reduce the threat of unlawful rearrest, with B.S.R. moving to Maryland, R.S.M. sacrificing her income, and N.S. no longer driving his children and grandchildren to school. *Id*. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154-55 (2010) (holding that measures taken to minimize risk of harm satisfied injury-in-fact requirement); *accord Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 524 (2026) (Barrett, J., concurring). However, despite taking these measures, Plaintiffs remain at substantial risk of future arrest because they continue to undertake daily activities in the District. Escobar Molina Decl. ¶¶ 3-4, 18-21; B.S.R. ¶ 25; N.S. Decl. ¶¶ 4; R.S.M. Decl. ¶ 1.

Defendants do not confront this evidence. They do not engage with the class member declarations showing the same pattern, and they come nowhere close to showing clear error.

Instead, to deny the policy exists, Defendants rely on the very statute and

regulation Plaintiffs allege they are violating. Br. 28. But "the existence of written policies … are of no moment in the face of evidence that such policies are neither followed nor enforced." *Thompson v. District of Columbia*, 832 F.3d 339, 350 (D.C. Cir. 2016) (quoting *Ware v. Jackson Cty.*, 150 F.3d 873, 882 (8th Cir. 1998)).

Defendants' reliance on the Lyons Memo to dispute the unlawful policy is doubly flawed. The Memo was not issued until January 28, 2026, nearly two months *after* the district court entered the preliminary injunction and nearly six months after the commencement of the policy at issue here. Lyons Memo at 1. It is not part of the record on appeal, and thus is not properly before this Court. *See infra* pp. 50-52. In any event, as the district court found in a separate order that Defendants did not appeal, the Memo violates the injunction and § 1357(a)(2). *Infra* pp. 53-55.

Defendants' reimagination of Plaintiffs' arrests to suggest probable cause existed also fails to show that the court's finding that the policy likely exists was clear error. Defendants do not dispute the dozens of *other* arrests in the record that demonstrate their policy, and for standing purposes, only the objective risk of future harm matters: Defendants' policy exists, it targets people with Plaintiffs' characteristics, and Plaintiffs continue to live or travel in the District. To the extent Defendants' arguments about Plaintiffs' arrests go to whether Defendants' policy violates § 1357(a)(2) on the merits, Plaintiffs respond *infra* at pages 31-33.

Nor does *Lyons* support Defendants. In *Lyons*, the plaintiff alleged police

stopped him for a traffic violation and subjected him to a chokehold without cause. 461 U.S. at 97-98. The Court rejected the plaintiff's standing to seek an injunction, finding it unlikely he would subsequently experience a traffic stop and chokehold without provocation. *Id.* at 108. Critically, the Court determined that the city had no policy akin to what the plaintiff challenged, under which "chokeholds, or other kinds of force for that matter, are authorized absent some resistance or other provocation by the arrestee or other suspect." *Id.* at 108, 110. Here, by contrast, numerous public statements from DHS leadership confirm that Plaintiffs' arrests without probable cause for escape likelihood were authorized, and unrebutted evidence shows that Defendants' agents carried out arrests pursuant to that unlawful policy.

Defendants' contention that *Lyons* "presumed the existence of a policy authorizing chokeholds but *still held* that the alleged future injury was too speculative," Br. 32, ignores the Court's determination that a future chokehold depended on the plaintiff "illegally resist[ing] arrest" to trigger a policy authorizing chokeholds *to counter resistance*, and that Lyons could avoid a future chokehold by "acting within the law" if stopped by police. *Lyons*, 461 U.S. at 103, 106. Here, by contrast, Plaintiffs face a realistic threat under Defendants' policy because they appear Latino, work low-wage jobs, live in or frequent Latino neighborhoods, and were arrested while engaging in lawful, ordinary activities in the District. No speculative intervening act is required.

The two other cases on which Defendants rely, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), and *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025), are likewise inapposite. In *Clapper*, the government's alleged surveillance activities were a secret, and plaintiffs could not show they were subject to the challenged policy; here, the extensive evidentiary record includes Defendants' own statements declaring the standard they use to make immigration arrests. 568 U.S. at 411. And unlike in *Perdomo*, Plaintiffs "are not arguing which factors [D]efendants may consider in their application of a legal standard, but rather contend that [D]efendants have *abandoned the proper legal standard entirely*." Op. 39 (emphasis added). In any event, the order in *Perdomo* contains no reasoning, discussion, or findings about standing. *See Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997).

***Traceability and redressability.*** Plaintiffs have shown that their injuries are traceable to Defendants' policy and that those injuries are redressable by the relief they seek.

Defendants' policy "has directly resulted in [P]laintiffs' arrests without administrative warrants and without consideration of escape risk." Op. 40. That satisfies traceability, which requires showing that the "injury was likely caused by the defendant." *Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 628 (D.C. Cir. 2024). The possibility that Plaintiffs could theoretically be arrested pursuant to a warrant in the future, as Defendants argue, is irrelevant. Plaintiffs

challenge Defendants' policy of making unlawful *warrantless* arrests, and the risk of an arrest pursuant to a warrant has no bearing on whether Defendants' unlawful policy causes Plaintiffs' injuries.

Plaintiffs also satisfy redressability because enjoining Defendants' unlawful policy redresses their injuries. "After all, if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). Defendants' argument that the injunction is not "tailored to Plaintiffs' asserted injuries," Br. 36, is wrong. Enjoining the policy relieves Plaintiffs of the *risk* of rearrest pursuant to the policy. *See Massachusetts v. EPA*, 549 U.S. 497, 525 (2007).

