NOT YET SCHEDULED FOR ORAL ARGUMENT

Case No. 26-5045

IN THE

# United States Court of Appeals for the District of Columbia Circuit

JOSÉ ESCOBAR MOLINA, *et al.*,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants-Appellants*.

*On Appeal from the United States District Court for the District of Columbia*

**BRIEF OF AMICI CURIAE THE CATO INSTITUTE, FAIR AND JUST PROSECUTION, AND THE LAW ENFORCEMENT ACTION PARTNERSHIP IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Preston Shipp
Estela Dimas
Octavia Carson
FAIR AND JUST PROSECUTION
pshipp@fairandjustprosecution.org
edimas@fairandjustprosecution.org
ocarson@fairandjustprosecution.org

Dated: October 16, 2026

Matthew P. Cavedon
*Counsel of Record*
Michael Z. Fox
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(706) 309-2859
mcavedon@cato.org
*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel certifies:

**Parties and *Amici Curiae*:**

**a.** All parties, intervenors, and amici appearing before the district court and in this Court are listed in the government's brief except for the *amici* filing this brief.

**b.** The Cato Institute is a not-for-profit corporation, exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3); it has no parent corporation; and no publicly held company has a 10% or greater ownership interest in the Cato Institute.

**c.** The Law Enforcement Action Partnership is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials who advocate for criminal justice and drug policy reforms that will make our communities safer and more just.

**d.** Fair and Just Prosecution, a project of the Tides Center, brings together elected prosecutors from both urban and rural communities around the nation as part of a network of leaders committed to a justice system grounded in fairness, equity, compassion, and fiscal responsibility.

**<u>Rulings Under Review</u>:**

References to the rulings at issue appear in the government's brief.

**<u>Related Cases</u>:**

This case was not previously before this Court.

/s/ Matthew P. Cavedon
*Counsel for Amici Curiae*
*Cato Institute*

Dated: October 16, 2026

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the Cato Institute is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. Pursuant to D.C. Circuit Rule 26.1(b), the Cato Institute states that it is a 501(c)(3) nonprofit organization dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice focuses on the proper role and scope of the criminal justice system in a free society.

*Amicus curiae* the Law Enforcement Action Partnership (LEAP) is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials who advocate for criminal justice and drug policy reforms that will make our communities safer and more just.

*Amicus curiae* Fair and Just Prosecution, a project of the Tides Center, brings together elected prosecutors from both urban and rural communities around the nation as part of a network of leaders committed to a justice system grounded in fairness, equity, compassion, and fiscal responsibility.

Dated: October 16, 2026

/s/ Matthew P. Cavedon
*Counsel for Amici Curiae*
*Cato Institute*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. iii

TABLE OF CONTENTS ............................................................................ iv

TABLE OF AUTHORITIES ...........................................................................v

INTEREST OF *AMICI CURIAE* .....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ...............................................................................................4

I. THE PRELIMINARY INJUNCTION UPHOLDS THE FOURTH AMENDMENT. ...........................................................................................4

II. THE PRELIMINARY INJUNCTION UPHOLDS THE FIFTH AMENDMENT. ...........................................................................................8

A. Warrantless Immigration Arrests Based on Race, Ethnicity, and Appearance Violate the Fifth Amendment. ............................................9

B. Across the Nation, Immigration Agents Have Disregarded Legal Constraints to Inflate Arrest Numbers. ..................................................12

III. ABSENT THE PRELIMINARY INJUNCTION, TRUST IN LAW ENFORCEMENT WILL CONTINUE TO WANE. ...................................15

A. The Administration's Prioritization of Low-Level Immigration Enforcement Undermines Legitimate Policing. ....................................15

B. Aggressive Immigration Enforcement Tactics Impair Institutional Legitimacy.........................................................................................18

CONCLUSION ............................................................................................21

CERTIFICATE OF COMPLIANCE.................................................................22

CERTIFICATE OF SERVICE .........................................................................23

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995)........9

*Au Yi Lau v. INS*, 445 F.2d 217 (D.C. Cir. 1971)........7

*Bolling v. Sharpe*, 347 U.S. 497 (1954)........9

*Boyd v. United States*, 116 U.S. 616 (1886)........5

*Entick v. Carrington*, 19 How. St. Tr. 1029 (1765)........5

*Escobar Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d 22 (D.D.C. 2026)........6

*Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023)........11

*Harris v. United States*, 331 U.S. 145 (1947)........4

*Hirabayashi v. United States*, 320 U.S. 81 (1943)........9

*Maryland v. Pringle*, 540 U.S. 366 (2003)........7

*Stanford v. Texas*, 379 U.S. 476 (1965)........3, 5

*Trump v. Illinois*, 146 S. Ct. 432 (2025)........2, 3

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)........3

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)........7

*United States v. Watson*, 423 U.S. 411 (1976)........6

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975)........9

*Whren v. United States*, 517 U.S. 806 (1996)........2, 3

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)........10, 11

**Statutes**

8 U.S.C. § 1357(a)(2)........7

D.C. Code § 24-211.07........19

**Other Authorities**

Alyssa Fowers & Emma Uber, P*ark Police Arrests Have Nearly Doubled Since Trump's Federal Law Enforcement Surge*, CITY CAST DC (Sept. 14, 2026)........19

Anna Giaritelli, *Stephen Miller 'eviscerated' ICE officials in private meeting for low deportation numbers*, WASH. EXAM'R (May 30, 2025) ..........................16

Ashleigh Fields, *Majorities of Americans disapprove of how ICE operates*, THE HILL (Nov. 15, 2025) ..........................................................................15

Buzz McClain, *New WashPost-Schar School Poll: 8 of 10 Oppose Federal Law Enforcement in D.C.*, SCHAR SCH. OF POL'Y & GOV'T, GEO. MASON UNIV. (Aug. 20, 2025)..........................................................................20

COMM. ON PUB. WORKS & OPS., COUNCIL OF D.C., ROUNDTABLE REPORT ON POTENTIAL HUMAN RIGHTS VIOLATIONS DUE TO FEDERAL GOVERNMENT INTRUSION (Jan. 8, 2026) ..........................................................................20

David J. Bier, *ICE Has Diverted Over 25,000 Officers from Their Jobs*, CATO INST. (Sept. 3, 2025)........................................................................ 17, 18

David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, CATO INST. (Aug. 5, 2025) ............................12

Exec. Order No. 14,333, 90 Fed. Reg. 39,301 (Aug. 11, 2025) ......................... 2, 19

Francisco Alvarado, *Fear of ICE raids creates chilling effect at South Florida construction sites*, YAHOO! NEWS (July 24, 2025) .............................................13

Graeme Blair et al., *Understanding the Summer 2026 Surge in ICE Arrests*, DEPORTATION DATA PROJECT (Sept. 8, 2026) ............................................... 12, 16

Gwynne Hogan et al., *There Were 430 ICE Street Arrests in the New York Area. More than 93% Targeted Latinos*, THE CITY (May 27, 2026) ...................13

Jessica James & Rebecca Turco, *DC Council Committee Calls for Mayor, Interim Chief to End Police Cooperation with ICE*, WJLA (Jan. 8, 2026).. 19, 20

José Olivares, *US immigration officers ordered to arrest more people even without warrants*, THE GUARDIAN (June 4, 2025) .......................................... 9, 15

Ken Dilanian & Julia Ainsley, *FBI returning agents to counterterrorism work after diverting them to immigration*, NBC NEWS (June 24, 2025) .......................17

Memorandum from Todd M. Lyons, Senior Official Performing the Duties of the Dir., U.S. Immigr. & Customs Enf't, to All ICE Personnel, *Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests* (Jan. 28, 2026) ..................................................................6

MINORITY STAFF OF THE PERMANENT SUBCOMM. ON INVESTIGATIONS OF THE S. COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFAIRS, 119TH CONG., UNCHECKED AUTHORITY: EXAMINING THE TRUMP ADMINISTRATION'S EXTRAJUDICIAL IMMIGRATION DETENTIONS OF U.S. CITIZENS (Comm. Print 2025)........17

Miriam Waldvogel, *Homan Claims ICE Officers "Don't Need Probable Cause" to "Briefly Detain" People*, THE HILL (July 11, 2025, 1:21 PM)........12

Mot. for Prelim. Inj. re: Suspicionless Stops & Violation of Equal Protection, *Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP (C.D. Cal. July 27, 2026) ........13

Nicole Foy et al., *506 U.S. Citizens Detained*, PROPUBLICA (Oct. 6, 2026) ...... 6, 13

President Ronald Reagan, Remarks at the Presentation Ceremony for the Presidential Medal of Freedom (Jan. 19, 1989)........8

PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING (2015)........18

Press Release, U.S. IMMIGR. & CUSTOMS ENF'T, *ICE Operation Safe Community—Washington, D.C. Nets More than 1,300 Arrests Throughout Virginia, Maryland* (Aug. 26, 2026) ........16

Ryan Mancini, *39 percent approve of Trump performance on immigration: Survey*, THE HILL (Aug. 3, 2026)........15

Sadie Gurman et al., *How Trump's Sweeping Expulsions Have Thrown the FBI Into Chaos*, WALL ST. J. (Feb. 5, 2025)........17

*Shelby Bremer, DEA special agent in charge of San Diego discusses immigration, US-Mexico border*, NBC SAN DIEGO (Mar. 8, 2025)........17

