ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-5045**

# In the United States Court of Appeals for the District of Columbia Circuit

JOSÉ ESCOBAR MOLINA, *et al.*,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-03417

## BRIEF OF *AMICI CURIAE* WASHINGTON TEACHERS' UNION, THE DC ALLIANCE OF CHARTER TEACHERS AND STAFF LOCAL 1927, AND INDIVIDUAL EDUCATORS IN SUPPORT OF PLAINTIFFS-APPELLEES AND IN SUPPORT OF AFFIRMANCE OF THE INJUNCTION

Daniel M. Rosenthal
Alice C. Hwang
Charlotte Schwartz*
JAMES & HOFFMAN, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Tel: (202) 496-0500
dmrosenthal@jamhoff.com
achwang@jamhoff.com
chschwartz@jamhoff.com
*Counsel for Amici Curiae*

**Not admitted in D.C. Circuit*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and *Amici*

Pursuant to Circuit Rule 28(a), *amici curiae* state that all parties appearing before the district court and in this Court are listed in the Brief for Appellants and Brief for Appellees. *Amici* further state that all *amici* appearing before the district court are listed in the Brief for Appellants and Brief for Appellees.

To the knowledge of counsel for *amici curiae*, and as of this date, the following are *amici* appearing before this Court:

- District of Columbia Alliance of Charter Teachers and Staff Local 1927
- Federation for American Immigration Reform
- Individual Educators
- Washington Teachers' Union

### B. Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants and Brief for Appellees.

### C. Related Cases

Related cases appear in the Brief for Appellees.

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *amici curiae* Washington Teachers' Union and District of Columbia Alliance of Charter Teachers and Staff Local 1927 make the following disclosures:

1. Washington Teachers' Union and District of Columbia Alliance of Charter Teachers and Staff Local 1927 are unincorporated labor associations and locals of the American Federation of Teachers. Washington Teachers' Union represents teachers and educators at District of Columbia Public Schools. District of Columbia Alliance of Charter Teachers and Staff Local 1927 represents teachers at public charter schools throughout the District of Columbia.
2. Washington Teachers' Union and District of Columbia Alliance of Charter Teachers and Staff Local 1927 do not have a parent company, and no publicly-held company has a 10% or greater ownership interest in the entities.

## CERTIFICATE OF COUNSEL

Pursuant to Circuit Rule 29(d), counsel for *amici curiae* Washington Teachers' Union, District of Columbia Alliance of Charter Teachers and Staff Local 1927, and individual educators hereby certifies that a separate amicus brief is necessary in this matter.

*Amici curiae* possess a distinct and unique perspective regarding the impact of Defendants' unlawful policy of warrantless immigration arrests on teachers, schools, school communities, and the education of students in the District of Columbia. Because the arguments herein are uniquely tailored to the specific institutional interests and firsthand experiences of *amici curiae*, filing a joint brief was impracticable, and a separate brief is necessary to ensure the distinct interests and perspectives are adequately presented to assist this Court.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... ii

DISCLOSURE STATEMENT ..... iii

CERTIFICATE OF COUNSEL ..... iv

TABLE OF CONTENTS ..... v

TABLE OF AUTHORITIES ..... vii

GLOSSARY ..... x

STATEMENT OF INTEREST OF *AMICI CURIAE* PURSUANT TO FED. R. APP. P. 29(a)(4)(D) ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 3

ARGUMENT ..... 5

I. Defendants' Unlawful Policy Disrupted Schools, Undermined Student Learning, and Separated Students from Their Families ..... 5

A. Defendants terrorized and traumatized students, teachers, and school communities by conducting enforcement actions at or near D.C. schools and separating students from their parents. ..... 5

B. Defendants' mass, baseless immigration arrests created an absenteeism crisis in D.C. schools and severely disrupted learning. ..... 10

C. Defendants' baseless, warrantless mass arrests made D.C.'s schools less safe by destroying trust in law enforcement. ..... 18

D. Teachers and schools were forced to divert significant time, effort, and resources to address the terror that Defendants' warrantless, mass arrests caused in D.C.'s school communities. ..... 19

II. Defendants' Policy Inflicted Irreparable Harm. ..... 22

III. The Public Interest and the Balance of the Equities Support the District Court's Preliminary Injunction. ..... 23

CONCLUSION ........................................................................................ 26
CERTIFICATE OF COMPLIANCE ...................................................... 27
CERTIFICATE OF SERVICE ............................................................... 28

## TABLE OF AUTHORITIES

* Authorities upon which we chiefly rely are marked with asterisks.

