**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 26-5045**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOSÉ ESCOBAR MOLINA, et al.,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Columbia, Civ. No. 25-03417

# BRIEF OF CHEFS STOPPING AAPI HATE; COUNCIL FIRE; IMMIGRANT FOOD; IMPACTGC, LLP; MASA GROUP; THRIFT THE DISTRICT; AND ERIK BRUNER-YANG AS AMICI CURIAE SUPPORTING APPELLEES AND AFFIRMANCE

Barak Cohen
*Counsel of Record*
Caroline Mew
Abigail F. Vice
Tiara Milner
ASHURST PERKINS COIE US LLP
700 Thirteenth Street, N.W.
Suite 800
Washington, DC 20005-3960
Telephone: 202.654.6337
Barak.Cohen@ashurstperkins.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A) and Circuit Rule 26.1, counsel for amici curiae certifies that Ifood Inc. owns 100 percent of the stock of Immigrant Food. The other amici curiae submitting this brief have no parent corporation. No publicly held corporation owns 10 percent or more of the stock of any amicus curiae.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for amici curiae certifies the following:

**Parties, Intervenors, and Amici.** Except for the amici curiae submitting this brief and the Federation for American Immigration Reform, all parties and intervenors appearing before the district court and in this Court are listed in the Brief for Appellants.

**Rulings Under Review.** References to the rulings at issue appear in the Brief for Appellees.

**Related Cases**. This case has not previously been before this Court. Cases that are related to this appeal within the meaning of Circuit Rule 28(a)(1)(C) are *Cruz Gamez* v. *Lyons*, No. 26-2090 (9th Cir.) and *Ramirez Ovando* v. *Mullin*, No. 26-1027 (10th Cir.). Counsel for amici curiae is aware of no other related cases.

## STATEMENT REGARDING CONSENT TO FILE

Counsel for defendants-appellants and counsel for plaintiffs-appellees consent to the filing of this brief in accordance with applicable rules. *See* D.C. Cir. R. 29(b).

## CERTIFICATE REGARDING SEPARATE BRIEFING

Amici curiae are local businesses, business owners, and organizations that support socially responsible business practices and growth in Washington, D.C. The District's business community drives economic growth, employs thousands of residents of the District, Maryland, and Virginia, and shapes the District's entrepreneurial identity. And immigrants are essential to the District's businesses as owners, employees, and customers. Immigrant-owned businesses—from restaurants and grocery stores to technology startups—create jobs and enrich the regional economy. Likewise, immigrant workers fill key roles, while immigrant customers drive revenue and foot traffic.

Pursuant to Circuit Rule 29(d), counsel for amici curiae certifies that a separate brief is necessary because, as of the date of this certification, counsel is aware of no other brief that addresses in depth the interests of local businesses in relation to enforcement of the immigration laws.

## TABLE OF CONTENTS

Page

Interest of amici curiae ... 1

Introduction and summary of argument ... 5

Argument ... 5

I. Immigrants are indispensable to the national and local economies ... 5

A. Immigrants create economic value as business owners and employers ... 6

B. Immigrants sustain economic value as workers and consumers ... 8

II. The injunction properly protects against harm to local businesses from warrantless civil immigration arrests without individualized determinations of likelihood of escape ... 11

A. Courts properly consider public and local economic harms within the balance of equities when adjudicating requests for preliminary injunctive relief ... 11

B. The district court properly enjoined the policy to preserve the status quo, avoiding the risk of severe economic disruption caused by an unlawful policy ... 14

Conclusion ... 18

## TABLE OF AUTHORITIES

### CASES

*Alpine Securities Corp.* v. *Financial Industry Regulatory Authority*, 121 F.4th 1314 (D.C. Cir. 2024) ... 12, 15, 17

*Celsis In Vitro, Inc.* v. *CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) ... 12

Page

Cases—continued:

