ORAL ARGUMENT NOT YET SCHEDULED

No. 26-5045

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JOSÉ ESCOBAR MOLINA, *et al.*,
Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,
Defendants-Appellants.

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

# BRIEF OF THE DISTRICT OF COLUMBIA, CALIFORNIA, COLORADO, ARIZONA, CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF APPELLEES

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

EMMA P. SIMSON
ELIZA H. SIMON
MITCHELL P. REICH
Senior Counsels to the
Attorney General

KARTHIK P. REDDY
Special Assistant Attorney General

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor
General

Office of the Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 890-9259
Karthik.Reddy@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1) and Federal Rule of Appellate Procedure 26.1, the undersigned certifies as follows:

A. *Parties and amici*.—All parties and amici appearing before the district court and in this Court are listed in the Brief for Appellees except for the following: Amicus Curiae Lawyers Defending American Democracy; Amici Curiae the Cato Institute, Fair and Just Prosecution, and the Law Enforcement Action Partnership; Amici Curiae Washington Teachers' Union, District of Columbia Alliance of Charter Teachers and Staff Local 1927, and individual educators; Amici Curiae Chefs Stopping AAPI Hate, Council Fire, Immigrant Food, ImpactGC, LLP, Masa Group, Thrift the District, and Erik Bruner-Yang; and Amici States.

B. *Ruling(s) under review*.—References to the ruling(s) under review appear in the Brief for Appellants and the Brief for Appellees.

C. *Related cases*.—Related cases are listed in the Brief for Appellants and the Brief for Appellees.

*/s/ Karthik P. Reddy*
KARTHIK P. REDDY

*Counsel for Amici Curiae*

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel states that a separate brief is necessary in this matter. This brief offers perspectives that are specific to the unique governmental interests of Amici States, rendering a joint brief with other amici curiae impracticable.

*/s/ Karthik P. Reddy*
KARTHIK P. REDDY

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

INTEREST OF AMICI CURIAE ........ 3

SUMMARY OF THE ARGUMENT ........ 5

ARGUMENT ........ 5

I. The Public Interest Favors The Preliminary Injunction ........ 6

II. The Public Interest Requires Compliance With Section 1357(a)(2)'s Warrantless Arrest Standard ........ 7

III. Unlawful Warrantless Arrests Impose Significant Community Harms ........ 9

IV. Unlawful Warrantless Arrests Undermine Public Safety And The Integrity of Public Institutions ........ 18

CONCLUSION ........ 21

## TABLE OF AUTHORITIES

*Cases*

*Alfaro v. Mullin*,
831 F. Supp. 3d 177 (E.D.N.Y. 2026) ....................4

*Almeida-Sanchez v. United States*,
413 U.S. 266 (1973) ....................8

*Arizona v. United States*,
567 U.S. 387 (2012) ....................8

*Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*,
445 F.2d 217 (D.C. Cir. 1971) ....................7

*Castañon Nava v. Dep't of Homeland Sec.*,
806 F. Supp. 3d 823 (N.D. Ill. 2025) ....................4

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
811 F. Supp. 3d 1 (D.D.C. 2025) ....................1

*Hussen v. Noem*,
822 F. Supp. 3d 944 (D. Minn. 2026) ....................4

*Lopez Romero v. Genalo*,
No. 26-cv-6184, 2026 WL 2240720 (S.D.N.Y. Aug. 3, 2026) ....................4

*M-J-M-A- v. Hermosillo*,
822 F. Supp. 3d 1147 (D. Or. 2026) ....................4

*Morales v. Chadbourne*,
793 F.3d 208 (1st Cir. 2015) ....................7

*Nken v. Holder*,
556 U.S. 418 (2009) ....................6

*N.S. v. Hughes*,
335 F.R.D. 337 (D.D.C. 2020) ....................6

*Pichardo Medina v. Hermosilla*,
No. 3:25-cv-02233-MC, 2025 WL 3712271 (D. Or. Dec. 22, 2025)....................9

*Ramirez Ovando v. Noem*,
810 F. Supp. 3d 1209 (D. Colo. 2025)............................................................4

*Rea v. Ball*,
No. 9:26-cv-01248, 2026 WL 1959270 (N.D.N.Y. July 2, 2026).........................4

*Sottera, Inc. v. Food & Drug Admin.*,
627 F.3d 891 (D.C. Cir. 2010).........................................................................6

*Tejeda-Mata v. Immigr. & Nat. Serv.*,
626 F.2d 721 (9th Cir. 1980)..........................................................................7

*Terry v. Ohio*,
392 U.S. 1 (1968).............................................................................................8

*Tincher v. Noem*,
816 F. Supp. 3d 931 (D. Minn. 2026)...............................................................6

*United States v. Brignoni-Ponce*,
422 U.S. 873 (1975)..........................................................................................8

*United States v. Cantu*,
519 F.2d 494 (7th Cir. 1975)..........................................................................7

*United States v. Green*,
670 F.2d 1148 (D.C. Cir. 1981).......................................................................8

*United States v. Jackson*,
415 F.3d 88 (D.C. Cir. 2005).......................................................................7–8

*United States v. Lee*,
106 U.S. (16 Otto) 196 (1882).........................................................................6

*Vasquez Perdomo v. Mullin*,
No. 25-cv-05605, 2026 WL 2751388 (C.D. Cal. Sept. 2, 2026)..........................4

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).............................................................................................6

*Statutes and Regulations*


8 U.S.C. § 1357 .......... 1, 5, 7, 9

8 C.F.R. § 287.8 .......... 1


*Other Authorities*


Stuart Anderson, *New Research Finds ICE Immigration Raids Harm the Economy*, Forbes (May 19, 2026) .......... 13

