ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-5045**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOSÉ ESCOBAR MOLINA, et al.,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

*Defendants-Appellants*

On Appeal from the United States District Court for the District of Columbia

# CONSENT BRIEF OF *AMICI CURIAE* LEGAL SERVICES ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Megan D. Browder
Legal Aid DC
1331 H Street, NW, Suite 350
Washington, D.C. 20005
Telephone: (202) 661-5967
mbrowder@legalaiddc.org

*Counsel for Amici*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for *amici* hereby certifies:

### A. Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this court are listed in the Brief for Appellee: Cato Institute, Fair and Just Prosecution, and Law Enforcement Action Partnership.

### B. Rulings Under Review

References to the rulings at issue appear in the Brief for Appellees.

### C. Related Cases

There are no related cases.

Dated: October 19, 2026

*/s/ Megan D. Browder*
Megan D. Browder

*Counsel for amici*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. Rules 29(a)(4) and 28(a)(1)(A), *amici* certify that (1) *amici* are non-profit, tax-exempt organizations that have issued no stock; have no parent corporation; and no publicly-owned corporation owns 10% or more of their stock; (2) the brief was authored entirely by counsel for the *amici curiae* and not by counsel for any party, in whole or in part; (3) no party or counsel for any party contributed money to fund preparing or submitting the attached brief; and (4) apart from *amici curiae*, no other person contributed money to fund preparing or submitting the attached brief.

Dated: October 19, 2026

*/s/ Megan D. Browder*
Megan D. Browder

*Counsel for amici*

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* legal services organizations represent and assist District of Columbia residents living in poverty and those living in low and moderate-income households, the majority of whom are people of color. *Amici*'s clients include people who daily risk being arrested or detained because ICE fails to follow the law, which requires an individualized assessment that any specific individual is undocumented and is a flight risk before arrest. The federal government's unlawful policy and practice harm both *amici*'s clients and *amici* themselves.

*Amici* include Legal Aid DC, African Communities Together, Ayuda, Bread for the City, Children's Law Center, DC Affordable Law Firm, and Tzedek DC. Individual statements of interest for each *amicus* are appended to this brief.

## STATEMENT REGARDING SEPARATE BRIEFING

*Amici* are a group of D.C. legal service organizations. Pursuant to Circuit Rule 29(d), *amici* certify that a separate brief is necessary to represent the diverse experiences of local legal service providers who work with D.C. residents impacted by recent immigration policies, which is a perspective distinct from other *amici*.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i
CORPORATE DISCLOSURE STATEMENT ........................................................ i
IDENTITY AND INTEREST OF *AMICI CURIAE* ............................................... ii
STATEMENT REGARDING SEPARATE BRIEFING ......................................... ii
TABLE OF CONTENTS ........................................................................ iii
TABLE OF AUTHORITIES ..................................................................... iv
INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1
ARGUMENT ........................................................................................3
I. Warrantless Arrests Without Probable Cause Harm All District Residents. ..3
A. ICE's warrantless arrest policy and practice harms District residents.........3
B. ICE's warrantless arrest policy makes the District less safe......................11
II. Defendants' Unlawful Policy And Practice Harms Legal Services Organizations ..........................................................................................16
A. Amici have expended funds for client and employee safety. ....................16
B. Amici have diverted resources away from their core services to new areas of law. ..............................................................................................18
CONCLUSION ....................................................................................19
ADDENDUM ......................................................................................21
CERTIFICATE OF COMPLIANCE ..........................................................25
CERTIFICATE OF SERVICE ..................................................................26

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13 (D.C. Cir. 2011) ....................16

*Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167 (2d Cir. 2021) ....................17

*Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, 2026 U.S. App. LEXIS 27506 (D.C. Cir. Sep. 8, 2026) ....................18

*Equal Rts. Ctr. v. Post Props, Inc.*, 633 F.3d 1136 (D.C. Cir. 2011) ....................17

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017)....................4

*United States v. Texas*, 144 F.4th 632 (5th Cir. 2025)....................18

**Statutes**

22 U.S.C. § 7101 ....................12

8 U.S.C. § 1101 ....................12

**Other Authorities**

ACLU & RTS. WORKING GRP., *The Persistence of Racial and Ethnic Profiling in the United States* (2009) ....................1

Aisha Alsinai, et al., *Use of Immigration Status for Coercive Control in Domestic Violence Protection Orders*, FRONTIERS IN SOCIOL. (Apr. 28, 2023)....................15

Alicja Johnson, *A Year After the National Guard Came to D.C., Immigrant Families Are Still Living in Fear*, Ayuda News (Aug. 11, 2026) ....................2

AM. IMMIGR. COUNCIL, *Immigrants in District of Columbia* ....................6

AM. IMMIGR. COUNCIL, *New data shows the number of immigrant entrepreneurs in the Washington, D.C. metro area grew by more than 11% in one year* (July 18, 2019) ....................6

AM. IMMIGR. COUNCIL, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 4, 2021) ....................9

Aziz Huq, *The Consequences of Disparate Policing: Evaluating Stop and Frisk as a Modality of Urban Policing*, 101 MINN. L. REV. 2397 (2017) ..........................11

