**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5045**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

JOSÉ ESCOBAR MOLINA, et al.,

Plaintiffs-Appellees,

v.

DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-03417

---

# REPLY BRIEF FOR APPELLANTS

---


BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

SHERI R. GLASER
LINDA Y. CHENG
ZACHARY S. HUGHBANKS
*Office of Immigration Litigation*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6054*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ....... 1

ARGUMENT ....... 4

I. PLAINTIFFS CANNOT SATISFY ARTICLE III'S CASE-OR-CONTROVERSY REQUIREMENT ....... 4

A. Plaintiffs Fail To Establish Article III Standing ....... 4

B. Plaintiffs Fail To Demonstrate Traceability And Redressability ....... 9

C. CASA Lacks Standing ....... 11

II. THE INA INDEPENDENTLY BARS PLAINTIFFS' CLAIMS ....... 13

III. PLAINTIFFS FAIL TO IDENTIFY A CAUSE OF ACTION UNDER THE APA ....... 15

A. The Alleged Unwritten Policy Does Not Exist ....... 15

B. The Alleged Agency Action Is Not Final ....... 17

IV. PLAINTIFFS FAIL TO REBUT THE DEFECTS IN THE PROPOSED WARRANTLESS-ARREST CLASS ....... 20

A. The Provisional Certification Order Is Properly Before This Court ....... 20

B. The Class Members Lack Article III Standing ....... 21

C. The Proposed Class Does Not Satisfy Rule 23(a) ....... 22

D. Rule 23(b) Bars Certification ....... 26

V. THE REMAINING FACTORS DISFAVOR INJUNCTIVE RELIEF ....... 27

A. Plaintiffs Fail To Establish Irreparable Harm ....... 27

B. The Balance Of Equities Favors The Government .................. 28

VI. THE INJUNCTION IS IMPERMISSIBLY OVERBROAD .................. 30

A. The Injunction Does Not Satisfy Rule 65(d) .................. 30

B. The Enforcement Order Confirms The Injunction's Overbreadth .................. 31

CONCLUSION .................. 33

# TABLE OF AUTHORITIES

## Cases

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ....................13

*Black Lives Matter L.A. v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024) ....................23, 25

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....................28

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....................5, 6, 9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................1, 4, 5

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015)....................11

*District of Columbia v. Wesby*,
583 U.S. 48 (2018)....................33

*DL v. District of Columbia*,
713 F.3d 120 (D.C. Cir. 2013)....................23

*Duncan v. Governor of V.I.*,
48 F.4th 195 (3d Cir. 2022)....................24

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................11, 13

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)....................12

*Fraihat v. ICE*,
16 F.4th 613 (9th Cir. 2021) ....................20

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006)....................24, 25

*Gen. Telephone Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)........24

*Gill v. Whitford*,
585 U.S. 48 (2018)........10

*Gupta v. McGahey*,
709 F.3d 1062 (11th Cir. 2013)........14

*Hartman v. Moore*,
547 U.S. 250 (2006)........17

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016)........22

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015)........16

*In re White*,
64 F.4th 302 (D.C. Cir. 2023)........23

*LaRoque v. Holder*,
679 F.3d 905 (D.C. Cir. 2012)........9

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........9

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)........19

*Massachusetts v. EPA*,
549 U.S. 497 (2007)........10

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)........7

*Mielo v. Steak 'n Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018)........22

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995)........13

*Nken v. Holder*,
556 U.S. 418 (2009)....28

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) ....22, 29

*O'Shea v. Littleton*,
414 U.S. 488 (1974)....21

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999)....14

*Shaw v. Smith*,
166 F.4th 61 (10th Cir. 2026) ....6, 7

*Shook v. Bd. of Cnty. Comm'rs*,
543 F.3d 597 (10th Cir. 2008)....26

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022)....27

*Sissoko v. Rocha*,
509 F.3d 947 (9th Cir. 2007)....14

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998)....25

*Trevizo v. Adams*,
455 F.3d 1155 (10th Cir. 2006)....22

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)....18

*United Farm Workers of Am. v. Mullin*,
2026 WL 2754794 (9th Cir. Aug. 24, 2026) ....5

*United States v. Meza-Campos*,
500 F.2d 33 (9th Cir. 1974)....32

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009)....30

*United States v. Texas*,
599 U.S. 670 (2023)........................................9, 10, 13

*Wagner v. Taylor*,
836 F.2d 578 (D.C. Cir. 1987)........................................20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)........................................23

*Winter v. NRDC*,
555 U.S. 7 (2008)........................................27, 28

**Statutes**

5 U.S.C. § 551 ........................................15

8 U.S.C. § 1252 ........................................2, 13

8 U.S.C. § 1357 ........................................4, 15

**Rules**

Fed. R. Civ. P. 23 ........................................22, 25, 26

**Regulations**

8 C.F.R. § 287.8........................................15

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012)........................................32

1 *Newberg & Rubenstein on Class Actions* (6th ed.) ........................................21

Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*,
7 J. on Telecomm. & High Tech. L. 127 (2009)........................................26, 30

16 *Wright & Miller's Federal Practice & Procedure* (3d ed.) ....................26, 30

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DEA | Drug Enforcement Agency |
| DHS | Department of Homeland Security |
| Dkt. | Docket |
| ICE | Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' answering brief (AB) does nothing to salvage the district court's sweeping injunction. Although Plaintiffs strain to defend it, their arguments further underscore the injunction's fundamental defects: speculative injuries, a nonexistent policy contrary to the actual written policy, and an amorphous class premised on fact-specific arrests. Each defect singularly precludes the extraordinary classwide relief imposed by the district court. This Court should reverse.