***CASA, Inc.'s associational and organizational standing.*** CASA, Inc. has associational standing because (1) its members have "standing to sue in [their] own right" for the same reasons the individual Plaintiffs have standing; (2) the interests it seeks to protect are "germane" to its mission "to create a more just society by … improving the quality of life in … immigrant communities" by providing a range of social, health, and other long-term services, CASA, Inc. Decl. ¶¶ 7-8, and (3) its members do not need to participate in the lawsuit because the claims and relief center on a systemic policy that does not require analyzing individual members' facts. *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022).

Defendants' arguments on the first element fail for the reasons discussed

above. Their contention that this lawsuit is not germane to CASA, Inc.'s purpose ignores the evidence that Defendants' unlawful policy has directly harmed its ability to provide long-term services core to its mission. CASA, Inc. Decl. ¶¶ 14-20. The considerable toll Defendants' policy has taken on the organization and its members ensures that it has "a stake in the resolution of the dispute." *Advanced Energy United v. FERC*, 185 F.4th 186, 210 (D.C. Cir. 2026). Defendants' further objection that this case raises individualized questions again rests on their mischaracterization of Plaintiffs' claims and the relief sought. *Infra* pp. 31-33.

As Plaintiffs argued below, CASA, Inc. independently has organizational standing, and this Court "may affirm based on any ground preserved in the record." *Ali v. Regan*, 111 F.4th 1264, 1277 n.6 (D.C. Cir. 2024). "To demonstrate injury in fact, an organization must allege a concrete and demonstrable injury to the organization's activities[.]" *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). "And causation is shown where new activities, not previously part of the organization's normal annual expenditures, became necessary in response to the injury, causing a drain on the organization's resources." *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, – F.4th – , 2026 WL 2635380, at *4 (D.C. Cir. Sept. 8, 2026).

Defendants' unlawful policy has "directly affected and interfered with" the organization's "core business activities" and "perceptibly impaired" its ability to

provide these services, including by causing CASA, Inc. to divert resources to counteract the injury. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). CASA, Inc.'s central business activities focus on providing long-term social, health, and related services to its members. CASA, Inc. Decl. ¶¶ 4-13. The unprecedented surge in unlawful warrantless immigration arrests in D.C. produced by Defendants' policy forced CASA, Inc. to divert resources away from providing these long-term services toward providing rapid, emergency response services to unlawfully arrested members and their relatives and has chilled open communication between CASA, Inc. and its members. CASA, Inc. Decl. ¶¶ 15-16, 21. To the extent its members are still willing to connect with it, CASA, Inc. must address its members' immediate detention-related concerns as a prerequisite to offering the long-term services that comprise its core business function. *Id.* ¶ 16.

CASA, Inc. has also been forced to invest additional resources to build trust with its members to receive the confidential information necessary to provide services to its members. *Id.* ¶ 22. CASA, Inc.'s diversion toward rapid response services therefore has substantially reduced its ability and capacity to provide its core, long-term legal, health, and social services to its members. *Id.* ¶¶ 17-22; *see also Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *4-5 (likelihood of standing increased where organization diverted resources to immigrant client outreach and experienced reduction in pro bono immigrant clients due to apprehension caused by

new policy); *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding standing where policy led to organization registering fewer voters, impairing accomplishment of mission); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27-29 (D.C. Cir. 1990) (finding standing where defendants' allegedly discriminatory advertisements required plaintiff organizations to spend more on educational and counseling services).

### 2. The INA Does Not Bar Jurisdiction.

Defendants' jurisdictional argument under the INA fares no better. Section 1252(g) states that "no court shall have jurisdiction" over a claim "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen] under this chapter" except through a petition for review of a final order of removal. 8 U.S.C. § 1252(g). The Supreme Court has explained that § 1252(g) bars jurisdiction "only [as] to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). It does not even apply to "all claims arising from deportation proceedings," *id.*, much less claims like those here that arise *outside* of removal proceedings. The Court has since reiterated that § 1252(g) is "narrow," noting that it "previously rejected as 'implausible'" the argument that "§ 1252(g) covers 'all claims arising from deportation proceedings'

or imposes 'a general jurisdictional limitation.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting *Reno*, 525 U.S. at 482).

Section 1252(g) does not apply here because Plaintiffs' claims do not concern or arise from any of those three discrete actions. Plaintiffs do not challenge the commencement, result, or any part of the process by which their removability may be determined. Instead, they challenge the unlawful *manner* in which they were arrested: without individualized probable cause determinations as to escape likelihood pursuant to Defendants' unlawful policy. Unlike the acts in § 1252(g), complying with § 1357(a)(2) is not a matter of Executive discretion. *Reno*, 525 U.S. at 485 n.9 ("Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."); *see also* Br. 40 (agreeing § 1252(g) is a discretion-protecting provision). Courts have rejected the government's position that § 1252(g) bars claims "simply because [they] relate to [a] discretionary, prosecutorial decision in the 'but for' causal sense." *Kong v. United States*, 62 F.4th 608, 613 (1st Cir. 2023); *accord Ozturk v. Hyde*, 136 F.4th 382, 397 (2d Cir. 2025).