*Sixteen indictments returned for previously deported illegal aliens identified in recent immigration enforcement actions*, IRS (June 18, 2025) ........17

*Survey: Americans Disapprove of Federal Agents' Enforcement Tactics*, STATES UNITED DEMOCRACY CTR. (Apr. 23, 2026) ........15

Thomas K. Clancy, *The Framers' Intent: John Adams, His Era, and the Fourth Amendment*, 86 IND. L.J. 979 (2011) ........5

*Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP, 2026 U.S. Dist. LEXIS 214808 (C.D. Cal. Sept. 2, 2026) ........14

*Venegas v. Homan*, No. 1:25-cv-00397-JB-N, 2026 U.S. Dist. LEXIS 215608 (S.D. Ala. Sept. 21, 2026) ........ 6, 14

**Constitutional Provisions**

U.S. CONST. amend. V ....................................................................................9

## INTEREST OF *AMICI CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice was founded in 1999 and focuses in particular on the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers.

Fair and Just Prosecution (FJP), a project of the Tides Center, is a national organization that brings together elected prosecutors from around the country as part of a nonpartisan network of leaders committed to a justice system grounded in fairness, equity, compassion, and fiscal responsibility. The leaders that FJP works with hail from over 60 jurisdictions—urban, suburban, and rural alike. Among its work, FJP develops and helps to implement policies that serve the two primary interests the prosecutors in our network are obligated to pursue: justice and public safety.

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money intended to fund the brief's preparation or submission.

The Law Enforcement Action Partnership (LEAP) is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials who advocate for criminal justice and drug policy reforms that will make our communities safer and more just. Founded by five police officers in 2002 with a sole focus on drug policy, today LEAP's speakers bureau numbers more than 275 criminal justice professionals advising on police-community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support of allied efforts, LEAP reaches audiences across a wide spectrum of affiliations and beliefs, calling for more practical and ethical policies from a public safety perspective.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Nonetheless, since President Trump declared a Crime Emergency on August 11, 2025,[2] federal agents have poured into the nation's capital, arresting individuals they perceive to be Latino without warrants and without probable cause. Compl. at 1. While "officers must not make interior immigration stops or arrests based on race or ethnicity," *Trump v. Illinois*, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J.,

[2] Exec. Order No. 14,333, 90 Fed. Reg. 39,301 (Aug. 11, 2025).

concurring), federal agents have arrested residents based entirely on their ethnicity, "send[ing] these individuals to detention centers far away from their families and lawyers." Compl. at 1.

Color-coded campaigns of official harassment are unconstitutional. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886–87 (1975) (holding that apparent Mexican ancestry alone is insufficient to justify a stop); *Whren*, 517 U.S. at 813. "The Fourth Amendment requires that immigration stops be based on reasonable suspicion of illegal presence, stops must be brief, [and] arrests must be based on probable cause . . . ." *Trump*, 146 S. Ct. at 436 n.4 (Kavanaugh, J., concurring). These rules, born of aversion to British subjugation in the colonial era, were adopted to prevent abuses such as those federal agents have been inflicting upon District residents. England's general warrant regime gave the King's agents "blanket authority" to search wheresoever they pleased. *Stanford v. Texas*, 379 U.S. 476, 481 (1965). That tyranny, which "had so bedeviled the colonists," led to the adoption of the Fourth Amendment. *Id.* However, the Department of Homeland Security (DHS) has resurrected the ancient abuses by stopping and seizing individuals based on nothing more than their outward appearance—a violation of not only the Fourth Amendment but the implicit guarantee of equal protection of the law enshrined in the Fifth Amendment's Due Process Clause.

These operations have devastated public confidence in law enforcement. The Administration's mass deportation agenda has set immigrant communities and their local police at odds, compromising public safety in the process. The ensuing distortion of law enforcement priorities has also been profound: thousands of state and federal officials have been pulled away from operations targeting terrorism, child exploitation, and human trafficking in order to smoke out low-level immigration violations.

If the Administration has its way, DHS's manhandling of the nation's capital will continue. Absent the preliminary injunction, federal agents will be able to resume arresting Latinos without probable cause, violating their Fourth and Fifth Amendment rights. This Court should affirm the district court's order enjoining such lawlessness.

## ARGUMENT

### I. THE PRELIMINARY INJUNCTION UPHOLDS THE FOURTH AMENDMENT.

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Its protections are not some "outworn bit of Eighteenth Century romantic rationalism but an indispensable need for a democratic society." *Harris v. United States*, 331 U.S. 145, 161 (1947) (Frankfurter, J., dissenting). Casting its strictures aside, federal immigration officials have set out to conduct as

many arrests as possible, even if that means arresting people without prior knowledge of who they are, whether they are in the country illegally, or whether they pose a flight risk. Compl. 6–7, 9–10.