### Cases

**de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491 (D.D.C. 2018) ........ 22-24

*Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020). ........ 24

*Issa v. Lancaster*, 847 F.3d 121 (3d Cir. 2017) ........ 24

**League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ........ 26

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ........ 22

*N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104 (9th Cir. 2010) ........ 24, 25

*Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021). ........ 22

*Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034 (7th Cir. 2017) ........ 24

### Statutes

D.C. Code § 38-208(c)(1)(A) ........ 16

### Other Authorities

Arya Ansari & Michael Gottfried, *The Grade-Level and Cumulative Outcomes of Absenteeism During Elementary School*, 92 CHILD DEV. 4 (2021) ........ 12, 25

Ashley Na & Kelly Hessedal, *Parent Detained, Taken by ICE Near Linda Vista Elementary School*, CBS 8 (Aug. 18, 2025, 1t 16:30 PDT) ........ 9

*See* Barb Angiuano & Caroline Beck, *ICE arrests 426 people across Indiana, shaking Indianapolis schools and communities*, WFYI Public Media (Sept. 17, 2026, at 13:56 EDT), https://www.wfyi.org/statewide/2026-09-17/ice-arrests-426-people-across-indiana-shaking-indianapolis-schools-and-communities ........ 15

Bilal Rahman, *California Stops Homeland Security Agents Entering Elementary Schools*, NEWSWEEK (Apr. 11, 2025, at 9:06 EDT) ................ 8

Carolyn Heinrich, Mónica Hernández, & Mason Shero, *Repercussions of a Raid: Health and Education Outcomes of Children Entangled in Immigration Enforcement*, 42 J. OF POL'Y ANALYSIS & MGMT. 350 (2022) .................................. 16, 17

Dana Goldstein & Irene Casado Sanchez, *Immigration Raids Add to Absence Crisis for Schools*, N.Y. TIMES (June 16, 2025) ......................... 12

Gustavo Solis, *Arrest Near a South Bay High School is Latest in a String of Immigration Enforcements Close to Schools*, KPBS 65 (Aug. 22, 2025, at 15:02 PDT) .................................................................... 9

Henry May, Lauren P. Bailes, & Danielle M. Riser, *Absenteeism & Achievement in Early Elementary Grades: A Multilevel Organizational Analysis*, 30 J. OF ED. FOR STUDENTS PLACED AT RISK 4 (2024) ............. 25

Joseph P. Ryan et al., *Early Exposure to Child Maltreatment and Academic Outcomes*, 23 CHILD MALTREATMENT 4 (2018) ....................... 16

Joshua Eaton, *CT Man Describes ICE Arrest that Followed Dropping Son at School Bus Stop in New Court Document*, Yahoo News (Sept. 16, 2026 at 13:54, EDT), https://www.yahoo.com/news/us/articles/ct-man-describes-ice-arrest-175405708.html ..................................................... 9

Julian Berger, *ICE Detains Man Taking His Child to East Charlotte School*, WFAE 90.7 (May 13, 2025, at 6:34 EDT) .................................... 8

Laura Acevedo, *ICE arrests parents of 2 young children near John Marshall Elementary School in Chollas* Creek, ABC 10News (Sept. 9, 2026, at 20:31 PDT), https://www.10news.com/news/local-news/ice-arrests-parents-of-2-young-children-near-john-marshall-elementary-school-in-chollas-creek ....................................................................... 9

Lillian Perlmutter, *ICE arrests near schools spur new outcry in San Diego*, Times of San Diego (Sept. 11, 2026, at 6:00 PDT), https://timesofsandiego.com/immigration/2026/09/11/ice-arrests-near-schools ............................................................................................. 9

Lucrecia Santibañez & Cassandra Guarino, *The Effects of Absenteeism on Academic and Social-Emotional Outcomes*, POL'Y ANALYSIS FOR CAL. EDUC., (Oct. 2020) ........................................................................ 25

Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged, and Detained for Days*, PROPUBLICA (Oct. 16, 2025, at 18:00 EDT) ............. 10

Press Release, ACLU of S. Cal., *United Farm Workers and Bakersfield Residents Sue Border Patrol for Unlawful Practices* (Feb. 26, 2025, AT 10:45 PDT) ............................................................................................ 11

Rachel Leingang, 'My Hands Were Really Shaky': High School Journalist Documents ICE Raids, The Guardian (Jan. 18, 2026, at 7:00 EDT), https://www.theguardian.com/us-news/2026/jan/18/minneapolis-ice-raids-high-school ............................................................................ 15

Robert White (@robertwhitedc.bsky.social), BLUESKY (Oct. 17, 2025, at 6:30 PM ET), https://bsky.app/profile/robertwhitedc.bsky.social/post/3m3gd64ibz22q ........................................................................ 8, 19