*Dandamudi* v. *Tisch*, 686 F.3d 66 (2d Cir. 2012) .......... 14, 17

*Finch* v. *Treto*, 82 F.4th 572 (7th Cir. 2023) .......... 12, 15

*Foley* v. *Connelie*, 435 U.S. 291 (1978) .......... 14, 17

*Gordon* v. *Holder*, 721 F.3d 638 (D.C. Cir. 2013) .......... 13, 16

*Hanson* v. *District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) ..... 12, 15

*League of Women Voters* v. *Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...... 13, 16

*Media Matters for America* v. *Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .......... 13, 16

*Novedades y Servicios, Inc.* v. *Financial Crimes Enforcement Network*, 181 F.4th 961 (9th Cir. 2026) .......... 12

*Singh* v. *Berger*, 56 F.4th 88 (D.C. Cir. 2022) .......... 12, 13, 15

*Truax* v. *Raich*, 239 U.S. 33 (1915) .......... 14, 17

*Washington* v. *Reno*, 35 F.3d 1093 (6th Cir. 1994) .......... 13

*Winter* v. *Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .. 11

*Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886) .......... 14, 17

**RULE**

Fed. R. App. P. 29(a)(4)(E) .......... 1

**OTHER AUTHORITIES**

American Immigration Council:

*Immigrants in the District of Columbia*,
https://map.americanimmigrationcouncil.org/locations/district-of-columbia/ (last visited Oct. 19, 2026) .......... 8

Page

Other authorities—continued:

*Immigrants in the United States*, https://map.americanimmigrationcouncil.org/locations/national (last visited Oct. 19, 2026) .................................................. 7

*Immigrants in the Washington, D.C. Metro Area*, https://map.americanimmigrationcouncil.org/city/washington-dc/ (last visited Oct. 19, 2026) .......................................... 8

*Nearly Half of Fortune 500 Companies in 2026 Were Founded by Immigrants or Their Children* (Sept. 16, 2026), https://www.americanimmigrationcouncil.org/report/fortune-500-companies-founded-by-immigrants-2026/ .......................................... 6

*New Data Shows Immigrant-Owned Businesses Employed 8 Million Americans; Immigrants Wield $1.1 Trillion in Spending Power* (Mar. 12, 2019), https://www.americanimmigrationcouncil.org/uncategorized/new-data-shows-immigrant-owned-businesses-employed-8-million-americans-immigrants-wield-1-1-trillion-in-spending-power/ ..................................................................... 7

Bureau of Labor Statistics, U.S. Department of Labor, *Foreign-Born Workers: Labor Force Characteristics 2024* (May 19, 2025), https://www.bls.gov/news.release/pdf/forbrn.pdf ................................ 9

David Dyssegaard Kallick, Americas Society/Council of the Americas, *Bringing Vitality to Main Street: How Immigrant Small Businesses Help Local Economies Grow* (Jan. 2015), https://www.as-coa.org/sites/default/files/ImmigrantBusinessReport.pdf ............................... 8

Ewing Marion Kauffman Foundation, *2017 Kauffman Index of Startup Activity*, https://www.kauffman.org/wp-content/uploads/2019/09/2017_Kauffman_Index_Startup_Activity_National_Report_Final.pdf ................................................................ 6

*Immigrants and the Economy* (Apr. 15, 2025), https://www.epi.org/publication/immigrants-and-the-economy/ ....................................... 9

Immigration Research Initiative, *50 States: Immigrants by Number and Share* (Sept. 28, 2026), https://immresearch.org/reports/50-states-immigrants-by-number-and-share-3/ ........................................ 9

U.S. Small Business Administration Office of Advocacy, *Small Business Facts: An Overview of Immigrant Business Ownership* (Oct. 2022), https://advocacy.sba.gov/wp-content/uploads/2022/10/Small-Business-Facts_Immigrant-Business-Ownership_508c_V2.pdf.......... 7

Vivek Wadhwa et al., *America's New Immigrant Entrepreneurs*, Duke University; U.C. Berkeley (2007)................................................ 7

## INTEREST OF AMICI CURIAE[1]

Amici curiae are businesses, nonprofit organizations, and business leaders that operate in or support the Washington, D.C. metropolitan area's restaurant, hospitality, retail, consulting, and professional services sectors. They submit this brief to address the interests of the D.C. business community and underscore the outsized contributions of immigrants to businesses across the District. They are well positioned to address how disruptions in the enforcement of immigration laws can affect workers, business owners, customers, communities, and the local economy. They include the following:

**Chefs Stopping AAPI Hate** is a Washington, D.C.–based nonprofit organization founded by chefs Tim Ma and Kevin Tien. The organization brings together those who define themselves as Asian American and Pacific Islander (AAPI) and allied chefs to raise awareness of anti-AAPI violence and racism. The organization also raises funds for AAPI victims, organizations, and small-business owners through collaborative meals, dining experiences, and other events. Its work directly supports members of the AAPI community and the restaurant industry, including immigrant workers and small-business owners.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for amici curiae certifies that no counsel for a party authored this brief in whole or in part, and no person other than amici curiae or their counsel contributed money to fund its preparation or submission.

**Council Fire** is an Annapolis-based sustainability and business-management consulting firm and certified B Corporation. It advises public, private, and philanthropic organizations on matters including sustainable business, climate resilience, community development, transportation, and natural-resource management. Through this work, Council Fire helps organizations pursue sustainable growth and strengthen the communities and economies in which they operate, giving it an interest in the stability of the region's workforce and business environment.

**Erik Bruner-Yang** is a Washington, D.C.–based chef and restaurateur, and the chef and owner of Maketto. Located on H Street Northeast, Maketto is a restaurant centered on Cambodian and Taiwanese cooking that seeks to build community through quality, consistency, and accessibility. As a Taiwanese American chef born in Taiwan to an American father and immigrant mother, Bruner-Yang brings a personal and professional understanding of the contributions that immigrant communities make to Washington, D.C.'s restaurant and hospitality industry. Through his work as a chef and restaurateur, he has a direct interest in governmental practices affecting immigrant workers, business owners, customers, and the communities that support local restaurants.

**Immigrant Food** operates restaurants in Washington, D.C., and Arlington, Virginia, that offer globally inspired food and use food as a platform to celebrate the achievements, experiences, and contributions of immigrants. Because immigrant experiences and culinary traditions are

central to its mission and operations, Immigrant Food has a direct interest in conditions affecting immigrant communities and the local restaurant economy.

**ImpactGC, LLP** is a Washington, D.C.–based transactional law firm that provides fractional general counsel services and other flexible legal services to growing businesses. Its clients include benefit corporations, nonprofits, women- and minority-owned businesses, social-impact companies, and other mission-driven enterprises. As counsel to businesses and nonprofit organizations, including enterprises operating in Maryland and the greater Washington region, ImpactGC has an interest in the stability of the regional business environment and the workforce and customer base on which its clients rely.

**Masa Group** is a Washington, D.C.–based social-justice consulting firm that works to advance progressive policies at the state, local, and national levels. The firm provides campaign, government-relations, lobbying, and related services to social-justice organizations, including organizations focused on immigration policy and immigrant communities. Led by a team with substantial immigration-policy experience, Masa Group also supports nonprofit organizations that assist immigrants, giving it a direct interest in policies and governmental practices affecting immigrant communities.

**Thrift the District** is a Washington, D.C.–based personal-styling business that provides sustainable wardrobe services, including closet

consultations, personal thrifting, wardrobe styling, and vintage curation. Founded by Stephanie Hernandez, the business seeks to make sustainable fashion choices accessible and to reduce clothing waste through practical styling and secondhand shopping. As a local sole proprietorship that provides services directly to Washington-area customers, Thrift the District has an interest in the economic stability and continued vitality of the community it serves.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court properly granted injunctive relief in this case for all of the reasons set forth in its order and appellees' brief—and for the additional reason that enjoining the government's challenged policy prevents the risk of serious harm to local businesses like amici, which depend on immigrant communities for their continued economic vitality. Immigrants are, in short, critical to the local economy, just as they are to the economy on a national scale. Immigrants start businesses, create jobs, and contribute to the workforce and the tax base. Therefore, disruptions to immigrant communities, such as the government's challenged policy, present substantial risks not only to those communities, but to local businesses and the regional economy as a whole. The government undertook the challenged policy for the purpose of changing the status quo, departing from its own previous practices. Any government interest is therefore far outweighed by the harm it risks, including harm to local businesses and communities, and the public's interest in lawful agency action and the right to work for a living. This Court should affirm.