Samantha Artiga & Petry Ubri, *Living in an Immigrant Family in America: How Fear and Toxic Stress Are Affecting Daily Life, Well-Being & Health*, KFF (Dec. 13, 2017) .......... 12

Moriah Balingit, *Federal Surge Has Taken a Toll on Children of Immigrants in Washington*, PBS News (Sept. 17, 2025) .......... 10

Scott Calvert & Harriet Torry, *Fear of ICE Raids Lead to Summer Festival Cancellations Across U.S.*, Wall St. J. Online (July 3, 2025) .......... 17

Tim Carman et al., *"One Thing After Another" for D.C. Restaurants*, Wash. Post, Jan. 7, 2026, at E1 .......... 13

Federica Cocco & Jonathan Edwards, *Prekindergarten Applications for D.C. Schools Plunge*, Wash. Post, Apr. 14, 2026, at B13 .......... 10

*ICE Separates Asylum-Seeking Family*, Colo. Immigrant Rights Coal. (Oct. 28, 2025) .......... 11

Taylor Dolven, *What Happens When ICE Takes Away a Colorado Family?*, Colo. Sun Online (Sep. 5, 2025) .......... 11

Marcela Escobari, Ian Seyal & Paul Beach, *Shock, Awe, and Economic Fallout: The Employment Effects of ICE Enforcement in US Cities*, Brookings (May 29, 2026) .......... 14

Blanca Estrada, *How ICE Raids Changed a Once Bustling Chicago Neighbourhood*, BBC (Feb. 1, 2026) .......... 15

Leila Fadel et al., *Masked Immigration Agents Are Spurring Fear and Confusion Across the U.S.*, NPR (July 10, 2025) .......... 19

Dr. Beret Fitzgerald & Dr. Apoorva Ram, Op-Ed, *Immigrants Are So Afraid of ICE They Skip Critical Medical Care*, Colo. Sun Online (May 1, 2025) ........................................................ 15

Jasmin Garsd, *Pediatricians Raise the Alarm of Trump's Immigration Crackdown on Kids*, NPR (Sept. 27, 2026) ........................................................ 16

Dana Goldstein et al., *Immigration Raids Add to Absence Crisis for Schools*, N.Y. Times, June 16, 2025, at A8 ........................................................ 11

Exequiel Hernandez, *ICE-ing the Economy: Immigration Enforcement Under Trump 2.0 and Local Economic Activity*, Univ. of Pa., Wharton Sch. (May 13, 2026) ........................................................ 13–14

Aleja Hertzler-McCain & Ayesha Roscoe, *D.C. Churches See a Drop in Attendance as Congregants Fear Immigration Action*, NPR (Aug. 24, 2025) ........................................................ 17

Ana B. Ibarra, *"Can I Just Be a Kid?" Students Shaken by Immigration Raids Seek Help from School Counselors*, CalMatters (Oct. 3, 2025) ........................................................ 11

Libor Jany & Hailey Wang, *As ICE Raids Surged This Summer, Emergency Calls to LAPD Plummeted*, L.A. Times Online (Sept. 20, 2025) ........................................................ 20

Cassandra D. Kelly-Cirino et al., *Importance of Diagnostics in Epidemic and Pandemic Preparedness*, 4 BMJ Glob. Health No. e001179 (2019) ........................................................ 16–17

Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A Scoping Review of Challenges Faced by Undocumented Immigrants in Accessing Emergency Healthcare*, 23 Int'l J. for Equity in Health, No. 184 (2024) ........................................................ 16

Kyung Lah et al., *Fake ICE Agent Cases on the Rise*, CNN (Oct. 3, 2025) ........................................................ 19

Kira Lerner, *When Immigration Shows Up at Daycare*, Guardian Online (Aug. 25, 2025) .......... 10, 13

Douglas MacMillan et al., *ICE Packed People in Despite Crowding Warning*, Wash. Post., July 24, 2026, at A1 .......... 2

Lisa Marshall, *Heightened ICE Enforcement Harms US-Born Workers, Shrinks Workforce*, CU Boulder Today (May 4, 2026) .......... 14

Ginger Moored, D.C. Office of Revenue Analysis, *D.C.'s Immigrant Workforce* (Feb. 16, 2017) .......... 12

José Olivares, *US Sees Spate of Arrests of Civilians Impersonating ICE Officers*, Guardian Online (June 28, 2025) .......... 19

Maria Luisa Paul, *As Trump Cracks Down on Immigration, U.S. Citizens Are Among Those Snared*, Wash. Post. Online (Apr. 5, 2025) .......... 8

Jaclyn Peiser et al., *ICE Shifts Shopping Habits of Migrants*, Wash. Post, June 29, 2025, at B9 .......... 13

Mark D. Perkins et al., *Diagnostic Preparedness for Infectious Disease Outbreaks*, 390 Lancet 2211 (2017) .......... 17

Alejandro Portes, Donald Light & Patricia Fernández-Kelly, *The U.S. Health System and Immigration: An Institutional Interpretation*, 24 Socio. Forum 487 (2009) .......... 17

Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025) .......... 18

Tim Reid et al., *Immigration Raids Leave Crops Unharvested, California Farms at Risk*, Reuters (June 30, 2025) .......... 15

Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (2015) .......... 16

Alfonso Sierra, *"Devastating for Our Youth"—ICE Raids Leave Lasting Scar on Central Valley Students, Families*, Am. Cmty. Media (Sept. 3, 2025) .................................................................. 12