Cassandra A. Bailey & Kaylee Widener, *The Nexus Between Immigration Status, Policy, and Proceedings, and Mental Health*, 47 Current Op. in Psych. (Oct. 2022) ..........................4

DC ACCESS TO JUSTICE COMM'N, *Delivering Justice: Addressing Civil Legal Needs in the District of Columbia*, (2019)..........................18

Emily Baumgaertner Nunn, *Migrants are skipping medical care, fearing ICE, doctors say*, N.Y. TIMES (May 9, 2025) ..........................9

Families United DC Metro..........................17

Jessica Sidman & Franziska Wild, *Many DC restaurant workers fear going to work amid Trump's immigration crackdown*, WASHINGTONIAN (Aug. 26, 2025).7

José Luis Ávila, *ICE hunt targets students and their families at the start of the new school year*, EL PAIS (Sept. 4, 2025)..........................10

Kira Lerner, *DC eateries suffer as workers terrified of ICE stay home: 'You don't want to go outside.'* (Aug. 29, 2025) ..........................7

Maanvi Singh, et al., *Gone in 90 seconds: an 'invisibilized' ICE is arresting more people than ever*, THE GUARDIAN (Sep. 28, 2026) ..........................3

Marcela Escobari, et al., *Shock, awe, and economic fallout: The employment effects of ICE enforcement in US cities*, BROOKINGS INST. (May 29, 2026) ..........................6

Marianne LeVine, et al., *ICE shift in tactics leads to soaring number of at-large arrests, data shows*, WASH. POST (Dec. 28, 2025) ..........................3

Meg Anderson, *Lawyers, judges see a chilling effect from immigrants' arrests at criminal courthouses*, NPR (Aug. 8, 2025) ..........................15

Memo. from Alejandro N. Mayorkas, DHS Sec'y, "Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021)..........................7

Paul Schwartzman & Britney Shammas, *A D.C. neighborhood long home to immigrants pushes back against ICE arrests*, WASH. POST (Sept. 17, 2025) ........5

PHYSICIANS FOR HUMAN RIGHTS, *Consequences of Fear: How the Trump*

*Administration's Immigration Policies and Rhetoric Block Access to Health Care* (Apr. 2025)........8

Shira Markoff, et al., *The devastating economic and human toll of mass deportation*, DC FISCAL POL'Y INST. (Aug. 2025) ........4

Steve Inskeep & Christopher Thomas, *Trump promised the 'largest deportation' in U.S. history. Here's how he might start*, NPR (Nov. 14, 2024)........1

Teddi Nicolaus, *Immigrants Bypassing Care in Wake of Deportation Fears*, 55:4 THE NATION'S HEALTH 12 (June 2025)........8

Thomas S. Dee, *Recent Immigration Raids Increased Student Absences*, Ed Working Paper No. 25-1202 (June 2025)........11

U.S. CITIZENSHIP & IMMIGR. SERV., *Abused Spouses, Children and Parents*........15

U.S. CITIZENSHIP & IMMIGR. SERV., *Victims of Human Trafficking: T Nonimmigrant Status* ........12

U.S. DEP'T OF HOMELAND SEC., Memo. from Benjamine C. Huffman, Acting Sec'y to Caleb Vitello, Acting ICE Director & Pete R. Flores, Customs & Border Protect., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) .......7

## INTRODUCTION AND SUMMARY OF ARGUMENT

Under the guise of effectuating President Trump's campaign promise to "launch the largest deportation program of criminals in the history of America,"[1] U.S. Immigration and Customs Enforcement ("ICE") instead carried out an unwritten policy to make sweeping arrests without first conducting an individualized determination that any individual has committed a crime (or even an immigration violation) or that the individual is a flight risk. Prior to the District Court's injunction, ICE targeted people who fit the "profile" of the kind of undocumented immigrants that the government seeks to deport: Black and Brown non-English speakers who work certain jobs. Plaintiffs brought suit to challenge this unlawful policy, and the District Court properly enjoined Defendants from continuing to "arrest first, ask questions later." This Court should affirm that injunction.

The federal government's policy and practice of racial, ethnic, and linguistic profiling has dark roots in this country. From Japanese internment camps to post-9/11 mass detentions,[2] each time that federal law enforcement overreaches in the

---

[1] Steve Inskeep & Christopher Thomas, *Trump promised the 'largest deportation' in U.S. history. Here's how he might start*, NPR (Nov. 14, 2024), https://www.npr.org/2024/11/12/nx-s1-5181962/trump-promises-a-mass-deportation-on-day-1-what-might-that-look-like.

[2] *See generally* ACLU & RTS. WORKING GRP., *The Persistence of Racial and Ethnic Profiling in the United States*, at 29 (2009), https://www.aclu.org/sites/default/files/pdfs/humanrights/cerd_finalreport.pdf.

name of security or targeting crime, whole communities are harmed. ICE's unlawful policy of arresting individuals without probable cause is no different. And, even though Defendants are currently enjoined, the harms of ICE's policy still reverberate in the District.[3]

*Amici* have seen firsthand the harms that this policy causes, for clients, their families and communities, and the organizations that serve them. If the preliminary injunction is not maintained, District residents and *amici* will be irreparably harmed. ICE's unlawful policy makes many District residents, regardless of their immigration status, afraid to go about their daily lives: they have to weigh going to work, taking their children to school, going to church, or going to the doctor against the increasingly high possibility that they will be arrested and detained because of how they look or the language they speak. Legal services organizations are also harmed. *Amici* have expended, and will continue to expend, additional resources to ensure that clients can address emergent matters safely and are adequately represented.