Plaintiffs still cannot demonstrate that any of them has Article III standing to seek prospective injunctive relief. Their principal answer to the absence of a "certainly impending" future injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401-02 (2013) (citation omitted), is to double down on past arrests, lingering fear, and generalized demographic characteristics—none of which establishes a real and immediate threat of a future arrest, much less a warrantless one lacking probable cause. Nor do principles of associational or organizational standing cure those foundational defects.

Plaintiffs likewise fail to overcome the independent statutory barriers to their claims. Their contention that the Immigration and Nationality Act (INA) does not bar their claims because an arrest neither "commence[s]

proceedings" nor "execute[s]" a removal order, 8 U.S.C. §1252(g), sharply splits with the decisions of several courts of appeals and ignores the obvious connection between taking an alien into custody and initiating the removal process. Moreover, because Plaintiffs challenge an alleged policy nowhere memorialized and identify no reviewable agency action, their APA claim fails.

Plaintiffs' defense of provisional class certification is equally without merit. Although Plaintiffs seek to evade review of provisional class certification on jurisdictional grounds, it is a familiar principle that the Court may review a class-certification ruling inextricably intertwined with an appealable preliminary injunction.

The merits of their class arguments are equally unavailing. The proposed, amorphous warrantless class cannot meet Rule 23's ascertainability requirement. Similarly, a so-called "system-wide practice or policy affecting all putative class members," AB 47 (citation omitted)—a premise belied by the record—does not suffice for commonality and typicality.

The remaining injunction factors tip decisively in the government's favor. Plaintiffs do not dispute that irreparable harm cannot exist without Article III standing. Instead, they quibble over whether the injunction prohibits warrantless arrests themselves or alleged policy governing such

arrests—a distinction without a difference. In all events, an injunction that exceeds the bounds of equitable relief and interferes with enforcement of federal law disserves the public interest. The retreat by Plaintiffs and their amici to policy concerns cannot substitute for the required equitable showing.

Finally, Plaintiffs seek to defend the injunction's overbreadth—compounded by the district court's enforcement order—by retreating to misplaced jurisdictional arguments and meritless claims of forfeiture. All agree that the enforcement cannot stand if the underlying injunction falls, and the government has consistently challenged the injunction's unlawful reporting requirements. Nor is there anything "self-contradictory," AB 41, in objecting to the scope *and* rigidity of the injunction, which reaches far beyond the relief necessary to redress Plaintiffs' purported injuries and unduly prescribes how immigration officers conduct warrantless arrests. No principles of Article III or equity permit that extraordinary regime. This Court should accordingly reverse the district court's grant of a preliminary injunction and provisional class certification.

## ARGUMENT

### I. PLAINTIFFS CANNOT SATISFY ARTICLE III'S CASE-OR-CONTROVERSY REQUIREMENT

#### A. Plaintiffs Fail To Establish Article III Standing

**1.** All agree that Article III standing for prospective injunctive relief requires a "certainly impending" future injury. *See Clapper*, 568 U.S. at 401-02 (citation omitted). Plaintiffs nevertheless argue that they face an "objective, substantial risk that Defendants' agents will rearrest them" because Immigration and Customs Enforcement (ICE) maintains an alleged unwritten policy to conduct warrantless arrests without probable cause of escape risk. AB 17.

That argument breaks down at its first move. There is no basis to conclude that Plaintiffs, out of everyone in the District, will be rearrested. But even accepting the claimed "substantial risk" of "rearrest," AB 17, it hardly follows that such a rearrest would be warrantless and without probable cause. Additionally, the only official policies in the record unmistakably require immigration officers to develop probable cause that a "subject is a removable alien" and "'likely to escape' before a warrant for his arrest can be obtained." (Dkt. 82-1 at 4) (citing 8 U.S.C. §1357(a)(2)). Indeed, formal written policies of

the Department of Homeland Security (DHS) have consistently incorporated the requirements of Section 1357 and its implementing regulations.

**2.** Plaintiffs' defense of the ruling below additionally overlooks that the district court found only past injuries. (Dkt. 68 at 14, 22-23, 26 & n.18, 33-40). Although Plaintiffs contend that they face a "realistic threat of unlawful rearrest," AB 17, every injury identified by the district court—including physical injuries from shackling, ankle monitoring, and generalized anxiety—arose from prior arrests. A past injury, without a real and immediate threat of recurrence, does not establish an Article III injury supporting prospective injunctive relief, even if styled as an ongoing harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 98 (1983) (no standing for prospective relief despite ongoing physical injury); *Clapper*, 568 U.S. at 416 (no standing for "nonparanoid fear"). The Ninth Circuit recently applied those principles in lifting a similar preliminary injunction that rested on "allegations of past harm." *United Farm Workers of Am. v. Mullin*, 2026 WL 2754794, at *1 (9th Cir. Aug. 24, 2026).