Plaintiffs' circumstances further demonstrate that § 1252(g) does not apply to their claims. As Defendants admit, Escobar Molina is not in removal proceedings and has never been issued a Notice to Appear ("NTA"), the document issued by DHS to commence removal proceedings. Op. 47 (citing Dkt. 50-1 (Decl. of Joseph

Simon, Deputy Field Office Director for D.C.) ("Simon Decl.") ¶ 20). His arrest therefore could not have arisen from the acts in § 1252(g). N.S. and R.S.M. were issued NTAs *after* their arrests, so their arrests could not have arisen from the post-arrest decisions to initiate removal proceedings against them. *Id.* ¶¶ 22-23; *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1260 (D.C. Cir. 2020) ("[A]n act can only 'aris[e] from' circumstances that precede it."); *Ozturk*, 136 F.4th at 398 (§ 1252(g) did not apply to petitioner's claims of unlawful and retaliatory detention because ICE detained her "*before* an NTA was filed with the immigration court"). B.S.R. had been in removal proceedings for nearly seven months before his arrest on August 18, 2025, and his claim, too, does not arise from a decision to commence proceedings or to adjudicate or execute a removal order. Simon Decl. ¶ 21.

Defendants' cases are inapposite. The plaintiffs in *Rauda v. Jennings*, 55 F.4th 773, 777 (9th Cir. 2022), *E.F.L. v. Prim*, 986 F.3d 959, 964 (7th Cir. 2021), and *Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1272 (11th Cir. 2021), challenged the execution of their removal orders. Plaintiffs do not challenge the execution of removal orders or any part of removal proceedings; indeed, no Plaintiff has a removal order. And unlike in *Tazu v. Att'y Gen.*, 975 F.3d 292 (3d Cir. 2020), where the appellant challenged "a brief door-to-plane detention" for the execution of an existing removal order—detention that the Third Circuit termed "directly about removal," *id.* at 296, 298-99—Plaintiffs' claims are independent of any decision or

action to remove them.

The INA accordingly does not bar jurisdiction over Plaintiffs' claims.

**3. Defendants' Policy Violates § 1357(a)(2) and the Regulation.**

Defendants do not dispute that if their policy exists, it violates § 1357(a)(2) and the regulation. The district court correctly concluded that it does.

This Court has held that "reason to believe" in § 1357(a)(2) is the equivalent of probable cause. *Au Yi Lau*, 445 F.2d at 222. Probable cause must be "particularized with respect to [each] person" and is an objective standard. *Barham*, 434 F.3d at 573. Although "the existence of probable cause does not depend on the elimination of all innocent explanations for a situation," "the existence of countervailing probabilities" is not "irrelevant." *United States v. Jackson*, 415 F.3d 88, 94 (D.C. Cir. 2005). Agents making arrests cannot "elide th[eir] burden [to establish probable cause] by ignoring … explanations" or facts that cut against a person's likelihood of escape. *See id.* at 95.

Based on the plain text of § 1357(a)(2), the district court correctly rejected Defendants' argument that probable cause as to unlawful presence can be double counted as probable cause for escape likelihood. Op. 31-32. The statute explicitly requires probable cause for both prongs. Allowing probable cause for unlawful presence to suffice for escape likelihood would violate the rule against surplusage.

Although Defendants do not defend their policy on the merits, they contend

that the individual Plaintiffs' arrests likely were lawful. Their assertion that an individual's "clear and undisputed removability" suffices to establish probable cause for escape likelihood, Br. 34, again conflates two distinct prongs of § 1357(a)(2). Defendants cite only one 40-year-old decision, *Contreras v. United State*s, 672 F.2d 307 (2d Cir. 1982), in which the individual also attempted to evade custody, *id.* at 309, and more recently, another circuit rejected that view, *United States v. Harrison*, 168 F.3d 483, 1999 WL 26921, *4 (4th Cir. 1999) (per curiam) (unpublished). Most importantly, the argument cannot be squared with the statutory text. *See* Op. 31-32.

Defendants' factual account of Plaintiffs' arrests is likewise unsupported. Escobar Molina was "walking to his work truck" (not "about to drive away," Br. 35), he "timely applied to renew his TPS status" before his arrest, and his "criminal charge for simple assault was dropped in 2019." Op. 8-9. The district court did not find B.S.R. was "specifically targeted" for arrest on August 18, as Defendants argued. *Id.* 10 & n.15. Plaintiffs dispute B.S.R.'s alleged 2025 criminal charge, and Defendants failed to produce any records thereof. *Id.* Agents opened N.S.'s car door right after he got in and turned his car on. *Id.* 13. And contrary to Defendants' claim that R.S.M. refused to comply with the agents' commands, Br. 36, R.S.M. and her husband promptly passed the agents their documents after asking for clarification, Op. 15; R.S.M. Decl. ¶ 3. Defendants point to no record evidence showing that the district court's factual findings were erroneous, much less clearly so.

In fact, the record points the other way. Plaintiffs' jobs, families, homes in the community, lengths of residence, and other circumstances demonstrate that they were *unlikely* to escape before agents could obtain and execute a warrant. Indeed, B.S.R. was wearing an ICE ankle monitor, which he showed to his arresting agents. B.S.R. Decl. ¶ 14. Defendants do not contest that the agents did not elicit *any* facts relevant to Plaintiffs' escape likelihood before arresting them. Nor do they offer any authority suggesting that the totality of the circumstances in Plaintiffs' arrests established probable cause for escape likelihood.

**4. Defendants' Unlawful Policy Is Final Agency Action.**

The district court correctly determined that Defendants' unlawful policy is a final agency action. Op. 61. An "agency action" includes "the whole or part of an agency rule," 5 U.S.C. § 551(13), which in turn "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). "Final" agency action is one that "mark[s] the consummation of the agency's decisionmaking process and … one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024).

Plaintiffs submitted ample and largely unrebutted evidence that Defendants instituted a policy of conducting warrantless civil immigration arrests in D.C.

without making individualized probable cause determinations as to escape likelihood. The district court's findings on that evidence are factual findings that can be reversed only for clear error. *Clevinger*, 134 F.4th at 1234.