The Framers understood that the unchecked power to stop, seize, question, and search conferred by general warrants would be "more pernicious to the innocent than useful to the public." *Boyd v. United States*, 116 U.S. 616, 629 (1886) (quoting *Entick v. Carrington*, 19 How. St. Tr. 1029 (1765)). Thus, they enacted the Fourth Amendment to safeguard each person's "indefeasible right of personal security, personal liberty, and private property." *Boyd*, 116 U.S. at 630. The Framers set "objective criteria to measure the propriety of government actions."[3] The Fourth Amendment's words are "precise and clear," and "reflect the determination" that Americans should be secure "from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Stanford*, 379 U.S. at 481.

Contrary to the Framers' intent, DHS has adopted a broad policy authorizing warrantless civil immigration arrests. Then-Acting Immigration and Customs Enforcement (ICE) Director Todd Lyons issued a memorandum ("the Lyons Memo") instructing officers that a person is "likely to escape" and therefore can be arrested without a warrant whenever an officer determines he "is unlikely to be

[3] Thomas K. Clancy, *The Framers' Intent: John Adams, His Era, and the Fourth Amendment*, 86 IND. L.J. 979, 980 (2011).

located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained."[4] The district court in this case rejected the standard set forth by the Lyons Memo, finding that it "fails fully to comply" with the preliminary injunction. *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d 22, 39 (D.D.C. 2026). Specifically, the court found that the Lyons Memo fails to instruct immigration officers that they must consider both "an individual's likelihood of being found at another clearly identifiable location" and "how an individual's community ties factor into the determination of an individual's likelihood of escape." *Id*. at 43. DHS's official policy, then, is to disregard the Fourth Amendment and other law by arresting people without probable cause that they pose a flight risk. In some instances, these arrests have occurred absent even probable cause to believe that the individual is in the country illegally.[5]

The Fourth Amendment does not allow for warrantless arrests to be made without probable cause. *United States v. Watson*, 423 U.S. 411, 423 (1976). Probable cause to conduct an arrest requires a "reasonable ground for belief of guilt, and that

---

[4] Memorandum from Todd M. Lyons, Senior Official Performing the Duties of the Dir., U.S. Immigr. & Customs Enf't, to All ICE Personnel, *Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests* (Jan. 28, 2026), *filed as* Ex. 1, *Hussen v. Noem*, No. 0:26-cv-00324-ECT-ECW (D. Minn.), ECF No. 85-1 (filed Jan. 30, 2026).

[5] *See, e.g.*, *Venegas v. Homan*, No. 1:25-cv-00397-JB-N, 2026 U.S. Dist. LEXIS 215608, at *31–32 (S.D. Ala. Sept. 21, 2026); Nicole Foy et al., *506 U.S. Citizens Detained*, PROPUBLICA (Oct. 6, 2026), https://tinyurl.com/2tj72djt.

belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks and citations omitted). This Court has held that "aliens in this country are sheltered by the Fourth Amendment in common with citizens," and statutory provisions authorizing immigration arrests "must be controlled by the constitutional standards governing similar detentions made by other law enforcement officials." *Au Yi Lau v. INS*, 445 F.2d 217, 223 (D.C. Cir. 1971); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (dicta) (positing that the Fourth Amendment protects "persons who are part of a national community or who have otherwise developed sufficient connections with this country to be considered part of that community"). Thus, a warrantless immigration arrest requires probable cause that a person is both unlawfully present and likely to escape before a warrant can be obtained. *Au Yi Lau*, 445 F.2d at 222; *see also* 8 U.S.C. § 1357(a)(2).

DHS is violating these requirements in its operations within the District. Officers did not have probable cause to believe that José Escobar Molina was in the country illegally. They did not know his name, did not ask for his name or identification, and declined to look at his papers. Having made no particularized determination regarding his immigration status, they called him "illegal" and placed him under arrest. Compl. 13–14. Named plaintiff B.S.R. was also arrested without a particularized determination as to his immigration status or flight risk, with the

officers simply stating, “We came for two people, so we have to arrest two people.” B.S.R. Decl. ¶¶ 14, 16. Other named plaintiffs faced similar circumstances. *See* N.S. Decl. ¶¶ 6–7; R.S.M. Decl. ¶¶ 1–3. DHS agents have illegally and unconstitutionally arrested individuals without a warrant or individualized probable cause. Removing the injunction would allow these violations of the Fourth Amendment to continue unabated.