Ted Oberg, *ICE Data Shows Surge in DC-Area Arrests of People Without Criminal Convictions*, NBC4 WASH. (Aug. 28, 2025, at 21:30 EDT)...... 10

Thomas S. Dee, *Recent Immigration Raids Increased Student Absences* 4 (Annenberg Institute, Ed Working Paper No. 25-1202, 2025), https://edworkingpapers.com/ai25-1202 ................................................ 11

U.S. DEP'T OF EDUC., *Chronic Absenteeism*, (Aug. 21, 2025) .................. 25

# GLOSSARY

| | |
|---|---|
| CFSA | D.C. Child and Family Services Agency |
| DC ACTS | District of Columbia Alliance of Charter Teachers and Staff Local 1927 |
| ICE | Immigration and Customs Enforcement |
| WTU | Washington Teachers' Union |

## STATEMENT OF INTEREST OF *AMICI CURIAE* PURSUANT TO FED. R. APP. P. 29(a)(4)(D)[1]

*Amici* are the Washington Teachers' Union ("WTU"), the District of Columbia Alliance of Charter Teachers and Staff Local 1927 ("DC ACTS") (both locals of the American Federation of Teachers), and individual teachers and educators at District of Columbia Public Schools and public charter schools throughout the District of Columbia.

The WTU is the collective bargaining representative for over 5,000 D.C. educators, from preschool through twelfth grade. The WTU's mission is to ensure and promote conditions that are vital to effective teaching and services for all students. The WTU champions fairness, democracy, economic opportunity, and high-quality public education for students, their families, and the communities their members serve. Helping children and students is at the core of WTU's mission, as is

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* Washington Teachers' Union, District of Columbia Alliance of Charter Teachers and Staff Local 1927, and individual educators affirm that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* or their counsel contributed money that was intended to fund the preparation or submission of this brief.

fighting for economic opportunity, a living wage, and fairness in the workplace for its members.

DC ACTS is the collective bargaining representative for educators at several D.C. charter schools. The union seeks to create opportunities for professional advancement and develop systematic solutions that provide support for all charter school staff. Through collective bargaining, the union empowers District of Columbia charter school communities, creates common understanding, and fosters school cultures where everyone is crew, not passengers. Ensuring the safety and well-being of students and their families is vital to this mission.

WTU and DC ACTS members and the individual educator *amici* teach students whose families are vulnerable to immigration enforcement.[2] *Amici* were impacted by Defendants' warrantless arrests on school communities and expended a huge amount of effort to address the devastating impact of that policy. *Amici* therefore have a strong interest in ensuring that this unlawful practice remains enjoined.

---

[2] In order to ensure the privacy and safety of *amici*, their students, and their school communities, the individual *amici* are identified in this brief by their initials only.

Pursuant to Fed. R. App. P. 29(a)(2) and Circuit Rule 29(b), *amici curiae* state that counsel for all parties have consented to the filing of this amicus brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Beginning August 11, 2025—just weeks before the start of the school year—District of Columbia residents were subjected to mass, arbitrary immigration arrests. Numerous residents were detained in dragnet-style arrests on their way to work, outside metro stations, at restaurants, at construction sites, and—critically to *amici*—at or near schools. In carrying out these mass immigration arrests, Defendants instituted an unlawful policy and practice of arresting people without either a warrant or an individualized assessment of probable cause as to their likelihood of escape.

The victims of these arrests included students and parents who are themselves class members, as well as children whose family members are. These arrests created harm to the children of D.C. and their educational advancement.

First, the Defendants' conduct traumatized children who witnessed or heard about the arrests, or who were separated from detained family members.

Second, by causing widespread fear among students and families of leaving their homes, the arrests created an attendance crisis in D.C. schools, as educators reported a sudden spike in absenteeism.

Third, schools became less safe as educators and students feared requesting assistance from law enforcement.

Fourth, teachers and schools were forced to spend significant time and resources to ensure that their students, especially Latino students, could learn. For example, prior to the District Court's issuance of the preliminary injunction, some teachers were taking time on a daily basis to manage or run carpools, accompany students to and from the bus or metro, and organize neighborhood "walking buses" to ensure that young students could walk safely to school while their parents remained safely at home.

These consequences constituted irreparable harm to class members and reinforced that the balance of the equities and the public

interest weighed in favor of the preliminary injunction issued by the district court.

## ARGUMENT

### I. Defendants' Unlawful Policy Disrupted Schools, Undermined Student Learning, and Separated Students from Their Families.

#### A. Defendants terrorized and traumatized students, teachers, and school communities by conducting enforcement actions at or near D.C. schools and separating students from their parents.