## ARGUMENT

### I. IMMIGRANTS ARE INDISPENSABLE TO THE NATIONAL AND LOCAL ECONOMIES

Immigrants contribute to the economy in every role they occupy—as entrepreneurs and employers, as workers, as consumers, and as taxpayers. Those contributions are especially pronounced in the Washing-

ton, D.C. metropolitan area and in the industries in which amici operate. Accordingly, disruptions that affect immigrant communities do not stop there—the uncertainty spreads to local businesses and harms the regional economy as a whole.

### A. Immigrants create economic value as business owners and employers.

Immigrant entrepreneurs play a substantial role in the growth of the national economy. Immigrants are almost twice as likely as native-born citizens to start their own businesses. *See* Ewing Marion Kauffman Foundation, *2017 Kauffman Index of Startup Activity*, at 5, https://www.kauffman.org/wp-content/uploads/2019/09/2017_Kauffman_Index_Startup_Activity_National_Report_Final.pdf. Nearly half of Fortune 500 companies were founded by an immigrant or the child of an immigrant. *See* American Immigration Council, *Nearly Half of Fortune 500 Companies in 2026 Were Founded by Immigrants or Their Children* (Sept. 16, 2026), https://www.americanimmigrationcouncil.org/report/fortune-500-companies-founded-by-immigrants-2026/. Immigrant representation is even higher as to businesses focused on innovation—more than half of Silicon Valley startups count one or more immigrants as among their key founders. *See* Richard T. Herman & Robert L. Smith, *Immigrant, Inc.: Why Immigrant Entrepreneurs Are Driving the New Economy (and How They Will Save the American Worker)* 5 (2009). And immigrants launched one-quarter of all engineering and technology com-

panies in the United States from 1995 to 2005, creating 450,000 jobs. *See* Vivek Wadhwa et al., *America's New Immigrant Entrepreneurs* 11, Duke University; U.C. Berkeley (2007).

Immigrant entrepreneurs may play an even larger role in industries that operate primarily on a more local level. In sectors such as food services—an industry in which several amici curiae operate—immigrants own more than one-third of businesses. *See* U.S. Small Business Administration Office of Advocacy, *Small Business Facts: An Overview of Immigrant Business Ownership* (Oct. 2022), https://advocacy.sba.gov/wp-content/uploads/2022/10/Small-Business-Facts_Immigrant-Business-Ownership_508c_V2.pdf.

What is more, across a broad range of industries, immigrant entrepreneurs generate substantial value in the national economy. By 2019, immigrant-owned companies employed nearly 8 million workers nationally. *See* American Immigration Council, *New Data Shows Immigrant-Owned Businesses Employed 8 Million Americans; Immigrants Wield $1.1 Trillion in Spending Power* (Mar. 12, 2019), https://www.americanimmigrationcouncil.org/uncategorized/new-data-shows-immigrant-owned-businesses-employed-8-million-americans-immigrants-wield-1-1-trillion-in-spending-power/. And immigrant-owned businesses generate more than $116 billion in income. *See* American Immigration Council, *Immigrants in the United States*, https://map.americanimmigrationcouncil.org/locations/national.

The regional equivalents of those national figures are particularly significant. In 2023, immigrant entrepreneurs numbered 125,700—accounting for 42.7 percent of all entrepreneurs in the Washington, D.C. metropolitan area. *See* American Immigration Council, *Immigrants in the Washington, D.C. Metro Area*, https://map.americanimmigrationcouncil.org/city/washington-dc/. The region's immigrant entrepreneurs generated approximately $4.1 billion in business income in 2023. *See id.* Immigrants in the District also work across a wide range of industries, including finance, health care, hospitality and food services, and education. *See* American Immigration Council, *Immigrants in the District of Columbia*, https://map.americanimmigrationcouncil.org/locations/district-of-columbia/. And immigrant-owned businesses do more than produce income for their owners. They employ workers, serve customers, support commercial corridors, and promote investment in surrounding communities. *See* David Dyssegaard Kallick, Americas Society/Council of the Americas, *Bringing Vitality to Main Street: How Immigrant Small Businesses Help Local Economies Grow* 2, 5, 8-9, 12, 14-34 (Jan. 2015), https://www.as-coa.org/sites/default/files/ImmigrantBusinessReport.pdf.