Nathan Solis & Ruben Vives, *FBI Urges ICE Agents to Identify Themselves After String of Impersonators Commit Crimes*, L.A. Times Online (Nov. 6, 2025)................................................................ 19

Darcy Spencer, *Bills to Limit ICE Impact Introduced in Prince George's County*, NBC4 Washington (Mar. 3, 2026) ........................... 17

Alex Stone, *Los Angeles Police Responded to a Kidnapping Call But Instead Found an ICE Operation*, ABC News (June 25, 2025) ................. 18

Joey Swanson, *Minneapolis Claims ICE Raids Cost City $700M in Wages, Business Losses*, KSTP (June 10, 2026) .......................................... 15

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. at Chi. (2013) ......................................................................... 19

*Labor Force Characteristics of Foreign-Born Workers Summary*, U.S. Bureau of Lab. Stat. (May 19, 2026) ......................................................... 3

U.S. Census Bureau, S0502: 2024 ACS 1-Year Estimate Subject Tables: Foreign-Born Population by Period of Entry Into the United States................... 3

*Immigration Enforcement Surge Triggered Immediate and Lasting Economic Disruption Across Los Angeles County's Latino Business Corridors*, UCLA Latino Pol'y & Pol. Inst. (July 22, 2026) ...................... 14–15

Tracee Wilkins et al., *You Come Monday, Someone's Gone: How Immigration Enforcement Is Affecting DMV Schools*, NBC4 Washington (Aug. 28, 2026) .................................................................................. 11

Robin Young, *Childcare Workers in D.C. Fear ICE Raids*, WBUR (Oct. 7, 2025) ........................................................................... 12

## INTRODUCTION

Across the country, federal immigration agents have undertaken enforcement actions that dispense with statutory safeguards that limit warrantless civil immigration arrests. The preliminary injunction entered by the district court prohibits violations of those safeguards: Before arresting a person without a warrant, agents must possess individualized probable cause both of unlawful presence and of a likelihood of escape.

The district court found compelling evidence that federal immigration agents repeatedly made warrantless arrests in the District of Columbia without "reason to believe" that the person was likely to escape before a warrant could be obtained, as the Immigration and Nationality Act ("INA") and federal regulations require. *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 49 (D.D.C. 2025); *see* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii). Those violations occurred against a backdrop of rapidly expanding enforcement activity across the nation—activity that has swept up longtime residents, workers, students, parents, and entire communities. Between 2024 and 2025, the number of federal immigration arrests in the District, Maryland, and Virginia increased by more than 300%,[1]

[1] Joe Heim & Emmanuel Martinez, *ICE Arrests in D.C. Region Reach Nearly 20,000 During Trump's Second Term*, Wash. Post Online (Apr. 6, 2026), https://www.washingtonpost.com/dc-md-va/2026/04/06/ice-arrests-dc-maryland-virginia-surge.

consistent with a reported new nationwide federal goal of arresting a minimum of 3,000 people every day.[2]

The District of Columbia, California, Colorado, Arizona, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington ("Amici States") have a significant interest in ensuring that federal immigration enforcement operates within the bounds Congress has set. When federal agents conduct unlawful warrantless arrests, the resulting harms reverberate far beyond the individuals seized: families are destabilized, workplaces are disrupted, schools are strained, economies are unsettled, and essential State and local services—including health care, education, and public safety—are hindered.

The preliminary injunction is tailored to prohibit immigration agents from conducting warrantless arrests outside of these guardrails. As such, the injunction protects not only the people subject to such unlawful arrests, but also the public interests in the Amici States, whose communities, institutions, and economies bear the consequences when federal agents act outside the scope of their lawful authority.

---

[2] Douglas MacMillan et al., *ICE Packed People in Despite Crowding Warning*, Wash. Post., July 24, 2026, at A1.

Because the district court correctly recognized the harms that unlawful warrantless arrests occasion, and because the injunction serves the public interest in lawful, orderly, and accountable enforcement practices, this Court should affirm.

## INTEREST OF AMICI CURIAE

Amici States are authorized to file this brief under Federal Rule of Appellate Procedure 29(a)(2). Amici States represent tens of millions of residents, including immigrants who are essential to Amici States' economies, schools, public services, and civic life. The District of Columbia is home to more than 100,000 immigrants; Amici States as a whole are home to over 30 million.[3] Immigrants comprise roughly 19% of the national workforce, and they serve crucial roles throughout Amici States, including educating our children, policing our streets, and caring for the sick and elderly.[4] Amici States thus have a strong interest in ensuring that federal immigration enforcement is carried out lawfully and in a manner that maintains public trust, protects community stability, and respects the statutory limits Congress placed on warrantless arrests.

As several recent federal court decisions reflect, federal immigration agents have made unlawful warrantless arrests across many jurisdictions—including in

[3] U.S. Census Bureau, S0502: 2024 ACS 1-Year Estimate Subject Tables: Foreign-Born Population by Period of Entry Into the United States (accessed Oct. 18, 2026).

[4] *Labor Force Characteristics of Foreign-Born Workers Summary*, U.S. Bureau of Lab. Stat. (May 19, 2026), https://www.bls.gov/news.release/forbrn.nr0.htm.

California,[5] Colorado,[6] Illinois,[7] Oregon,[8] Minnesota,[9] and New York.[10]

These arrests destabilize communities, deter residents from working, attending school, and seeking medical care, undermine confidence in law enforcement, and burden the State and local institutions that must respond to the resulting disruption. Nor are these harms confined to particular neighborhoods. When federal agents conduct warrantless arrests without individualized flight-risk determinations, the consequences ripple across the States' communities and economies.