---

[3] Alicja Johnson, *A Year After the National Guard Came to D.C., Immigrant Families Are Still Living in Fear*, Ayuda News (Aug. 11, 2026), https://ayuda.com/a-year-after-the-national-guard-came-to-d-c-immigrant-families-are-still-living-in-fear/.

## ARGUMENT

### I. WARRANTLESS ARRESTS WITHOUT PROBABLE CAUSE HARM ALL DISTRICT RESIDENTS.

*A. ICE's warrantless arrest policy and practice harms District residents.*

Despite constitutional, statutory, and regulatory requirements that ICE officers must have probable cause before detaining or arresting someone suspected of being undocumented, federal officers have ripped District residents and visitors from their vehicles, seized them outside of their homes, and ambushed them at once-safe locations like doctor's offices and schools. The District Court's injunction currently prohibits ICE from arresting and detaining individuals in the District without conducting an individualized probable-cause determination. This is increasingly important as ICE has changed its enforcement strategy, relying less on large-scale operations and more on "at-large" tactics that target individuals in their communities.[4]

Warrantless ICE detentions and arrests do not just harm undocumented immigrants. When ICE arrests individuals without making an individualized probable-cause assessment that the person is likely to escape before a warrant can

[4] *See, e.g.,* Maanvi Singh, et al., *Gone in 90 seconds: an 'invisibilized' ICE is arresting more people than ever*, THE GUARDIAN (Sep. 28, 2026), https://www.theguardian.com/us-news/ng-interactive/2026/sep/28/ice-us-immigration-new-tactics; Marianne LeVine, et al., *ICE shift in tactics leads to soaring number of at-large arrests, data shows*, WASH. POST (Dec. 28, 2025), https://www.washingtonpost.com/immigration/2025/12/28/ice-deportations-data-trump-arrests/.

be obtained, U.S. citizens and immigrants with lawful and protected status are also put at risk every time they leave their homes. ICE's policy instills fear in communities, which affects community members' financial, physical, and emotional health.[5]

Roughly half of D.C.'s immigrant population are not U.S. citizens, and about half of those non-citizens are undocumented.[6] Accordingly, even if federal officers were able to accurately identify and detain every immigrant in D.C., only one in every four of those individuals would be undocumented. In other words, 75% of those individuals would be U.S. citizens or have lawful status. Without conducting an individualized assessment, it is simply impossible for federal officers to know based on the racial or ethnic group that someone appears to belong to, the language they are speaking, or the job they have that there is probable cause that individual is an undocumented immigrant—and that they would likely flee before the agent could obtain a warrant. An unlawful detention or arrest, such as this, is an irreparable harm. *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017).

---

[5] *See, e.g.*, Cassandra A. Bailey & Kaylee Widener, *The Nexus Between Immigration Status, Policy, and Proceedings, and Mental Health*, 47 Current Op. in Psych. (Oct. 2022).

[6] Shira Markoff, et al., *The Devastating Economic and Human Toll of Mass Deportation*, DC FISCAL POL'Y INST. (Aug. 2025), https://www.dcfpi.org/all/the-devastating-economic-and-human-toll-of-mass-deportation/#post-32326-endnote-5.

Under ICE's unlawful policy prior to the injunction, *amici* regularly encountered clients and applicants for our services who were afraid to come to work, particularly if they worked in ICE-targeted industries like construction[7] and hospitality. *Amici*'s client communities still weigh their need to go about their daily lives against the fear that they can be arrested without probable cause.

The chilling effect impacts economic stability: *amici*'s clients report reduced work hours, missed shifts, or leaving employment entirely out of concern that traveling to and from the workplace may expose them to detention. One *amicus* client was so afraid that ICE would arrest or detain her at her job or en route that she quit her job. Another *amicus* reports that a regular community-outreach participant who is lawfully in the United States informed *amicus* that he was afraid to do his contracting work because his immigration papers had been stolen from him during a robbery. Since ICE started its "arrest first, ask questions later" policy, yet another amicus client has been so afraid to leave her home due to her fear of being detained that she no longer goes to the grocery store, sees friends, or engages in community activities. She only leaves her home to take her autistic son—who is non-speaking and has other medical needs, including a seizure disorder—to and from his

[7] Paul Schwartzman & Britney Shammas, *A D.C. neighborhood long home to immigrants pushes back against ICE arrests*, WASH. POST (Sept. 17, 2025), https://www.washingtonpost.com/dc-md-va/2025/09/17/dc-ice-arrests-trump-takeover/.

specialized school. The client is her son's primary caretaker, as her husband goes to work while she is caring for their son. She is scared for her husband every time he leaves home.