Plaintiffs' attempt to evade *Lyons* cannot withstand scrutiny. AB 23. In *Lyons*, the Supreme Court assumed that the City of Los Angeles authorized the challenged policy but still concluded that the plaintiff's past injuries fell

"far short of the allegations that would be necessary to establish a case or controversy" under Article III. *Lyons*, 461 U.S. at 105. Plaintiffs contend that *Lyons* turned on the plaintiff's ability to "avoid a future chokehold by" complying with the law "if stopped by police." AB 23. But the Supreme Court recognized that officers may have "illegally choke[d]" the plaintiff "without any provocation or resistance on his part" and still found "nothing to establish a real and immediate threat" of future injury. *Lyons*, 461 U.S. at 105. Nor does Plaintiffs' reliance on the named plaintiffs' demographic characteristics, "low-wage jobs," and "ordinary activities" establish a certainly impending warrantless arrest without probable cause. AB 23. The plaintiff in *Lyons* likewise risked another chokehold simply by driving in Los Angeles, which the Supreme Court found insufficient for prospective injunctive relief.

Plaintiffs' reliance on out-of-circuit decisions fares no better. For instance, the differences between this case and *Shaw v. Smith*, 166 F.4th 61 (10th Cir. 2026), are inescapable. *Contra* AB 17, 20. *Shaw* involved a permanent injunction entered after a bench trial and consideration of a full evidentiary record—including substantial expert testimony quantifying the statistical likelihood of future injury. *Shaw*, 166 F.4th at 70. And, unlike this case, the existence of the challenged policy in *Shaw* did not depend on a series

of speculative inferences; the state highway patrol admitted that it had implemented the very policy challenged and trained officers "to use a driver's state of origin as a factor in determining reasonable suspicion." *Id.* at 71.

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), likewise bears scant resemblance to this case. *See* AB 17-18. There again, the defendant did not dispute its "*stated* policy and practice" of "detain[ing] 'individuals based only on reasonable suspicion or probable cause that a person is not authorized to be in the United States.'" 695 F.3d at 998 (emphasis added) (citation omitted). Not so here.

**3.** The retelling of the named plaintiffs' arrests, AB 32, only underscores the weakness of their standing theory. Contrary to Plaintiffs' contention, AB 32, Molina "was about to get into the driver's seat of [his] truck" before his arrest, (Dkt. 17-2 ¶5). Plaintiffs' emphasis on Molina's timely renewal application for Temporary Protected Status and the subsequent dropping of his assault charge, AB 32, misses the point. The record confirms that immigration officers specifically targeted Molina based on the expired status and assault charge, belying Plaintiffs' characterization of DHS's warrantless arrests as indiscriminate enforcement against individuals engaging in "quotidian activities of daily life." AB 20.

Plaintiffs do not dispute that B.S.R. had overstayed his B-2 visa and was sitting in a vehicle when encountered by immigration officers. Rather, they question the reported criminal charge because the government has "failed to produce any records thereof." AB 32. That objection, however, does not refute the sworn declaration identifying the information underlying the enforcement action. *See* (Dkt. 50-2 ¶8).

According to Plaintiffs, "[a]gents opened N.S.'s car door right after he got in and turned his car on." AB 32. Put differently, N.S. was sitting in the driver's seat of a running vehicle, with a ready means of escape.

Plaintiffs contend that "R.S.M. and her husband promptly passed the agents their documents after asking for clarification." AB 32. That gloss omits their initial refusal to lower their windows and comply with officers' repeated instructions to produce identification, as well as ICE's determination of R.S.M.'s unlawful presence. *See* (Dkt. 17-5 ¶¶2-3); (Dkt. 50-1 at 6).

**4.** Plaintiffs' remaining attempts to establish an injury in fact fare no better. To start, the existence of an administrative warrant for at least one named plaintiff further illustrates the remoteness of any future injury. Plaintiffs' claim of "irrelevan[ce]," AB 24, is difficult to understand. Even if a future arrest would not necessarily occur under warrant, the warrant—at a

minimum—substantially diminishes any "real and immediate" threat of another warrantless arrest. *See Lyons*, 461 U.S. at 103. The warrant also confirms that R.S.M.'s claim is moot. Enjoining future warrantless arrests "will neither presently affect" her "rights nor have a more-than-speculative chance of affecting them in the future." *See LaRoque v. Holder*, 679 F.3d 905, 907 (D.C. Cir. 2012) (citation omitted).

Nor did the government fail to "address, let alone rebut," the declarations of roughly forty nonparties. AB 37. Article III demands that the named plaintiffs establish a certainly impending future injury, and the subjective speculation of individuals not even parties to this case cannot bridge that gap. *See United States v. Texas*, 599 U.S. 670, 674 (2023).

### B. Plaintiffs Fail To Demonstrate Traceability And Redressability

Plaintiffs' remaining arguments on Article III standing, AB 24-25, are equally unavailing. For starters, Plaintiffs misconstrue the traceability inquiry, arguing that the alleged policy "has directly resulted in [P]laintiffs' arrests" and injuries (e.g., shackling, ankle monitoring, anxiety) "without administrative warrants and without consideration of escape risk." AB 24 (citation omitted). Traceability requires "a causal connection between the injury and the conduct complained of" by Plaintiffs. *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560 (1992). Here, the relevant connection would be between the asserted threat of a *future* warrantless arrest without probable cause and ICE's supposed unwritten policy. But Plaintiffs instead trace their purported ongoing harms to *past* arrests. That argument misunderstands the traceability analysis and effectively concedes that Plaintiffs face no realistic threat of a future warrantless arrest—much less an unlawful one that stems from the alleged policy.