Defendants' policy satisfies both requirements for final agency action. First, the policy marks the consummation of Defendants' decisionmaking process as to how to conduct warrantless civil immigration arrests in the District. High-ranking DHS officials' unequivocal assertions that agents use reasonable suspicion, not probable cause, to make immigration arrests show that the policy is not "of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). This evidence also demonstrates that the policy comes from the top, and thus is "properly attributable to the agency itself" instead of being "only the ruling of a subordinate official." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020).

Second, the policy is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post*, 603 U.S. at 808. To determine whether an agency action "has direct and appreciable legal consequences," this Court "pragmatically focuses on the concrete consequences the action has or does not have as a result of the specific statutes and regulations that govern it." *POET Biorefining*, 970 F.3d at 405. Defendants' policy has concrete consequences for Plaintiffs, who were arrested without a warrant and without individualized probable cause determinations as to escape likelihood, and for CASA,

Inc., both because of its effect on its members and because it impaired CASA, Inc.'s ability to provide core services.

Contrary to Defendants' assertions, final agency action requires no "document demonstrating a deliberative process." Br. 43. This Court repeatedly has made clear that "[a]gency action generally need not be committed to writing to be final and judicially reviewable." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020); *accord Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008) (agency's unwritten policy was final agency action); *see also Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018) ("An agency's unannounced departure in practice from a written regulation is a distinct form of agency action that is challengeable[.]").

Defendants' objections to the district court's reliance on DHS officials' public statements are meritless. They show no clear error in the district court's finding that these statements "made by high-ranking officials … in their official capacity to the press, on DHS's official website, and on DHS's official social media account" and that "were made repeatedly, and publicly, to reach a broad audience, which includes law enforcement officers under DHS's command," should be "taken at face value." Op. 55-57. Defendants' only authority, *In re Murray Energy Corp.*, 788 F.3d 330 (D.C. Cir. 2015), is distinguishable because the agency's statements there were made "[i]n the context of an ongoing rulemaking" and thus were a "proposed view of the

law" with no "legal obligations or prohibitions." *Id.* at 336. Here, by contrast, "Defendants' public statements are *corroborated* by on-the-ground examples from over two dozen declarations describing roughly forty warrantless civil immigration arrests." Op. 57.

Defendants' analogy to *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), also fails. In *Lujan*, the plaintiffs challenged "continuing (and thus constantly changing) operations" unconnected to any "identifiable 'agency action.'" *Id.* at 890. Here, Plaintiffs challenge a discrete agency action: Defendants' policy of making warrantless civil immigration arrests using a lesser standard than what the statute and implementing regulation require. Plaintiffs do not challenge individual arrests; they challenge a policy common to the arrests. Nor do Plaintiffs mount a "broad programmatic attack" like the one the Court found objectionable in *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Plaintiffs do not lodge a generalized complaint about how Defendants conduct immigration arrests; they challenge a discrete and specific agency policy.

The presumption of regularity, which Defendants invoke in passing, likewise offers no aid. The presumption of regularity is an evidentiary presumption that applies only in "ordinary case[s]" where government officials are following standard practices indicative of adherence to their duty to faithfully execute the laws. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). The evidence here shows this is not

such a case. Regardless, the record evidence overcomes the presumption even were it to apply here. *See Wilson v. United States*, 369 F.2d 198, 200 (D.C. Cir. 1966).

Defendants' other arguments also fail. Defendants speculate that "countless examples" of arrests complying with § 1357 "likely exist," Br. 43, but do not (and did not below) offer evidence for this proposition. They do not even address, let alone rebut, the "declarations describing roughly forty" arrests in violation of § 1357(a)(2). Op. 57. As noted above, *supra* p. 5 n.3, Defendants also assert for the first time that the Broadcast was reissued on October 22, 2025. Br. 44. Below, the court noted "Defendants do not address [the] history [of the Broadcast] in their brief, and the exact status of the Broadcast remains unclear." Op. 60. It nonetheless concluded based on the evidence that "[i]n any event, one directive from 2022 cannot outweigh the host of more recent evidence indicating that a lower standard than probable cause is being implemented." *Id.* Defendants' late assertion does nothing to disturb that factual conclusion, let alone show it to be clearly erroneous.

**B. Plaintiffs Face Irreparable Harm Without an Injunction.**

The district court correctly found that Plaintiffs faced irreparable harm absent a preliminary injunction. Harm is irreparable if it is "certain and great," "actual and not theoretical," sufficiently imminent to create a "clear and present need" for relief, and beyond remediation. *League of Women Voters*, 838 F.3d at 7-8. Plaintiffs established each element.

As this Court has long recognized, an arrest inflicts an "irreparable loss of personal liberty." *Rubinstein v. Brownell*, 206 F.2d 449, 456 (D.C. Cir. 1953); *see also Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018); *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988). The harm of unlawful detention "is not compensable in damages." *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017).

Defendants do not dispute Plaintiffs would suffer loss of liberty if unlawfully arrested again or that the injury is irreparable. They instead reprise their standing arguments to challenge imminence. Those arguments fail for the reasons discussed above. *Supra* pp. 16-28. The district court correctly determined that Plaintiffs' harms are sufficiently imminent because they "are subject to a much heightened risk of … re-arrest given that they fall within the targeted group for such arrests." Op. 64. The individual Plaintiffs and class members all live and/or travel in D.C. and were arrested close to their homes, jobs, or while commuting to work or other common sites of daily life, such as the grocery store or medical appointments.