## II. THE PRELIMINARY INJUNCTION UPHOLDS THE FIFTH AMENDMENT.

DHS’s actions also violate the Fifth Amendment. “Anyone, from any corner of the Earth, can come to live in America and become an American.” President Ronald Reagan, Remarks at the Presentation Ceremony for the Presidential Medal of Freedom (Jan. 19, 1989).[6] Equality is not merely a rhetorical flourish—it is a constitutional imperative. The Fifth Amendment forbids the federal government from imposing burdens according to race or ethnicity, and it protects citizens and noncitizens alike. Nonetheless, DHS agents responsible for the Department’s D.C. offensive have suggested that protections against unreasonable arrest apply only to those who look a certain way. To appear tough on illegal immigration, the Trump Administration has directed immigration officers to “turn the creative knob up to 11”

[6] Available at https://tinyurl.com/29cb3dzn.

and "push the envelope."[7] These commands have led to a dramatic rise in arrests as agents openly discriminate on the basis of race, ethnicity, and appearance.

### A. Warrantless Immigration Arrests Based on Race, Ethnicity, and Appearance Violate the Fifth Amendment.

The Fifth Amendment states: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. It implicitly requires the federal government to guarantee equal protection, just as the states must under the Fourteenth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

At its core, this guarantee of equal protection requires the federal government to treat people as individuals—not to discriminate based on race or ethnicity. *See, e.g.*, *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) ("[A]ll governmental action based on race—a group classification long recognized as 'in most circumstances irrelevant and therefore prohibited,'—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed. These ideas have long been central to this Court's understanding of equal protection . . . .") (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). When federal immigration agents use perceived ethnicity as

[7] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, THE GUARDIAN (June 4, 2025) [hereinafter "Olivares, *US immigration*"] (quoting internal agency emails), https://tinyurl.com/2x3tvyx9.

the basis for arresting people, they literally deny equal protection of the laws on the quintessential forbidden ground.

This implicit guarantee of equal protection enshrined in the Fifth Amendment's Due Process Clause admits no exception for warrantless civil immigration enforcement—even if it might be more likely that persons who appear to be from a certain part of the world are in the country unlawfully. The Fifth Amendment's text protects every "person" present on U.S. soil, not merely those whose outward appearance conforms to assumptions that they are unlikely to be illegal immigrants. Using ethnicity as a proxy for immigration status divides the public into two tiers: those who enjoy the full panoply of constitutional safeguards, and those whose liberty is at the whim of federal agents—forced to constantly justify their presence just because they look a certain way. Basic constitutional principles prohibit the government from distributing the baseline protections of liberty according to race, ethnicity, or national origin.

Equal protection forbids facially discriminatory laws and the discriminatory enforcement of facially neutral laws. The Supreme Court first articulated this principle in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). There, San Francisco officials enforced a facially neutral ordinance governing laundry operations almost exclusively against Chinese owners while granting permits to nearly all non-Chinese applicants. The Court held:

> [T]hough the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

*Id.* at 373–74. This Court has further established that the Fifth Amendment "includes a prohibition on selective enforcement of the law based on impermissible considerations such as race." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1147 (D.C. Cir. 2023) (internal quotation marks omitted).

In the District and across the nation, DHS has wielded the facially neutral provision of the Immigration and Nationality Act (INA) codified at 8 U.S.C. § 1357(a)(2) with the very same "evil eye" and "unequal hand" that the *Yick Wo* Court condemned. *Yick Wo*, 118 U.S. at 373–74. DHS agents have used ethnic profiling to arrest multiple people within the District without reasonable suspicion and have conducted arrests without probable cause that these people are in the country illegally and are likely to escape before a warrant can be obtained. As discussed above, officers grabbed Mr. Escobar Molina and repeatedly called him "illegal" despite having no basis for suspicion aside from what they believed his ethnicity to be. Compl. 13–14. The arrest of B.S.R. also reflects profiling. He was arrested by officers who did not ask for his name or ID, simply asked if he was present illegally, and stated, "Well, we'll figure it out anyways if you are." B.S.R.

Decl. ¶ 6. Another person, C., a U.S. citizen, was pulled over by plainclothes agents who said they wanted to make sure he and his colleague were "all right," immediately questioned him on his immigration status—then, without identifying him, arrested him. Compl. ¶ 39. Agents used apparent ethnicity in determining whom to arrest.

### B. Across the Nation, Immigration Agents Have Disregarded Legal Constraints to Inflate Arrest Numbers.

White House Border Czar Tom Homan has publicly stated that immigration officers stop people based on "their location, their occupation, their physical appearance, [and] their actions."[8] Substituting group proxies for individualized suspicion, officers have fanned out into neighborhoods, arresting people with no prior law enforcement contact—a "telltale sign of illegal profiling."[9]

While stopping people on the basis of their "physical appearance" is unlawful, DHS is doing so consistently. ProPublica has documented more than 500 cases where ICE detained U.S. citizens since the start of the current Administration;

---

[8] Miriam Waldvogel, *Homan Claims ICE Officers "Don't Need Probable Cause" to "Briefly Detain" People*, THE HILL (July 11, 2025, 1:21 PM), https://tinyurl.com/27sf2sr6.