In the fall of 2025, when the district court considered Plaintiffs' motion for a preliminary injunction, federal agents arrested and detained members of D.C. schools' communities at or near schools, at times in front of schoolchildren, inciting fear and severely undermining the ability of D.C. educators to provide a safe learning environment for their students.

Defendants conducted arrests at or near schools at times when students and families were present, with the effect of maximizing the trauma and fear felt by students. For example, D.P., an elementary school teacher, described several arrests taking place near his school just before dismissal, thus ensuring that elementary school students and their parents witnessed the arrests. E.S., then a D.C. public school

teacher, observed an arrest approximately one block away from her elementary school at dismissal time in a direction that many families travel. L.B., a preschool teacher at a charter school, described how many students became terrified after witnessing a situation in which Immigration and Customs Enforcement ("ICE") agents attempted to arrest a child outside of school and then tackled a member of the school staff who went outside due to the significant disruption this was causing.

Students and families were also traumatized by arrests away from school. R.C., an elementary schoolteacher, explained that a significant enforcement action in the neighborhood the week before school started led to widespread fear in the school community, right at the beginning of the school year—an especially crucial time for elementary school students who learn essential skills and routines that set the standard for the entire school year. A significant number of students at R.C.'s school had a parent or close family member detained by ICE, many of whom had open asylum cases and work permits. As she put it, these were parents who worked hard, supported their kids, and reliably attended parent-teacher and other school events—and their families'

lives were upended by Defendants' unlawful policy. Similarly, two families at S.O.'s school found themselves in desperate straits after their primary breadwinners were detained by ICE. Notably, in both cases, the family member had lived in the United States for over fifteen years and had no criminal record. S.O. reported that, after the arrests, the children in these families often came to school hungry, terrified, and in extreme emotional distress.

Several teachers and educators explained that because their young students regularly witnessed and heard about these arrests, they were terrified just by seeing police cars around the school, or the National Guard surveilling the neighborhood. For example, D.P. explained that when a parent called and asked him to drive her daughter to school because of reported ICE activity in the neighborhood, he found himself taking a bawling second grader to school. R.C. recounted that, when a teacher was driving a fifth grader to school and passed a police car, the fifth grader ducked down and exclaimed "is that them?!"

D.C. Council At-Large Member Robert White reported receiving numerous similar accounts of traumatizing arrests throughout the

District. Council Member White described a "pattern" of "children witnessing arrests near dismissal or along walking routes; residents and teachers afraid to intervene or ask questions; and [Metropolitan Police Department] officers responding with hostility when bystanders attempted to understand what was happening."[3]

This pattern has repeated itself across the country in cities and counties where Defendants have deployed ICE agents at or near schools. For instance, in the spring of 2025, ICE agents arrived unannounced at a California elementary school and attempted to arrest five children.[4] ICE arrested a man while he was dropping his child off at school in Charlotte, North Carolina around the same time.[5] Throughout August of 2025, ICE arrested four parents at or near schools in the San Diego, California area, including at least one who

---

[3] Letter posted by At-Large Councilmember Robert White (@robertwhitedc.bsky.social), BLUESKY (Oct. 17, 2025, at 6:30 PM ET), https://bsky.app/profile/robertwhitedc.bsky.social/post/3m3gd64ibz22q.

[4] Bilal Rahman, *California Stops Homeland Security Agents Entering Elementary Schools*, NEWSWEEK (Apr. 11, 2025, at 9:06 EDT), https://www.newsweek.com/california-agents-elementary-schools-homeland-security-2058493.

[5] Julian Berger, *ICE Detains Man Taking His Child to East Charlotte School*, WFAE 90.7 (May 13, 2025, at 6:34 EDT), https://www.wfae.org/race-equity/2025-05-13/ice-detains-man-taking-his-child-to-east-charlotte-school.

was about to pick up his elementary-school-aged child, who was then left at the school until another family member could pick her up.[6] More recently, last month, ICE agents arrested two parents when they were dropping off their two children, ages 2 and 5, in San Diego.[7] And a father who had just put his 6-year-old child on the bus was arrested near a bus stop in Danbury, Connecticut.[8]

---

[6] Gustavo Solis, *Arrest Near a South Bay High School is Latest in a String of Immigration Enforcements Close to Schools*, KPBS 65 (Aug. 22, 2025, at 15:02 PDT), https://www.kpbs.org/news/border-immigration/2025/08/22/arrest-near-a-south-bay-high-school-is-latest-in-a-string-of-immigration-enforcements-close-to-schools; Ashley Na & Kelly Hessedal, *Parent Detained, Taken by ICE Near Linda Vista Elementary School*, CBS 8 (Aug. 18, 2025, at 16:30 PDT), https://www.cbs8.com/article/news/local/parent-detained-ice-near-linda-vista-elementary-school/509-6721460a-6cc4-43ee-96b1-7839d5133cc1.