### B. Immigrants sustain economic value as workers and consumers.

Immigrants sustain the economy as workers and consumers as well. They constitute more than 19 percent of the American workforce.

*See* Bureau of Labor Statistics, U.S. Department of Labor, *Foreign-Born Workers: Labor Force Characteristics 2024*, at 1 (May 19, 2025), https://www.bls.gov/news.release/pdf/forbrn.pdf. In the District of Columbia, immigrants constitute approximately 15 percent of residents and nearly 17 percent of the labor force. *See* Immigration Research Initiative, *50 States: Immigrants by Number and Share* (Sept. 28, 2026), https://immresearch.org/reports/50-states-immigrants-by-number-and-share-3/ (residents); *Immigrants in the District of Columbia*, *supra* (labor force).

The economic effects of immigrants' participation in the workforce are substantial. Immigrant workers contribute more than $2 trillion to the United States' gross domestic product. *See* Daniel Costa et al., Economic Policy Institute, *Immigrants and the Economy* (Apr. 15, 2025), https://www.epi.org/publication/immigrants-and-the-economy/. Immigrant-led households earned approximately $2.4 trillion in total income and held $1.7 trillion in spending power. *See Immigrants in the United States*, *supra*. That spending supports restaurants, retail establishments, service providers, housing, and other businesses, benefiting workers and enterprises throughout the economy.

Immigrant households also contribute substantial tax revenue. In 2023, immigrant-led households paid $651.9 billion in taxes. *See Immigrants in the United States*, *supra*. Those tax revenues support schools, infrastructure, public safety, and other essential services on which indi-

viduals and businesses, including amici, their employees, and their customers, depend.

* * *

Those contributions show why disruptions to immigrant communities reach far beyond the individuals directly subject to enforcement. Restaurants, retailers, and service providers depend on employees and customers who are willing and able to engage in ordinary commercial activity. Communities depend on the income, investment, and tax revenue that those individuals and businesses generate. Orderly enforcement of the immigration laws thus protects not only individual entrepreneurs but also the jobs, commercial relationships, and community investment their businesses create. *See* Kallick, *supra*.

Local businesses rely on a stable framework for workforce planning, investment, and commercial operations. Departures from the individualized likelihood-of-escape determination that Congress prescribed threaten that framework. That threat is acute in the Washington, D.C. metropolitan area, where immigrant entrepreneurs are prominent and economic relationships are particularly interconnected. Immigrant workers, entrepreneurs, and consumers support the restaurants, retail establishments, consulting firms, professional-services practices, and community organizations that amici represent. Disruptions to the orderly enforcement of immigration law therefore extend beyond the indi-

viduals against whom the challenged practices are enforced, reaching their employees or employers, their customers and suppliers, and ultimately the community as a whole.

## II. THE INJUNCTION PROPERLY PROTECTS AGAINST HARM TO LOCAL BUSINESSES FROM WARRANTLESS CIVIL IMMIGRATION ARRESTS WITHOUT INDIVIDUALIZED DETERMINATIONS OF LIKELIHOOD OF ESCAPE

The district court properly entered preliminary injunctive relief for the additional reason that the government's challenged policy would create serious disruptions for local businesses like those that amici represent. The challenged policy changes the status quo and departs from the government's previous practice. In comparison, harm to the local economy and the public's interests in lawful agency action and exercising the right to work for a living—in which amici and their business partners, employees, and customers share—weigh overwhelmingly in favor of preliminary injunctive relief.

### A. Courts properly consider public and local economic harms within the balance of equities when adjudicating requests for preliminary injunctive relief.