Amici States therefore have a substantial interest in ensuring that Defendants comply with Congress's limits on warrantless arrest authority and in supporting the district court's injunction, which promotes lawful, accountable enforcement that protects both individuals and the public.

---

[5] *See Vasquez Perdomo v. Mullin*, No. 25-cv-05605, ___ F. Supp. 3d ___, 2026 WL 2751388, at *18–19 (C.D. Cal. Sept. 2, 2026).

[6] *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1220–25 (D. Colo. 2025), *appeal docketed*, No. 26-1027 (10th Cir. Jan. 26, 2026).

[7] *See Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 854–59 (N.D. Ill. 2025), *aff'd*, 175 F.4th 828 (7th Cir. 2026).

[8] *See M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1182–83 (D. Or. 2026), *appeal docketed*, No. 26-2090 (9th Cir. Apr. 6, 2026).

[9] *See Hussen v. Noem*, 822 F. Supp. 3d 944, 995–98 (D. Minn. 2026).

[10] *See, e.g.*, *Alfaro v. Mullin*, 831 F. Supp. 3d 177, 183 (E.D.N.Y. 2026); *Rea v. Ball*, No. 9:26-cv-01248, 2026 WL 1959270, at *3 (N.D.N.Y. July 2, 2026); *Lopez Romero v. Genalo*, No. 26-cv-6184, 2026 WL 2240720, at *3 (S.D.N.Y. Aug. 3, 2026).

## SUMMARY OF THE ARGUMENT

Congress has placed clear limits on immigration agents' authority to make warrantless arrests, requiring individualized probable cause of both removability and likelihood of escape. However, federal agents have repeatedly disregarded these statutory safeguards, resulting in unlawful arrests, improper detentions, and chaotic enforcement practices across multiple States. The preliminary injunction serves the public interest by enjoining a policy that disregards Section 1357(a)(2)'s guardrails and preventing the systemic violations documented in this and other cases. When federal agents conduct warrantless arrests without a lawful basis, the resulting harms are far-reaching, including destabilized schools, disrupted workplaces and local economies, reduced access to healthcare, and diminished participation in civic life. These practices also undermine public safety and erode trust in local law enforcement, making communities less safe and enabling criminals to impersonate federal agents. Because the injunction prevents violations of federal law and mitigates widespread community harms, it strongly serves the public interest and should be affirmed.

## ARGUMENT

Amici States file this brief in support of the preliminary injunction issued below. They focus on one important factor at issue: why preliminary injunctive

relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[11]

## I. The Public Interest Favors The Preliminary Injunction.

The public interest factor is important to this case because the challenged conduct imposes harms far beyond the parties. Courts assessing preliminary injunction requests look to the impact on non-parties, not merely the litigants before them. *See Sottera, Inc. v. Food & Drug Admin.*, 627 F.3d 891, 898 (D.C. Cir. 2010). Defendants-Appellants' policy and practice of conducting unlawful warrantless arrests have generated significant disruptions in schools, workplaces, healthcare settings, and local institutions. The injunction thus serves the public interest by preventing these widespread harms to communities.

Moreover, the public interest demands that federal law enforcement agents "observe the limitations which [the law] imposes upon the exercise of the authority which it gives." *United States v. Lee*, 106 U.S. (16 Otto) 196, 220 (1882). As numerous courts have found, there is a public "interest in ensuring that people . . . are not unlawfully arrested" by federal agents. *N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020); *see also, e.g.*, *Tincher v. Noem*, 816 F. Supp. 3d 931, 978 (D. Minn. 2026) (rejecting notion that "public interest is served by officers stopping law-

---

[11] Where, as here, the federal government opposes the injunction, the balance of the equities and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

abiding motorists without reasonable, particularized suspicion of criminal wrongdoing"). Here, Congress expressly limited immigration agents' warrantless arrest authority through Section 1357(a)(2)'s dual probable cause requirements. The injunction merely ensures that Defendants-Appellants respect that structure.

## II. The Public Interest Requires Compliance With Section 1357(a)(2)'s Warrantless Arrest Standard.

In designing the legislative scheme governing the powers of immigration agents, Congress chose to limit agents' authority to make warrantless arrests to instances where an officer "has reason to believe" that an individual "is in the United States in violation of [immigration laws]" and "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

Courts have long interpreted Section 1357(a)(2)'s "reason to believe" language as incorporating the Fourth Amendment's probable cause standard. *See Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971) ("We agree with the Government that the arrest provision must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause."); *accord, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 215–16 (1st Cir. 2015); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *Tejeda-Mata v. Immigr. & Nat. Serv.*, 626 F.2d 721, 725 (9th Cir. 1980); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975). This standard requires a "fair probability," which is more than "mere suspicion." *United States v. Jackson*,

415 F.3d 88, 91 (D.C. Cir. 2005); *United States v. Green*, 670 F.2d 1148, 1151 (D.C. Cir. 1981). And through requirements like probable cause, the Fourth Amendment strikes a careful balance that "protects residents . . . from indiscriminate official interference," while also allowing immigration agents "adequate means of guarding the public interest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–83 (1975) (requiring, for immigration traffic stops, reasonable suspicion consistent with *Terry v. Ohio*, 392 U.S. 1 (1968)); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 274–75 (1973) (requiring probable cause for warrantless immigrations searches).