Immigrants make up roughly 16% of D.C.'s workforce,[8] including almost 50% of construction workers and 39% of tourism and hospitality workers.[9] But ICE's policies impact immigrants and non-immigrants alike. One report notes that job losses exceeded the number of people arrested after heightened ICE presence, attributing the greater job losses to the chilling effect of ICE's tactics.[10] The report further states that "employment fell, not just among immigrants, but across the local economy."[11] Even when employees are citizens or have legal status, "the fear is pervasive" because "[n]obody wants to spend a night in jail while your family

[8] AM. IMMIGR. COUNCIL, *Immigrants in District of Columbia*, https://map.americanimmigrationcouncil.org/locations/district-of-columbia/#.

[9] AM. IMMIGR. COUNCIL, *New data shows the number of immigrant entrepreneurs in the Washington, D.C. metro area grew by more than 11 percent in one year* (July 18, 2019), https://www.americanimmigrationcouncil.org/press-release/new-data-shows-the-number-of-immigrant-entrepreneurs-in-the-washington-d-c-metro-area-grew-by-more-than-11-percent-in-one-year/.

[10] Marcela Escobari, et al., *Shock, awe, and economic fallout: The employment effects of ICE enforcement in US cities*, BROOKINGS INST. (May 29, 2026), https://www.brookings.edu/articles/ice-enforcement-employment-effects-us-cities/.

[11] *Id.*

struggles to show immigration authorities you have the paperwork."[12]

ICE's unlawful policies also harm residents' health because people delay medical care out of fear of detention and arrest. Immediately after President Trump took office, DHS rescinded a prior policy that protected certain sensitive areas from ICE enforcement.[13] That prior policy recognized that ICE enforcement actions have an "impact on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there."[14] Accordingly, ICE generally would not take enforcement actions at schools, medical facilities, places of worship, or courthouses among other places. Predictably, DHS's rescission of the protected-

---

[12] Jessica Sidman & Franziska Wild, *Many DC restaurant workers fear going to work amid Trump's immigration crackdown*, WASHINGTONIAN (Aug. 26, 2025), https://www.washingtonian.com/2025/08/26/many-dc-restaurant-workers-fear-going-to-work-amid-trumps-immigration-crackdown/; *see also* Kira Lerner, *DC eateries suffer as workers terrified of ICE stay home: 'You don't want to go outside.'* (Aug. 29, 2025), https://www.theguardian.com/us-news/2025/aug/29/trump-ice-washington-dc-restaurants (noting that "many immigrants, both documented and undocumented, fear coming into DC and being on the streets, and some have been detained by ICE").

[13] U.S. DEP'T OF HOMELAND SEC., Memo. from Benjamine C. Huffman, Acting Sec'y to Caleb Vitello, Acting ICE Director & Pete R. Flores, Customs & Border Protect., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025), https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf.

[14] Memo. from Alejandro N. Mayorkas, DHS Sec'y, "Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw10272021.pdf.

areas policy, compounded with the illegal policies and practices challenged here, resulted in fewer people seeking routine and needed medical care.[15] Health care centers around the country report upwards of 30% of patients missing appointments and 40% of patients not picking up their prescriptions because they have to choose between accessing their health care and avoiding potential detention.[16] Doctors nationwide note that pregnant immigrants are not coming in for natal care out of fear of immigration consequences.[17] Research also shows that prior immigration crackdowns result in "poorer birth outcomes and mental health status, lapses in care, and fewer people accessing the types of public programs that reduce illness and

---

[15] Samantha Sporn, *Immigration Enforcement's Far-Reaching Effects on Health Outcomes*, GEORGETOWN J. ON POVERTY L. & POL'Y (Apr. 27, 2026); PHYSICIANS FOR HUMAN RIGHTS, *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Health Care*, at 8-11 (Apr. 2025) (detailing provider stories of increased no-shows and cancellations due to patient fear and how that fear extends to U.S. citizens and family members), https://phr.org/wp-content/uploads/2025/04/Consequences-of-Fear_Research-Brief_PHR_April-2025.pdf#xd_co_f=YjkxNzY4M2UtZDYzMy00Y2U2LWIzNTItYmQxMDViYzE2MDFh~.

[16] Teddi Nicolaus, *Immigrants Bypassing Care in Wake of Deportation Fears*, 55:4 THE NATION'S HEALTH 12 (June 2025), https://www.thenationshealth.org/content/55/4/1.2.