Nor is the preliminary injunction "tailored to" Plaintiffs' asserted injuries. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018). Supervising all warrantless immigration arrests in the entire District extends far beyond the relief necessary to redress those alleged harms. *Contra* AB 25; *see Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (explaining that redressability requires "a favorable decision [to] relieve a *discrete* injury" (emphasis added and citation omitted)).

Plaintiffs also lack standing to challenge the application of the purported warrantless-arrest policy to other nonparties. *See* (Dkt. 68 at 21-24). As the Supreme Court has explained, "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Texas*, 599 U.S. at 674 (citation omitted). A

cognizable injury in fact likewise requires more than an "asserted right to have the Government act in accordance with law." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Thus, the allegations of the nonparties, even if accepted as true, say nothing about whether the named plaintiffs themselves face the certainly impending injury that Article III demands.

### C. CASA Lacks Standing

In a final set of arguments, Plaintiffs fall back on two theories of standing for CASA, neither of which has merit. Plaintiffs do not dispute that CASA's associational standing rises and falls with the individual named plaintiffs' standing theory. AB 25-26. Because the individual named plaintiffs lack Article III standing for prospective injunctive relief, Argument §§I.A-B, *supra*, CASA's theory must fail too. Nor do Plaintiffs meaningfully address germaneness. This Court has explained that the germaneness requirement "prevent[s] litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (citation omitted). A general commitment to communities that may include immigrants does not sufficiently connect a litigation challenging warrantless immigration

arrests to CASA's mission. CASA's theory would provide standing to challenge any policy implicating immigrants—the precise type of generalized grievance that Article III prohibits.

That leaves organizational standing. For organizational standing, the alleged unwritten policy must "perceptibly impair[]" CASA's "ability to provide services." *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). This Court has stressed that "an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Id.* Similarly, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others.'" *Id.* at 920 (citation omitted).

But such expenditures are all that CASA offers here. *E.g.*, AB 27 (describing expenditures "to build trust with its members"); AB 26 (general "toll Defendants' policy has taken on the organization and its members"). CASA cannot manufacture standing by choosing to fight a policy not even germane to its mission and then claiming injury from the costs of that self-selected fight. As the Ninth Circuit has recently recognized, "[w]hen an organization's mission is frustrated just because it has a general objection to the challenged action, the organization has not suffered an injury-in-fact, even

when it expends resources to voice that objection." *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 632 (9th Cir. 2026) (en banc).

The contention that the alleged policy perceptibly impairs CASA's "core business activities" as a services organization fares no better. LDAD Amicus Br. 18-19. Organizational standing demands more than a diversion of "resources in response to a defendant's actions." *Hippocratic Medicine*, 602 U.S. at 395. CASA has failed to show that the alleged policy forced it to "expend resources in a manner that keeps [it] from pursuing its true purpose." *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995); *cf. Texas*, 599 U.S. at 676-77 (monetary costs incurred because of government's arrest policy insufficient for Article III standing). Even the district court declined to indulge Plaintiffs' far-fetched theory of organizational standing.

## II. THE INA INDEPENDENTLY BARS PLAINTIFFS' CLAIMS

Plaintiffs' argument that Section 1252(g) does not bar this lawsuit, AB 28-31, ignores a practical reality: an arrest often marks the "commencement" of removal proceedings. 8 U.S.C. § 1252(g). The Supreme Court has explained that Section 1252(g) "seems clearly designed to give some measure of protection" to those "discretionary determinations" and to prevent "separate

rounds of judicial intervention." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) (citation omitted).

The decision to arrest an alien, either for commencing removal proceedings or executing a removal order, falls squarely within this discretionary scope. Other courts of appeals have agreed. *See, e.g.*, *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) ("[C]laims … that the agents illegally arrested [the plaintiff], and that the agents illegally detained [the plaintiff] each arise from an action taken to commence removal proceedings."); *Sissoko v. Rocha*, 509 F.3d 947, 950 (9th Cir. 2007) (similar).

The issuance of Notices to Appear for N.S. and R.S.M. after their arrests, AB 30, changes nothing. Warrantless arrests routinely precede the issuance of a Notice to Appear, and that chronology does not place an arrest outside the scope of the government's discretionary authority under Section 1252(g). That same jurisdictional bar would also apply to any future arrests.

The same discretion applies to a decision not to commence removal proceedings following a warrantless arrest. AB 29. Probable cause to arrest an alien does not mean that the government will ultimately prevail in a future removal proceeding, and the government may decide not to effectuate removal.