Defendants do not address, and thus forfeit any objection to, CASA, Inc.'s irreparable harm. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). Defendants' actions "have perceptibly impaired [its] programs" and "directly conflict with [its] mission." *League of Women Voters*, 838 F.3d at 8; CASA, Inc. Decl. ¶¶ 15-21 (impairment of CASA, Inc.'s programs and ability to carry out its mission of

assisting members with securing long-term status and services).

The district court thus correctly held that Plaintiffs would suffer irreparable harm absent an injunction.

### C. The Equities and Public Interest Favor Plaintiffs.

The district court correctly held that the balance of equities and public interest—which merge when the government is the opposing party, *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)—favor Plaintiffs. "[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate." Op. 66 (quoting *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977)).

Defendants contend that the government is irreparably injured whenever it is "enjoined … from effectuating statutes enacted by representatives of its people." Br. 57 (citation omitted). But this injunction does the opposite: It prohibits Defendants and their agents from enforcing a policy that *violates* § 1357(a)(2). Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

The injunction also does not "micromanage every immigration arrest" or "dictate[] what probable-cause factors an immigration officer can consider." Br. 57. The district court enjoined Defendants from "enforcing their policy" of making warrantless arrests without probable cause as to escape likelihood, rather than

enjoining unlawful warrantless arrests themselves, which could have risked involving the court in adjudicating the legality of each warrantless arrest. That approach avoids case-by-case judicial management of arrests, "resolv[ing]" any "concern about judicial micromanagement." Op. 68. Nor does the injunction "dictate[]" the factors Defendants' agents must weigh: The district court recognized that "probable cause is a fact-specific, totality of the circumstances inquiry." *Id.* 67. The injunction reflects that principle. It lists factors for Defendants to include in arrest documentation that mirror those in their own prior policy but does not require them to consider any specific factors or to conduct the inquiry in any particular way. PI Order 2-3.

The injunction does not impede lawful immigration arrests; it merely forbids Defendants' policy of making *unlawful* arrests. *See League of Women Voters*, 838 F.3d at 12. The equities and public interest thus decisively favor the injunction.

### D. The Injunction Is Properly Tailored and Complies with Rule 65(d).

Plaintiffs did not seek, and the district court did not enter, an impermissible "follow-the-law" injunction. Br. 59. The preliminary injunction, in pertinent part, (1) forbids Defendants from enforcing their policy of making warrantless civil immigration arrests in D.C. without a pre-arrest individualized determination of probable cause for escape likelihood, (2) requires Defendants' agents to document "the facts and circumstances" surrounding warrantless immigration arrests in D.C.,

and (3) requires Defendants to periodically release that documentation to Plaintiffs' counsel. It "state[s] its terms specifically" and "describe[s] in reasonable detail … the act or acts required." Fed. R. Civ. P. 65(d).

Defendants' objections are meritless. As the district court recognized, "there is no bar on injunctions that order the defendant to cease conduct identified as violating a statute." Op. 83 n.51. This Court has held that "[e]ven if it tracks statutory language," an injunction "is not too vague if it relates the enjoined violations to the context of the case." *United States v. Philip Morris USA*, *Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). Here, where the extensive evidentiary record demonstrates "continuing and persistent violations of [a statute]," enjoining "practices which were violations of [the statute]," as this injunction does, is "wholly warranted." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

Defendants' objections to the scope of the injunction are self-contradictory. They assert that the injunction lacks sufficient detail while also accusing it of directing agents how to weigh probable cause factors and "rigidly prescrib[ing]" the form and content of the arrest documentation. Br. 60-61. Neither characterization withstands scrutiny. *First*, Defendants forfeited these objections to the reporting requirements by not raising them when they had the opportunity to object to the scope of Plaintiffs' requested relief. Dkt. 64-1 (Defs.' Corrected Supp. Br.) at 3-4; *Trudel v. SunTrust Bank*, 924 F.3d 1281, 1285 (D.C. Cir. 2019). *Second*, the

injunction does not prescribe the form or content of the documentation. Defendants' counsel admitted below that "officers are already required to fill out a form to 'describe the basis for the civil immigration arrest.'" Op. 67. The reporting requirements accord with Defendants' preexisting practices. Defendants' actual arrest documentation under the injunction has consisted of Form I-213s—a standard form ICE has used for decades that already contains a section where agents describe the encounter in narrative form. *Third*, the injunction does not direct agents to "assign weight to certain factors and discount others." Br. 61. It lists facts "required to be documented pursuant to" the Broadcast—Defendants' own prior policy—and requires agents to note community ties "if known at the time of arrest." PI Order 2-3. Nothing in the injunction dictates how agents conduct the probable-cause inquiry.

Defendants' objection to enjoining the Drug Enforcement Administration ("DEA") is equally meritless. N.S. swore that one of his arresting agents wore a vest marked "DEA," whereas Defendants provided no evidence that the individual was not a DEA agent. Op. 63 n.47.

## II. The Provisional Class Certification Order Is Not Properly Before This Court and Is Correct in Any Event.

### A. This Court Lacks Jurisdiction over the Class Certification Order.

Defendants cannot obtain review of class certification through this appeal. First, their notice of appeal expressly designated only the injunction, not class certification. Dkt. 73. Federal Rule of Appellate Procedure 3(c)(1)(B) requires the

notice of appeal to "designate the judgment—or the appealable order—from which the appeal is taken," and that requirement is jurisdictional. *Smith v. Barry*, 502 U.S. 244, 248 (1992). Although the notice listed docket numbers containing both the preliminary injunction and class certification because the district court decided them simultaneously, the notice expressly designated only the order and opinion "granting Plaintiffs' motion for a preliminary injunction." Dkt. 73. Even where a notice lists a docket number covering multiple orders, courts have reviewed only the ruling(s) specified in the notice. *Short v. Billings Cnty.*, 138 F.4th 1072, 1076 n.4 (8th Cir. 2025) (declining to review motion to dismiss ruling even though notice identified docket number including that ruling where the notice said "in so far as it determined and adjudged that [plaintiffs] are entitled to a preliminary injunction").