[9] David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, CATO INST. (Aug. 5, 2025), https://tinyurl.com/562k96b9; *see also* Graeme Blair et al., *Understanding the Summer 2026 Surge in ICE Arrests*, DEPORTATION DATA PROJECT (Sept. 8, 2026), https://tinyurl.com/3b485p8d.

"[n]early all were people of color," including over seventy children and more than a hundred people whose citizenship agents had questioned.[10] In New York, six officers approached a man from Guatemala, telling him, "You're Latino, you look like one of them," before demanding he identify pictures of other Latino individuals, asking for his papers, and arresting him.[11] In one series of Florida raids, over a hundred construction workers were detained—just six of whom turned out to be illegal immigrants.[12]

Cases analogous to the present one have also uncovered evidence of this nationwide trend. In litigating *Vasquez Perdomo v. Mullin*, the ACLU uncovered internal DHS messages, recordings, and bodycam footage showing agents' use of racial slurs and admissions of racial profiling in California.[13] In deciding to grant a preliminary injunction enjoining immigration officers from making unreasonable warrantless arrests, the court cited video footage of agents following a car and arresting an individual without any questioning, footage of workers at a carwash

---

[10] Foy et al., *supra*.

[11] Gwynne Hogan et al., *There Were 430 ICE Street Arrests in the New York Area. More than 93% Targeted Latinos*, THE CITY (May 27, 2026), https://tinyurl.com/4tskudke.

[12] Francisco Alvarado, *Fear of ICE raids creates chilling effect at South Florida construction sites*, YAHOO! NEWS (July 24, 2025), https://tinyurl.com/4tsppc7p.

[13] Mot. for Prelim. Inj. re: Suspicionless Stops & Violation of Equal Protection at 8–10, *Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP (C.D. Cal. July 27, 2026), ECF No. 632.

being "aggressively grabbed and violently arrested without a warrant and often without the agents knowing who they are," and testimony that agents "seem to target non-white, Spanish-speaking workers, regardless of whether they have long-standing ties to the community or lawful presence in the United States."[14]

Similarly, in Alabama, Leo Garcia Venegas, a U.S. citizen of Mexican descent, filed suit after DHS arrested him twice in 2025.[15] The district court issued an order staying a DHS policy letting officers preemptively detain construction workers "without a particularized suspicion that persons are illegal immigrants."[16] Its order detailed a May 2025 incident, recorded on video, where immigration officers ran past non-Latino workers at a construction site to seize only the Latinos, ignoring Mr. Venegas's proof of citizenship.[17] It also discussed a June 2025 incident where officers "told [Mr. Venegas] his REAL ID was fake" and detained him.[18]

The profiling experienced by Mr. Venegas, Mr. Escobar Molina, B.S.R., C., and others is part of a nationwide practice that DHS will reactivate in the District

[14] *Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP, 2026 U.S. Dist. LEXIS 214808, at *41–42 (C.D. Cal. Sept. 2, 2026).

[15] *See Venegas*, 2026 U.S. Dist. LEXIS 215608, at *2–6.

[16] *Id.* at *35.

[17] *Id.* at *3–4.

[18] *Id.* at *5–6.

should the injunction be lifted. This would come at a price to the perceived legitimacy of law enforcement.

## III. ABSENT THE PRELIMINARY INJUNCTION, TRUST IN LAW ENFORCEMENT WILL CONTINUE TO WANE.

When the Administration instructed immigration officers to "turn the creative knob up to 11" and "push the envelope,"[19] it set off a wave of abuses nationwide. The result has been increasing distrust in law enforcement. The general public largely disapproves of the tactics used by ICE and Customs and Border Protection (CBP).[20] Further, the use of law enforcement personnel for overzealous immigration enforcement hinders other policing activities. Maintaining the injunction is necessary to prevent these harms from further escalating.

### A. The Administration's Prioritization of Low-Level Immigration Enforcement Undermines Legitimate Policing.

DHS asserts that an inability to arrest people without probable cause of their illegality and flight risk will irreparably harm it. However, the vast majority of those arrested pose no danger to the community. According to an analysis by the

---

[19] Olivares, *supra* (quoting internal agency emails).

[20] Ashleigh Fields, *Majorities of Americans disapprove of how ICE operates*, THE HILL (Nov. 15, 2025), https://tinyurl.com/bu3xvyjx; *Survey: Americans Disapprove of Federal Agents' Enforcement Tactics*, STATES UNITED DEMOCRACY CTR. (Apr. 23, 2026), https://tinyurl.com/57u3vm7h; Ryan Mancini, *39 percent approve of Trump performance on immigration: Survey*, THE HILL (Aug. 3, 2026), https://tinyurl.com/2vybdxx2.