[7] Lillian Perlmutter, *ICE arrests near schools spur new outcry in San Diego*, Times of San Diego (Sept. 11, 2026, at 6:00 PDT), https://timesofsandiego.com/immigration/2026/09/11/ice-arrests-near-schools; Laura Acevedo, *ICE arrests parents of 2 young children near John Marshall Elementary School in Chollas* Creek, ABC 10News (Sept. 9, 2026, at 20:31 PDT), https://www.10news.com/news/local-news/ice-arrests-parents-of-2-young-children-near-john-marshall-elementary-school-in-chollas-creek.

[8] Joshua Eaton, *CT man describes ICE arrest that followed dropping son at school bus stop in new court document*, Yahoo News (Sept. 16, 2026 at 13:54, EDT), https://www.yahoo.com/news/us/articles/ct-man-describes-ice-arrest-175405708.html.

This pattern of conduct shows that, absent a preliminary injunction, nothing will prevent a return to the traumatization of the District's schoolchildren through unlawful, warrantless arrests.

B. Defendants' mass, baseless immigration arrests created an absenteeism crisis in D.C. schools and severely disrupted learning.

The trauma and long-lasting fear that these arrests instilled in children is reason enough to continue to enjoin Defendants' unlawful, mass arrests. But if that were not enough, it should be no surprise that when children and their families are terrified, students' learning is also severely disrupted.

Most obviously, D.C. teachers reported that Defendants' mass, warrantless immigration arrests caused a sudden increase in absenteeism in many D.C. schools. In interviews with counsel in the fall of 2025, D.C. teachers stated that absenteeism spiked in their classrooms because both students and their parents feared being arrested and detained on the way to school. Because Defendants had a policy and practice of making indiscriminate arrests—without a warrant or an individualized determination of probable cause of the likelihood of escape—students and parents could be arrested on the way

to school regardless of their criminal history, immigration status, length of residence, or ties to the community.[9] Teachers reported that absences were particularly acute among Latino and Hispanic students.

A recent Stanford University study found that, in early 2025, a series of U.S. Customs and Border Protection immigration raids in central California caused daily student absences to jump by 22 percent.[10] Much like the Defendants' policy and practice of arrests in D.C., the central California immigration sweep was described by observers as "a broad dragnet," with federal agents making indiscriminate arrests without a warrant and targeting victims based on the color of their skin.[11] Although the immigration raids did "not

---

[9] *See, e.g.*, Ted Oberg, *ICE Data Shows Surge in DC-Area Arrests of People Without Criminal Convictions*, NBC4 WASH. (Aug. 28, 2025, at 21:30 EDT), https://www.nbcwashington.com/investigations/ice-data-dc-arrests/3981520/; Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged, and Detained for Days*, PROPUBLICA (Oct. 16, 2025, at 18:00 EDT), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will.

[10] Thomas S. Dee, *Recent Immigration Raids Increased Student Absences* 4 (Annenberg Institute, Ed Working Paper No. 25-1202, 2025), https://edworkingpapers.com/ai25-1202.

[11] *Id.*; *see also* Press Release, ACLU of S. Cal., *United Farm Workers and Bakersfield Residents Sue Border Patrol for Unlawful Practices* (Feb. 26, 2025, AT 10:45 PDT), https://www.aclusocal.org/en/press-

occur on or near school grounds," parents and students feared being arrested, detained, and separated from their families if they stepped outside their homes—and many families opted to stay home, rather than risk being subjected to arrest.[12] The Stanford study found that absenteeism rose most precipitously for younger children, who are at acute risk of falling behind on basic math skills, reading, and socio-emotional development.[13]

This research mirrors the experiences of D.C. educators, who reported that classroom attendance in the fall of 2025 fell sharply after Defendants began implementing mass immigration arrests, as parents were terrified of leaving their homes. For example:

- E.W., an instructional coach for elementary school students, reported that attendance at her school plummeted almost

---

releases/united-farm-workers-and-bakersfield-residents-sue-border-patrol-unlawful-practices.

12 Dana Goldstein & Irene Casado Sanchez, *Immigration Raids Add to Absence Crisis for Schools*, N.Y. TIMES (June 16, 2025), https://www.nytimes.com/2025/06/16/us/immigration-raids-school-absences-deportation-fears.html.