A party seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also*

*Alpine Securities Corp.* v. *Financial Industry Regulatory Authority*, 121 F.4th 1314, 1324 (D.C. Cir. 2024). A business sustains irreparable harm if it risks being unable to continue "in its current form." *Alpine Securities*, 121 F.4th at 1329. On that score, courts also consider the prospective loss of business opportunities and customers. *See Novedades y Servicios, Inc.* v. *Financial Crimes Enforcement Network*, 181 F.4th 961, 977 (9th Cir. 2026); *Celsis In Vitro, Inc.* v. *CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Nor are courts constrained to consider only the specific harms of the parties; when evaluating whether preliminary injunctive relief is warranted, courts may properly account for harms to "the public—including third parties." *See Finch* v. *Treto*, 82 F.4th 572, 578 (7th Cir. 2023).

Those principles properly inform the ultimate balance of equities and consideration of the public interest. And they carry meaningful weight in favor of preliminary injunctive relief when the government's challenged practice changes the status quo and departs from its own prior practice, or infringes on the rights of the public—or, as here, both.

1. In general, courts are "institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the non-movant ultimately wins on the merits." *Hanson* v. *District of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (citation omitted); *see also Singh* v. *Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022). And in particular, when the government has previously permitted con-

duct that it now claims is harmful, the equities shift toward the movant. *See Singh*, 56 F.4th at 107-108; *see also League of Women Voters* v. *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

In *Singh*, the Marine Corps denied religious accommodations to Sikh recruits during basic training even though comparable accommodations were allowed after basic training and other departures from grooming rules were permitted. 56 F.4th at 107-108. Those existing practices, this Court explained, undermined the government's assertion that an injunction would harm its interests in unit cohesion and national security. *Id.* Similarly in *League of Women Voters*, this Court concluded that an injunction restoring a previous federal voter-registration form worked little harm to the government's interest in election integrity, given that there was "precious little record evidence" of voter fraud while the previous form had been in use. *See* 838 F.3d at 12-14.

2. The public interest independently favors requiring agencies to act lawfully: "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. To the contrary, "[t]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington* v. *Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *accord Media Matters for America* v. *Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025); *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

There is also a strong public interest in the exercise of "the right to work for a living," which the Supreme Court has described as being "of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax* v. *Raich*, 239 U.S. 33, 41 (1915); *see also Yick Wo* v. *Hopkins*, 118 U.S. 356, 370, 374 (1886) (explaining that laws such as San Francisco's, barring "Chinese subjects" from "carry[ing] on, in the accustomed manner, their harmless and useful occupation, on which they depend for a livelihood"—there, the operation of laundries—are "intolerable in any country where freedom prevails"). Unlike "the right to govern," for instance, the right to work protects an "ability to earn a livelihood and engage in licensed professions" for citizens and noncitizens alike. *Foley* v. *Connelie*, 435 U.S. 291, 295-297 (1978); *see also Dandamudi* v. *Tisch*, 686 F.3d 66, 71-72, 79 (2d Cir. 2012) (concluding that New York could not lawfully restrict pharmacist licenses to citizens and legal permanent residents, excluding other legal residents).

### B. The district court properly enjoined the policy to preserve the status quo, avoiding the risk of severe economic disruption caused by an unlawful policy.

Applying those principles, the district court properly concluded that the balance of equities and the public interest, collectively, favor preliminary relief in this case. In addition to the equities of the parties, courts

properly consider the interests of "the public—including third parties," such as amici and their communities. *See Finch*, 82 F.4th at 578.

As discussed, *see* pp. 5-11, *supra*, immigrants play a vital role in sustaining local businesses and the regional economy. Disruptions in the enforcement of the immigration laws generate substantial economic risks for local businesses like those represented by amici, which face the prospect of lost business and damage to goodwill and customer relationships. *See Alpine Securities*, 121 F.4th at 1329. Those harms are particularly weighty in comparison to a policy that would, as here, change the status quo and infringe on the public interests in lawful agency action and exercising the right to work for a living.