Ignoring the probable cause requirement upsets that balance in a way that harms the rights of those who are lawfully present in Amici States. Warrantless arrests conducted in the absence of individualized probable cause can result in "unnecessary harassment of some aliens . . . who federal officials determine should not be removed." *Arizona v. United States*, 567 U.S. 387, 408 (2012). And because, under Defendants-Appellants' policy and practice, anyone *believed* to be unlawfully present is subject to such arrests—including those who *are* lawfully present—such harassment can be expected to extend to U.S. citizens as well.[12]

---

[12] *See, e.g.*, Maria Luisa Paul, *As Trump Cracks Down on Immigration, U.S. Citizens Are Among Those Snared*, Wash. Post. Online (Apr. 5, 2025), https://www.washingtonpost.com/immigration/2025/04/05/us-citizens-deported-immigration/.

Section 1357(a)(2) thus ensures that, consistent with the Fourth Amendment, immigration agents who arrest an individual cannot bypass constitutional protections by resorting to warrantless arrests without individualized determinations regarding removability and likelihood of escape. It is in the public interest, consistent with Congress's framework in Section 1357(a)(2), to prohibit enforcement of federal policies that violate the INA's statutory guardrails, as the preliminary injunction here does.

## III. Unlawful Warrantless Arrests Impose Significant Community Harms.

Defendants-Appellants' policy and practice of carrying out unlawful warrantless arrests form an integral component of an "arrest first, ask questions later" style of immigration enforcement. *Pichardo Medina v. Hermosilla*, No. 3:25-cv-02233-MC, 2025 WL 3712271, at *3 (D. Or. Dec. 22, 2025). Unlawful warrantless arrests often ensnare both individuals who are lawfully present and those with strong community ties who pose no flight risk. *Id.* at *3–4. Such arbitrary immigration enforcement spreads fear across communities and causes harms that ripple beyond just those arrested. Amici States focus on four specific ways these unlawful warrantless arrests harm their communities: (1) education; (2) the economy; (3) public health; and (4) participation in civic life.

*First*, Defendants-Appellants' policy and practice of carrying out warrantless arrests impacts children's education. In the wake of Immigration and Customs

Enforcement (ICE) raids, parents in neighborhoods across the Washington metropolitan area kept their children home out of fear that they or their children could be targeted by ICE.[13] As one mother explained, she was "too afraid to take her two sons"—both U.S. citizens—"to their nearby charter school" due to concerns that she would be detained.[14] Prekindergarten applications in the District "plunged" during the ICE raids, "particularly in schools in immigrant neighborhoods and those with bilingual programs," as parents no longer felt comfortable "accompanying their kids to school" and opted to keep them home.[15] The raids also affected those children who did make it to school, with fear distracting students from learning. One District teacher reported "immense fear and terror" among his students that makes "everyone feel on edge every day."[16] Another educator, from neighboring Prince George's County, reported that his school district had "seen a spike in requests for mental health services" due to the raids and noted that "both children and staff are

---

[13] *See* Moriah Balingit, *Federal Surge Has Taken a Toll on Children of Immigrants in Washington*, PBS News (Sept. 17, 2025), https://perma.cc/9STV-VB7T; Kira Lerner, *When Immigration Shows Up at Daycare*, Guardian Online (Aug. 25, 2025), https://perma.cc/8MF9-TYKM.

[14] Balingit, *supra* note 13.

[15] Federica Cocco & Jonathan Edwards, *Prekindergarten Applications for D.C. Schools Plunge*, Wash. Post, Apr. 14, 2026, at B13.

[16] Balingit, *supra* note 13.

stressed."[17] Nor were these impacts specific to the Washington region: Families across the country have kept their children home from school to avoid the threat of arrest, with significant impacts on student performance and well-being.[18]

The long-term harms of Defendants-Appellants' unlawful warrantless arrest policy and practice are predictable: In addition to reduced school attendance and loss of learning, experts say that "[c]onstant vigilance and worry puts children at greater risk of developing chronic anxiety and depression."[19] These long-term harms are only exacerbated when children themselves are subjected to warrantless arrest and, too often, separated from their families.[20] As a result of similar immigration enforcement tactics in California, one child psychologist observed that "the stress,

---

[17] Tracee Wilkins et al., *You Come Monday, Someone's Gone: How Immigration Enforcement Is Affecting DMV Schools*, NBC4 Washington (Aug. 28, 2026), https://perma.cc/GL97-4TKW.

[18] *See, e.g.*, Dana Goldstein et al., *Immigration Raids Add to Absence Crisis for Schools*, N.Y. Times, June 16, 2025, at A8 (noting findings "that parents kept their children out of school more often after raids swept California's Central Valley" and that "raids can harm student achievement and disrupt how schools function, even when they do not occur on or near school grounds").

[19] Ana B. Ibarra, *"Can I Just Be a Kid?" Students Shaken by Immigration Raids Seek Help from School Counselors*, CalMatters (Oct. 3, 2025), https://perma.cc/FH4R-JUNX.

[20] *See, e.g.*, *ICE Separates Asylum-Seeking Family; Whereabouts of Two Minor Children Unknown Amid Violent Arrests and Questions of Local Cooperation*, Colo. Immigrant Rights Coal. (Oct. 28, 2025), https://perma.cc/4AVV-43VP; Taylor Dolven, *What Happens When ICE Takes Away a Colorado Family?*, Colo. Sun Online (Sep. 5, 2025), https://perma.cc/66SU-HYHV.

anxiety, and trauma that develop in this climate of fear and uncertainty surrounding immigration enforcement can become chronic, leading to immediate and long-term damage to children's mental and physical health."[21]

*Second*, Defendants-Appellants' policy and practice of illegal warrantless arrests have disrupted the local economy because both workers and customers, regardless of immigration status, have been afraid to leave their homes.