[17] Karen Feldscher, *Pregnant immigrants skipping, delaying care due to ICE fears* (Feb. 18, 2026), Harvard Sch. Pub. Health, https://hsph.harvard.edu/news/pregnant-immigrants-skipping-delaying-care-due-to-ice-fears/.

poverty overall."[18]

If the injunction is reversed, *amici* expect even more severe outcomes from ICE's current "arrest first, ask questions later" policy. For example, one *amicus* had a client who was the primary caregiver for her son, who is non-speaking, non-ambulatory, and has significant medical needs. During the COVID-19 pandemic, he was hospitalized with COVID for several months and was unable to leave his bed after coming home. The client and her son were living in a large apartment complex where ICE officers were in the parking lot daily, sometimes with as many as five trucks. They were arresting residents, construction workers, delivery people, and other visitors on sight, causing extreme fear in the client and other residents in the apartment complex. Her son was receiving nursing care through his insurance, but the nursing care was less consistent with ICE in the parking lot, so he was not always receiving the care he needed. The client had not left the apartment building for almost three months after ICE began sitting in the parking lot, and she noted that other neighbors had also not left the property over fear of being detained. Even with

---

[18] Emily Baumgaertner Nunn, *Migrants are skipping medical care, fearing ICE, doctors say*, NY TIMES (May 9, 2025), https://www.nytimes.com/2025/05/08/health/migrants-health-care-trump.html#:~:text=They%20are%20finding%20that%20people,Leer%20en%20espa%C3%B1ol; *see also* AM. IMMIGR. COUNCIL, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 4, 2021), https://www.americanimmigrationcouncil.org/fact-sheet/us-citizen-children-impacted-immigration-enforcement/.

the injunction in place, ICE officers are still at the complex at least twice a day. The client remains terrified to leave the apartment and only does so if absolutely necessary.

ICE's unlawful detention and arrest policies also destabilize whole families. Children live with anxiety and fear that their parents will not come home from routine immigration checks,[19] and parents are afraid to take their children to school. Moreover, the increased presence of armed law enforcement on routes to schools further heightens parents' concern for their own safety and that of their children as they travel to school. D.C., like other cities with increased ICE enforcement, saw increased truancy rates while ICE's warrantless arrest policy was in effect.[20] Truancy in D.C. schools is already an issue, and ICE's unlawful policy exacerbates the problem.[21]

---

[19] Tracee Wilkins, et al., *'You come Monday, someone's gone': How immigration enforcement is affecting DMV schools*, NBC4 Wash. (Aug. 28, 2026), https://www.nbcwashington.com/investigations/you-come-monday-someones-gone-how-immigration-enforcement-is-affecting-dmv-schools/4147630/.

[20] Zoe Cummings & Grant Roundtree, *'You See ICE And You Panic.' Student Fears Dominate Washington, D.C., Education Meeting As Officials Grapple With How To Rebuild Trust*, NEWSONE (Oct. 27, 2025), https://newsone.com/6566129/student-fears-over-ice-dominate-washington-education-meeting/.

[21] José Luis Ávila, *ICE hunt targets students and their families at the start of the new school year*, EL PAIS (Sept. 4, 2025), https://english.elpais.com/usa/2025-09-04/ice-hunt-targets-students-and-their-families-at-the-start-of-the-new-school-year.html#; *cf.* Thomas S. Dee, *Recent Immigration Raids Increased Student Absences*, Ed

*B. ICE's warrantless arrest policy makes the District less safe.*

The District Court's injunction is in the public interest because warrantless arrests without probable cause are likely to *increase*, not decrease, crime. Indeed, DHS's own data suggests that its sweeping arrest campaigns are overinclusive and capture individuals outside of the target scope. While DHS has not released the total number of arrestees, two-thirds of the 1,328 undocumented individuals arrested in the first half of August 2026 had no criminal record.[22] These numbers indicate that the injunction is necessary to prevent ICE from resuming its policy of warrantless arrests without making individualized determinations.

The injunction is also necessary to prevent the trust between community members and police from further being destroyed, which may ultimately lead to reduced crime reporting and increased crime.[23] For example, some *amici* assist

---

Working Paper No. 25-1202 (June 2025), https://edworkingpapers.com/sites/default/files/ai25-1202.pdf.

[22] ICE, *ICE Operation Safe Community – Washington, D.C. Arrests More Than 1,300 Illegal Aliens Throughout Virginia, Maryland* (Aug. 24, 2026), https://www.dhs.gov/news/2026/08/24/ice-operation-safe-community-washington-dc-arrests-more-1300-illegal-aliens.

[23] *See, e.g.*, Council of the District of Columbia, Comm. on Public Works and Ops., *Roundtable Report on Potential Human Rights Violations due to Federal Government Intrusion*, at 7-11 (Jan. 8, 2026), https://brianneknadeau.com/wp-content/uploads/2026/01/CIRCULATION-DRAFT_PWO-Roundtable-Report-on-Human-Rights-Violations.pdf; Aleaziz, *supra* n. 17; Aziz Huq, *The Consequences of Disparate Policing: Evaluating Stop and Frisk as a Modality of Urban Policing*, 101 MINN. L. REV. 2397, 2435 (2017).

clients with T- and U-visa applications, which provide non-immigrant visas for eligible victims of human trafficking and certain crimes, respectively, who cooperate with law enforcement. Congress created the T- and U-visa programs to protect victims of crimes and "[s]trengthen the ability of law enforcement agencies" to "detect, investigate, and prosecute" cases of human trafficking, domestic violence, sexual assault, and other crimes.[24] Since President Trump's federal deployment of ICE agents, however, immigrants are afraid to cooperate with the police and apply for a T- or U-visa or other forms of relief. That is not only contrary to Congress's purpose in creating the visas[25] but makes the entire community less safe because victims are not reporting crimes or are too afraid to cooperate with law enforcement. As one example, a client of one *amicus* was raped as a minor and initially reported it to the police. Even though the client could identify the rapist, the client stopped cooperating with the police out of fear of immigration enforcement. Another District resident reported that she did not report her abuser to the police because she was afraid of immigration consequences. Her abuser later took her son and fled to New

[24] U.S. CITIZENSHIP & IMMIGR. SERV., *Victims of Human Trafficking: T Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status#:~:text=Traffickers%20often%20take%20advantage%20of,investigate%20and%20prosecute%20human%20trafficking; https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-1

[25] *See* 8 U.S.C. § 1101; 22 U.S.C. § 7101.