## III. PLAINTIFFS FAIL TO IDENTIFY A CAUSE OF ACTION UNDER THE APA

### A. The Alleged Unwritten Policy Does Not Exist

Far from containing "extensive evidence" that ICE maintains a policy and practice of "arrest first, ask questions later," AB 6 (citation omitted), 18 44, the record tells a very different story. Section 1357 and DHS regulations require individualized probable cause of likelihood of escape to conduct a warrantless arrest. 8 U.S.C. §1357(a)(2); 8 C.F.R. §287.8. Additionally, the 2021 Broadcast Statement of Policy, (Dkt. 17-1 at 8), and the Lyons Memo, (Dkt. 82-1), implement the legal requirements for and provide guidance on warrantless arrests. Plaintiffs cannot seek APA review of an agency action that does not exist. *See* 5 U.S.C. §551(13) (defining agency action).

Plaintiffs' assertion that the Lyons Memo "is not properly before this Court," AB 22, is mistaken. The district court specifically considered the memorandum in entering its enforcement order. (Dkt. 102 at 2, 6-9, 12-13, 16-37, 43-45). The Lyons Memo reiterates the longstanding requirement that immigration officers comply with Section 1357; it does not rescind or supersede any prior policy authorizing warrantless arrests without probable cause. Thus, the Lyons Memo provides compelling evidence that the alleged unwritten policy never existed.

Plaintiffs principally rely on purported statements by "high-ranking" government officials, AB 6, to support the existence of the alleged unwritten policy. For instance, Plaintiffs reference an errant statement by a Chief Border Patrol Agent that immigration arrests require only reasonable suspicion. AB 6-7. Even assuming certain officials misstated the probable-cause standard governing warrantless arrests, isolated misstatements by officials without authority to establish agency policy do not reveal an official policy to conduct warrantless arrests without probable cause.

The invocation of the Administration's call for vigorous immigration enforcement is similarly misplaced. AB 5-6. Encouraging immigration officers to arrest more illegal aliens no more directs them to disregard Section 1357 than a police commissioner's familiar pledge to rid the streets of criminals instructs police officers to make arrests without probable cause.

Plaintiffs' attempt to distinguish *In re Murray Energy Corp.*, 788 F.3d 330 (D.C. Cir. 2015), is without merit. AB 35-36. Although that case involved "ongoing rulemaking," this Court did not limit its reasoning to that context. Rather, this Court recognized that an agency's "public statements about its legal authority" do not "constitute final agency action subject to judicial review." *In re Murray Energy Corp.*, 788 F.3d at 335. *Murray* involved

official agency statements, not remarks by officials without policy-making authority. Nor do declarations challenging individual arrests arising from different circumstances "corroborate[]" the alleged policy. AB 36 (emphasis omitted). Accepting Plaintiffs' theory would elevate an alleged unwritten practice—stitched together from speculation, distortion, and vitriol—over the agency's actual policies on warrantless arrests. That is not how probable cause or the APA works.[1]

### B. The Alleged Agency Action Is Not Final

Even if the asserted policy arose from agency action, that action was not final. AB 48. Plaintiffs have marshaled no evidence that the supposed unwritten policy marks the consummation of a decision-making process by authorized agency officials. And any purported unwritten decision to deviate from Section 1357 is not final because on October 22, 2025, ICE published another statement re-adopting the prior Broadcast Statement of Policy. DHS issued a separate memorandum as recently as January 28, 2026, which emphasized the need for ICE officers to comply with Section 1357 in conducting warrantless arrests. (Dkt. 82-1).

---

[1] Plaintiffs' theory also overlooks the "longstanding presumption of regularity" for agency conduct. *Hartman v. Moore*, 547 U.S. 250, 263 (2006).

Thus, the only identifiable products of agency decision-making all point in one direction: adherence to the law. It belies the record—and defies common sense—to conclude that DHS adopted an unwritten policy contrary to the law while routinely publishing written directives to follow it.

Plaintiffs also have not demonstrated that "direct and appreciable legal consequences" will flow from the alleged unwritten policy. *See U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). They identify physical injuries from past arrests, ankle monitoring, generalized anxiety, and CASA's inability "to provide core services." AB 35. At most, those injuries reflect downstream effects of discrete arrests, not legal consequences flowing from the alleged policy.

*Hawkes* illustrates the point. There, the Supreme Court held that an agency's determination whether particular property contained "navigable waters" amounted to final agency action because it bound the government in legal proceedings, "creat[ed] a five-year safe harbor" for qualifying property owners, "narrow[ed] the field of potential plaintiffs," and "limit[ed] the potential liability a landowner faces for discharging pollutants without a permit." *Hawkes*, 578 U.S. at 594, 598-99 (citation omitted).

Nothing comparable follows from the alleged unwritten policy in this case. Assuming it existed, the alleged policy fixes no right or obligation, alters no legal status, and binds neither the agency nor its officers. And immigration officers would face no consequences if they instead decided to comply with Section 1357 by developing probable cause before a warrantless arrest. Asserted harms from past arrests cannot supply a legal consequence that the alleged unwritten policy fails to impose.

Plaintiffs' strained reading of *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), carries little interpretative weight. Plaintiffs insist that, unlike the challenge in *Lujan*, they "challenge a discrete agency action." AB 36. But that contention assumes the very point that Plaintiffs must establish—that the alleged policy exists as an "identifiable 'agency action.'" *Lujan*, 497 U.S. at 890. Plaintiffs cannot transform a smattering of cherry-picked arrests into a reviewable agency action simply by cobbling them together and affixing the label of "unwritten policy." *See id.* (explaining that agency's alleged "land withdrawal review program" was "no more an identifiable 'agency action' … than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration.").