Second, even if Defendants had included class certification in their notice of appeal, review would still be unavailable. A class certification order is not immediately appealable except under Federal Rule of Civil Procedure 23(f). Rule 23(f) permits interlocutory review of an order granting or denying class certification (except for an order under Rule 23(e) preliminarily certifying a class for settlement purposes) only if the "petition for permission to appeal" is filed "within 45 days after the order is entered" where the United States (or its agencies or officers) is a party. Rule 23(f) is "strict and mandatory." *In re DC Water & Sewer Auth.*, 561 F.3d 494, 495 (D.C. Cir. 2009). Although it is non-jurisdictional, its "time limit is purposefully

unforgiving" and may not be equitably tolled. *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 196 (2019). Defendants never filed a Rule 23(f) petition, and noticed their appeal—which did not mention class certification—over two weeks after the Rule 23(f) deadline.

Pendent jurisdiction cannot cure this failure. Such jurisdiction is available only where the nonappealable order is "inextricably intertwined" with the properly appealed decision or review is "necessary to ensure meaningful review of the latter." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995). This Court exercises pendent jurisdiction "sparingly and only when substantial considerations of fairness or efficiency demand it." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 104 F.4th 287, 298 (D.C. Cir. 2024). A broader rule would undermine the certification process required by Congress for interlocutory decisions, 28 U.S.C. § 1292(b), and "encourage parties to parlay … collateral orders into multi-issue interlocutory appeal tickets." *Swint*, 514 U.S. at 49-50.

The class certification decision here is not inextricably intertwined with the preliminary injunction. Class certification turns on whether Rule 23's requirements, such as numerosity and commonality, are satisfied, whereas the injunction depends on a likelihood of success on the merits and irreparable harm, among other factors. "[I]ssues are not inextricably intertwined where their resolution requires application of separate and distinct legal standards" that "turn on wholly different factors." *Arc*

*of Cal. v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014); *see also Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 765 (D.C. Cir. 2023) (declining to exercise pendent jurisdiction over decision to decertify Fair Labor Standards Act collective action where party appealed class certification in part because the decisions "turn[] on … distinct legal analys[es]").

Nor is review of class certification necessary to ensure meaningful review of the injunction. This Court can decide the issues relevant to the injunction—jurisdiction, whether the policy violates § 1357(a)(2), irreparable harm, and the equities—without addressing Rule 23. It "can resolve the preliminary injunction issue without even a reference to the order [granting] class certification." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 450 (3d Cir. 1982); *see also, e.g.*, *Church*, 30 F.3d at 1347 n.10 (declining to review "any issues involving the class definition … because such review is not necessary to our review of the preliminary injunction"); *Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 152 (2d Cir.1983). Indeed, it is "instructive" that the district court "disposed of the preliminary injunction issue in its entirety before addressing the motion for class certification." *Kershner*, 670 F.2d at 450.

### B. The District Court Did Not Abuse Its Discretion in Provisionally Certifying the Class.

Even if this Court reaches the merits, Defendants' challenge fails.

**1.** Defendants repeat their standing arguments, which fail for the reasons

explained above. *Supra* pp. 16-28. In the Rule 23(b)(2) class context, courts review only the named plaintiffs' standing; absent class members need not independently show standing. *See J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019).

Defendants also gesture toward an "ascertainability problem," but do not explain it, Br. 48, and in any event forfeit the objection by failing to raise it below, *Trudel*, 924 F.3d at 1285. This Court has not yet addressed whether Rule 23 requires ascertainability. *J.D.*, 925 F.3d at 1320. For (b)(2) classes, "the rationale for precise ascertainability is inapposite," as the First and Tenth Circuits have held. *D.L. v. District of Columbia*, 302 F.R.D. 1, 17 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017) (citing *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) and *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir.1972)). Even were ascertainability required by Rule 23, class membership here turns on objective criteria—whether a person has been or will be subject to a warrantless civil immigration arrest without an individualized determination of probable cause as to escape likelihood—so there is no ascertainability problem. *See J.D.*, 925 F.3d at 1320.

**2.** Of Rule 23(a)'s four requirements, Defendants dispute numerosity, commonality, and typicality.

**Numerosity.** There is no magic number for numerosity; instead, it is satisfied where "joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Numerosity "is presumed at a level of 40 members." *D.L.*, 302 F.R.D. at 11. And "classes

including future claimants generally meet the numerosity requirement due to the impracticality of counting such class members, much less joining them." *J.D.*, 925 F.3d at 1322.

Defendants are wrong that a news article was Plaintiffs' "primary" evidence for numerosity. Br. 50. Plaintiffs relied on "roughly forty" unlawful warrantless arrests documented in sworn declarations. Op. 75. Defendants' assertion that there is no "objective criteria" for determining class size, Br. 50, is also incorrect. The class consists of people like Plaintiffs and the declarants whose arrests lack any probable-cause assessment as to escape likelihood: Membership in the class hinges on Defendants' application of their unlawful policy, not fact-specific probable-cause determinations in individual arrests.