Deportation Data Project, the share of interior immigration arrests leading to detention that involved a person with a criminal conviction fell to 27% in July 2026—an all-time low in the available data, *during the same month that set a record for total arrests*.[21] ICE's own accounting confirms the point. Announcing a D.C.-centered sweep that led to 1,328 arrests between August 1 and August 14, 2026, ICE reported that only around 400 of the arrestees had a criminal record, including charges that had not led to conviction.[22] By DHS's own numbers, roughly seven in ten of those arrested were not criminals.

Agents across the country have been implementing arbitrary arrest quotas imposed by White House Deputy Chief of Staff Stephen Miller.[23] In December 2025, U.S. Senate staffers interviewed nearly two dozen U.S. citizens arrested by DHS agents, who described being dragged from cars, held for days, facing fabricated assault claims, having proof of their citizenship ignored, and being denied medical care.[24] The investigation also found that immigration agents "detained U.S. citizen

---

[21] Blair et al., *supra*.

[22] Press Release, U.S. IMMIGR. & CUSTOMS ENF'T, *ICE Operation Safe Community—Washington, D.C. Nets More than 1,300 Arrests Throughout Virginia, Maryland* (Aug. 26, 2026), https://tinyurl.com/45yb5wx3.

[23] *See* Anna Giaritelli, *Stephen Miller 'eviscerated' ICE officials in private meeting for low deportation numbers*, WASH. EXAM'R (May 30, 2025), https://tinyurl.com/ybwpyjkm.

[24] MINORITY STAFF OF THE PERMANENT SUBCOMM. ON INVESTIGATIONS OF THE S. COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFAIRS, 119TH CONG., UNCHECKED

children and treated children with reckless disregard for their safety and wellbeing."[25] The injunction prevents such abuses.

The diversion of critical manpower and resources to conducting mass immigration arrests has also compromised traditional law enforcement objectives. Within the first eight months of the second Trump Administration, ICE had already drawn on the assistance of 42,000 federal, state, and local law enforcement officers,[26] including agents from the U.S. Marshals, FBI, DEA, ATF, and even IRS.[27] This has altered priorities. Homeland Security Investigations has had to suspend inquiries into

---

AUTHORITY: EXAMINING THE TRUMP ADMINISTRATION'S EXTRAJUDICIAL IMMIGRATION DETENTIONS OF U.S. CITIZENS 2–3 (Comm. Print 2025), https://tinyurl.com/5esma2cx.

[25] *Id.* at 4.

[26] David J. Bier, *ICE Has Diverted Over 25,000 Officers from Their Jobs*, CATO INST. (Sept. 3, 2025), https://tinyurl.com/4k2dkujd.

[27] *Id.*; *see e.g.*, *Shelby Bremer, DEA special agent in charge of San Diego discusses immigration, US-Mexico border*, NBC SAN DIEGO (Mar. 8, 2025) (DEA agents stating that this is "new to the DEA. We've always only done drugs and narcotics."), https://tinyurl.com/yfbs56nc; Sadie Gurman et al., *How Trump's Sweeping Expulsions Have Thrown the FBI Into Chaos*, WALL ST. J. (Feb. 5, 2025) (reporting that FBI specialists in counterintelligence and child exploitation have been reassigned to immigration enforcement), https://tinyurl.com/4x2fwymj; Ken Dilanian & Julia Ainsley, *FBI returning agents to counterterrorism work after diverting them to immigration*, NBC NEWS (June 24, 2025) (FBI agents returning to counterterrorism to address potential threats after being "sidetracked by immigration duties"), https://tinyurl.com/yfn3eb48; *Sixteen indictments returned for previously deported illegal aliens identified in recent immigration enforcement actions*, IRS (June 18, 2025), https://tinyurl.com/3sxxp5v6.

"human trafficking, child exploitation, cybercrime, weapons export controls, intellectual property theft, drugs, and terrorism to focus on arresting immigrants."[28]

DHS has sacrificed traditional policing prerogatives in order to maximize the arrests of people who pose little to no threat to the public.

### B. Aggressive Immigration Enforcement Tactics Impair Institutional Legitimacy.

The public is not viewing the shift in federal priorities positively. Effective policing depends on the willingness of ordinary people to report crime and cooperate in investigations. President Obama's Task Force on 21st Century Policing noted, "Law enforcement cannot build community trust if it is seen as an occupying force coming in from the outside to impose control on the community."[29] That is precisely how many D.C. residents have come to view the influx of federal agents that have flooded their streets and neighborhoods over the past 14 months. Many of these agents operate in unmarked vehicles without any information identifying who they are and what agency employs them. This has made it exceedingly difficult for residents and visitors to know who they are dealing with. Additionally, as a federal enclave—unlike the 50 states—D.C. is subject to direct federal control. When the

---

[28] Bier, *ICE Has Diverted over 25,000 Officers from their Jobs*, *supra*.