13 Arya Ansari & Michael Gottfried, 92 CHILD DEV. 4 at 14–15 (July, 2021) (unpublished manuscript) (on file at https://pmc.ncbi.nlm.nih.gov/articles/PMC9075049/pdf/nihms-1787193.pdf).

immediately after immigration enforcement activity in the neighborhood surrounding the school increased, with particularly severe absences on days when Defendants were reportedly active in the neighborhood. For example, E.W. reported that in just one multilingual classroom, ten out of 31 students had "significant" attendance issues. One elementary school student missed nearly the first full month of school.

- J.S., a kindergarten teacher, reported that—in the first two months of the 2025-2026 school year—several of her current and former students quickly accrued a substantial number of absences. These absences were directly linked to Defendants' indiscriminate immigration arrests: for example, J.S. described a family who was taking their kids to school, learned of ICE activity on the way to school, and went home rather than risk arrest.
- L.B., a D.C. public school educator, reported that several preschoolers missed the first few weeks of the school year entirely because their parents feared being swept up in Defendants' dragnet arrests.

- N.M., an educator at a D.C. elementary school, reported that several of her young students were disenrolled from school due to continued absences, likely because students or families were terrified of immigration arrests, without any indication whether they had enrolled somewhere else. Another of her students missed the first five weeks of the school year. Others attended sporadically based on reports of ICE enforcement actions in the neighborhood.
- R.C., an elementary schoolteacher, reported that nearly half of the Latino population of her school started regularly missing school during the initial surge of warrantless arrests.
- E.S., who was a D.C. public school teacher in the fall of 2025, reported that multiple students in her elementary school were consistently absent at the beginning of the school year—a critical time for elementary education—because their families did not feel safe and feared family separation.
- Even when students were able to attend school more regularly, several teachers reported a significant decrease in students participating in after-school programs, as they instead

> participated in carpools and walking buses to ensure they could get home safely. Teachers also reported a significant decrease in parental involvement in school activities. According to one teacher, J.S., attendance plummeted at her school's Hispanic Heritage Month celebration, likely because many families and students were afraid to attend events associated with Hispanic culture when ICE used racial profiling to conduct arrests. Likewise, E.S. observed that at her school, which had a significant Latino population, only two to three Latino families attended Back to School night—a critical event for teachers to build relationships with families and set up students for success. The event had been well attended in the past.

School districts elsewhere in the country likewise reported lower attendance, and in some cases precipitous drops in attendance, as a result of immigration enforcement.[14]

---

[14] *See* Barb Angiuano & Caroline Beck, *ICE arrests 426 people across Indiana, shaking Indianapolis schools and communities*, WFYI Public Media (Sept. 17, 2026, at 13:56 EDT), https://www.wfyi.org/statewide/2026-09-17/ice-arrests-426-people-across-indiana-shaking-indianapolis-schools-and-communities (Indiana school reported daily attendance rate dropped from 95% to 40% following ICE enforcement actions); Rachel Leingang, '*My hands were really*

Making matters worse, many D.C. families were at risk of being reported to Child and Family Services Agency ("CFSA") because of the fear instilled by Defendants' unlawful indiscriminate mass-arrest policy. When a student under 13 years old accrues more than 10 unexcused absences, District law requires schools to report that student to CFSA. D.C. Code § 38-208(c)(1)(A). Families who are reported to CFSA may then be investigated for neglect—a traumatic and intrusive process that could lead parents to lose custody of their minor children. Research shows that students who are subjected to a CFSA investigation have depressed math and reading scores and are significantly more likely to repeat a grade, even when that investigation finds no neglect or abuse.[15]

Because Defendants caused an absenteeism crisis in certain District schools, students were at risk of being reported to CFSA. J.S., a D.C. kindergarten teacher, estimated that in the fall of 2025, between

---

*shaky': high-school journalist documents ICE raids*, The Guardian (Jan. 18, 2026, at 7:00 EDT), https://www.theguardian.com/us-news/2026/jan/18/minneapolis-ice-raids-high-school ("School[] districts throughout the metro area have reported lower attendance.").

[15] Joseph P. Ryan et al., *Early Exposure to Child Maltreatment and Academic Outcomes*, 23 CHILD MALTREATMENT 4, 370 (2018).

five to six percent of the students at her school were at risk of being reported for chronic absences, even though she believed that the large majority of children staying home for fear of unlawful immigration came from loving, healthy homes. In other words, before the district court entered a preliminary injunction, families were facing an impossible choice: take their children to school, and risk being arrested in front of their children, detained, and indefinitely separated from their families; or stay home, which could lead to a CFSA investigation and loss of custody of their children. For loving parents subject to Defendants' unlawful policy, there was no option to ensure they could stay with their children.