1. As a threshold matter, the injunction preserves rather than disrupts the status quo. The government promulgated the challenged policy in order to change the status quo, *see Singh*, 56 F.4th at 97, and the injunction holds the preexisting framework in place while the litigation proceeds—precisely the kind of relief that courts are instructed to grant, *see Hanson*, 120 F.4th at 247.

Correlatively, the government's prior practices counsel in favor of the injunction as well. The new policy encourages warrantless arrests on the basis of characteristics and conduct that would not have resulted in a warrantless arrest before the policy was promulgated. *See Singh*, 56 F.4th at 107-108. Just as the Marine Corps' existing accommodations undercut the government's claimed harm in *Singh*, and just as the ab-

sence of fraud under the prior voter-registration form undercut the government's claimed harm in *League of Women Voters*, 838 F.3d at 12-14, the government's history of enforcement under the preexisting framework undercuts any contention that restoring that framework pending litigation will impair its enforcement mission.

2. The challenged policy threatens two important public interests. First, the public has a substantial interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *See League of Women Voters*, 838 F.3d at 12; *accord Media Matters*, 138 F.4th at 585; *Gordon*, 721 F.3d at 653. Businesses in the Washington, D.C. metropolitan area have developed against the backdrop of congressionally prescribed procedures that provide for the orderly enforcement of the immigration laws. As relevant here, that backdrop includes the requirements that Congress established for warrantless civil immigration arrests—a warrant, or an individualized determination of likelihood of escape. The government's adherence to those requirements gives employers, workers, and customers a predictable framework within which to hire, staff, invest, and transact. A policy that likely departs from those requirements therefore injures more than the person arrested; it also unsettles the legal framework on which businesses like amici rely, and it risks destabilizing the economic relationships, *see* pp. 10-11, *supra*, that connect immigrant workers, business owners, customers, and surrounding communities.

Second, the public has a strong interest in the exercise of "the right to work for a living"—which the law protects for citizens and noncitizens alike. *See Truax*, 239 U.S. at 41; *Foley*, 435 U.S. at 295-297; *see also Yick Wo*, 118 U.S. at 370; *Dandamudi*, 686 F.3d at 71-72, 79. Business owners, many of them immigrants themselves, earn their livelihoods by operating restaurants, retail establishments, consulting firms, and professional-services practices. Their employees earn their livelihoods by reporting to work at those businesses. Requiring a warrant or the individualized likelihood-of-escape determination that Congress prescribed preserves the conditions in which both can do so. The prospect of warrantless arrests without that determination, by contrast, disrupts hiring, staffing, consumer activity, and business planning—especially in industries that depend on immigrant workers, owners, and customers.

In sum, the harms to third parties like amici are concrete: lost shifts, forgone wages and sales, staffing disruptions, employee departures, reduced consumer activity, and business closures. *See Alpine Securities*, 121 F.4th at 1329. Those harms fall not only on the direct subjects of enforcement, but on employers, coworkers, customers, neighboring businesses, and the broader public—exactly the interests that the equitable analysis is designed to capture. The district court's injunction should be affirmed for the additional reason that it properly protects against those harms, by preserving existing conditions while the litigation proceeds.

## CONCLUSION

The district court's preliminary injunction should be affirmed.

Date: October 19, 2026

Respectfully submitted,

/s/ Barak Cohen
Barak Cohen
*Counsel of Record*
Caroline Mew
Abigail F. Vice
Tiara Milner
ASHURST PERKINS COIE US LLP
700 Thirteenth Street, N.W.
Suite 800
Washington, DC 20005-3960
Telephone: 202.654.6337
Barak.Cohen@ashurstperkins.com

*Counsel for Amici Curiae*

## CERTIFICATES OF COMPLIANCE AND SERVICE

I hereby certify that the foregoing brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced 14-point Century Schoolbook typeface, using Microsoft Word. I also certify that this brief complies with Fed. R. App. P. 29(a)(5) and 32(f) because it contains 2,748 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that on October 19, 2026, I filed this brief with the Clerk of this Court via the CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished through that system.

Dated: October 19, 2026

*/s/* Barak Cohen

Barak Cohen