In the District of Columbia, immigrant workers comprise a full quarter of the workforce and form a crucial part of many important industries—for example, as of 2017, 80% of the District's carpenters, 61% of cooks, 57% of childcare workers, 54% of construction workers, 42% of registered nurses, and 42% of scientists.[22] Defendants-Appellants' actions impair these individuals' contributions to the local economy. For example, childcare workers stopped reporting to daycares due to worries about being "caught up in a raid,"[23] with parents left "struggling with

---

[21] Alfonso Sierra, *"Devastating for Our Youth"—ICE Raids Leave Lasting Scar on Central Valley Students, Families*, Am. Cmty. Media (Sept. 3, 2025), https://perma.cc/NTA6-587G; *see also* Samantha Artiga & Petry Ubri, *Living in an Immigrant Family in America: How Fear and Toxic Stress Are Affecting Daily Life, Well-Being & Health*, KFF (Dec. 13, 2017), https://perma.cc/4UNH-SFC4.

[22] Ginger Moored, D.C. Office of Revenue Analysis, *D.C.'s Immigrant Workforce* (Feb. 16, 2017), https://perma.cc/UQ96-8RNU.

[23] Robin Young, *Childcare Workers in D.C. Fear ICE Raids*, WBUR (Oct. 7, 2025), at 1:25, https://perma.cc/VVF3-B258.

childcare, as so many who work as nannies or in childcare centers are immigrants."[24] Restaurants, too, were left understaffed: As one Capitol Hill restauranteur reported, several of his employees "were afraid to come to work" due to ICE raids, ultimately contributing to his decision to close his restaurant.[25] And local businesses have had to contend with fear on the part of their customers, too. As one server at a local Salvadoran restaurant explained, "We're worried about not getting enough customers" because "[e]veryone's afraid of ICE."[26]

These negative impacts on the local economy reflect nationwide economic impacts stemming from Defendants-Appellants' actions. In a study of over 5,000 ICE raids and 5.4 million data points on in-store foot traffic and spending between January 2024 and February 2026, a Wharton School economics professor found that heightened ICE enforcement activity in 2025 led to "8.1 billion fewer visits [to businesses]" nationwide and as much as $14 billion in forgone "spending in a single year."[27] Notably, the study found that "ICE activity before 2025 was not strongly

---

[24] Lerner, *supra* note 13.

[25] Tim Carman et al., *"One Thing After Another" for D.C. Restaurants*, Wash. Post, Jan. 7, 2026, at E1.

[26] Jaclyn Peiser et al., *ICE Shifts Shopping Habits of Migrants*, Wash. Post, June 29, 2025, at B9.

[27] Stuart Anderson, *New Research Finds ICE Immigration Raids Harm the Economy*, Forbes (May 19, 2026), https://www.forbes.com/sites/stuartanderson/2026/05/19/new-research-finds-ice-immigration-raids-harm-the-economy/ (citing Exequiel Hernandez, *ICE-ing the Economy: Immigration Enforcement Under Trump 2.0 and*

accompanied by reports of economic chilling, whereas the two follow each other very closely starting in January 2025."[28] This "economy of fear" makes customers "afraid to go out and shop" and workers "afraid to show up to work," creating "a downward spiral" in which businesses "cut back on hiring or shut down altogether," leading to "more business contraction and fewer jobs for everyone—including U.S.-born workers."[29] Similar research by the Brookings Institution found that ICE surges shrink local economies and cause job losses far in excess of the number of individuals arrested.[30] These harms have been felt throughout the country—from California to Illinois to Minnesota—where Department of Homeland Security agents carried out aggressive sweeps of city streets.[31]

---

*Local Economic Activity*, Univ. of Pa., Wharton Sch. 1, 3–4 (May 13, 2026), https://ssrn.com/abstract=6759278).

[28] Hernandez, *supra* note 27, at 6.

[29] Anderson, *supra* note 27.

[30] Marcela Escobari, Ian Seyal & Paul Beach, *Shock, Awe, and Economic Fallout: The Employment Effects of ICE Enforcement in US Cities*, Brookings (May 29, 2026), https://perma.cc/5ZZ3-H9DV; *see also* Lisa Marshall, *Heightened ICE Enforcement Harms US-Born Workers, Shrinks Workforce*, CU Boulder Today (May 4, 2026), https://www.colorado.edu/today/2026/05/04/heightened-ice-enforcement-harms-us-born-workers-shrinks-workforce (reporting on research suggesting that heightened ICE enforcement lowers "employment among remaining immigrants . . . likely due to a 'chilling effect' in which they stop going to work out of fear," and "has not expanded job opportunities for U.S.-born workers").

[31] *E.g.*, *Immigration Enforcement Surge Triggered Immediate and Lasting Economic Disruption Across Los Angeles County's Latino Business Corridors*, UCLA Latino Pol'y & Pol. Inst. (July 22, 2026), https://perma.cc/U4D8-FBHS (finding 46,000

*Third*, Defendants-Appellants' warrantless arrests have led to declines in medical visits, preventive care, and participation in State health programs, as residents have been afraid to seek treatment. In light of "ramped up ICE activity and threats of enforcement in or around health care settings," physicians across the country have reported that patients have delayed care, canceled appointments, and "ask[ed] for telehealth-only visits, even when in-person care is critical."[32] "The fear created by immigration enforcement," physicians explain, is "compromising the quality of care and undermining trust in the health care system."[33] As just one example, a Maryland mother delayed seeking needed medical care for her asthmatic

fewer customer visits and $3.16 million in lost revenue within first two weeks after June 2025 immigration enforcement, and that the "immediate economic shock . . . had not resolved nearly a year later"); Tim Reid et al., *Immigration Raids Leave Crops Unharvested, California Farms at Risk*, Reuters (June 30, 2025), https://reuters.com/business/immigration-raids-leave-crops-unharvested-california-farms-risk-2025-06-30/ (estimating that 70% of Central Valley agricultural workers were "frightened off" by immigration raids); Blanca Estrada, *How ICE Raids Changed a Once Bustling Chicago Neighbourhood*, BBC (Feb. 1, 2026), https://perma.cc/X6CP-A2TJ (reporting that fear of immigration enforcement has "turn[ed] one of Chicago's key economic hubs into something resembling a ghost town"); Joey Swanson, *Minneapolis Claims ICE Raids Cost City $700M in Wages, Business Losses*, KSTP (June 10, 2026), https://perma.cc/3GNF-QZQK (estimating losses of $445 million in business revenue and $152 million in wages due to "the effects of federal immigration enforcement").