York, in violation of court visitation rules and without her knowledge.[26] These are not isolated incidents but reflect what studies have shown: increased immigration enforcement leads to reduced crime reporting in immigrant communities.[27]

ICE's unlawful policy also ramped up the elevated anxiety and profound sense of uncertainty that accompany decisions about whether and how to pursue immigration relief. In particular, clients with prior removal orders or claims involving complex statutory barriers face acute fear of enforcement consequences. Compounding these challenges, clients have expressed distrust and concern regarding potential information-sharing between courts, law enforcement agencies, and federal immigration authorities, which can deter participation in family court proceedings or victim-based relief processes. These concerns are far from unfounded. On October 29, 2025, the D.C. Council held a roundtable hearing on potential human rights violations of ICE's policies and practices.[28] Over 50

---

[26] Meagan Flynn & María Luisa Paúl, *As ICE ramped up in D.C., immigrant crime victims faced visa roadblocks*, WASH. POST (Apr. 10, 2026), https://www.washingtonpost.com/dc-md-va/2026/04/10/u-visas-dc-ice-arrests/.

[27] *See, e.g.*, Reva Dhingra, et al., *Immigration Policies and Access to the Justice System: The Effect of Enforcement Escalations on Undocumented Immigrants and Their Communities*, POLIT. BEHAV. 44, 1359–1387 (2022), https://doi.org/10.1007/s11109-020-09663-w.

[28] Council of the District of Columbia, Comm. on Public Works and Ops., *Roundtable Report on Potential Human Rights Violations due to Federal Government Intrusion* (Jan. 8, 2026), https://brianneknadeau.com/wp-

witnesses testified at the hearing, reporting that residents are "afraid to report crimes, seek help, or even leave their homes for fear of being targeted."[29] The D.C. Council concluded that "many residents have lost trust in MPD."[30]

One *amicus* assisted a client with humanitarian parole status whose partner physically, emotionally, and financially abused them and tried to coerce them into marriage. The client has not filed a report against the abuser because they fear deportation. Another client, who was brutally persecuted in her home country for being a women's-rights activist, is eligible for a T- and U-visa as a victim of sexual assault and trafficking that occurred in the United States. *Amicus* had been working with her for months to report the crimes that occurred here and apply for a T- and U-visa. She is too scared to work with law enforcement, however, because of ICE's increased immigration enforcement and detentions.

ICE's policy and practice of unlawful arrests also emboldens violent criminals, who may even target undocumented people because they are less likely to seek police help. As the government itself acknowledges, this is common in the

content/uploads/2026/01/CIRCULATION-DRAFT_PWO-Roundtable-Report-on-Human-Rights-Violations.pdf.

[29] *Id.* at 24 (testimony of Tiffani Johnson, Advisory Neighborhood Commissioner for Single Member District 4B06).

[30] *Id.* at 2.

domestic-violence context, where abusive partners frequently use immigration status as a tool of their abuse.[31] *Amici* saw an increase in this control dynamic when ICE ramped up its policy of "arrest first, ask questions later."

ICE's illegal warrantless arrests undermine the functioning of the legal system in myriad other ways. *Amici*'s clients are afraid to go to court, even when it is necessary to provide their own defense, provide testimony for a custody or protective order, or serve as a witness in cases that are unrelated to their immigration status, even if an in-person meeting or proceeding would be more effective.[32] After one *amicus* client saw a neighbor snatched while taking the trash out, she was too afraid to leave her building. Although she requires translation that is easier in person, she requested remote hearings and asked that *amicus* meet her in her apartment to prepare for them. One *amicus* reports several clients who have not gone to their immigration hearings because they fear immigration enforcement at the courthouse. Local domestic violence organizations have seen about 36% fewer immigrant clients

---

[31] U.S. CITIZENSHIP & IMMIGR. SERV., *Abused Spouses, Children and Parents*, https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents; *see also* Aisha Alsinai, et al., *Use of Immigration Status for Coercive Control in Domestic Violence Protection Orders*, FRONTIERS IN SOCIOL. 1, 3-4 (Apr. 28, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10175620/.

[32] Meg Anderson, *Lawyers, judges see a chilling effect from immigrants' arrests at criminal courthouses*, NPR (Aug. 8, 2025), https://www.npr.org/2025/08/08/nx-s1-5467685/lawyers-judges-see-a-chilling-effect-from-immigrants-arrests-at-criminal-courthouses.

this year versus last year. These experiences reflect not isolated individual choices but the broader systemic impact of enforcement practices that undermine access to justice, destabilize families, and create significant barriers to legal remedies and, ultimately, safety.