## IV. PLAINTIFFS FAIL TO REBUT THE DEFECTS IN THE PROPOSED WARRANTLESS-ARREST CLASS

### A. The Provisional Certification Order Is Properly Before This Court

Plaintiffs acknowledge that the Court may review an order "inextricably intertwined" with or "necessary to ensure meaningful review" of the preliminary injunction order. AB 44; *see Wagner v. Taylor*, 836 F.2d 578, 585-86 (D.C. Cir. 1987); 16 *Wright & Miller's Federal Practice & Procedure* §3921.1 (3d ed. Apr. 2026 update). Contrary to their contention, however, the provisional class-certification decision fits comfortably within that category of orders.

In granting the preliminary injunction, the district court certified the provisional class to enable Plaintiffs to obtain District-wide relief. (Dkt. 68 at 70). Thus, the provisional class certification order defines the scope and reach of the very injunction under review; severing the two orders would divorce the injunction from the certification that defines its scope. Several courts of appeals have agreed with that reasoning. *See, e.g.*, *Fraihat v. ICE*, 16 F.4th 613, 635 (9th Cir. 2021) (recognizing that "[t]he district court's class certification ruling depended on, and was in service of, its preliminary injunction"); *Wagner*, 836 F.2d at 585-86 (similar). Just last month, in a similar

warrantless-arrest case, the Ninth Circuit denied a motion to dismiss that argued the court lacked jurisdiction to consider a final class-certification order without a separate Rule 23(f) petition. *Cruz Gamez v. Lyons*, No. 26-4343, Dkt. 21 (9th Cir. Oct. 20, 2026). Notably, the plaintiffs did not dispute that the court of appeals could review the provisional class-certification order. *Id.* Dkt. 9 at 8 (Aug. 17, 2026).

**B. The Class Members Lack Article III Standing**

At least one class member must establish standing. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). As explained above, the proposed class members have not demonstrated a certainly impending warrantless without probable cause. *See* Argument §I, *supra*. Not even the district court found as much, concluding only that the named plaintiffs faced an "increase[d]" chance of another warrantless arrest. (Dkt. 68 at 35). Plaintiffs do not dispute that, if the named plaintiffs lack standing, the class members do too. AB 45-46. And the government does much more than "gesture toward an 'ascertainability problem,'" AB 46 (citation omitted); it explicitly contends that the proposed warrantless-arrest class lacks objective criteria for determining membership. *See* 1 *Newberg & Rubenstein on Class Actions* §3:1 (6th ed. June 2026 update).

**C. The Proposed Class Does Not Satisfy Rule 23(a)**

Plaintiffs' proposed class does not meet the requirements of Rule 23(a).

**1.** To start, Plaintiffs fail to satisfy the numerosity requirement. Even assuming that plaintiffs' assertion of "roughly forty" unlawful arrests is accurate, AB 47, it does not confirm "that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although Plaintiffs advocate for a presumption that forty individuals satisfies numerosity, the rule's "text is, however, conspicuously devoid of any numerical minimum required for class certification." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016); *see Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (affirming determination that 84 putative class members was not enough for numerosity).

Nor could the district court likely provide an administrable standard for ascertaining class members who did not receive a pre-arrest finding of probable cause of escape risk because "immigration officers ... use their experience to stop suspected illegal immigrants based on a variety of factors." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 3 (2025) (Kavanaugh, J., concurring in the grant of the stay). And nothing in the record suggests how many of the illegal aliens residing in the District have faced a warrantless arrest, much less one without probable cause of escape risk. *See Mielo v. Steak 'n Shake*

*Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (numerosity not satisfied for subset of the "large number of disabled persons living in the United States").

Plaintiffs cannot satisfy numerosity by assuming the answer to the merits question in dispute. Their estimates of class size, AB 47, presuppose the existence of the alleged unwritten policy, without establishing how many individuals fall within the proposed class. That same defect also raises "fail-safe" concerns—when class membership depends on resolution of the merits. *See In re White*, 64 F.4th 302, 313, 315 (D.C. Cir. 2023).

**2.** The proposed class additionally lacks commonality. Sharing a similar injury does not alone demonstrate commonality; rather, certification must resolve "an issue that is central to the validity of each one of the [members'] claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258-60 (9th Cir. 2024) (concluding that the district court did not identify common evidence that could resolve plaintiffs' claims in "one stroke"); *DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013) (rejecting proposed class because it "constitute[d] only an allegation that the class members 'ha[d] all suffered a violation of the same provision of law'" (citation omitted)).

The commonality problem is particularly acute in the probable-cause context. Each arrest and escape-risk determination turns on a unique and idiosyncratic mix of facts considered under a totality standard, including familial ties, employment status, and other community connections. *See* AB 47-48 (conceding that the "validity of a warrantless [arrest] … can only be decided in the concrete factual context of the individual case" (citation omitted)). Plaintiffs cannot manufacture commonality by contending that "Defendants abandoned the probable cause determination for escape likelihood altogether." AB 48. Even if the alleged policy existed, whether a particular arrest violates Section 1357 depends on the circumstances of each encounter and thus cannot yield a common answer across the class. That assessment "would come 'at the expense of issues that are common and controlling for the class.'" *Duncan v. Governor of V.I.*, 48 F.4th 195, 208 (3d Cir. 2022) (citation omitted).