**Commonality.** The district court correctly held that Plaintiffs "satisfied the commonality requirement because their provisional class seeks to challenge a system-wide practice or policy affecting all putative class members—namely, [D]efendants' alleged policy and practice of conducting warrantless civil immigration arrests without the required finding of escape risk." Op. 76.

Defendants' arguments rest on a misconception of Plaintiffs' claims. Plaintiffs do not ask whether probable cause for escape likelihood existed in each arrest; they challenge Defendants' failure to make a pre-arrest individualized assessment for escape likelihood *at all*, across the class. Although the "validity of a warrantless

[arrest] is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case," that is "quite different from the question of the adequacy [and lawfulness] of the procedur[es]" used to arrest putative class members. *Sibron v. New York*, 392 U.S. 40, 59 (1968); *see also Gerstein v. Pugh*, 420 U.S. 103, 116-19 (1975). Varying individual circumstances do not defeat commonality because Defendants abandoned the probable cause determination for escape likelihood altogether.

Defendants' reliance on *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982), and *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006), is misplaced. In *Falcon*, commonality failed because the plaintiff provided evidence only for his own claim; his allegation that there was a company policy of discrimination was "otherwise unsupported." 457 U.S. at 157-58. In *Garcia*, plaintiffs failed to "make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the [defendant's] challenged … decisions." 444 F.3d at 632. Those concerns do not apply here, where the extensive evidentiary record establishes Defendants' common policy.

*Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249 (9th Cir. 2024), is even further afield. That case involved the *predominance* requirement for Rule 23(b)(3) money damages classes. *Id.* at 1258-62. That requirement is "more

demanding" than Rule 23(a)'s commonality requirement and does not apply to Rule 23(b)(2) injunctive relief classes like this one. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

**Typicality.** Factual variations in Plaintiffs' arrests do not defeat typicality. *Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987). "Typicality differs from commonality in that typicality concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims." *J.D.*, 925 F.3d at 1322. Plaintiffs' claims are typical because each individual Plaintiff was arrested "without a warrant and without consideration of escape risk." Op. 78-79. Individual variations do not matter for typicality for the same reasons they do not matter for commonality. *See J.D.*, 925 F.3d at 1322.

**3.** Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Plaintiffs seek to represent individuals suffering the *same* injury (the threat of unlawful rearrest) caused by the *same* act (Defendants' policy of making warrantless immigration arrests without assessing escape likelihood) and remediable by the *same* preliminary injunctive relief (an injunction against that policy). This is a quintessential Rule 23(b)(2) class: "Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common

claims arise from systemic harms that demand injunctive relief." *D.L. v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017); *see also In re District of Columbia*, 792 F.3d 96, 102 (D.C. Cir. 2015) ("Rule 23(b)(2) was intended for civil rights cases.").

Defendants' arguments about factual variations fail for the reasons explained above. *Supra* pp. 47-49. Their contention that the injunction "will not necessarily redress the injuries of future class members," Br. 53, lacks basis. The injunction redresses the classwide injury by preventing Plaintiffs and class members from being unlawfully rearrested pursuant to Defendants' policy.

For these reasons, this Court should not reach the provisional class-certification order; if it does, it should affirm.

## III. The Enforcement Order Is Not Properly Before This Court or, Alternatively, Should Be Affirmed.

### A. This Court Lacks Jurisdiction over the Enforcement Order.

The Court lacks jurisdiction to review the enforcement order for two reasons.

First, as noted above, Federal Rule of Appellate Procedure 3(c)(1)(B) requires the notice of appeal to "designate the judgment—or the appealable order—from which the appeal is taken." This "dictate[] [is] jurisdictional in nature, and [its] satisfaction is a prerequisite to appellate review." *Barry*, 502 U.S. at 248. Here, Defendants' notice of appeal listed only the order granting the preliminary injunction and the accompanying opinion. Dkt. 73. They neither timely noticed a second appeal

of the enforcement order nor amended their initial notice. So the enforcement order is not properly before the Court. *See Araya v. JPMorgan Chase Bank*, 775 F.3d 409, 412 (D.C. Cir. 2014).

Second, even if Defendants had timely noticed an appeal, § 1292(a)(1) still would not confer appellate jurisdiction. That provision authorizes immediate review only of an order that "modif[ies]" an injunction, not one that merely enforces or clarifies an existing injunction. 28 U.S.C § 1292(a)(1); *AFGE Local 2305 v. U.S. Dep't of Veterans Affs*, 177 F.4th 1, 14 (1st Cir. 2026). The "highly circumscribed" inquiry turns on the enforcement order's actual, practical effect: A clarification merely restates the parties' existing legal relationship in more specific terms, whereas a modification changes the earlier command, imposes a new substantive duty, or substantially readjusts that relationship. *Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1170-71 (10th Cir. 2009). Courts therefore treat an enforcement order as a modification only if it "constitutes a gross or blatant misinterpretation of the original injunction"; they may not "plunge into the details" and thereby "collapse the jurisdictional inquiry into a decision on the merits, thwarting the purpose of § 1292(a)(1)." *Id.* at 1171; *see also New York v. Trump*, 171 F.4th 1, 29-30 (1st Cir. 2026).

The enforcement order neither granted a new injunction nor modified the preliminary injunction. Plaintiffs sought enforcement of the existing, policy-level

prohibition by barring reliance on the Lyons Memo's probable cause standard and analytical approach, which contravene the injunction. Defendants themselves conceded below that the district court retained jurisdiction to enforce the existing injunction and that the Lyons Memo described the policy governing warrantless civil immigration arrests and was relevant to determining compliance. Dkt. 94 (Defs' Supp. Mem.) at 2-4. Indeed, Defendants invoked the Memo as evidence that they were complying with the injunction. *Id.* at 4. Defendants cannot now transform the district court's rejection of that evidence into a new substantive command, let alone a basis for appellate jurisdiction.