[29] PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING at 11 (2015), https://tinyurl.com/4jr27r46.

president co-opts the Metropolitan Police Department (MPD) to assist in immigration enforcement or turns federal agents into de facto municipal police officers not subject to local oversight,[30] the public can become suspicious of law enforcement generally and come to view officers as their adversaries.

The District attempted to prevent this. Under the Sanctuary Values Amendment Act of 2020, District agencies were barred from cooperating with federal immigration authorities absent a judicial warrant, inquiring into immigration status, and giving ICE access to facilities.[31] This policy ended with President Trump's Crime Emergency declaration, which federalized MPD.[32] MPD officers were then used to man immigration checkpoints.[33]

This move created widespread fear among District residents.[34] The D.C. Council's Committee on Public Works and Operations held a public roundtable, then

---

[30] Alyssa Fowers & Emma Uber, P*ark Police Arrests Have Nearly Doubled Since Trump's Federal Law Enforcement Surge*, CITY CAST DC (Sept. 14, 2026) (discussing how U.S. Park Police have doubled the number of officers assigned to the D.C. area, while partaking in practices local law enforcement is prohibited from engaging in such as high-speed pursuits without community oversight), https://tinyurl.com/mtupubz.

[31] D.C. Code § 24-211.07.

[32] Exec. Order No. 14,333, 90 Fed. Reg. 39,301.

[33] Jessica James & Rebecca Turco, *DC Council Committee Calls for Mayor, Interim Chief to End Police Cooperation with ICE*, WJLA (Jan. 8, 2026), https://tinyurl.com/mpt49ebt.

[34] Buzz McClain, *New WashPost-Schar School Poll: 8 of 10 Oppose Federal Law Enforcement in D.C.*, SCHAR SCH. OF POL'Y & GOV'T, GEO. MASON UNIV. (Aug. 20,

reported that "the recurring theme of the public witness testimony was the loss of trust in the MPD."[35] Speakers "painted a picture of federal law enforcement agents acting with impunity, arresting individuals perceived to be immigrants or Latino, [and] terrorizing communities," and described "masked and unidentifiable armed agents with no visible badges questioning, arresting, and 'disappearing' residents into unmarked cars."[36] The committee's chair told the media,

> we now have not only people who don't trust MPD because they're worried they'll be profiled or don't trust MPD because they are immigrants, we also have people who always believed they could trust MPD who now won't make that call because they're afraid their call will harm someone else.[37]

A safe city is one where anyone can report crime without fear of being arrested. It is one where members of vulnerable communities do not fear law enforcement. The injunction makes D.C. safer by helping MPD maintain its reputation as a neighbor and ally, rather than an adversary.

---

2025) (finding that 8 in 10 Washingtonians opposed MPD federalization and National Guard deployment, with 61% feeling less safe), https://tinyurl.com/yc5t9yys.

[35] COMM. ON PUB. WORKS & OPS., COUNCIL OF D.C., ROUNDTABLE REPORT ON POTENTIAL HUMAN RIGHTS VIOLATIONS DUE TO FEDERAL GOVERNMENT INTRUSION at 25 (Jan. 8, 2026) (circulation draft), https://tinyurl.com/32vjav6u.

[36] *Id.* at 2.

[37] James & Turco, *supra*.

## CONCLUSION

Washington, D.C. is the capital of the free world. The injunction advances the Fourth and Fifth Amendment values that make it worthy of that role, as well as the respect for law enforcement that keeps it safe. It stops the federal government from arresting people on account of what they look like or where its agents believe people came from.

For these reasons and those provided by Plaintiffs-Appellees, this Court should affirm the decision below.

Respectfully submitted,

/s/ Matthew P. Cavedon
Matthew P. Cavedon
*Counsel of Record*
Michael Z. Fox
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(706) 309-2859
mcavedon@cato.org

*Counsel for Amici Curiae*

Preston Shipp
Estela Dimas
Octavia Carson
FAIR AND JUST PROSECUTION
pshipp@fairandjustprosecution.org
edimas@ fairandjustprosecution.org
ocarson@ fairandjustprosecution.org

Dated: October 16, 2026

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,726 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Matthew P. Cavedon
Matthew P. Cavedon
*Counsel for Amici Curiae*

Dated: October 16, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by CM/ECF.

/s/ Matthew P. Cavedon
Matthew Cavedon
*Counsel for Amici Curiae*

Dated: October 16, 2026