Even for students able to attend school regularly, learning was disrupted by the extreme stress caused by Defendants' actions. Long-standing social science research shows that school-aged children who worry daily about being separated from their parents due to immigration enforcement experience long-term decline in educational attainment. For instance, a 2015 study found that immigration enforcement has the largest, negative impacts on children ages 6 to 13,

who become 25.2% more likely to drop out.[16] A 2017 study found that, in school districts with significant immigration raids, the raids had "large, immediate negative effects" on the reading and math proficiency rates of Hispanic children, which "persisted for multiple years and were not seen among White children."[17]

C. Defendants' baseless, warrantless mass arrests made D.C.'s schools less safe by destroying trust in law enforcement.

Defendants' baseless arrests also undermined school safety. For example, D.P. reported that the majority of students and educators at the school where he worked felt uncomfortable calling 911. Before Defendants' unlawful policy began, D.P.'s school had a productive relationship with local police in addressing issues arising from drug use near his school. D.P. reported that after the mass immigration arrests began, the school community no longer felt safe asking the police for help, out of fear that doing so could result in unlawful arrest and detention. D.P. and his colleagues had to find workarounds to keep

---

16 Carolyn Heinrich, Mónica Hernández, & Mason Shero, *Repercussions of a Raid: Health and Education Outcomes of Children Entangled in Immigration Enforcement*, 42 J. OF POL'Y ANALYSIS & MGMT. 350, 353 (2023) (discussing studies).

17 *Id.* at 354 (discussing studies).

their students safe when there were individuals in crisis due to drug use near the school.

D.C. Council Member Robert White even reported an incident during which the Metropolitan Police Department told concerned parents and teachers that "If you have such a problem with us, don't call 911 next time."[18] The message to school communities was clear: they could not count on law enforcement to keep their students safe. Instead, law enforcement, including local police, would only put their families in danger.

### D. Teachers and schools were forced to divert significant time, effort, and resources to address the terror that Defendants' warrantless, mass arrests caused in D.C.'s school communities.

In the fall of 2025, teachers across the District, who were already stretched thin, diverted significant time, money, and resources to ensure that their students could get to and from school safely and avoid being separated from their parents. Numerous teachers described setting up a transportation system to help students get to school without their parents having to risk being arrested and detained in front of their elementary-aged children. For example, E.W. described a

---

[18] Robert White (@robertwhitedc.bsky.social), *supra* note 3.

fellow teacher who shepherded two full cars of students every day, because those students' caregivers were afraid to leave the house. This teacher drove to students' neighborhoods twice every morning to pick them up for school, then twice in the afternoon to return them. Several teachers took time out of their day every day to manage or run carpools, many at their own expense. Teachers also accompanied students to and from the bus or metro, and organized neighborhood "walking buses" or safety patrols to ensure that young students could walk safely to school while their parents remained safely at home.

Even when teachers were able to get terrified students to school, they had to devote classroom time to helping students manage the fear and trauma from Defendants' dragnet arrests, thereby reducing the time available for learning. E.S. shared that she had to devote instructional time to reassuring students that it was safe to be at school after a student described ICE detaining their family member. Another teacher, R.C., spent 45 minutes calming down a student who was having a panic attack after witnessing ICE detain a close family member. R.C. had to spend so much time addressing the devastating

impacts of these warrantless arrests that she had to give up running an extracurricular activity she had run in the past.

Several educators also explained that they spent a significant amount of time, and their own money, helping families pick up the pieces when they were targeted by Defendants' unlawful, warrantless arrests. L.B. reported that she spent time establishing protocols and helping families plan for what to do if no one came to pick up her three-year-old students, in the event that their parents were arrested by ICE. R.C. described spending a significant amount of time helping families raise money to deal with the effects of these arrests, and helping to find pro bono and affordable legal help for family members who were detained. She also had to spend time and effort helping a family figure out where exactly their family member was being held because ICE refused to tell them, and then provided funds out of her own pocket for the family to be able to call him.

S.O., who worked at a D.C. charter school, had to devote significant time, effort, and resources to helping make sure that families affected by Defendants' warrantless arrests had enough to eat. The primary breadwinners of two families she worked with were

detained by ICE, leaving mothers with multiple children desperate to try to make ends meet. Even for parents who were not yet arrested, many were so afraid of being detained that they stopped working so as to avoid leaving the house, making it extremely difficult to provide for their families.

Finally, several teachers explained that their schools had to divert precious resources to pay for shuttles and extra counselors and psychologists. They also started to spend time and money developing tools for how to speak to school-aged children about the extreme stress they and their peers experienced because of ICE's arrests.