[32] Dr. Beret Fitzgerald & Dr. Apoorva Ram, Op-Ed, *Immigrants Are So Afraid of ICE They Skip Critical Medical Care*, Colo. Sun Online (May 1, 2025), https://perma.cc/N48R-L54K.

[33] *Id.*

child due to fears that she "could be detained by immigration enforcement."[34] And when her son was ultimately medevacked to the District for emergency care, she hesitated to join him due to fear of detention at the hospital.[35]

These accounts are in keeping with studies showing that aggressive enforcement tactics deter residents from seeking medical treatment.[36] That deterrence, in turn, impacts the broader health of the community because "[p]ublic health is served when individuals freely seek preventive care and do not stave off care until they need emergency room treatment in the midst of a health crisis." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 609 (E.D. Pa. 2017) (summarizing witness testimony).[37]

---

[34] Jasmin Garsd, *Pediatricians Raise the Alarm of Trump's Immigration Crackdown on Kids*, NPR (Sept. 27, 2026), https://www.npr.org/2026/09/17/nx-s1-5953989/immigration-crackdown-children-medical-care.

[35] *Id.*

[36] *See, e.g.*, Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A Scoping Review of Challenges Faced by Undocumented Immigrants in Accessing Emergency Healthcare*, 23 Int'l J. for Equity in Health, No. 184, at 2, 6, 8 (2024), https://pubmed.ncbi.nlm.nih.gov/39277719; Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 332 (2015), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2014.302218 (finding that immigrants reported that they "did not access or utilize health services for which they were eligible, including preventive services," because "[t]hey worried that . . . their lack of documentation . . . would put them at risk for detention and deportation").

[37] *See also, e.g.*, Cassandra D. Kelly-Cirino et al., *Importance of Diagnostics in Epidemic and Pandemic Preparedness*, 4 BMJ Glob. Health No. e001179, at 1, 6–7

*Fourth*, just as in other parts of the country, the threat of unlawful warrantless immigration arrests has chilled participation in numerous other activities of daily life across the D.C. region. Residents refrained from recreational activities like sports.[38] Attendance at local churches dropped as worshippers—including "citizens and people with legal status"—stayed home to avoid detention.[39] Organizers cancelled local festivals out of fear that attendees could become targets for detention.[40]

In short, the unlawful warrantless arrests challenged in this litigation have wrought harms throughout the District and its environs, just as they have elsewhere in the country. The impacts to education, local economies, public health, and other core aspects of civil society counsel in favor of affirming the preliminary injunction.

---

(2019), https://gh.bmj.com/content/bmjgh/4/Suppl_2/e001179.full.pdf; Mark D. Perkins et al., *Diagnostic Preparedness for Infectious Disease Outbreaks*, 390 Lancet 2211, 2211 (2017), https://www.thelancet.com/action/showPdf?pii=S0140-6736%2817%2931224-2; Alejandro Portes, Donald Light & Patricia Fernández-Kelly, *The U.S. Health System and Immigration: An Institutional Interpretation*, 24 Socio. Forum 487, 501–02, 506 (2009), https://www.jstor.org/stable/40542689.

[38] Darcy Spencer, *Bills to Limit ICE Impact Introduced in Prince George's County*, NBC4 Washington (Mar. 3, 2026), https://perma.cc/6FD7-CH9R.

[39] Aleja Hertzler-McCain & Ayesha Roscoe, *D.C. Churches See a Drop in Attendance as Congregants Fear Immigration Action*, NPR (Aug. 24, 2025), https://www.npr.org/2025/08/24/nx-s1-5508346/d-c-churches-see-a-drop-in-attendance-as-congregants-fear-immigration-action.

[40] *See* Scott Calvert & Harriet Torry, *Fear of ICE Raids Lead to Summer Festival Cancellations Across U.S.*, Wall St. J. Online (July 3, 2025), https://www.wsj.com/us-news/ice-raids-send-chill-through-summer-festivals-754169a2.

## IV. Unlawful Warrantless Arrests Undermine Public Safety And The Integrity Of Public Institutions.

In carrying out unlawful arrests without warrants—often while agents are wearing masks and hiding their identities—Defendants-Appellants have created widespread confusion, delays, and danger for both local law enforcement and for the community it protects. Thus, rather than protecting public safety, Defendants-Appellants undermine it.

To begin, as Defendants-Appellants' agents often hide their identities and affiliations—via ski masks, plain clothes, and unmarked vehicles—and refuse to identify themselves as they carry out arrests with no warrant, the public and law enforcement can have difficulty distinguishing them from criminals.[41] For example, local law enforcement in California has responded to reports of kidnappings and hit-and-run incidents, only to later determine that the incidents were part of ICE operations.[42]

Defendants-Appellants' tactics and lack of transparency have also made it easier for criminals to commit crimes by impersonating immigration agents. In

---

[41] Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025), https://perma.cc/P4S3-EVZ9.