## II. DEFENDANTS' UNLAWFUL POLICY AND PRACTICE HARMS LEGAL SERVICES ORGANIZATIONS

*Amici* are nonprofit organizations with finite resources that provide legal services to District residents living in poverty. Defendants-appellants' unlawful conduct pulls those resources away from *amici*'s core activities in a way that substantially impairs their ability to help their clients.

### *A. Amici have expended funds for client and employee safety.*

Because of ICE's unlawful "arrest first, ask questions later" policy, *amici* clients are afraid to use public transportation to meet with their lawyers or attend in-person court or administrative proceedings. *Amici* also have employees who, despite their lawful status, fear that ICE will unlawfully arrest or detain them. ICE's conduct therefore impairs *amici*'s ability to provide their core client services. In response to ICE's conduct, *amici* have provided rideshare funds for clients to safely meet with their lawyer, attend mediation, and attend court. For example, one *amicus* must now pay for rideshare costs to meet with a domestic-violence survivor who is too afraid of potential immigration enforcement to walk from the shelter to the office. These costs are not a "self-inflicted budgetary choice," *Am. Soc'y for Prevention of Cruelty*

*to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Equal Rts. Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1139-40 (D.C. Cir. 2011)) or "incurred at [*amici*'s] own initiative," but "reasonably necessary to continue [*amici*'s] established core activit[ies]," *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 174 (2d Cir. 2021).

At one *amicus*, senior staff spent significant time developing resources and plans to react to the increased immigration enforcement. In collaboration with other organizations, including AMICA, *amicus* staff spent over 100 hours alone on creating the website Families United DC Metro,[33] which helps families at risk of detention and deportation learn about their rights in the DC Metro Area related to family safety planning and immigration. *Amicus* then partnered with other *amici* to launch a new stream of internal and pro bono work related to immigration custodial powers of attorneys, which includes creating and translating documents, creating and conducting trainings, reconfiguring their intake database and online intake, and training internal staff and pro bono attorneys. *Amicus* also launched community training for allies and impacted community members. These new streams of work require significant staff time, including overtime hours for hourly staff, which did not exist previously at *amicus*. Other *amici* have helped clients execute custodial and

[33] Families United DC Metro, https://familiesuniteddcmetro.org/.

financial powers of attorney to protect their families in the event of detention or deportation and planned emergency clinics to help clients create detention and deportation plans. These "new activities, not previously part of the [*amici's*] normal annual expenditures," have "bec[o]me necessary" in response to ICE's unlawful activity." *Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, 2026 U.S. App. LEXIS 27506, at *12 (D.C. Cir. Sep. 8, 2026).

### B. *Amici have diverted resources away from their core services to new areas of law.*

The District, like the rest of the country, faces a severe access-to-justice crisis. One study showed that anywhere between 75% to 97% of D.C. civil litigants are unrepresented.[34] *Amici* are part of the limited number of nonprofits whose mission is to reduce the access-to-justice gap and serve as many people as possible. They must decide how to allocate limited resources among an ever-increasing need. ICE's unlawful arrests and detentions "directly affect[s]" *amici*'s "ability to provide legal services to immigrants." *United States v. Texas*, 144 F.4th 632, 642-43 (5th Cir. 2025). ICE's policy of arresting first and asking questions later has led to arrests of individuals with protected status, who *amici* then represent. For example, one *amicus*, whose core immigration activities had previously been limited to helping

[34] DC Access to Justice Comm'n, *Delivering Justice: Addressing Civil Legal Needs in the District of Columbia*, at 4 (2019), https://dcaccesstojustice.org/files/Delivering_Justice_2019.pdf.

clients obtain Special Immigrant Juvenile Status and T- and U-visas, has had to expand its practice areas. The federal government approved an *amicus* client's Special Immigrant Juvenile Status years ago, granting him legal status to be present in the U.S. Nonetheless, last fall ICE arrested and detained the client—without a warrant—as he was peaceably walking to a friend's house. Because of ICE's unlawful warrantless arrests, this *amicus* had to expand their practice area to include habeas petitions, which takes considerably more resources and limits *amicus*'s ability to help other clients. Similarly, ICE has also accelerated check-ins for unaccompanied children and survivors of domestic violence. Although clients usually attend these check-ins on their own, clients are more reluctant to attend, and *amici* now often accompany clients because ICE has detained and arrested individuals without probable cause of undocumented immigration status or that the person will be a flight risk. Additionally, one *amicus* prepares draft stays of removal in advance in case those clients are detained at a check-in—a practice that was unnecessary before. These actions and additional diversions of resources are in direct response to ICE's unlawful policies and additionally harm *amici*.

## CONCLUSION

For the foregoing reasons, and those set forth by Plaintiffs, this Court should affirm the preliminary injunction.