Plaintiffs' attempt to distinguish *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982), and *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006) fails. AB 48. As the Supreme Court explained in *Falcon*, "there is a wide gap" between an individual's claim and proof of the existence of "a class of persons who have suffered the same injury." *Falcon*, 457 U.S. at 157. In

*Garcia*, this Court held that a "plaintiff must 'make a significant showing to permit the court to infer that members of the class suffered from a common policy.'" 444 F.3d at 632 (citation omitted). That teaching dooms Plaintiffs' commonality argument because the alleged policy rests on "unsupported" speculation. *See id.* (citation omitted).

Nor did *Black Lives Matter L.A.* involve only "the *predominance* requirement for Rule 23(b)(3) money damages classes." AB 48. The Ninth Circuit repeatedly recognized that the district court did not "rigorously analyze the commonality question under Rule 23(a)" and then concluded that "the plaintiffs will face an uphill challenge in showing that *common questions* exist, let alone predominate over individual ones." 113 F.4th at 1258 (emphasis added), 1260. That is why the panel ordered the district court on remand to "identify which questions it believes are *common* to the class and whether those questions can be resolved using class-wide evidence." *Id.* at 1262 (emphasis added).

**3.** Plaintiffs' case for typicality does not withstand scrutiny. Although Plaintiffs contend that "[i]ndividual variations do not matter" for the typicality analysis, AB 49, typicality reflects the familiar principle that, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen.*

*Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). That principle defeats typicality here because probable cause turns on the particular facts and circumstances of each arrest.

**D. Rule 23(b) Bars Certification**

Rule 23(b) presents a separate obstacle to certification. *Contra* AB 49-50. Under Rule 23(b)(2), the challenged conduct must make final injunctive relief "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). That cannot happen here. The lawfulness of any future warrantless arrest implicates specific facts and circumstances bearing on probable cause and likelihood of escape. Those individual circumstances prevent the cohesion necessary for classwide relief. *See id.*; *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 604-05 (10th Cir. 2008) (no class "cohesiveness" under Rule 23(b) when relief sought required assessment of class members' particular circumstances); *see also* Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*, 7 J. on Telecomm. & High Tech. L. 127, 129 (2009) (explaining that "[c]ourts are poorly suited to design broad injunctive relief in" the Fourth Amendment context).

## V. THE REMAINING FACTORS DISFAVOR INJUNCTIVE RELIEF

### A. Plaintiffs Fail To Establish Irreparable Harm

Plaintiffs must "establish … that [they are] *likely* to suffer irreparable harm in the absence of preliminary relief." *Winter v. NRDC*, 555 U.S. 7, 20 (2008) (emphasis added). Thus, the interests of third parties cannot substitute for Plaintiffs' showing of irreparable harm. *See id.*; *contra* Chefs Amicus Br. 11-12; Churches Amicus Br. 4. A mere "'possibility' standard is too lenient." *Winter*, 555 U.S. at 22 (citation omitted). To qualify as irreparable harm, "[t]he asserted irreparable injury … must be ongoing or immine n[t]." *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022).

Plaintiffs' arguments on irreparable harm largely repackage their defective standing theories. That past arrests may inflict "irreparable loss of personal liberty," AB 38 (citation omitted), says nothing about whether the individual named plaintiffs face a real and immediate threat of future injury. As explained above, Plaintiffs have not established a certainly impending future arrest—much less a warrantless one without probable cause. *See* Argument §I, *supra*. And falling within a broad demographic profile of individuals who "appear Latino" and "live and/or travel in D.C.," AB 23, 38, does not demonstrate a "certain and great harm" necessary to sustain

preliminary relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted). To the extent that the district court considered prospective harms at all, it applied—at best—the impermissibly lenient "possibility" standard. *Winter*, 555 U.S. at 22 (citation omitted).

Plaintiffs' argument that the government has "forfeit[ed] any objection[] to CASA, Inc.'s irreparable harm" is similarly unpersuasive. AB 38. The government has consistently challenged CASA's ability to bring this lawsuit, and the district court did not even rely on Plaintiffs' resurrected theory of organizational standing. Plaintiffs cannot claim forfeiture of an argument about a theory the district court never adopted. Likewise, organizational expenditures insufficient for Article III standing, Argument §I.C, *supra*, cannot support a finding of irreparable harm.

### B. The Balance Of Equities Favors The Government

Nor does the balance of the equities tip in Plaintiffs' favor. Most fundamentally, the preliminary injunction harms the public, which has a strong interest in effective immigration enforcement. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs cannot evade that harm by characterizing the injunction as prohibiting ICE officers "from enforcing a policy that *violates*

§ 1357(a)(2)." AB 39. That logic would justify all manner of follow-the-law injunctions and open the door to pervasive judicial micromanagement of the Executive Branch's enforcement of federal law.

Plaintiffs' contention that the injunction targets only the alleged unwritten policy, not the "warrantless arrests themselves," AB 39-40, does little to obscure the injunction's practical effect. To start, that framing further forecloses standing because Plaintiffs would need a real and immediate threat of an unlawful warrantless arrest for which the alleged policy was *additionally* the but-for cause.