The First Circuit's recent decision in *AFGE Local 2305* is illustrative. There, the court held that provisions imposing new compliance and grievance-processing duties likely modified an injunction, but a ruling that post-injunction conduct violated the existing injunction did not. 177 F.4th at 14-21. The enforcement order here falls on the nonappealable side of that line: The district court merely applied the preliminary injunction's existing policy-level prohibition to a memorandum Defendants offered as proof of compliance. Its conclusion that the proffered Memo instead showed noncompliance enforced the original command; it did not modify it. This Court therefore lacks jurisdiction to review the enforcement order because it is not independently appealable under § 1292(a)(1).

### B. The Enforcement Order Properly Enforced the Preliminary Injunction.

In any event, Defendants' challenge to the enforcement order fails on the merits.

Defendants argue that the district court misread the Lyons Memo by focusing on its repeated references to whether a person would remain at the scene rather than on the Memo's opening definition of "likely to escape," and they complain that the district court did not read the Memo as a whole. Br. 63-64. The record shows otherwise. The district court's holistic reading of the Memo, including how it actually instructed officers, led to the inexorable conclusion that the Memo instructed officers to conduct warrantless arrests in a manner inconsistent with the injunction. Enforcement Op. at 20-29. Although the Memo's opening definition of escape risk referred to whether a person could be found "at the scene of the encounter or another clearly identifiable location," its operative guidance repeatedly omitted the latter part and instead focused on whether a person was likely to remain at the scene. Lyons Memo at 3-5.

Evidence of the Memo's implementation confirms the point: Based on ICE's own arrest reports, the district court found that "officers in the field appear to share the same understanding of the Lyons Memo as [P]laintiffs." Enforcement Op. at 24 (emphasis omitted). Defendants also conceded below that the Memo's vehicle guidance did not fully integrate the preliminary injunction because it treated a

person's ability to depart from the scene as effectively dispositive and did not account for whether the person could later be located at "another clearly identifiable location," such as home or a workplace, once a warrant was obtained. Defs' Supp. Mem. at 7-8. The district court separately found that the Memo omitted community ties even though Defendants conceded below that family, employment, and other ties may be relevant to escape likelihood. Enforcement Op. at 25-29; Defs' Supp. Mem. at 8.

Defendants' no-duty-to-investigate and micromanagement arguments, Br. 57, 65, fare no better. Neither the preliminary injunction nor the enforcement order requires officers to reconstruct an arrestee's life story or dictates that any particular factor must always control. They simply require what § 1357(a)(2) itself requires: an individualized probable cause determination that the person is likely to escape before a warrant can be obtained. The district court did not fault the Lyons Memo for omitting a mandatory checklist. Rather, it determined that the Memo violates the preliminary injunction because of its "flawed definition of escape risk" and "failure to instruct officers to consider community ties." Enforcement Op. at 37. As the district court explained, community ties are relevant to the proper individualized assessment of probable cause because they present evidence that weighs against a finding of a likelihood of escape. *Id.* at 25-29. Moreover, a policy that fails to account for community ties at all "runs counter … to precedent." *Id.* at 28 (citing *La Franca*

*v. INS*, 413 F.2d 686, 689 (2d Cir. 1969).

The enforcement order thus did what enforcement orders do: It applied the existing injunction to agency guidance that Defendants themselves submitted as evidence of compliance, and enjoined reliance on that guidance only to prevent implementation inconsistent with the injunction. If reached, the enforcement order should be affirmed.

## CONCLUSION

The Court should affirm the preliminary injunction. The class certification and enforcement orders should not be reached or should be affirmed.

Dated: September 28, 2026

Respectfully submitted,

/s/ Aditi Shah
Aditi Shah
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 420
Washington, DC 20045
(202) 457-0800
ashah@acludc.org
smichelman@acludc.org

Jehan A. Patterson
Alexandra Widas
Hassan Ahmad
Sean Berman
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com
awidas@cov.com
hahmad@cov.com
sberman@cov.com

Sirine Shebaya
Yulie Landan
Bridget Pranzatelli
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW, Suite 175
Washington, D.C. 20009

Adina Appelbaum
Ian Austin Rose
Samantha Hsieh
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW, Suite 701
Washington, D.C. 20036

(202) 331-3320
adina@amicacenter.org
austin.rose@amicacenter.org
sam@amicacenter.org

(213) 430-5521
sirine@niplg.org
yulie@nipnlg.org
bridget@nipnlg.org

Kathryn Huddleston
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
khuddleston@aclu.org

Ama Frimpong
Shana Khader
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
(240) 485-8844
afrimpong@wearecasa.org
skhader@wearecasa.org

Madeleine Gates
Ryan C. Downer
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, #400
Washington, D.C. 20005
(202) 319-1000
madeleine_gates@washlaw.org
ryan_downer@washlaw.org

*Counsel for Plaintiffs-Appellees*[5]

[5] Counsel wish to express their appreciation to ACLU-DC paralegal Ameerah Adetoro, fellows Abhi Nathan and Lauren Pelosi, and ACLU intern Kathryn Tso for their assistance in the preparation of this brief.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that my word processing program, Microsoft Word, counted 12,993 words of the foregoing brief, excluding those portions exempted by Federal Rule of Appellate Procedure 32(f), and that this complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

*/s/ Aditi Shah*
Aditi Shah

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system, which will send notice to all counsel who are registered CM/ECF users.

*/s/ Aditi Shah*
Aditi Shah