## II. Defendants' Policy Inflicted Irreparable Harm.

Family separation is well recognized in the case law as irreparable harm. *See de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) ("Separation irreparably harms plaintiffs every minute it persists"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 151 (D.D.C. 2021). In previously holding that family separation constitutes irreparable harm, the *de Nolasco* court relied on the American Academy of Pediatrics' policy statement explaining that the "'psychological distress, anxiety,

and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after the eventual reunification with a parent or other family.'" *De Nolasco*, 319 F. Supp. 3d at 503. Here, class members who were detained and separated from their children, and D.C. students who are themselves class members, experienced irreparable harm—harm that will follow them for years to come.

Indeed, *amici* witnessed the harm wrought by family separation firsthand. R.C. and S.O. recounted that students whose family members were detained, and whose families lost their primary breadwinners, had their lives upended and came to school in extreme distress. *See supra* at 6-7. The detained family members included parents with open asylum cases, work permits, and more than a decade living in the country—precisely the people that an individualized escape-risk assessment would protect. *See supra* at 6-7.

### III. The Public Interest and the Balance of the Equities Support the District Court's Preliminary Injunction.

There are no legitimate interests on the other side of the ledger that outweigh the irreparable harm that Defendants' unlawful policy caused to students and parents.

As in prior cases preliminarily enjoining immigration enforcement practices that result in family separation, the "public's interest in enforcing the criminal and immigration laws of this country would be unaffected by the issuance" of the injunction, because the Executive Branch will remain "free to prosecute those who unlawfully enter the United States and institute removal proceedings against them." *De Nolasco*, 319 F. Supp. 3d at 504. Moreover, a spike in school absences, resulting dips in math and reading scores, and unsafe schools hurt the public interest. *Cf. N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[T]he public certainly did not benefit from a decrease in the number of instructional days").

In contrast, children who are denied access to their education suffer long-lasting harm. *See, e.g.*, *Issa v. Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) (holding that denying students the language resources needed to learn constituted irreparable harm because denying a student a sound education could "change the trajectory of a child's life"); *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (holding that a school's bathroom policy caused irreparable harm to a transgender student because walking a long distance to a gender-

neutral bathroom "cause[d] him to miss class time"), *abrogated on other grounds*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

Students who are frequently absent from school will face a significant and persistent drop in their math and reading scores,[19] are four times more likely to drop out of high school,[20] and suffer lasting harms to their executive functioning and socio-emotional development.[21] Further, longitudinal research suggests that a child who is frequently absent from school in one year will be more likely to miss school in future years, compounding learning loss over time.[22] Here, the public has a strong interest in preventing lasting educational harm to the District's children. *See also N.D. v. Haw. Dep't of Educ.*, 600 F.3d

---

19 Henry May, Lauren P. Bailes, & Danielle M. Riser, *Absenteeism & Achievement in Early Elementary Grades: A Multilevel Organizational Analysis*, 30 J. OF ED. FOR STUDENTS PLACED AT RISK 4, (2024), https://www.tandfonline.com/doi/full/10.1080/10824669.2024.2413483.

20 U.S. DEP'T OF EDUC., *Chronic Absenteeism*, (Aug. 21, 2025), https://www.ed.gov/teaching-and-administration/supporting-students/chronic-absenteeism.

21 Lucrecia Santibañez & Cassandra Guarino, *The Effects of Absenteeism on Academic and Social-Emotional Outcomes*, POL'Y ANALYSIS FOR CAL. EDUC., (Oct. 2020), https://edpolicyinca.org/publications/effects-absenteeism-academic-and-social-emotional-outcomes.; Ansari & Gottfried, *supra* note 13.

22 Ansari & Gottfried, *supra* note 13.

1104, 1107–08 (9th Cir. 2010) (upholding a district court's finding that plaintiffs suffered irreparable harm when they missed just 17 days of school).

Finally, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence," including those requiring probable cause before making a warrantless arrest. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the district court's order granting the preliminary injunction should be affirmed.

Respectfully submitted,

/s/ Alice C. Hwang
Daniel M. Rosenthal
Alice C. Hwang
Charlotte Schwartz*
James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Tel: (202) 496-0500

Fax: (202) 496-0555
achwang@jamhoff.com
dmrosenthal@jamhoff.com

Dated: October 19, 2026

*Counsel for Amici*

**Not admitted in D.C. Circuit*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e):

   [x] this document contains 4,753 words,

   [ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   [x] this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14pt Century Schoolbook font; or

   [ ] this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

/s/ Alice C. Hwang
Alice C. Hwang
*Counsel for Amici Curiae*

Dated: October 19, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2026, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

/s/ Alice C. Hwang
Alice C. Hwang
*Counsel for Amici Curiae*