[42] Alex Stone, *Los Angeles Police Responded to a Kidnapping Call But Instead Found an ICE Operation*, ABC News (June 25, 2025), https://perma.cc/N6V2-44QN.

incidents across the country, individuals have posed as immigration agents and wielded the threat of deportation to commit robbery, kidnapping, and rape.[43] These incidents illustrate the importance of Defendants-Appellants adopting and adhering to policies that comply with federal law, as doing so would make it more difficult for common criminals to impersonate them and would help local law enforcement in identifying who is in fact a federal agent and who is not.

Defendants-Appellants' practices have also eroded trust between local law enforcement agencies and the communities they protect. Those without legal status are already less likely to report crime—even crimes where they are victims—out of fear that officials will ask them about their immigration status.[44] Fear of detention,

---

[43] *See, e.g.*, Nathan Solis & Ruben Vives, *FBI Urges ICE Agents to Identify Themselves After String of Impersonators Commit Crimes*, L.A. Times Online (Nov. 6, 2025), https://perma.cc/JK4Y-P23D; José Olivares, *US Sees Spate of Arrests of Civilians Impersonating ICE Officers*, Guardian Online (June 28, 2025), https://www.theguardian.com/us-news/2025/jun/28/civilians-impersonating-ice-officers; Leila Fadel et al., *Masked Immigration Agents Are Spurring Fear and Confusion Across the U.S.*, NPR (July 10, 2025), https://www.npr.org/2025/07/09/nx-s1-5440311/ice-raids-masked-agents; Kyung Lah et al., *Fake ICE Agent Cases on the Rise*, CNN, at 0:00–0:53 (Oct. 3, 2025), https://www.cnn.com/2025/10/03/us/video/ice-impersonators-investigation-lah-digvid.

[44] *See, e.g.*, Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. at Chi. 1, 6 (2013), https://perma.cc/XWQ9-4WAA ("Among US-born Latinos [i.e., citizens], 29 percent reported they are less likely to voluntarily offer information about crimes they know have been committed, and 26 percent indicated they are less likely to report a crime, because they fear that police will ask them or someone they know about their immigration status . . . or [that] of people they know.").

or of having a family or community member detained, makes victims and witnesses reluctant to come forward, to testify in court, and even to seek safety in a domestic violence shelter. Defendants-Appellants' escalating tactics have exacerbated these fears; for example, in the wake of the June 2025 immigration raids in Los Angeles, emergency calls to the Los Angeles Police Department fell by 28% (an average of 1,200 fewer calls per day).[45]

Finally, the States must contend with the confusion, chaos, and erosion of trust in law enforcement caused by Defendants-Appellants' actions with little confidence that these arrests are targeting actual public safety threats. Indeed, there is substantial evidence that most of the people arrested by Defendants-Appellants in the District of Columbia region since January 2025 have never been convicted of a crime. Despite then-Secretary Kristi Noem's claim that "70 percent of those arrested by ICE 'are convicted criminals or have criminal charges,'" the *Washington Post* has reported that 60% of "the roughly 19,500 people arrested by ICE in the District, Maryland, and Virginia between Jan. 20, 2025, and March 10, 2026," had "no criminal record" whatsoever.[46]

---

[45] Libor Jany & Hailey Wang, *As ICE Raids Surged This Summer, Emergency Calls to LAPD Plummeted*, L.A. Times Online (Sept. 20, 2025), https://perma.cc/N7MC-AU78.

[46] Heim & Martinez, *supra* note 1, at B14.

## CONCLUSION

For the foregoing reasons, the public interest counsels in favor of preliminary relief, and Amici States urge the Court to affirm the district court's preliminary injunction.

October 19, 2026

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

EMMA P. SIMSON
ELIZA H. SIMON
MITCHELL P. REICH
Senior Counsels to the
Attorney General

Respectfully submitted,

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

*/s/ Karthik P. Reddy*
KARTHIK P. REDDY
Special Assistant Attorney General

Office of the Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 890-9259
(202) 741-0649 (fax)
Karthik.Reddy@dc.gov

*On behalf of:*

ROB BONTA
*Attorney General of California*

KRISTIN K. MAYES
*Attorney General of Arizona*

KATHLEEN JENNINGS
*Attorney General of Delaware*

KWAME RAOUL
*Attorney General of Illinois*

ANTHONY G. BROWN
*Attorney General of Maryland*

DANA NESSEL
*Attorney General of Michigan*

AARON D. FORD
*Attorney General of Nevada*

RAÚL TORREZ
*Attorney General of New Mexico*

DAN RAYFIELD
*Attorney General of Oregon*

CHARITY R. CLARK
*Attorney General of Vermont*

NICHOLAS W. BROWN
*Attorney General of Washington*

PHILIP J. WEISER
*Attorney General of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*

ANNE E. LOPEZ
*Attorney General of Hawai'i*

AARON M. FREY
*Attorney General of Maine*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

KEITH ELLISON
*Attorney General of Minnesota*

JENNIFER DAVENPORT
*Attorney General of New Jersey*

LETITIA JAMES
*Attorney General of New York*

PETER F. NERONHA
*Attorney General of Rhode Island*

JAY JONES
*Attorney General of Virginia*

## CERTIFICATE OF SERVICE

I certify that on October 19, 2026, I caused a copy of this brief to be served to all registered counsel using the Court's CM/ECF system.

*/s/ Karthik P. Reddy*
KARTHIK P. REDDY

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rules of Appellate Procedure 29(a)(5) and 32(g) because the brief contains 4,682 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

*/s/ Karthik P. Reddy*
KARTHIK P. REDDY