Respectfully submitted,

*/s/ Megan D. Browder*
Megan D. Browder (D.C. Bar No. 1552273)
Legal Aid DC
1331 H Street, NW, Suite 350
Washington, D.C. 20005
Telephone: (202) 661-5967
Fax: (202) 727-2132
E-mail: mbrowder@legalaiddc.org

*Counsel for Amici*

## ADDENDUM

*Amicus* **Legal Aid DC** ("Legal Aid") is the oldest and largest general civil legal services provider in the District. Legal Aid provides direct legal services that help more than 10,000 District residents each year and advocates for systemic change to improve laws and policies that affect people living in poverty in the District. Legal Aid has been a leader in access to justice to ensure that every District resident has a meaningful ability to participate in the judicial process—an interest that has been significantly impaired by residents' fears of going to court due to expanded and unlawful law enforcement activities. In addition, Legal Aid represents domestic violence survivors to help achieve safety and stability. Survivors' fear of reporting crime to law enforcement has increased because of the use of the District's law enforcement processes for immigration enforcement.

*Amicus* **African Communities Together** (ACT) is a membership-based organization of African immigrants fighting for civil rights, opportunity, and a better life for themselves and their families. Across three chapters in New York City, Philadelphia, and the D.C. metro area, ACT connects African immigrants to critical services, helps Africans develop as leaders, and organizes its communities on the issues that matter. In D.C., ACT holds weekly in-person legal clinics at its Eastern Market office as well as additional clinics at churches, mosques, and community centers throughout the city. It also regularly hosts rallies, legislative meetings, and press events

on Capitol Hill as part of its federal advocacy work. As a result of the government's unlawful arrest practices, ACT's clients and members, regardless of immigration status, express fear about traveling in and around D.C. for legal services or to conduct advocacy. ACT has had to divert resources to address this new reality.

*Amicus* **Ayuda** advocates for low-income immigrants through direct legal, social and language services; training; and outreach in Washington, D.C.; Maryland; and Virginia. In 2025, Ayuda served 2,875 individuals through our legal and social service programs and provided 2,360 interpretation sessions for Limited English Proficient (LEP), Deaf, and Hard-of-Hearing individuals. Ayuda's clients—many of whom are survivors of crimes like domestic violence and trafficking—have been harmed by the federal government's enforcement practices, which instill fear, disrupt access to services, and divert Ayuda's limited resources away from its core mission of ensuring safety and justice for immigrant communities.

*Amicus* **Bread for the City** is a nonprofit organization that each year provides more than 30,000 low-income residents of Washington, D.C., with free comprehensive services, including supplemental food, clothing, medical care, social services, and legal services. We work to uproot racism, a major cause of poverty. The mission of Bread for the City is to help Washington, D.C. residents living with low incomes develop their power to determine the future of their own communities. We are committed to treating our clients with the dignity and respect that all people deserve. The Legal Clinic at

Bread for the City provides free legal services in the areas of family, landlord-tenant, public benefits, and immigration law. Our immigration practice helps noncitizens in a variety of immigration legal matters, including applications for work permits, green cards, asylum, citizenship, and other humanitarian benefits for victims of domestic violence, child abuse, or violent crimes. Therefore, the community we serve will likely be disproportionately affected by the subject DHS policy and would require Bread to divert more resources to counteract the harmful impact.

*Amicus* **Children's Law Center** believes every child should grow up with a strong foundation of family, health, and education and live in a world free from poverty, trauma, racism, and other forms of oppression. Our more than 100 staff—together with D.C. children and families, community partners, and pro bono attorneys—use the law to solve children's urgent problems today and improve the systems that will affect their lives tomorrow. Since our founding in 1996, we have reached more than 50,000 children and families directly and multiplied our impact by advocating for city-wide solutions that benefit hundreds of thousands more. Our work also includes providing representation, resources, and training to families and allies of families fearing future detention or deportation.

*Amicus* **DC Affordable Law Firm** (DCALF) is a leading legal services organization providing free and accessible legal representation to more than 500 modest- and low-income D.C. residents each year — empowering the one in five

residents otherwise excluded from the legal marketplace with critical legal services in central areas of human need. DCALF deploys innovative programs and strategies to bridge systemic civil justice gaps and expand access to representation across the District of Columbia. DCALF has worked alongside immigrants and their families since 2017, delivering a wide range of humanitarian immigration legal services to D.C. residents and their families, and empowering clients through training, resources, and representation to address their immigration legal needs and safeguard their futures in response to fears of detention or deportation.

*Amicus* **Tzedek DC** is a nonprofit headquartered at the University of the District of Columbia David A. Clarke School of Law whose mission is to safeguard the legal rights and financial health of D.C. residents with low incomes dealing with the often-devastating consequences of abusive debt collection practices and other consumer related issues. Tzedek DC conducts outreach to Spanish-speaking D.C. residents through its Sin Deudas, Sin Dudas program, which includes tabling at community events, providing financial literacy classes, and giving legal advice at drop-in clinics. Tzedek DC has had to cancel some of its Sin Deudas, Sin Dudas programming or convert to online virtual events because many members of the community, including those who are documented, are afraid to attend events in person due to immigration raids targeting all Latinos.

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,156 words.
2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: October 19, 2026

*/s/ Megan D. Browder*
Megan D. Browder

*Counsel for amici*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2026, the foregoing Consent Brief of *amici curiae* was served by electronically filing using the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

*/s/ Megan D. Browder*
Megan D. Browder