In all events, the injunction subjects every warrantless arrest to judicial supervision, leaving immigration officers to guess whether a court will later conclude that a previous split-second, fact-dependent judgment violated a court order. The inevitable effect is a pervasive chill on lawful immigration enforcement. On the other side of the ledger, "[t]he interests of individuals who are illegally in the country in avoiding being stopped by law enforcement … is ultimately an interest in evading the law," which is not "especially weighty." *Perdomo*, 146 S. Ct. at 5 (Kavanaugh, J., concurring).

## VI. THE INJUNCTION IS IMPERMISSBLY OVERBROAD

### A. The Injunction Does Not Satisfy Rule 65(d)

Plaintiffs misunderstand Rule 65's demand for specificity. They contend that the injunction does not violate Rule 65(d) because it "specifically" forbids immigration officers "from enforcing their policy of making warrantless civil immigration arrests in D.C. without a pre-arrest individualized determination of probable cause for escape likelihood." AB 40. That formulation amounts to "a generalized injunction to obey the law." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). And the injunction does not merely attempt to restate existing law; it converts those legal requirements into commands enforceable through contempt and other penalties, subjects every probable-cause determination to judicial scrutiny, and chills lawful immigration enforcement. *See* Kerr, *supra*, at 129 (courts "poorly suited to" craft broad injunctive relief in the Fourth Amendment setting).

Plaintiffs' charge of "self-contradict[ion]," AB 41, rests on a false dichotomy. An injunction can be impermissibly vague in its substantive commands *and* rigidly prescriptive in other respects—such as imposing reporting requirements untethered to Section 1357 and dictating how immigration officers must weigh probable-cause factors. Nor did the

government forfeit its objections to the injunction's reporting requirements. *See* Dkt. 64-1 at 3-4 (arguing that the documentation and reporting requests "subject the Government to on-going and rolling discovery").

### B. The Enforcement Order Confirms The Injunction's Overbreadth

The enforcement order lays bare the injunction's overbreadth. After all, the injunction's sweeping overreach and vagueness led to a dispute among the parties, prompting the district court to enter the enforcement order. Although Plaintiffs contend that the enforcement order "merely restates the parties' existing legal relationship in more specific terms," AB 51, that framing ignores that the order rewrites ICE's internal policies, further micromanaging how immigration officers conduct warrantless arrests throughout the District. *See* (Dkt. 101 at 1) (prohibiting the government from "rely[ing] on the probable cause standard or analytical approach set forth in the" Lyons Memo). And Plaintiffs miss the point when they argue that the government did not "notice[] a second appeal of the enforcement order" or "amend[]" the previous notice. AB 50-51. If the preliminary injunction falls, no one disputes that the enforcement order must fall with it.

The enforcement order also fails on its own terms. Although Plaintiffs concede that the Lyons Memo correctly defines likelihood of escape, they

insist that abbreviated references elsewhere in the memorandum somehow displace that definition. AB 53-54. That reading flips elementary interpretative principles on their head. An express definition does not evaporate because a subsequent reference fails to recite it in full. It is well-settled that "text must be construed as a whole" and that "[a] word or phrase is presumed to bear the same meaning throughout a text." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167, 170 (2012).

Nor does the phrase "another clearly identifiable location" mean some hypothetical place where immigration officers may find an individual at an indefinite time in the future. *Contra* AB 54. The Lyons Memo properly instructs immigration officers to conduct the likelihood-of-escape analysis "while in the field." (Dkt. 82-1 at 6). Plaintiffs' construction would elevate a speculative possibility of locating an individual in the future at an indeterminate time and place over the officer's "own inferences from the objective circumstances" in the present. *See United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974). Simply claiming a "home or a workplace," AB 54, does not establish that either exists, much less an intent to remain (or return) there before officers can obtain a warrant.

The enforcement order's requirement that immigration officers invariably consider community ties is equally misguided. *See* AB 54. Community ties may inform likelihood of escape, but probable cause demands a practical assessment of the totality of the circumstances, often on a highly compressed timeframe. *See District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018); FAIR Amicus Br. 7 ("Requiring ICE officers to develop and consider information regarding community ties is incompatible with the individualized probable-cause inquiry."). The Lyons Memo explains that "[n]o single factor is determinative" of likelihood of escape and identifies several considerations that inform an alien's ties to the community. (Dkt. 82-1 at 3-5). But neither Section 1357 nor its implementing regulations authorize the district court to transform one potentially relevant consideration into a mandatory element of a judicially prescribed checklist.

## CONCLUSION

For the foregoing reasons, this Court should reverse the grant of the preliminary injunction and provisional class certification.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant*
*Attorney General*

SHERI R. GLASER
LINDA Y. CHENG
ZACHARY S. HUGHBANKS
*Office of Immigration Litigation*

*/s/ Daniel F. Mummolo*
DANIEL F. MUMMOLO
*Counsel to the Assistant*
*Attorney General*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6054*
*daniel.f.mummolo@usdoj.gov*

November 9, 2026

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,462 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using a CenturyExpd BT 14-point font.

*/s/ Daniel F. Mummolo*
Daniel F. Mummolo

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel F. Mummolo*
Daniel F. Mummolo