**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5045**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

JOSÉ ESCOBAR MOLINA, et al.,

Plaintiffs-Appellees,

v.

DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-03417

---

## DEFERRED JOINT APPENDIX

## VOLUME 1 OF 2

---

JONATHAN D. GUYNN
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

SHERI R. GLASER
LINDA Y. CHENG
ZACHARY S. HUGHBANKS
*Office of Immigration Litigation*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6054*

# TABLE OF CONTENTS

**Page**

Order Granting Preliminary Injunction
(Dkt. 67) (Dec. 2, 2025) ........ JA1

Memorandum Opinion
(Dkt. 68) (Dec. 2, 2025) ........ JA5

Order Granting Plaintiffs' Motion to Enforce Preliminary Injunction
(Dkt. 101) (May 7, 2026) ........ JA93

Memorandum Opinion
(Dkt. 102) (May 7, 2026) ........ JA95

Class Action Complaint for Declaratory and Injunctive Relief
(Dkt. 1) (Sept. 25, 2025) ........ JA140

Plaintiffs' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification
(Dkt. 17) (Oct. 3, 2025) ........ JA176

Declaration of Alexandra J. Widas
(Dkt. 17-1) (Oct. 3, 2025) ........ JA222

Declaration of José Eliseo Escobar Molina
(Dkt. 17-2) (Oct. 3, 2025) ........ JA423

Declaration of B.S.R.
(Dkt. 17-3) (Oct. 3, 2025) ........ JA430

Declaration of N.S.
(Dkt. 17-4) (Oct. 3, 2025) ........ JA439

Declaration of R.S.M.
(Dkt. 17-5) (Oct. 3, 2025) ........ JA450

Declaration of Goerge Escobar, Chief of Programs and Services, CASA, Inc.
(Dkt. 17-6) (Oct. 3, 2025) ........ JA457

Declaration of Ana Gracia
(Dkt. 17-7) (Oct. 3, 2025) ............................................................JA477
Declaration of Anamaria
(Dkt. 17-8) (Oct. 3, 2025) ............................................................JA480
Declaration of Andrés
(Dkt. 17-9) (Oct. 3, 2025) ............................................................JA484
Declaration of Antony
(Dkt. 17-10) (Oct. 3, 2025) ..........................................................JA487
Declaration of B.R.G.
(Dkt. 17-11) (Oct. 3, 2025) ..........................................................JA491
Declaration of C.
(Dkt. 17-12) (Oct. 3, 2025) ..........................................................JA495
Declaration of Camilo
(Dkt. 17-13) (Oct. 3, 2025) ..........................................................JA499
Declaration of Cristina
(Dkt. 17-14) (Oct. 3, 2025) ..........................................................JA503
Declaration of Daniela Anello
(Dkt. 17-15) (Oct. 3, 2025) ..........................................................JA506
Declaration of Darwin Lopez Castañon
(Dkt. 17-16) (Oct. 3, 2025) ..........................................................JA513
Declaration of Elias
(Dkt. 17-17) (Oct. 3, 2025) ..........................................................JA516
Declaration of Fiona Lewis
(Dkt. 17-18) (Oct. 3, 2025) ..........................................................JA519
Declaration of Franco
(Dkt. 17-19) (Oct. 3, 2025) ..........................................................JA521

Declaration of Javier
(Dkt. 17-20) (Oct. 3, 2025) ..........................................................JA525
Declaration of Julio
(Dkt. 17-21) (Oct. 3, 2025) ..........................................................JA528
Declaration of Luz
(Dkt. 17-22) (Oct. 3, 2025) ..........................................................JA531
Declaration of M.P.
(Dkt. 17-23) (Oct. 3, 2025) ..........................................................JA536
Declaration of Mateo
(Dkt. 17-24) (Oct. 3, 2025) ..........................................................JA540
Declaration of Flores Roman
(Dkt. 17-25) (Oct. 3, 2025) ..........................................................JA544
Declaration of W.G.M.
(Dkt. 17-26) (Oct. 3, 2025) ..........................................................JA547
Declaration of Y.R.M.
(Dkt. 17-27) (Oct. 3, 2025) ..........................................................JA551
Proposed Order
(Dkt. 17-28) (Oct. 3, 2025) ..........................................................JA555

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 25-3417 (BAH)<br><br>Judge Beryl A. Howell |

**ORDER**

Upon consideration of plaintiffs' Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification ("Pls.' Prelim. Inj. Mot."), ECF No. 17, and Motion for Class Certification, ECF No. 19, the memoranda and supplemental memoranda and declarations and exhibits attached thereto, in support and opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby—

**ORDERED** that plaintiffs' Motion for Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification, ECF No. 17, is **GRANTED IN PART** and **DENIED IN PART** as to plaintiffs' request for a stay, pursuant to 5 U.S.C. § 705; it is further

**ORDERED** that the following class is provisionally certified:

> **Unassessed Escape Risk Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

it is further

**ORDERED** that plaintiffs' counsel from the Amica Center for Immigrant Rights, American Civil Liberties Union Foundation of the District of Columbia, American Civil Liberties

Union Foundation, National Immigration Project, Washington Lawyers' Committee for Civil Rights and Urban Affairs, and Covington & Burling, LLP, are hereby provisionally appointed as counsel for the provisionally certified plaintiff class; it is further

**ORDERED** that defendants and their agents are **PRELIMINARILY ENJOINED** from enforcing their policy or practice of making warrantless civil immigration arrests in the District of Columbia without a pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii), which statute and regulation also require the same individualized determination of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion or removal of aliens; it is further

**ORDERED** that defendants shall, within 72 hours of the issuance of this order, transmit a copy of this Order to defendants' officers, employees, agents, and contractors who have responsibilities related to the subject matter of this Order; it is further

**ORDERED** that defendants comply with the following reporting requirements:

(1) Any defendant or their agent who conducts a warrantless civil immigration arrest in the District of Columbia shall, as soon as practicable, document the facts and circumstances surrounding the warrantless civil immigration arrest in narrative form. This documentation shall include the specific, particularized facts that supported the agent's pre-arrest probable cause to believe that the person is likely to escape before a warrant can be obtained, including the following facts that are required to be documented pursuant to the Department of Homeland Security's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2) (available at:

https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf [https://perma.cc/MDT7-9DJP]): "that the alien was arrested without a warrant"; "the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area"; "the alien's ties to the community, if known at the time of arrest, including family, home, or employment"; and "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." The documentation shall include the date and time of the arrest, and the date and time the agent completed the documentation;

(2) In describing the individualized assessment of escape risk in the documentation ordered above, specific details as to the person being arrested must be provided such that the use of boilerplate language may be deemed indicative of noncompliance;

(3) Within 30 days of this Order and every 30 days thereafter until this litigation is terminated or the Court rules otherwise, defendants shall release to plaintiffs' counsel the documentation describing defendants' and their agents' warrantless civil immigration arrests within this District, or if requested by plaintiffs' counsel concerning specific individual warrantless arrests, no later than seven days after the request; it is further

**ORDERED** that, in addition to complying with D.C. Local Civil Rule 7(m), the parties shall comply with the following procedures regarding any alleged violations of this Order:

(1) If plaintiffs have a reasonable basis to believe that the defendants are in substantial noncompliance with one or more provisions of this Order, plaintiffs shall notify defendants in writing of the specific alleged compliance issue, which notice shall

identify, with particularity, the basis of the claim that defendants are not in substantial compliance and the specific provisions of this Order that are implicated;

(2) Within seven days of plaintiffs' response, the parties shall meet and confer. If the parties are unable to resolve the dispute within seven days of the meet and confer, plaintiffs may seek intervention from the Court by filing a motion for enforcement of the provisions identified through the aforementioned notice of substantial noncompliance or a motion for an order to show cause why defendants should not be held in contempt; it is further

**ORDERED** that plaintiffs' Motion for Class Certification, ECF No. 19, is **DENIED** without prejudice; it is further

**ORDERED** that plaintiffs shall post a bond of $1.00.

This Order shall remain in effect until further order of the Court.

**SO ORDERED**.

Date: December 2, 2025

Beryl A. Howell

**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 25-3417 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

This case arises in the wake of a publicly declared emergency in our Nation's Capital explained by the current president, in part, to ensure that "[t]his city will no longer be a sanctuary for illegal alien criminals," Decl. of Alexandra Widas, Pls.' Counsel ("Widas Decl."), Ex. 6,[1] ECF No. 17-1, and in the midst of public announcements by other federal officials that "[c]riminal aliens are a public safety threat, and there should be no place for sanctuary policies that place crime over the community," *id.*, Ex. 10.[2] Such repeated conjoined use by high-ranking officials of the words "criminal" and "alien" prompts the need for clarification of two fundamental facts in reviewing the two pending motions brought by individual immigrants and an immigrant-focused organization in this case. First, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012) (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)). As a legal matter, an immigration

---

[1] Widas Decl., Ex. 6, ECF No. 17-1 at 43 (Mike Lillis and Rebecca Beitsch, *DC Critics Slam Trump's Crackdown as Power Grab Focused on Immigration* at 3, The Hill (Aug. 20, 2025), https://perma.cc/D259-Q7F4).
[2] *Id.*, Ex. 10, ECF No. 17-1 at 60 (Hamed Aleaziz et al., *How Washington Became a Testing Ground for ICE* at 4, N.Y. Times (Oct. 1, 2025)).

status violation is a *civil* violation, as the D.C. Circuit made clear just a few months ago. *See N.S. v. Dixon*, 141 F.4th 279, 281-82, 286-87 (D.C. Cir. June 27, 2025) (indicating that immigration arrests are a civil sanction, not a criminal penalty). Consequently, viewing all immigrants potentially subject to removal as criminals is, as a legal matter, plain wrong. Second, immigration policy is indisputably important and "can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395 (citing *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588-589 (1952)). Treating all immigrants potentially subject to removal as if they were criminals highlights the Supreme Court's wise caution that "[p]erceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.*

Plaintiffs—whom plaintiffs describe as including Temporary Protected Status holders, immigrant asylum-seekers, and CASA, Inc., a membership organization of immigrants—move to enjoin preliminarily the Department of Homeland Security ("DHS"), its Secretary, and other federal agencies and officers (collectively, "defendants") from conducting warrantless civil immigration arrests in the District of Columbia ("the District") without making individualized probable cause determinations as to each arrestee's risk of escape, as required by 8 U.S.C. § 1357(a)(2), or in the alternative to stay the agency policy permitting such arrests. *See* Pls.' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification ("Pls.' Prelim. Inj. Mot."), ECF No. 17. In that motion, plaintiffs also seek provisional certification of a class of individuals "for whom Defendants did not make a pre-arrest, individualized assessment of probable cause as to flight risk," named herein the "Unassessed Escape Risk Class." Pls.' Notice of Filing Revised Proposed Orders for Plaintiffs' Motions, ECF

No. 62. Separately, plaintiffs also move for certification of a broader class consisting of all persons who, since August 11, 2025, have been or will be arrested in the District for alleged civil immigration violations without an administrative warrant and without probable cause, and an additional subclass to the Unassessed Escape Risk Class. *See id.* at 4; *see also* Pls.' Motion for Class Certification ("Pls.' Class Cert. Mot."), ECF No. 19.

Making clear what is not at issue in this lawsuit is helpful at the outset. Plaintiffs are not challenging the authority of federal law enforcement agents to make criminal arrests—either with a warrant or without a warrant—for suspected *criminal* conduct, whether that suspected criminal conduct is engaged in by a noncitizen or a U.S. citizen. *See* Nov. 19, 2025 Hearing Transcript ("Hr'g Tr.") at 5:7, ECF No. 61. Plaintiffs are also not challenging the long-standing authority under the Immigration and Naturalization Act ("INA") for Immigration and Customs Enforcement ("ICE") to make *civil* arrests of noncitizens, pursuant to an administrative warrant, and to detain noncitizens during the pendency of removal proceedings, when the statutory requirements are met. *See* 8 U.S.C. § 1226(a) (authorizing arrest of a noncitizen pursuant to an administrative warrant and detention during the pendency of removal proceedings); *see also* Hr'g Tr. at 6:7. Nor are plaintiffs challenging the *authority* provided in the INA to make warrantless civil arrests of a noncitizen to facilitate that person's removal from the country, when statutory and regulatory requirements are met. *See* 8 U.S.C. § 1357(a)(2); *see also* Hr'g Tr. at 6:13. Plaintiffs are only challenging the *way* that warrantless civil immigration arrests are seemingly being carried out in the District under an allegedly new administration policy—*i.e.*, a policy that plaintiffs claim fails to meet legal requirements under section 1357(a)(2) of the INA requiring officers to have probable cause to believe the noncitizen is in the United States unlawfully *and* is likely to escape before a warrant may be obtained. *See* Hr'g Tr. at 6:20, 7:5.

For the reasons discussed below, plaintiffs' motion to enjoin preliminarily defendants from continuing any policy or practice of conducting warrantless civil immigration arrests in the District without making individualized probable cause determinations as to each arrestee's risk of escape, as required by 8 U.S.C. § 1357(a)(2), is granted, and a final decision on the requested certification of a class and both subclasses will be reserved for a later time. Defendants are preliminarily enjoined from enforcing their policy of conducting warrantless civil immigration arrests without probable cause to believe that the arrestee is likely to escape before an administrative warrant can be obtained; and only plaintiffs' proposed Unassessed Escape Risk Class is provisionally certified.[3]

# I. BACKGROUND

The relevant factual and procedural background is summarized below.

## A. Factual Background

### *1. Declaration of Crime Emergency in the District on August 11, 2025, With Direction for "Mass" Immigration Arrests*

On August 11, 2025, the current presidential administration declared a "crime emergency" in the District of Columbia, prompting the deployment of 800 National Guard members from the District and other parts of the United States and removal of control of the D.C. Metropolitan Police Department from local government officials. Compl. ¶ 22, ECF No. 1 (quoting Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025)). Four days later, U.S. Attorney General Pamela Bondi ordered the Mayor of the District to provide assistance with "the enforcement of federal immigration law" and with "locating, apprehending, and detaining aliens unlawfully present in the

[3] Since plaintiffs' motion for a preliminary injunction is granted, as explained below, plaintiffs' alternative request to stay the agency action need not be considered. *See* Pls.' Prelim. Inj. Mot., ECF No. 17; Hr'g Tr. at 40:20-21 (plaintiffs' counsel agreeing that "if the injunction is granted, then I don't think we need the stay order").

United States." *Id.* ¶ 23 (quoting Order of the Att'y Gen., Order No. 6372-2025, Restoring Safety and Security to the District of Columbia (Aug. 15, 2025)).

According to plaintiffs, the administration's push for "mass immigration arrests" effected a change in the policy and procedures by which such civil arrests are conducted. Compl. ¶ 19. For approximately 15 years, ICE, a component of DHS, has required its officers to fill out a form identifying an arrest target—listing the targeted person's appearance, home, and occupation, and cataloging their criminal history—and to gain supervisor approval, before making an immigration arrest. *Id.* at ¶ 31.[4]

Plaintiffs allege that defendants have instituted a new "arrest first, ask questions later" policy of making warrantless civil immigration arrests without probable cause to believe someone is both in the United States unlawfully and an escape risk. Pls.' Prelim. Inj. Mot. at 5-6 (emphasis omitted). In support, plaintiffs proffer evidence of defendants repeatedly admitting to making warrantless civil arrests without the required probable cause findings. *See id.* at 6-7. For example, in July 2025, the Department of Justice fired the acting U.S. Attorney for the Eastern District of California after she told a Border Patrol official that he could not arrest immigrants without probable cause. *See* Widas Decl., Ex. 16.[5] In September 25, 2025, DHS issued a public statement calling the allegations in this lawsuit "disgusting, reckless, and categorically FALSE" because "DHS law enforcement uses '*reasonable suspicion*' to make arrests." *Id.*, Ex. 17 (emphasis added).[6] Obviously, DHS's quoted reference to "reasonable suspicion" is not the requisite "probable cause" standard required for civil immigration arrests. DHS further stated on its website

---

4 Compl. ¶ 31 (citing Julia Ainsley et al., *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC News (Sept. 9, 2025), https://perma.cc/6ZTC-PP6T).

5 Widas Decl., Ex. 16, ECF No. 17-1 at 86-87 (Heather Knight and Hamed Aleaziz, *Trump Fired a U.S. Attorney Who Insisted on Following a Court Order* at 1-2, NY Times (Sept. 26, 2025)).

6 *Id.*, Ex. 17, ECF No. 17-1 at 95 (Teo Armus and Jenny Gathright, *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.* at 2, The Washington Post (Sept. 25, 2025)).

that its officers are "trained to ask a series of well-determined questions to determine status and removability" when they "encounter individuals subject to arrest," without any mention of the requisite prong of escape risk for executing a warrantless civil immigration arrest. *Id.*, Ex. 18.[7] The next month, Chief Border Patrol Agent Gregory Bovino, in a public statement, reiterated, "We need reasonable suspicion to make an immigration arrest . . . . You notice I did not say probable cause, nor did I say I need a warrant." Second Decl. of Alexandria Widas ("Second Widas Decl."), Ex. 2, ECF No. 34-1.[8] These and other federal public official statements have misstated, eschewed or ignored the requisite legal standard for executing warrantless civil immigration arrests, while pressing the need for urgency in executing such arrests. *See, e.g.*, Widas Decl., Ex. 19 (post from DHS's official social media account, @DHSgov, reiterating that DHS "uses 'reasonable suspicion'" to make civil immigration arrests and that "[t]he Supreme Court recently vindicated us on this question"); *id.*, Ex. 22 (quoting statement from White House Deputy Chief of Staff Stephen Miller, instructing ICE to stop developing target lists of immigrants and to instead "just go out there and arrest illegal aliens" at Home Depots or 7-Elevens, betting that he and a handful of agents could go out on the District's streets and arrest 30 people right away)[9]; *id.*, Ex. 23 (quoting statement from Acting Executive Associate Director of ICE Enforcement and Removal Operations telling his agents to "turn up the creative knob up to 11 and push the envelope," and

---

[7] *Id.*, Ex. 18, ECF No. 17-1 at 101 (*DHS Debunks New York Times False Reporting: DHS Does NOT Deport U.S. Citizens* ("*DHS Oct. 1, 2025 Press Release*") at 1, DHS (Oct. 1, 2025), https://perma.cc/3PCA-2M7C).

[8] Second Widas Decl., Ex. 2, ECF No. 34-1 at 8 (Priscilla Alvarez and Michael Williams, *Border Patrol official denies racial profiling factors in immigration arrests, says officers do consider whether people appear "panicked" or "scared"* ("*Border Patrol official denies racial profiling*") at 1, CNN (Oct. 7, 2025), https://perma.cc/26HB-FVVN).

[9] *Id.*, Ex. 22, ECF No. 17-1 at 121 (Elizabeth Findell et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown; After deportations fell short of President Trump's campaign promises, federal agents summoned to a meeting in Washington were told to 'just go out there and arrest illegal aliens'* at 1, The Wall Street J. (June 10, 2025)).

another statement from a senior ICE official telling agents, "If it involves handcuffs on wrists, it's probably worth pursuing").[10]

Since this alleged change in policy for warrantless civil immigration arrests, such arrests have proliferated. According to one analysis, 943 immigration arrests took place between August 7 and September 9, 2025, comprising over 40% of all arrests in the District. Compl. ¶ 24.[11] Although the emergency period declared by the current president ended on September 11, 2025, plaintiffs allege that "mass immigration stops and arrests in D.C. are continuing." *Id.* ¶ 27; *see* Widas Decl., Ex. 10 (quoting Acting Executive Associate Director of ICE Enforcement and Removal Operations, who announced, "We're going to continue our operations in the D.C. metro area")[12]; *id.*, Ex. 11 (quoting Tricia McLaughlin, DHS Assistant Secretary for Public Affairs, who publicly remarked, "DHS law enforcement will not be slowed down")[13]; *id.*, Ex. 13 (U.S. Customs and Border Protection Chief Michael W. Banks, in a social media post published under the username @USBPChief, highlighting the immigration arrests in the District during the weekend of September 13, 2025).

### 2. *Plaintiffs Initiate This Action Challenging Defendants' Alleged Policy and Practice of Making Warrantless Civil Immigration Arrests Without Probable Cause in the District.*

Plaintiffs are four noncitizens with pending immigration applications—including for asylum and Temporary Protected Status renewal—and the nonprofit membership organization CASA, Inc., which has a mission to "improv[e] the quality of life in working-class Black,

---

10 *Id.*, Ex. 23, ECF 17-1 at 130, 132 (José Olivares, *US immigration officers ordered to arrest more people even without warrants* at 2, 4, The Guardian (June 4, 2025), https://perma.cc/528F-FQJB).

11 Compl. ¶ 24 (citing Alanna Durkin Richer & Rebecca Santana, *Over 40% of arrests in Trump's DC law enforcement surge relate to immigration, AP analysis finds*, Associated Press (Sept. 10, 2025), https://perma.cc/T4AQ-FZML).

12 Widas Decl., Ex. 10, ECF No. 17-1 at 61 (*How Washington Became a Testing Ground for ICE* at 5).

13 *Id.*, Ex. 11, ECF No. 17-1 at 69 (*DHS Scores Major Victory at Supreme Court* at 1, DHS (Sept. 8, 2025) https://perma.cc/5ACN-HFVV).

Latino/a/e, Afro-descendant, Indigenous, and immigrant communities" and provide "social, health, employment, and legal services to immigrant communities." Compl. ¶ 6. These plaintiffs allege they—or in the case of CASA, their members—were arrested by defendants' agents without an administrative warrant and without the required probable cause findings. *See* Compl. ¶¶ 3-5. The named individual and organizational plaintiffs and putative class are described below.

a. José Escobar Molina

José Escobar Molina was born in El Salvador and has lived in the United States since 1998. Pls.' Mot, Decl. of José Eliseo Escobar Molina ("Escobar Molina Decl.") ¶ 1, ECF No. 17-3. He successfully applied, in 2001, for Temporary Protected Status ("TPS"), which protects him from detention and deportation because of his immigration status. *Id.*; *see also Temporary Protected Status*, U.S. Citizenship & Immigr. Servs., https://perma.cc/X8LM-6NY2 ("Once granted TPS, an individual . . . cannot be detained by DHS on the basis of his or her immigration status in the United States.").

Defendants claim that Escobar Molina was "specifically targeted" by immigration enforcement personnel "based on information in law enforcement records," Supplemental Decl. of Kenneth Blanchard Jr. ("Supp. Blanchard Decl.") ¶ 8, ECF No. 63-2, which showed that Escobar Molina's Temporary Protected Status "expired" on March 9, 2025, and that he had a "2019 criminal charge for simple assault," Defs.' Opp'n, Ex. 2, Decl. of Kenneth Blanchard ("Blanchard Decl.") ¶ 7, ECF No. 50-2.[14] Yet, plaintiffs claim—and defendants later appear to concede, *see* Hr'g Tr. at 54:20-23—that Escobar Molina timely applied to renew his TPS status before that expiration date. *See* Escobar Molina Decl. ¶ 1. Plaintiffs also note, without apparent

---

[14] None of the underlying records for these attestations have been submitted to the record by defendants.

dispute by defendants, that Escobar Molina's criminal charge for simple assault was dropped in 2019. *See* Hr'g Tr. at 95:1-2.

At approximately 6:00 AM on August 21, 2025, Escobar Molina was walking to his work truck, dressed in his work clothes, to go to his job as a scaffolder. Escobar Molina Decl. ¶ 4-5. Two unmarked vehicles pulled up near his truck. *Id.* ¶ 5. Two people in plainclothes exited their vehicle, "grabbed [Molina] by the arms and immediately handcuffed [him]." *Id.* Two more people in plainclothes "grabbed [him] by the legs," *id.* ¶ 5, and "[p]ulling [him] by [his] limbs, the[] [four officers] shoved [him] into the[ir] black Suburban," *id.* ¶ 7. None of these people were "wearing uniforms or badges," and "they did not identify themselves," leading Escobar Molina to "fe[el] like [he] was being kidnapped." *Id.* ¶ 6.

These plainclothes people turned out to be law enforcement officers, who "did not ask [Molina] for [his] name or to see [his] identification, which [he] had with [him] in [his] wallet." *Id.* Nor did they "present[] a warrant, explain[] why they stopped [him], or indicate[] that they knew [his] name prior to stopping [him]." *Id.* ¶ 8. They did not "ask [him] any questions about [his] ties to the community," *id.*, such as his partner and two sons with whom he lives in Mount Pleasant, *id.* ¶ 3. When Escobar Molina repeatedly told the officers that he "had papers," the officers responded first by saying, "No you don't. You are illegal," *id.* ¶ 6, and then by "yell[ing]," "Shut up bitch! You're illegal," *id.* ¶ 7.

Without being asked for his name or any form of identification, Escobar Molina was taken "to a parking lot . . . near the Pentagon," where he was "put into a van" by officers with "badges and jackets that read 'Department of Homeland Security,'" *id.* ¶ 10, and then to an ICE facility in Chantilly, Virginia, where he arrived around 9:00 AM, *id.* ¶ 11. Around four hours later, Escobar Molina was interviewed by an officer who had a physical copy of Escobar Molina's work permit.

*Id.* ¶ 12. While at Chantilly, Escobar Molina was held with about 65 other people in a waiting cell "so crowded that it was impossible to lie down and sleep." *Id.* ¶ 11. He was "fed one small bean burrito, something sweet, and a glass of water during [his] entire 23-hour stay." *Id.*

After staying overnight in the facility in Chantilly, Escobar Molina was transported to a facility in Richmond, Virginia, from which he was released later that day. *Id.* ¶ 14. The "supervising ICE officer" who facilitated his release told Escobar Molina that the supervising officer "did not know why [Molina] had been brought to Richmond and that the officers had made an error in arresting [him] because [he] ha[s] TPS." *Id.* After "apologiz[ing] to [Molina] three times," the supervising officer "gave [him] a copy of [his] TPS approval notice and told [him] to carry it with [him] so [he] could show it if officers stopped [him] again" and told him he "was free to go." *Id.*

b. B.S.R.

B.S.R. was born in Honduras and has lived in the United States since 2019 when he entered with a visa, B.S.R. Decl. ¶¶ 1-2, ECF No. 17-3, which defendants note he has overstayed, *see* Blanchard Decl. ¶ 8. He has been civilly arrested by immigration authorities twice since January 20, 2025, including once after August 11, 2025. Defendants claim B.S.R. was "specifically targeted" by immigration enforcement personnel "based on information in law enforcement records," Supp. Blanchard Decl. ¶ 8, showing that B.S.R. "overstayed his B-2 visa and was in the country unlawfully" and had "a 2025 criminal charge for domestic violence and simple assault," Blanchard Decl. ¶ 8.[15] Plaintiffs, however, dispute this 2025 criminal charge relates to B.S.R. *See* Hr'g Tr. at 94:9-14.

---

[15] None of the underlying records for these attestations have been submitted to the record by defendants.

On the morning of January 28, 2025, B.S.R. was a passenger in his boss's car, and they had left their workplace to pick up supplies at Home Depot. B.S.R. Decl. ¶ 3. As they turned into the Home Depot parking lot, two cars parked in front of and behind them. *Id.* Several officers exited the two vehicles and "started banging on the windows" of B.S.R.'s boss's car. *Id.* ¶ 4. Two of the officers wore jackets emblazoned with "HSI," and the rest were in plainclothes. *Id.* One officer showed B.S.R. a Border Patrol badge through the passenger-side window. *Id.*

B.S.R.'s boss, who is a U.S. citizen, "told the officers they did not have the right to search the car," at which point the "officers began to threaten to break the windows." *Id.* ¶ 5. B.S.R. was "scared" and "decided to get out of the car and follow their orders." *Id.* The officers did not ask for his name or ID, but, after "grabb[ing] [B.S.R.] by the neck," one officer asked "if [he] was 'illegal,'" to which B.S.R. did not respond. *Id.* ¶ 6. Another officer then said, "Well, we'll figure it out anyways if you are." *Id.* The officers did not display a warrant or "ask [B.S.R.] any questions about [his] ties to the community," *id.* ¶ 7, such as his family and 13-month-old U.S. citizen daughter who live in the District, *id.* ¶ 1. B.S.R. was taken to a shopping center parking lot where he was transferred into a van and only then was he asked for his name. *Id.* ¶ 8. The officers eventually transferred him to Chantilly, where he was released with directions to check in periodically with ICE and to appear in immigration court. *Id.* ¶¶ 9-10. During his May 2025 check-in with ICE, he was given an ankle monitor. *Id.* ¶ 10. In June 2025, B.S.R. filed an asylum application. *Id.* ¶ 11.

On the morning of August 18, 2025, B.S.R. left his home with his father, and both got into their shared car to go to work. *Id.* ¶ 12. Two unmarked vehicles pulled up and officers in plainclothes got out and approached B.S.R. and his father's car. *Id.* One officer showed B.S.R. a Border Patrol badge through the window. *Id.* The officers asked B.S.R.'s father whether he had

overstayed his visa and asked for his ID, which B.S.R.'s father provided. *Id.* ¶ 13. B.S.R. and his father exited their car upon being ordered to do so. *Id.* ¶ 14. Without asking for B.S.R.'s name or ID, the officers handcuffed B.S.R. *Id.* Even after B.S.R. showed the officers his ankle monitor and explained that he was already subject to immigration monitoring, the officers "said it did not matter and that once [B.S.R.] was in custody, they would figure out if what [he] was saying about [his] status was true." *Id.* ¶ 14. The officers did not show a warrant or ask B.S.R. any questions about his ties to the community. *Id.* ¶ 15. When B.S.R.'s partner came outside and objected to the arrest, the officers "responded by saying, 'Sorry, we came for two people, so we have to arrest two people.'" *Id.* ¶ 16. After being taken to a Costco parking lot and questioned by an officer, *id.* ¶ 17, B.S.R. and his father were eventually transferred to the facility in Chantilly, *id.* ¶ 18.

While at Chantilly, B.S.R. "was hit with an awful smell of body odor." *Id.* ¶ 18. "Some people told [him] they had been detained there for five or six days and had not been able to shower or even brush their teeth." *Id.* "There were 50 to 60 people detained inside Chantilly" when B.S.R. arrived, with "groups of five or so people arriving every 40 minutes," rendering the waiting cell "so packed that people were forced to sleep on the floor and others had to stand for hours." *Id.* B.S.R. recalls that the "only access to drinking water was out of the sink attached to the back of the toilet, and the water that came out tasted like bleach." *Id.* B.S.R. remained at Chantilly for over twelve hours, during which he was given only a burrito and a bottle of water. *Id.* ¶¶ 18-19.

B.S.R. was released late that night, *id.* ¶ 20, although his father remained detained for longer and has been moved to "various immigration detention centers throughout the country," *id.* ¶ 22. B.S.R. describes leaving his father behind as "one of the most horrible feelings [he] ha[s] ever experience[d]." *Id.* ¶ 21.

c. N.S.

N.S. was born in Venezuela and has lived in the United States since October 2022. N.S. Decl. ¶ 1, ECF No. 17-4. When he entered the United States, he turned himself into Customs and Border Protection ("CBP") and was eventually released from custody on parole. *Id.* ¶ 2. He filed an asylum application in October 2023, filed an application to renew his Temporary Protected Status, and has a work permit. *Id.* At the same time, he is currently engaged in removal proceedings and has regular check-ins with ICE. *Id.*

On the morning of August 12, 2025, N.S. purchased some supplies from Home Depot for a construction job. *Id.* ¶ 5. As he walked back to his minivan with his supplies, he "saw people running and yelling, 'ICE! ICE!'" *Id.* He "was pushing the cart full of materials and . . . had his identification with [him]," so he "did not start running and instead walked to [his] car." *Id.*

According to N.S., after he got into his car and turned it on, an officer "opened the driver's side door, and yelled at [him], 'Legal or illegal?'" *Id.* ¶ 6. The officer grabbed N.S.'s arm. *Id.* N.S. showed the officer his driver's license, work permit, and asylum paperwork. *Id.* A second officer approached and reviewed N.S.'s documents; the second officer then told the first officer "to arrest [N.S.]" because "[he] was an 'illegal' and . . . '[N.S.'s] papers are useless.'" *Id.* ¶ 7. The officers "pulled [N.S.] out of the driver's seat, threw [him] up against the side of [his] car, and handcuffed [him] behind [his] back." *Id.* Although the first officer wore a vest that said "DEA" and a badge and hat that said "ICE," and the second officer wore a vest that said "ICE," *id.* ¶¶ 6-7, neither of the officers "identified themselves, presented a warrant, explained why they stopped [N.S.], or indicated that they knew [N.S.] or [his] name," nor did they ask him any questions about his ties to the community, *id.* at ¶ 7, such as his partner, children, stepchild, and grandchild who live in the District, *id.* ¶ 4. When N.S. asked to see a warrant, he was "told to be quiet." *Id.* ¶ 11.

In contrast, defendants assert, without submitting any declarations directly from arresting officers or other officers at the scene of the arrest, that ICE records indicate "ICE officers identified themselves as police with immigration, displayed badges and had marked law enforcement gear, [and] established positive identification [before] plac[ing] N.S. under arrest." Defs.' Opp'n, Ex. 1, Declaration of Joseph Simon ("Simon Decl.") ¶ 22, ECF No. 50-1.

In the same Home Depot parking lot where he was arrested, N.S. watched federal agents execute additional arrests, with other arrestees being "shot in the back with what [he] believe[d] were rubber bullets" or "throw[n] . . . on the ground." *Id.* ¶¶ 10-12. N.S. was transported to Chantilly, *id.* ¶ 14, and then moved several more times to different immigration facilities, *id.* ¶¶ 14-22. During this period, N.S. was "fed very little" and at one point "had to stand shackled for about three hours as [he] waited to board the plane," and was told "to go in the corner up against the wall to urinate because [there was] no access to a bathroom." *Id.* ¶ 20. N.S. was eventually "released on [his] own recognizance from ICE custody on September 9, 2025, after 28 days detained in five states and D.C." *Id.* ¶ 23.

d. <u>R.S.M.</u>

R.S.M. was born in El Salvador and has lived in the United States since 2017. R.S.M. Decl. ¶ 1, ECF No. 17-5. Her family has a pending U-visa application and she has a pending asylum case. *Id.*[16]

---

[16] The U-visa program allows a noncitizen who has "suffered substantial physical or mental abuse as a result of having been a victim" of a violent crime in the United States to obtain legal status for four years by cooperating with the government in the prosecution of that crime. 8 U.S.C. § 1101(a)(15)(U); *see also United States v. Browne*, 953 F.3d 794, 801 (D.C. Cir. 2020); *Guerra Rocha v. Barr*, 951 F.3d 848, 850 (7th Cir. 2020); *Coria v. Garland*, 114 F.4th 994, 998 (9th Cir. 2024) ("U visas are made available to certain aliens who are victims of criminal activity in the United States and who come forward to report it; certain family members of the applicant are also eligible for derivative U visa status.").

On the morning of August 26, 2025, R.S.M. was a passenger in a car with her husband, who was driving them both to work, when they were pulled over by a car with police lights and then "surrounded" by "about seven cars." *Id.* ¶ 2. Officers stood "on both the driver and passenger side" of the car and "started banging on the car windows." *Id.* R.S.M. and her husband passed the officers their drivers' licenses and their U-visa paperwork, but the officers "responded that [their] paperwork did not matter at all." *Id.* ¶ 3. One of the officers "used [a] device to scan [R.S.M.'s husband's] face . . . [and] waited a moment for a result to appear on the device." *Id.* ¶ 4. The other officers asked "It is him?," to which the officer with the scanner responded "No." *Id.* Another officer "said it did not matter that [R.S.M.'s] husband didn't match the person they were looking for, and . . . decided to arrest [them] anyway." *Id.* The officers "were not wearing any identification" and "[o]nly one officer was wearing a uniform." *Id.* ¶ 7. The officers "never showed [R.S.M. and her husband] any documents or a warrant, and they did not even seem to know [R.S.M.'s or her husband's] names when th[e officers] stopped [them]." *Id.* ¶ 6. The officer also did not ask any questions about their ties to the community, *id.*, such as their two teenage children who live in D.C., *id.* ¶ 1. In contrast, defendants assert, without submitting any declarations directly from arresting officers or other officers at the scene of the arrest, that ICE records indicate R.S.M.'s "arrest occurred after a consensual encounter and pedigree questions where an immigration officer determined that R.S.M. illegally entered the United States without inspection and was amenable to an enforcement action." Simon Decl. ¶ 23.

R.S.M. and her husband were taken to the immigration facility in Chantilly, Virginia. R.S.M. Decl. ¶ 9. She was eventually released with an ankle monitor, *id.* ¶ 12, although her husband remained in detention and the officers "did not give [her] the chance to say goodbye to

[her] husband, even though [she] wasn't sure when [she] would see him again," *id.* ¶ 11; *see also id.* ¶ 13 (noting that her husband remains detained).

e. CASA, Inc.

CASA, Inc., is a national nonprofit membership organization. Decl. of George Escobar, CASA Chief of Programs & Servs. ("CASA Decl.") ¶ 1, ECF No. 17-6. CASA's members "are predominantly noncitizens in a variety of immigration statuses." *Id.* Prospective members must apply, pay dues, and "subscribe to the principles of CASA." *Id.* ¶ 5.

CASA's mission is to "create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities." *Id.* ¶ 7. To accomplish its mission, CASA "offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia." *Id.* ¶ 8. CASA's D.C. services have "historically focused on securing and stabilizing immigration status, both temporary and permanent status, for non-detained community members," such as by supporting TPS, Deferred Action for Childhood Arrivals ("DACA"), U-visa, and naturalization applications. *Id.* ¶ 9. In addition to these immigration services, CASA assists members with "public benefits enrollments" and facilitates connections "with various essential service providers." *Id.* ¶ 11.

CASA alleges that both the organization itself and the organization's members have been harmed in several ways by defendants' challenged practice of allegedly making warrantless immigration arrests without probable cause.

As to harms against the organization, CASA first alleges that the ICE arrests have diverted CASA's resources from its primary mission. The organization witnessed a "forty-fold increase" in reports of ICE detentions in the period of August 14, 2025, to August 29, 2025, compared to the

rate of reports between January 2025 and August 14, 2025. *Id.* ¶ 14. CASA alleges that the increased arrests "have caused a significant disruption to [CASA's] functions and activities, pulling [the organization] away from [its] core focus of providing services that stabilize and protect CASA members to providing rapid, emergency response." *Id.* ¶ 15. "[D]etention response now comprises a significant portion of work undertaken by CASA's Legal and [Health] teams," including work "not fully compensated by these teams' budgets." *Id.* ¶ 17.

Additionally, CASA alleges several financial injuries. CASA's call-service costs have increased; compared to the month period between June 27 and July 26, 2025, the month period between July 27 and August 26, 2025, saw 14% higher costs, and the month period between August 27 and September 26, 2025, saw 5% higher costs than that. *Id.* ¶ 19. One of CASA's grants was reduced by 50% in September 2025 because of "delayed progress on grant deliverables," which CASA attributes to its team's inability to "even conduct an intake" for the program funded by the grant "when the community member is laser-focused on the fact that their loved one was . . . detained by ICE." *Id.* ¶ 20.

Lastly, CASA alleges that increased immigration arrests have directly interfered with its mission, by chilling members from sharing information with CASA staff because members are "fearful that their immigrant status will be weaponized against them." *Id.* ¶ 21. "[A]ctivit[ies] or application[s] that once took a single engagement to complete now require[] two to three follow-ups with the individual, so that trust is assured and the community member feels safe providing confidential information." *Id.* ¶ 22.

In addition to these alleged harms to CASA itself, CASA describes injuries to its members as a result of defendants' challenged new policy in the District of executing warrantless civil immigration arrests based on a lower standard than probable cause. CASA's Chief of Programs

and Services and many CASA members describe stories of arrest similar to those articulated by the named individual plaintiffs. As support, plaintiffs have submitted declarations detailing civil immigration arrests of twelve CASA members. *See* CASA Decl. ¶¶ 25-36 (describing arrests of twelve members, some of whom also submitted pseudonymous individual declarations); *see* Antony Doe Decl., ECF No. 17-10; Elias Doe Decl., ECF No. 17-17; Franco Doe Decl., ECF No. 17-19; Javier Doe Decl., ECF No. 17-20; Julio Doe Decl., ECF No. 17-21; Luz Doe Decl., ECF No. 17-22; Mateo Doe Decl., ECF No. 17-24.[17]

Members report that they were approached by officers who did not identify themselves, wore plain clothes, and drove unmarked vehicles. *See, e.g.*, Antony Doe Decl. ¶¶ 4-5 ("There were several police officers in the area, and they surrounded me. Some of them were wearing masks and hiding their faces. . . . They approached me, asked me to step out of the car, and told me I was under arrest."); Julio Doe Decl. ¶ 4 ("Throughout the whole interaction [with the "many" ICE agents who arrested him], none of the agents at any point identified themselves . . . ."); Luz Doe Decl. ¶ 5 (ICE agents emerged from "two unmarked SUVs"); Mateo Doe Decl. ¶ 6 ("[T]wo unmarked cars pulled up . . . . Four officers wearing masks got out of the cars. They were wearing jeans and t-shirts, but green vests and badges that said 'ICE.'").

The officers displayed no warrants. *See, e.g.*, Antony Doe Decl. ¶ 5 ("I asked them why they were detaining me, and they said that's how the law is. . . . They did not show me any documents or warrant either."); Elias Doe Decl. ¶ 5 ("The officers . . . did not give me any documents or a warrant prior to arresting me."); Franco Doe Decl. ¶ 4 ("The agents never provided

[17] Plaintiffs were granted leave, without objection from defendants, for non-plaintiff declarants to proceed under pseudonyms, Pls.' Consent Motion for Non-Plaintiff Declarants to Proceed Under Pseudonyms at 2, ECF No. 18; *see* Min. Order (Oct. 6, 2025) (granting plaintiffs' motion). Defendants qualified their consent "without prejudice to the government's ability to seek disclosure of those declarant's identities as necessary at the appropriate time," *id.* at 2, but have not, to date, sought any further identifying information.

any reason and never presented me with a warrant or any order for my arrest."); Julio Doe Decl. ¶ 4 ("[N]one of the agents . . . presented a warrant, or indicated that they knew me or my name prior to the arrest.); Luz Doe Decl. ¶ 7 ("Although they said they were from ICE, the officers did not present a warrant, explain why they stopped us, or indicate that they knew our names prior to stopping us."); Mateo Doe Decl. ¶ 7 ("When I asked why [they were arresting me], they said it was because I wasn't a permanent resident. . . . They did not hand me any documents or warrants."); CASA Decl. ¶ 34 (while arresting CASA member Miguel, ICE officials "did not show him any document or warrant"); *id.* ¶ 36 (while arresting CASA member's husband, DHS officials "did not show [him] any document or warrant").

Members were then either not questioned at all or briefly questioned about their status—but not about their ties to the community—before being arrested. *See, e.g.*, Antony Doe Decl. ¶ 6 ("Before they arrested me, the officers did not ask me any questions about my personal circumstances. They didn't ask about how long I have been in the United States, if I have family here, if I have a job, or anything else."); Elias Doe Decl. ¶¶ 3-5 (ICE agents "did not explain why they were arresting me," after asking only where he was from and to see his Salvadoran ID, which he provided. "At no point … did they ask me if I had immigration status or if I was a U.S. citizen . . . or anything else about my individual circumstances."); Franco Doe Decl. ¶ 4 ("Before arresting me, the agents did not ask me any questions about my family members, where I live and how long I have lived there, my work history, or anything else about my ties to the community."); Luz Doe Decl. ¶ 7 (None of the arresting officers "ask[ed] us any questions about our ties to the community, how long we have been living or working in D.C., [or] our family here . . . ."); Julio Doe Decl. ¶¶ 2-4 ("[T]hey asked for my ID . . . . They told me to get out of the car, and I asked why. The agent said if I didn't get out, they would break down the door. . . . The agents immediately put

handcuffs on me and grabbed me by the collar. I asked why . . . . One of the agents said that I was 'fine.' Another agent said that I wasn't, and they put me in the van."); CASA Decl. ¶ 34 ("They asked Miguel if the car he was driving belonged to him. He responded that it was his brother's. The officials, however, did not believe him, and demanded he call his brother. . . . Miguel's brother was asleep and did not answer the calls. In response, the ICE officials arrested and detained Miguel . . . [without] ask[ing] him any questions about his ties to the community or his individual circumstances."); *id.* ¶ 36 (DHS officers arrested Nerwin "[a]fter looking up his name in the system" but without "ask[ing] him any questions about his ties to the community or his individual circumstances.").

According to plaintiffs, these arrests were frequently accompanied by deprivations of basic human dignity, including being ill-treated, with inadequate food, uncomfortable and crowded sleeping facilities, and without information as to the duration or locations of detention. *See* Pls.' Prelim. Inj. Mot. at 15. For example, declarants have described while in DHS custody being forced to sleep in a freezing and cramped room without bedding, Julio Doe Decl. ¶ 6 ("In one room, there were no beds, so we were sleeping on the concrete floor. In another room with 100 people, we slept in bunk beds that were very close together."), being fed little food, *id.* ¶ 7 ("[W]e were still tied up and couldn't even eat the small sandwich they gave us."); Mateo Doe Decl. ¶ 9 (describing meals as "very small"); CASA Decl. ¶ 34 (describing CASA member Miguel as experiencing "dehumanizing and unhealthy" conditions where "officers failed to feed them at times"), and being separated from their families and sent to far-away ICE facilities with little explanation as to why they were being transferred or how long they would be there, *see, e.g.*, Antony Doe Decl. ¶ 9 (Pennsylvania); Javier Doe Decl. ¶ 7 (Louisiana); Mateo Doe Decl. ¶ 9 (Texas); CASA Decl. ¶ 33 (CASA member Carlos moved to Louisiana). They were also subjected to hearing guards brag

about the bonus money they would earn from the arrests. *See* CASA Decl. ¶ 27 ("Julio heard the officers bragging and celebrating how easy it had been to arrest him."); *id.* ¶ 28 ("During the drive, the men were bragging about the amount of money they earned as a bonus for arresting Angel.").

Several members also describe experiencing worsening health issues because of their arrest and detention and inadequate provision of medical care. *See* CASA Decl. ¶ 28 ("Angel is now in Caroline Detention Facility, where he is being denied medication for his cardiac arrhythmia."); Elias Doe Decl. ¶¶ 6, 8 ("When ICE arrested me, they forced me to miss my [dialysis] treatment [following open heart surgery]. . . . After several hours, the ICE officers said I could leave that evening because I was so sick after missing my dialysis treatment."); Luz Doe Decl. ¶ 14 ("[My partner] Daniel has been suffering from severe anxiety and has had difficulty sleeping" since he was arrested and detained. "He has had to see a psychologist multiple times because of his anxiety. He has also been to the doctor at the detention center multiple times because he has a rash over his body . . . .").

f. <u>Other Arrested Individuals</u>

Plaintiffs have also submitted seventeen declarations, of which ten are pseudonymous, from individuals who are neither individual plaintiffs or CASA members, but who also experienced warrantless civil immigration arrests under similar circumstances or who witnessed or attest to the arrest of others. *See* Ana Gracia Decl., ECF No. 17-7 (attorney describing the arrest of her client); Anamaria Doe Decl., ECF No. 17-8 (pseudonymous); Andrés Doe Decl., ECF No. 17-9 (pseudonymous); B.R.G. Decl., ECF No. 17-11 (pseudonymous); C. Decl., ECF No. 17-12 (pseudonymous); Camilo Doe Decl., ECF No. 17-13 (pseudonymous); Cristina Decl., ECF No. 17-14 (pseudonymous); Decl. of Daniela Anello ("Anello Decl."), ECF No. 17-15 (describing when she witnessed the arrest of two unnamed men); Decl. of Darwin Lopez Castañon ("Lopez

Castañon Decl."), ECF No. 17-16; Decl. of Fiona Lewis ("Lewis Decl."), ECF No. 17-18 (describing the arrest of her friend, Alex); M.P. Decl., ECF No. 17-23 (pseudonymous); Decl. of Paola Flores Roman ("Flores Roman Decl."), ECF No. 17-25 (attorney describing the arrests two of her clients); W.G.M. Decl., ECF No. 17-26 (pseudonymous); Y.R.M. Decl., ECF No. 17-27 (pseudonymous); Carlos Peña Decl., ECF No. 34-2 (pseudonymous); Decl. of Gerson Aaron Lopez Funez ("Lopez Funez Decl."), ECF No. 34-3; Decl. of Gustavo Reyes Solis ("Reyes Solis Decl."), ECF No. 34-4; *see also* Min. Order (Oct. 6, 2025) (granting plaintiffs' motion for non-plaintiff declarants to proceed pseudonymously, without foreclosing defendants' ability to seek disclosure of those declarant's identities at a future stage); Min. Order (Oct. 20, 2025) (granting plaintiffs' motion for additional declarants to proceed pseudonymously under the same conditions).

Like the individual plaintiffs and like CASA's members, these individuals reported being approached by officers who did not identify themselves, wore plain clothes, and drove unmarked vehicles. *See, e.g.*, Anello Decl. ¶ 3 (arresting officers emerged from "three unmarked cars"); Y.R.M. Decl. ¶ 2 (five "unmarked cars"); M.P. Decl. ¶ 4 ("The agents were plain clothed and were not wearing anything to indicate that they were law enforcement."); W.G.M. Decl. ¶ 2 ("They got out of an unmarked Subaru car with Texas license plates. The officers were in plain clothes wearing vests . . . ."); Lopez Castañon Decl. ¶¶ 3-4 ("[W]e saw two unmarked vehicles that began to follow us. . . . A masked agent approached my side . . . . He was wearing a red t-shirt and gray pants and had on a velcro vest that said 'Police' across the front. I could not see a badge of any kind.").

The officers often did not ask for their names or any other information before arresting them. B.R.G. Decl. ¶ 4 ("None of the agents at any point identified themselves, . . . or indicated

that they knew me or my name prior to the arrest."); C. Decl. ¶ 5 ("Neither officer appeared to know my colleague's name . . . before throwing him on the ground and restraining him."); Cristina Decl. ¶ 6 ("[H]e was not asked for his name, his identification, [or] what his immigration status was . . . ."); Lopez Castañon Decl. ¶ 11 ("None of the agents at any point ever identified themselves, . . . explained why they stopped us, or indicated that they knew us/knew our names prior to stopping us."). Nor did the officers ask many other questions. *See, e.g.*, Anamaria Doe Decl. ¶ 5 ("The agents did not ask me where I lived in Washington, D.C., how long I had lived there, whether or not I had family in Washington, D.C. other than my children, or any questions about my connections to the city or my community."); B.R.G. Decl. ¶ 4 (similar); Camilo Doe Decl. ¶ 5 (similar); Cristina Decl. ¶ 6 (similar); W.G.M. Decl. ¶ 6 (similar).

The officers displayed no warrants before making civil arrest of these individuals, often with the use of force. *See, e.g.*, Anamaria Doe Decl. ¶ 5 (no warrant); Andrés Doe Decl. ¶ 3 (same); B.R.G. Decl. ¶¶ 2-3 ("The agent . . . told me that if I try to run away they would shoot me. An ICE agent in a mask put handcuffs on me really tight and shoved me against a car."); C. Decl. ¶ 5 ("The second agent opened the passenger-side door, grabbed my colleague, threw him on the ground, and got on top of him. My colleague had not said a word or moved from his seat the entire time [before that]."); W.G.M. Decl. ¶¶ 3, 6 ("One of them grabbed me by my shirt and another grabbed me by my feet and they shuffled me into the car"); Camilo Doe Decl. ¶ 5 (no warrant); Lopez Castañon Decl. ¶ 11 (same); Cristina Decl. ¶ 6 (same); M.P. Decl. ¶ 7 (same); Y.R.M. Decl. ¶ 4 (same).

Declarants describe detentions following their civil immigration arrests that deprived them of basic human dignity, including being ill-treated, with inadequate food and uncomfortable and crowded sleeping facilities, and being denied medical attention. *See* Pls.' Prelim. Inj. Mot. at 15;

*see, e.g.*, B.R.G. Decl. ¶¶ 5-6 (sleeping in a room so cold that detainees called it the "freezer"; being fed little food; and sleeping in jails where the lights are always kept on); Y.R.M. Decl. ¶¶ 5, 6, 8 (needing to drink toilet water to survive; watching other detainees pass out from dehydration and hunger; being told by guards they have "no right[s] to anything"; taking multiple flights in a day while shackled; and witnessing beatings by detention center guards); Camilo Doe Decl. ¶ 7 ("I was put in a room made for 4 people with about 15 people in it. . . . Over the course of . . . two days, all they gave me to eat was a cold bean burrito and two ham sandwiches."); M.P. Decl. ¶¶ 8, 10-11 (being denied access to restrooms; kept in jails where the lights are always on; and not being able to bathe for days at a time); Carlos Peña Decl. ¶ 12 (being denied adequate medical care); Gracia Decl. ¶ 6 (having pleas for medical attention ignored).

g. Putative Class and Subclasses

Plaintiffs propose and seek certification of one over-arching class and two subclasses, as described below.

Escobar Molina, B.S.R., N.S., and R.S.M. seek to represent the following class:

> **Warrantless Arrests Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

Compl. ¶ 62; *see also* Pls.' Class Cert. Mot. at 1; Pls.' Notice of Filing Revised Proposed Orders at 4.

Escobar Molina seeks to represent the following subclass:

> **Immigration Status Subclass**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully.

Compl. ¶ 63; Pls.' Notice of Filing Revised Proposed Orders at 4 n.2.

Escobar Molina, B.S.R., N.S., and R.S.M. seek to represent the following subclass:

> **Unassessed Escape Risk Subclass**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

Compl. ¶ 64 (with original name "Flight Risk Subclass" modified herein to "Unassessed Escape Risk Subclass"); Pls.' Notice of Filing Revised Proposed Orders at 4 (same).

### B. Procedural History

Plaintiffs filed the instant suit on September 25, 2025, *see* Compl., alleging that "[d]efendants have a policy and practice of making mass civil immigration arrests in Washington, D.C., without a warrant and without the probable cause findings that are required by Congress under federal statute," which "policy and practice are tied to the President's promise to carry out mass immigration arrests and deportations," *id.* ¶ 19.

Plaintiffs bring two claims: The first claim challenges defendants' alleged policy of making warrantless civil immigration arrests without individualized assessment of immigration status, *see* Compl. ¶¶ 72-77, and the second claim challenges defendants' alleged policy of making warrantless civil immigration arrests without individualized assessment of escape risk, *see* Compl. ¶¶ 78-83. Both claims contend that defendants' policy violates statutory and regulatory provisions governing immigration arrests, *see* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)-(ii); the *Accardi* doctrine, which requires agencies to follow their own regulations; and the Administrative Procedure Act, 5 U.S.C. § 706, which directs courts to "hold unlawful and set aside" final agency actions that are arbitrary and capricious, contrary to law, or in excess of statutory authority.

As relief, plaintiffs seek, *inter alia*, class certification; declaratory judgment that defendants' policy of making warrantless civil immigration arrests without an individualized determination of both an immigration law violation and escape risk violates 8 U.S.C. § 1357(a)(2)

and 8 C.F.R. § 287.8(c)(2); vacatur of the allegedly unlawful policy and practice; and an injunction against further application of that policy and practice. *See* Compl. at 29-31 (Relief).

On October 3, 2025, plaintiffs filed a motion for preliminary injunction, to stay agency action, and for provisional class certification of the "Warrantless Arrest Class." *See* Pls.' Prelim. Inj. Mot. Concurrently, plaintiffs filed a motion for class certification. *See* Pls.' Class Cert. Mot.[18]

A hearing was held on these motions on November 19, 2025. At the end of hearing, both parties requested and were given an opportunity to submit supplemental filings. On November 20, 2025, plaintiffs filed a revised proposed order in response to concerns raised at the hearing about the burdens on law enforcement and the court of judicial micromanaging and second-guessing each civil immigration arrest conducted by defendants in the District. Pls.' Notice of Filing Revised Orders. To address these concerns, plaintiffs' revised proposed order modified the scope of relief requested "to apply against Defendants' unlawful policy" only, to require a "detailed meet-and-confer process" before seeking court intervention, and to add "documentation and reporting requirements" for defendants. *Id.* at 2-3. Plaintiffs also modified the proposed provisional class definition "to encompass only individuals for whom Defendants did not make a pre-arrest, individualized assessment of probable cause as to flight risk," or the "Unassessed

---

[18] Several amici have also filed briefs in support of plaintiffs. *See* Brief of *Amici Curiae* Washington Teachers' Union et al., ECF No. 46 (teachers' union explaining that defendants' "mass, warrantless arrests have . . . caused a sudden increase in absenteeism in D.C. schools . . . because both students and their parents fear being arrested and detained on the way to school"); Brief of *Amici Curiae* District of Columbia Legal Services Organizations, ECF No. 47 (legal services providers explaining that when ICE "arrest[s] first and ask[s] questions later, U.S. citizens and immigrants with lawful and protected status are also at risk every time they leave their homes," which "instills fear," "impacts economic stability," and "harm[s] residents' health because people delay medical care out of fear of detention"); Brief of *Amici Curiae* Busboys and Poets et al., ECF No. 48 ("companies and individuals who are part of . . . the local business community" explaining that "[g]iven the critical role that immigrants play in the local business community, adherence to the statutory guardrails [in 8 U.S.C. § 1357(a)(2)] will . . . benefit the local businesses of D.C. and the residents it serves"); Brief of Churches, Faith Leaders, and Religious Organizations as *Amici Curiae*, ECF No. 49 ("[Faith organization] *[a]mici* have become all too familiar with accounts of worshippers unable to participate in religious services out of fear of being subject to warrantless arrests while en route to their places of worship," including specific instances of arrests on the way to and from worship services, which has "interfered with the free exercise of religion.").

Escape Risk Class." *Id.* at 4. On November 24, 2025, defendants filed a supplemental brief responding to the plaintiffs' revised proposed order and expounding on their jurisdictional argument under 8 U.S.C. § 1252(f)(1), *see* Defs.' Supp. Br., ECF No. 63; Defs.' Amend. Supp. Br., ECF No. 64 (amended), as well as two supplemental declarations and a proposed order, *see* First Supp. Decl. of Joseph Simon ("Supp. Simon Decl."), ECF No. 63-1; Supp. Blanchard Decl.; Defs.' Proposed Order, ECF No. 63-3. On November 25, 2025, plaintiffs filed a response. *See* Pls.' Resp. to Defs.' Supp. Opp'n ("Pls.' Supp. Resp."), ECF No. 65. Plaintiffs' two pending motions are now ripe for resolution.

## II. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (emphasis in original) (internal quotation marks omitted)). As a result, such relief is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

A party seeking to obtain a preliminary injunction "must show that (1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) the issuance of a preliminary injunction 'is in the public interest.'" *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (alteration in original) (quoting *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022)). The last two factors "merge when the Government

is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), because "the government's interest *is* the public interest," *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).[19] A likelihood of success on the merits "encompass[es] not only substantive theories but also establishment of jurisdiction," *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015), and "the movant must raise at least a serious legal question on the merits" for entitlement to preliminary injunctive relief, *Changji Esquel Textile Co.*, 40 F.4th at 726 (cleaned up); *see also Pheenix USH LLC v. Dist. Dep't of Transp.*, No. 25-7060, 2025 WL 3013527, *3 (D.C. Cir. Oct. 24, 2025) ("But in making 'a prediction of the likelihood of success on the merits,' a court must assess the likelihood that jurisdiction exists." (quoting *Lackey v. Stinnie*, 604 U.S. 192, 207 (2025))); *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 774 (D.C. Cir. 2025) ("[I]f a court concludes that a claim fails as a matter of law—on a point of jurisdiction or merits—then a preliminary injunction is inappropriate."). Similarly, failure to establish irreparable harm is a sufficient basis for denial of such relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (noting that "movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief").

---

[19] The D.C. Circuit has "[i]n the past . . . applied a 'sliding scale' approach under which 'a strong showing on one factor could make up for a weaker showing on another,'" *Changji Esquel Textile Co.*, 40 F.4th at 726 (quoting *Sherley*, 644 F.3d at 392), but now regularly acknowledges that "[t]his approach is arguably in tension with intervening Supreme Court decisions stating without qualification that 'a party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits,'" *id.* (quoting *Munaf*, 553 U.S. at 690); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235-1236 (D.C. Cir 2025) ("It is questionable that the sliding scale approach remains good law after 2008, when the Supreme Court decided *Winter v. Natural Resources Defense Council, Inc.*[,] [which] can be read to require movants to establish *each* preliminary injunction factor independently. But we have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said." (emphasis in original; internal citations omitted)); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]his court has not yet decided whether *Winter v. National Resources Defense Council* is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned . . . .") (internal citation omitted). In accordance with *Winter*, plaintiffs' satisfaction of each factor is considered here.

## III. DISCUSSION

Plaintiffs seek a preliminary injunction prohibiting defendants from enforcing a policy of conducting warrantless immigration arrests without an individualized determination of probable cause, and for provisional certification of the Unassessed Escape Risk Class, *see* Pls.' Prelim. Inj. Mot.; Pls.' Notice of Filing Revised Proposed Order at 2, and request certification of a class of all persons who, since August 11, 2025, have been or will be subject to either of defendants' challenged policies, *see* Pls.' Class Cert. Mot. Defendants oppose both motions, raising jurisdictional and substantive arguments as well as concerns about the scope of relief. *See* Defs.' Opp'n; Defs.' Amend. Supp. Mem.

Following an overview of the relevant statutory framework, *see infra* Part III.A, plaintiffs' request for preliminary injunctive relief is addressed, *see infra* Part III.B, then plaintiffs' request for provisional class certification and class certification is considered, *see infra* Part III.C, and, finally, the relief granted and bond imposed are discussed, *see infra* Part III.D.

### A. Statutory Framework

Generally, officers making civil immigration arrests must have an administrative warrant. *See Arizona*, 567 U.S. at 408. "If no federal warrant has been issued, those officers have more limited authority." *Id.* Specifically, under the INA, an officer may conduct a warrantless immigration arrest only if the officer "has reason to believe that [1] the alien so arrested is in the United States in violation of any . . . law or regulation and [2] is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). Regulations promulgated under the INA track the statute. *See* 8 C.F.R. § 287.8(c)(2)(i)-(ii) (providing that "an arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States," and

"that the person is likely to escape before a warrant can be obtained"). Though 8 U.S.C. § 1357(a)(2) uses the phrase "reason to believe" as the standard for executing warrantless civil immigration arrests, "aliens in this country are sheltered by the Fourth Amendment in common with citizens," and therefore, to avoid running afoul of the Fourth Amendment, this statutory phrase is "considered the equivalent of probable cause." *Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222-23 (D.C. Cir. 1971); *see also Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause."); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) ("The words [in § 1357] of the statute 'reason to believe' are properly taken to signify probable cause."). Put simply, immigration enforcement officers may conduct a warrantless civil immigration arrest only if they have probable cause to believe that a person is both in the United States unlawfully *and* an escape risk.

Whether a person is likely to escape before an administrative warrant can be obtained requires an individualized determination based on knowledge of facts "particularized with respect to that person." *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). The facts informing this assessment may vary. Some courts have found the likelihood of escape to be higher when, for example, the noncitizen presented "conflicting documents," *Yam v. Immigr. & Naturalization Serv.*, 411 F.2d 683, 687 (D.C. Cir. 1969); "had been 'picked up before,'" *Aguirre v. Immigr. & Naturalization Serv.*, 553 F.2d 501, 502 (5th Cir. 1977); admitted that he had previously been removed, *United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021); or appeared "extremely nervous" as if "looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974).[20] Courts have also made

[20] Defendants cite one out-of-circuit district court case for the proposition that being "stopped in a vehicle" may also signal a high likelihood of escape. *See* Defs.' Opp'n at 26 (quoting *United States v. Murillo-Gonzalez*, 524 F.

the self-evident finding that the likelihood of escape is lower when the individual has resided in the country for a lengthy period of time and has strong community ties. *See, e.g.*, *La Franca v. Immigr. & Naturalization Serv.*, 413 F.2d 686, 689 (2d Cir. 1969) (noting that being "the owner and operator of a bakery in Jersey City" lowered petitioner's likelihood of escape before a warrant could be obtained); *United States v. Abdi*, No. 04-cr-88 (ALM), 2005 WL 6119695, at *6 (S.D. Ohio Sept. 12, 2005), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006) (no probable cause for escape risk where defendant owned a business, leased property, lived with his then-pregnant wife and two children, and had family in the area); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 890 (S.D. Ohio 2016) (same, where defendant had a stable job, lived with his fiancé, and helped pay her rent and raise her two children); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (same, where defendant worked two jobs, owned a vehicle, paid rent, and never experienced legal trouble before his immigration arrest).

Defendants discount the escape risk prong in § 1357(a)(2), arguing that being "clear[ly] and undisputed[ly]" deportable alone may signal a likelihood of escape, citing to Second Circuit cases as support. Defs.' Opp'n at 26 (citing *Vazquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018); *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982)). This view has been rejected by other courts, however. *See, e.g.*, *United States v. Harrison*, 168 F.3d 483, 1999 WL 26921, *4 (4th Cir. 1999) (per curiam) (unpublished table decision) (discussing *Contreras*, 672 F.2d at 309 and rejecting proposition that "in every case in which an alien is deportable an arrest

---

Supp. 3d 1139, 1151 (D.N.M. 2021), *aff'd on other grounds*, No. 22-2123, 2024 WL 3812480 (10th Cir. 2024)). That case, however, reflects cursory reasoning on this point and a highly deferential acceptance of testimony by the arresting officer, who said the defendant was likely to escape because he "was stopped in a vehicle" and, although he was not behind the wheel, "might attempt to flee and . . . a foot chase could ensue." *Murillo-Gonzalez*, 524 F. Supp. 3d at 1151. The conclusion that an individual poses an escape risk simply by being a passenger in a vehicle, because he could flee on foot, without more, is unpersuasive, as is the court's decision to defer to the officer's assessment on this point.

can be made without a warrant"); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 937, 946 (D. Minn. 2017) (holding, despite defendant's admission that "he was in the country illegally," that "having reason to believe [that the defendant] is an alien subject to removal from the United States does not, without more, provide the probable cause needed to make a lawful [warrantless] arrest" (internal quotation marks omitted)); *Pacheco-Alvarez*, 227 F. Supp. 3d at 872, 889-90 (holding that "ICE officers lacked 'reason to believe' [the defendant] posed a risk of escape," even though the defendant admitted he "was born in Mexico and did not have any documentation that would allow him to reside in the United States"); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016) ("Nor can it be the case that, simply by being potentially removable, an alien must be deemed to be likely to evade detention by ICE. Such a reading would render the limitations on warrantless arrest created by . . . [§] 1357(a)(2) meaningless."). Though the D.C. Circuit has not weighed in on this circuit split, the Fourth Circuit has explained persuasively that conflating unlawful status and escape risk "is contrary to the statute itself, which requires that the [Immigration and Naturalization Service] must have reasonable belief both that the alien is in the country illegally *and* that the alien is likely to escape before a warrant can be obtained." *Harrison*, 1999 WL 26921, at *4 (emphasis in original) (citing 8 U.S.C. § 1357(a)(2)). Indeed, such a conflation as defendants suggest would run counter to the Supreme Court's instruction that the likelihood-of-escape requirement be seriously applied to cabin "officers [to a] more limited authority" where "no federal warrant has been issued." *Arizona*, 567 U.S. at 408.

**B. Preliminary Injunction**

To obtain the preliminary injunctive relief they seek, plaintiffs must show a likelihood of success on the merits of their claim that defendants have an alleged new policy of executing warrantless civil immigration arrests in the District of Columbia based on a lower standard than

probable cause, which policy is in violation of applicable law and regulations; that, absent the requested preliminary relief, plaintiffs are likely to suffer irreparable harm; and, finally, that consideration of the equities and the public interest favors the requested relief. *See supra* Part II. These factors are considered *seriatim*.

### 1. *Likelihood of Success on the Merits*

Defendants raise a bevy of threshold arguments that plaintiffs' claims are likely to fail for jurisdictional reasons—primarily, that both individual plaintiffs and CASA lack standing, *see* Defs.' Opp'n at 9-15, that various INA jurisdiction-stripping provisions applies, *see id.* at 15-21, and that no reviewable final agency action is established because the new policy plaintiffs allege "does not exist," *see id.* at 12, 21-25. As to the substantive merits of plaintiffs' claims, defendants contend that the civil immigration arrests executed against the four individual plaintiffs were supported by probable cause of removability and escape risk, *see id.* at 25-28, and thus show only that immigration arrests are conducted in the District in a manner "consistent with the law," *id.* at 9. For the reasons discussed below, defendants' arguments are legally flawed and belied by the record and therefore unpersuasive.

#### a. Individual Plaintiffs' Standing

To establish standing, a plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Where plaintiffs seek "forward-looking injunctive" relief, as is the case here, "past injuries alone are insufficient to establish standing." *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (internal quotation marks omitted). Rather, "plaintiffs must show that they face an imminent threat of future injury." *Chaplaincy of*

*Full Gospel Churches v. Navy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012). At the preliminary injunction stage, a plaintiff need only demonstrate "a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) ("At earlier stages of litigation, . . . the manner and degree of evidence required to show standing is less than at later stages."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.").

Defendants challenge only plaintiffs' satisfaction of the first injury-in-fact requirement of standing. Defs.' Opp'n at 9-15. Plaintiffs, however, have clearly established injury in fact based on several factors which, combined, render the likelihood of another arrest "real and immediate," *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), and not mere "subjective apprehensions," Defs.' Opp'n at 11.

First, plaintiffs have presented evidence that defendants "are engaging in a systemic policy and practice of making warrantless arrests without individualized determinations of flight risk." Pls.' Combined Reply Supp. Prelim. Inj. Mot. and Class Cert. Mot. ("Pls.' Reply") at 5, ECF No. 54. "Courts generally agree that, 'when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again,' and it is consequently more likely that plaintiffs have standing to pursue equitable relief." *Hinton v. D.C.*, 567 F. Supp. 3d 30, 49 (D.D.C. 2021) (quoting *Does I Through III v. District of Columbia*, 216 F.R.D. 5, 11 (D.D.C. 2003)); *see also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ("[E]xposure to [the allegedly unlawful] policy is both itself an ongoing harm and evidence that there is 'sufficient likelihood' that Plaintiffs' rights will be violated again."). Here, as explained further below, *see*

*infra* Part III.B.1(d), the alleged existence of an unlawful policy is supported, *inter alia*, by defendants' own public statements acknowledging the use of a standard lower than probable cause to make warrantless immigration arrests, *see, e.g.*, Widas Decl., Ex. 17 at 1; *id.*, Ex. 19 at 1; Second Widas Decl., Ex. 1 at 1, ECF No. 34-1; *id.*, Ex. 2 at 1; as well as over two dozen sworn declarations from plaintiffs recounting examples where defendants' agents failed to make any inquiry to evaluate escape risk before making warrantless arrests, *see* ECF Nos. 17-2 to 17-27.

Second, plaintiffs have shown a substantial likelihood that they are among the group of individuals that defendants target for civil immigration arrests. As other courts have found, the likelihood of imminent harm increases when plaintiffs are among those targeted by a defendant's policy. *See, e.g.*, *Church v. City of Huntsville*, 30 F.3d 1332, 1337-39 (11th Cir. 1994) (plaintiffs who were homeless were "far more likely to have future encounters with the police" under city's alleged policy of harassing or removing homeless individuals); *Williams v. City of Chicago*, No. 22-cv-3773, 2023 WL 6388891, at *5 (N.D. Ill. Sept. 29, 2023) (plaintiffs alleged "sufficient risk of future harm" from police encounters where the city had an alleged policy of targeting plaintiffs' neighborhoods for stop-and-frisks due to the "high rates of ShotSpotter activations"). In this case, evidence from both parties at the preliminary injunction stage offer support for plaintiffs' allegation that defendants target individuals who "appear Latino, work in low-wage jobs, and live in or frequent neighborhoods with large numbers of Latino residents." Pls.' Reply at 6; *see also* Second Widas Decl., Ex. 2 (quoting Chief Border Patrol Agent stating that defendants consider "how [the arrestee] look[s]")[21]; *see also, e.g.*, Escobar Molina Decl. ¶¶ 1, 5 (fitting these

[21] Second Widas Decl., Ex. 2, ECF No. 34-1 at 9 (*Border Patrol official denies racial profiling* at 2).

characteristics); B.S.R. Decl. ¶¶ 1, 3, 12 (same); N.S. Decl. ¶¶ 1, 5 (same); R.S.M. Decl. ¶¶ 1-2 (same).[22]

Finally, plaintiffs have sufficiently shown that they cannot avoid repeating the quotidian conduct that led to their original arrests. Courts have been more willing to find that a plaintiff will once again be placed at risk of future injury "when, for reasons beyond the plaintiff's control, he or she is unable to avoid repeating the conduct that led to the original injury at the hands of the defendant." *Church*, 30 F.3d at 1338; *see also Melendres*, 695 F.3d at 998 (standing to challenge policy and practice of traffic stops while Latino plaintiffs were "going about . . . daily life"); *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) (standing to challenge alleged suspicionless stops and/or frisks because plaintiffs were engaging in "innocent, lawful conduct" such as "walking home from the grocery store, standing in front of their own homes or the homes of friends, or taking digital photographs"). Here, plaintiffs' declarations indicate that they were arrested while going about unavoidable, lawful activities of daily life. *See, e.g.*, Escobar Molina Decl. ¶ 5 (leaving apartment building and toward work truck); B.S.R. Decl. ¶ 12 (sitting in driveway in work truck); N.S. ¶ 5 (at Home Depot); R.S.M. Decl. ¶ 2 (passenger of car on way to work). Plaintiffs are thus "realistically threatened by a repetition of [their] experience." *Lyons*, 461 U.S. at 109.

---

[22] To the extent defendants argue that they target individuals based on their lack of legal status—rather than based on the factors plaintiffs claim—that argument would not defeat plaintiffs' standing. *See* Widas Decl., Ex. 19 (post from DHS's official social media account that plaintiffs' allegations in the instant lawsuit are "disgusting, reckless, and categorically FALSE," explaining that "[w]hat makes someone a target for immigration enforcement is if they are illegally in the U.S. – NOT their skin color, race, or ethnicity"). Even if defendants' representation were true, absent any changes to each of the plaintiff's legal status, plaintiffs would *still* be among the group of individuals that defendants target. Defendants have not, for instance, represented that previously arrested plaintiffs who are now in removal proceedings and released, will not be arrested again. *See generally* Defs.' Opp'n*; see, e.g.*, N.S. Decl. ¶ 2 (immigration officers arrested N.S. notwithstanding the fact that he was already in removal proceedings but had been released and had plainly not fled or escaped).

Defendants argue that the individual plaintiffs' claims "are based on pure speculation that they will be rearrested simply because they were arrested in the past," noting that "[t]he Supreme Court has rejected 'past-is-prologue' standing." Defs.' Opp'n at 9-10. None of the Supreme Court cases cited, however, is controlling on the facts present here. To start, defendants rely on *Lyons*, the seminal case on finding a lack of standing for forward-looking relief, to contend that "the individual Plaintiffs' standing theory is a redux of *Lyons.*" *Id.* at 10. In *Lyons*, the plaintiff alleged he was stopped by the police for a traffic violation and, despite offering no resistance or threat, subjected to a chokehold that rendered him unconscious. 461 U.S. at 97-98. The Court held that the plaintiff lacked standing to enjoin future chokeholds absent a concrete, imminent threat that he personally would be choked again. *Id.* at 105. "[T]he odds that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation," the Court reasoned, were insufficient to make out a federal case for equitable relief. *Id.* at 108 (internal quotation marks and citation omitted). To establish an actual controversy for standing, the Court indicated that plaintiff would have needed to allege, for instance, "that he would have another encounter with the police" by committing another offense and "that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06.

This case differs materially from the facts of *Lyons* on the three considerations discussed above—namely, that defendants have likely adopted a policy and practice of warrantless arrests without probable cause, that plaintiffs are likely among those targeted, and that plaintiffs likely cannot avoid repeating the conduct that led to their original injuries. All these considerations crystallize the "reality of the threat of repeated injury." *See id.* at 107 n.8 (emphasis omitted). The Supreme Court stressed that the plaintiff in *Lyons* had not established a policy that "ordered or authorized police officers to" perform illegal chokeholds against those they encounter, *id.* at 106,

whereas plaintiffs here have proffered multiple sworn declarations indicating that defendants *have* adopted a policy and practice of conducting warrantless civil immigration arrests in the District without consideration of escape risk. Also, unlike the *Lyons* plaintiff, whom the Court had refused to assume would again commit a traffic infraction prompting a police stop in which a chokehold was likely to be used, plaintiffs here are far more likely to have future encounters with the immigration officers. Plaintiffs have proffered evidence suggesting not only that they are among the group of individuals targeted by defendants' agents, but also that they cannot avoid run-ins with these agents lest they avoid "going about . . . daily life." *See Melendres*, 695 F.3d at 998. Moreover, defendants are under pressure from the White House to meet increasing goals in the number of arrests of individuals targeted by the policy. *See* Widas Decl., Ex. 4 (quoting senior White House adviser Stephen Miller who, in May 2025, said, "Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day.").[23] As those "goals" remain in place or even rise, so too does the risk that plaintiffs, who are already being targeted by the policy, will be subject again to warrantless arrest without meeting the statutorily required predicates.

Defendants also invoke Justice Kavanaugh's concurrence in *Noem v. Perdomo*, 2025 WL 2585637 (Sept. 8, 2025), a recent Supreme Court emergency order staying a district court's injunction in a case challenging federal immigration stops without reasonable suspicion, and note the concurrence suggested the plaintiffs there likely lacked standing under *Lyons*. Even defendants

---

[23] Widas Decl., Ex. 4, ECF No. 17-1 at 29 (Kyle Cheney and Josh Gerstein, *DOJ Is Walking Back the White House's Goal to Arrest 3,000 Immigrants Per Day* at 1-2, Politico (Aug. 3, 2025) (noting that government attorneys "denied any such quota existed" in response to a lawsuit challenging the immigration arrests in Los Angeles, and observing "a gulf between what White House advisers say in public and what the Justice Department says in court").

concede that this "concurrence" does not "constitute[] binding precedent," *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997); *see* Hr'g Tr. at 75:5-6. The Court majority merely issued a one-paragraph order granting a stay without any explanation for its holding. *See Perdomo*, 2025 WL 2585637, at *1. Bluntly put, why the Court ruled as it did remains unclear—and without reasoning, this order cannot even be considered as persuasive. Second, Justice Kavanaugh's conclusion that the plaintiffs lacked standing in *Perdomo* rested on the claims asserted in that case—specifically, plaintiffs there sought to enjoin defendants from targeting individuals for immigration stops based on certain factors, such as race or ethnicity, their accent, and the type of work they did. *Id.* Justice Kavanaugh reasoned that plaintiffs in *Perdomo* likely lacked standing under *Lyons,* as defendants may "stop suspected illegal immigrants based on a variety of factors," and thus "plaintiffs ha[d] no good basis to believe that law enforcement will unlawfully stop *them* in the future" based "*only* on [prohibited] factors." *Id.* at *3 (emphases in original). In contrast, this case concerns an entirely different context, namely, civil immigration arrests rather than immigration stops, which were at issue in *Perdom*o, and a different type of challenge. Specifically, plaintiffs are not arguing which factors defendants may consider in their application of a legal standard, but rather contend that defendants have abandoned the proper legal standard entirely. *See* Pls.' Reply at 8. Thus, Justice Kavanaugh's concurrence in *Perdomo*, to the extent it has persuasive, let alone controlling, authority, is inapposite.

Defendants further rely on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), contending "the mere fact that [an] allegedly unlawful government enforcement operation has been authorized does not satisfy the 'certainly impending' requirement," especially as "ICE's directives expressly prohibit . . . warrantless arrests under § 1357(a)(2) without prior consideration of flight risk." Defs.' Opp'n at 11. Relatedly, defendants argue that plaintiffs lack standing to challenge

immigration arrests as to nonparties, noting that the Supreme Court has "long held that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 14 (internal quotation marks omitted) (quoting *United States v. Texas*, 599 U.S. 670 (2023)). *Clapper* and *United States v. Texas* are similarly inapposite. In both cases, the Court found the plaintiffs' alleged future harms highly speculative in large part because plaintiffs could not show they were subject to the policy being challenged. *See Clapper*, 568 U.S. at 411 (reasoning that plaintiffs "fail[ed] to offer any evidence that their communications have been monitored under" the challenged policy); *Texas*, 599 U.S. at 673-74 ("[A] citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."). In contrast, the individual plaintiffs in this case have already been arrested once pursuant to the challenged policy and have sufficiently established a concrete future threat of arrest given that they are among the group of individuals targeted by defendants' challenged policy and practice.

Lastly, defendants do not challenge the causation or redressability requirements of standing at this stage, *see* Hr'g Tr. at 75:23, nor can they. "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Here, defendants' alleged policy has directly resulted in plaintiffs' arrests without administrative warrants and without consideration of escape risk, and enjoining the policy would "relieve [this] discrete injury" to plaintiffs, *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 525 (2007). The individual plaintiffs have therefore established their standing to pursue their claims.

b. CASA's Standing

An association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants contest only that CASA has not satisfied the first requirement for such associational standing. *See* Defs.' Opp'n at 14-15. For all the reasons the individual plaintiffs have standing, *see supra* Part III.B.1(a), however, so too would CASA's members have standing to sue in their own right. Like the individual plaintiffs, CASA's members are also subject to defendants' allegedly unlawful policy, are among the group of individuals that defendants target, and cannot avoid repeating the quotidian conduct that led to their original arrests. *See, e.g.*, CASA Decl. ¶ 26 (CASA member Luz arrested while working food delivery job); *id.* ¶ 29 (CASA member Mateo arrested while picking up food delivery in parking lot); *id.* ¶ 31 (CASA member Javier arrested at Fort Totten Metro stop); *id.* ¶ 34 (CASA member Miguel arrested while walking out of a grocery store).

Defendants do not challenge CASA's ability to satisfy the second and third requirements for associational standing, *see* Defs.' Opp'n at 14-15, and, thus, "the court may treat the unaddressed arguments as conceded," *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014). In any event, the interests CASA seeks to protect in this litigation are germane to its mission "to create a more just society by building power and improving the quality of life in . . . immigrant communities," CASA Decl. ¶ 7, and CASA's members will not need to participate in the lawsuit

because the issue of defendants' systemic policy and practice of conducting warrantless arrests does not "require the consideration of the individual circumstances of any aggrieved member of the organization," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

Since CASA has associational standing, the question of CASA's organizational standing need not be reached. *See Ctr. For Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 69 (D.C. Cir. 2022) ("Because we conclude that the Center for Biological Diversity has associational standing, we need not address its claim of organizational standing . . . ."); *Children's Health Def. v. FCC*, 25 F.4th 1045, 1049 n.2 (D.C. Cir. 2022) ("Because we conclude that [the plaintiff] has associational standing, we do not address whether it has organizational standing.").

c. The INA's Jurisdiction-Stripping Provisions

Plaintiffs have established standing to sue, but defendants point to three subparagraphs of the INA's § 1252 as stripping this Court of jurisdiction to adjudicate plaintiffs' claims. *See* Defs.' Opp'n at 15-21. Two subparagraphs, in § 1252(a)(5) and (b)(9), operate jointly and are discussed first, followed by discussion of § 1252(g).

*i. 8 U.S.C. § 1252(a)(5) and (b)(9)*

Section 1252 is titled "Judicial review of orders of removal," setting the focus of this section precisely on "orders of removal." This section's subparagraph (a)(5), titled "Exclusive means of review," states, in relevant part, that "[n]otwithstanding any other provision of law . . . , a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." 8 U.S.C. § 1252(a)(5). This places judicial review of removal orders solely before courts of appeals, not district courts.

Section 1252's subsection (b), titled "Requirements for review of orders of removal," reiterates the focus on "orders of removal" both in the title and again in the introductory text to this subsection. This introductory text states, "With respect to review of an order of removal under subsection (a)(1), the following requirements apply," *id.* § 1252(b), and goes on, in subparagraph (b)(9), titled "Consolidation of questions for judicial review," to clarify the scope of matters placed solely before courts of appeals. *Id.* § 1252(b)(9). Specifically, subparagraph (b)(9) provides, in relevant part, that, "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." *Id.* In other words, when the government takes actions to remove a noncitizen from this country, "§ 1252(a)(5)[] prescribes the vehicle for judicial review," namely a petition for review filed with an appropriate court of appeals, and "[l]est there be any question about the scope of judicial review, § 1252(b)(9) mandates that '[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order.'" *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (quoting 8 U.S.C. § 1252(b)(9)). Article I immigration courts develop factual records that may support the removal of a noncitizen, and courts of appeals review those factual records for error; subparagraphs 1252(a)(5) and (b)(9) ensure district courts do not become involved in reviewing such factual records.

According to defendants, "[t]he arrests that the individual Plaintiffs challenge were actions taken to remove them from the United States," and, since "[p]laintiffs challenge the questions of

law and fact behind these actions, . . . 8 U.S.C. § 1252(a)(5), (b)(9) require that they bring the[ir] claims in petitions for review in the court of appeals." Defs.' Opp'n at 16.

Under binding precedent, defendants' argument fails. Subparagraph (b)(9) applies only "[w]ith respect to review of an order of removal," 8 U.S.C. § 1252(b), and "'does not present a jurisdictional bar' where those bringing the suit 'are not asking for review of an order of removal,' 'the decision . . . to seek removal,' or 'the process by which . . . removability will be determined.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018)) (allowing challenge to Deferred Action for Childhood Arrivals ("DACA") recission); *see Jennings*, 583 U.S. at 354 (three-Justice plurality) (holding that, "by its terms," § 1252(b)(9) did not apply when "respondents challenge[d] their detention without bail, not an order of removal"); *id.* at 293 (additional three-Justice plurality) (emphasizing that an "expansive interpretation of § 1252(b)(9) would lead to staggering results," such as "cramming" challenges to "inhumane conditions of confinement" into the petition-for-review process).

None of the individual plaintiffs have been issued orders of removal, *see* Simon Decl. ¶¶ 20-23, and three of the plaintiffs were not even in removal proceedings at the time they were arrested, *id.* ¶¶ 20, 22-23. The fourth plaintiff, B.S.R., had removal proceedings ongoing for months before his arrest but had been released, and was released again shortly after the challenged arrest. *See* Defs.' Opp'n at 4-5.[24] None of these arrests were made as a "direct[], linear[] part of

---

[24] Defendants claim that nine days before B.S.R.'s rearrest on August 18, 2025, "B.S.R. violated a term of the alternative to detention program by failing to charge his ankle monitor." Defs.' Opp'n at 27 (citing Simon Decl. ¶ 21). Nothing in defendants' proffered exhibits support this assertion, however. *See* Simon Decl.; Blanchard Decl. (no mention of B.S.R.'s ankle monitor in either declaration). Plaintiffs also dispute this information, stating that B.S.R. has no recollection of letting his ankle monitor die and has never been informed that he did so outside the context of this litigation, and additionally arguing that the ankle monitor program is administered by an independent contractor that would not have passed this information to the government. Hr'g Tr. 95:13-24. When confronted with the lack of evidence in the record, government counsel asserted that the information that B.S.R. was targeted for arrest because he failed to charge his ankle monitor came from conversations with "folks at CBP and by looking at his arrest packet." Hr'g Tr. 68:19-20. Government counsel indicated that defendants "certainly can supplement the record with that information." Hr'g Tr. 68:20-21. When provided with such an opportunity, however, defendants' declarants

the removal process." *Id.* at 17; *see Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 890-91 (N.D. Ill. 2020) (holding that, since arrests took place before the Attorney General decided to commence removal proceedings, arrests could not be "action[s] taken . . . to remove an alien" (omission in original and emphasis omitted)). Defendants submitted declarations indicating that officers arrest individuals, bring them back to ICE facilities, and *then* "r[u]n systems-checks" and "determine[] what, if any further enforcement action or appropriate next step would take place in the case." Simon Decl. ¶ 10; *see Nava*, 435 F. Supp. 3d at 891-92 (holding that challenge to arrests was permissible because the arrests allegedly took place "before [ICE] had any reason to believe that the [plaintiffs] had violated an immigration law" and without an escape-risk determination). In no sense, then, were plaintiffs' arrests part of their removal, and their claims do not challenge an order of removal, directly or indirectly.

The consequences of applying § 1252(b)(9) to the instant plaintiffs' claims demonstrate why that provision covers only claims "[w]ith respect to review of an order of removal." 8 U.S.C. § 1252(b)(9). Defendants urge application of § 1252(b)(9) to require an individual to wait to challenge his or her arrest until an order for removal is entered, but "no such order [might] ever be entered in a particular case," and, thus, this interpretation potentially "depriv[es] that detainee of any meaningful change for judicial review" of a claimed unlawful arrest. *Jennings*, 583 U.S. at 293. Even noncitizens eventually subject to an order of removal would, as a procedural matter, be able to challenge the manner of their arrests only by attempting to show that evidence obtained by

continued to remain silent on the status of B.S.R.'s ankle monitor and its relation to B.S.R.'s arrest. *See* Supp. Simon Decl.; Supp. Blanchard Decl. Notably, none of the records in the referenced "arrest packet" or otherwise relied upon by defendants' declarants have been submitted for the record. Given the continued lack of evidence backing up defendants' allegation regarding B.S.R., plaintiffs request that the "allegation should be stricken from the record and not considered by this Court." Pls.' Amend. Supp. Resp. at 13 n.5. This request is denied since these holes in the factual record, where defendants hold the pertinent backup evidence—should such evidence exist—are actually probative in assessing the reliability and accuracy, or lack thereof, of other representations by defendants about their actions more broadly.

the arrest prejudiced the outcome of their removal proceedings and should be suppressed—not to challenge the arrest itself as an unlawful seizure under the INA and the U.S. Constitution. *See Sanchez v. Sessions*, 904 F.3d 643, 649 (9th Cir. 2018) (considering unlawful arrest allegation as part of suppression motion); *Yanez-Marquez v. Lynch*, 789 F.3d 434, 450-51 (4th Cir. 2015) (same); *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 274-75 (3d. Cir. 2012) (same); *Leal-Burboa v. Garland*, No. 21-70279, 2022 WL 17547799, *1 (9th Cir. Dec. 9, 2022) (same); *Rajah v. Mukasey*, 544 F.3d 427, 44 (2d Cir. 2008) (same).

For these reasons, courts have repeatedly held that government actions collateral to the removal process may be challenged via lawsuits filed in district court, notwithstanding § 1252(a)(5) and (b)(9). *Nielson v. Preap*, 586 U.S. 392 (2019) (challenge to scope of mandatory detention after lawful permanent residents were released from criminal incarceration); *Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86 (D.D.C. 2020) (challenge to delay in deciding U-visa application); *Ahmed v. Noem*, No. 25-cv-1351 (RBW), 2025 WL 2299447 (D.D.C. Aug. 8, 2025) (challenge to deletion of student's record from federal database allowing international student to enroll at U.S. university); *Medina v. DHS*, No. 17-cv-218 (RSM), 2017 WL 2954719, at *1, 15 (W.D. Wash. Mar. 14, 2017) (challenge to post-arrest interrogation methods); *Roy v. Cnty. of Los Angeles*, No. 12-cv-09012 (AB), 2018 WL 914773, at *2, 18 (C.D. Cal. Feb. 7, 2018) (challenge to immigration detainer agreements between DHS and local law enforcement agencies). Indeed, multiple other courts have held that lawsuits addressing claims identical to those raised here, alleging warrantless civil immigration arrests without probable cause, are not barred by § 1252(b)(9). *See Nava*, 435 F. Supp. 3d at 895 (denying motion to dismiss for lack of jurisdiction); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 704 (E.D. Cal. 2025) (issuing preliminary injunction); *see also Ramirez Ovando v. Noem*, 25-cv-3183 (RBJ), 2025 WL

3293467 (D. Colo. Nov. 25, 2025) (issuing preliminary injunction where government did not raise any INA jurisdictional bars).

*ii. 8 U.S.C. § 1252(g)*

Defendants also argue that plaintiffs' claims constitute "challenges to decisions and actions about whether and when to commence removal proceedings" and are therefore barred by § 1252(g) of the INA. Defs.' Opp'n at 18. Not so. Subsection 1252(g) bars district court jurisdiction over claims "only [as] to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders,'" not to "all claims arising from deportation proceedings." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original). Plaintiffs specifically disavow that they are "seeking relief related to any removal proceedings or challenging any removal order" or "challenging the commencement, result, or any part of the process by which their removability will be determined." Pls.' Reply at 1, 13. Instead, they challenge their warrantless civil arrests, not any of the three enumerated actions, so § 1252(g) does not bar jurisdiction.

One plaintiff, Escobar Molina, has no pending removal proceeding and has never been issued a Notice to Appear (the document required to commence removal proceedings), even now, months after his arrest and release. Simon Decl. ¶ 20; Hr'g Tr. at 17:16-17 (plaintiffs' counsel stating that "Escobar Molina, as defendants acknowledge, is not even in removal proceedings"). B.S.R. had been in removal proceedings for seven months when he was arrested, Simon Decl. ¶ 21, and thus his arrest could not "commence [removal] proceedings" nor was part of the adjudication, let alone execution, of an order of removal, thereby falling outside the scope of 8 U.S.C. § 1252(g). N.S. and R.S.M. were issued NTAs commencing removal proceedings shortly after their arrests, Simon Decl. ¶¶ 22-23, but the decision to initiate removal proceedings occurred

*after* their arrests when they had already been taken to ICE detention facilities, *id.* ¶¶ 10, 22-23; N.S. Decl. ¶ 15 (NTA issued after interview at ICE facility); R.S.M. Decl. ¶ 11 ("document about immigration court" issued after interview at ICE facility); Hr'g Tr. 54:13-14 (government confirming that only "[t]wo of the plaintiffs were targeted arrests").

This conclusion is bolstered by the fact that the challenged actions are not the kinds of classic prosecutorial decisions covered and protected from judicial review by the terms of § 1252(g). The Supreme Court has described prosecutorial decisions as "particularly ill-suited to judicial review" because such decisions require assessment of "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Reno*, 525 U.S. at 490 (quoting *Wayte v. United States*, 470 U.S. 598, 607-08 (1985)). Here, the substantive issues before the Court involve interpreting the INA and DHS regulations and deciding whether plaintiffs have shown a likelihood that defendants have a policy and practice of making civil immigration arrests without the requisite probable cause. Statutory interpretation and assessments whether probable cause exists for an arrest are well within courts' normal purview.

The cases cited by defendants to interpret § 1252(g) so broadly as to bar plaintiffs' instant claims are unpersuasive. Defendants rely most heavily on *Tazu v. Att'y Gen.*, 975 F.3d 292 (3d Cir. 2020), Defs.' Opp'n at 19-20, where the noncitizen plaintiff challenged, *inter alia*, his brief detention prior to being put on a plane back to his home country, *Tazu*, 975 F.3d at 298. A removal order was already in place, but the government had previously been unable to execute the order because Tazu's passport had expired. *Id.* at 294. Once the government obtained a new passport for Tazu, his removal order could be executed and, at that point, he was arrested, detained, and (had he not filed suit) would have been on a plane back to Bangladesh within several days. *Id.* at

295, 297-98. The Third Circuit held that § 1252(g) barred judicial review of his claim challenging those actions because the arrest and detention were actions taken to effectuate Tazu's final order of removal. *Id.* at 298. Most of the cases cited by defendants similarly involve noncitizens' efforts to prevent the government from removing them from the country *after* a final order of removal has issued. *See Hamama v. Homan*, 912 F.3d 869, 874 (6th Cir. 2018) (§ 1252(g) barred review of "Attorney General's enforcement of long-standing removal orders"); *Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022) (§ 1252(g) applied when government declined to reopen noncitizen's appeal of removal order); *Camerena v. Dir., ICE*, 988 F.3d 1268, 1274 (11th Cir. 2021) (§ 1252(g) barred habeas claims that sought to delay removal under final removal orders).

Defendants point to one out-of-circuit magistrate judge decision, *Saadulloev v. Garland*, which found that § 1252(g) barred review of a habeas corpus claim by a noncitizen seeking his release from detention after he was arrested by ICE, before a final order of removal had issued. No. 23-cv-106, 2024 WL 1076106, at *1 (W.D. Pa. Mar. 12, 2024); Defs.' Opp'n at 19. In that case, however, the arresting officers "served [plaintiff] with a notice to appear" during the arrest, "which initiated the . . . removal proceedings," demonstrating that the arrest "flowed directly from the [arresting] agents' discretionary decision to commence removal proceedings." *Saadulloev*, 2024 WL 1076106, at *1, 3.

Each of the individual plaintiffs' situations here stand in stark contrast to those in *Tazu*, *Saadulloev*, and the other cases cited by defendants. In those cases, plaintiffs' challenges were to the execution or commencement, respectively, of removal proceedings, to which their detention and arrest were merely instrumental. *See Tazu*, 975 F.3d at 298-99 ("[D]etaining Tazu was simply the enforcement mechanism the Attorney General picked to execute his removal."); *Saadulloev*, 2024 WL 1076106, at *1 ("The [arresting ICE] officers served Saadulloev with a notice to appear

before an immigration judge on April 18, 2023, which initiated the current removal proceedings."). None of the arrests of the four individual plaintiffs in this case, on the other hand, were made in immediate anticipation of commencing removal proceedings, much less executing a final order of removal. Two plaintiffs' arrests were not close in time to the commencement of removal proceedings; B.S.R. was already in removal proceedings at the time of his arrest, Simon Decl. ¶ 21, and the Attorney General has yet to initiate removal proceedings against Escobar Molina, *id.* ¶ 20. Their arrests thus cannot be characterized as "actions taken to commence" removal proceedings. 8 U.S.C. § 1252(g). N.S. and R.S.M. did receive NTAs *after* their arrests, but unlike in *Tazu* and *Saadulloev*, their arrests were not made as part of a "discretionary decision to commence removal proceedings." *Saadulloev*, 2024 WL 1076106, at *3. Instead, the agents apparently arrested N.S. and R.S.M. and took them to ICE facilities where, only after an interview, the decision was made to commence removal proceedings. N.S. Decl. ¶ 15; R.S.M. Decl. ¶ 11.

Thus, the INA does not bar jurisdiction over plaintiffs' individual claims because plaintiffs are challenging neither a final order of removal nor a discretionary prosecutorial decision to commence, adjudicate, or execute removal, but rather the defendants' alleged policy and practice of making civil immigration arrests without the probable cause required under the INA's § 1357(a)(2) to make such arrests.

d. Final Agency Action

Defendants contend that "plaintiffs cannot proceed under the APA because they have not shown that the purported policy and practice of making warrantless arrests is a final agency action." Defs.' Opp'n at 21 (capitalizations altered). This argument, again, discounts binding legal precedent and is belied by the record and, therefore, is unpersuasive.

For an agency action to be "final," the action must "mark[] the consummation of the agency's decisionmaking process" and be "one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (internal quotation marks omitted). What constitutes a final agency action should be interpreted "pragmatic[ally]," *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018), as agency action may be final despite expression in a more "informal" form, *see Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000). *See, e.g.*, *CropLife Am. v. Env't Prot. Agency*, 329 F.3d 876, 881 (D.C. Cir. 2003) (finding that an agency's press release with "clear and unequivocal language" that the agency "will not consider or rely on any [third-party] human studies in its regulatory decision making" to "create[] a 'binding norm'"). "The crux of the inquiry is whether the action is official and presently in effect." *Planned Parenthood of Greater New York v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-2453, 2025 WL 2840318, at *17 (D.D.C. Oct. 7, 2025) (citing *Soundboard Ass'n v. Fed. Trade Comm.*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)).

Here, "the record" as a whole "leaves no doubt" that defendants in practice have consummated a decisionmaking process that resulted in the implementation of a new policy of conducting warrantless civil immigration arrests based on a lower standard than probable cause. *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (holding that "the record leaves no doubt the [agency] has a policy of disclosing confidential information," which constituted a final agency action even where "the details of the . . . policy are still unclear"); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (finding that DHS adopted an unwritten policy directing ICE officers to consider deterrence of mass migration in their custody determinations based on "ample support in the record," including "firsthand knowledge and

collection of data" from immigration experts and defendants' own statements that they consider deterrence as a factor).

The challenged decision originates from the top, coming to a head with the current administration's August 11, 2025 declaration of an "emergency" in the District, *see* Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025), which placed the District's Metropolitan Police Department under "direct federal control" for a 30-day period and deployed 800 National Guard troops onto the city's streets, Widas Decl., Ex. 20 (quoting the current president).[25] In that declaration of emergency, the president repeatedly referenced the topic of immigration, proclaiming that the federal government was going to put things "in control very quickly, like we did in the southern border," *id.*, Ex. 5,[26] and promising that "[t]his city will no longer be a sanctuary for illegal alien criminals," *id.*, Ex. 6.[27] A few days later, on August 15, 2025, defendant Attorney General Pamela Bondi issued an order directing the District's Mayor to use local resources to assist with "enforcement of federal immigration law," including with "locating, apprehending, and detaining aliens unlawfully present in the United States." *Id.*, Ex. 7.[28] This enforcement push was further buttressed by an earlier directive from defendant Kristi Noem, the Secretary of DHS, granting to certain enumerated non-DHS federal agents the "authority to arrest and apprehend illegal aliens," *id.*, Ex. 8[29]; as well as the imposition of rising quotas—or, as defendants describe, nonbinding "goals," Hr'g Tr. 69:14-15, 18 (defendants' counsel conceding White House officials made statements about rising "goals" for civil immigration arrests)—that quickly grew to 3,000

[25] Widas Decl., Ex. 20, ECF No. 17-1 at 107 (Kaia Hubbard, *Trump deploys National Guard to D.C., takes control of local police in crime crackdown* at 2, CBS News (Aug. 11, 2025), https://perma.cc/H7QT-ZPSS).
[26] *Id.*, Ex. 5, ECF No. 17-1 at 34 (Michelle Stoddart et al., *Trump puts DC police department under federal control, deploys National Guard* at 1, ABC News (Aug. 12, 2025), https://perma.cc/4VZ6-UJL7).
[27] *Id.*, Ex. 6, ECF No. 17-1 at 43 (*DC Critics Slam Trump's Crackdown* at 3).
[28] *Id.*, Ex. 7, ECF No. 17-1 at 48 (Off. of Att'y Gen., Order No. 6372-2025, "Restoring Safety and Security to the District of Columbia" at 2 (Aug. 15, 2025), https://perma.cc/7NPP-U3EP).
[29] *Id.*, Ex. 8, ECF No. 17-1 at 50 (*Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials* at 1, DHS (Jan. 23, 2025), https://perma.cc/XW6H-ERZ6).

arrests nationwide per day, *id.*, Ex. 3 (reporting on a call in January 2025 in which senior ICE officials "were told that each of the agency's field offices should make 75 arrests per day [totaling more than 1,800 daily arrests nationwide]" and that "managers would be held accountable for missing those targets");[30] *id.*, Ex. 4 (quoting senior White House adviser Stephen Miller increasing quota to 3,000 daily nationwide in May 2025, and promising that the administration was "going to keep pushing to get that number up higher each and every day").[31]

Heeding these orders, DHS's leadership has, according to plaintiffs, implemented a policy and practice of arresting people who live or work in the District and whom they perceive to be Latino, without the required probable cause findings that those individuals are in the United States unlawfully and are likely to escape before an administrative warrant can be obtained. *See* Pls.' Prelim. Inj. Mot. at 6.

Finding that defendants have implemented such a policy and practice does not require a far leap of logic: defendants *themselves* have repeatedly emphasized an abandonment of the probable cause standard. For example, Tricia McLaughlin, DHS Assistant Secretary for Public Affairs and "the principal advisor to Secretary Noem on all external and internal communications," has made multiple public statements confirming this point.[32] On September 25, 2025, in response to this lawsuit, McLaughlin, as DHS spokesperson, is quoted as making the following public statement:

---

30 *Id.*, Ex. 3, ECF No. 17-1 at 21 (Nick MiroffMaria Sacchetti, *Trump officials issue quotas to ICE officers to ramp up arrests* at 1, The Washington Post (Jan. 28, 2025)).

31 *Id.*, Ex. 4, ECF No. 17-1 at 28-29 (*DOJ Is Walking Back the White House's Goal* at 1-2).

32 Tricia McLaughlin's biography page on DHS's website describes her role as quoted in the text. *See* Tricia McLaughlin, DHS (last updated Jan. 31, 2025), https://perma.cc/KF5B-5AAY. The law is well-settled that "judicial notice may be taken of factual content found on official public websites of government agencies." *Bega v. Jaddou*, No. 22-cv-02171 (BAH), 2022 WL 17403123, at *3 (D.D.C. Dec. 2, 2022), *aff'd sub nom. Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330 (D.C. Cir. 2023); *see also* Fed. R. Evid. 201(b)(2), (d) (providing that a court may, "at any stage of the proceeding," "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of facts available on the District of Columbia's website); *Carik v. U.S. Dep't of Health & Human Servs.*, 4 F. Supp. 3d 41, 48 n.4, (D.D.C. 2013) (same, as to information on a federal agency's website).

"Allegations that DHS law enforcement officers engage in 'racial profiling' are disgusting, reckless, and categorically FALSE. . . . Under the fourth amendment of the U.S. Constitution, DHS law enforcement uses '*reasonable suspicion*' to make arrests. . . . The Supreme Court recently vindicated us on this question." Widas Decl., Ex. 17 (emphasis added).[33] That same day, DHS's official social media account, @DHSgov, posted the same statement, again reiterating that DHS "uses '*reasonable suspicion*' to make arrests" and that "[t]he Supreme Court recently vindicated us on this question." *Id.*, Ex. 19 (emphasis added). On October 1, 2025, DHS issued a press release on its official website to "set[] the record straight," declaring that its "law enforcement officers are trained to ask a series of well-determined questions to determine status and removability" when they "encounter individuals subject to arrest," *id.*, Ex. 18[34]—yet the press release notably said nothing about escape risk assessments, one of the two-pronged requirements for a warrantless civil immigration arrest. Later that same month, DHS issued another press release on its official website, again confirming that "DHS law enforcement uses '*reasonable suspicion*' to make arrests," as "vindicated" by the Supreme Court. Second Widas Decl., Ex. 1, ECF 34-1.[35] Around the same time, Chief Border Patrol Agent Gregory Bovino told the press, "We need *reasonable suspicion* to make an immigration arrest . . . . You notice *I did not say probable cause*, nor did I say I need a warrant. We need *reasonable suspicion* of illegal alienage that's well grounded within the United States immigration law." *Id.*, Ex. 2 (emphases added).[36]

---

[33] Widas Decl., Ex. 17, ECF No. 17-1 at 95 (*Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.* at 2).

[34] *Id.*, Ex. 18, ECF No. 17-1 at 101 (*DHS Oct. 1, 2025 Press Release* at 1).

[35] Second Widas Decl., Ex. 1, ECF No. 34-1 at 4 (*DHS Debunks Governor Pritzker's Harmful Lies About Operation Midway Blitz in Chicago, Federal Law Enforcement* at 1 (hereinafter, "*DHS Debunks Governor Pritzker's Harmful Lies*"), DHS (Oct. 6, 2025)).

[36] Second Widas Decl., Ex. 2, ECF No. 34-1 at 8 (*Border Patrol official denies racial profiling* at 1).

These statements are just some examples, of many, illustrating the finality of defendants' recent policy of making warrantless arrests under a standard lower than probable cause. *See also, e.g.*, Widas Decl., Ex. 22 (White House official, Stephen Miller, quoted as instructing ICE to stop developing target lists of immigrants and to instead "just go out there" and arrest people right away at Home Depots or 7-Elevens)[37]; *id.*, Ex. 23 (quoting statement from Acting Executive Associate Director of ICE Enforcement and Removal Operations telling his agents to "turn up the creative knob up to 11 and push the envelope," and another statement from a senior ICE official telling agents, "If it involves handcuffs on wrists, it's probably worth pursuing").[38] In fact, when a former-acting U.S. Attorney for the Eastern District of California told Bovino that he could not make civil immigration arrests without probable cause, she reportedly was fired. *Id.*, Ex. 16.[39]

Tellingly, neither defendants' briefs nor their declarations disavowed these public statements. When questioned at the hearing, government counsel's principal defense was that "these statements [were made] by non-attorneys" who "don't necessarily understand" "legal terms of art" like "reasonable suspicion, [and] probable cause." Hr'g Tr. at 63:15-19. This is a remarkable assertion. On its face, the government's defense appears to be that the individuals behind these statements are ignorant or incompetent, or both. These statements, however, were made by high-ranking officials—including Secretary Noem's principal communications advisor and a Chief Border Patrol Agent—in their official capacity to the press, on DHS's official website, and on DHS's official social media account. The Chief Border Patrol Agent, in fact, made clear that he meant "reasonable suspicion" and not "probable cause." Second Widas Decl., Ex. 1

---

[37] Widas Decl., Ex. 22, ECF No. 17-1 at 121 (*The White House Marching Orders* at 1).

[38] *Id.*, Ex. 23, ECF No. 17-1 at 130, 132 (*US immigration officers ordered to arrest more people* at 2, 4).

[39] *Id.*, Ex. 16, ECF No. 17-1 at 86-87 (*Trump Fired a U.S. Attorney Who Insisted on Following a Court Order* at 1-2).

(quoting Chief Border Patrol Agent to say, "You notice I did not say probable cause.").[40] The statements were made repeatedly, and publicly, to reach a broad audience, which includes law enforcement officers under DHS's command. Attempting to add authority and credibility, the statements proclaimed that a recent Supreme Court decision—presumably, *Perdomo*—vindicated DHS's warrantless arrests under a reasonable suspicion standard. In short, nothing about these statements suggests ignorance or incompetence; indeed, to assume so would also be to assume ignorance or incompetence from DHS's legal counsel, who repeatedly failed to prevent these statements from being made in DHS's official communications to the public.

Nonetheless, to dispel any doubt that these high-ranking officials were simply confused, ignorant, or incompetent, government counsel at the hearing was offered the opportunity to present witnesses under oath to testify that those public statements are wrong and that immigration officers are applying the proper probable cause standard, but defendants' counsel declined the opportunity. Hr'g Tr. at 65:8-11, 21-25. Later that day, "DHS sent News4 [of NBC] a statement" in response to the hearing in this case, maintaining: "'DHS law enforcement uses '*reasonable suspicion*' to make arrests. . . . The Supreme Court recently vindicated us on this question." Mauricio Casillas, *Lawsuit could limit how ICE conducts arrests in DC*, NBC (Nov. 19, 2025) (emphasis added), https://perma.cc/2ZKG-GY3B?type=image.[41] Though granted permission to make post-hearing submissions, defendants' supplemental declarations likewise did not address these public statements, let alone correct or disavow them. *See* Supp. Simon Decl., ECF No. 63-1; Supp. Blanchard Decl., ECF No. 63-2. Nor did the supplemental filings explain why—if a probable

---

[40] Second Widas Decl., Ex. 1, ECF No. 34-1 at 4 (*DHS Debunks Governor Pritzker's Harmful Lies* at 1).

[41] Judicial notice is taken of defendants' public statement to NBC News after the hearing in this case, which is consistent with statements defendants have previously made that are included in the record. *See, e.g.*, *Xiaobing Liu v. Blinken*, 544 F. Supp. 3d 1, 6 (D.D.C. 2021) ("The 'Court may take judicial notice of Executive Branch statements and reports pursuant to Federal Rule of Evidence 201[.]'" (quoting *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 24 n.6 (D.D.C. 2018))).

cause standard is being applied as defendants' claim, *see* Supp. Blanchard Decl. ¶ 7—an acting U.S. Attorney was reportedly fired after informing DHS leadership that civil immigration arrests could not be made without probable cause. *See* Widas Decl., Ex. 16.[42] Defendants' continued silence regarding these public statements in their declarations, submitted under penalty of perjury, is particularly telling as defendants were cautioned by the Court at the hearing to approach post-hearing submissions with the understanding that "[s]ilence is loud in this case." Hr'g Tr. at 102:12. Whether defendants decline to correct or are unable to disavow the statements made by high-ranking DHS officials is no matter since the result is the same: these statements are taken at face value as reflecting the current policy and practice of DHS and federal law enforcement agents making civil immigration arrests.

This is, in fact, plaintiffs' point in citing to public statements by high-ranking DHS officials as proof of the current challenged policy and practice. Rather than the possible alternative excuse that such public statements are the result of ignorance or incompetence on the part of DHS's high-ranking officials and legal counsel, the better, straight-forward explanation is that DHS's statements derive from an intentional policy and practice of conducting warrantless civil immigration arrests without the requisite probable cause findings and reflect a purposeful attempt to conflate such *arrests* with civil immigration *stops*, which were the subject of a lower standard outlined in a single Supreme Court Justice's concurrence in *Perdomo*.

In any event, the finding of final agency action does not rest on defendants' official statements alone: Defendants' public statements are *corroborated* by on-the-ground examples from over two dozen declarations describing roughly forty warrantless civil immigration arrests conducted without the requisite probable cause findings. As plaintiffs aptly note, in none of these

---

42 Widas Decl., Ex. 16 (*Trump Fired a U.S. Attorney Who Insisted on Following a Court Order* at 1-2).

arrests documented in their declarations did the agents ask any questions about the arrestees' personal circumstances—such as the person's residence, length of stay in the United States, family members, work history, or anything else about the person's community ties—which courts have found to be relevant in the consideration of escape risk. *See* Pls.' Prelim. Inj. Mot. at 22; *see, e.g.*, Escobar Molina Decl. ¶ 8; B.S.R. Decl. ¶ 7; N.S. Decl. ¶ 7; R.S.M. Decl. ¶ 6; Antony Doe Decl. ¶ 6; Anamaria Doe Decl. ¶ 5; B.R.G. Decl. ¶ 4; Camilo Doe Decl. ¶ 5; Franco Doe Decl. ¶ 4; Cristina Decl. ¶ 6; W.G.M. Decl. ¶ 6. Nor did the arrested individuals display attempts to evade law enforcement, such as by walking, running or driving away when stopped. *See, e.g.*, Escobar Molina Decl. ¶ 5; B.S.R. Decl. ¶¶ 5-6; N.S. Decl. ¶¶ 5-6; R.S.M. Decl. ¶ 5; Anamaria Doe Decl. ¶ 6; Andrés Doe ¶¶ 3-4; Antony Doe ¶ 5; B.R.G. Decl. ¶ 3; Franco Doe Decl. ¶ 3; Javier Doe Decl. ¶¶ 5-6; Luz Doe ¶ 5.

Despite the record evidence, defendants dispute the existence of such a policy, insisting that ICE's directive issued in 2022 to its officers, plus annual trainings, require probable cause findings and comport with section 1357(a)(2). *See* Defs.' Opp'n at 23 (citing *Broadcast Statement of Policy*, Appendix A, Pls.' Ex. 1, ECF 17-1; Simon Decl. ¶ 18). This defense puts a new twist on the old saying, "I can't believe what you say, because I see what you do,"[43] by asserting the position "don't believe <u>either</u> what we say or what we do, just trust whatever we tell you now." This position is unavailing for several reasons.

First, as already noted, recent public statements by DHS high-ranking officials are taken at face value as the articulation by the current administration of the policies and practices being implemented for civil immigration arrests, as borne out by sworn declarations by persons targeted by that policy. That is more than ample proof of the challenged policy at issue in this lawsuit.

[43] James Baldwin, "A Report From Occupied Territory," THE NATION (July 11, 1966).

Second, as plaintiffs note, defendants' declarations discussing the training provided to some of its officers is "virtually irrelevant," Pls.' Supp. Resp. at 11, as all of the trainings discussed with respect to the officers who arrested plaintiffs occurred *before* August 11, 2025—i.e., before defendants instituted the alleged policy and practice challenged in this case, *see* First Supplemental Decl. of Joseph Simon ("Supp. Simon Decl.") ¶¶ 7-8, ECF No. 63-1 (discussing trainings in March 2024 and February 2025); Supp. Blanchard Decl. ¶ 6 (discussing a training in June 2025). Defendants have not proffered any evidence suggesting that federal officers tasked with making civil immigration arrests since the administration's recent implementation of a lower "reasonable suspicion" standard have been trained on the legally correct standard required for such arrests. Any training that the officers may have received under a prior policy thus has no bearing on the current policy and practice.

Third, as a factual matter, defendants' own declarations state only that these trainings were provided to Enforcement and Removal Operations officers from ICE, Simon Decl. ¶ 23, and law enforcement personnel from CBP, Supp. Blanchard Decl. ¶¶ 5-6. Defendants' declarations do not attest that personnel from other federal agencies tasked with conducting civil immigration arrests receive similar training. Defendants' counsel also could not make such a representation when questioned at the hearing. *See* Hr'g Tr. at 88:14-15, 24-25 (responding, when asked what training has been provided to other agents outside of CBP and ICE, that "the declarations are silent on that"). Nor could defendants produce any supplemental declarations after the hearing describing the training that such deputized non-DHS agents received. *See* Supp. Simon Decl., ECF No. 63-1; Supp. Blanchard Decl., ECF No. 63-2. The D.C. Circuit has been clear that INA regulations, *see* 8 C.F.R. § 287.5(e)(3) and § 287.5(c)(1), require immigration officers to receive training before they can make civil immigration arrests, and that when this authority is delegated to other federal

agents, they too must undergo the required training prior to making civil immigration arrests. *See N.S.*, 141 F.4th at 286-87 (concluding that the U.S. Marshals, though delegated authority by the Attorney General to make a civil immigration arrest of a noncitizen, were not authorized to do so because they failed to undergo the required training, and therefore the arrest "was not valid"). Without adequate training, such deputized personnel would be even more susceptible to following directives from high-ranking DHS officials without recognizing the officials' misstatements about the lawful standard for making civil immigration arrests.

Finally, defendants cite the Broadcast Statement of Policy, issued in 2022, instructing ICE officers to comply with section 1357(a)(2)'s probable cause requirements, Defs.' Opp'n at 23, and explain that any warrantless arrests made without probable cause is "unsanctioned," *id.* at 35. This citation is not at all helpful to defendants, however, since, on June 11, 2025, ICE's Principal Legal Advisor "unequivocal[ly]" dictated to all ICE officers nationwide that the Broadcast "remains terminated" and has been "rescind[ed]." *Castañon Nava v. Dep't of Homeland Sec.*, 2025 WL 2842146, at *22 (N.D. Ill. Oct. 7, 2025). On October 7, 2025, a district court in Illinois ordered ICE "to reissue the Broadcast to all ICE officers nationwide . . . with the instruction that the Broadcast shall remain in effect through February 2, 2026." *Id.* at *24. Defendants do not address this history in their brief, and the exact status of the Broadcast remains unclear. In any event, one directive from 2022 cannot outweigh the host of more recent evidence indicating that a lower standard than probable cause is being implemented. *See, e.g.*, Widas Decl., Ex. 17 (quoting DHS Assistant Secretary for Public Affairs, Tricia McLaughlin, who said in September 2025 that immigration officers use a "reasonable suspicion" standard to make arrests);[44] *id.,* Ex. 22, (quoting

[44] Widas Decl., Ex. 17, ECF No. 17-1 at 95 (*Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.* at 2).

White House official, Steven Miller, instructing ICE to stop developing target lists and to instead "just go out there and arrest illegal aliens" right away in May 2025).[45]

In sum, on the current record, plaintiffs have established that defendants' alleged policy and practice of making warrantless arrests without probable cause is a final agency action.

e. Defendants' Policy and Practice of Making Unlawful Warrantless Civil Immigration Arrests

Not only are plaintiffs likely to establish this Court's jurisdiction over their claims, plaintiffs are also likely to succeed on the substantive merits of those claims.

Recall that under the INA, an agent can make an immigration arrest without an administrative warrant only if the agent "has reason to believe that [1] the alien so arrested is in the United States in violation of any such law or regulation and [2] is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. § 287.8(c)(2)(i)-(ii) (similar). Further, the law is clear that, to comport with the Fourth Amendment, the "reason to believe" standard for a civil immigration arrest under the INA is "the equivalent of probable cause." *Au Yi Lau*, 445 F.2d at 222-23; *see also Tejeda-Mata*, 626 F.2d at 725; *Cantu*, 519 F.2d at 496.

Here, as discussed in the section above, plaintiffs have established a substantial likelihood of an unlawful policy and practice by defendants of conducting warrantless civil immigration arrests without probable cause. *See* Part III.B.1.d. This finding is supported, *inter alia*, by defendants' own official public statements that they apply a "reasonable suspicion" standard to conduct warrantless arrests, as well as roughly forty examples detailed in plaintiffs' declarations of arrests conducted without any questions as to escape risk. *Id.*

[45] Widas Decl., Ex. 22, ECF No. 17-1 at 121 (*The White House Marching Orders* at 1).

Defendants' systemic failure to apply the probable cause standard, including the failure to consider escape risk, directly violates the clear statutory requirements under the INA, *see* 8 U.S.C. § 1357(a)(2), and DHS's implementing regulations, *see* 8 C.F.R. § 287.8(c)(2)(ii); *see also, e.g.*, *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017) ("[The plaintiff's] admission regarding his immigration status provided probable cause for the first half of what § 1357(a)(2) demands. There is, however, no evidence that ICE or any other immigration officer had probable cause to believe that [the plaintiff] was 'likely to escape before a warrant can be obtained for his arrest,' the second half of what is needed before a warrantless arrest under § 1357(a)(2) is lawful."); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008-09 (N.D. Ill. 2016) ("[B]ecause immigration officers make no determination whatsoever that the subject of a detainer is likely to escape upon release before a warrant can be obtained, ICE's issuance of detainers that seek to detain individuals without a warrant goes beyond its statutory authority to make warrantless arrests under 8 U.S.C. § 1357(a)(2).").

As such, defendants' policy and practice of making warrantless civil immigration arrests without the requisite probable cause findings is also "arbitrary, capricious, or contrary to law" and "in excess of statutory authority," in violation of the APA. *See* 5 U.S.C. § 706(2)(A), (C).[46] Under the APA, agency actions may "be set aside if they are contrary to law—if, in other words, they are 'not authorized by the statutory text,' or some other source of lawful authority." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *16 (D.D.C. July 2, 2025) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006)). Similarly, under the APA, agency

[46] Plaintiffs have established a likelihood of success in showing that defendants' policy and practice of making warrantless civil immigration arrests without probable cause as to escape risk violates the APA, and thus plaintiffs' alternative argument that defendants' policy and practice also violates the *Accardi* doctrine need not be reached. *See* Pls.' Prelim. Inj. Mot. at 26-27.

actions "may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Nat'l Env'l. Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted). Indeed, although defendants dispute the policy's existence, defendants do *not* dispute that if such a policy and practice did exist, it would violate the INA, the accompanying regulations, and the APA. Hr'g Tr. at 87:18-20 (defendants' counsel answering, in response to whether the policy alleged by plaintiffs would violate the law, that "[i]f the Court were to find that [defendants did have the policy plaintiffs' alleged], yes, but as I have mentioned before, there is no such policy, but, yes, we don't dispute, the two sides, as to what the law is").[47]

### 2. *Irreparable Harm*

To establish irreparable harm for purposes of obtaining preliminary injunctive relief, the moving party "must make two showings": "First, the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm. Second, the harm must be beyond remediation." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (citations, internal quotation marks, and alteration omitted). The second showing means that the harm cannot later be fixed by "adequate compensat[ion] or other corrective relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297-

[47] Defendants' argument that plaintiffs fail to state a plausible claim against defendant Drug Enforcement Administration ("DEA") fails. Defs.' Opp'n at 29-30. Contrary to defendants' assertion that "there are no allegations that DEA made illegal immigration arrests of Plaintiffs in violation of immigration laws asserted in the complaint," *id*. at 29, plaintiffs have proffered evidence that the DEA is one of the federal agencies enlisted to assist in immigration enforcement, *see* Widas Decl., Ex. 8 (DHS press release indicating that the DEA has been given "authority to investigate and apprehend illegal aliens"), and the sworn declaration of an individual plaintiff that an agent involved in his challenged arrest wore a vest that said "DEA," N.S. Decl. ¶¶ 6-8. Defendants' counsel, at the hearing, argued that although "the person was wearing a DEA vest, . . . they were wearing an ICE badge, so they were ICE agents." Hr'g Tr. at 84:21-22. This is not a game of "catch me if you can" and, in construing the complaint liberally, as is required at this stage, as well as "granting plaintiff the benefit of all inferences that can be derived from the facts alleged," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), plaintiffs have alleged sufficient facts of a DEA agent participating in a challenged civil immigration arrest to make the claim against the DEA plausible.

98 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). As applied more specifically to an organization, harm is shown "if the 'actions taken by [the defendant] have perceptibly impaired the [organization's] programs," *League of Women Voters*, 838 F.3d at 8 (alterations in original) (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)), including by making "the organization's *activities* more difficult," *id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis in original)). "If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission,'" which "is required to ensure that organizations cannot engage in activities simply to create an injury." *Id.* (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430).

Both the individual and organizational plaintiffs satisfactorily show irreparable harm. While defendants reprise their standing argument to contend concerns about re-arrests of the individual plaintiffs and CASA members is merely speculative or theoretical, and consequently not imminent, Defs.' Opp'n at 31, plaintiff B.S.R. has actually been subjected twice to civil immigration arrests, B.S.R. Decl. ¶¶ 7, 14, and these plaintiffs are subject to a much heightened risk of such re-arrest given that they fall within the targeted group for such arrests.

The D.C. Circuit and courts in this District have widely held that an "irreparable loss of personal liberty . . . would follow from an arrest." *See Rubinstein v. Brownell*, 206 F.2d 449, 456 (D.C. Cir. 1953); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) ("Courts in this and other jurisdictions have found that deprivations of physical liberty . . . are the sort of actual and imminent injuries that constitute irreparable harm." (collecting cases)); *Sec. & Exch. Comm'n v. Bankers All. Corp.*, No. 95-cv-0428 (PLF), 1995 WL 317586, *6 (D.D.C. 1995) ("As for the question of irreparable harm in the absence of a stay, clearly [defendant] will be harmed by being

incarcerated."); *Barwood, Inc. v. District of Columbia*, 1999 U.S. Dist. LEXIS 21427, at *18 (D.D.C. Feb. 16, 1999), *overruled on other grounds*, 202 F.3d 290 (D.C. Cir. 2000) ("[T]here can be no injury more irreparable than being illegally arrested."). "Unlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

In line with these cases involving arrests and detentions, this Court easily finds that the individual plaintiffs and CASA members face irreparable injury under defendants' policy and practice of making unlawful warrantless immigration arrests. Indeed, "being shackled and detained" is so "serious [an] infringement on one's personal freedoms" that even "a few hours" of detention has been found to constitute irreparable harm. *See N.S. v. Hughes*, 335 F.R.D. 337, 351-52 (D.D.C. 2020), *injunction vacated on other grounds sub nom. N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025). Here, plaintiffs have been arrested and detained for periods ranging from hours to weeks. *See* N.S. Decl. ¶ 23 (detained for a month); Escobar Molina Decl. ¶¶ 5, 14 (detained for a day and a half); B.S.R. Decl. ¶¶ 12, 19-20 (detained approximately 14 hours); R.S.M. Decl. ¶¶ 2, 12 (detained approximately 12 hours).

The irreparability of the threatened injury is further intensified by "inhumane and devastating" conditions plaintiffs will likely face upon another detention, *see* Pls.' Prelim. Inj. Mot. at 28, including being screamed at by federal officials, Escobar Molina Decl. ¶ 7; N.S. Decl. ¶ 13; Y.R.M. Decl. ¶ 8, held in overcrowded and frigid cells, Escobar Molina Decl. ¶ 11; B.S.R. Decl. ¶ 18; Julio Decl. ¶ 6; B.R.G. Decl. ¶ 5, denied sufficient food, N.S. Decl. ¶ 14; Escobar Molina Decl. ¶ 11; B.S.R. Decl. ¶ 18; Camilo Decl. ¶ 7, denied access to restrooms, M.P. Decl. ¶ 8, denied adequate sleep, Escobar Molina Decl. ¶ 11; B.S.R. Decl. ¶ 18; B.R.G. Decl. ¶ 6; M.P. Decl. ¶ 10, denied timely medical care, Cristina Decl. ¶ 8; Gracia Decl. ¶ 6; Carlos Peña Decl.

¶ 12, forced to drink water from the toilet, Y.R.M. Decl. ¶ 5, and moved constantly between different locations, N.S. Decl. ¶¶ 12-22; Escobar Molina Decl.¶¶ 9-13; Camilo Decl. ¶¶ 7-8; Y.R.M. Decl. ¶ 6. Such "harm from detention surely cannot be remediated after the fact and is a quintessential irreparable harm." *Make the Rd. New York v. Noem*, No. 25-cv-190 (JMC), 2025 WL 2494908, at *20 (D.D.C. Aug. 29, 2025) (internal quotation marks omitted).

### 3. *Balance of the Equities and the Public Interest*

The last two preliminary-injunction factors, merged in this case where the government is a party, also favor plaintiffs. Federal agencies "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). As the D.C. Circuit has made clear, "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). For this reason, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Defendants point to a parade of horribles that may ensue if plaintiffs' original proposed injunction were granted and argue vigorously that the "balance of the equities and public interest tips decisively in Defendants' favor." Defs.' Opp'n at 32. To bolster this point, defendants initially described two negative effects of the proposed injunction: (1) the "injunction would throw a central element of immigration enforcement, immigration arrests, into intolerable uncertainty," which would "risk unintended operational consequences and public-safety concerns," and (2) "such an injunction would inject the judiciary into micromanaging every operation and stop conducted in a district of 700,000 people," because "[p]laintiffs would risk nothing by alleging each arrest violates

the injunction," potentially subjecting the government to endless contempt proceedings. Defs.' Opp'n at 29, 32. At oral argument, defendants' counsel clarified that the "operational consequences" and "intolerable uncertainty" were "related to the second" concern regarding the potential for time-consuming and potentially "chill[ing]" contempt proceedings. Hr'g Tr. 91:4, 92:13. Since officers are already required to fill out a form to "describe the basis for the civil immigration arrest," *id.* at 91:24-25, the operational consequences of reporting the probable cause reasons for such an arrest appear to be minimal. Moreover, while defendants point to "public-safety concerns" and the "myriad significant economic and social problems caused by illegal immigration," Defs.' Opp'n at 32 (quoting *Perdomo*, 2025 WL 2585637, at *12-13), the requested injunction would allow all aspects of immigration enforcement to continue, within the express bounds of the INA, as interpreted to align with the Fourth Amendment, *see Au Yi Lau*, 445 F.2d at 222; Hr'g Tr. 41:1-2 (plaintiffs' counsel stating, "We are not challenging the government's ability to make a lawful immigration arrest.")

Defendants' second concern—that the injunction will subject defendants and their agents to a never-ending flurry of contempt proceedings and invite "micromanaging" by the Court—is well-taken. Defs.' Opp'n at 32. As defendants note, "probable cause is a fact-specific, totality of the circumstances inquiry." *Id.* at 29 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). Thus, plaintiffs' original proposed relief, which would enjoin defendants and their agents "from making warrantless immigration arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained," *see* Pls.' Original Proposed Order at 2, ECF No. 17-28, could be read to encompass individual mistaken or overzealous civil immigration arrests which, while perhaps unlawful, are not a consequence of defendants' challenged policy. Although plaintiffs indicate that they "are

not challenging the specific facts of every single arrest" and "whether the probable cause determination was erroneous," Hr'g Tr. 47:23-25, the original proposed injunction posed the risk of allowing exactly such challenges via contempt proceedings. *See Canadian Club Corp. v. Canada Dry Ginger Ale*, 60 F.2d 785, 788 (3d Cir. 1932) (modifying proposed injunction when plaintiffs' version "might, conceivably, provoke endless contempt proceedings").

Plaintiffs' revised proposed order submitted after the hearing resolves defendants' legitimate concern about judicial micromanagement of individual civil immigration arrests and tips the balance of the equities in plaintiffs' favor. *See* Pls.' Revised Proposed Order, ECF No. 62-1; Hr'g Tr. 49:20-21 (Court directing plaintiff to "go back and wordsmith" the injunction to ensure these concerns are resolved). Rather than enjoining the warrantless arrests themselves, the newly proposed injunction enjoins defendants from "enforcing their *policy and practice* of making warrantless civil immigration arrests" without a probable cause finding of escape risk. Pls.' Revised Proposed Order ¶ 1 (emphasis added). This revision avoids the prospect of contempt proceedings for individual erroneous arrests, bolstered by plaintiffs' inclusion of a requirement that parties meet and confer regarding any alleged noncompliance prior to initiating contempt proceedings. *Id.* at 4. Defendants continue to express concerns that the "revised proposal would still require the Court to review the circumstances behind individual arrests and adjudicate whether a given arrest was lawful." Defs.' Amend. Supp. Br. at 3. Any such inquiry would be part of a larger inquiry into whether the defendants were continuing to apply a *policy* of making such arrests unlawfully, with individual arrests as evidence, rather than as individual violations themselves. *See Potter v. District of Columbia*, 126 F.4th 720, 723 (D.C. Cir. 2025) (contempt proceedings require "'clear and convincing evidence'" of violation of "'clear and unambiguous' order of the court" (quoting *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993))).

With the defendants' "separation of powers" concerns regarding judicial micromanagement of immigration arrests resolved, *see* Defs.' Opp'n at 33, the balance of equities and the public interest favor entry of a preliminary injunction. The revised injunction sought by plaintiffs requires only that defendants remedy ongoing violations of the law and take steps to communicate the boundaries of the law to their agents. *See* Pls.' Revised Proposed Order ¶¶ 1-2; *see Robbins*, 715 F.3d at 1146 (finding that "the public interest . . . benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional questions").

Plaintiffs have thus satisfied the requirements to enjoin preliminarily defendants from enforcing a policy, evinced in the statements of senior officials and the conduct of field-level agents, of making warrantless civil immigration arrests without a probable cause assessment as to the likelihood of escape before a warrant can be obtained. Whether plaintiffs qualify for class-wide relief will be discussed next.

### C. Provisional Class Certification

Plaintiffs seek provisional certification of the following class for the purposes of their request for preliminary injunctive relief:

> **Unassessed Escape Risk Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

Pls.' Revised Proposed Order at 2, ECF No. 62-1 (with original name "Flight Risk Subclass" modified herein to "Unassessed Escape Risk Subclass"). For the reasons discussed below, provisional certification of the Unassessed Escape Risk Class is appropriate.

Separate from a request for provisional class certification, plaintiffs also move for final certification of the following broader class and an additional subclass to the Unassessed Escape Risk Class:

> **Warrantless Arrests Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.
>
> **Immigration Status Subclass**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully.

Pl.'s Revised Proposed Order at 1-2, ECF No. 62-2. Since factual disputes remain with respect to what law enforcement personnel knew about the proposed class representatives' legal statuses prior to their arrests, plaintiffs' motion for final class certification is reserved for a later time.[48]

Given the preliminary posture of the case, plaintiffs "need only provisional class certification in order for the Court to grant their preliminary injunction," *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018) (emphasis omitted). Indeed, courts in this district have commonly granted provisional class certification for the purposes of granting a preliminary injunction. *See, e.g.*, *L.G.M.L. v. Noem*, No. 25-cv-2942, 2025 WL 2671690, at *21 (D.D.C. Sept. 18, 2025); *Charles H. v. District of Columbia*, 2021 WL 2946127, at *14 (D.D.C. June 16, 2021);

[48] Specifically, the parties dispute, for example, whether the arresting officers had reason to believe the named plaintiffs were in the United States unlawfully prior to making warrantless civil immigration arrests. Plaintiffs contend that, with respect to Escobar Molina and B.S.R., the law enforcement personnel who arrested them did not have probable cause as to removability, because the officers did not ask any questions related to immigration status before conducting the arrests. *See* Pls. Class Cert. Mot. at 14; Pls.' Notice of Filing Revised Proposed Orders for Plaintiffs' Motions at 4 & n.2. On the other hand, defendants assert that Escobar Molina and B.S.R. were "specifically targeted" by immigration enforcement personnel "based on information in law enforcement records," Supp. Blanchard Decl. ¶ 8, which underlying records defendants have not submitted to the court as evidence. Given this factual issue, determination of plaintiffs' final class certification motion—which seeks certification not only of the Unassessed Escape Risk Class but also of the broader Warrantless Arrests Class and the Immigration Status subclass—will be addressed at a subsequent time.

*P.J.E.S. by and through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 501-02 (D.D.C. 2020); *Damus*, 313 F. Supp. 3d at 328-35; *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017); *R.I.L.-R.*, 80 F. Supp. 3d at 191. "In granting such provisional certification, the Court must still satisfy itself that the requirements of [Federal Rule of Civil Procedure] 23 have been met." *Damus*, 313 F. Supp. 3d at 329. "Provisional certification does not lessen the rigor of Rule 23," *L.G.M.L.*, 2025 WL 2671690, at *7, but the court proceeds with the understanding that "[a]n order that grants . . . class certification may be altered or amended before final judgment," FED. R. CIV. P. 23(c)(1)(C).

Under Rule 23, a class may be certified only if the class satisfies all the requirements in Rule 23(a) and the requirements in one of the three subparagraphs of Rule 23(b). Rule 23(a) contains four requirements: "numerosity, commonality, typicality, and adequacy of representation." *Amgen v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (discussing FED. R. CIV. P. 23(a)(1)-(4)). Once plaintiffs show that the prerequisites listed in Rule 23(a) are met, they must fit their class within one of three "types of class actions" listed in Rule 23(b). FED. R. CIV. P. 23(b). As relevant here, to certify a class under Rule 23(b)(2), plaintiffs must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.* Plaintiffs have satisfied these requirements for provisional class certification purposes, as reviewed below, following discussion of defendants' jurisdictional objections.

***1. Jurisdiction***

As two threshold matters, defendants contend that the court should not certify the proposed class or subclasses because "[p]laintiffs lack standing to seek class certification," and "Section

1252(f)(1) prohibits the Court from issuing class wide relief." Defs.' Opp'n at 34; *see* Def.'s Amend. Supp. Br. at 5. Neither argument holds water.

With respect to plaintiffs' standing to certify a class, defendants rehash the same arguments they raised to challenge plaintiffs' individual standing. *See* Defs.' Opp'n at 34-35. As already explained, defendants' standing argument fails. *See supra* Part III.B.1(a)-(b). Nor does 8 U.S.C. § 1252(f)(1) strip jurisdiction to issue APA or class-wide injunctive relief requiring defendants to comply with § 1357(a)(2), for the simple reason that § 1357(a)(2) does not fall within § 1252(f)(1)'s bar on injunctive relief, which bar applies only to the covered INA provisions in 8 U.S.C. §§ 1221-1232.

Defendants try to shoehorn § 1357(a)(2) into the enumerated covered INA provisions, arguing that because among the covered provisions are § 1226 governing arrests and detention with an administrative warrant and § 1229 governing the initiation of removal proceedings, enjoining DHS's implementation of § 1357(a)(2) will "necessarily interfere[] with operation of Sections 1226 and 1229." Defs.' Opp'n at 36; *see* Defs.' Amend. Supp. Br. at 6 (also referencing § 1231, which governs mandatory detention pending removal, and § 1225, which governs arrest and detention of arriving aliens, neither of which was mentioned in defendants' original briefing). Similarly, defendants argue that because *some* parts of 8 C.F.R. § 287, which contains the implementing regulation for 8 U.S.C. § 1357(a)(2), rely upon or cross-reference covered INA provisions, § 1252(f)(1) strips jurisdiction to grant the plaintiffs' requested injunction based on 8 C.F.R. § 287.8(c)(2), which derives its power solely from 8 U.S.C. § 1357(a)(2). *See* Defs.' Amend. Supp. Mem. at 7. In essence, defendants argue that because the government must first arrest someone in order to detain them, any injunction affecting the way arrests are made will necessarily affect the "operation of" provisions governing detention. *See id.* at 6 ("A warrantless

arrest under section 1357(a)(2) is simply a threshold exception to arrest by warrant . . . , and after the arrest, detention may proceed under sections 1225, 1226, and 1231 no differently."). Such a reading would give § 1252(f)(1) a meaning without any limiting principle, expanding the provision far beyond its terms to strip district courts of jurisdiction over all kinds of matters not expressly covered. Under defendant's reading, *any* class-wide injunction that has downstream effects on the detention of unlawful immigrants might be barred by § 1252(f)(1), even if the injunction arose under non-covered provisions the INA or even under some other statute. The Supreme Court has rejected such a reading of this class-action bar provision, noting instead that "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022) (emphasis in original).

Defendants rely on cases that, ironically, only confirm the inapplicability of the § 1252(f)(1) bar here. In *N.S. v. Dixon*, the D.C. Circuit overturned an overbroad injunction that prohibited the U.S. Marshals from making *any* immigration arrests—whether with an administrative warrant (governed by § 1226) or without (governed by § 1357). 141 F.4th 279, 289 (D.C. Cir. 2025); *see* Defs.' Opp'n at 36-37. Here, plaintiffs seek an injunction restraining only warrantless civil immigration arrests governed by § 1357(a)(2), which is not covered by § 1252(f)(1). *See* Pls.' Revised Proposed Order. Defendants also emphasize that under *Garland v. Aleman Gonzalez*, § 1252(f)(1) covers "not just [] the statute itself but [] the way that it is being carried out," and argue that § 1252(f)(1) therefore bars any injunction that in some way affects the operation of one of the covered sections. Defs.' Opp'n at 36 (cleaned up in original) (quoting *Aleman Gonzalez*, 596 U.S. at 550). In *Aleman Gonzalez*, however, the question was whether § 1252(f)(1) barred injunctions as to regulations or policies implementing §§ 1221-1232, or just

injunctions that would halt the enforcement of statutory provisions altogether by, for example, holding an entire provision of the INA unconstitutional. *Aleman Gonzalez*, 596 U.S. at 550, 553-54. Indeed, the Court clarified that *Aleman Gonzalez* did not mean that courts must refrain from issuing injunctions that might have "some collateral effect" on §§ 1221-1232. *Id.* at 554 n.4.

Confirming the limits of *N.S.* and *Aleman Gonzalez*, the Ninth Circuit considered and rejected a similar argument by DHS in *Gonzales v. Department of Homeland Security*, 508 F.3d 1227, 1232-33 (9th Cir. 2007). In that case, plaintiffs sought to enjoin DHS from denying certain applications for permission to reapply for admission to the United States after being removed previously, a process governed by § 1255(a) of the INA, which is not covered by § 1252(f)(1). *Id.* at 1230. DHS pointed out that, after such an application is denied, the next step is a proceeding to reinstate the order of removal that was originally used to remove the noncitizen—a process governed by § 1231(a)(5) of the INA, a provision that is covered by § 1252(f)(1)'s bar on class-wide injunctions. *Id.* at 1232-33. According to DHS, an injunction affecting reapplications for admission would affect the operation of a covered provision, since rejecting a noncitizen's reapplication was a step toward reinstatement of a removal order. *Id.* The Ninth Circuit squarely rejected that argument because the injunction "implicates . . . [a] provision which falls under part V [rather than part IV, the part covered by § 1252(f)(1)], notwithstanding that a reinstatement proceeding may be a collateral consequence of an unsuccessful . . . application." *Id.* at 1233. The exact same logic applies here. Just because a warrantless civil immigration arrest, governed by § 1357(a), may lead to detention or other consequences governed by §§ 1221-1231 does not mean that an injunction implicating § 1357(a)(2) is effectively an injunction impairing the operation of the covered sections. *See Refugee & Immigr. Center for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 107 (D.D.C. 2025) (injunction requiring compliance with asylum law governed by

non-covered provisions was permissible even if the injunction "might have downstream effects on removal proceedings" covered by § 1252(f)(1)). Section 1252(f)(1) thus poses no bar to the exercise of jurisdiction to issue a class-wide injunction here.[49]

### *2. Rule 23(a) Factors*

a. Numerosity

To satisfy numerosity, the class representatives must demonstrate that the "class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The requirement imposes no "hard rules for when joinder will be found to be impracticable," *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015), but "[g]enerally speaking, courts have found that a proposed class consisting of at least forty members will satisfy the impracticability requirement," *Bynum v. D.C.*, 214 F.R.D. 27, 32 (D.D.C. 2003). In addition, "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'" *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (quoting 1 Rubenstein, Newberg on Class Actions § 3:15); *see also Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975) ("Smaller classes are less objectionable where . . . the plaintiff is seeking injunctive relief on behalf of future class members as well as past and present members.").

Numerosity in this case is straightforward. Indeed, defendants concede that plaintiffs have "identif[ied] roughly forty alleged instances" of unlawful arrests in their declarations alone. Defs.' Opp'n at 38. Plaintiffs further indicate that "ICE made around 1,200 arrests" from early August until mid-September, and that "[m]ass immigration arrests in D.C. remain ongoing." Pls.' Prelim.

---

49 Defendants devote several pages in their supplemental briefing to arguing that § 1252(f)(1) would also prohibit declaratory relief or a stay of agency action. Defs.' Amend. Supp. Mem. at 7-12. Since neither type of relief will be granted at this stage, those questions are not reached.

Inj. Mot. at 5 (citing Widas Decl., Ex. 10 (reporting information received from "officials with knowledge of the data")[50]). Defendants fault plaintiffs' inability to identify exactly "how many of the 1,200 ICE arrests were made subject to an impermissible policy and practice," Defs.' Opp'n at 38, but in considering "the number of potential class members, the Court need only find an approximation of the size of the class, not an exact number of putative class members." *Coleman*, 306 F.R.D. at 76 (internal quotation marks omitted). Here, plaintiffs have plainly demonstrated that the proposed class consists of at least 40 members, and likely many more than that. *See Bynum*, 214 F.R.D. at 32.

b. Commonality

To satisfy commonality, the class representatives must establish that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). A common question is one that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). In other words, "the class must show that its theory can be proved on a classwide basis." *Brown v. D.C.*, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (internal quotation marks omitted).

Here, plaintiffs have satisfied the commonality requirement because their provisional class seeks to challenge a system-wide practice or policy affecting all putative class members—namely, defendants' alleged policy and practice of conducting warrantless civil immigration arrests without the required finding of escape risk. The alleged policy "appl[ies] equally and generally to the entire class," *Steele v. United States*, 159 F. Supp. 3d 73, 80 (D.D.C. 2016), and thus "the truth or falsity of these questions would 'resolve an issue that is central to the validity of each one of the

---

50 Widas Decl., Ex. 10, ECF No. 17-1 at 61 (*How Washington Became a Testing Ground for ICE* at 5).

claims in one stroke,'" *id.* (quoting *Wal-Mart*, 564 U.S. at 349-50). *See also, e.g.*, *DL v. D.C.*, 713 F.3d 120, 127-28 (D.C. Cir. 2013) (noting that commonality can be established by showing "widespread" wrongdoing by a defendant through a "uniform policy or practice that affects all class members."); *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 483 (D.D.C. 2019) (holding that it was "more than sufficient to meet the commonality requirement" when class members "were subject to the same work policies and practices" (internal quotation marks omitted)); *Damus*, 313 F. Supp. 3d at 332 (holding commonality satisfied where plaintiffs "sufficiently identified a common cause and injury as a result of the [challenged policy,] the current parole regime").

Contrary to defendants' contentions, the legality of the challenged policy and practice is not a question that requires wading into "fact-specific and individualized" determinations about each class members' arrest. Defs.' Opp'n at 40. As plaintiffs explain, they do not challenge whether the agents actually had probable cause to arrest each putative class member, but rather whether defendants were making pre-arrest individualized assessments for "flight risk *at all*, across the entire class." Pls.' Reply at 35-36 (emphasis in original). Indeed, a district court in California rejected a similar argument by defendants in a case challenging Border Patrol agents' alleged arrest and detention of farm workers without reasonable suspicion or probable cause. *See United Farm Workers*, 785 F. Supp. 3d at 725. There, the court found that defendants' characterization of escape risk assessments as "inherently individualized determinations" "misse[d] the mark," because the plaintiffs "d[id] not contend Border Patrol erred in assessing flight risks; they contend[ed] that the probable cause determinations were not performed *at all*." *Id.* (emphasis in original).

Other courts have reached similar conclusions. *See also, e.g.*, *L.G.M.L.*, 2025 WL 2671690, at *8 (noting that "the potential factual differences that Defendants identify," in a class suit challenging the hasty expulsion of "certain unaccompanied alien children . . . back to their

home country of Guatemala," "do not affect Plaintiffs' entitlement to relief on their claims about statutorily and constitutionally required *process*" (emphasis in original) (internal quotation marks omitted)); *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) ("Indeed, (b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct."); *Moreno v. Napolitano*, 2014 WL 4911938, at *8 (N.D. Ill. Sept. 30, 2014) ("Defendants . . . misunderstand the nature of Plaintiffs' claims. Rather than challenge the reasonableness or constitutionality of each individual decision to issue a detainer, Plaintiffs are challenging the general policies and procedures used by Defendants when issuing detainers."). Plaintiffs thus satisfy the commonality requirement.

c. Typicality

To satisfy typicality, the class representatives must show that "the claims or defenses of the representative parties are typical of the claims or defenses of class." FED. R. CIV. P. 23(a)(3). "The requirement for typicality is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Stephens*, 329 F.R.D. at 483. Varying fact patterns "do[] not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001). The commonality and typicality inquiries "tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

The proposed class representatives' claims in this case are typical of those of the putative class members. Each plaintiff alleges he was arrested without a warrant and without consideration

of escape risk. *See* Escobar Molina Decl. ¶¶ 5-8 (arresting agents did not ask any questions about immigration status or ties to the community before arresting without a warrant); B.S.R. Decl. ¶¶ 14-16 (did not ask about immigration status or ties to the community); R.S.M. Decl. ¶¶ 3-6 (did not ask about ties to the community); N.S. Decl. ¶¶ 5-7 (did not ask about ties to the community). Thus, notwithstanding the "individual factual circumstances" behind each arrest, Defs.' Opp'n at 42, individual plaintiffs at bottom "suffered a similar injury from the same course of conduct," *Bynum*, 214 F.R.D. at 34. *See also, e.g.*, *Damus*, 313 F. Supp. 3d at 334 ("Although the specific details of each named Plaintiff's parole adjudication may vary, the crux of their allegations is typical of the claims of the putative class that the Government is no longer providing asylum-seekers with the individualized determinations and opportunities for release required under the Directive."); *Gonzalez v. U.S. Immigr. Customs Enf't*, 975 F.3d 788, 810-12 (9th Cir. 2020) (finding typicality despite the purportedly "unique" factual circumstances of plaintiff's probable cause determination, because plaintiff's legal claim was "no different than [that of] any other class member"); *Kidd v. Mayorkas*, 343 F.R.D. 428, 439 (C.D. Cal. 2023) (finding typicality despite "factual differences across various ICE encounters," because "[p]laintiffs do not . . . seek a declaration or injunction directed at any individual ICE encounter" but rather "challenge ICE's policies or practices on a systemwide basis."). Typicality is also satisfied.

d. Adequacy

Finally, to satisfy adequacy, the representative parties must show they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy requirement "embraces two components: the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute

the interests of the class through qualified counsel.'" *J.D.*, 925 F.3d at 1312 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

The proposed class representatives in this case are adequate. With respect to the first element, the proposed class representatives do not have antagonistic or competing interests with the unnamed members of the class. Plaintiffs and putative class members all are subject to defendants' policy and practice with respect to making warrantless civil immigration arrests without consideration of escape risk, risk suffering similar injuries including detention and separation from their families, and share a common interest in ensuring the protection of their rights. *See generally* Escobar Molina Decl. ¶¶ 22-28; B.S.R. Decl. ¶¶ 26-33; N.S. Decl. ¶¶ 27-33; R.S.M. Decl. ¶¶ 18-24.

With respect to the second element, the proposed class representatives are able to vigorously prosecute the interests of the class through qualified counsel. Courts typically find proposed class representatives inadequate in "flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 210-11 (D.D.C. 2018). None of these concerns are present here. The proposed class representatives are represented by very capable counsel from Covington & Burling LLP and a number of civil rights organizations, whose adequacy is not contested. *See* Defs.' Opp'n at 43-44; *see also* ECF Nos. 19-1 to 19-6 (detailing proposed class counsel's credentials and experience with class actions). Plaintiffs also attest that they understand the responsibility of being a class representative and are willing to protect the class's interests. *See* Escobar Molina Decl. ¶¶ 22-28; B.S.R. Decl. ¶¶ 26-33; N.S. Decl. ¶¶ 27-33; R.S.M. Decl. ¶¶ 18-24. The proposed class representatives satisfy the adequacy requirement.

### *3. Rule 23(b)(2) Requirements*

A Rule 23(b)(2) class may be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360 (internal quotation marks omitted). Accordingly, Rule 23(b)(2) has been interpreted as imposing two requirements: (1) the defendant's action or refusal to act must be generally applicable to the class, and (2) plaintiff must seek final injunctive relief or corresponding declaratory relief on behalf of the class. *See Steele*, 159 F. Supp. 3d at 81; *Bynum*, 214 F.R.D. at 37–38; *R.I.L-R*, 80 F. Supp. 3d at 182.

Plaintiffs' proposed class suit satisfies both requirements. First, plaintiffs challenge what they allege to be a systemic policy and practice of effectuating warrantless arrests without probable cause, and thus defendants' challenged actions are "generally applicable to the class." *Steele*, 159 F. Supp. 3d at 81. Second, enjoining such a policy and practice "would provide relief to each member of the class," *Wal-Mart*, 564 U.S. at 360, by prohibiting defendants from arresting class members without an administrative warrant and without probable cause that the person is an escape risk.

Defendants' objection to Rule 23(b)(2) certification stems from similar grounds to their objections regarding commonality and typicality, arguing that "each arrested alien has a unique set of circumstances and unique avenues for seeking relief." Defs.' Opp'n at 44. Again, this argument is unpersuasive because plaintiffs are only challenging defendants' general policy and

practice of conducting warrantless arrests without probable cause; they "are not asking for this Court to remedy discrete errors," *Damus*, 313 F. Supp. 3d at 334.

Indeed, Rule 23(b)(2) exists precisely "so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." *DL v. D.C.*, 860 F.3d 713, 726 (D.C. Cir. 2017). As such, courts have regularly certified classes challenging immigration-related policies. *See, e.g.*, *J.D.*, 925 F.3d at 1312 (upholding certification of pregnant noncitizen unaccompanied minors in the government's custody who challenged the government's alleged "across-the-board ban on access to abortion"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306, 2025 WL 1825431, at *46 (D.D.C. July 2, 2025) (certifying Rule 23(b)(2) class of all individuals subject to a presidential proclamation that declared an "invasion" of noncitizens across the southern border and limited the ability of those noncitizens to apply for asylum or a withholding of removal); *R.I.L-R*, 80 F. Supp. 3d at 182 (certifying Rule 23(b)(2) class of noncitizen plaintiffs challenging an alleged DHS policy of "denying release to all asylum-seeking Central American families in order to deter further immigration"); *L.G.M.L.*, 2025 WL 2671690, at *7 (provisionally certifying Rule 23(b)(2) class "of all unaccompanied alien children from Guatemala in (and who will be in) [the government's] custody" who challenge their hasty expulsion back to their home country); *United Farm Workers*, 785 F. Supp. 3d at 731 (provisionally certifying two classes, one challenging detentive stops without reasonable suspicion and another challenging warrantless arrests without consideration of flight risk), *appeal docketed*, No. 25-4047 (9th Cir.). This case is no different, and Rule 23(b)(2) provisional class certification is granted.

**D. Relief and Bond**

***1. Relief***

Plaintiffs have demonstrated a likelihood of success on the merits of their challenge to defendants' policy and practice of making warrantless civil immigration arrests without an individualized determination supporting a probable cause finding of escape risk, as well as the likelihood of their irreparable harm and the balance of equities in their favor. *See supra* Part III.B.1. Additionally, they have shown entitlement to provisional class certification as to their Unassessed Escape Risk Class. *See supra* Part III.C. Accordingly, an injunction will issue against defendants' unlawful policy and practice of making warrantless civil immigration arrests without probable cause that the individual is likely to escape before a warrant can be obtained.

"Every order granting an injunction," including a preliminary injunction, "must . . . state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d)(1). Although an injunction may not "order[] the defendant simply to refrain from violating the law 'in any particular' or from breaching a general duty," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 665 F.2d 1310, 1317 (D.C. Cir. 1981) (quoting *Russell C. House Transfer & Storage Co. v. United States*, 189 F.2d 349, 351 (5th Cir. 1951)), an injunction will "not [be] too vague if it relate[s] the enjoined violations to the context of the case," *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009).[51]

---

[51] Defendants characterize plaintiffs' requested relief as an "impermissible 'follow the law' injunction." Defs.' Opp'n at 29 (capitalization altered). Yet, there is no bar on injunctions that order the defendant to cease conduct identified as violating a statute. *See, e.g.*, *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 189, 191-92 (1949) (enforcing an injunction not to violate specific provisions of the FLSA as to plaintiff class); *Philip Morris USA*, 566 F.3d at 1137 (permitting injunctions that "track[] the language of the statute," so long as the terms are concrete enough to be followed). In any case, plaintiffs request injunctive relief beyond the plain terms of the statute. *See* Pls.' Revised Proposed Order.

Defendants have adopted a policy of making arrests using a deficient standard under both the INA and well-settled constitutional principles. *See supra* Part III.B.1(d)-(e). An injunction directing defendants to cease applying such policy and instead to instruct their agents to arrest members of the plaintiff class in compliance with the law—i.e., only after establishing probable cause that they are likely to escape before a warrant can be obtained—is entirely reasonable and sufficiently specific for defendants to follow. *See* Pls.' Revised Proposed Order ¶ 1.[52] While defendants have submitted declarations indicating that at least ICE and CBP agents have historically been trained on the correct standard for warrantless arrests, *see* Simon Supp. Decl. ¶ 5; Blanchard Supp. Decl. ¶ 7, plaintiffs' proposed injunction requires defendants to transmit the injunction itself to *all* agents of *all* defendants who might have responsibilities related to the Order, *see* Pls.' Revised Proposed Order ¶ 2—clarifying for defendants' field officers any confusion caused by senior officials' statements that "reasonable suspicion," rather than probable cause, should be used to make arrests. *See, e.g.*, Widas Decl., Ex. 17 (quoting DHS public statement that "DHS law enforcement uses 'reasonable suspicion' to make arrests"); Second Widas Dec., Ex. 2 (quoting Chief Border Patrol Agent Gregory Bovino as stating, "We need reasonable suspicion to make an immigration arrest . . . . You notice I did not say probable cause, nor did I say I need a warrant." ).

Plaintiffs' request for reporting will also be granted as part of the preliminary injunction. *See* Pls.' Revised Proposed Order ¶¶ 3-5.[53] Defendants object that the proposed reporting

---

[52] Defendants' concern that the injunction originally sought by plaintiffs would subject defendants to regular contempt proceedings in which defendants would have to lodge a "fact-specific, totality-of-the-circumstances" defense of individual arrests, Defs.' Opp'n at 29, has been resolved by plaintiffs' revised proposed injunction, as discussed *supra* Part III.B.3.

[53] Additionally, plaintiffs' proposed meet-and-confer requirements are, as defendants say, "essentially imbedded in Local Civil Rule 7(m)," Defs.' Amend. Supp. Mem. at 3, but include slightly more detail as to the timeline and method for conferral, *see* Pls.' Revised Proposed Order ¶¶ 6-8. These requirements will promote efficient administration and enforcement of the injunction and will be included in the order of the Court.

requirements, which would require defendants and their agents to "document the facts and circumstances surrounding [each] warrantless civil immigration arrest in narrative form" including "the specific, particularized facts that supported the agent's pre-arrest probable cause to believe that the person [was] likely to escape before a warrant [could] be obtained," Pls.' Revised Proposed Order ¶ 3, would "subject the Government to on-going and rolling discovery even though Plaintiffs brought claims solely under the Administrative Procedure Act" and thereby "convert the Court into one that constantly supervises mini-discovery disputes." Defs.' Amend. Supp. Br. at 4. These concerns do not outweigh the benefits of the proposed reporting requirements. While in APA cases "the focal point for judicial review should be the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), this reporting is not aimed at assisting plaintiffs in proving their underlying APA case, but rather at ensuring compliance with the court-ordered preliminary injunction, especially given that defendants appear unable to keep their policies straight between the high-ranking DHS officials, DHS counsel, and other levels of management. *See* Hr'g Tr. 59:21-22 (defendants' counsel confirming reasonable suspicion is not a lawful basis to make a civil immigration arrest); *id.* 60:5-6 (defendants' counsel admitting that "communications people in the government" made statements that reasonable suspicion does provide a basis for civil immigration arrests); Supp. Blanchard Decl. ¶ 7 (stating that "CBP instructs its law enforcement personnel that to conduct a warrantless civil immigration arrest pursuant to 8 U.S.C. § 1357(a)(2) there must be probable cause" but not contradicting the statements by DHS leadership that "reasonable suspicion" is used). Even if plaintiffs could use some of the information disclosed in later stages of litigation, the reporting requirements are still permissible because courts may allow discovery in APA cases when "[t]he agency action challenged . . . is unlike the actions normally challenged in APA cases, such as a promulgated regulation." *AFL-CIO v. Dep't of Lab.*, 349

F.R.D. 243, 248 (D.D.C. 2025), especially when discovery is needed to "ascertain the contours of the precise policy at issue," *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)).

The balance of the equities also tips in favor of ordering the defendants to provide information about individual arrests to plaintiffs while the preliminary injunction is in place. Notably, the reporting requirements are not unduly burdensome given that defendants' counsel conceded at trial that agents making immigration arrests "already fill out" a form for each arrest that "should" include the facts giving rise to probable cause to make the arrest. Hr'g Tr. 91:11-25.

On the other hand, the reporting requirements support the public interest and the administrability of the preliminary injunction order given the substantial ambiguities in the record about who is making these civil immigration arrests, whether these officers have the required training to do so, and on what basis these officers are making such arrests. For instance, when N.S. was arrested, one officer wore a vest that said "DEA" but a badge that said "ICE," and none of the arresting officers identified themselves, N.S. Decl. ¶ 4, but the government was unable to clarify at oral argument why an agent would have been wearing the insignia of multiple agencies, Hr'g Tr. 85:14-25. Reports of masked agents making what appear to be civil immigration arrests without identification or explanation are widespread, *see* Antony Doe Decl. ¶ 4; Mateo Doe Decl. ¶ 6; B.R.G. Decl. ¶ 2-3, furthering confusion over who is arresting immigrants and why, *see Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (WBY), 2025 WL 2777659, *40 (D. Mass. Sept. 30, 2025). As Judge Young of the District of Massachusetts recently wrote, "ICE goes masked for a single reason—to terrorize Americans into quiescence." *Id.* The same is true of agents making arrests without identifying themselves or their reasons for the arrest. Transparency

during these arrests "is a matter of honor." *Id.* Requiring defendants to put pen to paper and explain who made each arrest and why constitutes the bare minimum to ensure defendants are compliant with the Constitution, the INA, and this Court's order, given the blatant misstatements about the INA's requirements for such arrests repeatedly espoused by DHS high-ranking officials.

Thus, the injunction requested by plaintiffs with revisions will be entered.

### 2. *Bond*

Defendants request that any injunctive relief be accompanied by a bond pursuant to Federal Rule of Civil Procedure 65(c), which provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Rule 65(c), however, "gives this court broad discretion to determine the appropriate amount of an injunction bond." *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 121 (D.D.C. 2025) (citing *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)). "Exercising that discretion, federal courts typically require substantial bonds only in suits between private parties with significant monetary interests at stake." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 224 (D.D.C. 2025).

Plaintiffs reasonably request the security required by Rule 65(c) to be set at $1.00. Pls.' Prelim. Inj. Mot. at 35 n.2. Courts have commonly found that "in public interest cases," such as this one, "when the risk of harm to the government is non-existent or remote, [only] a nominal bond may be appropriate." *CASA, Inc. v. Trump*, No. 25-cv-201 (DLB), 2025 WL 2257625, *10 (D. Md. Aug. 7, 2025); *see also J.G.G. v. Trump*, 786 F. Supp. 3d 37, 83 (D.D.C. 2025), *vacated and remanded on other grounds*, No. 25-5217, 2025 WL 2317650 (D.C. Cir. 2025) (imposing a $1.00 nominal bond in class suit challenging summary removal of plaintiffs from United States to

El Salvador as violative of due process); *L.G.M.L. v. Noem*, No. 25-cv-2942 (TJK), 2025 WL 2671690, *20 (D.D.C. Sept. 18, 2025) (same bond required, in a class suit challenging the government's plan to expel hastily from the United States certain unaccompanied alien children and send them back to their home country of Guatemala); *Barbara v. Trump*, 790 F. Supp. 3d 80, 104 (D.N.H. 2025) (same bond required, in a suit defending birthright citizenship). This is especially true in cases where plaintiffs seek to "vindicate fundamental rights" under immigration laws, as "given their vulnerable status," plaintiffs "in all likelihood lack the monetary resources necessary to post a bond." *J.G.G.*, 786 F. Supp. 3d at 83. Accordingly, plaintiffs in this case are directed to collectively post a nominal bond of $1.00.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs' Motion for a Preliminary Injunction, to Stay, and for Provisional Class Certification, ECF No. 17, is **GRANTED IN PART**, as described above, and **DENIED IN PART** as to plaintiffs' request for a stay, pursuant to 5 U.S.C. §706. Plaintiffs' Motion for Class Certification, ECF No. 19, is **DENIED** without prejudice. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: December 2, 2025

**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 25-3417 (BAH)<br><br>Judge Beryl A. Howell |

**ORDER**

Upon consideration of plaintiffs' Motion to Enforce Preliminary Injunction, ECF No. 78, and Motion for Extra-Record Discovery, ECF No. 85, the memoranda and supplemental memoranda and declarations and exhibits attached thereto, in support and opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby—

**ORDERED** that plaintiffs' Motion to Enforce Preliminary Injunction, ECF No. 78, is **GRANTED**; it is further

**ORDERED** that, when conducting civil immigration arrests without a warrant in this District, defendants shall not rely on the probable cause standard or analytical approach set forth in the five-page memorandum from former Acting Director of Immigration and Customs Enforcement, Todd Lyons, *see* Mem. from Todd M. Lyons, Senior Off. Performing Duties of Dir., Re: Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests (Jan. 28, 2026), ECF No. 78-1 (Pls.' Ex. 10); it is further

**ORDERED** that plaintiffs' Motion for Extra-Record Discovery, ECF No. 85, is **GRANTED**; and it is further

**ORDERED** that plaintiffs may serve on defendants requests for production and admission and up to ten (10) interrogatories, and take up to five (5) depositions, and the parties, by May 18, 2026, shall confer and propose to the Court a scheduling order for the expeditious completion of this discovery.

This Order shall remain in effect until further order of the Court.

**SO ORDERED**.

Date: May 7, 2026

**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 25-3417 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

On December 2, 2025, the Court granted in part a motion for a preliminary injunction brought by the nonprofit membership organization CASA, Inc. and four noncitizens, who alleged that law enforcement officers were unlawfully making warrantless civil immigration arrests in the District of Columbia without the required probable cause findings under 8 U.S.C. § 1357(a)(2). In relevant part, the Court preliminarily enjoined defendants—the Department of Homeland Security ("DHS"), its Secretary, and other federal agencies and officers—from enforcing a policy and practice of making warrantless civil immigration arrests without probable cause to believe "that the person being arrested is likely to escape before a warrant can be obtained." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 65 (D.D.C. 2025) (Preliminary Injunction Order) (citing 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)).

Just two months later, plaintiffs filed the instant motion to enforce the December 2, 2025, preliminary injunction, contending defendants have been "[u]ndeterred" and "continue to enforce their unlawful policy and practice, carrying out warrantless immigration arrests without the required probable cause determinations." Pls.' Mot. to Enforce. Prelim. Inj. ("Pls.' Mot. (Enf.)")

at 1, ECF No. 78. Following a hearing and supplemental briefing, the dispute in plaintiffs' motion to enforce the injunction order has narrowed to whether a five-page memorandum—shared nationwide with personnel at Immigration and Customs Enforcement ("ICE"), a component of DHS, about, *inter alia*, the legal standards for warrantless civil immigration arrests—comports with the preliminary injunction. *See* Mem. from Todd M. Lyons, Senior Off. Performing Duties of Dir., Re: Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests (Jan. 28, 2026) ("Lyons Memo"), ECF No. 78-1 (Pls.' Ex. 10). Plaintiffs posit that defendants' continuing conduct and the Lyons Memo's instructions only confirm that the unlawful practice denied by defendants does exist and that "remarkably little has changed" despite the Court's preliminary injunction order. Pls.' Mot. (Enf.) at 18. The Court agrees with this assessment, as explained further below.

Around the same time that plaintiffs filed their motion to enforce the preliminary injunction, plaintiffs also filed a contested motion for extra-record discovery in the underlying action, arguing that defendants' slim eleven-page administrative record "contain[ed] essentially nothing that would aid this Court's review" on the ultimate merits of this case. *See* Pls.' Mot. Extra-Record Discovery ("Pls.' Mot. (Disc.)") at 1, ECF No. 85 (emphasis omitted).

For the reasons discussed below, plaintiffs' motion to enforce the preliminary injunction is granted. Defendants' flawed definition of escape risk to mean only whether an individual will remain at the scene of encounter before an administrative warrant can be obtained, as well as defendants' failure to instruct their agents to consider community ties, violate the December 2, 2025 preliminary injunction order. Further, as explained below, plaintiffs' motion for extra-record discovery is also granted.

## I. BACKGROUND

The following sections summarize the relevant factual and procedural background.

### A. Plaintiffs' Complaint and Motion for Preliminary Injunction

The facts giving rise to plaintiffs' complaint are extensively recounted in an earlier memorandum opinion granting in part plaintiffs' motion for a preliminary injunction. *Escobar Molina*, 811 F. Supp. 3d at 15-27. Rather than rehash the same facts, only the details most relevant to plaintiffs' pending motion to enforce the preliminary injunction are set out below.

Briefly, on August 11, 2025, the current presidential administration declared a "crime emergency" in the District of Columbia and directed mass immigration arrests, prompting the deployment of National Guard troops in the District. Compl. ¶¶ 22, 23, ECF No. 1 (quoting Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025)). Four days later, then-Attorney General Pamela Bondi ordered the Mayor of the District to assist with "locating, apprehending, and detaining aliens unlawfully present in the United States." *Id.* ¶ 23 (quoting Order of the Att'y Gen., Order No. 6372-2025, Restoring Safety and Security to the District of Columbia (Aug. 15, 2025)).

Less than two months later, on September 25, 2025, plaintiffs—four noncitizens and CASA, Inc., a membership organization of immigrants—filed the instant suit under the Administrative Procedure Act ("APA") alleging that "[d]efendants have a policy and practice of making mass civil immigration arrests in Washington, D.C., without a warrant and without the probable cause findings that are required by Congress under federal statute," which "policy and practice are tied to the President's promise to carry out mass immigration arrests and deportations," *id.* ¶ 19. Plaintiffs filed the suit on behalf of themselves and all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a

warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses an escape risk. *Id.* ¶ 62.

Shortly after filing the complaint, on October 3, 2025, plaintiffs filed a motion for a preliminary injunction, to stay agency action, and for provisional class certification. *See* Pls.' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification ("Pls.' Prelim. Inj. Mot."), ECF No. 17.[1] Plaintiffs' preliminary injunction motion sought to enjoin defendants from making warrantless civil immigration arrests without the requisite probable cause findings, as well as provisional class certification for the class of individuals who have or will be arrested pursuant to the challenged policy and practice. Plaintiffs argued that the administration's push for "mass immigration arrests" resulted in defendants instituting a new "arrest first, ask questions later" policy of making warrantless civil immigration arrests without probable cause to believe that the individual is both in the United States unlawfully and an escape risk. *Id.* at 5-6; *see also* ¶¶ 3-5, 19. In support, plaintiffs proffered evidence of defendants' imposition of rising quotas for the number of immigration arrests, *Escobar Molina*, 811 F. Supp. 3d at 44; repeated and incorrect public statements from high-ranking government officials within DHS, ICE and another DHS component, U.S. Customs and Border Protection ("CBP"), that warrantless civil immigration arrests require only a finding of "reasonable suspicion," a lower standard than probable cause, *id.* at 44-45 (citing, e.g., plaintiffs' exhibits of public statements from then-DHS Assistant Secretary for Public Affairs, Tricia McLaughlin; Chief Border Patrol Agent, Gregory Bovino; and Acting Executive Associate Director of ICE

---

[1] Plaintiffs also filed a motion for final class certification with their motion for preliminary injunction and provisional class certification, *see* Pls.' Motion for Class Certification, ECF No. 19, which was denied without prejudice as premature with the precise scope of the challenged policy uncertain, *Escobar Molina*, 811 F. Supp. 3d at 54 (explaining that "[s]ince factual disputes remain with respect to what law enforcement personnel knew about the proposed class representatives' legal statuses prior to their arrests, plaintiffs' motion for final class certification is reserved for a later time").

Enforcement and Removal Operations, Marcos Charles); and on-the-ground examples of roughly forty warrantless civil immigration arrests persuasively indicating that these civil arrests were executed without the requisite probable cause findings, such as findings as to the arrestees' community ties, *id.* at 47.

### B. Preliminary Injunction Order

On December 2, 2025, following a hearing and supplemental briefing, plaintiffs' preliminary injunction motion was granted in part with respect to warrantless civil immigration arrests made without individualized assessment of escape risk, for the provisional class of persons who have or will be subject to this unlawful policy or practice. Although defendants denied that any written memorandum existed memorializing the administration's policy for conducting warrantless civil immigration arrests, defendants' repeated public statements declaring their application of the incorrect "reasonable suspicion" standard were taken "at face value as reflecting the current policy and practice of DHS and federal law enforcement agents making civil immigration arrests," a policy and practice reflected in the approximately forty warrantless civil immigration arrests described in plaintiffs' declarations. *Id.* at 47.

Specifically, defendants were preliminarily enjoined "from enforcing their policy or practice of making warrantless civil immigration arrests in the District of Columbia without a pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)." *Id.* at 65. Given their persistent denial of the challenged policy despite all evidence and officials' public statements to the contrary, defendants were further ordered to comply with reporting requirements, which included: (1) requiring "[a]ny defendant or their agent who conducts a warrantless civil immigration arrest in the District" to, "as soon as

practicable, document the facts and circumstances surrounding the warrantless civil immigration arrest in narrative form"; (2) requiring any descriptions of "individualized assessment of escape risk in the documentation" to include "specific details as to the person being arrested"; and (3) requiring defendants to "release to plaintiffs' counsel the documentation describing defendants' and their agents' warrantless civil immigration arrests within this District" within 30 days of the Order and every 30 days thereafter, or if requested by plaintiffs' counsel concerning specific warrantless arrests, within seven days of the request. *Id.* at 66. Finally, the parties were directed to approach any disputes over defendants' compliance with the order by first meeting and conferring before seeking the Court's intervention with a motion to enforce or a motion to initiate contempt proceedings. *Id.* at 66-67.

### C. Defendants' Actions and Documentation After the Preliminary Injunction

#### *1. Lyons Memorandum*

Less than two months following the entry of the preliminary injunction order, the then-Acting Director of ICE, Todd Lyons, issued, on January 28, 2026, a five-page memorandum to all ICE personnel nationwide outlining the scope of the civil immigration arrest authority for arrests both with and without administrative warrants.[2] As to warrantless arrests, the memorandum instructed officers that there must be "probable cause to believe that: (1) the subject is a removable

---

[2] On April 16, 2026, Todd Lyons announced plans to resign at the end of May 2026, adding one more name to the slew of resignations, demotions, and firings in the last few months of the senior leadership involved in the administration's immigration and law enforcement efforts. *See ICE acting director Todd Lyons will resign at end of May, DHS says*, Associated Press (Apr. 16, 2026), https://perma.cc/6UNT-KXL6. Indeed, few of the senior officials referenced in the Court's December 2, 2025 memorandum opinion remain in their positions. *See Pam Bondi, a Trump loyalist who oversaw Justice Department upheaval, is out as his attorney general*, Associated Press (Apr. 2, 2026), https://perma.cc/5KVE-DJPH (Pamela Bondi, then-Attorney General, fired); *In his words: How Gregory Bovino became a face of Trump's mass deportations and ended his career*, Associated Press (Mar. 17, 2026), https://perma.cc/9G97-GRLA (Gregory Bovino, then-commander-at-large of Border Patrol, demoted); *Trump fires Homeland Security Secretary Noem after mounting criticism over her leadership*, Associated Press (Mar. 5, 2026), https://perma.cc/A4XA-X887 (Kristi Noem, then-DHS Secretary, fired); *Top DHS spokesperson who became a face of Trump immigration policy is leaving*, National Public Radio (Feb. 17, 2026), https://perma.cc/DF24-WSYK (Tricia McLaughlin, then-DHS Assistant Secretary for Public Affairs, resigned).

alien; **and** (2) the subject is 'likely to escape' before a warrant for his arrest can be obtained." Lyons Memo, at 3 (footnotes omitted) (emphasis in original). The memorandum further defined the meaning of "likely to escape," explaining that "an alien is 'likely to escape' if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." *Id.* Piggy-backing on this definition of "likely to escape," the memorandum proceeded to list seven non-exhaustive factors to consider for whether when an alien is "likely to remain at the scene of the encounter":

1. The subject's behavior prior to and during the encounter (e.g., refusal to follow lawful commands, attempts to evade officers, or other suspicious behavior prior to the arrest);[3]

2. The subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle);[4]

3. The subject's age and health;

4. Possession of identity or work authorization documents that the immigration officer suspects are fraudulent;[5]

5. Presentation of unverifiable or suspected false information to the immigration officer;[6]

---

[3] For this first factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974) (warrantless arrest was proper where alien appeared extremely nervous, looked around as if intending to run, and admitted alienage and that he had no immigration papers)."

[4] For the second factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975) (warrantless arrest was proper for alien in a moving car, who was highly mobile and possessed the capacity to change momentarily their location and direction)."

[5] For the fourth factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Reyes-Oropesa*, 596 F.2d 399, 400 (9th Cir. 1979) (warrantless arrest was proper when an alien working in a garage presented a forged resident card to immigration officers)."

[6] For the fifth factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (warrantless arrest was proper when an alien provided a name, date of birth and immigration status that could not be corroborated by the officer's records check)."

6. Whether the officer has probable cause to arrest the subject for improper entry by an alien, in violation of [Immigration and Nationality Act ("INA")] § 275, 8 U.S.C. § 1325, or reentry of a removed alien, in violation of INA § 276, 8 U.S.C. § 1326;[7] and

7. Whether the alien has complied with the legal requirements for registration under INA § 262, 8 U.S.C. § 1302, and notification of the Secretary of his or her address under INA § 265, 8 U.S.C. § 1305, including whether he or she is carrying on his or her person evidence of registration as required by INA § 264(e), 8 U.S.C. § 1304(e).

*Id.* at 3-4. The memorandum concluded the list of factors by directing that "officers should closely consider whether the alien is likely to remain at the scene of the encounter while a warrant for his or her arrest is issued." *Id.* at 4.

The memorandum expressed the view that "significant differences" exist between the meaning of "likely to escape," in the context of warrantless immigration arrests under 8 U.S.C. § 1357(a)(2), and "risk of flight," as understood in custody determinations, *id.* n.20 (citing 8 C.F.R. § 236.1(c)(3)). *Id.* at 4-5. As the memorandum articulated, "[f]light risk determinations are made after an alien's arrest, where the alien has already been identified, fingerprinted, interviewed, and may have had DNA collected." *Id.* (emphasis in original). Meanwhile, the "likelihood of escape" is an "on-the-spot determination . . . often made with limited information about the subject's identity, background, or place of residence and no corroboration of any self-serving statements made by the subject." *Id.* at 5. Said differently, "[w]hile the flight-risk analysis assesses whether an already identified and detained alien is likely to comply with future immigration obligations such as court appearances and appearances before [Enforcement and Removal Operations], the likelihood-of-escape analysis is narrowly focused on determining whether the person is likely to

[7] For the sixth factor, the Lyons Memo provided the following citation and parenthetical: "*United States v. Puebla-Zamora*, 996 F.3d 535, 538 ('previous removal for illegal entry established probable cause that he may escape before a warrant could issue')."

escape before the officer can practically obtain an administrative arrest warrant, while in the field." *Id.* at 5.[8]

Finally, the memorandum instructed its officers and agents, following a warrantless arrest, to "document in the narrative section of the Form I-213, Record of Deportable/Inadmissible Alien, all factors considered in determining that the alien was likely to escape before a warrant could be obtained." *Id.* The memorandum required documentation of "both aggravating and mitigating factors," to be "completed during processing, as soon as practicable following the arrest." *Id.*

### 2. *Form I-213s*

Plaintiffs represent that, "[p]ursuant to the Order, Defendants have produced Form I-213s, a standard form entitled 'Record of Deportable/Inadmissible Alien,' for 33 warrantless civil immigration arrests that occurred in the District of Columbia after December 2, 2025." Pls.' Mot. (Enf.) at 4. Plaintiffs received the first batch of Form I-213s on January 2, 2026, and the second batch on February 2, 2026. *Id.* at 15. In the time following the preliminary injunction order, almost all the recorded warrantless arrests were conducted by ICE; only three were conducted by CBP. Third Blanchard Decl. ¶¶ 4-5, ECF No. 82-11.

Generally, the Form I-213s "contain[ed] a 'Narrative' section that describe[d] the immigration agent's encounter with the individual who was arrested," and "[m]any of the

---

[8] As more fully discussed below, *see infra* n.11, the Lyons Memo's definition of "escape risk" is in tension with statutory text and historical understanding, and defendants' distinction between the statutory word "escape," under 8 U.S.C. § 1357(a)(2), and the judicial concept of "flight," under 8 C.F.R. § 236.1(c)(3) as cited by defendants, is questionable. To begin, 8 C.F.R. § 236.1(c)(3), *see* Lyons Memo at n.20, governs only detention and release of "criminal aliens." The detention and release of aliens more generally is in fact governed by 8 CFR § 236.1(c)(8). *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) (noting, under 8 U.S.C. § 1226(a), 8 C.F.R. § 236.1(c)(8) and § 1236.1(c)(8), that "[a]liens who are arrested and detained may generally apply for release on bond or conditional parole" and must "show that he does not pose a danger to the community and that he is likely to appear for future proceedings). In any event, although the Lyons Memo refers to the analysis required under 8 C.F.R. § 236.1—whether clause (c)(3) or (c)(8)—as a "flight risk" analysis, the word "flight" appears nowhere in 8 C.F.R. § 236.1 or the related statutory provision the regulation is implementing, *see* 8 U.S.C. § 1226; *see also Procedures for the Detention and Release of Criminal Aliens by the Immigration and Naturalization Service and for Custody Redeterminations by the Executive Office for Immigration Review*, 63 Fed. Reg. 27441-01, 27449 (May 19, 1998) (citing as authority, *inter alia*, 8 U.S.C. § 1226).

narratives contain[ed] a list of factors purportedly establishing probable cause as to escape risk in addition to the descriptions." *Id.* at 4-5. Plaintiffs note that six of the 33 Form I-213s, three of which plaintiffs had affirmatively requested, were tardily produced. *Id.* Plaintiffs also note receiving from defendants "a chart entitled 'CBP DC Safe and Beautiful Warrantless Immigration Arrests Ending Dec. 29, 2025,' which contained summaries of, but not the I-213s or other documentation for, three arrests," and that the I-213s for those three arrests were belatedly produced after plaintiffs' counsel inquired. *Id.* & n.3.

Defendants, by way of two declarations from leadership at ICE and CBP, have represented taking steps to improve deficiencies in the I-213 narratives. At ICE, Acting Field Office Director for the District, Erik S. Weiss, shares that after production of the first batch of Form I-213s to plaintiffs in January 2, 2026, "discussions were had to address the deficiencies in the I-213 narratives." Declaration of Erik W. Weiss, Act. Field Office Dir. of ICE, Enf't and Removal Operations ("Weiss Decl.") ¶ 3, ECF No. 82-10. This conferral was, apparently, productive. On January 28, 2026, ICE officers "conducted a pull of the I-213 narratives for the production scheduled for February 2, 2026, of the warrantless arrests made in the Washington D.C." area, which uncovered that three of eleven warrantless arrests for the month of January "lacked the requisite analysis for risk of escape and a few others lacked the specific time of arrest." *Id.* In response, ICE "implemented a plan moving forward for an Assistant Field Office Director to make a weekly pull of the warrantless arrests in the Washington D.C." area, to "review for completeness with the requirements set forth in the Court Order in each I-213 narrative, and if necessary, [to] make[] available contemporaneous counseling with an officer who submitted a less than a complete I-213 narrative." *Id.* ¶ 4. Additionally, ICE permits officers to "amend the I-213 narrative to address the missing information, but the amendment must be made as soon as possible

to the arrest and be clearly marked as such." *Id.* Leadership at ICE attests that, "[m]oving forward, compliance with the Court Order for full and complete I-213 narratives should be increased, any officers not adhering to this Court's Order will be counseled, and ICE [] will continue to address and correct any substandard reporting requirements." *Id.*

Similarly, although having conducted, as of the date of the declaration on January 28, 2026, only three warrantless immigration arrests since December 2, 2025, CBP has also made changes to their documentation procedures following the Court's preliminary injunction order. Specifically, CBP's Acting Deputy Executive Assistant Commissioner, Kenneth Blanchard, attested that CBP "added fields to the arrest report to require CBP Officers and Agents who make a civil immigration arrest to enter narrative text describing the 'Probable Cause for Immigration Violation,' select the 'Location of Arrest Type' – 'Business, Residence, Vehicle, Public Area, Other,' enter narrative text describing the 'Alien Ties to Community,' and enter narrative text describing 'Facts Supporting Likely Escape.'" Supplemental Decl. of Kenneth W. Blanchard Jr., Act. Deputy Exec. Assistant Comm'r of CBP, Operations Support ("Third Blanchard Decl.") ¶ 3, ECF No. 82-11. All CBP officers conducting civil immigration arrests in the District have been informed to complete the arrest report. *Id.*

### D. Plaintiffs' Motion to Enforce Preliminary Injunction

On February 19, 2026, about two months after the December 2, 2025 preliminary injunction order, plaintiffs moved to enforce the order, contending that defendants are "[u]ndeterred" and "continue to enforce their unlawful policy and practice, carrying out warrantless immigration arrests without the required probable cause determinations." Pls.' Mot. (Enf.) at 1. Plaintiffs' motion included a declaration from plaintiffs' counsel with attached exhibits, including social media posts, press releases, and new articles commenting on the

immigration arrests nationwide, as well as a copy of the Lyons Memo. *See* Pls.' Mot. (Enf.), Decl. of Alexandra J. Widas ("Third Widas Decl."), ECF No. 78-1. This enforcement motion was also supported by sworn declarations from eight additional individuals, four of whom filed pseudonymously, who were civilly arrested without a warrant in the District after the December 2, 2025 preliminary injunction, as well as copies of 26 of the 33 Form I-213s produced by defendants to plaintiffs. *See* ECF Nos. 78-2 to 78-9 (declarations); 78-10 to 78-35 (I-213s).[9] As relief, plaintiffs sought an order compelling defendants to undertake more onerous obligations beyond those originally ordered by the preliminary injunction, including preparing written training materials subject to review by and conferrals with plaintiffs, conducting trainings of immigration officers based on the training materials, and additional reporting requirements, such as the production of body-worn camera footage or any other video footage of warrantless arrests in this District. Pls.' Mot. (Enf.), [Proposed] Order Granting Mot. Enf. Prelim. Inj. ("Pls.' Original Proposed Order"), ECF No. 78-36.

Defendants oppose plaintiffs' motion, denying any failure to comply with the preliminary injunction to warrant any additional relief. *See* Defs.' Mem. Opp. Pls.' Mot. Enforce Prelim. Inj. ("Defs.' Opp'n (Enf.)"), ECF No. 82. In opposition, defendants also submitted additional evidence to supplement the record, including four more Form I-213s produced to but not shared by plaintiffs, *see* ECF Nos. 82-5 (J.L.H.), 82-6 (E.A.G.R.), 82-7 (N.A.V.C.), 82-8 (E.E.F.), resulting in a combined total of thirty Form I-213s shared with the Court by the parties; and the two declarations

[9] The eight individuals submitting sworn declarations are new and only add to the roughly forty warrantless civil immigration arrests described in the over two dozen sworn declarations submitted in support of the original preliminary injunction order. *See* Pls.' Mot. (Enf.), Adolfo Doe Decl., ECF No. 78-2 (pseudonym); Benito Lopez Decl., ECF No. 78-3 (pseudonym); Edwin Espinoza Forsith Decl., ECF No. 78-4; Harvey Valle Gutierrez Decl., ECF No. 78-5; Jose Argueta Decl., ECF No. 78-6; Joshua Doe Decl. (pseudonym), ECF No. 78-7; Luis Neri Amado Decl., ECF No. 78-8; Rolando Doe Decl. (pseudonym), ECF No. 78-9; *see* Pls.' Mot. (Enf.) at 18 (confirming that the eight declarations are from individuals arrested after the preliminary injunction order).

discussed above from ICE's Acting Field Office Director for the District, Erik S. Weiss, and CBP's Acting Deputy Executive Assistant Commissioner, Kenneth Blanchard, *see* Weiss Decl.; Third Blanchard Decl.

Following full briefing of the motion, *see* Pls.' Reply in Supp. Mot. Enforce Prelim. Inj. ("Pls.' Reply (Enf.)"), ECF No. 83, an over two-hour hearing was held on March 11, 2026, at which the parties provided extensive oral arguments, *see* Min. Entry (Mar. 11, 2026). At the hearing, this Court questioned why plaintiffs "keep pointing . . . to the I-213s," when the individual Form I-213s fall further "outside the policy realm" than the Lyons Memo. Hr'g Tr. (Mar. 11, 2026) 17:2, 7; *see also id.* 17:20-21 (reminding parties that the Court "ha[s] to stay at the policy level where [it] ha[s] jurisdiction"). In response, plaintiffs agreed that the Court may "stick at the policy level" with the Lyons Memo rather than assess each individual Form I-213, because "what is happening in these I-213s . . . is exactly what is codified in the Lyons [M]emo." *Id.* 18:17-22. Plaintiffs then offered "to submit supplemental briefing that's specific to the Lyons [M]emo, as well as a revised proposed order that is more focused on the Lyons [M]emo." *Id.* 43:21-23.

Accordingly, following the hearing, parties were ordered to submit additional briefing on the Lyons Memo, including "the Court's authority to scrutinize the Lyons Memo and any jurisdictional limits to that authority," and "whether, as a legal matter, the Lyons Memo provides accurate guidance as to what may satisfy probable cause to believe that a person being arrested is likely to escape before a warrant can be obtained, *see* 8 U.S.C. § 1357(a)(2)." *See* Min. Order (Mar. 11, 2026). Plaintiffs' supplemental briefing included a revised proposed order, which simply requests that this Court "order[] that Defendants shall not rely on the probable cause standard or analytical approach set forth in the Lyons Memo when conducting civil immigration arrests without a warrant in this District." Pls.' Supp. Br., [Revised Proposed] Order Granting Motion to

Enforce ("Pls.' Revised Proposed Order"), ECF No. 91-2 (capitalization altered). With supplemental briefing complete, *see* Pls.' Supp. Br. Supp. Mot. Enforce Prelim. Inj. ("Pls.' Supp. Br."), ECF No. 91; Defs.' Supp. Mem. Opp'n Pls.' Mot. Enforce ("Defs.' Supp. Opp'n"), ECF No. 94; Pls.' Supp. Reply Supp. Mot. Enforce Prelim. Inj. ("Pls.' Supp. Reply"), ECF No. 95, plaintiffs' motion is ripe for review.

**E. Plaintiffs' Motion for Extra-Record Discovery**

Around the same time plaintiffs filed their motion to enforce the preliminary injunction order, plaintiffs also continued with dispositive briefing on the merits of the underlying APA claim by filing a motion for extra-record discovery, *see* Pls.' Mot. (Disc.), ECF No. 85, consistent with the Court's dispositive motion briefing schedule, *see* Min. Order (Jan. 26, 2026). Plaintiffs' discovery motion criticized the administrative record produced by defendants, totaling eleven pages, as "sparse" and "contain[ing] essentially *nothing* that would aid this Court's review." Pls.' Mot. (Disc.) at 1 (emphasis in original). Plaintiffs "request that the Court order Defendants to respond to requests for production and requests for admission, answer a limited set of ten interrogatories, and sit for five depositions." *Id.* at 13. This contested motion also became ripe for review on April 29, 2026. *See* Defs.' Mem. Opp. Pls.' Mot. Discovery ("Defs.' Opp'n (Disc.)"), ECF No. 90; Pls.' Reply in Supp. Pls.' Mot. Extra-Record Disc. ("Pls.' Reply (Disc.)"); Pls.' Decl. of Alexandra J. Widas Supp. Pls.' Mot. Extra-Record Disc., ECF No. 98; Administrative Record, ECF No. 99-1.

Both of plaintiffs' pending motions inform the other and are resolved in this Memorandum Opinion.

## II. LEGAL STANDARD

When deciding a motion to enforce a preliminary injunction, a district court has the authority to enforce the terms of its mandates absent a stay of the preliminary injunction order. *See Deering Milliken, Inc. v. F.T.C.*, 647 F.2d 1124, 1128-29 (D.C. Cir. 1978) (recognizing that a district court has "power[] to enforce its unstayed judgment since the [district] court has retained that power throughout the pend[e]ncy of the appeal"). A motion to enforce must be granted if a prevailing plaintiff demonstrates that a defendant has not complied with a prior judgment entered against it, and denied if a plaintiff has received all relief required by the prior judgment. *See Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) ("Success on a motion to enforce a judgment gets a plaintiff only 'the relief to which the plaintiff is entitled under its original action and the judgment entered therein.'" (quoting *Watkins v. Washington*, 511 F.2d 404, 406 (D.C. Cir. 1975)) (alterations omitted)).

When reviewing a motion for extra-record discovery in an APA case, a court is typically "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019). Where, however, an agency has compiled an administrative record that is "so bare as to frustrate effective judicial review," extra-record discovery may be permitted. *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990); *see also Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487-88 (D.C. Cir. 2011) ("[I]f a party makes a significant showing—variously described as a strong, substantial, or prima facie showing—that it will find material in the agency's possession indicative of . . . an incomplete record, it should be granted limited discovery." (citation omitted)).

## III. DISCUSSION

As detailed above, plaintiffs have filed two contested motions, each supported by supplemental exhibits: (1) a motion to enforce the Court's December 2, 2025 preliminary injunction prohibiting defendants from enforcing a policy of conducting warrantless civil immigration arrests without an individualized determination of escape risk, *see* ECF No. 78; and (2) a motion for extra-record discovery, *see* ECF No. 85. Each motion is discussed in turn.

### A. Plaintiffs' Motion to Enforce the Preliminary Injunction

Jurisdiction over plaintiffs' motion to enforce the preliminary injunction is reviewed first, followed by whether the policy detailed in the Lyons Memo violates the preliminary injunction.

#### *1. This Court Retains Jurisdiction to Enforce its Preliminary Injunction*

Defendants have appealed the preliminary injunction order, *see* Not. of Appeal, ECF No. 73, which generally divests this Court of jurisdiction "over those aspects of the case involved in the appeal." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (citation omitted).[10] Plaintiffs argue, however, that "[b]ecause the Lyons Memo bears directly on Defendants' compliance with the preliminary injunction, the Court maintains jurisdiction to adjudicate Plaintiffs' motion to enforce the preliminary injunction." Pls.' Supp. Br. at 4. Plaintiffs are correct.

"When an appeal is taken from an interlocutory order, such as the grant or denial of an injunction, . . . the district court retains jurisdiction to act with respect to matters not related to the issues involved in the appeal or when a district court's action would aid in the appeal." *Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 869 F. Supp. 35, 38 (D.D.C. 1994). Importantly, "whether

---

[10] Defendants noticed an appeal of the preliminary injunction order on February 2, 2026, and the briefing schedule was entered on May 1, 2026, *see* Order, *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 26-5045 (May 1, 2026), with final briefs due almost four months from now on August 28, 2026. The lengthy briefing schedule and the fact that no date has yet been set for oral argument militate against pausing consideration of the pending motions to await further guidance from the appeals court.

the addressee of an injunction has complied is *not* a subject 'involved in the appeal,'" and thus a district court retains its jurisdiction over such matters. *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000) (emphasis added). The D.C. Circuit has expressly recognized that a district court has "power[] to enforce its unstayed judgment since the [district] court has retained that power throughout the pend[e]ncy of the appeal." *Deering Milliken*, 647 F.2d at 1128-29. Indeed, no court has been "persuaded . . . that, absent a stay, a district court is without jurisdiction to enforce its orders pending appeal"—"[t]he precedent is voluminous and convincing." *In re Grand Jury Subpoena No. 7409*, No. 18-41 (BAH), 2018 WL 8334866, at *2 (D.D.C. Oct. 5, 2018) (collecting cases), *aff'd sub nom. In re Grand Jury Subpoena*, 749 F. App'x 1 (D.C. Cir. 2018); *see also Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1201-02 (11th Cir. 2016) ("Absent entry of a stay on appeal . . . the District Court retained jurisdiction to enforce its orders.").

Federal Rule of Civil Procedure 62 "codifies this inherent power of a court" to enforce or, if necessary, to clarify or modify, "the terms of the injunction being appealed from." *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 985 F. Supp. 2d 23, 29 (D.D.C. 2013) (alteration and internal quotation marks omitted). Specifically, Rule 62 provides that, "[w]hile an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." FED. R. CIV. P. 62(d); *see also Cobell v. Norton*, 310 F. Supp. 2d 77, 83 (D.D.C. 2004) ("[A] district court is not deprived of jurisdiction to modify [or enforce] a preliminary injunction while that injunction is on appeal."); *Sequen v. Albarran*, 2025 WL 3773755, at *3 n.2 (N.D. Cal. Dec. 31, 2025) ("[T]he Court notes that it retains jurisdiction to clarify and enforce the preliminary injunction and to modify it pending appeal as needed to preserve the status quo."). A court's exercise of authority under Rule 62(d) "can inure to the

benefit of plaintiffs or defendants." *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001); *see also Aubert v. Poast*, 166 F.4th 654, 656 (7th Cir. 2026) (explaining, *inter alia*, that Rule 62(d) "give[s] the district court some power to manage equitable relief even while the case is pending on appeal").

Here, the jurisdictional issue is straightforward and undisputed. Defendants agree with plaintiffs that "the Court retains jurisdiction to enforce the existing preliminary injunction," Defs.' Supp. Opp'n at 2, and concede that "the Lyons Memo explains Defendants' policy on warrantless civil immigration arrests and the Court can consider it in evaluating whether Defendants are continuing to enforce an unlawful policy of conducting warrantless civil immigration arrests without an individualized likelihood of escape determination," *id.* at 6. Indeed, defendants themselves proffer the Lyons Memo as evidence of compliance with the preliminary injunction. *See id.* ("[T]he Lyons Memo is . . . relevant to Defendants' compliance with the preliminary injunction."). Further, as the Court's preliminary injunction order covers only warrantless civil immigration arrests in the District, parties also agree that any determinations made about the legality of the Lyons Memo and any relief granted would apply only to warrantless civil immigration arrests in the District. *See id.* at 5 (agreeing to "abide by the Court's standard when making warrantless civil immigration arrests in Washington, D.C.," but not elsewhere); Pls.' Revised Proposed Order at 1 (limiting relief requested to warrantless civil immigration arrests "in this District").

Defendants' only jurisdictional challenge has been mooted by plaintiffs. Specifically, defendants protest any attempts by plaintiffs "to expand the preliminary injunction while it is on appeal," referring to plaintiffs' original proposed order "ask[ing] the Court to order Defendants to prepare written training materials . . . and use them to conduct trainings of immigration officers,

and order additional reporting requirements, including requiring Defendants to produce, among other things, body-worn camera footage." Defs.' Supp. Opp'n at 2; *see also* Pls.' Original Proposed Order, ECF No. 78-36. Plaintiffs, in reply however, clarified that their "Revised Proposed Order supersedes their earlier proposed order" accompanying their enforcement motion, and they "now seek only an order directing Defendants not to 'rely on the probable cause standard or analytical approach set forth in the Lyons Memo.'" Pls.' Supp. Reply at 2 (emphasis omitted) (quoting Pls.' Revised Proposed Order at 1). Plaintiffs thus are no longer seeking to impose additional training and reporting requirements on defendants.

In short, the parties agree, correctly, that subject matter jurisdiction exists over plaintiffs' now principal claim in their enforcement motion—namely, that the Lyons Memo fails to comply with the Court's December 2, 2025 preliminary injunction order.

***2. The Lyons Memo Fails Fully to Comply with the Preliminary Injunction***

Plaintiffs challenge just about every aspect of the Lyons Memo's guidance on escape risk, criticizing the memorandum's definition for escape risk, its list of seven non-exhaustive factors to consider, and the omission of community ties as one of the factors. In view of these flaws, plaintiffs ask the Court to prohibit defendants from "rely[ing] on the probable cause standard or analytical approach set forth in the Lyons Memo when conducting civil immigration arrests without a warrant in this District." Pls.' Revised Proposed Order at 1.

Below, the memorandum's definition for "escape risk" and the related second factor of the seven-factor list is discussed first, followed by the memorandum's silence on community ties, and finally the other factors (factors one and three through seven) are discussed. As the preliminary injunction governs defendants' conduct at the policy level, rather than arrests of any particular individual, review will be limited to whether the Lyons Memo, on its face, comports with the

preliminary injunction order or instead, when judged in relation to that order, sweeps more broadly than authorized by describing too broadly those circumstances in which warrantless civil immigration arrests are lawful under 8 U.S.C § 1357(a)(2).

### *a. The Lyons Memo Provides Flawed Guidance on Escape Risk*

Plaintiffs argue that the Lyons Memo "inconsistently and, in some places incorrectly, defines 'escape risk'" narrowly to mean whether an individual will remain in place at the scene of encounter with law enforcement before an administrative warrant can be obtained for his arrest, rather than more broadly to mean whether the individual will be located at either the scene of encounter *or another clearly identifiable location*. Pls.' Supp. Br. at 7. The former narrow interpretation, plaintiffs contend, would support a finding of escape risk for anyone who is "merely existing in public," Pls.' Mot. at 15, such as someone waiting for a bus, *see, e.g.*, Adolfo Doe Decl. ¶ 2, or driving a car on a public road, *see, e.g.*, Joshua Doe Decl. ¶ 3. Plaintiffs' challenge to the Lyons Memo's effort to define the statutory term "likely to escape," 8 U.S.C. § 1357(a)(2), as reflected throughout the memorandum and in factor two, is well taken.

Plaintiffs raise no issue with the Lyons Memo's initial definition of "escape risk" to mean whether "an immigration officer determines [an individual] is unlikely to be located at the scene of the encounter *or another clearly identifiable location once an administrative warrant is obtained*," Lyons Memo at 4 (emphasis added)—and therefore the sufficiency of this definition to reflect the meaning in the statutory text of "likely to escape" is assumed for purposes of resolving this motion.[11] Subsequent descriptions in the Memo, however, drop the italicized phrase thereby

---

[11] The fact that this definition, agreed upon by both parties, is accepted for the purpose of resolving plaintiffs' motion to enforce does not mean that this definition best reflects the meaning of "likely to escape" under 8 U.S.C. § 1357(a)(2). The Lyons Memo understands "escape" to mean whether an immigration officer will be able to locate the individual at a particular location and at a specific time to arrest them, when dictionary and statutory definitions of "escape" in this context focus instead on whether an individual will attempt to avoid legal proceedings or evade the administration of justice. Black's Law Dictionary, for example, has defined "escape," among other things, as "[t]he

effectively limiting the immigration officer's analysis to whether an individual "is likely to remain at the scene of the encounter." *Id*; *see also* Lyons Memo at 5 (limiting "escape risk" to whether an individual "is likely to remain at the scene of the encounter while a warrant for his or her arrest is issued"). For example, the Lyons Memo also asserts that "the likelihood-of-escape analysis is narrowly focused on determining whether the person is likely to escape before the officer can practically obtain an administrative warrant, *while in the field*." Lyons Memo at 5 (emphasis added). Consistent with this narrow construction, factor two of the Lyons Memo instructs officers

---

voluntary departure from lawful custody by a prisoner with the intent to evade the due course of justice." Blacks Law Dictionary (6th ed. 1990). Merriam-Webster's Dictionary of Law similarly defines escape to mean "depart[ing] from lawful custody with the intent of avoiding confinement or the administration of justice." Merriam-Webster's Dictionary Online, https://www.merriam-webster.com/dictionary/escape (last visited May 4, 2026). The dictionary definitions of "escape" to mean the evasion of legal processes is confirmed in the criminal context under Title 18 of the United States Code, which in multiple places refer to "escape" in some form as avoiding "any process issued under the laws of the United States by any court, judge, or magistrate judge." 18 U.S.C. § 751; *see also id.* §§ 752, 755.

To put this concretely, the Lyons Memo's definition of "escape risk" does not contemplate whether a person is already in immigration proceedings or will comply with a summons to report to immigration authorities or appear before court, which is an independent and possibly narrower consideration than whether a person will be at a clearly identifiable location at a specific time when an administrative warrant for that person's arrest is obtained. After all, noncitizens whose identifying information is already in the immigration system—such as those with pending immigration applications, or work authorization, or scheduled court hearings, *see, e.g.*, Espinoza Forsith Decl. ¶ 1 (stating that he already had an immigration hearing "scheduled for April 2026" before his arrest)—have demonstrated a willingness to comply with legal processes, making them less likely to be at risk of evading the administration of justice. In contrast, noncitizens who have entered improperly without submitting themselves to the immigration process, and who remain in the country unbeknownst to immigration authorities, may pose a greater risk of evading legal proceedings.

Indeed, historically, federal civil immigration enforcement did not rely on costly mass arrests and detention centers to address the issue of law-abiding noncitizens without legal status in this country, but rather issued summonses to bring them before immigration authorities. As the Supreme Court has made clear, "it is not a crime for a removable alien to remain present in the United States," and "[i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona v. United States*, 567 U.S. 387, 407 (2012). "In the ordinary course, if [DHS] discovers that an alien is living in the United States without authorization, it may initiate removal proceedings against the alien by sending him a 'notice to appear,'" *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) (citing 8 U.S.C. § 1229(a)), which "does not authorize an arrest" but instead "gives the alien information about the proceedings, including the time and date of the removal hearing," *Arizona*, 567 U.S. at 407 (citing 8 U.S.C. § 1229(a)(1)). Only in limited circumstances were arrests deemed appropriate and necessary. *See id.* (noting that arrests can be made with a warrant issued at the Attorney General's discretion under 8 U.S.C. § 1226(a), citing to a 2011 ICE Memorandum "describing factors informing this" decision, or without a warrant under 8 U.S.C. 1357(a)(2) where the probable cause findings are met). The current administration's apparent reliance on arrests as a routine method of immigration enforcement is a departure from statutory text and historical understanding, but as plaintiffs do not challenge the definition for "escape risk" set forth in the text accompanying this footnote, no occasion arises here to more fully consider its breadth.

that a "subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle)" may support a finding that the individual is likely to escape. *Id.* at 3 (citing *United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975)).

At the outset, the parties, notably, purport to *agree* on the correct definition of "escape risk." Specifically, defendants express their agreement that "[t]he likelihood of escape determination is not limited to the likelihood that the alien will remain at the scene of the encounter," Defs.' Supp. Opp'n at 7, stating that the determination also includes whether the individual is likely to be found at "another clearly identifiable location once an administrative warrant is obtained," *id.* (quoting Lyons Memo at 3). The parties' agreement as to this definition has some support in case law from district courts, concluding that an individual is not an escape risk if he is likely to be found again at a clearly identifiable location, such as his home or place of employment. *See, e.g.*, *United States v. Bautista-Ramos*, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (holding that "[u]nlike cases in which ICE officers do not know an alien's true name or other identifying information," "there is no indication that ICE officers would have had trouble finding [arrestee] again if they had released him while they obtained a warrant" as they had "his name and place of employment," "leads on his address, his wife's name and her restaurant's address, his two daughters' names and addresses, and another relative's name and address"), *report and recommendation adopted*, No. 18-cr-04066, 2018 WL 5723948 (N.D. Iowa Nov. 1, 2018); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 890 (S.D. Ohio 2016) (finding "no evidence that [arrestee] posed a risk of escape" despite being arrested in a vehicle while on the road, because among other things he was "just a few miles from his home," where he lived with his partner and her children, and "had a stable job as a painter").

Thus, the parties' disagreement is not over how the Lyons Memo defined "escape risk," but rather whether the Lyons Memo properly conveys that definition to its officers. Defendants insist this guidance task is appropriately accomplished, noting the one part of the Lyons Memo that states the complete definition, *see* Defs.' Supp. Opp'n at 7 (quoting Lyons Memo at 3), and discounting plaintiffs' criticisms about the truncated definition used in the other parts of the Memo, as "misconstru[ing]" the guidance about assessing escape risk "while in the field," *id.* According to defendants, the instruction for officers to "determin[e] whether the person is likely to escape before the officer can practically obtain an administrative arrest warrant, while in the field," Lyons Memo at 5, means only that an officer must make the probable cause determination at the scene of the encounter rather than "[w]aiting until a later time," and not, as plaintiffs understand, that an officer must arrest an individual if the person will likely leave the scene of the encounter before the officer can obtain an administrative warrant while still in the field. Defs.' Supp. Opp'n at 8. Defendants also argue that the second factor of the Lyons Memo—that a factor for escape risk includes an individual's ability to "promptly depart" the scene, such as by having control over a vehicle—was based on precedent from another circuit and just "a factor" of many that can be considered. *Id.* at 5 (citing *Cantu*, 519 F.2d at 497).

Defendants' arguments are unpersuasive. Although defendants correctly note that one sentence of the five-page Lyons Memo provides a definition of escape risk drawing no criticism from plaintiffs, *see id.* at 7 (quoting Lyons Memo at 3), defendants fail to address plaintiffs' point that the memorandum later twice frames the inquiry as only whether an individual is "likely to remain at the scene of the encounter" pending issuance of an arrest warrant, without any mention about whether the individual may be found at another clearly identifiable location. *See* Lyons Memo at 3 (discussing only factors to consider for "[w]hether the [person] is likely to remain at

the scene of the encounter"); *id.* at 4 ("[O]fficers should closely consider whether the [person] is likely to remain at the scene of the encounter while a warrant for his or her arrest is issued."). Indeed, with respect to the related, second factor of the Lyons Memo—that a person's ability to "promptly depart the scene of encounter," such as by being a driver in a vehicle, is an escape risk factor—defendants actually concede that this guidance does not "fully incorporate this Court's opinion granting Plaintiffs' motion for preliminary injunction," as "the Court [had] determined that an alien's presence in a vehicle is not sufficient to find that an alien is likely to escape." Defs.' Supp. Opp'n at 5 (citing *Escobar Molina*, 811 F. Supp. 3d at 31 n.20).

Moreover, defendants' attempts to "soften or rewrite the Lyons Memo through briefing," Pls.' Supp. Reply at 6—by arguing that plaintiffs "misconstrue" the memorandum and offering alternative interpretations—do not override the crucial fact that officers in the field appear to share the *same* understanding of the Lyons Memo as plaintiffs complain about. Nearly every Form I-213 that discusses escape risk states that the individual was "[a]rrested at large, (not at their residence or place of business)" and/or "encountered by Immigration Officer while in vehicle."[12] In many cases, this proffered justification for the warrantless civil arrest was made without any reference to whether the individual could be found again at another clearly identifiable location, such as their home or place of employment. *See, e.g.*, E.J.D.B. I-213 at 2, ECF No. 78-20 (listing, as only two factors relevant to escape risk, that the individual "was [a]rrested at large" and "was encountered by Immigration Officer while in vehicle"); Joshua Doe I-213 at 2, ECF No. 78-24 (same); L.C.

[12] *See* A.V.J. I-213 at 1, ECF No. 78-10; A.R.G. I-213 at 3, ECF No. 78-11; Adolfo Doe I-213 at 2, ECF No. 78-12; B.A.A.G. I-213 at 2, ECF No. 78-13; Rolando Doe I-213 at 2, ECF No. 78-17; Espinoza Forsith I-213 at 2, ECF No. 78-18; E.J.D.B. I-213 at 2, ECF No. 78-20; E.D.V.V. I-213 at 2, ECF No. 78-21; F.A.A.A. I-213 at 2, ECF No. 78-22; Joshua Doe I-213 at 2, ECF No. 78-24; J.P.C. I-213 at 2, ECF No. 78-25; J.D.J.M. I-213 at 3, ECF No. 78-27; L.C. I-213 at 2, ECF No. 78-29; Benito Lopez I-213 at 2, ECF No. 78-30; Luis Neri-Amado I-213 at 2, ECF No. 78-31; P.P.C. I-213 at 2, ECF No. 78-34; W.L.R. I-213 at 2, ECF No. 78-35; E.A.G.R. I-213 at 3, ECF No. 82-6; E.E.F. I-213 at 3, ECF No. 82-8.

I-213 at 2, ECF No. 78-29 (same); Benito Lopez I-213 at 2, ECF No. 78-30 (same); B.A.A.G. I-213 at 2, ECF No. 78-13 (listing as factors relevant to escape risk only that the individual was "[a]rrested at large," "in a vehicle," and "entered the United States after evading inspection"); Luis Neri-Amado I-213 at 2, ECF No. 78-31 (same). Whatever defendants may represent to this Court as the correct interpretation of the Lyons Memo, defendants' officers have not received the same message.

In short, the Lyons Memo does not properly instruct law enforcement officers to comply with the preliminary injunction order: Immigration officers must consider not only an individual's likelihood of remaining at the scene of the encounter, but also, per the definition the Lyons Memo itself proffers as legally supportable and agreed upon by plaintiffs for purposes of this motion, the individual's likelihood of being found at another clearly identifiable location. This likelihood of being found elsewhere, such as a stable home or long-standing employment place, leads inexorably to the next flaw-by-omission aspect of the Lyons Memo, which simply ignores community ties.

***b. The Lyons Memo Fails to Address Community Ties***

Before turning to the other factors outlined in the Lyons Memo, "[e]qually significant is what the Lyons Memo omits," Pls.' Supp. Br. at 17—specifically, how an individual's community ties factor into the determination of an individual's likelihood of escape. As this Court clearly emphasized when issuing the preliminary injunction, defendants' officers were conducting warrantless civil immigration arrests without the requisite probable finding, because "in none of the[] arrests documented in [plaintiffs'] declarations did the agents ask any questions about the arrestees' personal circumstances—such as the person's residence, length of stay in the United States, family members, work history, or anything else about the person's community ties—which courts have found to be relevant in the consideration of escape risk." *Escobar Molina*, 811 F.

Supp. 3d at 47. An individual's community ties, as was further explained, are relevant to the escape risk determination because someone who "has resided in the country for a lengthy period of time and has strong community ties," such as employment, a family, or a home, is more likely to remain in the District. *Id.* at 31 (collecting cases). Lest there be any doubt, the preliminary injunction order also expressly required that "the alien's ties to the community, if known at the time of arrest, including family, home, or employment" be "documented" in the I-213s. *Id.* at 66.

Yet the Lyons Memo—which defendants submit as evidence of compliance with the preliminary injunction order—provides no guidance on considering an individual's ties to his or her community. The Lyons Memo does not, for instance, advise its agents and officers to query whether an individual has family, resides, or works in the District, all of which tend to weigh against establishing probable cause as to escape risk. *See, e.g.*, *La Franca v. Immigr. & Naturalization Serv.*, 413 F.2d 686, 689 (2d Cir. 1969) (noting that being "the owner and operator of a bakery in Jersey City" lowered petitioner's likelihood of escape before a warrant could be obtained); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (same, where defendant had a stable job and lived with his partner and her two children).

The Lyons Memo's failure to address the impact of community ties on escape risk is directly reflected in the Form I-213s filled out by officers following a warrantless civil immigration arrest, which are meant to "document all the likelihood of escape factors" known to the arresting officer pre-arrest. Lyons Memo at 5. As plaintiffs point out, defendants' documentation is virtually silent about an individual's ties to the community. Pls.' Mot. (Enf.) at 7. Nor do the I-213s generally describe the agents taking any steps to query individuals about their home address, employment status, or family ties prior to making the civil arrests, such as including any questions asked by the agents regarding these factors or the answers provided by the individuals who were

arrested. *Id.* The lack of documentation on an arrestees' community ties is corroborated by sworn testimony of those who were arrested, many of whom live and work in the District, who confirm no inquiry whatsoever was made into their ties to the community before their arrest. *See* Adolfo Doe Decl. ¶ 4; Benito Lopez Decl. ¶ 5; Edwin Espinoza Forsith Decl. ¶ 3; Harvey Valle Gutierrez Decl. ¶ 4; Jose Argueta Decl. ¶ 5; Joshua Doe Decl. ¶ 8; Luis Neri Amado Decl. ¶ 5; Rolando Doe Decl. ¶ 4.

Defendants concede that, "[o]f course, an alien's ties to the community through family, employment or otherwise could be relevant to whether an alien is likely to escape," Defs.' Supp. Opp'n at 8, and cut against any probable cause finding of escape risk. That point is certainly not made in the Lyons Memo, however. In defending the Lyons Memo, defendants point to the instructions to its agents to consider "identity cards or work authorization" as evidence of the memorandum "contemplat[ing]" that "residence and gainful employment . . . would weigh against finding that the alien is likely to escap[e]." *Id.*[13] Defendants also protest that "an immigration officer must make a split-second determination about whether the alien is likely to escape[,] which does not allow for an extensive investigation into the alien's biography." *Id.*

Defendants' arguments amount to little more than creative reframing of the Lyons Memo. The memorandum's instruction to consider "identity cards or work authorization," read in context, clearly refers to "identity cards or work authorization documents that the immigration officer suspects are *fraudulent*," which would be a factor *supporting* a finding of escape risk. Lyons

---

[13] Defendants are correct that production of "identity cards or work authorization" undercuts any finding of a likelihood of escape since the noncitizen is plainly participating in and complying with, rather than avoiding or evading, legal immigration processes. Similarly, entering through an immigration port, seeking asylum or another type of immigration relief, having a pending immigration case, and attending court hearings, also reflect such participation and compliance by a noncitizen. *See, e.g.*, Benito Lopez Decl. ¶ 1; Edwin Espinoza Forsith Decl. ¶ 1; Harvey Valle Gutierrez Decl. ¶¶ 1, 4. It would be hard to square as credible a probable cause finding that a noncitizen was "likely to escape," as properly defined to mean that the individual is likely to evade the administration of justice, *see supra* at n.11, where the noncitizen was engaged in the legal process and even produced documentation verifying that fact.

Memo at 3 (emphasis added). Law enforcement agents generally do not appear to be contemplating, as defendants' brief claims, that proof of residence and gainful employment would weigh *against* a finding of a likelihood of escape. In many of the declarations submitted by plaintiffs, individuals recount being arrested immediately after giving officers their license or work permit, without further questions being asked. *See* Benito Lopez Decl. ¶ 2 (recounting that officers arrested him immediately after reviewing his Venezuela license and work permit); Harvey Valle Gutierrez Decl. ¶ 4 (agents arrested him immediately after reviewing his Real ID and work permit); Joshua Doe Decl. ¶¶ 6-7 (agents scanned his driver's license, told him he was not allowed in the country, broke his license in half, and arrested him). This is not just occurring here in the District of Columbia: A district court in Oregon also recently considered a challenge to ICE's policy and practice of conducting warrantless immigration arrests, and similarly concluded that ICE officers were arresting individuals "despite [their] providing identification." *M-J-M-A- v. Hermosillo*, No. 6:25-cv-02011, 2026 WL 562063, at *6 (D. Or. Feb. 27, 2026).

Moreover, defendants cite nothing to support their bald assertion that the necessity for immigration officers to make "split-second determination[s]" preclude questions into an individual's background. Defs.' Supp. Opp'n at 8. In fact, defendants' position runs counter not only to precedent, *see La Franca*, 413 F.2d at 689 (requiring consideration of background), but also to historical practice, *see* Pls.' Mot. (Enf.), Decl. of Alexandra J. Widas ("Fifth Widas Decl."), ECF No. 185-2 (Pls.' Ex. 1) (showing that an earlier ICE Academy training presentation on warrantless arrests required officers to consider "[w]hether the noncitizen is an employee or a resident of [the] location where the arrest took place," and "[t]he noncitizens['] ties to the community"). Here, many of defendants' officers persist in making warrantless civil immigration arrests without asking *any* questions about the subject's community ties. *See, e.g.*, Jose Argueta

Decl. ¶ 4 (recounting that he received a phone call from someone "claiming to be from the Washington D.C. police" directing him to come pick up his stolen car, only to be immediately arrested when he arrived and identified himself); Luis Neri Amado Decl. ¶ 5 (recounting that he was arrested without any questions about his "ties to the community, how long [he's] been living/working in DC, [his] family here, or anything else about [his] circumstances").

At bottom, the preliminary injunction order's instructions to defendants were clear: among other things, law enforcement officers' "document[ation] [of] the facts and circumstances surrounding the warrantless civil immigration arrest" must include "the alien's ties to the community, if known at the time of arrest, including family, home, or employment." *Escobar Molina*, 811 F. Supp. 3d at 66. The Lyons Memo's failure to instruct its officers to inquire about community ties pre-arrest, resulting in most of the Form I-213s containing no information about community ties, constitutes a violation of the preliminary injunction order.

***c. The Other Factors in the Lyons Memo Facially Pass Muster***

Finally, in addition to factor two discussed above, *see supra* Part III.A.2(a), plaintiffs also find fault with the six other factors described in the Lyons Memo: factors one, three, four, five, six, and seven. *See supra* I.C.1 (listing the factors). Briefly, plaintiffs challenge factor one for "permit[ting] agents to rely on whatever they deem 'suspicious behavior,' regardless of whether the person actually manifested an intent to escape." Pls.' Supp. Br. at 15 (cleaned up); factor three for being "overbroad and vague," *id.* at 14; factors four and five for "impermissibly permit[ting] immigration agents to rely on mere suspicion, or their lack of affirmative knowledge, rather than objectively reasonable inferences," *id.* at 15; and factors six and seven for "conflating unlawful status and escape risk," *id.* at 11. As addressed below *seriatim*, despite the overarching concern about the repeated use of the truncated definition in the Lyons Memo and its omission of any

mention of community ties as among the factors mitigating any probable cause finding of escape risk, plaintiffs at this juncture have not established that each of the remaining factors, standing alone, violate the preliminary injunction order.[14]

#### *i. Factor One*

Plaintiffs have not shown that factor one on its face violates the preliminary injunction. Factor one instructs law enforcement officers to consider a "subject's behavior prior to and during the encounter (e.g., refusal to follow lawful commands, attempts to evade officers, or other suspicious behavior prior to the arrest)." Lyons Memo at 3. As noted in the memorandum opinion accompanying the Court's preliminary injunction order, the escape risk determination under 8 U.S.C. § 1357(a)(2), "requires an individualized determination based on knowledge of facts 'particularized with respect to that person,'" which could include an agent's observations of an individual on the scene of the encounter. *Escobar Molina*, 811 F. Supp. 3d at 31. For example, "appear[ing] 'extremely nervous' as if 'looking for an opportunity to run'" could be a reason supporting a finding of escape risk. *Id.* (quoting *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974)). Plaintiffs offer no evidence to support their belief that officers are, *as a policy*, "rely[ing] on whatever they deem 'suspicious behavior,' regardless of whether the person actually 'manifest[ed] an intent to escape,'" Pls.' Supp. Br. at 15, nor does the most natural reading of factor one support that interpretation. As explained previously, jurisdiction exists in this case only over policies, not individual arrests, *see Escobar Molina*, 811 F. Supp. 3d at 32-37 (discussing

---

[14] On this point, it bears noting that a probable cause determination requires consideration of the totality of the circumstances, as the Lyons Memo, at 3, recognizes, and, for this reason, the promulgation of regulations implementing 8 U.S.C § 1357(a)(2) rejected commentators' recommendation to list factors governing civil immigration arrests, *see* Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406-01, 42411 (Aug. 17, 1994) ("The commenters also suggested that the rule should specify which factors Service officers should use to determine the likelihood of escape. This is the type of discretionary detail that is appropriate in a training course and manual, but not in a regulation."). The Court appreciates the challenges in identifying a comprehensive set of factors the agency itself has declined to provide in its regulations.

standing); *id.* at 37 (discussing the jurisdiction-stripping provisions under the INA); *id.* at 42 (discussing final agency action under the APA). Plaintiffs' challenge to factor one is thus unsuccessful.

***ii. Factors Four and Five***

Nor have plaintiffs shown that factors four and five, viewed at the policy level, violate the preliminary injunction. Factor four instructs agents to consider as a factor relevant to escape risk an individual's "[p]ossession of identity or work authorization documents that the immigration officer suspects are fraudulent." Lyons Memo at 3 (citing *United States v. Reyes-Oropesa*, 596 F.2d 399, 400 (9th Cir. 1979) as holding that "warrantless arrest was proper when an alien working in a garage presented a forged resident card to immigration officers"). Factor five similarly directs officers to consider an individual's "[p]resentation of unverifiable or suspected false information to the immigration officer." Lyons Memo at 4 (citing *United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) as holding that "warrantless arrest was proper when an alien provided a name, date of birth and immigration status that could not be corroborated by the officer's records check").

Plaintiffs criticize the case cited in support of factor four (*Reyes-Oropesa*) for being "minimally reasoned (and out-of-circuit)," Pls.' Reply (Enf.) at 8, and the case cited in support of factor five (*Quintana*) for similarly "conduct[ing] no meaningful analysis," Pls.' Supp. Br. at 16. Yet plaintiffs fail to recognize that factors four and five facially also comport with D.C. Circuit precedent. *See Yam v. Immigr. & Naturalization Serv.*, 411 F.2d 683, 687 (D.C. Cir. 1969) (holding that production of "conflicting documents" calling into question a person's identity "certainly would 'warrant a man of reasonable caution in the belief' that [a subject] was in the United States illegally and that he was likely to abscond" (footnote omitted)).

Plaintiffs further complain that "these factors permit agents to rely on . . . an individual's 'home address, employment, and family ties' being 'unknown or unverified'" without "conduct[ing] . . . investigation into these details," but the evidence they provide to support this belief is inconclusive. Pls.' Supp. Br. at 15. As an initial matter, the Lyons Memo cited the *Quintana* case as support, which involved an officer who *did* investigate a subject's identity, arresting the subject only after a records check yielded "no immigration history, port-of-entry crossing, or visa information for the name . . . provided." 623 F.3d at 1241. Further, nothing in the record evidence at this moment supports plaintiffs' understanding of the memorandum. Of the 30 Form I-213s in the record, only seven included "unverified" home or work information to support probable cause for escape risk, and of the seven, plaintiffs provided declarations from only one of the arrested individuals.[15] That declaration, however, revealed that officers deemed information to be "unverified" only after the stopped individual refused to provide an ID or answer any questions. *See* Rolando Doe ¶ 3 (recounting that after he and his coworkers were stopped on the way to work, officers "asked [them] if [they] were citizens, what [their] names were, and how old [they] were" and "also demanded [their] IDs," but that he "didn't have an ID" and "said to them in English that [he] didn't want to respond to these questions"). In sum, plaintiffs' challenges to factors four and five are not, at this juncture, supported by precedent or record evidence.

***iii. Factors Six and Seven***

Plaintiffs' challenge to factors six and seven for "conflating unlawful status and escape risk" is also unpersuasive. Pls.' Supp. Br. at 12. Both factors provide that only *limited* types of immigration violations, not all immigration violations, may be relevant to an individual's

---

[15] A.R.G. I-213 at 3; Rolando Doe I-213 at 2, E.D.V.V. I-213 at 2; J.P.C. I-213 at 2; J.D.J.M. I-213 at 3; P.P.C. I-213 at 2; W.L.R. I-213 at 2.

likelihood of escape on the ground that certain violations may go beyond mere unlawful status to suggest "surreptitious and criminal" behavior or an "unwillingness to cooperate with an immigration officer's lawful authority." Lyons Memo at 4-5.

Specifically, factor six states that a non-citizen is more likely to escape if he or she committed one of two specific immigration related offenses: improper entry, 8 U.S.C. § 1325 or reentry after removal, 8 U.S.C. § 1326. By statute, Congress has deemed both improper entry under 8 U.S.C. § 1325 and reentry after removal under 8 U.S.C. § 1326 to be two of the more serious types of immigration violations, elevating both from mere civil infractions to criminal offenses subject to a "fine[] under title 18" or "imprison[ment]." 8 U.S.C. § 1325(a) (misdemeanor or felony offense, depending on number of prior violations); *id.* § 1326 (felony offense). *See United States v. Texas*, 144 F.4th 632, 669 (5th Cir.), vacated on other grounds, 150 F.4th 656 (5th Cir. 2025) ("Congress criminalized the unlawful entry and reentry of aliens under 8 U.S.C. §§ 1325(a) and 1326(a)."). The memorandum directs officers to "closely consider" the escape risk of an individual whose entry constitutes a "serious and deceitful criminal offense," Lyons Memo at 4, a view seemingly supported by at least two other circuits. *See United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021) (finding, on plain error review, that "previous removal for illegal entry [was sufficient to] establish[] probable cause that [a noncitizen] may escape before a warrant could issue"); *La Franca*, 413 F.2d at 689 (finding that having been "twice . . . deported" and "abscond[ing]" "subsequent to re-entry" increased likelihood of escape). In contrast, as defendants explain, factor six would not apply to individuals who are present unlawfully but entered legally, such as "an alien [who was] admitted into the United States on a non-immigrant visa [but] then remain[ed] in the United States after the visa expire[d]." Defs.' Supp. Opp'n at 9.

Similarly, factor seven does not sweep in all individuals with unlawful status, but rather focuses only on noncitizens who have failed to comply with the registration requirements under INA § 262, *see* 8 U.S.C. § 1302 (requiring "alien[s]" to register with the government, which results in the government issuing to the alien "a certificate of alien registration or an alien registration receipt card," 8 U.S.C. § 1304(d)); and the address notification requirements under INA § 265, *see* 8 U.S.C. § 1305 (requiring "alien[s]" to "notify the Attorney General in writing of each change of address and new address"). Under 8 U.S.C. § 1306(a) and (b), a willful or inexcusable violation of either requirement constitutes a criminal misdemeanor punishable by a fine or imprisonment. Similarly, under 8 U.S.C. § 1304(e), an alien's failure to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him" is a misdemeanor carrying fines and imprisonment terms. As defendants explain, "an alien who has registered and complied with the address notification requirements has demonstrated a willingness to cooperate with immigration officers and thus is less likely to escape" compared to "an alien who failed to comply with these requirements." Defs.' Supp. Opp'n at 10.

Plaintiffs' criticism that the Lyons Memo "fail[s] to incorporate any instruction to consider individualized circumstances," Pls.' Supp. Reply at 7, ignores the memorandum's explicit instruction that although "[t]he circumstances of an alien's failure to comply with the immigration laws" or "unwillingness to cooperate" with immigration officers "*may* support the conclusion that the alien is likely to escape," "*[n]o single factor is determinative*," Lyons Memo at 4 (emphases added). The Lyons Memo also caveats that the "possible factors" listed are non-exhaustive, and, consistent with D.C. Circuit precedent, educates that "[w]hether an alien is likely to remain at the scene of the encounter is based on the *totality of the circumstances* known to the immigration officer at the time of the encounter and prior to the arrest." Lyons Memo at 4 (emphasis added

and omitted); *see United States v. Holder*, 990 F.2d 1327, 1328, (D.C. Cir. 1993) (noting that "probable cause" requires a "totality of the circumstances" analysis). On its face, the Lyons Memo expressly cautions officers that the possible factors listed are suggestive rather than prescriptive, and absent evidence of a policy and practice of officers acting otherwise, "[t]he nature of the totality-of-the-circumstances analysis . . . precludes [courts] from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *District of Columbia v. R.W.*, No. 25-248, 2026 WL 1052344, at *3 (U.S. Apr. 20, 2026) ("The totality of the circumstances requires courts to consider the whole picture." (internal quotation marks omitted)).

Plaintiffs' proffer of various examples in which they believe a noncitizen could meet the conditions of factors six or seven yet still not pose an escape risk also misses the mark. *See* Pls.' Supp. Reply at 6-8. For instance, plaintiffs contend that "many individuals who enter the country improperly do not evince an ability or desire to evade immigration authorities," citing as an example to Espinoza Forsith, "who presented himself to immigration officials upon entry in April 2023 and was already in asylum proceedings at the time of his warrantless arrest in January 2026." Pls.' Supp. Reply at 7.[16] To be sure, the Lyons Memo does not expend much effort in describing circumstances that would mitigate or even undercut any credible probable cause finding of "likely to escape," *see supra* n.11 & 13, and any future iteration of similar guidance would be improved with more attention to such mitigating factors to prove an effective guide "in the field." Yet the preliminary injunction applies only to defendants' enforcement of an unlawful "policy or practice."

[16] Plaintiffs' representation that Espinoza Forsith was "already in asylum proceedings" is not a fact in the record. *See* Espinoza Forsith Decl. ¶ 1 (stating only that he has "not yet had any hearings in immigration court" but had one "scheduled for April 2026" before his arrest, without any mention of asylum).

*Escobar Molina*, 811 F. Supp. 3d at 65; *see also id.* at 42-43 (explaining that plaintiffs' APA claim requires finding the existence of a policy and practice); *see supra* III.A.1 (explaining that jurisdiction exists to enforce preliminary injunction, which pertained to defendants' policy and practice). Isolated ICE or CBP agent's misjudgments of escape risk thus fall outside the reach of the preliminary injunction order and this Court's jurisdiction, though a collection of such misjudgments may be probative evidence of a pervasive policy and practice that has persisted since issuance of the preliminary injunction order. *See, e.g.*, *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1019-20, 1022 & n.55 (N.D. Cal. 2025) (finding DHS has a policy of re-detaining without making individualized determinations of formerly released noncitizens who had entered the country improperly, including some asylum-seekers, in light of "voluminous" and "extensive" evidence"). Plaintiffs' challenges to factors six and seven are thus unpersuasive absent additional evidence.[17]

* * *

To be clear, this memorandum opinion does not render any final conclusions about the legality of the challenged policy and practice, which is left for future proceedings after discovery and briefing on dispositive motions. The determination, at this juncture, that certain factors outlined in the Lyons Memo are compliant with the preliminary injunction order is not to say that those factors would survive APA review at final judgment with the benefit of a full record. Nor does this determination suggest that every warrantless civil arrest predicated on consideration of those factors would satisfy the probable cause requirement under 8 U.S.C. § 1357(a)(2). Indeed,

[17] Plaintiffs also cursorily challenge factor three, which instructs officers to consider a "subject's age and health," for being "overbroad and vague." Pls.' Supp. Br. at 14 (citing Lyons Memo at 3). Neither sides' briefs expend much ink on this factor, and none of the Form I-213s rely on this factor as a justification for the warrantless arrest. Absent further elucidation, and given that probable cause is a "totality of the circumstances" analysis, *Holder*, 990 F.2d at 1328, plaintiffs have not shown that inclusion of factor three violates the preliminary injunction order.

some of the Form I-213s and the accompanying declarations in the record contain, simultaneously, dubious reasons for finding escape risk and highly concerning facts about the arrest. *See, e.g.*, Luis Neri Amado Decl. ¶ 4 (recounting that officers broke his car window and dragged him out). Plaintiffs, however, have not amended their complaint to challenge the Lyons Memo under the APA, nor, for understandable jurisdictional reasons, are plaintiffs challenging specific individual arrests.

At bottom, consideration of plaintiffs' motion to enforce is limited: The only question at present is whether defendants are violating the preliminary injunction order. Review of defendants' actions is accordingly limited to whether, at the policy level, the Lyons Memo correctly instructs that officers must make "a pre-arrest individualized determination . . . of probable cause that the person being arrested is likely to escape before a warrant can be obtained" before making a warrantless arrest. *Molina*, 811 F.Supp. at 65 (Preliminary Injunction Order). For all the reasons above, the Lyons Memo's flawed definition of escape risk, *see supra* III.A.2(a), and failure to instruct officers to consider community ties, *see supra* III.A.2(b), violate the preliminary injunction order, though other challenged portions of the Lyons Memo pass muster on their face, *see supra* III.A.2(c)(i)-(iii).

As for the remedy for violation of the preliminary injunction order, plaintiffs' proposed order prohibiting defendants from "rely[ing] on the probable cause standard or analytical approach set forth in the Lyons Memo when conducting civil immigration arrests without a warrant in this District" is granted in full. Pls.' Revised Proposed Order at 1. Providing guidance on the factors relevant to a probable cause finding of escape risk is a constructive step with inherent challenges. *See supra* n.14. Yet, the Lyons Memo's flawed definition of escape risk and failure to mention community ties as a mitigating factor leaves no alternative but to prohibit reliance on the

memorandum in its entirety. Should the parties confer and reach an alternative, *agreed-upon* resolution, the parties are welcome to propose jointly an amended remedy to the Court.

**B. Plaintiffs' Motion for Extra-Record Discovery**

Separately, to "enable the Court's review" of the ultimate merits of this APA case at final judgment, plaintiffs have also filed a motion for extra-record discovery. Pls.' Mot. (Disc.) at 1. Plaintiffs criticize the "sparse" eleven-page administrative record—of which "one of the pages is a blank notes page, and the rest are arrest records and 'intel' workups on just a subset of the individual Plaintiffs in this case"—for "contain[ing] essentially *nothing* that would aid this Court's review." *Id.* (emphasis in original). "[T]o fill the evidentiary chasm," *id.* at 1, plaintiffs "request that the Court order Defendants to respond to requests for production and requests for admission, answer a limited set of ten interrogatories, and sit for five depositions," *id.* at 13. Whether jurisdiction exists to consider the motion is addressed first below, followed by a discussion of whether plaintiffs are entitled to discovery. In short, the motion is granted.

***1. This Court Retains Jurisdiction to Permit Merits Discovery***

Defendants have not challenged this Court's jurisdiction to consider plaintiffs' motion for extra-record discovery. *See generally* Defs.' Opp'n (Disc.). Nevertheless, the Court has an independent obligation to ascertain the adequacy of its own jurisdiction. *See Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 33 (D.C. Cir. 2021). Jurisdiction may be exercised to proceed.

Under long-settled doctrine, absent a stay order, an appeal from an interlocutory order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the underlying action on the merits. 11A Wright and Miller, Federal Practice and Procedure § 2962 (3d ed. Apr. 2026 updated) ("The district court may proceed with the litigation while the interlocutory appeal is pending.") (collecting cases); *see also Soc'y for Animal Rts., Inc.*

*v. Schlesinger*, 512 F.2d 915, 918 (D.C. Cir. 1975) ("We assume that the case will proceed forward expeditiously in the district court despite the pendency of the [§] 1292(a) appeal in this court."). Thus, "[a]lthough the filing of a notice of appeal ordinarily divests the district court of jurisdiction over issues decided in the order being appealed," when "the appeal is [only] from an order granting or denying a preliminary injunction," a court may proceed with litigation related to the final judgment. *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996); *see also Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 791 (10th Cir. 2013) ("[I]n an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits." (quoting *United States v. Price*, 688 F.2d 204, 215 (3d Cir. 1982))); *F.T.C. v. Assail, Inc.*, 98 F. App'x 316, 317 (5th Cir. 2004) (per curiam) ("[I]t is settled that a district court has jurisdiction to proceed with the merits of the case and to grant a permanent injunction while an appeal of a preliminary injunction order is pending.").

Here, defendants' interlocutory appeal challenges only the grant of the preliminary injunction, and no stay of the preliminary injunction order pending appeal is in effect, nor sought by defendants. *See* Defs.' Statement of Issues, *Escobar Molina v. DHS*, No. 26-5045 (D.C. Cir. Mar. 9, 2026) (identifying the only issue on appeal as "[w]hether the district court correctly determined that Plaintiffs established that they were entitled to an order preliminarily enjoining Defendants' alleged policy of conducting warrantless immigration arrests without probable cause and an escape risk assessment").

Defendants' interlocutory appeal of the preliminary injunction thus "does not divest the district court with jurisdiction to proceed with a decision on the merits." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 937 F. Supp. 2d 18, 26 (D.D.C. 2013). Plaintiffs' motion for extra-record discovery is focused on advancing the case toward final judgment by creating a proper record for

judicial review, and has no bearing on whether plaintiffs were entitled to a preliminary injunction, the determination of which will be reviewed based on the limited record before the Court at the time of its order. *See Colbert v. Potter*, 471 F.3d 158, 165 (D.C. Cir. 2006) ("Appellate courts do not ordinarily consider evidence not contained in the record developed at trial."). Accordingly, as the discovery sought will not implicate the appellate record, but rather allow the case to "proceed forward expeditiously" toward final judgment, the Court retains jurisdiction to address the merits of plaintiffs' discovery motion. *Soc'y for Animal Rts.*, 512 F.2d at 918.

### 2. *Plaintiffs are Entitled to Extra-Record Discovery*

In APA cases, "an agency must 'disclose the basis' of its action" to "permit meaningful judicial review." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962)); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted b[e] clearly disclosed and adequately sustained."). "Agencies bear the responsibility of compiling the administrative record, which must include all of the information that the agency considered either directly or indirectly." *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 12 (D.D.C. 2015) (internal quotation marks omitted).

Although as a general matter "[t]he APA limits judicial review to the administrative record," there are two exceptions: (1) where the party seeking discovery makes a "strong showing of bad faith or improper behavior"; or (2) "when the record is so bare that it prevents effective judicial review." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). Relevant here, the second exception "includes cases in which a claim is premised on an agency's alleged unlawful policy, yet the record does not reveal 'whether [the] agency's challenged policy exists.'" *Univ. of Cal. Student Ass'n v. McMahon*, No. 25-cv-354, 2025 WL

1906548, at *2 (D.D.C. Mar. 18, 2025) (quoting *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018)). In those rare instances, a "district court is free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue.'" *Hisp. Affs. Project*, 901 F.3d at 388; *see, e.g.*, *All. for Retired Americans v. Bessent*, No. 25-cv-0313, 2025 WL 1114350, at *3 (D.D.C. Mar. 20, 2025) (permitting extra-record discovery, in case challenging defendants' alleged decision to give U.S. DOGE Service personnel access to government records and systems, because "unlike the typical APA case, which involves the enactment of a rule or other agency action taken in public view[,] only the Defendants know the 'contours' of [their] actions"); *AFL-CIO v. Dep't of Lab.*, 349 F.R.D. 243, 248 (D.D.C. 2025) (similar, finding "a key question" was "whether the alleged disclosure policy in fact exists," and "the parties' arguments and the record . . . ha[d] not clarified matters regarding the alleged policies' scope" (internal quotation marks and alteration omitted)).

This case falls squarely under the second exception articulated by the D.C. Circuit in *Hispanic Affairs Project*, 901 F.3d at 388. The parties have taken wholly divergent positions on the existence of defendants' alleged policy and practice of making warrantless civil immigration arrests in the District without the requisite probable cause findings. Defendants insist that "no such policy exists" and back up that position by producing an effectively empty administrative record totaling eleven pages. *See* Defs.' Opp'n (Disc.) at 2; Administrative Record, ECF No. 99-1. Further, defendants represent that any motions to supplement the record would be "oppose[d]" because "they have no documents to add." Defs.' Opp'n (Disc.) at 13. Plaintiffs vigorously disagree, a position supported by a preliminary finding in this case that the alleged policy and practice does exist. *Escobar Molina*, 811 F. Supp. 3d at 49 ("This finding is supported, *inter alia*, by defendants' own official public statements that they apply a 'reasonable suspicion' standard to

conduct warrantless arrests, as well as roughly forty examples detailed in plaintiffs' declarations of arrests conducted without any questions as to escape risk."). As "a key question" is "whether the alleged [challenged] policy in fact exists," *AFL-CIO*, 349 F.R.D. at 248, and with defendants refusing to supplement the thin record, discovery is "permissible" for the "purpose of proving that the Department of Homeland Security has a practice or policy" as alleged, *Hisp. Affs. Project*, 901 F.3d at 386 n.4.

Ignoring the preliminary finding already made in this case, *Escobar Molina*, 811 F. Supp. 3d at 49, defendants attempt to avoid the mandate of the second exception by whittling down its application to only when the *scope* but not the *existence* of the policy is disputed, arguing that where "no such policy exists," plaintiffs' discovery request is an impermissible "fishing expedition" based on "nothing but their own speculation." *See* Defs.' Opp'n (Disc.) at 4, 9; *see also id.* 8-9 (attempting to distinguish on that ground some cases cited by plaintiffs, *e.g.*, *AFL-CIO*, 349 F.R.D. 243, and *All. for Retired Americans*, 2025 WL 1114350). Yet, again, defendants fail to recognize that plaintiffs' allegations about an unlawful policy and practice have been found to be not only non-speculative, but likely meritorious. *See Escobar Molina*, 811 F. Supp. 3d at 65 (granting in large part preliminary injunction motion). In any event, defendants overstate the case law. Although "fishing expeditions" are disfavored, narrow discovery requests supported by evidence are not. In *Hispanic Affairs Project v. Acosta*, plaintiffs brought an APA claim alleging that DHS had a "practice of habitually approving and extending H-2A visas for lengthy periods of time," in violation of the requirement that H-2A visas be for "temporary" work. 901 F.3d at 388. Plaintiffs there, as here, supported their allegations with numerous declarations; and defendants there, as here, argued that plaintiffs failed to adequately allege a challengeable agency action. *Id.* Disagreeing, the D.C. Circuit explained that if plaintiffs could show that a "particular practice"

existed, the agency action would be challengeable. *Id.* The Circuit then remanded for the district court to consider the "alleged pattern and practice," informing the district court that it was "free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue.'" *Id.* The exercise of discretion in this case is no different.

Defendants further argue that the Lyons Memo is the "only nationwide guidance" and obviates the need "to discern the existence of some other policy prior to the Lyons Memo." Defs.' Opp'n (Disc.) at 4-5. Defendants' argument fails to persuade. For one, defendants maintain that the Lyons Memo "did not create [a] new policy" but merely "remind[ed]" officers of existing authority. *Id.* at 5. If defendants' representation is accepted as true, discovery would still be necessary to "ascertain the contours" of the existing policy, which is far from clear in the Lyons Memo. *Hisp. Affs. Project*, 901 F.3d at 388. Second, however, the Lyons Memo's assertion that no new policy has been created is contradicted by the memorandum's own clear statement that the way "ICE previously applied the phrase 'likely to escape' . . . was incorrect." Lyons Memo at 4; *see also* Notice at 1, ECF No. 86 (expressly repudiating this "past common practice" of ICE officers). If defendants' position is, alternatively, that the Lyons Memo—as indicated by its own representation—has replaced a "past common practice," discovery would also be appropriate to corroborate this assertion and show "when and how the principles set out in the Lyons Memo were implemented in the District" to repudiate this practice and what, precisely, that "past common practice" was. Pls.' Reply (Disc.) at 8. The Lyons Memo thus does not help defendants escape discovery and instead does the opposite.

Defendants' remaining challenges also fall short. First, defendants cripple their own argument that "[p]laintiffs should have moved to supplement the administrative record, not for discovery," by representing that, "[t]o be clear, Defendants would oppose any motion to

supplement the administrative record and maintain that they have no documents to add." Defs.' Opp'n (Disc.) at 13. By defendants' own admission, having plaintiffs move to supplement the record would amount to no more than an exercise in futility.

Second, defendants' continued attempts to explain away damaging public statements made by senior DHS officials, *id.* at 5-7, is nothing more than a recycling of arguments made in earlier briefing opposing the preliminary injunction, *see Escobar Molina*, 811 F. Supp. 3d at 46. These arguments have already been rejected, *id.*, and defendants have provided no reason to revisit that decision. Indeed, records, such as emails, memoranda or other communications, produced in discovery may show whether these public statements were applauded or corrected within DHS and its components, and thereby shed light on the scope of the policy and practice being challenged.

Third, defendants miss the point in asserting that discovery is unnecessary because the Form I-213s provide plaintiffs "all the relevant information regarding individual arrests." Defs.' Opp'n (Disc.) at 10. Plaintiffs are not challenging specific past arrests, but rather a broader policy and practice. *See Escobar Molina*, 811 F. Supp. 3d at 19-22, 33-34 (noting that named plaintiffs, although released, are still targets of the challenged policy and practice). Extra-record discovery will, among other things, reveal "whether Defendants' agents received requisite training" and "the standard on which they were trained." Pls.' Mot. (Disc.) at 9-10. Finally, defendants' last-ditch citation to the "presumption of regularity," *see* Defs.' Opp'n (Disc.) at 9, is, bluntly stated, incredible. Nothing about an eleven-page administrative record renders this presumption appropriate.

In sum, plaintiffs' motion for extra-record discovery is granted on the terms they request, namely: plaintiffs may serve on defendants requests for production and admission and up to ten (10) interrogatories, and take up to five (5) depositions to gather evidence "with respect to the

Lyons Memo, the Broadcast Statement of Policy, Defendants' professed use of 'reasonable suspicion' to make immigration arrests, immigration arrest quotas/goals, officer training on warrantless immigration arrests, and information about ongoing immigration arrests in the District." Pls.' Reply (Disc.) at 7. The parties may confer and propose to the Court by the date reflected in the accompanying order a scheduling order for the expeditious completion of this discovery.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs' Motion to Enforce Preliminary Injunction, ECF No. 78, is **GRANTED**. Further, plaintiffs' Motion for Extra-Record Discovery, ECF No. 85, is **GRANTED**. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: May 7, 2026

**BERYL A. HOWELL**
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSÉ ESCOBAR MOLINA,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

B.S.R.,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

N.S.,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

R.S.M.,
c/o CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

CASA, INC.,
8151 15th Avenue
Langley Park, MD 20783

*on behalf of themselves and others similarly situated,*

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
245 Murray Lane SW
Washington, D.C. 20528

KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*,
245 Murray Lane SW
Washington, D.C. 20528

No.

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW
Washington, D.C. 20530

PAMELA J. BONDI, *in her official capacity as Attorney General of the United States*,
950 Pennsylvania Ave NW
Washington, D.C. 20530

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
500 12th Street SW
Washington, D.C. 20024

TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*,
500 12th Street SW
Washington, D.C. 20024

U.S. CUSTOMS AND BORDER PROTECTION,
1300 Pennsylvania Avenue NW
Washington, D.C. 20004

RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*,
1300 Pennsylvania Avenue NW
Washington, D.C. 20004

U.S. BORDER PATROL,
1300 Pennsylvania Avenue NW
Washington, D.C. 20004

MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*,
1300 Pennsylvania Ave NW
Washington, D.C. 20004

U.S. DRUG ENFORCEMENT ADMINISTRATION
8701 Morrissette Drive
Springfield, VA 22152

TERRANCE C. COLE, *in his official capacity as Administrator of the U.S. Drug Enforcement Administration*,
8701 Morrissette Drive
Springfield, VA 22152

*Defendants*.

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Policy and practice of making warrantless immigration arrests without probable cause in Washington, D.C.)

## INTRODUCTION

Over the past month and a half, plain-clothed, masked, and armed federal agents have flooded the streets of the nation's capital, indiscriminately arresting without warrants and without probable cause District residents whom the agents perceive to be Latino. Federal agents systematically arrest individuals in these immigration sweeps without a warrant and without any individualized assessment that they are in the United States unlawfully and/or that they are likely to escape before a warrant can be obtained. U.S. Immigration and Customs Enforcement ("ICE") then sends these individuals to detention centers far away from their families and lawyers. In some cases, officials belatedly realize that there is no legal basis to hold in custody the individual whom federal agents arrested without any individualized assessment and release them. Even those released from detention experience significant physical and psychological harm from their arbitrary arrest and detention, and they fear that they will experience those harms again.

Defendants' policy and practice of making immigration arrests without a warrant and without probable cause have sown terror in Latino and other communities across the District and violate unequivocal statutory restrictions on warrantless arrests. Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc. bring this lawsuit on behalf of themselves and those similarly situated to put an end to this unlawful policy and practice in D.C.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (right of review). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and the inherent equitable powers of this Court.

2. Venue is proper in this District pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

3. **Plaintiff José Escobar Molina** is a 47-year-old man who has lived in D.C. for 25 years. He has maintained valid Temporary Protected Status ("TPS") for El Salvador since 2001. On August 21, 2025, Mr. Escobar Molina was walking from his apartment building in Northwest D.C. to his work truck, about to start his workday, when two cars pulled up next to him. As he was about to get into his truck, plain-clothed and unidentified federal agents exited the cars and—without conducting any inquiry—seized Mr. Escobar Molina, grabbing him by the arms and legs and immediately handcuffing him. The agents arrested him without a warrant and without asking for his name, his identification, or anything about his immigration status. The agents also did not ask him where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community prior to arresting him. After ICE detained Mr. Escobar Molina overnight at its processing center in Chantilly, Virginia, the next day an ICE supervisor finally realized that he had valid TPS, which statutorily prohibits ICE from detaining him, and released him. Due to his Latino ethnicity, Mr. Escobar Molina fears being arrested and detained again while going about his daily life in D.C.

3. **Plaintiff B.S.R.***[1] is a 29-year-old man who moved to D.C. with his family in 2019 and lived in D.C. with them until a few weeks ago. B.S.R. is from Honduras and has a pending asylum application in the United States because he fears persecution if he is forced to return to Honduras.

[1] Plaintiffs have concurrently filed a motion to proceed pseudonymously for Plaintiffs B.S.R, N.S., and R.S.M. All pseudonyms are marked with an asterisk in their first instance.

On August 18, 2025, an officer displaying a U.S. Border Patrol ("USBP" or "Border Patrol") badge and additional unidentified agents approached B.S.R. and his father while they were in their car outside their home in Northeast D.C. and preparing to head to work. The agents arrested B.S.R. without a warrant and without asking him for his name, his identification, or anything about his immigration status before arresting him. They also did not ask him whom he lives with, how long he has lived here, or anything else about his ties to the community. B.S.R. was wearing an ankle monitor ICE had previously ordered him to wear, which he showed the agents after he was arrested. After spending approximately ten hours detained at the ICE processing center in Chantilly, Virginia, he was released. Due to his Latino ethnicity, he fears being arrested and detained again while driving through D.C. almost every day on his way to work.

4. **Plaintiff N.S.*** is a 51-year-old man who has lived in D.C. since 2024. N.S. is from Venezuela and has a pending asylum application in the United States because he fears persecution if he is forced to return to Venezuela. On August 12, 2025, an agent wearing a U.S. Drug Enforcement Administration ("DEA") vest and a badge and hat that said "ICE" stopped N.S. while he was in his car in the parking lot of The Home Depot in D.C., where he had just finished shopping. The officers arrested N.S. without a warrant and without asking him anything about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. After ICE held him for nearly four weeks in various detention centers around the country, it released N.S. on his own recognizance. Due to his Latino ethnicity, he lives in fear of being arrested and detained again while going about his daily life in D.C.

5. **Plaintiff R.S.M.*** is a 36-year-old woman who has lived in D.C. with her family since 2020. R.S.M. is from El Salvador and has a pending asylum application in the United States because she fears persecution if she is forced to return to El Salvador. Early in the morning on

August 26, 2025, R.S.M. and her husband were driving to work when several unidentified agents surrounded them with their vehicles. The agents approached R.S.M. and her husband while they were in their car and asked them for their identification and whether they had permission to live in the United States. The agents arrested R.S.M. without a warrant and without asking her anything about where she lives, whom she lives with, how long she has lived here, or anything else about her ties to the community. After spending about ten hours detained at the ICE processing center in Chantilly, Virginia, ICE released R.S.M. with an ankle monitor. Due to her Latina ethnicity, R.S.M. lives in fear of being arrested and detained again while going about her daily life in D.C.

6. **Plaintiff CASA, Inc.** is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities, and it provides a variety of social, health, employment, and legal services to immigrant communities, with a particular focus in D.C., Maryland, Virginia, Pennsylvania, and Georgia. Due to the recent surge in warrantless immigration arrests without probable cause in D.C., CASA's resources have been diverted to focus on providing emergency response services for people arrested in D.C. rather than spending those resources on the core social services it provides, interfering with CASA's core activities. CASA's members include individuals who recently have been arrested in D.C. without a warrant and without probable cause as to immigration status and/or flight risk and who are likely to face such stops and arrests in the future.

7. **Defendant U.S. Department of Homeland Security ("DHS")** is the federal agency responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a).

8. **Defendant Kristi Noem** is the Secretary of DHS and is sued in her official capacity. As Secretary of DHS, she oversees component agencies such as ICE, U.S. Customs and Border Protection ("CBP"), and U.S. Border Patrol.

9. **Defendant U.S. Department of Justice ("DOJ")** is the federal agency responsible for enforcing federal law and overseeing many of the federal government's law enforcement agencies.

10. **Defendant Pamela J. Bondi** is the U.S. Attorney General and is sued in her official capacity. As Attorney General of the U.S., she leads the U.S. Department of Justice and oversees component agencies including the Drug Enforcement Administration ("DEA").

11. **Defendant U.S. Immigration and Customs Enforcement ("ICE")** is a component agency of DHS and is tasked with managing enforcement of laws related to immigration. Among other functions, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, assumes custody over individuals in immigration detention, and is responsible for management and oversight of the civil immigration detention system.

12. **Defendant Todd M. Lyons** is the Acting Director of ICE and is sued in his official capacity. As Acting Director of ICE, he oversees its functions, including managing enforcement of laws related to immigration, carrying out stops and arrests of individuals believed to be in violation of civil immigration law, and managing the civil immigration detention system.

13. **Defendant U.S. Customs and Border Protection ("CBP")** is a component agency of DHS that is responsible for, among other things, interdiction and processing of individuals attempting to enter or exit the United States at the U.S. border without authorization. CBP agents, including those employed by CBP's component agencies such as U.S. Border Patrol, have been involved in making stops and arrests of individuals for civil immigration violations in D.C. pursuant to the immigration sweeps since on or about August 11, 2025.

14. **Defendant Rodney S. Scott** is the Commissioner of CBP and is sued in his official capacity. As Commissioner of CBP, he has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention.

15. **Defendant U.S. Border Patrol ("USBP" or "Border Patrol")** is a component agency of CBP and is responsible for interdiction and processing of individuals attempting to enter or exit the United States without authorization at the U.S. border. Border Patrol agents have made stops and arrests for civil immigration violations in D.C. pursuant to the immigration sweeps since on or about August 11, 2025.

16. **Defendant Michael W. Banks** is Chief of USBP and is sued in his official capacity. As Chief of USBP, Defendant Banks has direct authority over all USBP policies, procedures, and practices related to stops, arrests, and detention.

17. **Defendant U.S. Drug Enforcement Administration ("DEA")** is the federal law enforcement agency tasked with combatting and investigating drug trafficking offenses. DEA agents have made stops and arrests for civil immigration violations in D.C pursuant to the immigration sweeps since on or about August 11, 2025.

18. **Defendant Terrance C. Cole** is the Administrator of DEA and is sued in his official capacity. As Administrator of DEA, Defendant Cole oversees DEA's law enforcement functions and practices.

## FACTUAL ALLEGATIONS

### A. Mass Immigration Arrests in D.C. Since the Federal Takeover of the District in August 2025

19. Defendants have a policy and practice of making mass civil immigration arrests in Washington, D.C., without a warrant and without the probable cause findings that are required by Congress under federal statute. This policy and practice are tied to the President's promise to carry

out mass immigration arrests and deportations. During the 2024 presidential campaign, President Trump promised that "on Day One . . . [w]e will begin the largest deportation operation in the history of our country."[2] In January, after President Trump took office, the administration imposed an arrest quota of 75 arrests per day on ICE field offices across the country, including the Washington, D.C. ICE field office.[3] In May, the arrest quota increased to a new goal of *3,000* arrests each day, a number that White House Deputy Chief of Staff Stephen Miller publicly confirmed.[4] Miller said that "number is going to keep getting bumped higher over time."[5]

20. To help meet the quota and carry out these mass roundups, DHS granted non-DHS federal agencies immigration enforcement powers. *See* Press Release, U.S. Dep't of Homeland Sec., Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials (Jan. 23, 2025). Agents from these other agencies lack the kind of training immigration agents are expected to have when conducting immigration arrests.[6]

21. As part of his mass deportation plans, President Trump has exerted greater control over the nation's capital, including increasing civil immigration arrests in D.C. On March 27, 2025, for

---

[2] Press Release, The White House, Promises Made, Promises Kept: Border Security Achieved in Fewer Than 100 Days (Apr. 28, 2025), https://www.whitehouse.gov/articles/2025/04/promises-made-promises-kept-border-security-achieved-in-fewer-than-100-days (quoting Transcripts, Roll Call, Donald Trump Holds a Campaign Rally in Concord, North Carolina – October 21, 2024, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-concord-north-carolina-october-21-2024/#108).

[3] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, Wash. Post (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota.

[4] Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily*, Fox News (May 29, 2025, 3:25 PM), https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day.

[5] *Id.*

[6] Holmes Lybrand, et al., *FBI agents are again pulled from their day jobs to address a Trump priority*, CNN (Aug. 14, 2025), https://www.cnn.com/2025/08/14/politics/fbi-washington-immigration-epstein.

instance, he issued an Executive Order entitled "Making the District of Columbia Safe and Beautiful," which included the establishment of a Task Force to "coordinate to ensure effective Federal participation in," *inter alia*, "directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area." Exec. Order No. 14252, 90 Fed. Reg. 14559 (Mar. 27, 2025).

22. On August 11, 2025, President Trump declared a "crime emergency" in the District, pursuant to which he commandeered the D.C. Metropolitan Police Department ("MPD") for federal purposes and deployed 800 D.C. National Guard members to neighborhoods across the District. Exec. Order No. 14333, 90 Fed. Reg. 39301 (Aug. 11, 2025). While announcing the emergency declaration, President Trump "repeatedly turned to the topic of immigration" and declared that "[t]his city will no longer be a sanctuary for illegal alien criminals."[7]

23. A few days later, on August 15, 2025, Attorney General Pamela Bondi issued an order purporting to direct the Mayor of D.C. to use local resources to assist with "enforcement of federal immigration law," including with "locating, apprehending, and detaining aliens unlawfully present in the United States." Order of the Att'y Gen., Order No. 6372-2025, Restoring Safety and Security to the District of Columbia (Aug. 15, 2025).

24. An immediate and significant surge in immigration stops and arrests in D.C. followed these orders. As of September 9, 2025, over 40 percent of the arrests in D.C. made since the President's emergency declaration were federal civil immigration arrests—totaling 943 immigration arrests,

[7] Mike Lillis & Rebecca Beitsch, *DC officials say Trump crackdown is about immigration, power*, The Hill (Aug. 20, 2025, 5:31 PM), https://thehill.com/homenews/state-watch/5460622-trump-dc-crime-crackdown-immigration.

more than any other cause for arrests.[8] Over a 10-day period during the surge, over 70 percent of those arrested for immigration law violations had *no* criminal records—demonstrating that the purpose of the "emergency" declaration was in fact immigration action rather than a purported crackdown on "crime."[9]

25. The ongoing mass immigration stops and arrests have roiled life for people who live and work in D.C., particularly those whom ICE officers and other federal agents perceive to be Latino. Federal agents are stopping people while they are walking and driving in D.C. simply because the agents perceive them to be of Latino ethnicity. In some instances, the racial profiling is blatant and explicit. For example, on August 31, 2025, while a Latina woman was walking to a CVS in Northwest D.C. to pick up medicine for her daughter, an armed officer in camouflage stopped her to check her immigration status simply because—as the officer stated explicitly—the officer believed she did not "look like a citizen" and looked like she is from another country. In fact, the woman is a U.S. citizen.

26. In these encounters, Defendants' agents are systematically making immigration arrests without a warrant and without probable cause findings as to immigration status and flight risk as required under federal immigration law. ICE has used untargeted traffic stops to arrest individuals for alleged civil immigration violations.[10] ICE agents have arrested parents dropping off their children at school, leading neighbors to form "walking school buses" to safely escort kids to

---

[8] Alanna Durkin Richer & Rebecca Santana, *Over 40% of arrests in Trump's DC law enforcement surge relate to immigration, AP analysis finds*, Associated Press (Sept. 10, 2025), https://apnews.com/article/dc-immigration-federal-intervention-543a6079974fda90f96bae17ae53729e.

[9] *Id.*

[10] *See, e.g.*, *Trump's crackdown in DC leaves residents on edge as federal agents set up checkpoints*, WTOPnews (Aug. 21, 2025), https://wtop.com/dc/2025/08/trumps-immigration-crackdown-brings-checkpoints-and-new-fears-to-washington.

school.[11] People have also been arrested by federal agents on their way to church in the Columbia Heights neighborhood in D.C., where a large number of immigrants live, making people afraid to attend services.[12] Federal agents have also targeted food delivery drivers in D.C., stopping and arresting them without prior knowledge about their immigration status.[13] *See* Jeremy Raff et al., *The D.C. Delivery Workers Hiding From ICE* N.Y. Times (Sept. 8, 2025), https://www.nytimes.com/video/world/americas/100000010349920/dc-ice-deportations-delivery-drivers-immigrants.html (D.C. delivery driver describing how federal agents in D.C. "are targeting people who look Latino").

27. Although the "emergency" period pursuant to the August 11 declaration formally ended on September 11, mass immigration stops and arrests in D.C. are continuing. On September 15, in response to D.C. Mayor Muriel Bowser's September 10 announcement opposing continued

---

[11] Teo Armus, *They watched ICE detain their dad. Now D.C. neighbors escort them to school.*, Wash. Post (Sept. 11, 2025), https://www.washingtonpost.com/immigration/2025/09/11/immigrants-school-kids-trump-dc; *see also Federal surge has taken a toll on children of immigrants in Washington*, PBS News (Sept. 17, 2025, 2:24 PM), https://www.pbs.org/newshour/politics/federal-surge-has-taken-a-toll-on-children-of-immigrants-in-washington.

[12] Michael Sean Winters, *DC Mass attendance falls after immigration arrests*, The Tablet (Aug. 25, 2025), https://www.thetablet.co.uk/news/dc-mass-attendance-falls-after-immigration-arrests; *see also* Madalaine Elhabbal, *ICE arrests take toll on DC churches*, Cath. News Agency (Aug. 21, 2025, 6:18 PM), https://www.catholicnewsagency.com/news/266095/ice-arrests-take-toll-on-dc-churches.

[13] Teo Armus et al., *ICE Is Joining D.C. Police Patrols. Moped Drivers Are Getting Detained*, Wash. Post (Aug. 21, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/21/dc-police-ice-moped-crackdown-delivery-drivers; Didi Martinez*, Detentions of D.C. delivery drivers leave immigrant communities on edge*, NBC News (Aug. 19, 2025, 5:00 AM), https://www.nbcnews.com/news/us-news/dc-delivery-driver-detentions-spark-concern-fear-community-rcna225671.

cooperation between MPD and ICE,[14] President Trump threatened on his social media platform Truth Social to "call a National Emergency, and Federalize, if necessary!!!"[15]


Donald J. Trump
@realDonaldTrump

The Federal Government, under my auspices as President of the United States of America, has stepped into the complete criminal mess that was Washington, D.C., our Nation's Capital. Because of this, D.C. has gone from one of the most dangerous and murder ridden cities in the U.S.A., and even around the World, to one of the safest - In just a few weeks. The "place" is absolutely booming, with restaurants, stores, and businesses packed and, for the first time in decades, virtually NO CRIME. It has been a beautiful thing to watch but, now, under pressure from the Radical Left Democrats, Mayor Muriel Bowser, who has presided over this violent criminal takeover of our Capital for years, has informed the Federal Government that the Metropolitan Police Department will no longer cooperate with ICE in removing and relocating dangerous illegal aliens. If I allowed this to happen, CRIME would come roaring back. To the people and businesses of Washington, D.C., DON'T WORRY, I AM WITH YOU, AND WON'T ALLOW THIS TO HAPPEN. I'll call a National Emergency, and Federalize, if necessary!!! Thank you for your attention to this matter. MAKE AMERICA GREAT AGAIN!!! President DJT

**8.43k** ReTruths **36.1k** Likes Sep 15, 2025, 1:06 AM

*See also* Michael W. Banks (@USBPChief), X, (Sept. 17, 2025, 10:42 A.M.) https://t.co/U7DrgTVu0f (boasting of immigration arrests in D.C. during the weekend of September 13, 2025).

---

[14] Sophie Rosenthal, *MPD will not continue to cooperate with ICE after emergency federal control ends*, WUSA9 (Sept. 10, 2025, 1:14 PM), https://www.wusa9.com/article/news/local/home-rule/mpd-ice-emergency-federal-surge-ends-mayor-muriel-bowser-president-donald-trump/65-452b67be-a444-4dba-925b-9519f4c87604.

[15] Donald J. Trump (@realDonaldTrump), Truth Social, (Sept. 15, 2025, 1:06 AM), https://truthsocial.com/@realDonaldTrump/posts/115206570863756188.

### B. Defendants Have a Policy and Practice of Making Warrantless Arrests Without Making Individualized Determinations of Immigration Status and Flight Risk

28. Defendants have a policy and practice of making warrantless immigration arrests without conducting an individualized assessment establishing probable cause that the person being arrested is unlawfully present in the country and is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2).

29. Congress requires immigration arrests to be based on warrants, with certain narrow exceptions. Under 8 U.S.C. § 1357(a)(2), two conditions must be met before an agent may conduct a warrantless arrest: the agent must have "reason to believe" *both* that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." "Reason to believe" is "considered the equivalent of probable cause," *Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971), which "must be particularized with respect to the person to be searched or seized," *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366 (2003)).

30. This is not the first time Defendants DHS and ICE have instituted a version of this unlawful policy. In 2018, Chicago residents and non-profit organizations sued ICE for its policy and practice of conducting warrantless arrests in the Chicago area without complying with the probable cause requirements in § 1357(a)(2). Second Amended Complaint, *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Dec. 18, 2018), ECF 58. After the district court denied the government's motion to dismiss, the case was resolved by a 3-year settlement agreement that required ICE to adopt a nationwide policy to prohibit warrantless arrests that failed to meet the requirements of § 1357(a)(2). As part of the settlement, on November 23, 2021, ICE issued a Broadcast Statement of Policy making clear that "mere presence within the United States

in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be obtained."[16] The Policy also listed specific factors that may be relevant to determine flight risk, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof."[17]

31. However, Defendants have now changed their policy in the District of Columbia in order to carry out mass arrests. Tellingly, Defendants no longer require immigration officers to gain prior supervisor approval of, or even to fill out a paper form with information about, the person they arrest. This reflects the administration's intention to "move[] from targeted enforcement to broad street sweeps."[18]

32. The circumstances of the immigration arrests in D.C. illustrate Defendants' policy and practice of conducting warrantless arrests without an individualized assessment of probable cause that the person both is unlawfully present in the United States and is a flight risk.

33. For example, on August 21, 2025, plain-clothed and unidentified federal agents arrested Mr. Escobar Molina without a warrant while he was getting in his truck to go to work. They did not ask for his name or his identification or ask anything about his immigration status, where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. The agents immediately handcuffed Mr. Escobar Molina, grabbed him by the arms

---

[16] ICE Broadcast Statement of Policy, *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Nov. 23, 2021), Appendix A to Settlement Agreement at 17-18, available at https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf.

[17] *Id.*

[18] Julia Ainsley et al., *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC News (Sept. 9, 2025, 5:00 AM), https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407.

and legs, and called him "illegal" repeatedly. When he responded that he has "papers" (in other words, immigration status), they replied, "No you don't. You are illegal." After the agents put Mr. Escobar Molina into a vehicle, when Mr. Escobar Molina told them again that he had "papers," the driver of the car yelled at him, "Shut up, bitch! You're illegal." The agents did not make an individualized determination about Mr. Escobar Molina's immigration status or flight risk before they arrested him. While Mr. Escobar Molina was in detention, ICE fingerprinted and interviewed him and, based on DHS's standard practice, Defendants created a record of Mr. Escobar Molina's arrest. *See* U.S. Dep't of Homeland Sec., DHS/ICE/PIA-015 Enforcement Integrated Database (May 2019), https://www.dhs.gov/publication/dhsicepia-015h-enforcement-integrated-database-eid-criminal-history-information-sharing ("The Enforcement Integrated Database . . . stores and maintains information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by U.S. Immigration and Customs Enforcement (ICE) . . . [and other] components within DHS.").

34. On August 18, 2025, federal agents, including at least one Border Patrol agent, arrested B.S.R. after he got in his car to go to work with his father. The officers handcuffed B.S.R. and his father. They did so without a warrant and without asking for B.S.R.'s name, his identification, or anything about his immigration status, where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. Indeed, shortly after his arrest, B.S.R. showed the agents the ankle monitor that he wears as a condition of release due to his processing by ICE in January 2025. B.S.R.'s partner attempted to explain to the arresting officers that B.S.R. was already in an immigration process. The agents did not make an individualized determination

about B.S.R.'s immigration status or flight risk before they arrested him. Based on DHS's standard practice, Defendants created a record of B.S.R.'s arrest.

35. ICE also arrested N.S. without a warrant and without making an individualized assessment of probable cause for his flight risk. On August 12, 2025, ICE agents arrested N.S. without a warrant and without asking him anything about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. The agents pulled N.S. out of the driver's seat, threw him against the car, handcuffed him, and provided him a clear bag in which to place his belongings, before placing him in the back of a van. The agents who arrested N.S. did not make an individualized determination about his flight risk before they arrested him. While in detention, Defendants fingerprinted, photographed, and interviewed N.S., and based on DHS's standard practice, Defendants created a record of his arrest.

36. R.S.M. likewise was arrested by ICE without a warrant. On August 26, 2025, she and her partner were pulled over while driving to work in D.C. The agents asked her and her husband for identification and did not indicate that they knew who they were prior to stopping them. The officers forcibly opened the car doors, pushed R.S.M. against the car, handcuffed her with her hands behind her backs, and put her in a car. Before arresting her, the agents did not ask R.S.M. anything about where she lives, whom she lives with, how long she has lived here, or anything else about her ties to the community. They did not make an individualized determination of her flight risk before they arrested her. While in detention, Defendants fingerprinted and interviewed R.S.M., and based on DHS's standard practice, Defendants created a record of her arrest.

37. Another individual, C.*, is a U.S. citizen who works in landscaping and frequently travels to D.C. for his work. On the morning of August 20, 2025, as he was driving into D.C. in his work truck, he was initially stopped by a Park Police agent, who said he had trouble seeing his car tags

and needed to make sure C. and his coworker in the passenger seat were "all right." Shortly afterwards, a plainclothes agent came up to the passenger side of the car and began aggressively questioning C.'s colleague about his immigration status. Although C.'s colleague did not say anything (and had not said or done anything during the stop), the agent opened the passenger-side door, pulled C's colleague out of the car, pushed him to the ground, and restrained him. The agents did not have a warrant for C.'s colleague's arrest, nor did they ask C.'s colleague any questions about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community before arresting him. The agents did not make an individualized determination of C.'s colleague's flight risk before they arrested him. Based on DHS's standard practice, Defendants created a record of C.'s colleague's arrest.

38. Elias*, a CASA member, was in a car accident in D.C. on August 21, 2025, when ICE agents arrived at the scene. The agents told Elias that he was under arrest and put handcuffs on him. The agents did not ask Elias anything about where he lives, who he lives with, how long he has lived here, or anything else about his ties to the community. The agent did not make an individualized determination about Elias's flight risk before arresting him. Based on DHS's standard practice, Defendants created a record of his arrest.

39. Another CASA member, Nerwin*, was riding in the passenger seat of a car in D.C. on August 28, 2025, when a police officer pulled the car over and told his co-worker, who was driving, that the car had expired registration. The officer stepped away to speak to someone on the phone. Afterwards, agents wearing vests that said "DHS" arrived and told Nerwin he was under arrest and brought him to the ICE Processing Center at Chantilly, Virginia, where he was detained before being moved to other detention facilities. The officer never asked Nerwin about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community

before arresting and detaining him. The officer did not make an individualized determination about flight risk. Based on DHS's standard practice, Defendants created a record of his arrest.

40. Another CASA member, Miguel*, was walking out of a grocery store in D.C. toward his car on August 18, 2025, when ICE agents approached him. One of the agents asked if he owned the car. When Miguel explained that it was his brother's car, the agent demanded that Miguel call his brother to prove it. Miguel's brother did not pick up the phone, as it was late at night, and the agents arrested Miguel without a warrant for civil immigration reasons and transported him to an ICE office in Virginia. The agents did not ask him for his name, his identification, or anything about his immigration status. Nor did they ask him about where he lives, who he lives with, how long he has lived there, or anything else about his ties to the community. The agents did not make an individualized determination about Miguel's immigration status or flight risk before they arrested him. Based on DHS's standard practice, Defendants created a record of his arrest.

41. Another CASA member, Juan*, was arrested while taking out the trash at his workplace in D.C. on August 14, 2025. The agents approached Juan and told him that he was under arrest. They did not explain who they were or why Juan was being arrested and did not provide a warrant. The agents did not ask Juan for his name, his identification, or anything about his immigration status. Nor did they ask him about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. They did not make an individualized determination about his immigration status or flight risk before arresting him. Juan only learned they were immigration agents when he arrived at the detention center. Based on DHS's standard practice, Defendants created a record of his arrest.

42. Another CASA member, Gordon*, was sitting on his motorbike in a parking lot in D.C. on August 31, 2025, when he was arrested by ICE agents. The ICE agents arrested Gordon without

a warrant; never asked about where he lives, who he lives with, how long he has lived here, or anything else about his ties to the community; and never made an individualized determination about flight risk. Based on DHS's standard practice, Defendants created a record of his arrest.

43. Another CASA member, Flavio*, was working at a construction site in D.C. on August 26, 2025, when agents in green uniforms and police officers arrived and began arresting workers, including Flavio. The officers led Flavio out of the building and put him in a marked car. The agents arrested Flavio without a warrant for civil immigration reasons and did not explain why they arrested him. The agents did not ask Flavio for his name, his identification, or anything about his immigration status. Nor did they ask him about where he lives, who he lives with, how long he has lived here, or anything else about his ties to the community. They did not make an individualized determination about his immigration status or flight risk before arresting him. Based on DHS's standard practice, Defendants created a record of his arrest.

44. Another CASA member, Antony*, was driving in D.C. on August 25, 2025, when he was forced to brake quickly to avoid hitting a police vehicle blocking the road. The federal agents, some of whom were wearing masks and hiding their faces and most of whom were wearing green uniforms with vests that said "Police," surrounded Antony's car and told him that he was under arrest and detained him. He initially was brought to a police station in D.C. before being taken to the ICE Processing Center in Chantilly, Virginia, and from there he was transferred to other detention centers. The agents arrested Antony for civil immigration reasons without a warrant and without asking him for his name, identification, or anything about his immigration status. Nor did they ask him about where he lives, whom he lives with, how long he has lived here, or anything else about his ties to the community. They did not make an individualized determination about

his immigration status or flight risk before arresting him. Based on DHS's standard practice, Defendants created a record of his arrest.

### C. Plaintiffs and D.C. Residents of Immigrant and Latino Backgrounds Anticipate and Fear Future Unlawful Arrests Due to Defendants' Policy and Practice of Making Warrantless Arrests Without Probable Cause

45. Because of the widespread nature of the arrests pursuant to Defendants' unlawful policy and practice of making warrantless arrests without probable cause, and because of the systemic nature of Defendants' disregard for the requirements of federal law, Plaintiffs and those who live and work in D.C., particularly those of Latino ethnicity, face a substantial risk that they will be subjected to unlawful warrantless arrests in the near future.

46. For example, Plaintiff R.S.M. has repeatedly witnessed unmarked cars patrolling her neighborhood in the northeastern part of D.C. The week that she was arrested, she saw unmarked cars patrolling the area several days in a row, and she has seen unmarked cars patrolling since her arrest. R.S.M. was arrested one block from her home.

47. In D.C.'s most diverse neighborhoods, residents walk around scared after witnessing officers smash car windows to drag their neighbors into unmarked cars, with one resident describing her neighborhood as a "police state."[19] One lawful permanent resident in D.C. described unusually quiet streets in the Columbia Heights neighborhood, and expressed, "We don't feel safe, for the simple reason that we're Latino."[20] The U.S. citizen mother discussed above who was told by an armed officer that she does not look like a citizen now carries proof of citizenship

---

[19] Jake Horton & Aisha Sembhi, *Videos show impact of Trump's crackdown in one Washington DC neighbourhood*, BBC (Aug. 26, 2025), at https://www.bbc.com/news/articles/c1le1zpqyzlo; Paul Schwartzman & Brittany Shammas, *A D.C. neighborhood long home to immigrants pushes back against ICE arrests*, Wash. Post (Sept. 17, 2025), https://www.washingtonpost.com/dc-md-va/2025/09/17/dc-ice-arrests-trump-takeover.

[20] Ted Hesson & Suheir Sheikh, *Washington's immigrant neighborhoods push back against ICE arrests*, Reuters (Sept. 19, 2025, 8:14 AM), https://www.reuters.com/world/us/washingtons-immigrant-neighborhoods-push-back-against-ice-arrests-with-protests-2025-09-19.

everywhere out of fear of future arrest because, as the agent told her, he believed she looked like she was from another country.

48. Defendants' conduct is causing ongoing harm to Plaintiffs and other Latino members of the D.C. community. Plaintiff Escobar Molina, for example, was arrested and detained overnight in terrible conditions only to be released with an apology from an ICE officer acknowledging that he never should have been arrested in the first place. He still experiences pain from being grabbed by his arms and legs and pushed into the arresting officers' vehicle while handcuffed. He has since changed parts of his daily routine as he lives in fear that he will be arrested again without a warrant and without any probable cause determination. Mr. Escobar Molina also suffers from nightmares in which he relives his arrest and imagines being arrested again. Mr. Escobar Molina is afraid not only for himself but also for his U.S. citizen sons because they are also Latino.

49. Plaintiff B.S.R. is also fearful of being arrested and detained again due to Defendants' unlawful policy. As a result of Defendants' unlawful policy, B.S.R. has moved outside of D.C. However, B.S.R. continues to travel through the D.C. area in transit to worksites on a near-daily basis and is at substantial risk of arrest again in the near future as a result.

50. Plaintiff N.S. continues to suffer from health problems due to his arrest and detention. His knee is swollen due to being shackled for several hours at a time and sitting on several long flights as he was repeatedly transferred while detained. He is also now experiencing leg pain and high blood pressure. N.S. is now fearful and stressed due to his arrest and detention. He is unable to sleep through the night. He is scared to walk outside or drive and has stopped driving his grandchildren and youngest son to school.

51. Plaintiff R.S.M. has felt panicked and scared to go outside due to her fear of rearrest, and she has been having difficulty sleeping. R.S.M.'s family members are likewise deeply afraid, and

some of them are reluctant to leave the house. R.S.M. watches her 16-year-old son walk to school to ensure he will not be arrested.

52. Defendants' policy and practice of warrantless arrests without probable cause have also significantly harmed CASA. CASA offers a wide range of social, health, job training, employment, and legal services to immigrant communities in D.C. (and in other states) in furtherance of its mission. CASA assists individuals in applying for a variety of government benefits. CASA also provides its members with free legal assistance, including free legal consultations on immigration issues, as well as several hotlines through which community members can request assistance. In the D.C. region in particular, CASA's legal services have historically focused on securing and stabilizing immigration status—both temporary and permanent status—for non-detained community members, and CASA's Health and Human Services ("HHS") program in the D.C. region has focused on increasing community members' social stability, including by assisting them with public benefits enrollments, and providing case management for a variety of needs, including access to critical health and social services.

53. One of the hotlines that CASA operates is an ICE tip hotline, through which community members can report ICE enforcement actions that they have witnessed or experienced. The purpose of the ICE tip hotline is not to interrupt or obstruct active ICE enforcement actions, but rather to provide support to individuals and families who have been impacted by those ICE enforcement actions. Accordingly, calls to CASA's ICE tip hotline are typically to report an ICE arrest that has recently occurred. After a report is submitted to CASA, CASA investigates the report and provides legal and humanitarian support to those who have been impacted.

54. Defendants' policy and practice of warrantless arrests without probable cause has caused a forty-fold increase in reports of immigration arrests in D.C. via CASA's ICE tipline in the two-

week period between August 14 and August 29, 2025, compared to the period from January 2025 to August 13, 2025.

55. The surge in unlawful arrests has caused significant disruption to CASA's functions and activities, pulling CASA away from its core focus of providing services that stabilize and protect CASA members to providing rapid, emergency response to unlawful detentions affecting CASA members. These shifts in resources and focus have impaired CASA's ability to carry out its core functions. Specifically, detention response now comprises a significant portion of work undertaken by CASA's Legal and HHS teams. This work is not fully compensated by these teams' budgets. The HHS team, for example, now expends approximately 25 percent of its workload—equivalent to over one-and-a-half full-time employees—on detention response and follow-up. Rather than focusing on their core missions, these staff must now triage calls and requests for detention-related assistance, conduct needs assessments for families impacted by recent ICE detentions, and connect legal and social assistance to the families of those detained.

56. Similarly, instead of CASA's immigration legal team being able to focus on securing long-term status for individuals, the team now spends a significant amount of time providing rapid legal response and referrals to the families of detained individuals. Legal clinics run by CASA at which community members could previously receive assistance with immigration applications have now been replaced by rapid legal response phone calls every day to provide family members with post-arrest information and guidance. Naturalization and U-Visa applications have been replaced with assistance locating detained loved ones and referrals to private attorneys. In effect, mass immigration arrests in D.C.—pursuant to Defendants' policy and practice of making warrantless arrests without probable cause, which permit such mass arrests—have impaired the legal team's ability to engage in stabilizing community members through substantive, extended legal

assistance, turning CASA into an emergency legal advice and referral operation, instead of a long-term legal representation operation.

57. CASA faces increased costs due to Defendants' unlawful policy and practice of warrantless arrests without probable cause in D.C., especially in funding its hotline services. CASA's hotline expenses for the period covering July 27, 2025, to August 26, 2025, which includes only two weeks of the D.C. ICE enforcement surge, reflected an increase of approximately 14 percent from the previous period of June 27, 2025, to July 26, 2025.

58. In addition, CASA's funding to provide services to the community has been jeopardized as a consequence of shifting resources to respond to ICE's unlawful seizures. CASA's shift of human resources to detention response threatens its ability to comply with grant deliverables specified in existing grant contracts. For example, just this month, one such county grant was reduced by 50 percent in part due to delayed progress on grant deliverables. Through this grant, CASA's HHS team is to do significant work that directly contributes to the county's dedication to growing clean energy in low-income, working-class neighborhoods. This work is directly tied to CASA's goals of stabilizing and improving the quality of life of community members. Yet, the HHS team cannot conduct an intake for a community member under this grant without first addressing the community member's immediate need and concern—that their loved one has been detained. Because of the need to divert the HHS team's attention to respond to ICE's expanded, unlawful actions against its community, CASA risks continuing to lose such critical funding that supports its mission.

59. Defendants' unlawful policies and practices in D.C. have also impaired CASA's core function of connecting community members to social services by chilling open communication between CASA and its members. Prior to the surge in immigration activity in D.C., CASA would

regularly connect community members to vital social services through free consultations that help members navigate complex public benefits programs. However, CASA's ability to connect community members to social services depends on members' willingness to share personal information with staff. Since immigration enforcement activity increased in D.C., community members have become increasingly reluctant to share personal information, fearful that their immigrant status will be weaponized against them even though they are, by law, permitted to access such benefits. CASA has noticed a marked decrease in participation in public benefits programs by immigrant community members. Further, cases that CASA manages and services it delivers now take longer to carry out because of the additional time that CASA must invest in building trust and providing education to each community member in this environment.

60. These harms to CASA itself are on top of the harms CASA's members are facing as a result of Defendants' unlawful policies and practices as recounted in the stories of some individual CASA members above, including trauma, fear, and the feeling of being deprived of the basic dignity of participating in public life in D.C. CASA has many members who reside, work, and travel through Washington, D.C., many if not most of whom are Latino. These CASA members include citizens, lawful permanent residents, individuals with a variety of other immigration statuses, and undocumented noncitizens. Some of CASA's members who have been arrested will likely be or have been released from detention and will be subjected to Defendants' unlawful policy and practice of warrantless arrests without probable cause again in D.C. CASA members who reside, work, and travel through D.C. who have not yet been arrested under Defendants' unlawful policy and practice are also at substantial risk of being subjected to Defendants' policy and practice in the near future. Thus, like Plaintiffs, these CASA members face a substantial risk of being unlawfully arrested pursuant to Defendants' policy and practice.

## CLASS ACTION ALLEGATIONS

61. Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

62. Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. seek to represent the following class:

> **Warrantless Arrests Class:** All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

63. Messrs. Escobar Molina and B.S.R. seek to represent the following subclass:

> **Immigration Status Subclass:** All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully.

64. Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. seek to represent the following subclass:

> **Flight Risk Subclass:** All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

65. Plaintiffs reserve the right to amend or modify the class and subclass definitions as appropriate.

66. The proposed class and subclasses satisfy the prerequisites of Rule 23(a) and 23(b)(2). They satisfy the numerosity requirement of Rule 23(a)(1) because they include anyone who has been or will be subjected to Defendants' policy and practice of making warrantless arrests without the requisite probable cause findings. Although the number of individuals who have been or will be subject to unlawful warrantless arrests by Defendants is not known with precision, class

members number in the thousands. Since August 11, 2025, federal agents have arrested at least 940 people within the District, with no indications of possessing a warrant or conducting any sort of pre-arrest, individualized assessment of the arrested person's immigration status or flight risk. This includes at least 16 individuals of whom undersigned counsel are currently aware, who have been arrested without a warrant and without an individualized assessment of an immigration law violation and/or flight risk since August 11, 2025.

67. The proposed class and subclasses satisfy the commonality requirement of Rule 23(a)(2) as they share common issues of fact or law, including but not limited to whether Defendants' policy and practice of warrantless arrests without individualized determinations of probable cause for an immigration law violation or flight risk violates 8 U.S.C. § 1357(a)(2).

68. The proposed classes also satisfy the typicality requirement of Rule 23(a)(3). The claims of the proposed class representatives for the Warrantless Arrests Class are typical of the claims for that class because Messrs. Escobar Molina, B.S.R., and N.S., and Ms. R.S.M. were all arrested without a warrant and without an individualized determination of their immigration status and/or flight risk prior to their arrests.

69. Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no conflict of interest with the putative class members, will fairly and adequately protect the interests of the class, and understand and accept their responsibilities as class representatives.

70. The proposed classes satisfy the requirements of Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, as they have a policy and practice, to which everyone in the Warrantless Arrests Class and the two subclasses is subject, of making warrantless arrests without the requisite probable cause findings. Final injunctive or declaratory relief therefore is appropriate to the class and subclasses as a whole.

71. Counsel for Plaintiffs have extensive experience litigating class actions and cases involving civil and constitutional rights generally, and the rights of noncitizens specifically, and are therefore qualified to be certified as class counsel pursuant to Rule 23(g).

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i), the *Accardi* doctrine, and the Administrative Procedure Act, 5 U.S.C. § 706: Warrantless Arrests Without Individualized Assessment of Immigration Status

72. Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same). "Reason to believe" is "considered the equivalent of probable cause," *Lau*, 445 F.2d at 222, which "must be particularized with respect to the person to be searched or seized," *Barham*, 434 F.3d at 573.

73. Defendants have a policy and practice of making warrantless arrests in D.C. without making individualized determinations of immigration status and/or flight risk as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii).

74. Defendants' policy and practice of making warrantless arrests in D.C. without making individualized determinations of immigration status as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i) is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the elementary principle of administrative law that agencies are required to follow their own regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

75. This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

76. This Court also has inherent equitable authority to enjoin violations of federal law by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

77. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Warrantless Arrests Class and Immigration Status Subclass are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued and future irreparable injury.

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the *Accardi* doctrine, and the Administrative Procedure Act, 5 U.S.C. § 706: Warrantless Arrests Without Individualized Assessment of Flight Risk

78. Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same). "Reason to believe" is "considered the equivalent of probable cause," *Lau v.* , 445 F.2d at 222, which "must be particularized with respect to the person to be searched or seized." *Barham*, 434 F.3d at 573.

79. Defendants have a policy and practice of making warrantless arrests in D.C. without making individualized determinations of immigration status and/or flight risk as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii).

80. Defendants' policy and practice of making warrantless arrests in D.C. without making individualized determinations of flight risk as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C.

§ 706(2)(A), (C), and violates the elementary principle of administrative law that agencies are required to follow their own regulations. *See Accardi*, 347 U.S. at 268.

81. This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

82. This Court also has inherent equitable authority to enjoin violations of federal law by federal officers. *See Armstrong*, 575 U.S. at 326.

83. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Warrantless Arrests Class and Flight Risk Subclass are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued and future irreparable injury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Certify a class of all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk (**"Warrantless Arrests Class"**), and appoint Plaintiffs José Escobar Molina, B.S.R., N.S., and R.S.M. as class representatives;

B. Certify a subclass of all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully (**"Immigration Status Subclass"**) and appoint Plaintiffs José Escobar Molina and B.S.R. as the subclass representatives;

C. Certify a subclass of all persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-

arrest, individualized assessment of probable cause that the person poses a flight risk (**"Flight Risk Subclass"**) and appoint Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M. as subclass representatives;

D. Appoint the undersigned counsel as class counsel for the Warrantless Arrests Class and the Immigration Status and Flight Risk Subclasses;

E. Declare that Defendants' policy and practice of making warrantless immigration arrests without making a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i);

F. Declare that Defendants' policy and practice of making warrantless immigration arrests without making a pre-arrest, individualized assessment of probable cause that the person poses a flight risk violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2) (ii);

G. Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of *both* an immigration law violation and flight risk, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii);

H. With respect to the Warrantless Arrests Class, enjoin Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of *both* an immigration law violation and flight risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i),(ii);

I. With respect to the Immigration Status Subclass, enjoin Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of an immigration law violation in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i);

J. With respect to the Flight Risk Subclass, enjoin Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of flight risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

K. Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge all records collected and maintained about Plaintiffs and class members from their unlawful arrests, including any derivative information;

L. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable source of law; and

M. Award such further relief as the Court deems appropriate.

September 25, 2025

Respectfully submitted,

*s/ Adina Appelbaum*
Adina Appelbaum (D.C. Bar No. 1026331)
Ian Austin Rose (Md. Bar No. 2112140043)
Samantha Hsieh (Va. Bar No. 90800)*
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Avenue NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
austin.rose@amicacenter.org
sam@amicacenter.org

*s/ Aditi Shah*
Aditi Shah (D.C. Bar No. 90033136)
Scott Michelman (D.C. Bar No. 1006945)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA**
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
ashah@acludc.org
smichelman@acludc.org

Kathryn Huddleston (Tex. Bar No. 24121679)*++
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
khuddleston@aclu.org

*s/ Sirine Shebaya*
Sirine Shebaya (D.C. Bar No. 1019748)
Yulie Landan (Cal. Bar No. 348958)*+
Bridget Pranzatelli (D.C. Bar No. 90029726)
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Road NW, Suite 175
Washington, D.C. 20009
(213) 430-5521
sirine@niplg.org
yulie@nipnlg.org
bridget@nipnlg.org

*s/ Jehan A. Patterson*
Jehan A. Patterson (D.C. Bar No. 1012119)
Chris Kimmel (D.C. Bar No. 1047680)**
Alexandra Widas (D.C. Bar No. 1645372)***
Hassan Ahmad (D.C. Bar No. 1030682)***
Sean Berman (D.C. Bar No. 90026899)
Austin Riddick (D.C. Bar No. 90018117)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com
ckimmel@cov.com
awidas@cov.com
hahmad@cov.com
sberman@cov.com
ariddick@cov.com

Eva H. Lilienfeld (N.Y. Bar No. 6143085)*
Graham Glusman (N.Y. Bar No. 6099535)*
**COVINGTON & BURLING LLP**
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
elilienfeld@cov.com
gglusman@cov.com

*s/ Madeleine Gates*
Madeleine Gates (D.C. Bar No. 90024645)
**WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS**
700 14th Street NW, #400
Washington, D.C. 20005
(202) 319-1000
madeleine_gates@washlaw.org

*s/ Ama Frimpong*
Ama Frimpong (D.C. Bar No. 1602444)*
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
(240) 485-8844
afrimpong@wearecasa.org

*Attorneys for Plaintiffs*[21]

**Motion for Admission* pro hac vice *forthcoming.*
***Petition for Admission forthcoming.*
****Petition for Admission pending.*

*+Not Admitted in D.C.; working remotely from N.Y. and admitted in Cal. only*
*++Not Admitted in D.C.; working remotely under supervision of D.C. Bar member, practice limited to federal courts in D.C., and admitted in Ariz. and Tex. only.*

[21] Counsel wish to acknowledge the assistance of legal program manager Lily Hartmann; law clerks Maggie Hopkins, Marcus Ransom, and Joseph Hasbrouck; and paralegal Yahir Santillan-Guzman in the investigation of the facts and the preparation of this complaint.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417-PLF |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, TO STAY AGENCY ACTION, AND FOR PROVISIONAL CLASS CERTIFICATION**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ........ ii

**TABLE OF AUTHORITIES** ........ iv

**INTRODUCTION** ........ 1

**STATUTORY BACKGROUND** ........ 2

**STATEMENT OF FACTS** ........ 3

A. Since President Trump's August 11 Emergency Declaration in D.C., Defendants Have Been Conducting Mass Immigration Arrests in the District ........ 3

B. Defendants' Agents Are Making Warrantless Immigration Arrests in D.C. Without an Individualized Determination of Probable Cause that the Person Is Here Unlawfully and Is a Flight Risk. ........ 5

C. Plaintiffs and Putative Class Members Will Be Arrested, Detained, and Separated from Their Families Under Defendants' Unlawful Policy and Practice. ........ 14

**ARGUMENT** ........ 17

I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ........ 18

A. The INA and DHS Regulations Require Agents to Make an Individualized Determination That the Person Is in the United States Unlawfully and Is a Flight Risk Before Arresting That Person Without a Warrant. ........ 18

B. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Flight Risk Violates the INA. ........ 21

C. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Either of The Statutorily Required Criteria Is a Final Agency Action That Violates the APA. ........ 23

D. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Flight Risk Violates the *Accardi* Doctrine. ........ 26

II. Absent Immediate Injunctive Relief, Plaintiffs and the Putative Class Will Continue Facing Irreparable Harm Due to Defendants' Unlawful Policy and Practice. ........ 27

III. The Equities and the Public Interest Favor Plaintiffs. ........ 31

IV. Provisional Class Certification Is Warranted. 33

**CONCLUSION 34**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)....18, 26, 27, 28

*Adams v. District of Columbia*,
285 F. Supp. 3d 381 (D.D.C. 2018)....18

*Affinity Healthcare Servs., Inc. v. Sebelius*,
720 F. Supp. 2d 12 (D.D.C. 2010)....18

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024)....18

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018)....24, 28

*Arizona v. United States*,
567 U.S. 387 (2012)....2

**Au Yi Lau v. U.S. Immig. & Naturalization Serv.*,
445 F.2d 217 (D.C. Cir. 1971)....2, 19

**Barham v. Ramsey*,
434 F.3d 565 (D.C. Cir. 2006)....2, 19, 20

*Barwood, Inc. v. District of Columbia*,
1999 U.S. Dist. LEXIS 21427 (D.D.C. Feb. 16, 1999)....28

*Battle v. F.A.A.*,
393 F.3d 1330 (D.C. Cir. 2005)....27

*Beck v. Ohio*,
379 U.S. 89 (1964)....19

*Bennett v. Spear*,
520 U.S. 154 (1997)....24, 25

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020)....24

*Brinegar v. United States*,
338 U.S. 160 (1949)....20

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ....................18

*Charles H. v. District of Columbia*,
2021 WL 2946127 (D.D.C. June 16, 2021) ....................33

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ....................25

*Commc'ns & Control, Inc. v. F.C.C.*,
374 F.3d 1329 (D.C. Cir. 2004) ....................26

**Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ....................24, 25

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) ....................18

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ....................27, 33

*De La Paz v. Coy*,
786 F.3d 367 (5th Cir. 2015) ....................20

*de Nolasco v. U.S. Immigr. & Customs Enf't*,
319 F. Supp. 3d 491 (D.D.C. 2018) ....................29

*Devenpeck v. Alford*,
543 U.S. 146 (2004) ....................20

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) ....................35

*Fisher v. Pension Benefit Guar. Corp.*,
151 F. Supp. 3d 159 (D.D.C. 2016) ....................26

*Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ....................32

*Holden v. Finch*,
446 F.2d 1311 (D.C. Cir. 1971) ....................27

*J.G.G. v. Trump*,
2025 WL 1577811 (D.D.C. June 4, 2025) ....................35

*Jacksonville Port Auth. v. Adams*,
556 F.2d 52 (D.C. Cir. 1977) ....................33

*Jefferson v. Harris*,
285 F. Supp. 3d 173 (D.D.C. 2018) ..........27

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ..........32

*Kirwa v. U.S. Dep't of Def.*,
285 F. Supp. 3d 21 (D.D.C. 2017) ..........33

*L.G.M.L. v. Noem*,
2025 WL 2671690 (D.D.C. Sept. 18, 2025) ..........33

**League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..........28, 31, 32, 33

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ..........29

*Make the Rd. New York v. Noem*,
2025 WL 2494908 (D.D.C. Aug. 29, 2025) ..........29, 31

*Maryland v. Pringle*,
540 U.S. 366 (2003) ..........19

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) ..........28

*Michigan v. E.P.A.*,
576 U.S. 743 (2015) ..........26

*Morales v. Chadbourne*,
793 F.3d 208 (1st Cir. 2015) ..........19

*Morton v. Ruiz*,
415 U.S. 199 (1974) ..........27

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..........26

*N.S. v. Hughes*,
335 F.R.D. 337 (D.D.C. 2020) ..........28

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ..........26

*Orellana v. Nobles Cnty.*,
230 F. Supp. 3d 934 (D. Minn. 2017) ..........21

*P.J.E.S. by and through Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) ....................33

*Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*,
313 F. Supp. 3d 62 (D.D.C. 2018) ....................26

*R.I.L–R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) ....................28, 32, 34

**Ramirez v. U.S. Immigr. & Customs Enf't*,
310 F. Supp. 3d 7 (D.D.C. 2018) ....................29

**Ramirez v. U.S. Immigr. & Customs Enf't*,
338 F. Supp. 3d 1 (D.D.C. 2018) ....................24, 25

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
2025 WL 1825431 (D.D.C. July 2, 2025) ....................25

*Rubinstein v. Brownell*,
206 F.2d 449 (D.C. Cir. 1953) ....................28

*Sierra Club v. Thomas*,
828 F.2d 783 (D.C. Cir. 1987) ....................25

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ....................32

*Smith v. United States*,
843 F.3d 509 (D.C. Cir. 2016) ....................19

*Steele v. United States*,
159 F. Supp. 3d 73 (D.D.C. 2016) ....................34

*Tate v. Pompeo*,
513 F. Supp. 3d 132 (D.D.C. 2021) ....................29

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
578 U.S. 590 (2016) ....................25

*United States v. Abdi*,
2005 WL 6119695, No. 2:04-CR-88 (S.D. Ohio Sept. 12, 2005) ....................22

*United States v. Cantu*,
519 F.2d 494 (7th Cir. 1975) ....................21, 23

*United States v. Green*,
670 F.2d 1148 (D.C. Cir. 1981) ....................20

*United States v. Khan*,
324 F. Supp. 2d 1177 (D. Colo. 2004)....................23

*United States v. Pacheco-Alvarez*,
227 F. Supp. 3d 863 (S.D. Ohio 2016)....................20, 21, 23

*United States v. Quintana*,
623 F.3d 1237 (8th Cir. 2010)....................20

*Washington v. Reno*,
35 F.3d 1093 (6th Cir. 1994)....................33

*Westover v. Reno*,
202 F.3d 475 (1st Cir. 2000)....................21

*Ybarra v. Illinois*,
444 U.S. 85 (1979)....................19, 20

**Statutes, Regulations, & Rules**

5 U.S.C. § 705....................1, 18, 28

5 U.S.C. § 706....................18, 24, 28

8 U.S.C. § 1357....................*passim*

8 C.F.R. § 287.8....................18, 19, 26, 27

Fed. R. Civ. P. 5....................38

Fed. R. Civ. P. 23....................1, 33, 34

Fed. R. Civ. P. 65....................1, 35

Local Civ. R. 7....................1

**Other Authorities**

Exec. Order No. 14,252, 90 Fed. Reg. 14559 (Mar. 27, 2025)....................4

Exec. Order No. 14,333, 90 Fed. Reg. 39301 (Aug. 11, 2025)....................4

Pursuant to Federal Rules of Civil Procedure 23 and 65, and 5 U.S.C. § 705, Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc., respectfully move for provisional class certification and for a preliminary injunction and/or to stay agency action on behalf of themselves and similarly situated individuals who have been or will be subjected to Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause as required by the Immigration and Nationality Act.[1]

## INTRODUCTION

Since the President's August 11, 2025, declaration of a purported "emergency" in the District of Columbia, Defendants have saturated D.C. with federal agents and instituted a policy and practice of making sweeping, warrantless civil immigration arrests without probable cause. Under this policy and practice, plain-clothed, masked, and armed federal agents arrest people who live and work in D.C., whom they perceive to be Latino, without a warrant and without making the individualized probable cause assessments—*both* that the person is in the United States unlawfully *and* that the person is likely to escape before a warrant can be obtained—required under federal law. The agents arrest individuals on their way to work, school, or church; haul them into vehicles; and transport them to detention centers where they are forced to remain in inhumane conditions, often for long periods and far away from their families and lawyers. In some cases, U.S. Immigration and Customs Enforcement ("ICE") releases individuals, but only *after* they have already suffered the physical and psychological harms that come with being arrested and detained. This policy and practice is plainly contrary to the Immigration and Nationality Act ("INA"), which requires an agent to obtain probable cause for both unlawful presence and flight risk *before* arresting a person without a warrant.

[1] Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel conferred with Defendants' counsel about this motion, and Defendants' counsel stated that Defendants oppose the motion.

Defendants' policy and practice of *arrest first, ask questions later* has sown fear and alarm among D.C.'s Latino and immigrant communities. People who live and work in D.C., especially those whom agents may perceive to be Latino, fear being arrested and detained because agents making immigration arrests are ignoring the statutory limitations on their ability to do so without a warrant. Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc. seek a preliminary injunction against, as well as, or in the alternative, a stay of, this policy and practice to ensure that Defendants' agents make immigration arrests in D.C. in accordance with federal law: before an agent makes an immigration arrest without a warrant, the agent must make an individualized determination of probable cause that the person *both* is in the United States unlawfully *and* is likely to escape before a warrant can be obtained.

## STATUTORY BACKGROUND

Generally, officers making immigration arrests are required to have a warrant. *See Arizona v. United States*, 567 U.S. 387, 408 (2012). "If no federal warrant has been issued, those officers have more limited authority." *Id.* That limited authority is codified in 8 U.S.C. § 1357(a)(2), which permits warrantless arrests ***only if*** the agent has "*reason to believe* that the [noncitizen] so arrested is in the United States in violation of any … law or regulation [made in pursuance of law regulating the admission, exclusion, expulsion, or removal of noncitizens] *and* is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphases added). Section 1357(a)(2) "must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause." *Au Yi Lau v. U.S. Immig. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971). "Probable cause" requires a "particularized" inquiry and must be "objectively discernible." *See Barham v. Ramsey*, 434 F.3d 565, 573–74 (D.C. Cir. 2006). Accordingly, § 1357(a)(2) demands that, before an agent can make an immigration arrest without a warrant, the agent must first make an individualized determination of probable cause that the

person *both* is in the United States unlawfully *and* is a flight risk.

Defendants have recognized as much: under the settlement agreement in *Castañon Nava v. Department of Homeland Security*, No. 1:18-cv-03757 (N.D. Ill. 2018), a case brought by Chicago residents and non-profit organizations challenging ICE's policy and practice of making warrantless arrests in the Chicago area without probable cause for flight risk as required by § 1357(a)(2), ICE issued a "Broadcast Statement of Policy" making clear that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*" and listing specific factors that may be relevant to a flight risk determination, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof." Declaration of A. Widas ("Widas Decl."), Ex. 1.

## STATEMENT OF FACTS

### A. Since President Trump's August 11 Emergency Declaration in D.C., Defendants Have Been Conducting Mass Immigration Arrests in the District.

One of President Trump's top priorities in his second term is to conduct mass deportations. During the 2024 presidential campaign, President Trump promised that "[o]n Day One … [w]e will begin the largest deportation operation in the history of our country." *Id.*, Ex. 2. In January, after President Trump took office, the administration imposed a quota of 75 immigration arrests per day on ICE field offices across the country, including on the Washington, D.C. field office. *Id.*, Ex. 3. In May, White House Deputy Chief of Staff Stephen Miller publicly announced that "[u]nder President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day." *Id.*, Ex. 4.

President Trump has used executive orders to carry out his promise of mass deportations in Washington, D.C. On March 27, 2025, the President issued an Executive Order entitled "Making the District of Columbia Safe and Beautiful," which included the establishment of a Task Force to "coordinate to ensure effective Federal participation in," *inter alia*, "directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area." Exec. Order No. 14,252, 90 Fed. Reg. 14559 (Mar. 27, 2025). More recently, President Trump's August 11 declaration of an "emergency" in D.C., Exec. Order No. 14,333, 90 Fed. Reg. 39301 (Aug. 11, 2025), placed the D.C. Metropolitan Police Department under "direct federal control" for a 30-day period and deployed 800 National Guard troops onto the city's streets, Widas Decl., Ex. 20. In announcing the August 11 emergency, President Trump repeatedly referenced the topic of immigration, declaring that the federal government was going to put things "in control very quickly, like we did in the southern border," *id.*, Ex. 5, and that "[t]his city will no longer be a sanctuary for illegal alien criminals," *id.*, Ex. 6. A few days later, on August 15, Defendant Attorney General Pamela Bondi issued an order directing the Mayor of D.C. to use local resources to assist with "enforcement of federal immigration law," including with "locating, apprehending, and detaining aliens unlawfully present in the United States." *Id.*, Ex. 7.

An immediate and significant surge in immigration arrests in D.C. has followed since these orders. To facilitate mass immigration arrests in D.C., Defendant Kristi Noem, Secretary of the Department of Homeland Security ("DHS"), granted non-DHS federal agencies immigration enforcement powers, *id.*, Ex. 8, permitting agents from other federal agencies—who lack the kind of training immigration agents are expected to have—to conduct immigration arrests in D.C., *id.*, Ex. 9. According to the *Washington Post*, since early August, "residents have sent hundreds of

videos, photos and tips" to the D.C. Migrant Solidarity Network, an immigrant support group, regarding immigration enforcement and arrests in Washington, D.C. *Id.*, Ex. 10. Amy Fischer, who leads the organization, noted that the footage "reflected a dramatic surge in dragnet-style arrest tactics" and that "[w]e just saw the roving patrols arresting anybody that looked brown, basically." *Id.* The numbers bear out the focus on immigration arrests in D.C. since August 11: "from early August until mid-September, ICE made around 1,200 arrests, according to officials with knowledge of the data." *Id.*

Mass immigration arrests in D.C. remain ongoing. Marcos Charles, the Acting Executive Associate Director of Enforcement and Removal Operations ("ERO") at ICE, announced in an interview that "[w]e're going to continue our operations in the D.C. metro area." *Id.* DHS Assistant Secretary for Public Affairs Tricia McLaughlin stated in public remarks that "DHS law enforcement will not be slowed down." *Id.*, Ex. 11. The *Washington Post* reported that "outside of the emergency operations center, ICE retains vast authority to detain D.C. residents regardless of city policies." *Id.*, Ex. 12. And social media posts by Defendant U.S. Customs and Border Protection ("CBP") confirm that immigration arrests are continuing in Washington, D.C. *Id.*, Ex. 13 (boasting of immigration arrests in D.C. during the weekend of September 13, 2025). Moreover, on September 15, President Trump threatened to declare another emergency in the District to ensure increased operations by ICE. *Id.*, Exs. 14, 15.

### B. Defendants' Agents Are Making Warrantless Immigration Arrests in D.C. Without an Individualized Determination of Probable Cause that the Person Is Here Unlawfully and Is a Flight Risk.

To conduct these mass immigration arrests in D.C., Defendants have instituted a policy and practice of making arrests without a warrant and without making an individualized assessment as to whether someone both is in the United States unlawfully *and* is a flight risk. The immigration arrests in D.C. systematically follow the same general *arrest first, ask questions later* pattern.

First, agents stop people whom they perceive to be Latino while they are walking, driving, or at work. Second, the agents arrest those individuals without showing a warrant and without knowledge of facts that could provide an agent with probable cause to believe those individuals are in the United States unlawfully and are likely to escape before a warrant can be obtained. Third, the agents take virtually all the individuals they have arrested to an immigration detention center, where they spend days, weeks, or even longer, and in some cases are subsequently released because of a complete lack of basis for their detention.

Defendants have repeatedly admitted that they are making warrantless arrests without the required probable cause findings. In July 2025, for example, the Department of Justice fired the acting U.S. Attorney for the Eastern District of California after she told a Border Patrol official that he could not arrest individuals without probable cause. *Id.*, Ex. 16. In response to this lawsuit, DHS asserted in a September 25, 2025, public statement that it "uses [the] '*reasonable suspicion*'" standard to make immigration arrests—admitting that DHS continues to violate the probable cause requirements imposed by law and uses the different, lower standard of reasonable suspicion. *Id.*, Ex. 17 (emphasis added). Similarly, that same day, DHS stated in a post in response to this lawsuit on the social media platform X that "DHS law enforcement uses 'reasonable suspicion' to make arrests." *Id.*, Ex. 19. DHS further stated that "law enforcement are trained to ask a series of well-determined questions to determine status and removability," without saying anything about flight risk. *Id.*, Ex. 18. Mr. Miller's mid-May instruction to ICE to stop "develop[ing] target lists of immigrants" and to instead "just go out there" and arrest people "right away" at Home Depots or 7-Elevens similarly disregarded probable cause requirements. *Id.*, Ex. 22. Around the same time, ICE ERO Acting Executive Associate Director Marcos Charles told his agents to "turn up the creative knob up to 11 and push the envelope … If it involves handcuffs on wrists, it's probably

worth pursuing." *Id.*, Ex. 23.

The circumstances of Plaintiffs' and other individuals' arrests demonstrate this policy and practice. For example, on August 21, 2025, Defendants' agents accosted Plaintiff Escobar Molina, a Latino D.C. resident with valid Temporary Protected Status ("TPS"), outside of his apartment building in Northwest D.C. while he was walking to his car to leave for work. Declaration of José Escobar Molina ("Escobar Molina Decl.") ¶ 5. They arrested him without showing a warrant and without asking him for his name, his identification, or anything about his immigration status, how long he has lived here, his family members, or anything else about his ties to the community. *Id.* ¶¶ 6–8. At no point did Mr. Escobar Molina attempt to resist arrest. *Id.* ¶ 7. *After* the agents arrested Mr. Escobar Molina, they repeatedly called him "illegal," and when he responded that he had documents showing his immigration status, the agents replied, "No you don't. You are illegal," and further rebuffed Mr. Escobar Molina's efforts to explain his status after they placed him into a vehicle, yelling at him, "Shut up bitch! You're illegal." *Id.* ¶¶ 6–7. It was not until after Mr. Escobar Molina spent a day and night detained at the ICE Washington Field Office in Chantilly, Virginia ("Chantilly"), and was transported to a different facility in Richmond, Virginia, that an ICE officer authorized his release upon recognizing that Mr. Escobar Molina is statutorily prohibited from being detained because he has valid TPS. *Id.* ¶ 11–14.

On August 18, 2025, federal agents, including at least one Border Patrol agent, arrested Plaintiff B.S.R. in Northeast D.C. after he got in his car to go to work with his father. Declaration of B.S.R. ("B.S.R. Decl.") ¶ 12. The agents seemed to be looking for B.S.R.'s father, but they did not have any information about B.S.R. relevant to a civil immigration arrest. *Id.* ¶ 13. Regardless of that lack of knowledge, the agents arrested B.S.R. alongside his father, placing handcuffs on him and putting him into a vehicle, without asking for B.S.R.'s name, identification, or anything

about his immigration status, where he lives, with whom he lives, how long he has lived here, or anything else about his ties to the community. *Id.* ¶¶ 14–15. B.S.R. did not make any attempt to resist arrest. *Id.* ¶ 14. Shortly after his arrest, B.S.R. showed the agents the ankle monitor he wears following his previous arrest by ICE in January 2025 and also told the agents he has a pending asylum application. *Id.* The agents said that this information did not matter and that once he was in custody they would figure out if what he was saying about his status was true or not. *Id.* B.S.R.'s partner came outside and also attempted to explain to the agents that B.S.R. was already in an immigration process, but the agents responded, "we came for two people, so we have to arrest two people." *Id.* ¶ 16. B.S.R. suspects that those two people were his father and his mother and that because he happened to be outside in the car with his father, the agents arrested him and his father instead. *Id.* After Defendants detained B.S.R. for more than 12 hours at Chantilly, he was released. *Id.* ¶¶ 18–20.

On August 12, 2025, immigration officers approached Plaintiff N.S. in the parking lot of a Home Depot in Northeast D.C. Declaration of N.S. ("N.S. Decl.") ¶¶ 5–6. N.S. had walked back to his minivan after exiting the store with a shopping cart filled with purchases. *Id.* ¶ 5. He had just sat down in his car and turned on the engine when an officer opened the driver's side door and yelled at him, "Legal or illegal?" *Id.* ¶ 6. This officer and another agent pulled N.S. out of the driver's seat, threw him against the car, handcuffed him, and, after a 20-minute wait, placed him in the back of a van. *Id.* ¶¶ 7–11. They did not provide a warrant or show any document to N.S. prior to arresting him. *Id.* ¶¶ 6–7. N.S. did not make any attempt to resist arrest. *Id.* ¶ 7. Before arresting him, the agents did not ask him anything about where he lives, with whom he lives, how long he has lived here, or anything else about his ties to the community. *Id.* ICE detained N.S. for four weeks in various detention centers around the country before releasing him on his own

recognizance. *Id.* ¶ 23.

On August 26, 2025, Plaintiff R.S.M. was driving to work with her husband when immigration agents pulled over their car. Declaration of R.S.M. ("R.S.M. Decl.") ¶ 2. The agents did not provide a warrant or show any document to R.S.M. and her husband prior to the arrest. *Id.* ¶ 6. Before arresting R.S.M. and her husband, the agents asked no questions about where they live, with whom they live, how long they have lived here, or anything else about their ties to the community. *Id.* R.S.M. did not make any attempt to resist arrest. *Id.* ¶ 5. She was detained at Chantilly for approximately ten hours, before being released with an ankle monitor; her husband remains detained by ICE and was transferred to a detention center in Texas. *Id.* ¶¶ 9–13.

Several members of Plaintiff CASA, a national nonprofit membership organization, have also been arrested recently in D.C. without a warrant and without probable cause as to immigration status and/or flight risk and are likely to face such arrests in the future. Declaration of CASA, Inc. ("CASA Decl.") ¶¶ 23–36. On August 15, 2025, Declarant and CASA member Luz and her husband Daniel were making a food delivery on their motor bike when a police officer pulled them over and asked for their registration and their IDs. Declaration of Luz Doe ("Luz Decl.") ¶ 3–4; CASA Decl. ¶ 26. Approximately five minutes later, three agents emerged from two unmarked SUVs and announced they were from ICE and they were there to detain Luz and her husband. Luz Decl. ¶ 5; CASA Decl. ¶ 26. Luz and her husband did not make any attempt to flee or resist arrest. Luz Decl. ¶ 5. The agents did not provide a warrant or any documentation to Luz and her husband. Luz Decl. ¶ 7–8; CASA Decl. ¶ 26. Before arresting them, the agents asked no questions about how long they have been living or working in D.C., their family here, or anything else about their ties to the community. Luz Decl. ¶ 7; CASA Decl. ¶ 26. After being detained at Chantilly for approximately ten hours, Luz was released, whereas her husband remains in detention at a different

facility in Virginia. Luz Decl. ¶ 9–10, 12; CASA Decl. ¶ 26.

On August 21, 2025, Declarant and CASA member Elias was on his way to a doctor's appointment to receive dialysis treatment when he was in a car accident. Declaration of Elias Doe ("Elias Decl.") ¶ 2; CASA Decl. ¶ 25. ICE agents arrived shortly after local police and an ICE officer arrested Elias, putting handcuffs on him and taking him to a detention center without showing him a warrant or any other document and without asking him about his immigration status, where he lives, with whom he lives, how long he has lived there, or anything else about his ties to the community. Elias Decl. ¶¶ 3–5; CASA Decl. ¶ 25. Elias did not attempt to flee or resist arrest. Elias Decl. ¶ 5. ICE released Elias later that day because he was so ill, without giving any explanation for Elias' arrest. *Id.* ¶ 6.

On August 18, 2025, CASA member Miguel was walking out of a grocery store in D.C. toward his brother's car when ICE agents approached him. CASA Decl. ¶ 34. When Miguel could not prove the car belonged to his brother, the agents arrested him. *Id.* They did not provide a warrant or show any document to Miguel prior to the arrest. *Id.* Before arresting Miguel, the agents asked no questions about his individual circumstances or his ties to the community. *Id.* The agents brought him to an immigration detention center, where the conditions were dehumanizing and unhealthy. *Id.* Rather than continue to endure that environment, Miguel "voluntarily" deported to his home country. *Id.*

On August 25, 2025, Declarant and CASA member Antony was driving in Northwest D.C. when he had to stop abruptly due to a car blocking the street. Declaration of Antony Doe ("Antony Decl.") ¶ 3; CASA Decl. ¶ 30. Officers wearing green uniforms with vests that said "Police" and one Park Police officer approached Antony in his car and told him immediately he was under arrest. Antony Decl. ¶¶ 4–5; CASA Decl. ¶ 30; *see also* Widas Decl., Ex. 24. ("Most federal

agents were wearing camouflage with vests that read U.S. Border Patrol, Police, or FBI."). The agents did not provide a warrant or show any document to Antony prior to the arrest. Antony Decl. ¶ 5; CASA Decl. ¶ 30. Before arresting Antony, the agents asked no questions about his personal circumstances, where he lives, with whom he lives, how long he has lived there, or anything else about his ties to the community. Antony Decl. ¶ 6; CASA Decl. ¶ 30. Antony did not attempt to resist arrest. Antony Decl. ¶ 5. The agents brought him to an immigration detention center, and he remains in custody. *Id.* ¶ 7–9; CASA Decl. ¶ 30.

On August 28, 2025, Declarant and CASA member Julio was on his way to work with his nephew, who was driving both of them when six ICE agents stopped them. Declaration of Julio Doe ("Julio Decl.") ¶ 2; CASA Decl. ¶ 27. The agents asked Julio and his nephew for their IDs, in response to which Julio showed his Real ID and his nephew showed his green card. Julio Decl. ¶ 2; CASA Decl. ¶ 27. The agents then told Julio to get out of the car, and when Julio asked why, an agent said if he did not get out, they would break down the door. Julio Decl. ¶ 2; CASA Decl. ¶ 27. After he got out of the car, the agents immediately handcuffed him, grabbed him by the collar, and placed him in their van. Julio Decl. ¶ 3; CASA Decl. ¶ 27. The agents did not provide a warrant or any documents to Julio prior to the arrest. Julio Decl. ¶ 4; CASA Decl. ¶ 27. Before arresting Julio, the agents asked no questions about how long he has been living or working in the D.C. area, his family, or anything else about his ties to the community. Julio Decl. ¶ 4; CASA Decl. ¶ 27. After spending two nights in Chantilly, Julio was eventually moved to a detention center in Texas, where he remains. Julio Decl. ¶ 5; CASA Decl. ¶ 27.

Defendants' agents have also arrested numerous individuals who are not Plaintiffs or members of CASA under similar circumstances, without individualized assessments of both flight risk and immigration status as federal law requires. For example, on August 20, 2025, Declarant

C., a naturalized U.S. citizen, was driving to work with a Latino colleague in Northwest D.C. when he was pulled over in his work truck by a dark blue SUV marked "Park Police." Declaration of C. ("C. Decl.") ¶ 3. One officer approached the driver's side window where C. was, while a second officer approached the passenger side where C.'s colleague was and aggressively yelled at him, "Where are you from?" *Id.* ¶¶ 3–5. C.'s colleague made no attempt to exit the car or flee. *Id.* C.'s colleague was then pulled from the vehicle, pushed to the ground, and arrested, before he could say a word. *Id.* According to C.: "Neither officer appeared to know my colleague's name, and they did not show a warrant for him." *Id*. The officers did not ask C.'s colleague any questions about his ties to the area or his individual circumstances before arresting him. *Id.*

On August 28, 2025, Declarant B.R.G. was driving to work with a colleague when he encountered a police checkpoint. Declaration of B.R.G. ("B.R.G. Decl.") ¶ 2. Police officers demanded that B.R.G. exit the car and arrested him. *Id.* ¶ 2–3. The officers did not provide a warrant or show any documentation to B.R.G. prior to the arrest. *Id.* ¶ 4. B.R.G. did not attempt to resist arrest in any way, and despite that, the officers told him that if he did try to run away, they would shoot him. *Id.* ¶ 3. Before arresting B.R.G., the agents asked no questions about how long he has lived and worked in D.C., his family here, or anything else about his ties to the community. *Id.* ¶ 4.

On September 7, 2025, Declarant W.G.M. was walking toward his girlfriend's apartment building in Northeast D.C. when he was approached by unidentified officers. Declaration of W.G.M. ("W.G.M. Decl.") ¶ 2. The officers arrested him, saying they would check his immigration status after they had already handcuffed him. *Id.* ¶ 3. The officers did not provide a warrant or show any documentation to W.G.M. prior to the arrest. *Id.* ¶ 6. W.G.M. did not make any attempt to flee or resist arrest. *Id.* ¶ 3. Before arresting W.G.M., the agents asked no questions

about his circumstances, how long he has lived and worked in D.C., whether he has family here, or anything else about his ties to the community. *Id.* ¶ 6.

On September 16, 2025, Declarant Andrés Doe was returning from work and walking to his car when ICE agents stopped him and said that he looked like a person they were looking for and demanded his identification, which he provided. Declaration of Andrés Doe ("Andrés Decl.") ¶ 2. After checking his ID and confirming he was not the person they were looking for, the agents said the check showed he lacked legal status and arrested him. *Id.* ¶ 3. They did not present a warrant or any documentation to Andrés prior to arresting him. *Id.* Andrés did not make any attempt to flee or resist arrest. *Id.* ¶ 4. Andrés informed the agents that he had a young son at home who was born in the United States, but the agents told him that did not matter. *Id.* ¶ 4.

On September 18, 2025, Angel was waiting with his coworkers outside the building where he worked when agents wearing vests that said "ERO" and "Police" approached them. CASA Decl. ¶ 28. The agents arrested Angel without asking him any questions about his immigration status, his family, how long he has been in the United States, or anything else about his ties to the community. *Id.* The agents brought Angel and his coworker, whom they also arrested, to Chantilly, and Angel remains detained at a different facility. *Id.*

Several other Declarants have experienced a similar sequence of events in their arrests: Defendants' agents approached them while they were driving, Declaration of Darwin Lopez Castañon ("Darwin Decl.") ¶ 3, Declaration of Mateo Doe ("Mateo Doe Decl.") ¶ 6; CASA Decl. ¶ 36 (describing Nerwin's arrest); Declaration of Y.R.M. ("Y.R.M. Decl.") ¶ 2; Declaration of Camilo Doe ("Camilo Doe Decl.") ¶¶ 1–3; Declaration of M.P. ("M.P. Decl.") ¶¶ 3–6 (describing a sibling's arrest); Declaration of Cristina ("Cristina Decl.") ¶¶ 4–5 (describing her son's arrest); Declaration of Paola Flores Roman ("Flores Roman Decl.") ¶¶ 5, 7 (describing a client's arrest);

Declaration of Ana Gracia ("Gracia Decl.") ¶ 6 (describing a client's arrest), walking, Declaration of Javier Doe ("Javier Doe Decl.") ¶¶ 4–5; Declaration of Franco Doe ("Franco Doe Decl.") ¶¶ 2–3; Flores Roman Decl. ¶ 6 (describing her client's experience); Declaration of Fiona Lewis ("Fiona Lewis Decl.") ¶ 2 (describing a friend's arrest), or at work, Declaration of Anamaria Doe ("Anamaria Doe Decl.") ¶¶ 1–4; CASA Decl. ¶ 35 (describing Gordon's arrest); CASA Decl. ¶ 33 (describing Carlos's arrest), arrested them under circumstances that indicated the agents had no knowledge of objective facts that would lead a reasonable officer to believe that the person was in the United States unlawfully, Javier Doe Decl. ¶ 6; Mateo Doe Decl. ¶ 7; Y.R.M. Decl. ¶¶ 3–4; Franco Doe Decl. ¶¶ 3–4; B.R.G. Decl. ¶ 4; Julio Doe Decl. ¶¶ 2–4; Camilo Doe Decl. ¶¶ 3–5; M.P. Decl. ¶ 7 (describing a sibling's experience); Cristina Decl. ¶ 6 (describing her son's experience); Anamaria Doe Decl. ¶¶ 4–5; Flores Roman Decl. ¶¶ 6–7 (describing a client's experience); Gracia Decl. ¶ 6 (describing her client's experience), and without asking any questions about that person's ties to the community to make an individualized determination about their flight risk, Javier Doe Decl. ¶ 6; Mateo Doe Decl. ¶ 7; Y.R.M. Decl. ¶¶ 3–4; Franco Doe Decl. ¶¶ 3–4; B.R.G. Decl. ¶ 4; Julio Doe Decl. ¶ 4; Camilo Doe Decl. ¶ 5; M.P. Decl. ¶ 7 (describing a sibling's experience); Cristina Decl. ¶ 6 (describing her son's experience); Anamaria Doe Decl. ¶¶ 4–5; Flores Roman Decl. ¶¶ 6–7 (describing a client's experience); Gracia Decl. ¶ 6 (describing her client's experience).

### C. Plaintiffs and Putative Class Members Will Be Arrested, Detained, and Separated from Their Families Under Defendants' Unlawful Policy and Practice.

Plaintiffs Escobar Molina, B.S.R, N.S., and R.S.M. and putative class members have suffered significant harms as a result of Defendants' policy and practice of making unlawful warrantless arrests in D.C. Those who have been held in detention have suffered inhumane conditions. Mr. Escobar Molina, for example, was held in a waiting cell at Chantilly that was so

crowded it was impossible to sleep and was "fed one small bean burrito, something sweet, and a glass of water during [his] entire 23-hour stay at Chantilly." Escobar Molina Decl. ¶ 11. B.S.R. likewise was only given a burrito and a bottle of water during the approximately 14 hours he spent at Chantilly. B.S.R. Decl. ¶ 18. Declarants have described being forced to sleep on the floor of a frigid room without bedding, Julio Doe Decl. ¶ 6; B.R.G. Decl. ¶ 5 (describing a room so cold that detainees called it the "freezer"); needing to drink toilet water to survive, Y.R.M. Decl. ¶ 5; witnessing beatings by detention center guards, Y.R.M. Decl. ¶ 8; taking multiple flights in one day while chained from wrists-to-ankles, N.S. Decl. ¶¶ 18–19, Y.R.M. Decl. ¶ 6; sleeping in jails where the lights are kept on 24 hours a day, B.R.G. Decl. ¶ 6; M.P. Decl. ¶ 10; watching other detainees pass out from dehydration and hunger, Y.R.M. Decl. ¶ 5, B.S.R. Decl. ¶ 22; going days without bathing, B.S.R. Decl. ¶¶ 18, 22, M.P. Decl. ¶¶ 10–11; being told by guards that they have "no right[s] to anything," Y.R.M. Decl. ¶ 5; and innumerable other deprivations of basic human dignity. *See also, e.g.*, CASA Decl. ¶ 28 (ICE agents bragging about the bonus money they would earn from arresting Angel); N.S. Decl. ¶ 20 (detainees kept shackled while forced to urinate without a bathroom), Antony Decl. ¶ 9 (denying Antony the opportunity to contact his family for eight days following a sudden arrest), Gracia Decl. ¶ 6 (describing experience of client who sustained a nosebleed and blunt head trauma, resulting in dizziness and vomiting when officers engaged in a car chase with that individual handcuffed in the backseat and then ignored his pleas for medical attention for 40 minutes).

Numerous Plaintiffs and putative class members have also suffered the pain of separating from their families. Some individuals have been sent to ICE facilities in entirely different regions of the country, far away from the District, attorneys, and their families. This includes being sent to facilities in California, *see* N.S. Decl. ¶ 19–21, Louisiana, *see* Darwin Decl. ¶ 13, Pennsylvania,

*see* Antony Decl. ¶ 9, and Texas, *see* Cristina Decl. ¶ 7; CASA Decl. ¶ 27 (Julio), with little or no explanation as to why they are being transferred or how long they will be there. The children and families of unlawfully arrested individuals often struggle to make ends meet, compounding the trauma of the experience.

Plaintiffs and putative class members are also suffering emotional distress as a result of their unlawful arrests and detentions and live in fear of being arrested and detained again under Defendants' unlawful policy. For example, when Mr. Escobar Molina leaves his apartment, he checks for officers outside his apartment two or three times, and he no longer goes to the park with his sons out of fear of being arrested again. Escobar Molina Decl. ¶ 20. B.S.R. moved out of D.C. due to his fear of being arrested again, though he continues to travel into and through D.C. for work. B.S.R. Decl. ¶ 25. N.S. has stopped taking his grandchildren and youngest son to school out of fear of being arrested, N.S. Decl. ¶ 26, and R.S.M. has been "panicked and scared to go outside" and has not been going to work because her uniform would reveal her ankle monitor. R.S.M. Decl. ¶ 16. Her children are also now fearful of leaving the house, and her family "are living in constant fear that they will be arrested and detained by immigration." *Id.* ¶ 17. Many have difficulty sleeping and experience nightmares reliving the horror they experienced. *Id.* ¶ 16 (trouble sleeping); N.S. Decl. ¶ 26 (unable to sleep through the night); Escobar Molina Decl. ¶ 19 (nightmares); *see also* Declaration of Daniela Anello ("Anello Decl.") ¶¶ 3–8 (describing trauma to schoolchildren from ICE arrest near elementary school).

Defendants' unlawful policy and practice has also caused significant harms to CASA. CASA has needed to divert much of its staff and resources from providing social, health, employment, and legal services that are core to CASA's mission to providing emergency response services for people who have been arrested in D.C. under Defendants' policy. CASA Decl. ¶¶ 17–

22. For example, CASA typically provides legal clinics where CASA provides community members consultations and assistance with immigration applications; instead, CASA now must prioritize daily rapid-response legal phone calls to provide information and guidance to family members of arrested individuals using resources it otherwise would have expended on working to aid individuals in obtaining asylum, other forms of affirmative immigration relief, and other forms of long-term stabilizing community benefits. *Id.* ¶ 18.

CASA also faces increased costs due to ICE's unlawful seizures, especially in funding its hotline services, and lost grant funding because staff shifts and resource diversions have forced it to miss deliverables, impairing CASA's ability to conduct its core functions of providing critical long-term social services. *Id.* ¶¶ 19–20. Defendants' policy and practice have also chilled open communication between CASA and its members, discouraged community members from sharing personal information, and impaired CASA's core mission of connecting community members to social services. *Id.* ¶ 21. CASA is concerned about its continued ability to provide its longstanding core social services to immigrant communities in D.C. while also executing the rapid-response work necessary to support its community members in the wake of ICE's enforcement surge. *Id.* ¶ 17. Given the likelihood its members will continue to be arrested and detained under Defendants' unlawful policy and practice, CASA's resources, effectiveness, and entire service model is in jeopardy. *Id.*

## ARGUMENT

To obtain a preliminary injunction, a party "must show that (1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) the issuance of a preliminary injunction 'is in the public interest.'" *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022)). The

same standard applies to a motion to stay agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 705. *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) ("Motions to stay agency action pursuant to [§ 705 of the APA] are reviewed under the same standards used to evaluate requests for interim injunctive relief.") (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

As set forth below, Plaintiffs satisfy all four factors and therefore are entitled to preliminary injunctive relief as well as, or alternatively, a stay of Defendants' policy of conducting warrantless immigration arrests without an individualized determination of probable cause. In addition, given that Plaintiffs seek preliminary injunctive relief on behalf of the proposed Warrantless Arrests class, as defined in their concurrently filed motion for class certification, the Court should provisionally certify the class and issue classwide preliminary relief.

## I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Plaintiffs are likely to succeed on the merits of their claim that Defendants' policy and practice of making warrantless arrests in D.C. without making individualized determinations of flight risk violates 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the APA, 5 U.S.C. § 706(2)(A), (C), and the *Accardi* doctrine. ECF 1, Compl., Second Claim for Relief, ¶¶ 78– 83. *See Adams v. District of Columbia*, 285 F. Supp. 3d 381, 390 (D.D.C. 2018) (plaintiffs need only show a likelihood of success "on at least one count of [the] underlying Complaint").

### A. The INA and DHS Regulations Require Agents to Make an Individualized Determination That the Person Is in the United States Unlawfully and Is a Flight Risk Before Arresting That Person Without a Warrant.

As noted above, under 8 U.S.C. § 1357(a)(2), an agent can make an immigration arrest without a warrant ***only if*** the agent "has reason to believe that the [noncitizen] so arrested is in the United States in violation of any . . . law or regulation [made in pursuance of law regulating the admission, exclusion, expulsion, or removal of noncitizens] *and* is likely to escape before a warrant

can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added); *see also* 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is [a noncitizen] illegally in the United States."); *id.* § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."). The "reason to believe" requirement in § 1357(a)(2) is the "equivalent of probable cause." *Au Yi Lau*, 445 F.2d at 222; *see also Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 'must be read in light of constitutional standards, so that "reason to believe" must be considered the equivalent of probable cause.'") (collecting cases).

"Where the standard is probable cause, a search or seizure of a person must be supported by probable cause *particularized with respect to that person*." *Barham*, 434 F.3d at 573 (emphasis added) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("[T]he belief of guilt[, a reasonable ground for which is required for probable cause,] must be particularized with respect to the person to be searched or seized."). Probable cause is an "objective" standard, *Smith v. United States*, 843 F.3d 509, 515 (D.C. Cir. 2016), which is defined as "whether, at the moment the arrest was made … the facts and circumstances within [the arresting officer's] knowledge and of which [the arresting officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). As a result, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). "[P]robable cause, of course, requires more than mere suspicion." *United States v. Green*, 670 F.2d 1148, 1151 (D.C. Cir. 1981) (citing

*Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Moreover, "Fourth Amendment case law makes clear that an officer cannot predicate a search or seizure on an individual's 'mere propinquity to others independently suspected of criminal activity.'" *Barham*, 434 F.3d at 573 (quoting *Ybarra*, 444 U.S. at 91).

With respect to the probable cause findings required by 8 U.S.C. § 1357(a)(2), officers must conduct an individualized assessment that the person they are arresting without a warrant is *both* (1) in the United States unlawfully *and* (2) likely to escape arrest before a warrant can be obtained. *See, e.g.*, *United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (officer was required to have "'reason to believe' (*i.e.*, probable cause to believe) that the person [being arrested] was [a noncitizen] subject to deportation because [he was] illegally present in this country … [and was] likely to escape before a warrant [could] be obtained") (last alteration in original); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016) (officer making immigration arrest needed probable cause to believe person being arrested was "(1) unlawfully present in the United States and (2) likely to escape before [the arresting officer] could obtain a warrant for his arrest").

These requirements must be independently satisfied: even where probable cause exists for one prong of § 1357(a)(2), a warrantless arrest is invalid if probable cause does not exist for the other prong. *See* 8 U.S.C. § 1357(a)(2) (agent must have "reason to believe that the [noncitizen] so arrested is in the United States in violation of [an immigration law] *and* is likely to escape before a warrant can be obtained for his arrest") (emphasis added); *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief [that an individual is unlawfully present in the United States], before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained for his arrest."); *Pacheco-Alvarez*, 227 F. Supp. 3d at

889 ("ICE officers may make warrantless arrests for suspected immigration violations only when they have both probable cause for the arrest *and* probable cause that the subject is likely to escape.").

**B. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Flight Risk Violates the INA.**

Defendants' policy and practice violates the statutory requirement that agents make an individualized determination that a person is likely to escape before a warrant can be obtained before arresting that person. The likelihood of escape (flight risk) prong of § 1357(a)(2) is "a *statutory limitation*" on agents' ability to arrest without a warrant that "is *always seriously applied*." *United States v. Cantu*, 519 F.2d 494, 496– 97 (7th Cir. 1975) (emphases added). Even where there is probable cause to arrest based on the immigration status prong of § 1357(a)(2), agents act "in direct violation of the statute" where "there is no evidence that [the plaintiff] was likely to escape before a warrant could be obtained for her arrest." *Westover v. Reno*, 202 F.3d 475, 479–80 (1st Cir. 2000); *see also, e.g.*, *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017) ("[Plaintiff's] admission regarding his immigration status provided probable cause for the first half of what § 1357(a)(2) demands. There is, however, no evidence that ICE or any other immigration officer had probable cause to believe that [plaintiff] was 'likely to escape before a warrant can be obtained for his arrest,' the second half of what is needed before a warrantless arrest under § 1357(a)(2) is lawful.").

ICE itself has acknowledged that it must satisfy both probable cause requirements in a Broadcast Statement of Policy pursuant to the *Castañon Nava* settlement agreement, where it stated that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*" and identified factors that may be relevant to the flight risk determination, including

"the ICE Officer's ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond." Widas Decl., Ex. 1.

In none of the more than twenty arrests documented herein did the agents obtain knowledge of facts relevant to any of these factors. Indeed, in none of the arrests did the agents ask any questions about where the person they arrested lives, how long the person has lived in the United States, who the person lives with and the person's family members, the person's work history, or anything else about the person's ties to the community—factors that courts have held militate against finding probable cause that the person poses a flight risk. *See* Darwin Decl. ¶ 11, B.S.R. Decl. ¶ 7, CASA Decl. ¶¶ 24–28, 30–33, Escobar Molina Decl. ¶ 8, N.S. Decl. ¶ 7, R.S.M. Decl. ¶ 6, Javier Doe Decl. ¶ 6, Mateo Doe Decl. ¶ 7, Y.R.M. Decl. ¶¶ 3–4, Franco Doe Decl. ¶¶ 3–4, B.R.G. Decl. ¶ 4, Julio Doe Decl. ¶ 4, Camilo Decl. ¶ 5, M.P. Decl. ¶ 7 (describing a sibling's experience), Cristina Decl. ¶ 6 (describing her son's experience), Anamaria Doe Decl. ¶¶ 4–5, Flores Roman Decl. ¶¶ 6–7 (describing a client's experience), Gracia Decl. ¶ 6 (describing her client's experience); *see also, e.g.*, *United States v. Abdi*, 2005 WL 6119695, No. 2:04-CR-88, at *6 (S.D. Ohio Sept. 12, 2005), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006) (court held no probable cause for flight risk where facts, including defendant's ownership of a business, leased storefront, and apartment rental, where he lived with his then-pregnant wife and two young children, suggested that defendant had strong community ties; defendant additionally had neither moved nor traveled despite being the subject of an FBI investigation); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (finding no probable cause of flight risk where defendant "had a stable job as a

painter; lived with his fiancée, Daisy; helped pay the rent on their home; and helped her raise her two kids") (internal citations omitted); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (facts that defendant "worked two jobs" in the community where he lived, and "contributed to rent payments for the apartment he shared with a roommate" made flight risk unlikely even though he lacked specific familial ties in the United States). Indeed, for some individuals, Defendants ignored significant evidence that the person was *not* a flight risk: B.S.R., for instance, had an ankle monitor that he had been wearing since his previous arrest by ICE in January and that he showed to the agents after they handcuffed him. B.S.R. Decl. ¶ 14.

Moreover, none of the Plaintiffs or Declarants displayed any furtive conduct suggesting they were likely to escape arrest, and none of them made any effort to resist or to drive or walk away. *Cf. Cantu*, 519 F.2d at 497 (finding probable cause where arrestee was speeding cross-country). Indeed, most of them were arrested while going about daily and routine life activities. For example, Plaintiffs and Declarants have been arrested while commuting to work. *E.g.*, Flores Roman Decl. ¶ 6 (describing client stopped en route to work); CASA Decl. ¶ 31 (same), *id.* ¶ 33 (same); Escobar Molina Decl. ¶ 5 (stopped while getting in his car to go to work); Javier Doe Decl. ¶¶ 4–5 (stopped en route to work); Julio Doe Decl. ¶ 2 (same); M.P. Decl. ¶¶ 3–4 (same); B.S.R. Decl. ¶ 3 (stopped at Home Depot), Gracia Decl. ¶ 6 (same); N.S. Decl. ¶ 5 (same); CASA Decl. ¶ 26 (stopped while waiting for food to deliver as a DoorDasher); *id.* CASA Decl. ¶ 25 (attending dialysis appointments); Elias Doe Decl. ¶ 2–3 (same); Widas Decl. Ex. 27 (going to church); CASA Decl. ¶ 34 (going back to their cars from the grocery store))

### C. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Either of The Statutorily Required Criteria Is a Final Agency Action That Violates the APA.

The APA directs courts to "hold unlawful and set aside" final agency actions that are (1) arbitrary, capricious, or contrary to law or (2) in excess of statutory authority. *See* 5 U.S.C.

§ 706(2)(A), (C). While any one of these grounds alone would suffice for an injunction, Defendants' policy and practice is unlawful for all these reasons and should be stayed and enjoined.

Defendants' policy of making warrantless immigration arrests without making the probable cause findings required by § 1357(a)(2) is a final agency action. It is well established under D.C. Circuit law that a policy does not need to be in writing to be a final agency action for APA purposes. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) ("[W]e also agree with the Railroad Administration that the absence of a written memorialization by the agency does not defeat finality."); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) ("Despite Defendants' assertions to the contrary, agency action need not be in writing to be judicially reviewable as a final action.") (collecting cases where APA review was available despite lack of written policy).

For an agency action to be a "final" agency action, it must be an action that "mark[s] the consummation of the agency's decisionmaking process and … one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted). The action "must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). "Courts take a pragmatic approach to finality." *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018) (citing *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016)). When this Court granted plaintiffs' motion for a preliminary injunction in *Ramirez*, it "approach[ed] finality pragmatically" and "reasoned that Defendants had consummated a decisionmaking process by failing to consider each Plaintiff for less restrictive placements as required by the statutory provision and that legal consequences flowed from those failures." *Ramirez*, 338 F. Supp. 3d at 40. Moreover, "where 'an agency is under an unequivocal

statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers "final agency action" review.'" *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)).

Defendants' policy and practice of making warrantless immigration arrests without probable cause of flight risk satisfies both prongs of the final agency action test. Defendants' policy reflects a final decision by Defendants as to how to conduct warrantless immigration arrests in D.C. in pursuit of the President's goal of mass immigration arrests and deportations; it is not an action of "merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178; *see also* Widas Decl., Ex. 19 (DHS's post on X: "DHS law enforcement uses 'reasonable suspicion' to make arrests."). In addition, it is an action "by which rights or obligations have been determined, or from which legal consequences will flow," *Corner Post, Inc.*, 603 U.S. at 808, given that it is determinative of whether an individual will be arrested and detained without a warrant.

Defendants' policy and practice is contrary to law and in excess of statutory authority for the reasons stated above: it directly violates the express requirements of § 1357(a)(2). "Under the APA, 'agency actions will be set aside if they are contrary to law—if, in other words, they are not authorized by the statutory text, or some other source of lawful authority." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *16 (D.D.C. July 2, 2025) (quoting *Fisher v. Pension Benefit Guar. Corp.*, 151 F. Supp. 3d 159, 165 (D.D.C. 2016)) (internal quotation marks omitted).

The policy is also arbitrary and capricious because Defendants have failed to provide any explanation or facts to support their decision to make warrantless immigration arrests without the statutorily required probable cause findings. "The goal of [arbitrary and capricious] review is to assess whether or not the agency reached its decision through a 'logical and rational' process….

[I]t is axiomatic that the agency has to have 'articulate[d] … a rational connection between the facts found and the choice[s] [it] made.'" *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) and *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Defendants' failure to offer any explanation for its policy "renders its void *ab initio* rationale arbitrary and capricious." *Commc'ns & Control, Inc. v. F.C.C.*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004). In addition, Defendants' failure to comply with its own regulations—here, DHS violating 8 C.F.R. § 287.8(c)(2)(ii), which implements the flight risk prong of § 1357(a)(2)—is an independent basis to find their policy arbitrary and capricious. *Nat'l Env'l. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" (citation omitted)).

The conflict with the regulation also renders Defendants' policy invalid on another independent basis, as explained next.

### D. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Flight Risk Violates the *Accardi* Doctrine.

Defendants' policy and practice also violates DHS's own regulation requiring an individualized determination of probable cause for flight risk before a warrantless immigration arrest may be effected. Under the *Accardi* doctrine, it is well-settled that agencies are required to follow the procedural and substantive standards contained in their own regulations. *Holden v. Finch*, 446 F.2d 1311, 1315 (D.C. Cir. 1971); *see also Battle v. F.A.A.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267– 68 (1954). In particular, "[w]here the rights of individuals are affected, it is

incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018) ("[I]nterference with regulations that seek to safeguard a plaintiff's individual rights implicates the *Accardi* doctrine and its requirement that agencies abide by their own procedures."); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (same).

DHS's regulation, 8 C.F.R. § 287.8(c)(2)(ii), expressly requires that a "warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." This regulation protects individuals' rights under § 1357(a)(2) not to be subject to a warrantless arrest without probable cause. Defendants' failure to follow their own regulation significantly prejudices Plaintiffs and putative class members. Defendants' policy and practice of making warrantless immigration arrests without probable cause that the person Defendants' agents are arresting without a warrant "is likely to escape before a warrant can be obtained" directly violates 8 C.F.R. § 287.8(c)(2)(ii). Defendants' policy and practice should be set aside and vacated for violating the *Accardi* doctrine.

Plaintiffs accordingly are likely to succeed on the merits of their claim that Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause for flight risk violates 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); the APA, 5 U.S.C. § 706(2)(A), (C); and the *Accardi* doctrine.

## II. Absent Immediate Injunctive Relief, Plaintiffs and the Putative Class Will Continue Facing Irreparable Harm Due to Defendants' Unlawful Policy and Practice.

Irreparable harms are "certain and great, actual and not theoretical," "so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and "beyond remediation." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up); *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)

(applying same irreparable injury analysis to section 705 stay motion). The D.C. Circuit has held that an "irreparable loss of personal liberty … would follow from an arrest," *Rubinstein v. Brownell*, 206 F.2d 449, 456 (D.C. Cir. 1953), and this Court has held that "there can be no injury more irreparable than being illegally arrested," *Barwood, Inc. v. District of Columbia*, 1999 U.S. Dist. LEXIS 21427, at *18 (D.D.C. Feb. 16, 1999), *overruled on other grounds*, 202 F.3d 290 (D.C. Cir. 2000). Moreover, "[c]ourts in this and other jurisdictions have found that deprivations of physical liberty … are the sort of actual and imminent injuries that constitute irreparable harm." *Aracely, R. v. Nielsen*, at 155 (D.D.C. 2018) (collecting cases). Indeed, "[u]nlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact." *R.I.L–R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

Plaintiffs and putative class members face irreparable injury under Defendants' policy and practice of making unlawful warrantless immigration arrests in D.C. Plaintiffs have been arrested and detained for periods ranging from hours to weeks. *See* R.S.M. Decl. ¶¶ 2, 12 (detained for approximately 12 hours); B.S.R. Decl. ¶¶ 12, 19–20 (detained approximately 14 hours); Escobar Molina Decl. ¶¶ 5, 14 (detained for a day and a half); N.S. Decl. ¶ 23 (detained for a month). Shorter periods of restraint than these constitute irreparable harm. *See N.S. v. Hughes*, 335 F.R.D. 337, 351–52 (D.D.C. 2020), *injunction vacated on other grounds sub nom. N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025) ("A deprivation of liberty that includes being shackled and detained is a serious infringement on one's personal freedoms, and the fact that class members are detained for only a few hours does not change that fact."). In addition, the conditions Plaintiffs and putative class members face while being arrested and detained are inhumane and devastating, including being painfully shackled, *see* B.S.R. Decl. ¶ 17; screamed at, abused, and demeaned by federal officials, Escobar Molina Decl. ¶ 7, N.S. Decl. ¶ 13, Julio Decl. ¶ 7, Y.R.M. Decl. ¶ 8; held in

overcrowded cells, Escobar Molina Decl. ¶ 11, B.S.R. Decl. ¶ 18, B.R.G. Decl. ¶ 5; denied sufficient food, N.S. Decl. ¶ 14, Escobar Molina Decl. ¶ 11, B.S.R. Decl. ¶ 18, Camilo Decl. ¶ 7; denied adequate medical care, Cristina Decl. ¶ 8, Gracia Decl. ¶ 6; forced to drink water from the toilet, Y.R.M. Decl. ¶ 5; and moved constantly between different locations, N.S. Decl. ¶¶ 12–22, Escobar Molina Decl.¶¶ 9–13, Camilo Decl. ¶¶ 7–8, Y.R.M. Decl. ¶ 6. Such "'harm from detention surely cannot be remediated after the fact' and is a quintessential irreparable harm." *Make the Rd. New York v. Noem*, 2025 WL 2494908, at *20 (D.D.C. Aug. 29, 2025) (quoting *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018)).

In addition to the irreparable harm Plaintiffs and putative class members face as a result of being detained, many people impacted by Defendants' policy and practice have young children and are now living in fear of being separated from their families. *See de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) ("Separation irreparably harms plaintiffs every minute it persists"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 151 (D.D.C. 2021). A number of CASA's members have been separated from their children following their unlawful arrests. *See* CASA Decl. ¶¶ 29 (Mateo separated from wife and seven-year-old son); 35 (Gordon separated from wife and three children ages twelve, nine, and six); 30 (Antony separated from wife and six children); 33 (Carlos separated from wife and three children); 36 (Nerwin separated from wife and two children ages five and six); *see also* Franco Decl. ¶ 7 (separated from wife and eight-month-old daughter). Though he has TPS and his sons are U.S. citizens, Mr. Escobar Molina no longer goes to the park with his sons because he does not want them to see him get arrested, and he tells his sons to carry their passports with them at all time. Escobar Molina Decl. ¶¶ 18–20. B.S.R. moved out of D.C. for fear of being arrested again, though he continues to have to travel in D.C. for work. B.S.R. Decl. ¶ 25. N.S.

has been fearful and stressed ever since his arrest and detention and has stopped taking his grandchildren and youngest son to school. N.S. Decl. ¶ 26. R.S.M. has been panicked about leaving the house since her arrest and detention and feels hopeless and has trouble sleeping; her children are also now fearful of leaving the house. R.S.M. Decl. ¶¶ 16–17.

The harms Plaintiffs and putative class members face are sufficiently imminent to constitute irreparable harm because Defendants are continuing their policy and practice of unlawful immigration arrests in D.C. and Plaintiffs face rearrest as a result, because of where they live, work, and travel on a daily basis. Mr. Escobar Molina lives and works in the District and was arrested across the street from his home in Mount Pleasant, and he continues to see and hear about other immigration enforcement activity in his area. Escobar Molina Decl. ¶¶ 3–5, 18. B.S.R. works on job sites throughout the greater D.C. region and commutes through the District nearly every day. B.S.R. Decl. ¶ 25. N.S. both lives and works in the District. N.S. Decl. ¶¶ 3–4. R.S.M. was arrested one block from her home in Northeast D.C. and saw government patrols in her neighborhood for hours at a time for multiple days afterward. R.S.M. Decl. ¶ 14.

The conclusion of the emergency period declared on August 11 has not slowed the federal government's immigration enforcement efforts pursuant to this policy and practice in D.C. Immigration arrests in D.C. continue apace. *See, e.g.*, Anamaria Decl. ¶ 2 (arrested September 24); CASA Decl. ¶ 28 (Angel arrested September 18); Andrés Decl. ¶ 2 (arrested September 16); Anello Decl. ¶¶ 3–8 (describing September 25, 2025, arrest near elementary school); *see also* Widas Decl., Ex. 13. President Trump recently threatened to "call a National Emergency, and Federalize, if necessary!!!" to continue conducting mass immigration arrests in D.C. Widas Decl., Ex. 15. Moreover, in response to this lawsuit, DHS admitted that it uses "reasonable suspicion"—as explained above, a lower standard than probable cause—"to make arrests." *Id.*, Ex. 17. Based

on what the government has done and what it has said it will continue to do, Plaintiffs and putative class members are squarely in the path of the government's unlawful policy and practice—under which they will inevitably be unlawfully arrested again. *See Make the Rd. New York*, 2025 WL 2494908, at *20 (holding that plaintiff showed irreparable harm where its "declarations [were] replete with uncontested evidence that the Government is systematically targeting individuals attending their immigration court proceedings for placement into expedited removal").

For an organization, irreparable harm occurs where Defendants' actions "have perceptibly impaired [the organization's] programs" and "directly conflict with the organization's mission." *League of Women Voters of the U.S.*, 838 F.3d at 8 (cleaned up). In addition to the current and imminent harms to its members, CASA is also suffering and will continue to suffer irreparable injuries to its programs and mission in the absence of a stay or injunction. Defendants' unlawful policy has caused CASA to increase expenditure on its hotline for people who have been arrested by ICE, to shift staff from other programs to address arrests and detentions and to lose grant funding due to being unable to meet deliverables as a result of shifting staff around, and it has impaired CASA's ability to conduct its core functions of assisting members with securing long-term status and connecting community members to social services. CASA Decl. ¶¶ 15–21. Because Defendants' policy and practice has "perceptibly impaired" CASA's programs and "directly conflict[s] with" CASA's mission, and will continue to do so, CASA faces irreparable harm. *League of Women Voters of the U.S.*, 838 F. 3d at 8.

## III. The Equities and the Public Interest Favor Plaintiffs.

The balance of equities and public interest "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)). Where the relief sought is squarely within the public interest, there can be no harm to the government, as the "Government cannot suffer harm from an injunction

that merely ends an unlawful practice," and the "public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L.–R.*, 80 F. Supp. 3d at 191 (cleaned up); *see also Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511–12 (D.C. Cir. 2016).

As described in Section II, the injuries to Plaintiffs and putative class members are significant, and the public's interest is undoubtedly in having Defendants follow the law—including their own regulations. Moreover, the relief that Plaintiffs seek is narrowly tailored to address the unlawful conduct at issue. Plaintiffs principally request the Court to order Defendants and their agents to refrain from making warrantless immigration arrests without the probable cause findings required by § 1357(a)(2), to comply with DHS's "Broadcast Statement of Policy," which was undisputedly in place until as recently as May 2025 when making warrantless immigration arrests, and to provide documentation to Plaintiffs' counsel on a regular schedule. These reasonable and minimally intrusive requirements are necessary to ensure that Defendants' conduct conforms to the requirements of § 1357(a)(2).

On the other side of the scale, Defendants have no colorable interest in continuing their policy and practice of making immigration arrests without probable cause. "There is generally no public interest in the perpetuation of an unlawful agency action." *League of Women Voters of the U.S.*, 838 F.3d at 12. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate."). The requested relief in no way impedes lawful immigration arrests by Defendants.

The public interest and equities therefore strongly favor Plaintiffs.

## IV. Provisional Class Certification Is Warranted.

This Court should provisionally certify the following class to grant preliminary injunctive relief:

> **Warrantless Arrest Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

"Plaintiffs … need only provisional class certification in order for the Court to grant their preliminary injunction." *Damus*, 313 F. Supp. 3d at 329. Although "[i]n granting such provisional certification, the Court must still satisfy itself that the requirements of Rule 23 have been met," the Court's "analysis is tempered … by the understanding that such certifications may be altered or amended before the decision on the merits." *Id.* (citation omitted). This Court has provisionally certified class actions for purposes of granting a preliminary injunction on numerous occasions. *See, e.g.*, *L.G.M.L. v. Noem*, 2025 WL 2671690, at *21 (D.D.C. Sept. 18, 2025) (provisionally certifying class for purpose of granting preliminary injunction); *Charles H. v. District of Columbia*, 2021 WL 2946127, at *14 (D.D.C. June 16, 2021) (same); *P.J.E.S. by and through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520–21 (D.D.C. 2020) (same); *Damus*, 313 F. Supp. 3d at 328–35 (same); *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017) (same); *R.I.L.–R.*, 80 F. Supp. 3d at 191 (same). The Court should do the same here.

Plaintiffs' concurrently filed motion for class certification and accompanying exhibits, which are incorporated by reference here, demonstrate that the proposed class satisfies the requirements of Rule 23(a) and (b)(2). The class is sufficiently numerous, Fed. R. Civ. P. 23(a)(1), as it comprises hundreds of individuals similarly situated to Plaintiffs who, since August 11, 2025, have been or will be subject to Defendants' unlawful policy and practice. Pls.' Mot. for Class Cert. § I.A. The class also satisfies the commonality requirement, Fed. R. Civ. P. 23(a)(2), because

the key legal issues in this action—including whether Defendants have a policy and practice of making warrantless immigration arrests and without a pre-arrest, individualized assessment of probable cause *both* that the person is (1) in the United States unlawfully *and* (2) poses a flight risk—are "generally applicable to the class." *Steele v. United States*, 159 F. Supp. 3d 73, 81 (D.D.C. 2016) (citation omitted). Pls.' Mot. for Class Cert. § I.B. The class also satisfies the typicality requirement in Rule 23(a)(3) because the individual Plaintiffs' claims arise from the same course of conduct responsible for the claims of putative class members. Pls.' Mot. for Class Cert. § I.C. Finally, the class satisfies the adequacy requirement in Rule 23(a)(4) because Plaintiffs do not have any antagonistic or competing interests with unnamed members of the class. Pls.' Mot. for Class Cert. § I.D. Plaintiffs and putative class members have also suffered the same injury arising from the Defendants' specific policy and practice of making illegal warrantless arrests. *Id.*

Provisional class certification under Rule 23(b)(2) is appropriate because Defendants have employed—and absent the relief requested here will continue to employ—a policy and practice of making warrantless immigration arrests in D.C. without the probable cause determinations that federal law requires in a manner that generally applies to each class member, and the injunctive and declaratory relief Plaintiffs seek would benefit the entire class. Pls.' Mot. for Class Cert. § II. Finally, Plaintiffs' counsel are qualified to serve as counsel for the provisionally certified class. *Id.* at § III.

## CONCLUSION

For the foregoing reasons, this Court should provisionally certify Plaintiffs' proposed class, grant the requested preliminary injunction as to Plaintiffs and the proposed class, and/or stay Defendants' policy and practice of making warrantless immigration arrests without the required

probable cause findings.[2]

[2] Because the entry of an injunction will not harm the Defendants, the security required by Fed. R. Civ. P. 65(c) should be set at $1. *See, e.g.*, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) ("The language 'in such sum as the court deems proper' [in Rule 65(c)] has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond."); *J.G.G. v. Trump*, 2025 WL 1577811, at *31 (D.D.C. June 4, 2025), *vacated and remanded on other grounds*, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025) ("In light of the circumstances and nature of this case, [the Court] finds that a nominal amount is proper and exercises its discretion to require Plaintiffs to collectively post $1.00.").

October 3, 2025

Respectfully submitted,

*s/ Adina Appelbaum*
Adina Appelbaum (D.C. Bar No. 1026331)
Ian Austin Rose (Md. Bar No. 2112140043)
Samantha Hsieh (Va. Bar No. 90800)**
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Avenue NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
austin.rose@amicacenter.org
sam@amicacenter.org

*s/ Aditi Shah*
Aditi Shah (D.C. Bar No. 90033136)
Scott Michelman (D.C. Bar No. 1006945)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA**
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
ashah@acludc.org
smichelman@acludc.org

Kathryn Huddleston (Tex. Bar No. 24121679)*++
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
khuddleston@aclu.org

*s/ Sirine Shebaya*
Sirine Shebaya (D.C. Bar No. 1019748)
Yulie Landan (Cal. Bar No. 348958)*+
Bridget Pranzatelli (D.C. Bar No. 90029726)
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Road NW, Suite 175
Washington, D.C. 20009
(213) 430-5521
sirine@niplg.org
yulie@nipnlg.org
bridget@nipnlg.org

*s/ Jehan A. Patterson*
Jehan A. Patterson (D.C. Bar No. 1012119)
Chris Kimmel (D.C. Bar No. 1047680)***
Alexandra Widas (D.C. Bar No. 1645372)***
Hassan Ahmad (D.C. Bar No. 1030682)***
Sean Berman (D.C. Bar No. 90026899)
Austin Riddick (D.C. Bar No. 90018117)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com
ckimmel@cov.com
awidas@cov.com
hahmad@cov.com
sberman@cov.com
ariddick@cov.com

Eva H. Lilienfeld (N.Y. Bar No. 6143085)**
Graham Glusman (N.Y. Bar No. 6099535)**
**COVINGTON & BURLING LLP**
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
elilienfeld@cov.com
gglusman@cov.com

*s/ Madeleine Gates*
Madeleine Gates (D.C. Bar No. 90024645)
**WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS**
700 14th Street NW, #400
Washington, D.C. 20005
(202) 319-1000
madeleine_gates@washlaw.org

*s/ Ama Frimpong*
Ama Frimpong (D.C. Bar No. 1602444)*
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
(240) 485-8844
afrimpong@wearecasa.org

*Attorneys for Plaintiffs*[3]

[*]*Motion for Admission* pro hac vice *forthcoming.*
[**]*Motion for Admission* pro hac vice *pending.*
[***]*Petition for Admission pending.*

[+]*Not Admitted in D.C.; working remotely from N.Y. and admitted in Cal. only*
[++]*Not Admitted in D.C.; working remotely under supervision of D.C. Bar member, practice limited to federal courts in D.C., and admitted in Ariz. and Tex. only.*

[3] Counsel wish to acknowledge the assistance of legal program manager Lily Hartmann; law clerks Alexis Gorfine, Maggie Hopkins, Marcus Ransom, and Joseph Hasbrouck; and paralegal Yahir Santillan-Guzman in the investigation of the facts and the preparation of this motion.

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I certify that this motion will also be served via e-mail on counsel for Defendants, in accordance with Federal Rule of Civil Procedure 5(b), and on the Civil Division of the U.S. Attorney's Office for the District of Columbia, in accordance with Standing Order No. 25-55 (JEB).

Dated: October 3, 2025

Respectfully submitted,

*/s/ Jehan A. Patterson*
Jehan A. Patterson (D.C. Bar No. 1012119)
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
(202) 662-6000
jpatterson@cov.com

*Attorney for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417-PLF |

**DECLARATION OF ALEXANDRA J. WIDAS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, TO STAY AGENCY ACTION, AND FOR PROVISIONAL CLASS CERTIFICATION**

I, Alexandra J. Widas, declare pursuant to 28 U.S.C. § 1746 that:

1. I am an attorney with the law firm Covington & Burling LLP. I represent Plaintiffs José Escobar Molina, B.S.R., N.S., R.S.M., and CASA, Inc., on behalf of themselves and similarly situated individuals ("Plaintiffs") in this action. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification. If called upon to do so, I could and would competently testify as follows:

2. Attached hereto as **Exhibit 1** is a true and correct copy of the U.S. Customs & Immigration Enforcement's ("ICE") Broadcast Statement of Policy, which is Appendix A to the Settlement Agreement in *Castanon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-0757 (N.D. Ill. Nov. 23, 2021), as found on the ICE website, available at https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf (last accessed Oct. 1, 2025).

3. Attached hereto as **Exhibit 2** is a true and correct copy of a Press Release from the White House entitled "Promises Made, Promises Kept: Border Security Achieved in Fewer Than 100 Days" (Apr. 28, 2025), as found on the White House website, available at https://www.whitehouse.gov/articles/2025/04/promises-made-promises-kept-border-security-achieved-in-fewer-than-100-days/#:~:text=PROMISE%20KEPT%3A,a%20single%20migrant%20on%20camera.%E2%80%9D (last accessed Oct. 1, 2025).

4. Attached hereto as **Exhibit 3** is a true and correct copy of a Washington Post article by Nick Miroff and Maria Sacchetti entitled "Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests" (Jan. 28, 2025), available at https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota, accessed through Lexis+.

5. Attached hereto as **Exhibit 4** is a true and correct copy of a Politico article by Kyle Cheney and Josh Gerstein entitled "DOJ Is Walking Back the White House's Goal to Arrest 3,000 Immigrants Per Day" (August 3, 2025), available at https://www.politico.com/news/2025/08/03/white-house-doj-immigration-quota-mismatch-00490406 (last accessed Oct. 2, 2025).

6. Attached hereto as **Exhibit 5** is a true and correct copy of an ABC News article by Michelle Stoddart, et al. entitled "Trump Puts D.C. Police Department Under Federal Control, Deploys National Guard" (Aug. 12, 2025), available at https://abcnews.go.com/Politics/trump-hold-news-conference-crime-dc-after-threatening/story?id=124528406 (last accessed Oct. 1, 2025).

7. Attached hereto as **Exhibit 6** is a true and correct copy of an article from The Hill by Mike Lillis and Rebecca Beitsch entitled “DC Critics Slam Trump's Crackdown as Power Grab Focused on Immigration” (Aug. 20, 2025), available at https://thehill.com/homenews/state-watch/5460622-trump-dc-crime-crackdown-immigration (last accessed Oct. 1, 2025).

8. Attached hereto as **Exhibit 7** is a true and correct copy of Order No. 6372-2025 of the U.S. Attorney General entitled “Restoring Safety and Security to the District of Columbia (Aug. 15, 2025), available at https://www.justice.gov/ag/media/1411361/dl?inline (last accessed Oct. 1, 2025).

9. Attached hereto as **Exhibit 8** is a true and correct copy of a Press Release from the U.S. Department of Homeland Security entitled “Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials” (Jan. 23, 2025), available at https://www.dhs.gov/news/2025/01/23/statement-dhs-spokesperson-directive-expanding-immigration-law-enforcement (last accessed Oct. 1, 2025).

10. Attached hereto as **Exhibit 9** is a true and correct copy of a CNN article by Holmes Lybrand, et al. entitled “FBI Agents Are Again Pulled from Their Day Jobs to Address a Trump Priority” (Aug. 14, 2025), available at https://www.cnn.com/2025/08/14/politics/fbi-washington-immigration-epstein (last accessed Oct. 1, 2025).

11. Attached hereto as **Exhibit 10** is a true and correct copy of a New York Times article by Hamed Aleaziz, et al. entitled “How Washington Became a Testing Ground for ICE” (Oct. 1, 2025), available at https://www.nytimes.com/2025/10/01/us/politics/washington-dc-ice.html (last accessed Oct. 1, 2025).

12. Attached hereto as **Exhibit 11** is a true and correct copy of a Press Release from the U.S. Department of Homeland Security entitled “DHS Scores Major Victory at Supreme Court” (Sept. 8, 2025), available at https://www.dhs.gov/news/2025/09/08/dhs-scores-major-victory-supreme-court (last accessed Oct. 1, 2025).

13. Attached hereto as **Exhibit 12** is a true and correct copy of a Washington Post article by Jenny Gathright entitled “Trump’s D.C. Emergency Has Ended. ICE and the National Guard Can Stay.” (Sept. 11, 2025), available at https://www.washingtonpost.com/dc-md-va/2025/09/10/trump-dc-emergency-ends (last accessed Oct. 1, 2025).

14. Attached hereto as **Exhibit 13** is a true and correct copy of an X post by Michael W. Banks (@USBPChief) from Sept. 17, 2025 at 10:42 a.m., available at https://t.co/U7DrgTVu0f (last accessed Oct. 1, 2025).

15. Attached hereto as **Exhibit 14** is a true and correct copy of a Fox5DC article by Sam Kosmas entitled "Trump Threatens National Emergency in D.C. If Mayor Does Not Cooperate with ICE" (Sept. 15, 2025), available at https://www.fox5dc.com/news/trump-threatens-national-emergency-dc-mayor-does-not-cooperate-ice (last accessed Oct. 1, 2025).

16. Attached hereto as **Exhibit 15** is a true and correct copy of a Truth Social post by Donald J. Trump (@realDonaldTrump) from September 15, 2025 at 1:06 a.m., available at https://truthsocial.com/@realDonaldTrump/posts/115206570863756188 (last accessed Oct. 1, 2025).

17. Attached hereto as **Exhibit 16** is a true and correct copy of a New York Times Article by Heather Knight and Hamed Aleaziz entitled "Trump Fired a U.S. Attorney Who Insisted on Following a Court Order" (Sept. 26, 2025), available at https://www.nytimes.com/2025/09/26/us/trump-fires-us-attorney-california-immigration.html, accessed through Lexis+.

18. Attached hereto as **Exhibit 17** is a true and correct copy of a Washington Post article by Teo Armus and Jenny Gathright entitled "Lawsuit Accuses ICE of Illegally Arresting Latino Immigrants in D.C." (Sept. 25, 2025), available at https://www.washingtonpost.com/immigration/2025/09/25/dc-ice-arrests-lawsuit-trump, accessed through Lexis+.

19. Attached hereto as **Exhibit 18** is a true and correct copy of a Press Release from the U.S. Department of Homeland Security entitled "DHS Debunks New York Times False Reporting: DHS Does NOT Deport U.S. Citizens" (Oct. 1, 2025), available at https://www.dhs.gov/news/2025/10/01/dhs-debunks-new-york-times-false-reporting-dhs-does-not-deport-us-citizens (last accessed Oct. 1, 2025).

20. Attached hereto as **Exhibit 19** is a true and correct copy of an X post by the U.S. Department of Homeland Security (@DHSgov) (Sept. 25, 2025 at 4:45 p.m.), available at https://x.com/DHSgov/status/1971315047201694042 (last accessed Oct. 1, 2025).

21. Attached hereto as **Exhibit 20** is a true and correct copy of a CBS News article by Kaia Hubbard entitled "Trump Deploys National Guard to D.C., Takes Control of Local Police in Crime Crackdown" (Aug. 11, 2025), available at https://www.cbsnews.com/news/trump-to-hold-news-conference-on-d-c-crime-amid-federal-takeover-threat/ (last accessed Oct. 2, 2025).

22. **Exhibit 21** has been intentionally omitted.

23. Attached hereto as **Exhibit 22** is a true and correct copy of a Wall Street Journal article by Elizabeth Findell, et al. entitled "The White House Marching Orders That Sparked the L.A. Migrant

Crackdown" (June 10, 2025), available at https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877?gaa_at=eafs&gaa_n=ASWzDAhPnC21W13RUdUvpajq2XZzKcnvQzQxLxeFxFp5RIwrHAy5CiCVwDrNhPKkxCE%3D&gaa_ts=68dde8a0&gaa_sig=b_ASurmSyW_IsR-vzR6tKFNvbDyPthF-RA-AcgTH6NlbQ66OB5-NBlYEQpTH7x6PeYtoJ1HVLcUHHpcK0jMG3A%3D%3D, accessed through Lexis+.

24. Attached hereto as **Exhibit 23** is a true and correct copy of an article from The Guardian by José Olivares entitled "U.S. Immigration Officers Ordered to Arrest More People Even Without Warrants" (June 4, 2025), available at https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests (last accessed Oct. 1, 2025).

25. Attached hereto as **Exhibit 24** is a true and correct copy of a CBS News article by Lauren Victory and Sabrina Franza entitled "FBI Reports 'Targeted Immigration Enforcement Operation' in South Shore, Chicago" (Sept. 30, 2025), available at https://www.cbsnews.com/chicago/news/ice-chicago-south-shore-fbi (last accessed Oct. 1, 2025).

26. Attached hereto as **Exhibit 25** is a true and correct copy of an Associated Press article published by WTOP News entitled "Trump's Crackdown in DC Leaves Residents on Edge as Federal Agents Set Up Checkpoints" (Aug. 21, 2025), available at https://wtop.com/dc/2025/08/trumps-immigration-crackdown-brings-checkpoints-and-new-fears-to-washington (last accessed Oct. 1, 2025).

27. Attached hereto as **Exhibit 26** is a true and correct copy of a news article from The Tablet by Michael Sean Winters entitled "DC Mass Attendance Falls After Immigration Arrests" (Aug. 25, 2025), available at https://www.thetablet.co.uk/news/dc-mass-attendance-falls-after-immigration-arrests (last accessed Oct. 1, 2025).

28. Attached hereto as **Exhibit 27** is a true and correct copy of a Catholic News Agency article by Madalaine Elhabbal entitled "ICE Arrests Take Toll on DC Churches" (Aug. 21, 2025), available at https://www.catholicnewsagency.com/news/266095/ice-arrests-take-toll-on-dc-churches (last accessed Oct. 1, 2025).

29. Attached hereto as **Exhibit 28** is a true and correct copy of a Washington Post article by Teo Armus entitled "They Watched ICE Detain Their Dad. Now D.C. Neighbors Escort Them to School." (Sept. 11, 2025), available at https://www.washingtonpost.com/immigration/2025/09/11/immigrants-school-kids-trump-dc (last accessed Oct. 1, 2025).

30. Attached hereto as **Exhibit 29** is a true and correct copy of an PBS News article by Moriah Balingit entitled "Federal Surge Has Taken a Toll on Children of Immigrants in Washington" (Sept. 17, 2025), available at https://www.pbs.org/newshour/politics/federal-surge-has-taken-a-toll-on-children-of-immigrants-in-washington (last accessed Oct. 1, 2025).

31. Attached hereto as **Exhibit 30** is a true and correct copy of a Washington Post article by Teo Armus, et al. entitled "ICE Is Joining D.C. Police Patrols. Moped Drivers Are Getting Detained." (Aug. 21, 2025), available at https://www.washingtonpost.com/dc-md-va/2025/08/21/dc-police-ice-moped-crackdown-delivery-drivers (last accessed Oct. 1, 2025).

32. Attached hereto as **Exhibit 31** is a true and correct copy of an NBC News article by Didi Martinez entitled "Detentions of D.C. Delivery Drivers Leave Immigrant Communities on Edge" (Aug. 19, 2025), available at https://www.nbcnews.com/news/us-news/dc-delivery-driver-detentions-spark-concern-fear-community-rcna225671 (last accessed Oct. 1, 2025).

33. Attached hereto as **Exhibit 32** is a true and correct copy of an NBC News article by Julia Ainsley, et al. entitled "Under Trump Administration, ICE Scraps Paperwork Officers Once Had to Do Before Immigration Arrests" (Sept. 9, 2025), available at https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407 (last accessed Oct. 1, 2025).

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on October 3, 2025, in Washington, D.C.

*/s/ Alexandra J. Widas*
Alexandra J. Widas (D.C. Bar No. 1645372)

# Exhibit 1

# APPENDIX A

Broadcast Statement of Policy

**This Broadcast states the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) and is to be interpreted consistent with all implementing regulations, as well as any DHS or ICE policies or memoranda governing immigration enforcement priorities and any additional requirements such policies or memoranda may impose upon the taking of any action to enforce the immigration laws of the United States.**

A. Warrantless Arrests

Under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), Immigration & Customs Enforcement ("ICE") Officers may conduct warrantless arrests if there is "reason to believe that the alien [] [to be] arrested is [present] in the United States in violation of any [U.S. immigration] law and is likely to escape before a warrant can be obtained for [the] arrest." The "reason to believe" standard requires ICE Officers to have probable cause that an individual is in the United States in violation of U.S. immigration laws *and* probable cause that the individual is likely to escape before a warrant can be obtained for the arrest.

In considering "likelihood of escape," an ICE Officer must consider the totality of circumstances known to the officer before making the arrest. While there is no exhaustive list of factors that should be considered in determining whether an individual is "likely to escape before a warrant can be obtained" under 8 U.S.C. § 1357(a) / INA § 287(a), factors relevant to the determination may include the ICE Officer's ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond. The particular circumstances before the ICE Officer are not to be viewed singly; rather, they must be considered as a whole. However, mere presence within the

United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be *obtained*.

When conducting enforcement actions, ICE Officers shall, at the time of arrest or as soon as it is practical and safe to do so, identify themselves as immigration officers in accordance with 8 C.F.R. § 287.8(c)(2)(iii).

After having made an arrest under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), an ICE Officer must document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable. This documentation must include: (1) that the alien was arrested without a warrant; (2) the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area; (3) whether the alien is an employee of the business, if arrested at a place of business, or whether the alien is a resident of the residence, if arrested at a residential location; (4) the alien's ties to the community, if known at the time of arrest, including family, home, or employment (**Note**: Information learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest.); (5) the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained; and (6) a statement of how "at the time of arrest, the designated immigration officer [did], as soon as it [wa]s practical and safe to do so, identify himself or herself as an immigration officer who is authorized to execute an arrest; and state[d] that the person is under arrest and the reason for the arrest."

B. Vehicle Stops

The policy above applies to all warrantless arrests under 8 U.S.C. § 1357 (a) (2) / INA § 287(a)(2), including warrantless arrests resulting from vehicle stops.

As federal law enforcement officers, ICE Officers lack federal statutory authority to enforce state or local vehicle or traffic laws. *See* 8 U.S.C. §§ 1357 (a)(4), (a)(5) / INA §§ 287(a)(4), (a)(5). Accordingly, when making vehicle stops, ICE Officers shall not state to the driver or occupant(s) of a vehicle that the purpose for a stop is related to any vehicle or traffic laws and regulations.

ICE Officers may stop a vehicle to enforce civil immigration laws only if they are aware of specific, articulable facts that reasonably warrant suspicion that the vehicle contains an alien(s) who may be illegally in the country.

As soon as practicable after making an arrest under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) pursuant to a vehicle stop, in addition to the documentation requirements for warrantless arrests described above, the ICE Officer also must document the facts and circumstances surrounding the vehicle stop that resulted in a warrantless arrest in the narrative section of the alien's I-213. This documentation shall include the specific, articulable facts that formed the basis for the ICE Officer's reasonable suspicion that an alien in the vehicle stopped was present within the United States in violation of U.S. immigration law.

# Exhibit 2

*The* WHITE HOUSE

ARTICLES

# PROMISES MADE, PROMISES KEPT: Border Security Achieved in Fewer Than 100 Days

The White House

April 28, 2025

Since President Donald J. Trump took office, he and his administration have ushered in the most secure border in modern American history — and he didn't need legislation to do it. President Trump has made good on the promises he made on the campaign trail to usher in an unprecedented era of homeland security.

Here are a few of those promises:

**PROMISE MADE:** "We will close the border. We will stop the invasion of illegals into our country." *(10/12/24, Aurora, CO)*

**PROMISE KEPT:**

- Illegal border encounters are down by 95%.
- Illegal immigrant "gotaways" — the top threat to public safety — are down by 99%.
- Fox News correspondent Bill Melugin: "If Fox were to send me down there right now, I would have trouble finding a single migrant on camera."
- CBS immigration reporter Camilo Montoya-Galvez: "Typically, when we go to the U.S./Mexico border, we at least see one group of people who are trying to cross into the U.S. illegally. We did not see a single migrant."
- *The Wall Street Journal*: Border Crossings Grind to Halt as Trump's Tough Policies Take Hold
- *The New York Times*: How Trump's Hard-Line Tactics Are Driving Down Migration
- CBS News: Amid Trump crackdown, illegal border crossings plunge to levels not seen in decades
- Axios: Border crossings plunge to lowest levels in decades: New data

- *New York Post*: Northern border sector previously overrun by illegal migrants sees dramatic drop in crossings: 'We haven't seen anyone since November'
- *The Times*: This city was a border flashpoint. Now the only migrants are quail
- Reuters: Migrant arrests at US-Mexico border in March lowest ever recorded
- Bloomberg: US-Bound Migration Plunges 99% Along Panama Jungle Route
- *The Washington Times*: Under Trump, border catch-and-release has dropped 99.99% from worst Biden month
- *Los Angeles Times*: California-Mexico border, once overwhelmed, now nearly empty

---

**PROMISE MADE:** "We will expel every single illegal alien gang member and migrant criminal operating on American soil and remove the savage gang, Tren de Aragua, from the United States." *(1/19/25, Washington, D.C.)*

**PROMISE KEPT:**

- President Trump designated Tren de Aragua, MS-13, and other vicious gangs and cartels as Foreign Terrorist Organizations.
- Department of Justice: 27 Members or Associates of Tren de Aragua Charged with Racketeering, Narcotics, Sex Trafficking, Robbery and Firearms offenses
- Homeland Security Secretary Kristi Noem: "Under President Trump, we have arrested over 150,000 aliens — including more than 600 members of the vicious Tren de Aragua gang."
- The Trump Administration directed the successful apprehension of a key MS-13 gang leader — an illegal immigrant living in Virginia and operating as one of the top three MS-13 leaders in the U.S.
- The Trump Administration directed the successful arrests of three illegal immigrant MS-13 gang members in Florida, wanted on first-degree murder charges, and another high-ranking MS-13 member in New York, linked to 11 murders.
- ICE arrested 370+ illegal immigrants as part of a major operation in Massachusetts — many of whom have serious criminal convictions and charges, including murder, child rape, fentanyl trafficking, and armed robbery.

---

**PROMISE MADE:** "On Day One … We will begin the largest deportation operation in the history of our country." *(10/21/24, Concord, NC)*

**PROMISE KEPT:**

- New York Post: Trump's mass deportation raids result in 655% spike in arrests of terrorists roaming US — including one of India's 'most wanted'
- Since President Trump took office, there have been 139,000 deportations.
  - In President Trump's first 50 days, ICE arrested 32,809 illegal immigrants — nearly 75% of whom were accused or convicted criminals — virtually the same number of arrests over the entirety of Biden's final year in office.
- NBC News: Immigration enforcement operations ramp up in cities across the U.S.

---

**PROMISE MADE:** "I will immediately end the Biden border nightmare that traffickers are using to exploit vulnerable women and children." *(7/21/23)*

**PROMISE KEPT:**

- The number of unaccompanied illegal immigrant children reached a record low.
  - At its peak under Biden, 4.6% of illegal border crossings were unaccompanied minors — many of whom were victims of trafficking. In the first two weeks of March under President Trump, just 0.4% of illegal crossings were unaccompanied minors.

---

**PROMISE MADE:** "Under my leadership, we will seal it up and expand that wall until we have total control." *(3/4/23, National Harbor, MD)*

**PROMISE KEPT:**

- White House Press Secretary Karoline Leavitt: "More than 85 miles of new border barrier are already in various stages of construction and planning."
- President Trump resumed construction of the border wall immediately, with dozens of miles of new construction underway.
- *Santa Fe New Mexican*: Construction to fill border wall gaps underway in Southern New Mexico
- NewsNation: "Border wall construction resumes in Texas"

---

**PROMISE MADE:** "You have the gotaways. You know what the gotaways are? It's the people that don't want to be looked at at all. So, they're worse than the people we're seeing that's why they don't want to be looked at." *(11/3/24, Macon, GA)*

**PROMISE KEPT:**

- Border Czar Tom Homan: "Known gotaways — people we knew crossed the border … weren't apprehended, weren't fingerprinted, weren't vetted. Average day under Joe Biden? More than 1,800 gotaways. Yesterday? 38 — 38 too many, but we'll get that to zero. We went from 1,800 [per day] to 38."
- Fox News's Bill Melugin: "Border Patrol's nationwide recorded gotaways have plummeted to a stunningly low daily average of just 77 over the last 21 days, according to internal CBP data we've reviewed. President Biden averaged 1,837 gotaways per day in fiscal year 2023 at the height of the crisis, totaling 670,674 for the year."

---

**PROMISE MADE:** "I will ban all welfare and federal benefits for illegals, and then they won't come." *(10/29/24, Allentown, PA)*

**PROMISE KEPT:**

- President Trump signed an executive order to ensure taxpayer resources are not used to incentivize or support illegal immigration.
- The Trump Administration ended food stamps for illegal immigrants.
- The Trump Administration "clawed back" tens of millions paid to house illegal aliens in luxury NYC hotels and ended a $40 million contract to "improve … inclusion of sedentary migrants."
- The Department of Education revoked waivers that allowed certain colleges to divert federal funds intended for low-income students and students with disabilities to illegal immigrants.

---

**PROMISE MADE:** "I will end catch-and-release." *(10/12/24, Aurora, CO)*

**PROMISE KEPT:**

- Since taking office, the Trump Administration has arrested 150,000+ illegal immigrants, deported 139,000+ illegal immigrants, and released just nine illegal immigrants into the U.S. — a staggering 99.99% decrease over the same period last year under Biden.
- *New York Post*: Trump orders Border Patrol to immediately stop setting illegal migrants free in the US: 'Catch and release is ended'
- *The Washington Times*: Under Trump, border catch-and-release has dropped 99.99% from worst Biden month

---

**PROMISE MADE:** "My administration will deliver justice for every family whose loved one has been stolen from them by migrant crime, including Laken Riley, Rachel Morin, Jocelyn Nungaray, Kayla Hamilton, and every other precious American soul that we have lost to these animals. Their memories will live in their hearts forever and our hearts forever, and we will never, ever forget them." *(1/19/25, Washington, D.C.)*

**PROMISE KEPT:**

- Fox News: Trump signs Laken Riley Act into law as first legislative victory in new administration
- Newsweek: Laken Riley's Mom Says Trump Didn't Forget Her Daughter as Bill is Signed
- The Hill: Trump signs Laken Riley Act, marking first legislative win of second term

---

**PROMISE MADE:** "I will invoke the Alien Enemies Act of 1798. Think of that. 1798, this was put there. 1798 — that's a long time ago, right? To target and dismantle every migrant criminal network operating on American soil." *(10/12/24, Aurora, CO)*

**PROMISE KEPT:**

- The White House: Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua
- *The New York Times*: Trump Invoked the Alien Enemies Act to Speed Up Deportations

---

**PROMISE MADE:** "Kamala's app for illegals will be shut down immediately — within 24 hours." *(10/12/24, Aurora, CO)*

**PROMISE KEPT:**

- NBC News: Trump shuts down immigration app, dashing migrants' hopes of entering U.S.
- *The New York Times*: Trump Shuts Down Migrant Entry App, Signaling the Start of His Crackdown
- Fox News: Up to 1M migrants who used Biden's CBP One app ordered to deport by Trump admin

---

**PROMISE MADE:** "Today, I am announcing a new plan to end all sanctuary cities in North Carolina and all across our country… and we will bring down the full weight of the federal government on any jurisdiction that refuses to cooperate." *(9/21/24, Wilmington, NC)*

**PROMISE KEPT:**

Case 1:25-cv-03417-BAH Document 17-1 Filed 10/03/25 Page 17 of 201
USCA Case #26-5045 Document #2203562 Filed: 11/16/2026 Page 242 of 562

- Politico: Fresh executive order targets sanctuary cities, federal aid for undocumented migrants
- Reuters: Trump steps up immigration crackdown, warns city, state officials against interference
- *The Wall Street Journal*: Trump Plans to Withhold All Federal Funding From Sanctuary Cities
- Politico: Trump administration sues New York over sanctuary policies for undocumented immigrants
- AP: Trump administration sues Chicago in latest crackdown on 'sanctuary' cities




NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS

Subscribe to The White House newsletter

Your email

SIGN UP

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

# Exhibit 3

# Trump officials issue quotas to ICE officers to ramp up arrests

Washington Post.com

January 28, 2025

Copyright 2025 Factiva ®, from Dow Jones

All Rights Reserved

Copyright 2025, The Washington Post Co. All Rights Reserved.

**Section:** SOCIALISSUES-RELIGION-IMMIGRATION

**Length:** 1042 words

**Byline:** By Nick MiroffMaria Sacchetti

## Body

U.S. Immigration and Customs Enforcement officials have been directed by Trump officials to aggressively ramp up the number of people they arrest, from a few hundred per day to at least 1,200 to 1,500, because the president has been disappointed with the results of his mass deportation campaign so far, according to four people with knowledge of the briefings.

The quotas were outlined Saturday in a call with senior ICE officials, who were told that each of the agency's field offices should make 75 arrests per day and managers would be held accountable for missing those targets. The four people spoke on the condition of anonymity to disclose internal briefings.

The orders significantly increase the chance that officers will engage in more indiscriminate enforcement tactics or face accusations of civil rights violations as they strain to meet quotas, according to current and former ICE officials.

White House "border czar" Tom Homan has said for weeks that ICE would not conduct mass roundups and its officers would prioritize immigrants with criminal records and who are gang members. But the quotas issued this weekend would place ICE officers under more pressure to seize a wider range of potential deportees to avoid reprimand, including immigrants who have not committed crimes.

Neither ICE nor Homan responded to requests for comment. After an earlier version of this article was published, White House press secretary Karoline Leavitt said in an email that, "your story is false," but did not reply when asked for specifics.

Homan told ABC News in an interview broadcast Sunday that the administration is "in the beginning stages" of its mass deportation plan, and while public safety threats and national security threats are a priority, "as that aperture opens, there'll be more arrests nationwide."

ICE announced in a statement Sunday that agents "began conducting enhanced targeted operations today in Chicago," with help from other federal agencies, including the FBI. Acting Homeland Security secretary Benjamine C. Huffman last week revoked a directive that had essentially barred ICE from arresting immigrants in or around sensitive areas such as schools, hospitals and churches.

Later Sunday, Homan appeared on a streaming service with Phil McGraw, the television doctor known as Dr. Phil, to emphasize that ICE is searching for specific immigrants who have committed crimes.

"Sweeps don't occur anywhere," Homan told McGraw, whose MeritTV said they were inside the ICE Command Center in Chicago.

An ICE official who was not authorized to discuss the quota said the agency's list of criminal suspects was sufficiently long, so officers would be able to continue prioritizing public safety and national security threats to meet quotas.

Last year, ICE told lawmakers there were about 670,000 immigrants on its caseload who had criminal convictions or faced criminal charges. Some are serving sentences in jails and prisons.

But Paul Hunker, a former ICE chief counsel in Dallas, said arresting serious offenders takes time, staff and planning - more time than quotas might allow.

"Quotas will incentivize ICE officers to arrest the easiest people to arrest, rather than the people that are dangerous noncitizens," said Hunker, who, as the agency's chief counsel in Dallas, oversaw offices in North Texas and Oklahoma from 2003 through January 2024.

"I've just never heard of that," he said, referring to the quotas.

The agency manages a docket of about 7.8 million people who potentially face deportation, but many of them have pending claims in the U.S. immigration system or a form of provisional residency status. ICE's caseload more than doubled during Joe Biden's presidency amid record numbers of illegal border crossings.

ICE officers deployed aggressively during President Donald Trump's first week in office, boosting the number of immigrants taken into custody from fewer than 400 on Tuesday to nearly 600 on Friday. The number declined to 286 on Saturday, according to ICE.

Trump's supporters and others have pointed out that those totals will not yield the "millions" of deportations the president has promised.

Trump made a similar promise during his first term and came up far short, reaching a peak of about 267,000 during the 2019 fiscal year. The Biden administration deported 271,000 in fiscal year 2024, the highest annual total in a decade. Trump has long had little patience for explanations of why his goals are not realistic.

ICE officers have been told for years that indiscriminate roundups are unsafe and counterproductive, because they spread panic throughout immigrant communities and produce significant public backlash. ICE and the White House did not immediately respond to requests for comment.

Trump officials have told ICE the president expects arrest operations to proceed around-the-clock and that officers should cancel personal leave, according to the four people briefed on the directives.

ICE has about 5,500 officers nationwide working on immigration enforcement, a staffing level that has remained roughly flat for the past decade. The Trump administration took steps to supplement those numbers by deputizing officers and agents at the Justice Department to investigate immigration violations and make arrests, enlisting personnel from the FBI, U.S. Marshals, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives and the Federal Bureau of Prisons.

Trump also ordered ICE's Homeland Security Investigations division to shift its focus to immigration enforcement. The agency is DHS's investigative division for counterterrorism, drug smuggling, human trafficking cases, child exploitation and other crimes.

"Mobilizing these law enforcement officials will help fulfill President Trump's promise to the American people to carry out mass deportations," Huffman said in a statement. "For decades, efforts to find and apprehend illegal aliens have not been given proper resources. This is a major step in fixing that problem."

Former ICE officials, speaking on the condition of anonymity to describe the work of Homeland Security Investigations, said reassigning special agents to carry out civil immigration enforcement will mean they devote less time to probing serious crimes.

## Notes

PUBLISHER: Washington Post

## Classification

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** WPCOM

**Subject:** IMMIGRATION (93%); IMMIGRATION, CITIZENSHIP & DISPLACEMENT (91%); NATIONAL SECURITY & FOREIGN RELATIONS (91%); ARRESTS (90%); BORDER CONTROL (90%); NEGATIVE NEWS (90%); CORRECTIONS (89%); CRIME, LAW ENFORCEMENT & CORRECTIONS (89%); CRIMINAL OFFENSES (89%); DEPORTATION (89%); INTERNATIONAL RELATIONS & NATIONAL SECURITY (89%); NATIONAL SECURITY (88%); SAFETY (85%); US FEDERAL GOVERNMENT (79%); GOVERNMENT BODIES & OFFICES (78%); GOVERNMENT DEPARTMENTS & AUTHORITIES (78%); IMMIGRATION LAW (78%); INTERVIEWS (78%); LAW ENFORCEMENT (78%); SPECIAL INVESTIGATIVE FORCES (78%); SENTENCING (77%); CIVIL RIGHTS (73%); CRIMINAL CONVICTIONS (73%); SAFETY, ACCIDENTS & DISASTERS (68%); gcat Political/General News (%); gcom Society/Community (%); gcrim Crime/Legal Action (%); gimm Human Migration (%); gpir Politics/International Relations (%)

**Company:** usice United States Immigration and Customs Enforcement

**Industry:** TELEVISION INDUSTRY (69%); STREAMING MEDIA (64%); STREAMING PLATFORMS (60%)

**Person:** DR PHIL MCGRAW (50%)

**Geographic:** WASHINGTON DC, USA (79%); UNITED STATES (94%); NORTH AMERICA (79%); namz North America; usa United States; usdc Washington DC; uss Southern U.S.

IP Descriptors: immigration, Immigration, Religion, SocialIssues

**Load-Date:** January 28, 2025

---

End of Document

# Exhibit 4

POLITICO

-50% -50% -50% -50%
$198.99 $113.99 $148.99 $198

# DOJ is walking back the White House's goal to arrest 3,000 immigrants per day

It's another discrepancy between what White House advisers say and the administration's legal posture.



Federal agents stand in Los Angeles on July 7, 2025, as part of the Trump administration's immigration crackdown there. | Damian Dovarganes/AP

By **KYLE CHENEY** and **JOSH GERSTEIN**
08/03/2025 07:00 AM EDT
Updated: 08/03/2025 01:24 PM EDT

Stephen Miller was unequivocal: Immigration and Customs Enforcement officers would seek to arrest 3,000 or more immigrants per day, a staggering target that he said was necessary to carry out President Donald Trump's mass deportation agenda.

"Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day," the senior White House adviser told Fox News' Sean Hannity in May.

Top Stories from POLITICO

Read More

00:00

02:00

But when federal judges pressed for details about that figure last week, the administration denied any such quota existed. The contradiction came in a lawsuit that alleged the intense pressure to rack up arrests had led ICE to conduct illegal sweeps in Los Angeles.

It's not the only case that has featured the 3,000-arrest-per-day target as a crucial piece of evidence that the administration's single-minded drive to rack up arrests may have prompted immigration authorities to cut corners or break the law. Washington-based Judge Jia Cobb, a Biden appointee, cited the figure when she ruled Friday that the administration's dramatic expansion of "expedited" deportation proceedings violated the law. And Judge Trina Thompson, a Biden appointee in San Francisco, pointed to the purported goal Thursday when she blocked the administration's bid to end temporary protected status for tens of thousands of Nicaraguan, Honduran and Nepali immigrants.

But on Wednesday, the Justice Department said no such orders had ever been given.

"DHS has confirmed that neither ICE leadership nor its field offices have been directed to meet any numerical quota or target for arrests, detentions, removals, field encounters, or any other operational activities that ICE or its components undertake in the course of enforcing federal immigration law," a Justice Department attorney reported to the 9th Circuit Court of Appeals.

While DOJ attorney Yaakov Roth attributed the quota claim to "anonymous reports in the newspapers," he didn't mention that Miller — Trump's deputy chief of staff and homeland security adviser — had publicly confirmed the 3,000-daily-arrest "goal" in the televised interview on Fox.

The discrepancy is the latest example of a gulf between what White House advisers say in public and what the Justice Department says in court. In this instance, the chasm may be undermining the DOJ's already strained credibility with judges.

Homeland Security officials did not respond to requests for comment. A White House spokesperson, Abigail Jackson, did not directly respond to questions about the discrepancy between Miller's comments and the administration's position in court.

"The Trump Administration is committed to carrying out the largest mass deportation operation in history by enforcing federal immigration law and removing the countless violent, criminal illegal aliens that Joe Biden let flood into American communities," Jackson said.

Advertisement

AD

A Justice Department spokesperson said there is no disconnect between the DOJ's court filings and the White House's public statements.

"The entire Trump Administration is united in fully enforcing our nation's immigration laws and the DOJ continues to play an important role in vigorously defending the President's deportation agenda in court," the DOJ spokesperson said.

Immigration advocates have pointed to reports about the daily 3,000-arrest quota as proof that the administration's most extreme tactics — ones they contend violate due process and other constitutional or legal principles — are the result of a single-minded drive to hit numerical targets. Judges have pointed to those reports as well, figuring them into the analysis of whether the administration's tactics are legal.

The existence of the target has created particular complications in the case challenging the immigration sweeps in Los Angeles. The administration is fighting an order that a federal judge issued last month prohibiting ICE from conducting "roving" immigration arrests based on broad criteria such as presence at a home improvement store or car wash.

The claim of a quota featured prominently in oral arguments at the 9th Circuit last week on the administration's bid to overturn that order. And when the 9th Circuit ruled Friday night, leaving the order largely intact, the judges seemed to highlight the contradiction by quoting the entirety of DOJ's denial and then taking note of Miller's statement to Fox about a "goal."

The three Democratic-appointed judges assigned to the case said the vague factors ICE appeared to be relying on "impermissibly cast suspicion on large segments of the law-abiding population, including anyone in the District who appears Hispanic, speaks Spanish or English with an accent, wears work clothes, and stands near a carwash, in front of a Home Depot, or at a bus stop."

During the arguments Monday, the appeals judges assigned to the case pressed the Justice Department for an answer on whether ICE officers were under pressure to meet some numerical target that might encourage them to detain

people based on grounds that fall short of the “reasonable suspicion” the law required.

Roth conceded that such a quota, if it existed, could support claims that some arrests did not meet the legal standard. But he said it wouldn’t justify the proactive order that Judge Maame Ewusi-Mensah Frimpong imposed three weeks ago, barring “roving” arrests in the federal judicial district centered in Los Angeles.

“That might increase the risk of a constitutional violation in a particular case, but I don’t think that alone would be sufficient for an injunction,” Roth replied.

A lawyer fighting the immigration arrests, Mohammad Tajsar of the ACLU, told the appeals court in a filing Thursday that the government’s statements do not rule out the existence of some sort of quota motivating ICE officers.

“Defendants’ carefully worded letter does not negate an arrest quota,” Tajsar wrote. “Those actions can heavily influence agents’ and officers’ conduct.”

**FILED UNDER:** DEPARTMENT OF JUSTICE, LEGAL, STEPHEN MILLER, IMMIGRATION AND CUSTOMS ENFORCEMENT

## Global Security

Free through the end of 2025, this POLITICO Pro newsletter preview explores the people, policies, and power shifts shaping today's international security landscape.

EMAIL

Your Email

EMPLOYER

Employer

* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service . You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here . This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT



**America’s accelerating exit from itself**

Financial Times



**The secret life of the first millennial saint**

The Economist



**Break Free From Partisan News: Try…**

If you are tired of echo chambers and partisan new...

Reason




**What our analysis of 900 firms shows abo…**

The Economist



**Kevin Sorbo Begs: Quit Eating Blueberries If…**

heartflowhealth.com

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do Not Sell or Share My Personal Information and Opt Out of Targeted Advertising

© 2025 POLITICO LLC

# Exhibit 5

# Trump puts DC police department under federal control, deploys National Guard

abcnews.go.com/Politics/trump-hold-news-conference-crime-dc-after-threatening/story

Michelle Stoddart, Kelsey Walsh, Tierra Cunningham

August 12, 2025




Despite the president's claims, crime in D.C. is down over the last two years.

At an extraordinary news conference on Monday, President Donald Trump revealed plans to take over the Washington, D.C. police department and deploy National Guard troops in the nation's capital to combat what he says is rampant violent crime that statistics show is actually decreasing.

"We're here for a very serious purpose. Very serious, very," Trump said. "Something's out of control. But we're going to put it in control very quickly, like we did in the southern border. I'm announcing a historic action to rescue our nation's capital from crime, bloodshed, bedlam and squalor and worse. This is Liberation Day in D.C., and we're going to take our capital back."

He said he was declaring a public safety emergency in order to put the Washington police department under federal control and station the National Guard on the city's streets.




President Donald Trump with Defense Secretary Pete Hegseth and US Attorney General Pam Bondi addresses the media in the James S. Brady Press Briefing Room of the White House, Washington, August 11, 2025.
Will Oliver/EPA/Shutterstock

Trump announced that Attorney General Pam Bondi will be taking command of the Metropolitan Police Department and DEA Administrator Terry Cole will be interim federal commissioner of the force.

He delivered his message standing beside Bondi, Secretary of Defense Pete Hegseth, U. S. Attorney for the District of Columbia Jeanine Pirro, FBI Director Kash Patel and Interior Secretary Doug Burgum who will all play a role in the takeover Trump announced.

"Let me be crystal clear. Crime in D.C. is ending and ending today. We are going to use every power we have to fight criminals here," Bondi said.




Attorney General Pam Bondi speaks, alongside Defense Secretary Pete Hegseth and President Donald Trump during a news conference to discuss crime in Washington, DC, in the Brady Press Briefing Room at the White House in Washington, August 11, 2025.
Andrew Caballero-Reynolds/AFP via Getty Images

Hegseth said 800 National Guardsmen would be deployed to start. He later told Fox News' Laura Ingraham that how long the Guard members are deployed is "the president's call."

The Defense secretary said the Guard would serve similar functions as those deployed to Los Angeles earlier this summer in reaction to anti-ICE protests. While they won't be performing law enforcement functions, "They're going to be proactive. If you take an action or a shot at them, there will be a consequence," he said.

Trump said the capital "has been overtaken by violent gangs and bloodthirsty criminals, roving mobs of wild youth, drugged out maniacs and homeless people," and added that police "now they are allowed to do whatever the hell they want."

Contrary to the president's claim, preliminary year-to-date crime comparisons from Washington's Metropolitan Police Department show that overall crime in D.C. has decreased by 7% since last year, with violent crime down 26% and property crime reduced by 5%.

He said the city's homeless would be dealt with as well.

"We're going to be removing homeless encampments from all over our parks, our beautiful, beautiful parks, which now a lot of people can't walk on," he said. "They've been very, very dirty, very -- got a lot of problems. But we've already started that. We're moving the encampments away, trying to take care of people. Some of those people, we don't know how they even got there. And some of those people are from different countries, different parts of the world. Nobody knows who they are. They have no idea."

He continued, "But they're there getting rid of the people from underpasses and public spaces from all over the city. There are many places that they can go, and we're going to help them as much as you can help. But they'll not be allowed to turn our capital into a wasteland for the world to see," he said.

"If our capital is dirty, our whole country is dirty and they don't respect us," he said, comparing Washington to other world cities.

FBI and Border Patrol officers arrest a man along the U Street corridor during a federal law enforcement deployment to the nation's capital, August 10, 2025 in Washington.
Andrew Leyden/Getty Images

House Judiciary Committee Ranking Democrat Rep. Jamie Raskin said he will be introducing a resolution to reverse what he called "this plainly ridiculous" state of local emergency and "restore full home rule powers to the Mayor, Council and people of the District of Columbia."

Washington Mayor Muriel Boswer, a Democrat, responded Monday afternoon that "we're at a 30 year violent crime low," adding, "while this action today is unsettling and unprecedented, I can't say that given some of the rhetoric of the past, that we're totally surprised."

Washington, DC Mayor Muriel Bowser speaks at a press conference after President Donald Trump announced a federal takeover of the Metropolitan Police Department at the Wilson Building, August 11, 2025 in Washington.
Kevin Dietsch/Getty Images

The president promoted the news conference in multiple posts on his social media platform and on Sunday posted that it would "also be about Cleanliness and the General Physical Renovation and Condition of our once beautiful and well maintained Capital."

In a separate post, Trump said the homeless should leave D.C., accompanied by photos of homeless encampments along his route from the White House to his golf club in Sterling, Virginia.

"The Homeless have to move out, IMMEDIATELY. We will give you places to stay, but FAR from the Capital," Trump wrote. "The Criminals, you don't have to move out. We're going to put you in jail where you belong."

The news conference comes after Trump last week ordered an increase in law enforcement as part of an executive order he signed in March to "Make the District of Columbia Safe and Beautiful."

A White House official said the law enforcement effort a "whole of government approach to improve overall public safety" and said that law enforcement will "be focused on high traffic tourist areas and other known hotspots."

The official added that federal officers "will be identified, in marked units, and highly visible."

Trump said Sunday that he has given D.C. Mayor Muriel Bowser an opportunity to reduce crime rates but she has failed to do that.

"The Mayor of D.C., Muriel Bowser, is a good person who has tried, but she has been given many chances, and the Crime Numbers get worse, and the City only gets dirtier and less attractive. The American Public is not going to put up with it any longer," he claimed.

President Donald Trump speaks during a news conference to discuss crime in Washington, D.C, in the Brady Press Briefing Room at the White House in Washington, August 11, 2025.
Jim Watson/AFP via Getty Images

Bowser said Sunday that Washington has spent the last two years driving down violent crime, “driving it down to a 30 year low, in fact.”

“It is true that we had a terrible spike in crime in 2023, but this is not 2023, this is 2025 and we've done that by working with the community, working with the police, working with our prosecutors, and, in fact, working with the federal government," Bowser told MSNBC.

A man, who was later arrested, interacts with Border Patrol and FBI agents along the U Street corridor, August 10, 2025, in Washington.
Andrew Leyden/Getty Images

On Saturday, Trump said the nation’s capital has become “one of the most dangerous cities anywhere in the World.”

Last week, he threatened to deploy the National Guard to D.C. and, as he has on several occasions since he was inaugurated in January, suggested that there should be a federal takeover.

That call came after Edward Coristine, a former Department of Government Efficiency employee, was beaten after he tried to break up a carjacking in D.C.

The seven-day law enforcement effort is being led by the U.S. Park Police but includes personnel from the Metro Transit Police Department, Amtrak Police Department, United States Capitol Police, Washington’s Metro Police Department, Homeland Security Investigations, Federal Protective Service, Enforcement and Removal Operations, Drug

Enforcement Administration, Federal Bureau of Investigation, Bureau of Alcohol, Tobacco, Firearms, and Explosives, United States Marshals Service, United States Attorney's Office-District of Columbia, Department of Interior, Pre-Trial Services Agency, Court Services and Offender Supervision Agency (CSOSA), the White House official said.

*ABC News' Isabella Murrary and Luis Martinez contributed to this report.*

## Related Topics

President Trump

# Exhibit 6

# DC critics slam Trump's crackdown as power grab focused on immigration

thehill.com/homenews/state-watch/5460622-trump-dc-crime-crackdown-immigration

Mike Lillis, Rebecca Beitsch August 20, 2025




Mayor Muriel Bowser (D) and other officials in Washington, D.C., say the Trump administration's crime crackdown is really about exerting power and elevating immigration enforcement — not making D.C. safer.

While top Trump officials say the high-profile deployments have had the immediate effect of stifling crime in the District, local critics are raising questions about both the geographic placement of National Guard troops and federal officers — who have been most prominent in tourist hot spots and other wealthier parts of the city — and the focus of the criminal crackdown.

Of the 556 arrests tallied by the White House since it began increasing federal law enforcement presence on Aug. 7, nearly half of the arrests, 233, have been classified by the administration as migrants without legal status, a White House official said Tuesday.

"I think it makes the point that this is not about D.C. crime," Bowser said earlier in the week, adding that the administration should be transparent about its intent.

"Nobody is against focusing on driving down any level of violence," Bowser said. "And so if this is really about immigration enforcement, the administration should make that plain."

The list of those arrested includes immigrants with alleged criminal histories of assault, kidnapping, burglary and larceny, the White House official said. But it also includes delivery drivers arrested as they tried to pick up food from commercial venues, sparking a backlash from human rights advocates and some D.C. residents.

Fueling the criticisms, the highest profile arrest to date was that of a Justice Department employee accused of throwing a sandwich at an agent of U.S. Customs and Border Protection in a section of the city best known for its vibrant nightlife.

Sign up for the Morning Report

The latest in politics and policy. Direct to your inbox.
By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

Other high-profile or viral encounters have largely centered on immigration.

Video captured at least five masked agents who refused to answer questions about what agency they were with as they used a stun gun on a delivery driver before placing the man in an unmarked vehicle. When an onlooker said the officers were ruining the country, one federal agent responded “liberals already ruined it.”

In another case, a man captured video of his delivery driver as he was detained just minutes away, arrested by officers after the Arabic speaker was apparently unable to answer questions posed by officers.

The apparent focus on immigration has prompted protests around the city. In one high-profile example, video from Tuesday shows a crowd in the Columbia Heights neighborhood marching behind a group of Immigration and Customs Enforcement (ICE) agents and chanting “ICE go home” until the agents reach their vehicles and leave the area.

The following day, the administration pushed back against the demonstrations, dispatching Vice President Vance, White House deputy chief of staff Stephen Miller and Defense Secretary Pete Hegseth to Union Station, the transportation hub where National Guard troops have been stationed for days.

Vance touted the National Guard presence as “a great example of what’s possible when you actually have the political willpower to bring law and order and common decency back to the public spaces of the United States of America,” while Miller railed against “stupid white hippies” protesting the crackdown.

Some Democrats say the president has launched the tough-on-crime effort merely to deflect attention away from the ongoing saga surrounding Jeffrey Epstein, the late financier and convicted sex offender who had past ties to Trump and his elite social circle in South

Florida.

“Trump is using DC as a stage and DC residents as props in a political play to distract from his Epstein problem,” D.C. Del. Eleanor Holmes Norton (D) posted on the social platform X. “This is unacceptable.”

Charles Allen, a D.C. Council member, cast the takeover as a way to assert control and distract from problems within the Trump presidency.

“Authoritarianism, power, and control — what this has all been about — made plain,” he wrote on X last week.

“It might make sense if he’s trying to create compelling TV and distract folks from the real scandals he’s facing, but it doesn’t make our city safer & it’s a dangerous abuse of power and authority,” he added later.

Announcing his D.C. crime crackdown earlier in the month, Trump said it was necessary to combat levels of crime in Washington he portrayed as dystopian. The surge in federal forces would “rescue our nation’s capital from crime, bloodshed, bedlam and squalor, and worse,” he said.

But during that announcement, Trump repeatedly turned to the topic of immigration.

“This city will no longer be a sanctuary for illegal alien criminals,” he said.

“We will have full, seamless, integrated cooperation at all levels of law enforcement, and we’ll deploy officers across the District with an overwhelming presence.”

Initially, the administration deployed 800 unarmed National Guard troops, on top of hundreds of other officers across a host of agencies including the FBI, ICE and U.S. Customs and Border Protection.

Since then, the numbers have grown dramatically, with six GOP-led states sending their National Guard forces to D.C. at the request of the administration, bringing the total to nearly 2,000 various law enforcement officers patrolling D.C. Additionally, the guard members will begin carrying weapons, according to numerous reports.

During a press briefing on Wednesday, Bowser made clear that she doesn’t support the surge of military troops.

“I don’t think the National Guard should be used for law enforcement,” she said. “Calling women from their homes and their jobs and their families — they have to be used on mission-specific items that benefit the nation. I don’t think you have an armed militia in the nation’s capital.”

The D.C. Police Union, which says it represents 3,000 of the city's law enforcement officers, has hailed the arrival of the federal reinforcements as a necessary step in combating violent crime in the nation's capital. The union posted numbers on Monday indicating that crime in D.C. plummeted in the first week after Trump announced the law enforcement surge, versus the week prior. Violent crimes, the group said, were down 22 percent over that span, while all crimes were down 8 percent.

Carjackings saw the greatest change, down 83 percent.

"At the direction of @POTUS, our nation's capital is a SAFER place — and we are just getting started," U.S. Attorney General Pam Bondi posted Tuesday on X.

Bondi said the surge has led to the seizure of 76 guns, including nine on Monday night alone.

On Wednesday, Bondi promoted a new campaign from the U.S. Marshals Service offering a $500 reward for information leading to an arrest during the federal surge.

"Together, we will make DC safe again!" she wrote.

Violent crime in D.C., which saw a large spike during the COVID pandemic, has since plummeted even long before Trump's policing campaign, however, raising questions about the true effectiveness of the federal surge. Offenses related to carjackings, for example, fell from 319 through the first eight months of 2024 to 190 over the same span this year, according to D.C.'s Metropolitan Police Department.

Given those trends, Trump's critics see a more menacing campaign, warning that the militarization of Washington's streets brings with it an authoritarian air that's quickly damaged certain businesses. That includes restaurants, which saw a plunge in reservations in the days after the administration's law enforcement takeover.

"The whole region understands that oppression of people in Washington hurts everybody who lives in our region," Rep. Jamie Raskin (Md.), the senior Democrat on the House Judiciary Committee, told MSNBC on Tuesday. "We don't want to see people's rights being trampled there."

The crackdown comes as D.C. police officers have been under pressure to do more to assist federal officers with immigration enforcement.

The Metropolitan Police Department has traditionally sought to bar its officers from taking actions based solely on immigration status if someone doesn't otherwise have a criminal warrant out for their arrest.

But in a move that was later shifted under court scrutiny, Bondi sought to appoint a new D.C. police commissioner while also seeking to unwind D.C. laws limiting police involvement in immigration enforcement.

Immigration advocates in D.C. say now any brush with law enforcement could be disastrous for migrants.

“This disturbing policy strips away the rights and safety of our communities. Even the most common police interactions — such as a traffic violation or reporting a crime — can have life-altering consequences for immigrants, including detention and deportation,” the Amica Center for Immigrant Rights said in a statement before Bondi’s order was tamed by the courts.

“This policy adds to the atmosphere of fear and distrust, perpetuates racial profiling, and criminalizes innocent people.”

Tags Eleanor Holmes Norton Jeffrey Epstein Muriel Bowser Pete Hegseth Stephen Miller

Copyright 2025 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# Exhibit 7

**Office of the Attorney General**
**Washington, D. C. 20530**

ORDER NO. 6372-2025

RESTORING SAFETY AND SECURITY TO THE DISTRICT OF COLUMBIA

Residents of the District of Columbia, the thousands of Americans who commute into the District for work every day, and the millions of tourists from all over the world who visit our Nation's capital have a right to feel safe and to be free from the scourge of violent crime. Notwithstanding false media narratives and apparent efforts by some District employees to manipulate crime statistics, the danger posed by violent crime in the District is plain for all to see. As Executive Order 14333 of August 11, 2025 (Declaring a Crime Emergency in the District of Columbia), makes clear, the "rising violence in the capital now urgently endangers public servants, citizens, and tourists" and is impeding the proper functioning of the Federal Government. These dangers are multiplied by the District's sanctuary city policies, which actively shield criminal aliens from the consequences required by federal law. The proliferation of illegal aliens into our country during the prior Administration, including into our Nation's capital, presents extreme public safety and national security risks to our country.

Pursuant to section 3 of Executive Order 14333 and section 740(a) of the District of Columbia Home Rule Act, Drug Enforcement Administration Administrator Terrance C. Cole shall serve as the Attorney General's designee for the duration of the emergency declared by the President for the purpose of directing the Mayor of the District of Columbia to provide such services of the Metropolitan Police Department ("MPD") as the Attorney General deems necessary and appropriate.

Pursuant to section 3 of Executive Order 14333 and section 740(a) of the District of Columbia Home Rule Act, I hereby deem the following services to be necessary and appropriate and direct the Mayor to immediately provide for:

1. Assistance with the enforcement of federal immigration law, as deemed necessary and appropriate by Administrator Cole, notwithstanding D.C. Code § 24–211.07 or any other provision of the D.C. Code or MPD policy.
2. Assistance with locating, apprehending, and detaining aliens unlawfully present in the United States, as deemed necessary and appropriate by Administrator Cole, notwithstanding section II, paragraphs A.2 and F of General Order GO-PCA-702.01, D.C. Code § 24–211.07, or any other provision of the D.C. Code or MPD policy.
3. Database inquiries and compliance with requests for information from any federal law enforcement entity, as deemed necessary and appropriate by Administrator Cole, notwithstanding paragraph 22 of General Order GO-PER-201.26 or any other provision of the D.C. Code or MPD policy.
4. Enforcement of section 22-1307 of the D.C. Code and all D.C. municipal regulations pertaining to the unlawful occupancy of public spaces, as deemed necessary and appropriate by Administrator Cole.

Attorney General Order No. 6370-2025 is hereby rescinded.

8/15/25
Date

Pamela Bondi
Attorney General

# Exhibit 8

NOTICE Due to the lapse in federal funding, this website will not be actively managed. Click here for more information.

Homeland Security

U.S. Department of Homeland Security

# Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials

**Release Date:** January 23, 2025

WASHINGTON – Today, Acting Department of Homeland Security Secretary Benjamine Huffman issued a directive essential to fulfilling President Trump's promise to carry out mass deportations.

The directive gives Department of Justice (DOJ) law enforcement officials in the U.S. Marshals, Drug Enforcement Administration (DEA), the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Federal Bureau of Prisons authority to investigate and apprehend illegal aliens.

*"Thanks to the last Administration's open border policies, we've seen violent criminals and gang members terrorize American communities. Today's action empowers law enforcement officials at the DOJ to help identify and apprehend aliens who have illegally come into our country. Mobilizing these law enforcement officials will help fulfill President Trump's promise to the American people to carry out mass deportations. For decades, efforts to find and apprehend illegal aliens have not been given proper resources. This is a major step in fixing that problem."*

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)

## Keywords

DEPARTMENT OF JUSTICE (DOJ) (/KEYWORDS/DEPARTMENT-JUSTICE-DOJ) IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)

Last Updated: 01/24/2025

# Exhibit 9

# FBI agents are again pulled from their day jobs to address a Trump priority

cnn.com/2025/08/14/politics/fbi-washington-immigration-epstein

Holmes Lybrand, Evan Perez, Josh Campbell August 14, 2025




FBI agents and Secret Service Police officers patrol the Navy Yard neighborhood in Washington, DC, on August 12.

Evelyn Hockstein/Reuters

FBI agents – thrust into yet another role for which they are not trained – have been put on patrol duties with local police as part of President Donald Trump's declaration of a crime emergency in Washington, DC.

In the past several months, the agency's rank-and-file, who specialize in complex threat investigations, have been assigned to fulfill a bevy of roles outside their lanes of expertise, spending overnight and weekend shifts poring over old Jeffrey Epstein files looking for necessary redactions, assisting ICE in finding and removing illegal immigrants and now patrolling the streets of the nation's capital.

While federal agencies including the FBI often link up with local police departments to help with specific investigations and task forces or to build out certain tools they may need, such as gun tracing, agents are not trained or equipped for community policing, multiple federal

law enforcement officials told CNN.

FBI Director Kash Patel took office vowing to “let cops be cops.” But in recent years, the FBI has touted how many new agents don’t come from former police backgrounds and instead come from backgrounds in technology, law and other disciplines. One 2024 class of new agents included more than 44% with advanced degrees, according to an internal newsletter.

“FBI agents are not police officers,” Former FBI deputy director and CNN law enforcement analyst Andrew McCabe said Tuesday. “Most of them don’t come to the FBI from a background as a police officer. So they don’t have the training and the skillset and the experience of doing that work, which can be dangerous both for them and for the people they would be policing.”

For many FBI agents, much of the job is done largely at a desk, and training necessary to de-escalate situations in the field, or what beat cops are looking for when trying to identify threats or potential hostile situations, are not comprehensively part of training for agents.

What’s more, the FBI use-of-force policy generally has a much lower threshold for when agents are allowed to use their firearms to protect themselves than most police departments – in the case of Washington, DC, officers, have options to use tasers and pepper spray before using lethal force, not standard equipment for agents.

Federal agents are also typically only minimally trained in conducting vehicle stops, which remains one of the most dangerous aspects of a police officer’s job. Unlike routine police encounters with suspects, which may only involve one or two officers, when agencies like the FBI conduct an arrest, they typically plan out the operation methodically in advance and execute it with a complement of agents that far outnumbers the suspect.

Several law enforcement officers told CNN that many agents now tasked with patrolling the streets of DC alongside the Metropolitan Police Department are in a wait-it-out posture, hoping they’ll be able to turn their complete focus back to the cases they were investigating previously when Trump’s 30-day period of controlling the MPD is currently set to come to an end.

“This isn’t hard: If we’re doing (policing) we’re not covering down on those other threats,” said one person.

Other federal agencies involved in the surge of resources to DC, like the Secret Service, US Marshals Service, Federal Protective Service, ICE and Border Patrol have officers with far more experience arresting individuals or conducting more standard, on-the-ground police work than the FBI.

The difference in training was an issue that arose most recently in the protests following the police killing of George Floyd in 2020.

Agents with no significant training in crowd control were thrust into the streets to help protect federal buildings and found themselves outnumbered by protesters. To try to deescalate tensions, some agents took a knee in a symbolic gesture that has since become a flashpoint in the Trump administration's retribution against so-called "woke" policies associated with political opponents. Under Patel, some of those agents have faced reassignments to less-prestigious jobs and internal disciplinary investigations.

The FBI declined to comment on multiple questions from CNN for this story.

Since the weekend, FBI agents have been embedding with Metropolitan Police Officers and, according to Patel, were involved in 10 of the 23 arrests that occurred in DC Monday night. It's unclear to what extent FBI agents participated in the arrests.

The arrests included unlawful possessions of firearms, DUI warrants, one on a search warrant for a prior murder charge and more, Patel touted on social media.

"When you let good cops be cops they can clean up our streets and do it fast," Patel wrote on X. "More to come. Your nation's Capital WILL be safe again."

## Epstein files and immigration

In 2025, hundreds of FBI agents were reassigned to immigration-related duties, which raised concerns at the time among some agents that the switch could hinder important national security investigations, including into espionage by foreign countries and terror threats.

At the time of the push for more federal agents to help with immigration enforcement, FBI agents involved were told by supervisors not to document moving resources away from high-priority cases.

Behind the scenes, some FBI agents clashed with their immigration enforcement counterparts, with major flashpoints involving the refusal by those agents to engage in what they viewed as racial profiling and other tactics that could violate the Constitution, according to law enforcement sources. While agency leaders have publicly touted a very close and cooperative working relationship between organizations, the situation has at times been much different on the ground, sources said.

Then came the files of Jeffrey Epstein, the sex offender and accused sex trafficker who killed himself in prison in 2019 before the case against him could go to trial.

FBI agents in March worked tirelessly, sometimes in 12-hour shifts, to review documents and evidence against Epstein in order to make redactions on the Justice Departments failed attempt to cull conspiracy theories and accusations that they were continuing to hide imagined crimes against the rich and powerful. Much of which stemmed from Trump's allies, including those in key leadership positions.

Agents were ordered to put aside investigations related to threats from China and Iran, as well as cases in order to complete the Epstein redactions, something every division in the bureau was ordered to supply agents for.

Reaction to Trump's plan which calls for FBI agents to patrol with DC police

“There is no other entity that does that work if the FBI is not doing it,” McCabe said. “And that is really important stuff that needs to be done every day in this country by a limited resource of FBI agents. And so every time you distract them into doing something like this, you’re doing less of that.”

Patel and his deputy director, Dan Bongino, often tout the work of the FBI online, recently highlighting the bust of an alleged human trafficking operation in Nebraska, fentanyl seizures, and other FBI successes.

## Volatile time at FBI

The new reassignments to help patrol DC come days after two senior FBI officials, including the acting-director before Patel was appointed by Trump to lead the agency, along with other agents, were summarily fired following perceived opposition to the administration.

The firings, including of former acting director Brian Driscoll after he fought the administration’s plans to quickly fire more than 100 mid-level and senior employees in the early days of Trump’s second administration, has also spread an air of concern among agents over who could be targeted next or what past actions could land them in trouble with Trump-appointed leadership.

Law enforcement sources fear this volatile period inside the FBI could lead to a brain drain amid constantly evolving threats as numerous agents, analysts and professional staff consider departing for other agencies, or into the private sector where their national security and investigative skills remain highly sought.

“Morale is the worst I’ve seen,” said one law enforcement source. “The bureau is becoming unrecognizable. Lots of people are weighing really difficult decisions right now.”

# Exhibit 10

# *How Washington Became a Testing Ground for ICE*

A series of arrests captured on video reveal how immigration officers have worked with other law enforcement agencies to identify migrants during stops for minor infractions.

Listen to this article · 14:10 min Learn more



**By Hamed Aleaziz, Brent McDonald and Amogh Vaz**
Reporting from Washington

Oct. 1, 2025 Updated 6:08 p.m. ET

A man from El Salvador was stopped for allegedly driving a landscaping truck through federal parkland. A Honduran man was pulled over when the police said he ran a stop sign as his family left a local park. A Jordanian man was detained while working in a food truck on the National Mall during a crackdown on unlicensed vendors.

President Trump's deployment of federal law enforcement officers in August across Washington — intended, officials said, to lower crime — transformed what was one of the largest sanctuary cities in the country into a test case for Immigration and Customs Enforcement as it expands its efforts in major urban centers.

The agency sharply increased its arrests in the city by working alongside the local police and other federal agencies to identify immigrants during stops for minor traffic violations, according to law enforcement officials, lawyers for detained migrants, internal immigration records and witness accounts.

ICE had made only 85 arrests in Washington from Jan. 20 through the end of July, according to data obtained by the Deportation Data Project. But from early August until mid-September, ICE made around 1,200 arrests, according to officials with knowledge of the data.

One key to the strategy: ICE's close partnership with both the Metropolitan Police Department and the U.S. Park Police, according to a New York Times review of dozens of videos filmed by witnesses in Washington. At other times, the agency operated alone, with masked officers detaining people in sometimes aggressive encounters that drew angry protests from neighbors.

Last week, an immigrants rights organization sued the Department of Homeland Security, accusing the agency of targeting people for their ethnicity, making arrests without probable cause and sowing "terror in Latino and other communities across the District."

The department called allegations that it had engaged in racial profiling "disgusting, reckless, and categorically FALSE."




President Trump addressed federal officers and National Guard members at a U.S. Park Police facility in Washington days after declaring a crime emergency in the city. Nathan Howard/Reuters

As the administration works to deepen police cooperation on immigrant enforcement throughout the country, the effort in Washington shows how migrants stopped by local law enforcement for low-level infractions can swiftly be detained by ICE — a boost for an agency struggling to meet the White House's demands for higher arrest numbers.

Since January, ICE has signed more than 520 agreements in 35 states that allow local law enforcement to collaborate with federal officials on immigration enforcement during routine patrols.

However, the administration has faced resistance to such arrangements from liberal cities with so-called sanctuary policies, which ban the police from assisting immigration agents.

To get around that in Washington, the Trump administration exploited the city's tenuous status as a federal district, compelling the police to cooperate with ICE by declaring a "crime emergency." Previously, under Washington's sanctuary city law, local police officers had not been permitted to cooperate with federal immigration enforcement authorities.

It also took advantage of the array of federal law enforcement already operating in the region, including the U.S. Park Police, which also has officers in New York and San Francisco. During the surge, Interior Secretary Doug Burgum deputized immigration officers to patrol with Park Police officers and granted the Park Police authority to pursue fleeing offenders.

Tricia McLaughlin, a homeland security spokeswoman, said in a statement that immigration officials in Washington had "arrested gang members, kidnappers, drug traffickers and other violent thugs." She highlighted the department's collaboration with the local police, the Park Police and other law enforcement agencies, adding, "Criminal aliens are a public safety threat, and there should be no place for sanctuary policies that place crime over the community."

The Department of Homeland Security did not respond to questions about how many of the 1,200 people detained for immigration violations in Washington had also been accused of committing other crimes.

While Mayor Muriel Bowser has said that local police officers would stop assisting immigration enforcement when Mr. Trump's emergency order expired on Sept. 10, the federal deployment has opened the door to more cooperation.

The Metropolitan Police Department has left in place a policy change allowing officers to share information with federal immigration authorities about people not in custody, such as during traffic stops, according to Daniel Gleick, a spokesman for the mayor's office. And the police department continues to work with a federal task force focused on Washington that includes officers from homeland security, the mayor acknowledged on Wednesday.

"We never wanted M.P.D. to patrol with homeland security agencies, but they are part of the task force, and that should change," she told reporters.

Mr. Trump has also threatened to once again take over the city's police department if the mayor does not cooperate on immigration enforcement.

And ICE officials, who continue to work with other federal agencies in Washington, said they did not plan to let up. "We're going to continue our operations in the D.C. metro area," Marcos Charles, who leads ICE's enforcement and removal operations, said in an interview.

## Seizing On Traffic Violations

One of the first visible signs of ICE's presence in Washington came at "safety compliance" checkpoints set up on major streets at rush hour, after dark outside popular restaurants and during the day in residential zones. Videos show officers working alongside local police officers as drivers were told to pull over their cars or scooters for minor infractions.

Immigration officers were also frequently seen in videos accompanying local police officers during routine traffic stops.

The Times obtained videos from witnesses who recorded them, or from the lawyers of the people arrested, and verified their locations, names and legal status with federal law enforcement officials. Some witnesses who shared videos with The Times requested that their names be withheld out of fear of retaliation.

In one case, Aaron, a 41-year-old Honduran man, was driving away from a local park on Sept. 8 with his wife and two young children when he was pulled over for failing to make a full stop at an intersection.

Videos of the incident show a police vehicle parked directly behind his car, followed by two Customs and Border Protection vehicles.

Federal officers determined that he did not have legal status and detained him, records show.

Aaron, who asked to be identified by only his first name out of fear of retribution, said he had lived in Washington for six years, building a life in the immigrant-rich Columbia Heights neighborhood. He worked as a maintenance worker, fixing HVAC systems, and coached soccer.

In an interview from inside an ICE detention facility in Virginia, Aaron said he had no idea how his family would pay for rent and food without him.

“I mean, I’m destroyed, completely destroyed,” he said. “They changed my life — I think forever.”

Some police officials are worried about the long-term impact of the work with immigration authorities. One police official, who spoke on the condition of anonymity because they were not authorized to speak publicly, voiced concerns that the department’s forced alliance with ICE could shatter trust between local police officers and the immigrant community.

# A New Focus for Park Police




A U.S. Park Police officer and homeland security agents in August pulled over, questioned and administered a sobriety test to a man in Washington suspected of having incorrect tags on his vehicle.
Kenny Holston/The New York Times

The primary role of the Park Police, a division of the National Park Service, is protecting national parklands, federal buildings and monuments in Washington, New York and San Francisco. But under the current administration, the agency has stepped up its role in immigration enforcement, a shift from its traditional focus, according to former officers.

Videos collected and verified by The Times show members of the Park Police, trailed by homeland security agents, initiating traffic stops of landscaping, construction and food delivery vehicles around the city.

On Aug. 20, Park Police officers pulled over a truck that bore the logo of a Maryland landscaping business as it drove through Rock Creek Park, a national park that bisects the District of Columbia.

The officers said the vehicle was pulled over because its tags were obscured, and asked to see the identification of those inside the truck, according to the driver, a U.S. citizen who spoke on the condition of anonymity out of fear of retaliation.

When one member of the landscaping crew failed to provide a valid ID, he was pulled from the passenger seat, according to the driver, who filmed the arrest on his phone.

“This is an illegal detention,” he can be heard shouting in the video.

Ms. McLaughlin, the homeland security spokeswoman, said officers discovered during the stop that the man was a Honduran immigrant who had entered the United States illegally, adding that he had resisted arrest.

The next day, the landscaping company sent its clients an email saying that it would be forced to pause work in Washington “until we can determine how to ensure the safety of our team.”

Rock Creek Park, a forested greenway typically frequented by cyclists and joggers, has been a major area of focus of the joint immigration operations.

In late August, a junk removal truck driving through the park was pulled over by Park Police officers working with agents from Homeland Security Investigations. The alleged violation: driving a commercial vehicle through a federal park.

The two men inside the truck, one from Nicaragua and the other from Egypt, were placed in custody pending deportation, the Department of Homeland Security said.

A few days later, a Park Police officer pulled over Erminio Guevara, a native of El Salvador, for driving a landscaping truck through the same park. A local resident filmed Mr. Guevara as he was being arrested and loaded into an unmarked S.U.V. She asked the officers why he was being detained and whether they had racially profiled him. They did not respond.

According to the department, Mr. Guevara admitted to entering the United States illegally in 2001.

Since early August, residents have sent hundreds of videos, photos and tips to D.C. Migrant Solidarity Mutual Aid, an immigrant support group that set up an ICE tip hotline.

Amy Fischer, who leads the organization, said the footage reflected a dramatic surge in dragnet-style arrest tactics.

“We just saw the roving patrols arresting anybody that looked brown, basically,” Ms. Fischer said.

The Department of Homeland Security has rejected such claims, saying that it uses “reasonable suspicion” to make arrests.

“What makes someone a target for immigration enforcement is if they are illegally in the U.S. — NOT their skin color, race, or ethnicity,” the agency wrote in a social media post.

The Park Police’s partnership with ICE has drawn the agency into the administration’s aggressive public campaign against undocumented immigrants.

In August, the two agencies worked together to detain Laith Husam Farah Zaza, a Jordanian man accused of overstaying his visa, as he worked in a food truck near the National Mall. Afterward, immigration officials posted his photo on social media, highlighting the role of the Park Police in “targeting unlawful food truck and cart vendors.”

Mr. Farah Zaza’s wife, Fatima Marroquin-Pineda, who is a U.S. citizen, said her husband had been working extra hours as a line cook to help pay the fees required to obtain legal status through their marriage.

She said she was shocked to see the government celebrate his arrest on social media. “He was not a criminal, and it’s not a crime to work on a food truck,” she said.

Aubrie Spady, an Interior Department spokeswoman, said in a statement: "U.S. Park Police are responsible for conducting common, legitimate traffic stops. If immigration violations are found, the U.S. Park Police allow the Department of Homeland Security to take it from there."

## Questions About Due Process

ICE has also worked on its own in Washington, targeting people in their cars and stopping others on the sidewalk for minor infractions.

Videos show some officers wearing masks while carrying out arrests — a practice that is now banned in California — creating confusion and alarm among local residents.

ICE officials have said the face coverings are necessary to protect the safety of their officers, noting they have been threatened and attacked. "The brave men and women of ICE choose to wear masks for safety, not secrecy," the agency said in a statement.

On Sept. 2, Allison Price, 49, was walking her dog with her husband in D.C.'s Chevy Chase neighborhood when she saw two armed, masked agents in a beat-up minivan pull over a utility vehicle. In less than five minutes, the vehicle's driver and passenger were in handcuffs and whisked away.

The Department of Homeland Security said that two men, Marvin Saul Alvarez from El Salvador and Daniel Misael Perez-Perez from Guatemala, had entered the United States illegally and were picked up during "a targeted enforcement operation."

"It was like an abduction," said Ms. Price, who recorded the arrest on her cellphone while unsuccessfully pressing an officer to identify his agency. No other police officers were present.

"I kept thinking, if it was me or my family and I was disappeared, how would you have any evidence?"




Allison Price and her husband, Jonathan Kaplan, were alarmed by masked immigration officers making an arrest near their Washington home on Sept. 2. Brent McDonald/The New York Times

After the arrest, Ms. Price uploaded the video to YouTube and asked the community to help circulate it online.

"This is not acceptable," Ms. Price said. "I'm a D.C. resident of 25 years. Like, how is this happening? What is the authority? What is due process?"

Campbell Robertson and Albert Sun contributed reporting.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

**Brent McDonald** is a Times senior video journalist based in Washington.

**Amogh Vaz** is a video journalist for The Times.

---

A version of this article appears in print on of the New York edition with the headline: In Washington, a Testing Ground for ICE Tactics

# Exhibit 11

# DHS Scores Major Victory at Supreme Court

dhs.gov/news/2025/09/08/dhs-scores-major-victory-supreme-court




**Release Date:** September 8, 2025

*The Supreme Court ruled the Trump Administration can continue operations in Los Angeles to remove dangerous criminal illegal aliens from the streets*

WASHINGTON – The Department of Homeland Security landed a major legal victory Monday morning when the Supreme Court issued a stay in the case of *Perdomo v. Noem*. The ruling allows DHS to continue carrying out immigration operations in the Los Angeles area.

*"This is a win for the safety of Californians and the rule of law,"* said **Assistant Secretary Tricia McLaughlin**. *"DHS law enforcement will not be slowed down and will continue to arrest and remove the murderers, rapists, gang members, and other criminal illegal aliens that Karen Bass continues to give safe harbor."*

The court ruled 6-3 in favor of the Trump Administration. With its decision, the court stayed a ruling by federal judge Maame Ewusi-Mensah Frimpong in July blocking DHS from conducting immigration sweeps in Southern California.

To the mainstream media's chagrin, there are no "indiscriminate stops" being made. The Supreme Court simply applied longstanding precedent regarding what qualifies as "reasonable suspicion" under the Fourth Amendment. What makes someone a target of ICE

is if they are illegally in the U.S. DHS enforces federal immigration law without fear, favor, or prejudice.

In his opinion, **Justice Brett Kavanaugh**'s discussed the federal government's duty to enforce immigration laws on the books and the fact that the Judicial Branch does NOT make those laws:

- *"The fact remains that, under the laws passed by Congress and the President, [illegal aliens] are acting illegally by remaining in the United States – at least unless Congress and the President choose some other legislative approach to legalize some or all of those individuals now illegally present in the country. And by illegally immigrating into and remaining in the country, they are not only violating the immigration laws, but also jumping in front of those noncitizens who follow the rules and wait in line to immigrate into the United States through the legal immigration process."*

- *"[I]t is also important to stress the proper role of the Judiciary. The Judiciary does not set immigration policy or decide enforcement priorities. It should come as no surprise that some Administrations may be more laissez-faire in enforcing immigration law, and other Administrations more strict. Article III judges may have views on which policy approach is better or fairer. But judges are not appointed to make those policy calls."*

Last Updated: 09/24/2025

# Exhibit 12

*Democracy Dies in Darkness*

**D.C., Md. & Va.**

# Trump's D.C. emergency has ended. ICE and the National Guard can stay.

President Trump no longer has control of D.C. police now that his 30-day emergency has ended. Immigration enforcement and National Guard presence will continue.

Updated September 11, 2025



By Jenny Gathright

President Donald Trump's 30-day emergency control of D.C. police officially expired Wednesday, meaning he no longer has the power to direct Mayor Muriel E. Bowser (D) to provide him with whatever police services he deems necessary — a milestone that Bowser has framed as imperative for the city.

But as Trump's unprecedented flex of presidential authority over public safety in the nation's capital ends, other notable interventions in the city, including the National Guard presence and aggressive immigration enforcement, can continue. D.C. will also remain uniquely vulnerable to federal incursion — as evidenced by actions in Congress on Wednesday, when lawmakers considered a slate of bills to overhaul the city's criminal justice policies and further restrict its limited home rule.

The result, for D.C. residents and officials, will be an uneasy transition, as uncertainty persists about what will change for residents on the ground as a result of the emergency ending. In a news conference Wednesday, Bowser emphasized that her administration is still focused on public safety — but what is changing is the president's authority to make demands of her police force through one specific section of the Home Rule Act, the law that grants the city its limited self-government.

"Our public safety mission doesn't change," Bowser said. "What changes with the end of the emergency is the Home Rule charter, Section 740 that … compels the mayor to provide [D.C. police] services."

Bowser issued a mayoral order last week establishing what she sees as the city's off-ramp from Trump's emergency declaration: an "emergency operations center" that formalizes coordination between D.C. and the federal law enforcement agencies that regularly work with city police — but notably excluded Immigration and Customs Enforcement from the list of agencies to communicate with.

The order seemed to have Bowser's intended effect. The White House and Congress soon backed off threats to extend Trump's emergency, seemingly satisfied with her offer of indefinite coordination.

**Make the most of the DMV with our newsletter**

Make living in D.C. a little easier and more fun. Sign up for the Post Local newsletter to get local news, weather and expert advice — where to eat, where to drink and how to get around — every weekday.



(The Washington Post)

But outside of the emergency operations center, ICE retains vast authority to detain D.C. residents regardless of city policies. Bowser on Wednesday said broadly that her police department would not focus on immigration enforcement after the emergency ends, noting that a new D.C. police policy allowing officers to assist ICE in certain circumstances was tied to the presidential emergency. Over the past month, police were frequently accompanied by ICE agents while on patrol.

Trump declared his D.C. emergency on Aug. 11, invoking the part of the Home Rule Act that gives the president the power to direct the D.C. mayor to provide him or her with "such services of the Metropolitan Police force as the President may deem necessary and appropriate" for up to 30 days, or longer with Congress's approval. The mayor, in turn, "shall provide" those services — leaving the city no choice but to comply.

Separate from the emergency declaration, Trump also surged federal law enforcement presence in the District and ordered in the D.C. National Guard, which he controls.

The city looked different for residents during the emergency. D.C. police worked with federal law enforcement to seize illegal guns and make other arrests — an escalation of the long-established, routine collaboration between D.C. and the feds. National Guard troops from the District and several states with Republican governors dotted the city's Metro stations and touristy areas along the National Mall. D.C.'s court system stayed up past typical hours under a crush of prosecutions. And many residents responded with defiance to what they saw as federal overreach, filming and yelling at masked ICE agents and gathering in the thousands for a protest last weekend.

Trump, outside a D.C. restaurant Tuesday evening, declared his intervention a success.

"It's a safe city. I just want to thank the National Guard. We loved working with the mayor and the chief, and we all worked together, and the outcome is really spectacular. We have a capital that's very, very safe right now," he said.

As for what will happen to the National Guard, whose deployment in D.C. could stretch months longer, Bowser said it was her sense that the deployment will wind down as people get tired of it. Internal documents, reviewed and reported on by The Washington Post, showed that military officials have been briefed on the at-times negative public sentiments toward their D.C. operation — and are aware of the risks that the domestic mobilization poses to Americans' trust in the military.

"My sense is that people will get weary," Bowser said. "Guardsmen, the states where people have left — they will get weary, and they will want to know that they are serving their mission. And I think there's going to be a useful life of such a deployment in the District, and I think that useful life is coming to an end."

In one of the month's most controversial shifts for residents, D.C. police's relationship with ICE changed during the emergency period, alarming many in the deep-blue city whose laws and police department policies prevent local officers from enforcing immigration laws.

During the first week of the emergency, D.C. Police Chief Pamela A. Smith issued an order that officers would be allowed to help ICE transport detainees and could share information with ICE about people not in D.C. police custody, including at traffic stops. A department spokesperson framed the change as a clarification and emphasized that other D.C. police policies prohibiting collaboration with ICE remained on the books. But the order drew alarm from the city's immigrant communities and advocates.

Late on the same day Smith issued her order, U.S. Attorney General Pam Bondi — Trump's designee for requesting D.C.'s services during the emergency — issued an order of her own, unsatisfied with Smith's policy change. Bondi demanded "full cooperation" from D.C. police with immigration enforcement, rescinding Smith's new order and seeking to suspend several D.C. police policies that prohibit the department from sharing information with immigration authorities. District officials challenged Bondi's order in a lawsuit, and while a judge indicated that the city would probably have to comply with Bondi's demands, the court never issued a final ruling.

Though the legal question was not fully resolved, the department's apparent change in posture played out on the District's streets, where ICE accompanied D.C. police as they enforced traffic laws on moped drivers delivering food, many of whom are immigrants. The joint patrols transformed routine traffic enforcement — which before Trump's emergency often resulted in immediate releases — into a pipeline for moped drivers to land in ICE detention.

Now, with the emergency over, the Trump administration can no longer compel D.C. police to cooperate with ICE, Bowser said. She emphasized in her Wednesday news conference that immigration enforcement would not be a focus for the local police.

"Immigration enforcement is not what [the Metropolitan Police Department] does. And with the end of the emergency, it won't be what MPD does in the future," Bowser said.

While the mayor stopped short of declaring that the police chief would rescind her order on assisting ICE, she said Wednesday that the order "goes with the emergency, and the emergency is over."

The Trump administration requested some other services from D.C. during the emergency, Bowser officials said Wednesday, though neither the mayor's office nor the White House has detailed a full list.

In response to an inquiry from The Post about those specific requests, D.C. Deputy Mayor for Public Safety and Justice Lindsey Appiah offered a broad statement about compliance with Bondi's order.

"During the Presidential emergency, the District worked with the U.S. Attorney General Pamela Bondi and her designee on providing the services of the Metropolitan Police Department identified in the Attorney General's order issued on August 15," Appiah said. "Services in the order included assistance with the enforcement of federal immigration law; assistance in locating, apprehending, and detaining those unlawfully present in the United States; requests for information from a federal law enforcement entity; and the enforcement of unlawful occupancy of public spaces."

A senior Bowser administration official said other specific requests from the federal government during the emergency were related to beautification, graffiti removal, crime analytics, homeless encampments assistance and river cleanup but did not provide further details about the specific asks.

As the city exits the emergency, Bowser also acknowledged that local police would need to repair trust with residents, particularly immigrant communities that have been targeted by immigration enforcement — and who have seen D.C. police work alongside ICE agents.

"I can assure you we're going to do everything possible" to rebuild trust, Bowser said. "I don't know that it's a one-and-done thing. I think that building community trust is a long-term commitment that we have in the District."

*Meagan Flynn, Tara Copp and Alex Horton contributed to this report.*

# Exhibit 13

𝕏

## Post

**Chief Michael W. Banks**
@USBPChief

Border Patrol enforces immigration laws wherever the mission takes us. This past weekend, while supporting @ICEgov operations in Washington, D.C., Border Patrol agents arrested multiple criminal aliens who had managed to remain in the U.S. - until now. Among those taken into custody were individuals from Venezuela and Colombia with serious criminal histories, including aggravated homicide, assault, and firearms charges.



0:15

10:42 AM · Sep 17, 2025 · **71.6K** Views

**Don't miss what's happening**
People on X are the first to know.

Log in

**Sign up**

Read 55 replies

Don't miss what's happening

People on X are the first to know.

Log in

Sign up

# Exhibit 14

# Trump threatens national emergency in DC if mayor does not cooperate with ICE

fox5dc.com/news/trump-threatens-national-emergency-dc-mayor-does-not-cooperate-ice

Sam Kosmas September 15, 2025



[Trump threatens to declare another emergency in DC]

President Donald Trump says he's ready to declare a national emergency and federalize Washington, D.C. after Mayor Muriel Bowser said she does not expect police to cooperate with Immigration and Customs Enforcement.

**WASHINGTON** - President Donald Trump says he's ready to declare a national emergency and federalize Washington, D.C. after Mayor Muriel Bowser said she does not expect police to cooperate with Immigration and Customs Enforcement.

In a post to his social networking site Truth Social, Trump claimed that his federal intervention in the nation's capital dramatically reduced crime and revitalized the city.

## Truth Social post

"It has been a beautiful thing to watch but, now, under pressure from the Radical Left Democrats, Mayor Muriel Bowser, who has presided over this violent criminal takeover of our Capital for years, has informed the Federal Government that the Metropolitan Police

Department will no longer cooperate with ICE in removing and relocating dangerous illegal aliens," he posted.

He warned that the move could lead to a surge in crime and said he would take action to ensure public safety in the nation’s capital.

"If I allowed this to happen, CRIME would come roaring back," he wrote. "To the people and businesses of Washington, D.C., DON’T WORRY, I AM WITH YOU, AND WON’T ALLOW THIS TO HAPPEN. "

He added, "I’ll call a National Emergency, and Federalize, if necessary!!!"

The White House has not released a plan regarding any steps or timeline for a emergency declaration.

In August, Trump expanded the presence of federal law enforcement and immigration agents across the city, took control of the Metropolitan Police Department, and activated thousands of National Guard troops.



President Donald Trump and First Lady Melania Trump attend an event at the Pentagon in Arlington, Virginia to commemorate the 24th anniversary of the September 11, 2001 terrorist attacks, Thursday, September 11, 2025. (Official White House Photo by A

**The Source:** Information in this article comes from the Associated Press, President Donald Trump’s Truth Social post, and previous FOX 5 reporting.

# Exhibit 15

TRUTH.

# Truth Details

2677 replies

Donald J. Trump
@realDonaldTrump

The Federal Government, under my auspices as President of the United States of America, has stepped into the complete criminal mess that was Washington, D.C., our Nation's Capital. Because of this, D.C. has gone from one of the most dangerous and murder ridden cities in the U.S.A., and even around the World, to one of the safest - In just a few weeks. The "place" is absolutely booming, with restaurants, stores, and businesses packed and, for the first time in decades, virtually NO CRIME. It has been a beautiful thing to watch but, now, under pressure from the Radical Left Democrats, Mayor Muriel Bowser, who has presided over this violent criminal takeover of our Capital for years, has informed the Federal Government that the Metropolitan Police Department will no longer cooperate with ICE in removing and relocating dangerous illegal aliens. If I allowed this to happen, CRIME would come roaring back. To the people and businesses of Washington, D.C., DON'T WORRY, I AM WITH YOU, AND WON'T ALLOW THIS TO HAPPEN. I'll call a National Emergency, and Federalize, if necessary!!! Thank you for your attention to this matter. MAKE AMERICA GREAT AGAIN!!! President DJT

**8.47k** ReTruths **36.2k** Likes Sep 15, 2025, 1:06 AM

# Exhibit 16

# Trump Fired a U.S. Attorney Who Insisted on Following a Court Order

The New York Times
September 26, 2025 Friday 14:16 EST

Copyright 2025 The New York Times Company All Rights Reserved

**Section:** US

**Length:** 1382 words

**Byline:** Heather Knight and Hamed Aleaziz, Heather Knight is a reporter in San Francisco, leading The Times’s coverage of the Bay Area and Northern California.

**Highlight:** The top federal prosecutor in Sacramento was fired hours after she reminded a Border Patrol chief to abide by court-ordered restrictions on immigration raids.

## Body

For 15 years, Michele Beckwith oversaw some of the toughest federal prosecutions in California. She went after transnational terrorists, sex traffickers and the Aryan brotherhood.

She became the acting U.S. attorney in Sacramento this year when her boss, a Biden appointee, stepped down in January.

But her career crumbled in July, she said, after she issued a warning to Gregory Bovino, the California face of President Trump's immigration crackdown.

The dismissal of Ms. Beckwith appeared to be an early example of how Mr. Trump has fired top federal prosecutors who did not help carry out his political agenda.

Last week, Mr. Trump fired a U.S. attorney in Virginia who determined there was insufficient evidence to indict James B. Comey, the former F.B.I. director, and Letitia James, the New York State attorney general, both political targets of the president. The Virginia prosecutor was

replaced by a Trump loyalist who *convinced a federal grand jury* on Thursday to indict Mr. Comey on two counts.

Documents reviewed by The New York Times show that the July 15 firing of Ms. Beckwith occurred less than six hours after she told Mr. Bovino, *the Border Patrol chief in charge of the Southern California raids*, that a court order prevented him from arresting people without probable cause in a vast expanse that stretches from the Oregon border to Bakersfield. She was removed not only from her post as acting U.S. attorney in the Eastern District of California, but from the office altogether.

“It’s unjust,” she said of the firings across the federal government this year, in an interview. “We have to stand up and insist the laws be followed.”

Ms. Beckwith, a Democrat, was replaced temporarily by Kimberly Sanchez, a Republican who also worked in the Eastern District. Two days later, Mr. Bovino and his agents went to Sacramento and raided a Home Depot parking lot, where they said they arrested at least eight people for being in the country without authorization.

“Folks, there is no such thing as a sanctuary city,” Mr. Bovino said in a *video he shared on social media*, with a holstered gun at his hip and canisters secured to his vest as he stood in front of the State Capitol.

“Whether it’s here in Sacramento or nationwide,” he continued, “we’re here, and we’re not going anywhere.”

The end of Ms. Beckwith’s federal career was precipitated by a phone call from Mr. Bovino on July 14. He told her that he was bringing his officers to Sacramento, about 600 miles north of the Mexico border, and wanted to know whom to notify in her office if they were assaulted, she recalled.

Ms. Beckwith said she reminded him that the Border Patrol was under a federal court order prohibiting it from stopping people indiscriminately in her district. It was clear, she said, that he knew about the order but did not seem to think it would stop his raid.

At 10:57 the next morning, she emailed Mr. Bovino to reiterate she expected "compliance with court orders and the Constitution."

Hours later, her work cellphone went dark. Then her computer did, too. She checked her personal email account.

At 4:31 p.m., she received an email from Saurabh Sharma, special assistant to Mr. Trump.

"Michele," it stated, "On behalf of President Donald J. Trump, I am writing to inform you that your position as First Assistant United States Attorney and employment with the Department of Justice is terminated, effective immediately."

Ms. Beckwith was promptly marched out of the office.

A spokeswoman for Mr. Trump referred questions to the Department of Justice, which declined to comment on the matter.

A Department of Homeland Security official, who was part of the Sacramento operation and spoke on the condition of anonymity because they were not authorized to speak publicly, said that federal officials were offended by Ms. Beckwith's suggestion that immigration agents were going to violate the rights of migrants.

What's more, the official said, Mr. Bovino felt Ms. Beckwith was refusing to provide his team the legal support it needed to safely conduct the operations.

In a statement, Mr. Bovino said, "The former Acting US Attorney's email suggesting that the United States Border Patrol does not ALWAYS abide by the Constitution revealed a bias against law enforcement."

Ms. Beckwith's impasse with Mr. Bovino was rooted in a lawsuit filed by the American Civil Liberties Union after his border agents conducted the unannounced raids in Bakersfield, where they arrested day laborers outside a Home Depot and farmworkers in orchards in January.

A federal judge in April ruled that the Border Patrol could detain people only if they had a reasonable suspicion that they were violating federal immigration law.

"You just can't walk up to people with brown skin and say, 'Give me your papers,'" U.S. District Court Judge Jennifer Thurston said. She granted an injunction stopping the Border Patrol from detaining people without probable cause while the case proceeds.

But that order did not apply to Southern California, where federal officials intensified their crackdown in June, leading to protests and Mr. Trump's deployment of the National Guard against the wishes of California leaders. A Los Angeles judge in July also placed restrictions on immigration raids in Southern California, but the Supreme Court overruled her decision this month.

"The Supreme Court's decision is evidence of the fact Border Patrol follows the Constitution and the Fourth Amendment," Mr. Bovino said.

There are 93 U.S. attorneys overseeing federal prosecutions in districts throughout the country. It is common for them, as appointees, to resign after a new president is elected.

It is not common, however, for presidents to demand that prosecutors carry out certain acts as a condition of employment, said Nina Mendelson, a professor of law at the University of Michigan with expertise in administrative law. U.S. attorneys are supposed to be able to operate freely from political pressure.

"We still have a norm of prosecutorial independence and even-handedness and integrity at the federal level," she said. "Political pressure to prosecute enemies or shield friends would not typically be considered cause for removal."

In August, Attorney General Pam Bondi appointed Eric Grant, who defended the Trump administration against major environmental lawsuits during the president's first term, as interim U.S. attorney for the Eastern District of California. Mr. Grant replaced Ms. Sanchez, who is now second in command in the office, the position that Ms. Beckwith once had.

Ms. Mendelson said the firing of longtime civil servants without cause, as in the case of Ms. Beckwith, is rare. Ms. Beckwith said that while the president had the right to remove her as acting U.S. attorney, he should have allowed her to return to prosecutorial work in the Eastern District.

Ms. Beckwith has appealed her termination, arguing she could not be fired without cause and without due process. She is seeking that her removal be expunged from her record, as well as back pay with interest and attorneys' fees.

Ms. Beckwith said she was motivated by justice, not politics.

She was raised in Ohio by a father who worked in a fiberglass factory and a mother who stayed home to take care of her and her sister. They did not talk about politics.

She and her husband, also a lawyer, moved to California in 2004 for work and eventually decided to raise their family in Davis, a college town west of Sacramento, where she is a member of the school P.T.A. Though she is a registered Democrat, she pointed out that she has served Republican and Democratic presidents alike.

"I'm an American who cares about her country," she said. "I'm a public servant. That is my calling."

PHOTOS: The California National Guard was ordered to Los Angeles by President Trump to assist with an immigration crackdown. (PHOTOGRAPH BY GABRIELA BHASKAR/THE NEW YORK TIMES); Michele Beckwith, the former acting U.S. attorney in Sacramento, is suing over her removal from office by President Trump. (PHOTOGRAPH BY ROZETTE HALVORSON FOR THE NEW YORK TIMES); Gregory Bovino, U.S. Border Patrol chief in charge of Southern

California, complained about legal advice from Ms. Beckwith. (PHOTOGRAPH BY PATRICK T. FALLON/AGENCE FRANCE-PRESSE — GETTY IMAGES) This article appeared in print on page A14.

## Classification

**Language:** ENGLISH

**Document-Type:** News

**Publication-Type:** Web Publication

**Subject:** NEGATIVE NEWS (90%); CRIMINAL PROSECUTION (93%); ATTORNEYS GENERAL (68%); IMMIGRATION (90%); IMMIGRATION LAW (90%); BORDER CONTROL (90%); GOVERNMENT & PUBLIC ADMINISTRATION (89%); INDICTMENTS (90%); MANAGERS & SUPERVISORS (72%); US STATE GOVERNMENT (89%); SEX TRAFFICKING (73%); LAWYERS (91%); SANCTUARY SITES (76%); LAW COURTS & TRIBUNALS (90%); NEGATIVE PERSONAL NEWS (90%); US FEDERAL GOVERNMENT (90%); TERRORISM (73%); PROBABLE CAUSE (74%); TERRITORIAL & NATIONAL BORDERS (90%); IMMIGRATION, CITIZENSHIP & DISPLACEMENT (90%); EVIDENCE (70%); NATIONAL SECURITY & FOREIGN RELATIONS (91%); ARRESTS (89%); INTERVIEWS (76%); FEDERAL INVESTIGATIONS (90%); TERRORISM & COUNTERTERRORISM (90%); LITIGATION (90%); GOVERNMENT BODIES & OFFICES (90%); PUBLIC PROSECUTORS (96%); IMMIGRATION ENFORCEMENT (90%); SPECIAL INVESTIGATIVE FORCES (91%); US DEMOCRATIC PARTY (78%); US REPUBLICAN PARTY (78%); Beckwith, Michele (%); United States Attorneys (%); Appointments and Executive Changes (%); Justice Department (%); United States Politics and Government (%); Trump, Donald J (%); Illegal Immigration (%); Immigration Detention (%); Border Patrol (US) (%); Bovino, Gregory (%); California (%)

**Company:** SPAREBANKEN VEST ASA (63%)

**Organization:** FEDERAL BUREAU OF INVESTIGATION (56%); US ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF CALIFORNIA (54%)

**Industry:** SIC6021 NATIONAL COMMERCIAL BANKS (63%); ATTORNEYS GENERAL (68%); SEX TRAFFICKING (73%); LAWYERS (91%); PARKING SPACES & FACILITIES (50%); PUBLIC PROSECUTORS (96%)

**Person:** JAMES COMEY (79%); DONALD TRUMP (93%); Beckwith, Michele; Trump, Donald J; Bovino, Gregory

**Geographic:** BAKERSFIELD, CA, USA (79%); SACRAMENTO, CA, USA (94%); NEW YORK, USA (79%); CALIFORNIA, USA (94%); UNITED STATES (92%); MEXICO (79%)

**Load-Date:** September 29, 2025

---

End of Document

# Exhibit 17

# Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.

washingtonpost.com

September 25, 2025

Copyright 2025 Factiva ®, from Dow Jones

All Rights Reserved

FACTIVA

Copyright 2025, The Washington Post Co. All Rights Reserved.

The Washington Post

**Section:** SOCIALISSUES-RELIGION-IMMIGRATION

**Length:** 1226 words

**Byline:** By Teo ArmusJenny Gathright

## Body

Four D.C. residents and the Maryland-based immigrant rights' organization CASA sued the Trump administration Thursday, alleging that federal officials violated immigration law by systematically arresting people in the District whom they perceived to be Latino without warrants or probable cause.

The lawsuit follows a sharp surge in immigration arrests across the nation's capital since President Donald Trump in August seized temporary control of the D.C. police department, mobilized the National Guard and ramped up federal law enforcement. Although Trump said he launched the surge to tamp down on violent crime, immigration enforcement became a highly visible focus.

Federal officers, sometimes working alongside D.C. police, arrested hundreds of immigrants they said were in the United States illegally - as well as some with open asylum cases or other protections against being detained or immediately deported.

The class-action lawsuit, filed in federal court in D.C., said ICE has been bypassing two statutory requirements its officers must meet before making an immigration-related arrest without a warrant: probable cause that the person being arrested is in the U.S. illegally, and probable cause that they are likely to escape before law enforcement can obtain a warrant.

"They're not even doing the bare minimum as far as asking individual questions about a person's immigration status," said Ama Frimpong, legal director at CASA. Their actions, she added, have sent a chill through immigrant communities in and around D.C.

Tricia McLaughlin, a spokeswoman for the Department of Homeland Security, said in a statement that the allegations made in the lawsuit were "disgusting, reckless, and categorically FALSE."

"What makes someone a target for immigration enforcement is if they are illegally in the U.S. - NOT their skin color, race, or ethnicity," she said. "DHS law enforcement uses 'reasonable suspicion' to make arrests. There are no 'indiscriminate stops' being made."

She cited a recent ruling from the Supreme Court, which sided with the federal government in a suit that alleged federal agents were making indiscriminate stops during a similar surge in Los Angeles this year. Justice Brett M. Kavanaugh wrote in a concurring opinion that race or ethnicity can be considered along with other factors, such as what jobs people are working, in forming reasonable suspicion to stop someone for an immigration check.

However, the core argument in the D.C. lawsuit concerns detentions, not stops, Frimpong said.

Detentions surged dramatically during Trump's crackdown. In its first 29 days, law enforcement officials arrested more than 943 immigrants in D.C., according to figures released by the White House. That's more than twice the number of people ICE arrested in the District during the first

six months of Trump's presidency, according to a Washington Post analysis of figures from the Deportation Data Project at the University of California at Berkeley.

The four plaintiffs, who were all arrested during the crackdown, continue to fear being arrested by ICE while going about their daily lives because they are Latino, the lawsuit claims.

The lawsuit was filed Thursday as a class-action case in the U.S. District Court for the District of Columbia. In addition to DHS and the agency's secretary, Kristi L. Noem, the other defendants it names are the Justice Department, Attorney General Pam Bondi, four agencies housed within those departments that plaintiffs say were also involved in the arrests - Immigration and Customs Enforcement, Customs and Border Protection, Border Patrol and the Drug Enforcement Administration - and their top officials.

Natalie Baldassarre, a Justice Department spokeswoman, declined to comment.

The suit outlines the stories of several plaintiffs arrested by ICE agents in D.C. despite having some form of protection from deportation or already being under ICE supervision.

The lead plaintiff, a 47-year-old Salvadoran man named José Escobar Molina, was arrested by ICE last month despite having had temporary protected status since 2001, the lawsuit claims. While walking from his Northwest Washington apartment to his work truck on the morning of Aug. 21, Escobar Molina was seized by unidentified federal agents, who arrested him without a warrant and without asking for his name or identification, the lawsuit said.

Escobar Molina told them he had papers, the lawsuit alleged, but the agents did not listen.

"No you don't. You are illegal," the agents responded, according to the lawsuit.

After agents put him in a car, Escobar Molina again told them he had papers.

"Shut up, bitch! You're illegal," the driver of the car yelled back.

The next day, after Escobar Molina was held overnight at an ICE processing facility in Chantilly, Virginia, an ICE supervisor realized he had temporary protected status, the suit claims.

Aditi Shah, a staff attorney at the American Civil Liberties Union of D.C. who is working on the case, said Escobar Molina's release showed that ICE knew "he shouldn't have been arrested or detained in the first place."

So many people had been arrested in the D.C. crackdown starting in mid-August that the Northern Virginia processing center - which is not designed for overnight stays - had become severely overcrowded with hundreds of people sleeping on floors for multiple days.

The lawsuit also describes several other Latino plaintiffs, referred to by pseudonyms, who were detained by ICE despite having pending asylum applications - including one 51-year-old man who was arrested in the parking lot of a D.C. Home Depot and then held for nearly four weeks in various detention centers before being released.

Stories like that one, Shah said, show how ICE's alleged violation of probable cause requirements have "sown terror" among the city's immigrant communities.

"This is a policy and practice of conducting unlawful arrests," she said. "People like our plaintiffs and other individuals whose stories we describe in the complaint are living in fear each day because they may be subject to arrest and detention."

White House officials said in a statement this month that of more than 2,600 criminal arrests between Aug. 7 and Sept. 14, more than 1,000 involved "illegal aliens."

The White House did not respond to questions Thursday on whether that figure included immigrants with open asylum applications or work permits.

The lawsuit also claims that the surge in arrests has caused harm to CASA, a nonprofit headquartered in Langley Park, Maryland, that works with tens of thousands of immigrants across the D.C. region.

"We are now having to focus on and instead respond to requests for assistance related to someone's detention," said Frimpong, the group's legal director. "We've had to divert resources to responding to the issues caused by the federal agents' illegal actions."

For instance, a team normally dedicated to helping people enroll in public benefits has devoted about a quarter of its time to responding to arrests, the lawsuit says. And legal teams have scrapped green card and naturalization legal clinics to help families locate their loved ones or find attorneys.

Moves such as those have hurt CASA's ability to meet deliverables required as a condition of some grants - in one case causing the organization to lose about half the funding in a county grant, the suit said.

## Notes

PUBLISHER: Washington Post

## Classification

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** WPCOM

**Subject:** IMMIGRATION (99%); IMMIGRATION LAW (93%); CRIME, LAW ENFORCEMENT & CORRECTIONS (93%); ASSOCIATIONS & ORGANIZATIONS (90%); ARREST WARRANTS (90%); GOVERNMENT & PUBLIC ADMINISTRATION (78%); LAW ENFORCEMENT (90%); SUITS & CLAIMS (93%); VIOLENT CRIME (73%); HISPANIC AMERICANS (90%); POLITICAL ASYLUM (78%); LAW COURTS & TRIBUNALS (73%); SUPREME COURTS (73%); NEGATIVE PERSONAL NEWS (91%); US FEDERAL GOVERNMENT (89%); CLASS ACTIONS (78%); NATIONAL SECURITY (71%); PROBABLE CAUSE (91%); POLICE FORCES (78%); IMMIGRATION, CITIZENSHIP & DISPLACEMENT (96%); CRIMINAL OFFENSES (78%);

NATIONAL SECURITY & FOREIGN RELATIONS (91%); RACE & ETHNICITY (89%); DEPORTATION (89%); DECISIONS & RULINGS (72%); ARRESTS (92%); LITIGATION (94%); GOVERNMENT BODIES & OFFICES (91%); IMMIGRATION ENFORCEMENT (91%); SPECIAL INVESTIGATIVE FORCES (89%); PUBLIC OFFICIALS (90%); gcat Political/General News (%); gcom Society/Community (%); gcrim Crime/Legal Action (%); gethm Ethnic Minorities (%); gimm Human Migration (%); gpir Politics/International Relations (%); gsoc Social Issues (%)

**Person:** BRETT M KAVANAUGH (79%); DONALD TRUMP (90%)

**Geographic:** SAN FRANCISCO BAY AREA (79%); LOS ANGELES, CA, USA (79%); WASHINGTON DC, USA (99%); CALIFORNIA, USA (92%); MARYLAND, USA (92%); UNITED STATES (96%); NORTH AMERICA (79%); namz North America; usa United States; usdc Washington DC; uss Southern U.S.

IP Descriptors: immigration, Immigration, Religion, SocialIssues

**Load-Date:** September 25, 2025

---

End of Document

# Exhibit 18

NOTICE Due to the lapse in federal funding, this website will not be actively managed. Click here for more information.

Homeland Security

U.S. Department of Homeland Security

# DHS Debunks New York Times False Reporting: DHS Does NOT Deport U.S. Citizens

**Release Date:** October 1, 2025

*Make no mistake, if you lay a hand on a law enforcement officer, you will be prosecuted to the fullest extent of the law*

**WASHINGTON** — The U.S. Department of Homeland Security (DHS) today sets the record straight, again, about the New York Times false and misleading report alleging DHS is targeting U.S. citizens during targeted U.S. Immigration and Customs Enforcement (ICE) operations.


‘I’m From Here!’: U.S. Citizens Are Ending Up in Trump’s Dragnet

As immigration agents take a more aggressive approach, they have stopped and in some cases detained American citizens.

*“We have said it a million times: ICE does NOT arrest or deport U.S. citizens. One week after the terrorist attack targeting ICE in Dallas, the media is once again shamefully peddling a false narrative, attempting to demonize our DHS law enforcement agents, who are already facing a 1000% increase in assaults against them,”* said **Assistant Secretary Tricia McLaughlin**. *“Any U.S. citizens arrested are because of obstructing or assaulting law enforcement.”*

The following are some of the FALSE claims made in the New York Times article and the facts from DHS:

**FALSE CLAIM**: *DHS roams the streets, courthouses, and workplaces demanding proof of citizenship from residents.*

**THE FACTS**: DHS enforcement operations are highly targeted and are not resulting in the arrest of U.S. citizens. We do our due diligence. We know who we are targeting ahead of time. If and when we do encounter individuals subject to arrest, our law enforcement is trained to ask a series of well-determined questions to determine status and removability. ICE does not arrest or detain U.S. citizens.

**FALSE CLAIM**: *Detainees are being held in immigration facilities overnight without access to a lawyer or even a phone call.*

**THE FACTS**: Any claim that there are subprime conditions at ICE detention centers are false. In fact, ICE has higher detention standards than most U.S. prisons that hold actual U.S. citizens. All detainees are provided with proper meals, medical treatment, and have opportunities to communicate with lawyers and their family members.

**FALSE CLAIM**: *Kenny Laynez-Ambrosio was innocently detained during a traffic stop.*

**THE FACTS**: On May 2, 2025, several adult male illegal aliens from Guatemala were arrested by U.S. Border Patrol agents responding to a request for assistance from Florida Highway Patrol (FHP) Troopers conducting a vehicle stop near John D. MacArthur Beach State Park in North Palm Beach, FL. During the encounter, Kenny Laynez who was part of a group of illegal aliens that r**esisted arrest** during a traffic stop.

**FALSE CLAIM**: *Jason Brian Gavidia was innocently arrested during an immigration enforcement operation.*

**THE FACTS**: Gavidia was detained on the street for investigation for **interference** and released after being confirmed to be a U.S. citizen with no outstanding warrants.

**FALSE CLAIM**: *Javier Ramirez was driven around for hours and did not speak to a lawyer or any family member for three days.*

**THE FACTS**: Ramirez was arrested for **assaulting a law enforcement officer and interfering with agents performing their duties**.

**FALSE CLAIM**: *George Retes was wrongly arrested and held by ICE.*

**THE FACTS**: As U.S. Customs and Border Protection (CBP) and ICE agents were executing criminal search warrants on July 10 at the marijuana sites in Camarillo, CA, George Retes—a U.S. citizen—became v**iolent and refused to comply with law enforcement**. He challenged agents and **blocked their route by refusing to move his vehicle out of the road**. CBP arrested Retes for **assault.**

**FALSE CLAIM**: *Leonardo Garcia Venegas was wrongfully detained for hours.*

**THE FACTS**: During a targeted worksite operation, Garcia Venegas **attempted to obstruct and prevent the lawful arrest of an illegal alien**. He physically got in between agents and the subject they were attempting to arrest and refused to comply with numerous verbal commands. Anyone who actively obstructs law enforcement in the performance of their sworn duties, including U.S. citizens, will of course face consequences which include arrest

## Topics

IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 10/01/2025

# Exhibit 19

https://x.com/DHSgov/status/1971315047201694042

X

- Home
- Explore
- 10 Notifications
- Messages
- Grok
- Lists
- Bookmarks
- Communities
- Premium
- Verified Orgs
- Profile
- More

Post

Post

Reply

**Homeland Security**
@DHSgov

These are the types of anti-ICE LIES that place the men and women of @ICEgov in danger.

Allegations that DHS law enforcement officers engage in "racial profiling" are disgusting, reckless, and categorically FALSE.

What makes someone a target for immigration enforcement is if they are illegally in the U.S.—NOT their skin color, race, or ethnicity.

Under the fourth amendment of the U.S. Constitution, DHS law enforcement uses "reasonable suspicion" to make arrests. There are no "indiscriminate stops" being made. The Supreme Court recently vindicated us on this question. DHS enforces federal immigration law without fear, favor, or prejudice.

Race-baiting opportunism in the form of a baseless lawsuit is no better than when it comes from politicians or activists.

Washington Examiner

Subscribe

# DC residents file class action against ICE for 'arbitrary' arrests

4:45 PM · Sep 25, 2025 · **188.3K** Views

619 790 2.8K 72

# Exhibit 20

U.S. Government Shutdown Manchester Attack World Politics HealthWatch MoneyWatch

POLITICS

# Trump deploys National Guard to D.C., takes control of local police in crime crackdown

By **Kaia Hubbard**
Updated on: August 11, 2025 / 7:59 PM EDT / CBS News




*Washington* – President Trump said Monday that he is deploying members of the National Guard to Washington, D.C., and that the federal government has taken control of the D.C. police as part of a push to crack down on crime in the nation's capital, despite data showing crime has declined in the city in recent years.

"I'm announcing a historic action to rescue our nation's capital from crime, bloodshed, bedlam and squalor and worse," Mr. Trump said at a news conference at the White House. "This is liberation day in D.C., and we're going to take our capital back."

Flanked by Secretary of the Interior Doug Burgum, Attorney General Pam Bondi, Defense Secretary Pete Hegseth and FBI Director Kash Patel, Mr. Trump said he was officially enforcing Section 740 of the District of Columbia Home Rule Act of 1973 and placing the D.C. Metropolitan Police Department "under direct federal control." He said Bondi was taking control of the department immediately under a public safety emergency. A White House official later said the arrangement is expected to last 30 days, the maximum amount of time allowed under the law without action from Congress.

"In addition, I'm deploying the National Guard to help reestablish law, order and public safety in D.C., and they're going to be allowed to do their job properly," Mr. Trump said, adding later that about 800 guardsmen would be called up.

Hegseth said the Guard was formally mobilized Monday morning and would be "flowing into the streets of Washington in the coming week." In an accompanying executive order, Mr. Trump wrote that the deployment "shall remain in effect until I determine that conditions of law and order have been restored in the District of Columbia."

Case 1:25-cv-03417-BAH Document 17-1 Filed 10/03/25 Page 108 of 201
USCA Case #26-5045 Document #2203562 Filed: 11/16/2026 Page 333 of 562




Read More

Violent crime in D.C. has been declining for the last year and a half after spiking in 2023, according to local police data. So far this year, robberies have dropped

crime in the capital city hit its lowest level in more than 30 years, the Justice Department said.



President Trump delivers remarks during a press conference in the James S. Brady Press Briefing Room of the White House on Aug. 11, 2025.

ANDREW HARNIK / GETTY IMAGES

The president criticized what he called "phony numbers" on crime in D.C., saying the administration would "look into that." And he said the crime issue "directly impacts the functioning of the federal government and is a threat to America, really."

"We have other cities also that are bad. Very bad. You look at Chicago, how bad it is. You look at Los Angeles, how bad it is," Mr. Trump said. "We're not going to lose our cities over this."

The president said the effort "will go further," saying the administration is "starting very strongly with D.C." and "we're going to clean it up real quick."

"It's becoming a situation of complete and total lawlessness," the president added. He called it "embarrassing" for him to be "up here talking about how unsafe and dirty and disgusting this once beautiful capital was," ahead of his meeting with Russian President Vladimir Putin on Friday.

The president cited a number of high-profile crimes, including the alleged assault of a former Department of Government Efficiency staffer last week, who the president said was "savagely beaten by a band of roving thugs after defending a young woman from an attempted carjacking." Shortly after the incident, the White House announced that it had boosted the presence of federal law enforcement in the district, as Mr. Trump threatened a federal takeover of the city.

Mr. Trump said a process had begun over the weekend to remove homeless encampments in the district. He noted that the Metropolitan Police Department and federal authorities would be supported by the 800 D.C. National Guardsmen and potentially "much more."

"If necessary, we're going to move servicemembers directly to joining the guardsmen," Mr. Trump said.

In an executive order declaring a crime emergency in the district, the president determined that "special conditions of an emergency nature exist" that require the use of the MPD for federal purposes, including maintaining law and order, protecting federal buildings, monuments and other federal property and ensuring the "conditions necessary for the orderly functioning of the Federal

Government." The executive order directs the D.C. mayor to provide the services of the Metropolitan Police force for federal use "for the maximum period permitted under section 740 of the Home Rule Act."

The law allows the president to require the D.C. mayor to provide "such services of the Metropolitan Police force as the President may deem necessary and appropriate" for a period of 48 hours, a deadline that can be extended by notifying Congress about the takeover and how much longer it is likely to continue. A House Oversight Committee spokesperson confirmed to CBS News that the panel had been notified by the president of the extension beyond 48 hours. The statute says the president can control the police department for up to 30 days, "unless the Senate and the House of Representatives enact into law a joint resolution authorizing such an extension."

D.C. Mayor Muriel Bowser said that "we will follow the law" and comply with the president's order. She said she hopes to meet with Bondi soon, and noted that the D.C. police chief remains in operational control of the MPD.

"While this action today is unsettling and unprecedented, I can't say that, given some of the rhetoric of the past, that we're totally surprised," Bowser said at a news conference later in the day. "I can say to D.C. residents that we will continue to operate our government in a way that makes you proud."

The moves come after the administration deployed about 450 federal law enforcement officers from a number of agencies across D.C. overnight Sunday.

The president pledged in a social media post Sunday that he would "make our Capital safer and more beautiful than it ever was before."

"The Homeless have to move out, IMMEDIATELY," Mr. Trump said on Truth Social. "We will give you places to stay, but FAR from the Capital. The Criminals, you don't have to move out. We're going to put you in jail where you belong. It's all going to happen very fast, just like the Border."

The president previously deployed the National Guard in Los Angeles amid heated protests over immigration raids in June. Mr. Trump also deployed the National Guard in June 2020 to D.C. to quell protests after the death of George Floyd.

In March, Mr. Trump signed an executive order establishing a "D.C. Safe and Beautiful Task Force." He has said violent crime must be stopped in the district, claiming that it "has become one of the most dangerous cities anywhere in the World."

Bowser pushed back on the characterization of crime in the district, noting on Monday that violent crime is down following a well-documented spike in violence in 2023 in the wake of the COVID-19 pandemic.

"We have been able to reverse that 2023 crime spike. This year, crime isn't just down from 2023. It's also down from 2019, before the pandemic, and we're at a 30-year violent crime low," she said. "We're not satisfied. We haven't taken our foot off the gas. And we continue to look for ways to make our cities safer."

The mayor told MSNBC on Sunday that she has talked with Mr. Trump "repeatedly" about crime and that "the president is very aware of our efforts." Bowser acknowledged that "the D.C. National Guard is the president's National Guard, so that's always his prerogative." And she noted that "federal law enforcement is always on the street in D.C. and we always work cooperatively with them."

In another post later Sunday, the president said Bowser "is a good person who has tried, but she has been given many chances, and the Crime Numbers get worse, and the City only gets dirtier and less attractive."

Del. Eleanor Holmes Norton, a Democrat who represents the district in a nonvoting seat in the House, said Mr. Trump's move to federalize D.C. police is a "historic assault on D.C. home rule," calling it a "counterproductive, escalatory seizure of D.C.'s resources to use for purposes not supported by D.C. residents."

Aaron Navarro and Weijia Jiang contributed to this report.

## More from CBS News


40% of arrests in D.C. crackdown have been immigration-related, data shows


Trump's legal crackdown on "sanctuary" jurisdictions yields few results so far


Parts of Golden Gate National Recreation Area closed as government shutdown begins


Blue Angels, military aircraft out of Salinas, California airshow due to government shutdown

In: **Muriel Bowser** **Donald Trump** **National Guard of the United States** **Crime** **Washington D.C.**

**Kaia Hubbard**

Kaia Hubbard is a politics reporter for CBS News Digital, based in Washington, D.C.

© 2025 CBS Interactive Inc. All Rights Reserved.

**Why Gen X is the real loser generation**

PAID THE ECONOMIST Read More

**Sam Altman Lists 5 Books That Will Give You an Unfair Advantage**

Ever since he was a kid, Sam Altman—the CEO of OpenAI —has been an avid reader. He shares the nine books that he thinks will change your life.

PAID BLINKIST: SAM ALTMAN'S READING LIST

## Flight Attendant Reveals How Seniors Can Fly Business Class For The Price Of Economy

Americans, You'll Want To Check This Out ASAP!
PAID AIRLINES | INSIDER DEALS

## Amazon Driver Reveals the Little-Known Secret That's Costing Amazon Big

This simple trick can save tons of money on amazon but most Prime members are ignoring it.

## Virginia Residents With Credit Card Debt Could Be In For Loan-Free Relief

Americans with over $20k in unsecured debt could reduce their eligible debt payments by 30% or more by doing

## French Scientists Discover New Method To Alleviate Senior Fatigue

New research suggests this method helps seniors who suffer from a deficiency, which can lead to fatigue, cold

## Palantir might be the most overvalued firm of all time

PAID THE ECONOMIST Read More

## Sharpen your chainsaw in 10 seconds without removing the chain.

PAID SHERUM Learn More

## Snoop's Crypto Cringe: Unc Fumbles the Bag with Trump Ties

PAID BLAVITY.COM Click Here

## The Rattler: A Free Newsletter Vehemently Defending Freedom

PAID REASON Subscribe

## Don't Miss Out on the All-New Toyota Tacoma Tacozilla

PAID CAR & DRIVER

## Jeff Bezos Says the 1-Hour Rule Makes Him Smarter. I Gave It A Go.

Thousands swear by the morning routing of the 1-Hour Rule. I gave it a go to see what all the fuss is about.

## Tirzepatide Wins For Weight Loss - Only $119/Month

Ships to your door. No insurance required. 3 simple steps.

PAID FUTURHEALTH

## This 250th Anniversary Hat Is Being Snapped up in Ashburn

PAID FANYIL Shop Now

## Nobel Scientists Discover Method To Alleviate Senior Fatigue

New research suggests this method helps seniors who suffer from a deficiency, which can lead to fatigue, cold hands, and brain fog.

## Costco Shoppers Say This Fat-Burning Patch Triggers Weight Loss "Unlike Any Other"

PAID CONSUMERSFIND Learn More

## Dishonest Drivers Beware: This 4K Dash Cam Sees All

Amazon is Selling It Right Now, With Millions of Positive Reviews!

PAID SHERUM Learn More

## Touchdowns and Trump Moves: Football Players Embrace the Viral Dance Craze

PAID BLAVITY.COM Watch Now

## It's the Perfect Retirement Symbol

Our unisex Hawaiian hat is the perfect badge of retirement. Buy 2, get 10% off. Shop today.

PAID FANYIL Shop Now

## Edema Is Not From Salty Food. Meet the Real Enemy of Swollen Legs

PAID FOOTRENEW

## Judge denies bid to reopen Abrego Garcia case

CBS NEWS

## Sam's Club Is Offering Its Best Membership Deal of the Year: Join Sam's Club for Just $15

## Your Dog Will Absolutely Love This Anti-Anxiety Dog Bed!

But don't just take our word for it — this bed is recommended by over 600,000 dog owners! It helps relieve stress and anxiety, so your dog can finally sleep peacefully. Now 60% OFF

## Neuropathy? When The Burning, Tingling & Numbness Won't Stop - Do This

PAID TRENDING NEWS Learn More

## Edema is Not From Salty Food! Meet The Main Enemy of Edema

PAID FOOTRENEW

## Heidi Klum Halloween Costumes Through the Years

She's thrown ~Heidiween~ for over 20 years and counting.

PAID COSMOPOLITAN

## Your jackpot journey starts here - Play slots now!

PAID SPLIT RICHES Learn More

## Neither Left nor Right: A Newsletter for Libertarians.

If you are tired of echo chambers and partisan news, try this daily newsletter. No cost.

PAID REASON Sign Up

Featured

Hegseth Military Meeting

Government Shutdown 2025

NFL Week 4 Picks

CFB Week 5 What to Watch

Follow Us On

YouTube

Facebook

Instagram

X

**Privacy**

Privacy Policy

California Notice

Your Privacy Choices

Terms of Use

**More from CBS News**

Newsletters

Podcasts

Download Our App

Brand Studio

Sitemap

**Company**

About Paramount

Advertise With Paramount

Join Our Talent Community

Help

Feedback

Copyright ©2025 CBS Interactive Inc. All rights reserved.

# Exhibit 21

# Exhibit 21 intentionally omitted.

# Exhibit 22

# The White House Marching Orders That Sparked the L.A. Migrant Crackdown; After deportations fell short of President Trump's campaign promises, federal agents summoned to a meeting in Washington were told to 'just go out there and arrest illegal aliens'

The Wall Street Journal Online

June 10, 2025

Copyright 2025 Factiva ®, from Dow Jones
All Rights Reserved

FACTIVA®

Copyright 2025 Dow Jones & Company, Inc. All Rights Reserved.

THE WALL STREET JOURNAL.

**Section:** POLITICS; Politics and Policy

**Length:** 2151 words

**Byline:** By Elizabeth Findell, Ruth Simon, Michelle Hackman and Tarini Parti

## Body

Even with the high-profile arrests of suspects by masked immigration agents and the plane loads of migrants swiftly ferried out of the U.S., President Trump was falling short of the number of daily deportations

carried out by the Biden administration in its final year.

So in late May, Stephen Miller, a top White House aide and the architect of the president's immigration agenda, addressed a meeting at the headquarters of Immigration and Customs Enforcement, known as ICE. The message was clear: The president, who promised to deport millions of immigrants living in the country illegally, wasn't pleased. The agency had better step it up.

Gang members and violent criminals, what Trump called the "worst of the worst," weren't the sole target of deportations. Federal agents needed to "just go out there and arrest illegal aliens," Miller told top ICE officials, who had come from across the U.S., according to people familiar with the meeting.

Agents didn't need to develop target lists of immigrants suspected of being in the U.S. illegally, a longstanding practice, Miller said. Instead, he directed them to target Home Depot, where day laborers typically gather for hire, or 7-Eleven convenience stores. Miller bet that he and a handful of agents could go out on the streets of Washington, D.C., and arrest 30 people right away.

"Who here thinks they can do it?" Miller said, asking for a show of hands.

ICE agents appeared to follow Miller's tip and conducted an immigration sweep Friday at the Home Depot in the predominantly Latino neighborhood of Westlake in Los Angeles, helping set off a weekend of protests around Los Angeles County, including at the federal detention center in the city's downtown. On Saturday, Trump ordered 2,000 National Guard troops to Southern California, despite objections by Gov. Gavin Newsom.

Law-enforcement officers used tear gas, rubber bullets and flash-bang stun grenades against increasingly unruly crowds. Demonstrators threw tree branches, scooters, fireworks and debris from a freeway overpass onto police vehicles below. The unrest continued Monday and roughly 700 Marines were dispatched to protect federal property and personnel.

"To do this in militaristic gear in L.A. is intended to notch up the image of deportations being in high gear," said Muzaffar Chishti, senior fellow at the Migration Policy Institute. "But the actual deportations are paltry compared with the imagery."

Since Miller's meeting with ICE officials, daily arrests have risen, according to ICE officials.

There are no written directives, but officers have been told to "do what you need to do" to make more arrests, according to current and former ICE officials familiar with the directives.

The administration's immigration enforcement is a sharp break with past government practices, according to attorneys, immigration advocates and officials from previous administrations.

Federal agents make warrantless arrests. Masked agents take people into custody without identifying themselves. Plainclothes agents in at least a dozen cities have arrested migrants who showed up to their court hearings. And across the U.S., people suspected of being in the country illegally are disappearing into the federal detention system without notice to families or lawyers, according to attorneys, witnesses and officials.

In Coral Springs, Fla., at least eight agents in tactical gear, shields and rifles surrounded a home with guns raised to arrest a father with no criminal history. In Irvine, Calif., ICE agents drove a phalanx of military vehicles in the Orange County suburb to arrest a person, though not for illegal immigration. They were seeking a resident's son who had allegedly posted fliers alerting neighbors to the presence of ICE agents.

The raid alarmed the Foundation for Individual Rights and Expression, an organization that defends free speech, which requested a copy of the warrant. "Criticism of government officials is core protected speech, and to criticize them you have every right to identify them," said Aaron Terr, the group's director of public advocacy.

The Trump administration defends its tactics for arrests, including many documented in cellphone videos and posted on social media. ICE officers have been donning protective gear and concealing their faces because of threats, said Tom Homan, the White House border czar. "They're simply trying to enforce the law, and they're trying to protect themselves," he said.

"Keeping President Trump's promise to deport illegal aliens is something the administration takes seriously," said Abigail Jackson, a White House spokeswoman.

Breaking glass

The Trump administration hopes news reports and other publicity about its tough enforcement actions will prompt immigrants who are in the country illegally to leave the U.S. voluntarily. Migrants have been offered a $1,000 payment if they document their departures.

On social media, regional ICE offices post photos of immigrants taken into custody along with photos of burly ICE agents, their faces masked or blurred or their backs turned. "Over the past 100 days, ICE and our partners have accomplished some amazing feats," the ICE office in Houston posted on X.

The Border Patrol's El Centro sector in Southern California posted photos of a broken car window on Facebook: The caption said, "This illegal alien is listing his accomplishments for the past week: Refused to open window during an immigration inspection; Got his window shattered for an extraction."

Alfredo "Lelo" Juarez Zeferino, a Washington state farmworkers union organizer, was another ICE target. Agents in an unmarked car stopped him as he was driving his wife to her job at a tulip farm. The agents, who didn't show badges or identification, smashed in his window and pulled him from the car, according to Familias Unidas por la Justica, a farmworker union.

ICE has stopped regularly publishing arrest data, and has been accused of overstating the numbers. The Trump administration arrested roughly 66,500 migrants living in the U.S. illegally and deported nearly 66,000 in its first 100 days, a higher pace of arrests compared with 2024, and a slightly slower pace for deportations.

Earlier this year, ICE officials set daily arrest quotas and deputized agents from the Federal Bureau of Investigation and other law-enforcement agencies. ICE officials eliminated a Biden-era policy that blocked officers from arresting people without proof of legal residency who happened to be in the vicinity of targeted suspects. Raids at schools, churches and hospitals are now allowed.

In February, two agents wearing tactical gear entered El Potro's Mexican Cafe and Cantina in Liberty, Mo., while another guarded the front door, according to a lawsuit filed in the U.S. District Court in Chicago. In all, more than 10 agents participated.

The ICE agents said they were looking for someone, but didn't say who, or provide a photograph, according to the lawsuit. Agents arrested 12 restaurant employees. The suit against the government alleges that the arrests were made without a warrant or probable cause that the workers would flee. In a court filing, much of which was redacted, the government said the arrests "were supported by documented, probable cause determinations."

One problem for the administration was that ICE had only about 5,000 officers ready and trained to make arrests, according to an agency official. As ICE officers face more threats, they form ever-larger teams to conduct arrests, officials said. Larger teams means ICE can be in fewer places.

Officials from the White House and the Department of Homeland Security have made clear there will be consequences for not hitting arrest targets. Top officials at DHS have pushed out one acting ICE director and are threatening a second.

Late last month, the top ICE official overseeing arrests and deportations, Kenneth Genalo, resigned rather than fire deputies for poor performance, said people familiar with the matter.

One reason deportations haven't picked up might be that ICE operations have received so much attention, prompting migrants to be more cautious, according to agents and leaders.

A Cuban man in San Antonio being processed by ICE agents and law enforcement officers after being arrested last month while driving his children to school. PHOTO: Danielle Villasana for WSJ

Last kiss

On a recent morning, half a dozen SUVs waited in the dark of a suburban neighborhood in San Antonio. Agents joked over the radio about how easy they were to spot: They had struggled to turn off their automatic headlights, and two neighbors drove around the block, peering into the agents' windows before returning to their driveways.

Minutes later, their target, a Cuban father who worked at a local candy factory, began loading two young children into a red SUV. The agents initially planned to follow and arrest him after he had dropped the children at school. Instead, they decided to arrest him immediately because the children's mother was also in the car.

With lights flashing, the SUVs converged on the car. The man stepped from the driver's seat with his hands up while the woman in the passenger seat scolded the agents for arresting him in front of the children. She asked if she could give her husband a kiss before they took him. None of the agents responded.

The agents next tailed a yellow pickup through a taqueria restaurant drive-through line before arresting the driver. They let him go when he showed a Global Entry card proving he was a U.S. citizen. Agents said they may have confused the man with his son.

Elsewhere, Americans detained by ICE have said they were held for hours or longer before being allowed to prove their citizenship.

ICE agents checking the identification of a man they were set to arrest in San Antonio. He was released after proving he was a U.S. citizen. PHOTO: Danielle Villasana for WSJ

Courthouse arrests have become a nationwide strategy, according to DHS officials and lawyers. They allow ICE to boost arrest numbers with fewer resources. It also puts migrants in a corner: Should they risk arrest by following the legal process and appearing in court?

At a court in Phoenix last month, attorney Isaac Ortega said prosecutors requested dismissals for a string of cases, including that of his client, a Venezuelan man who had entered the U.S. legally under a Biden administration program terminated by Trump.

After the man left the hearing room, agents arrested him. They refused to identify themselves, answer questions or show a warrant.

"It was completely out of the norm," Ortega said.

Other lawyers say clients have been denied access to legal counsel. Luis Campos, a Tucson-based attorney, said a Border Patrol agent physically blocked him from seeing a woman on the maternity ward who had just given birth. The woman and her family had requested that she have counsel, Campos said. ICE said all laws and procedures were followed.

In some jurisdictions, agents said their supervisors have allowed them to more frequently seek criminal warrants to arrest targets. Administrative warrants are typically used for illegal immigration, which is a civil, not a criminal, violation. Criminal warrants allow agents to break down doors and forcibly enter homes.

Bags with the belongings of people who were arrested by ICE agents in San Antonio. PHOTO: Danielle Villasana for WSJ

Maksim Zaitsev, a 36-year-old Russian citizen with a pending asylum case, said he was beaten by ICE agents after calling for his wife when the agents arrested him during an immigration check-in at an ICE office. "It was like I was in a washing machine," Zaitsev said in an interview from a detention facility in Adelanto, Calif.

Photographs in court filings show Zaitsev with bruises and scabs on his face. Zaitsev was charged for biting an officer, but a federal judge dismissed the assault case, citing government misconduct. Zaitsev said it was self-defense.

"We came to the United States for protection because of what we encountered in Russia," he said. "It seems that we are encountering here what we fled."

Videos shared on social media show plainclothes men, one masked, arresting people at a courthouse in Albemarle County, Va., without identifying themselves or their agency. That prompted James Hingeley, the county's elected commonwealth attorney, to launch an investigation. ICE said in a statement that the arrest was a lawful operation by its agency and bystanders who attempted to intervene would be prosecuted.

Hingeley said arrests by officers who don't identify themselves pose a threat to the people being taken into custody, as well as to bystanders. "If you operate as if you're a street gang," he said, "you create a danger to yourself and the public."

Write to Elizabeth Findell at elizabeth.findell@wsj.com , Ruth Simon at Ruth.Simon@wsj.com , Michelle Hackman at michelle.hackman@wsj.com and Tarini Parti at tarini.parti@wsj.com

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** WSJO

**Subject:** IMMIGRATION (94%); IMMIGRATION, CITIZENSHIP & DISPLACEMENT (93%); DEPORTATION (92%); NATIONAL SECURITY & FOREIGN RELATIONS (92%); ARRESTS (90%); ILLEGAL IMMIGRANTS (90%); IMMIGRATION ENFORCEMENT (90%); SPECIAL INVESTIGATIVE FORCES (90%); TALKS & MEETINGS (90%); US PRESIDENTS (90%); CRIME, LAW ENFORCEMENT & CORRECTIONS (89%); WEAPONS & ARMS (89%); DAY LABORERS (78%); IMMIGRATION LAW (78%); LAW ENFORCEMENT (78%); NEGATIVE MISC NEWS (78%); NEGATIVE NEWS (78%); PROTESTS & DEMONSTRATIONS (78%); TEAR GAS (78%); TRENDS & EVENTS (74%); LAWYERS (73%); VIOLENT CRIME (73%); ARMED FORCES (62%); MILITARY WEAPONS (62%); GRENADES (61%); ccat Corporate/Industrial News (%); csmlbs Small/Medium Businesses (%); gcat Political/General News (%); gcivds Civil Unrest (%); gcns National/Public Security (%); gcom Society/Community (%); gcrim Crime/Legal Action (%); gillim Illegal Immigration (%); gimm Human Migration (%); gpir Politics/International Relations (%); gpol Domestic Politics (%); grisk Risk News (%); gsoc Social Issues (%); nanl Analyses (%); ncat Content Types (%); ncolu Columns (%); nfact Factiva Filters (%); nfcpex C&E Executive News Filter (%); nimage Images (%); nstacs Statistics (%); PROVIDER TERMS: bureau/Politics Campos, Luis Chishti, Muzaffar coverage/Enterprise coverage/Washington Enterprise Exclusive Analysis Genalo, Kenneth Hingeley, James Homan, Tom Integrated Webview Jackson, Abigail Law leder Miller, Stephen MVPTEST Newsom, Gavin NWREGULAR Ortega, Isaac Policy Politics Politics and Policy PTC SYND Tell me something I don't know Terr, Aaron US News Washington Wires WPWSJ00027089433 WSJ WSJ Japanese WSJ-PRO-WSJ.com WSJ.com WSJ.com Site Search WSJAsia WSJEurope wsjwashington wsjwashington-politics xBrand Immersive XBRNDIMMRS Zaitsev, Maksim Zeferino, Juarez (%)

**Company:** HOME DEPOT INC (83%); 7-ELEVEN INC (55%); usice United States Immigration and Customs Enforcement

**Organization:** US IMMIGRATION & CUSTOMS ENFORCEMENT (83%)

**Ticker:** HD (NYSE) (83%)

**Company-Number:** DJ Ticker: bureau/Politics Campos, Luis Chishti, Muzaffar coverage/Enterprise coverage/Washington Enterprise Exclusive Analysis Genalo, Kenneth Hingeley, James Homan, Tom Integrated Webview Jackson, Abigail Law leder Miller, Stephen MVPTEST Newsom, Gavin NWREGULAR Ortega, Isaac Policy Politics Politics and Policy PTC SYND Tell me something I don't know Terr, Aaron US News Washington Wires WPWSJ00027089433 WSJ WSJ Japanese WSJ-PRO-WSJ.com WSJ.com WSJ.com Site Search WSJAsia WSJEurope wsjwashington wsjwashington-politics xBrand Immersive XBRNDIMMRS Zaitsev, Maksim Zeferino, Juarez

**Industry:** NAICS444110 HOME CENTERS (83%); NAICS445131 CONVENIENCE RETAILERS (55%); NAICS457110 GASOLINE STATIONS WITH CONVENIENCE STORES (55%); SIC5411 GROCERY STORES (55%); LAWYERS (73%); CONVENIENCE STORES (66%); ARMED FORCES (62%); MILITARY WEAPONS (62%); EMERGENCY VEHICLES (61%); RETAILERS (51%); BRIDGES & TUNNELS (50%)

**Person:** DONALD TRUMP (90%); GAVIN NEWSOM (79%); JOE BIDEN (79%)

**Geographic:** LOS ANGELES, CA, USA (92%); SAN ANTONIO, TX, USA (79%); CALIFORNIA, USA (94%); WASHINGTON DC, USA (92%); TEXAS, USA (79%); UNITED STATES (97%); NEW ZEALAND (92%); AUSTRALIA (79%); NORTH AMERICA (79%); OCEANIA (79%); apacz Asia Pacific; ausnz Australia/Oceania; namz North America; nz New Zealand; sant San Antonio; usa United States; usca California; usdc Washington DC; uss Southern U.S.; ustx Texas; usw Western U.S.

IP Descriptors: bureau/Politics Campos, Luis Chishti, Muzaffar coverage/Enterprise coverage/Washington Enterprise Exclusive Analysis Genalo, Kenneth Hingeley, James Homan, Tom Integrated Webview Jackson, Abigail Law leder Miller, Stephen MVPTEST Newsom, Gavin NWREGULAR Ortega, Isaac Policy Politics Politics and Policy PTC SYND Tell me something I don't know Terr, Aaron US News Washington Wires WPWSJ00027089433 WSJ WSJ Japanese WSJ-PRO-WSJ.com WSJ.com WSJ.com Site Search WSJAsia WSJEurope wsjwashington wsjwashington-politics xBrand Immersive XBRNDIMMRS Zaitsev, Maksim Zeferino, Juarez

IP Codes: bureau/Politics Campos, Luis Chishti, Muzaffar coverage/Enterprise coverage/Washington Enterprise Exclusive Analysis Genalo, Kenneth Hingeley, James Homan, Tom Integrated Webview Jackson, Abigail Law leder Miller, Stephen MVPTEST Newsom, Gavin NWREGULAR Ortega, Isaac Policy Politics Politics and Policy PTC SYND Tell me something I don't know Terr, Aaron US News Washington Wires WPWSJ00027089433 WSJ WSJ Japanese WSJ-PRO-WSJ.com WSJ.com WSJ.com Site Search WSJAsia WSJEurope wsjwashington wsjwashington-politics xBrand Immersive XBRNDIMMRS Zaitsev, Maksim Zeferino, Juarez

**Load-Date:** June 11, 2025

---

End of Document

# Exhibit 23

US immigration

This article is more than **3 months old**

# US immigration officers ordered to arrest more people even without warrants

## Exclusive: Ice officers told to get 'creative' with arrests, including of undocumented people encountered by chance




An Ice agent in Chicago in January. Photograph: Christopher Dilts/Bloomberg via Getty Images

**José Olivares** *in New York*

Wed 4 Jun 2025 07.00 EDT

Senior US immigration officials over the weekend instructed rank-and-file officers to "turn the creative knob up to 11" when it comes to enforcement,

including by interviewing and potentially arresting people they called "collaterals", according to internal agency emails viewed by the Guardian.

Officers were also urged to increase apprehensions and think up tactics to "push the envelope" one email said, with staff encouraged to come up with new ways of increasing arrests and suggesting them to superiors.

"If it involves handcuffs on wrists, it's probably worth pursuing," another message said.

The instructions not only mark a further harshening of attitude and language by the Trump administration in its efforts to fulfill election promises of "mass deportation" but also indicate another escalation in efforts, by being on the lookout for undocumented people whom officials may happen to encounter - here termed "collaterals" - while serving arrest warrants for others.

The emails, sent by two top Immigration and Customs Enforcement (Ice) officials this past Saturday, instructed officers around the country to increase arrest numbers over the weekend. This followed the Department of Homeland Security secretary, Kristi Noem, and the White House deputy chief of staff, Stephen Miller, pressing immigration officials last month to jack up immigration-related arrests to at least 3,000 people a day.

One of the emails, written by Marcos Charles, the acting executive associate director of Ice's enforcement and removal operations, instructs Ice officials to go after people they may coincidentally encounter.

"All collaterals encounters [sic] need to be interviewed and anyone that is found to be amenable to removal needs to be arrested," Charles wrote, also saying: "We need to turn up the creative knob up to 11 and push the envelope."

The email later added: "We complained for the last four years about not being allowed to do our job, and now the time has come for us to step up!"

Experts explained that collateral arrests happen when Ice has a warrant to arrest a particular person or persons but when they arrive, they might encounter additional people, such as relatives or co-workers, and then arrest them as well. This despite not having additional warrants or necessarily any evidence of crimes. Being undocumented in the US is a civil offense, not criminal, so "collateral" arrests may oftentimes include people with no criminal backgrounds.

Ice is typically required to have a warrant before they arrest someone. Although not illegal, the practice of collateral arrests without a warrant has been less common, due to heightened legal requirements.

"I am extremely troubled by [the emails] for a number of reasons," said Mark Fleming, associate director of litigation at the National Immigrant Justice Center (NIJC). Fleming said the emails suggest an attempt by Ice to skirt the legal requirements for warrantless arrests.

In 2022, a court settlement put in place some rules for Ice, requiring the agency to have warrants to justify an arrest. If officers did not have a warrant during a collateral arrest, Ice had to show probable cause to justify the arrest and detention. Notably, an officer had to document that a person was likely to escape before getting the additional warrant.

The settlement terms ended in mid-May. But Fleming and the NIJC are challenging the Trump administration, claiming that the settlement should continue to protect people from warrantless arrests. They also accuse Ice of violating the settlement terms earlier this year when Ice officials unlawfully arrested a number of people without obtaining warrants, Fleming and the NIJC said, and then generating the warrant after the arrests.

The emails obtained by the Guardian, Fleming said, shows that Ice "learned nothing from the litigation and the policy that resulted. It sure seems like there is an intention to once again violate both the statute but also the requirements for making warrantless arrests."

**Sign up to This Week in Trumpland** Free newsletter

A deep dive into the policies, controversies and oddities surrounding the Trump administration

**Enter your email address**

Sign up

**Privacy Notice:** Newsletters may contain information about charities, online ads, and content funded by outside parties. If you do not have an account, we will create a guest account for you on theguardian.com to send you this newsletter. You can complete full registration at any time. For more information about how we use your data see our Privacy Policy. We use Google reCaptcha to protect our website and the Google Privacy Policy and Terms of Service apply.

Another email reviewed by the Guardian was sent on Saturday by a senior longtime Ice official, Francisco Madrigal.

"While the weekend is still young, please look at efforts to increase our arrests over these two days compared to our results from last weekend,"

Madrigal wrote. "We know there are different dynamics to consider on Sats and Sundays, and many of you have been pushing what works and trying out new lines of effort as well.

"If you'd like to run something up or if we can help give a push somewhere, please reach out. If it involves handcuffs on wrists, it's probably worth pursuing," Madrigal added.

The Trump administration has roped in other federal agencies and further deputized local law enforcement officials as it pushes to widen its dragnet. Charles also asked officials, on the topic of collateral arrests and increased efforts, to "convey this to your local federal partners and teams".

The Department of Homeland Security responded that the Trump administration was pursuing "criminal illegal aliens".

"After four years of not being allowed to do their jobs, Ice officers are being empowered under President Trump and Secretary Noem's leadership to enforce the law and arrest illegal aliens," the DHS assistant secretary Tricia McLaughlin said in a statement. "Although it may come as a shock to the Guardian that the Trump administration is arresting illegal aliens, this is not groundbreaking news, and it is exactly what the American people elected President Trump to do."

Michael Kagan, the director of the UNLV Immigration Clinic, said the push to arrest people without warrants was a divergence from Obama- and Biden-era policies, during which Ice prioritized arresting people with criminal backgrounds. Under the first and current Trump administrations, "everyone can be a priority", he said.

"Collateral arrests are an outgrowth of that," Kagan added, warning that they can open the door to abuses, including racial profiling and the arrest of US citizens. "It's about immigration enforcement becoming indiscriminate and just targeting whoever they can get their hands on, rather than a more targeted approach."

## Most viewed

# Exhibit 24

CAR T-Cell Therapy Access Barriers M.D./alert

Chicago | News Weather Sports Video 70°

LOCAL NEWS

# FBI reports "targeted immigration enforcement operation" in South Shore, Chicago

CBS NEWS CHICAGO

By Lauren Victory, Sabrina Franza
Updated on: September 30, 2025 / 6:58 PM CDT / CBS Chicago

Federal agents reported in the South Shore neighborhood were part of a "U.S. Border Patrol targeted immigration enforcement operation" overnight, the FBI confirmed.

Agents were seen holding long guns outside a residential building overnight near 75th Street and South Shore Drive. Most federal agents were wearing camouflage with vests that read U.S. Border Patrol, Police, or FBI. Several agents were seen on an armored green truck, going in and out of U-Haul and Budget rental trucks.

Women and children appear to be some of the people led away by federal agents and taken into vans staged in a parking lot near a school. Officials have not confirmed how many people were taken into custody.

CBS News Chicago spoke to a man who says his boyfriend, who is a U.S. citizen, was escorted off the premises by federal agents.

"Ziptied, they put him in a bus, they had immigrants and the Black people in one bus. They still, they said they were checking people for warrants," Marlee Sanders said.

AD




Sanders took CBS News crews inside the building, where he said federal agents busted holes through walls and doors to access the people living inside. Those doors are now boarded up following the operation.




CBS News crews were taken inside the building, where federal agents busted holes through walls and doors to access the people living inside

CBS NEWS CHICAGO

Law enforcement sources said that what happened is protocol to briefly detain everyone in a large building to keep everyone safe during a mission.

Residents who live inside the building said they were shocked by how they were treated.

Pertissue Fisher said she was detained by federal agents and asked if she was a U.S. citizen.

"They asked me was I was a U.S. citizen, I said yeah. I was born here."

She was held for hours in a van with other neighbors while agents confirmed her identity, citizenship, and confirmed she had no active warrants.

Fisher described the scene as she said children were also led out of the building.

"No shoes, the kids didn't had no shoes, no pants on. They just treated us like we were nothing."

"He said he had warrants for five people, so I said, 'So why you detaining the whole building?' He said it's for the safety of our people."

Ebony Watson watched and filmed what was a massive show of force, and rental trucks were used in the mission alongside ICE, FBI, and other federal agencies.

CBS News Chicago tried to contact the property manager of the building, but no one would meet or give us any information about what happened.

"It's crazy, it felt like we were under siege last night," Darrell Ballard said.

The neighborhood is still trying to get questions answered about what happened.

"They brought a baby out completely naked and wouldn't allow the mother the chance to clothe her child, it's, it's distressing," Ballard said.

The FBI spokesperson did not provide further details. CBS News Chicago reached out to ICE, Homeland Security, and Border Patrol for information about the operation, including how many were detained and why, but has yet to hear back.

Watch CBS News

## Trump seeking to deploy troops to protect ICE in Illinois

This comes a day after Gov. JB Pritzker said his administration learned the Trump administration is seeking to deploy 100 troops in Illinois, following the deployment of armed federal agents in downtown Chicago over the weekend, and multiple clashes between protesters and ICE agents in west suburban Broadview in recent weeks.

Pritzker said the Illinois National Guard has learned the Department of Homeland Security sent a memo to the Pentagon, requesting the deployment of 100 military troops in Illinois to protect ICE personnel and facilities. The governor's office said it's unclear if those troops would be Illinois National Guard, National Guard members from other states, or active-duty military troops.

Pritzker and Mayor Brandon Johnson both have repeatedly said that the Trump administration's immigration crackdown in the Chicago area, and his repeated threats to send in troops have nothing to do with public safety.

### More from CBS News


37 arrested in South Shore ICE raid that DHS claims targeted gang




Federal officials target Twin Cities in immigration fraud investigation



Pepper ball fired at CBS Chicago reporter part of incidents involving media outside Broadview ICE facility



Federal judge sends case against 8 suspects in July 4 ICE facility attack in Texas to a grand jury

In: **South Shore** **Immigration** **Chicago**

**Lauren Victory**

Lauren Victory is a Morning Insider reporter for CBS2 Chicago. Lauren joined the station in May 2016 and is a graduate of the Medill School of Journalism at Northwestern...

© 2025 CBS Broadcasting Inc. All Rights Reserved.

Pritzker compares Trump to Putin, calls for invoking 25th Amendmen...

Discover

Watch CBS News

## Take a Shot at Saving

Show off your good driving skills with Snapshot and see if you could save.

PAID PROGRESSIVE INSURANCE Get quote

## Hi-Neck Sleeveless 100% Pima Cotton Blouse, Scarlet Red - True Fit - Scarlet Red / M

Elevate your ensemble with the refined structure of this Hi-Neck Sleeveless Cotton Blouse. Designed with a

## Discover a prostate cancer Rx treatment.

All Rights Reserved. 074-0555-PM 02/22

PAID XTANDI.COM Learn More

## Sam Altman Lists 5 Books That Will Give You an Unfair Advantage

Ever since he was a kid, Sam Altman—the CEO of OpenAI —has been an avid reader. He shares the nine books that he thinks will change your life.

PAID BLINKIST: SAM ALTMAN'S READING LIST

## Heritage Crochet Knit Jacket - Modern Fit - Aquatic/White / XL

Our Heritage Crochet Knit Jacket features an intricate crochet design. This jacket is adorned with braided trim, offering design and interest to the piece. The addition of soft shoulder pads help create structure with this jack…

## HelloFresh Vs. Blue Apron: Which Meal Kit Is Worth Your Money In 2025?

Meal Kit Face-Off: Who Comes Out On Top?

## Squad Goals

We'll help you find a great rate, even if it's not with us!

PAID PROGRESSIVE INSURANCE Get quote

## Ashburn: Here's The Average Price of a 6-Hour Gutter Upgrade

Thanks to this smart gutter upgrade its never been easier to prevent clogs and water damage and keep your home protected year-round.

## The Name Your Price® tool

Try our handy online tool today and we'll help get you options that fit your budget.

PAID PROGRESSIVE INSURANCE Get quote

Watch CBS News

## Discover Canva for Campus

Help your students build in-demand visual skills with Canva for Campus. Reach out to our team today to learn more.

## Replace Your Entire Roof in as Little as 1 Day!

Don't buy a new roof until you check this out.

PAID METAL ROOFING INNOVATIONS Learn More

## See Why Thousands Trust This Home Warranty

Get peace of mind—affordable coverage for appliances and systems.

PAID FIRST AMERICAN HOME WARRANTY Learn More

## Costco Shoppers Say This Fat-Burning Patch Triggers Weight Loss "Unlike Any Other"

PAID CONSUMERSFIND Learn More

## We Did The Research On HelloFresh And Blue Apron For You

Big Differences, One Clear Winner

PAID POPDUST Learn More

## Residents in Virginia With Credit Card Debt Could Be in for a Big Surprise

PAID WEEKLY FINANCIAL SOLUTIONS

## Residents In Virginia With Credit Card Debt Could Be In For A Big Surprise

There's a way to pay off credit card debt without getting a loan. See if you are eligible for the program.

PAID WEEKLY FINANCIAL SOLUTIONS

## The Smart Way to Handle Home Repairs

Plans from just $28/month. For a limited time, use promo code FA200 for $200 off.

PAID FIRST AMERICAN HOME WARRANTY Learn More

## 8 Dumbest Things Middle-Class Americans Waste Money On

Think you're good with money? These hidden money traps are fooling even the smartest Americans.

PAID FINANCEBUZZ Read More

## Here's What a New Metal Roof Should Cost You in 2025!

Enter your ZIP and answer a few quick questions.

PAID METAL ROOFING INNOVATIONS | Get Quote

Watch CBS News

## Tirzepatide Wins For Weight Loss - Only $119/Month

Ships to your door. No insurance required. 3 simple steps.

PAID FUTURHEALTH

## Edema Is Not From Salty Food. Meet the Real Enemy of Swollen Legs

PAID FOOTRENEW

## Tirzepatide Crushes Ozempic For Weight Loss - Only $179/Month

Tirzepatide beats stubborn weight with 2X the speed. Order today.

PAID MEDVI

## Don't Miss Out on the All-New Toyota Tacoma Tacozilla

PAID CAR & DRIVER

## Upgrade Your Wallet with a New Cash Back Card.

See Recommendations for Great Cash Back Credit Cards of 2025. Compare Cards that Fit Your Needs.

PAID INTUIT CREDIT KARMA | Learn More

## Here's The Average Price of Gutter Protection For 2,500 Sq Ft House

Choose LeafFilter gutter protection for your gutter needs. They'll clean out, repair, and protect your gutters from

## Dexcom G7 is proven to lower A1C and increase time in range[3–7].

Dexcom G7 shows your glucose in real time, so you can make more informed decisions, and better control your

Featured

Hegseth Military Meeting

Government Shutdown 2025

NFL Week 4 Picks

CFB Week 5 What to Watch

Follow Us On
Watch CBS News

YouTube

Facebook

Instagram

TikTok

X

**CBS News Chicago**

Meet the Team

Program Guide

Contests & Promotions

Advertise With Us

Sitemap

**Regulation**

Public File for WBBM-TV

Public Inspection File Help

FCC Applications

EEO Report

**Privacy**

Privacy Policy

California Notice

Your Privacy Choices

Terms of Use

**Company**

About Paramount

Advertise With Paramount

Join Our Talent Community

Help
Watch CBS News

Feedback

©2025 CBS Broadcasting Inc. All Rights Reserved.

# Exhibit 25

This article is about 2 months old

# Trump's crackdown in DC leaves residents on edge as federal agents set up checkpoints

**The Associated Press (https://wtop.com/author/the-associated-press/)**
August 21, 2025, 8:56 PM




**Trump visits National Guard troops in DC, vows city will be 'maxed out in terms of beauty'**

WASHINGTON (AP) — Federal authorities have set up checkpoints around the nation's capital, sometimes asking people for their immigration status and detaining them, as President Donald Trump's crackdown ensnares more residents each day.

Trump claimed that a crime crisis required his Republican administration's intervention in the Democratic-led city this month, brushing aside statistics that showed the problem was already waning. However, immigration enforcement appears to be a priority, as more than a third of people arrested in the last two weeks were in the country illegally, according to the White House.

Hundreds of federal agents and National Guard soldiers have surged into Washington, leaving some residents on edge and creating tense confrontations in the streets.

A day care center was partially closed Thursday when staff became afraid to go to work because they heard about federal agents nearby. An administrator asked parents to keep their children at home if possible.

Other day cares have stopped taking kids on daily walks because of fears about encountering law enforcement.

# Trump visits cops and troops

The White House said there have been 630 arrests, including 251 people who are in the country illegally, since Aug. 7, when Trump began surging federal agents into the city. Trump has been ratcheting up the pressure since then, seizing control of the D.C. police department on Aug. 11 and deploying more National Guard troops, mostly from Republican-led states.

On Thursday evening, Trump visited with officers and troops at a U.S. Park Police facility in the latest show of force from the White House.

“We’re not playing games,” he said.

Trump suggested that operations in the city could be drawn out and serve as a model for others around the country.

“We’re going to make it safe, and we’re going to go on to other places, but we’re going to stay here for a while,” he said.

Soldiers have been largely stationed in downtown areas, such as monuments on the National Mall and transit stations. However, federal agents are operating more widely through the city. D.C. Mayor Muriel Bowser (https://apnews.com/article/trump-bowser-dc-home-rule-national-democrats-8e262a15267bdae66049201a4cc4a6a8) acknowledged the proliferation of traffic checkpoints Thursday.

“The surge of federal officers is allowing for different types of deployments, more frequent types of deployments, like checkpoints,” Bowser said.

A crowd of people gathered outside a municipal office building to protest Trump’s crackdown, waving signs and cheering speakers who denounced the president’s plans. Their numbers swelled into the hundreds until police closed off nearby streets. When the rally ended, many remained to dance and listen to music.

In other neighborhoods Thursday evening, residents banged pots and pans on rooftops, front steps and street corners.

# Not a normal traffic stop

On Thursday morning, as Martin Romero rode through Washington's Rock Creek Park on his way to a construction job in Virginia, he saw police on the road up ahead. He figured it was a normal traffic stop, but it wasn't.

Romero, 41, said U.S. Park Police were telling pickup trucks with company logos to pull over, reminding them that commercial vehicles weren't allowed on park roads. They checked for licenses and insurance information, and then U.S. Immigration and Customs Enforcement agents came over.

Romero said there were two agents on one side of his truck and three on the other. He started to get nervous as the agents asked where they were from and whether they were in the country illegally.

"We just came here to work," Romero said afterwards. "We aren't doing anything bad."

Two people in his truck were detained and the agents didn't give a reason, he said. He also saw three other people taken from other vehicles.

"I feel really worried because they took two of our guys," he said. "They wouldn't say where they're taking them or if they'll be able to come back."

Romero said he called his boss, who told him to just head home. They wouldn't be working today.

Enrique Martinez, a supervisor at the construction company, came to the scene afterwards. He pondered whether to call families of the detained men.

"This has never happened to our company before," Martinez said. "I'm not really sure what to do."

# Checkpoints are legal, to a point

The Supreme Court has upheld the use of law enforcement and government checkpoints for specific purposes, such as policing the border and identifying suspected drunk drivers.

But there are restrictions on that authority, especially when it comes to general crime control. Jeffrey Bellin (https://law.vanderbilt.edu/bio/?pid=jeffrey-bellin), a former prosecutor in Washington and professor at Vanderbilt Law School who specializes in criminal law and procedures, said the Constitution doesn't allow "the government to be constantly checking us and stopping to see if we're up to any criminal activity."

He said checkpoints for a legally justifiable purpose — like checking for driver's licenses and registrations — cannot be used as "subterfuge" or a pretext for stops that would otherwise not be allowed. And though the court has affirmed the use of checkpoints at the border, and even some distance away from it, to ask drivers about immigration status, Bellin said it was unlikely the authority would extend to Washington.

Anthony Michael Kreis (https://law.gsu.edu/profile/anthony-kreis/), a professor at Georgia State College of Law, said the seemingly "arbitrary" and intrusive nature of the checkpoints in the capital could leave residents feeling aggrieved.

"Some of the things could be entirely constitutional and fine, but at the same time, the way that things are unfolding, people are suspicious — and I think for good reason," he said.

Lilly Burchfield, 25, said she's seen people in her neighborhood come out of their homes to yell at federal agents.

"It feels like we're all coming together as a community and everyone that I've talked to has been outraged by what's happening," she said.

## From Los Angeles to D.C.

There are few places in the country that have been unaffected by Trump's deportation drive, but his push into D.C. is shaping into something more sustained, similar to what has unfolded in the Los Angeles area since early June.

In Los Angeles, immigration officers — working with the Border Patrol and other federal agencies — have been a near-daily presence at Home Depots, car washes and other highly visible locations.

In a demonstration of how enforcement has affected routines, the bishop of San Bernardino, California, formally excused parishioners of their weekly obligation to attend Mass after immigration agents detained people on two parish properties.

Immigration officials have been an unusually public presence, sending horse patrols to the city's famed MacArthur Park (https://apnews.com/article/california-immigration-raid-troops-military-2d81f5c35f9d11db9e32234e03480497) and appearing outside California Gov. Gavin Newsom's (https://apnews.com/article/obama-newsom-redistricting-texas-democrats-house-midterms-26ef7d0ccb44e57a5ddc36ff99f7de9c) news conference last week on congressional redistricting. Authorities said an agent fired at a moving vehicle last week after the driver refused to roll down his window during an immigration stop.

The National Guard and Marines were previously in the city for weeks on an assignment to maintain order amid protests.

A federal judge blocked the administration from conducting indiscriminate immigration stops in Southern California but authorities have vowed to keep the pressure on.

———

Associated Press writers Eric Tucker, Ashraf Khalil, Matt Brown and Joey Cappelletti in Washington and Elliot Spagat in San Diego contributed reporting.

Copyright © 2025 The Associated Press. All rights reserved. This material may not be published, broadcast, written or redistributed.

(1/12)



**Trump District of Columbia** Between a now empty pickup truck and what's left of his work crew at right, Martin ...See full captic

AP Photo/Jacquelyn Mar

**Related Categories:**

**Government News (https://wtop.com/government/) | Latest News (https://wtop.com/news/) | Local News (https://wtop.com/local/) | National News (https://wtop.com/national/) | Washington, DC News (https://wtop.com/local/dc/)**

**Tags:**

**dc federal takeover (https://wtop.com/tag/dc-federal-takeover/) | law enforcement surge (https://wtop.com/tag/law-enforcement-surge/)**

# Exhibit 26

THE TABLET

Login

SUBSCRIBE




# DC Mass attendance falls after immigration arrests

**Michael Sean Winters** 25 August 2025, The Tablet Prev **Next**




Sacred Heart church in Washington's Columbia Heights neighbourhood is home to people of many nationalities, with Mass celebrated each weekend in English, Haitian Creole, Portuguese, Spanish and Vietnamese.

Roman Catholic Archdiocese of Boston

Privacy - Terms

THE TABLET

Login

SUBSCRIBE

Parish priests in Washington, DC reported a sharp decline in Mass attendance and participation in religious education, due to immigrants' fears of being detained

This followed President Donald Trump's decision to federalise the city's police and import National Guard troops from other jurisdictions. The president said this was necessary to combat crime in the US capital, although crime has been declining in the city the past few years and other cities register far higher crime rates.

Fr Emilio Biosca Agüero OFM Cap, parish priest of Sacred Heart Church in Washington, said that seven of his parishioners had been detained including one man who came to the church for marriage preparation and another who was in confirmation class. After two men were detained in front of Sacred Heart's school, hundreds of people expected for a celebration of St Oscar Romero at the church stayed away, with only 200 attending.

Sacred Heart is in the heart of Washington's Columbia Heights neighbourhood, and is home to people of many nationalities. Mass is celebrated each weekend in English, Haitian Creole, Portuguese, Spanish and Vietnamese. Biosca said attendance at Masses was down about 20 per cent in recent months, due to concern immigration enforcement agents would arrest them.

A few blocks north of Sacred Heart, the Episcopal Church of St Stephen and the Incarnation announced it was cancelling services after immigration officials were seen monitoring the church's distribution of food to needy residents.

Informal networks of congregants use WhatsApp to warn each other if they see immigration agents, who often wear no identifying uniform or badge, and some churches have conducted training seminars to teach people how to react if police, immigration agents or National Guard troops confront them, informing them of their rights, and making sure they have contact information for immigration lawyers.

"The people who participate at Sacred Heart are hardworking, resilient, law-abiding and devout, placing their trust in God and hoping that US laws will take into account their contribution to improving this country," said Fr Biosca.

**Immigration arrests shake parishes in Washington, DC**

**Where have all the 'illegal' migrants to the US gone?**

THE TABLET

Login

SUBSCRIBE

THE CATHOLIC CHURCH IN AMERICA | US POLITICS

**Help us keep The Tablet's voice independent, clear and far-reaching.**

Founded in 1840, The Tablet is the leading independent English-language Catholic weekly, celebrated for great writing, astute analysis, brilliant arts and books reviews and trustworthy reporting from correspondents in Britain, Ireland, Rome and across the world.

Independent, high-quality journalism is at the heart of what we do. The Tablet does not have deep pockets and we are not funded by rich donors. If you appreciate our work please consider supporting The Tablet's Development Fund. It only takes a moment and you can cancel at any time.

- Support with £5 per month
- Support with £10 per month
- Support with other amount.

DONATE NOW

VISA Pay G Pay

Article end

Prev Next

## MOST READ ARTICLES

1 Plea for dialogue in Congo after peace deal fails

THE TABLET

Login

SUBSCRIBE

4 Pope Leo XIV appoints top lawyer to succeed him as Prefect of Dicastery for Bishops

5 Cardinal explains how synodality brings together key dimensions of Vatican II

6 Tablet retreat – a Franciscan adventure

## FROM THE EDITOR'S DESK

### The question of digital ID and why scapegoating migrants serves no-one

### Trump's peace deal – a long and winding road

## RELATED ARTICLES



### Supreme challenge – how President Trump is using his executive power



## Arvo Pärt at 90



## Tablet retreat – a Franciscan adventure

THE TABLET

The International Catholic News Weekly

SIGN UP FOR OUR NEWSLETTER

Get the latest news and special offers delivered to your inbox

Type your email address here…

THE TABLET

Login

SUBSCRIBE

Subscribe
Advertise
Jobs
About us
Permissions
Help
Contact us

FOLLOW US

Website by Digital Virtue
Copyright © The Tablet Publishing Company 2025, all rights reserved.

# Exhibit 27

Wednesday, October 01, 2025 A service of EWTN News CNA •••

CNA | Catholic News Agency

Donate MENU

# ICE arrests take toll on DC churches



The Shrine of the Sacred Heart in Washington D.C. | Credit: Madalaine Elhabbal/CNA



By Madalaine Elhabbal

Washington, D.C. Newsroom, Aug 21, 2025 / 18:18 pm

Catholic churches that serve Spanish-speaking communities in the Archdiocese of Washington have reported anxiety as encounters with immigration enforcement continue to function as a major aspect of the Trump administration's crackdown on crime in the nation's capital.

Sacred Heart Shrine in Columbia Heights reported that **six of its parishioners were detained** by Immigrations and Customs Enforcement (ICE) agents in recent weeks, including an usher who was on his way to evening Mass. Other parishes in the archdiocese have also expressed concern amid the current situation in the District.

This comes after the Trump administration **announced Aug. 11** the deployment of federal agents and the National Guard in order to crack down on widespread crime in D.C.

Following an executive order from Washington Metropolitan Police Chief Pamela Smith, D.C. police officers have been permitted to notify ICE agents of encounters with undocumented migrants, resulting in tight collaboration between the two law enforcement agencies in the city.

Ad



Support Pope Leo XIV this World Mission Sunday

This October 19, answer the Pope's invitation to be missionaries of hope among the peoples.

*The Pontifical Missic*

Sacred Heart Shrine's pastor, Father Emilio Biosca Agüero, OFM Cap, told **Religion News Service** that one of the parishioners detained by ICE was a man in marriage preparation, while another was in a confirmation class.

Some of the detainees, the pastor noted, were stopped by immigration officials while on their way to the shrine for catechetical classes over the past several weeks. Bisoco estimated in the report that Mass attendance at his parish has dropped about 20% from 2,500 to less than 2,000 people.

The priest also said the parish WhatsApp chats "have been filled with immigration agent sightings and warnings to parish members."

Biosca Agüero declined to comment to CNA on the story.

Last month, an ICE spokesperson **told CNA**: "While ICE is not subject to previous restrictions on immigration operations at sensitive locations, to include schools, churches, and courthouses, ICE does not indiscriminately take enforcement actions at these locations."

"U.S. Immigration and Customs Enforcement arrests aliens who commit crimes and other individuals who have violated our nation's immigration laws," the spokesperson noted, adding: "All aliens in violation of U.S. immigration law may be subject to arrest, detention, and, if found removable by final order, removed from the United States."

According to the RNS report, attendance at St. Gabriel Catholic Church in the Petworth neighborhood of D.C. has also gone down.

The communications director at Our Lady Queen of the Americas parish, Kevin Arevalo, told CNA that "the parishioners that we have had coming to Sunday Mass

have expressed concerns and fears over the situation here in D.C."

Arevalo said there have not been any detentions on church grounds and that he is not aware of any parishioners being detained on their way to attend Mass at the parish or nearby.

However, he noted several detentions he has heard of have taken place in neighborhoods like Columbia Heights and Mount Pleasant, and many parishioners of Our Lady Queen of the Americas "have to go through those areas to get to our parish."

As such, Arevalo and the parish's administrator, Father James Morrison, are currently preparing alternative ways to reach the community amid rising fears regarding immigration enforcement.

"I know that most of them live pretty far and go out of their way to come here for our Masses and activities," he said, "so we're looking at using digital media and our channels, our online channels, to reach out to them and serve them in whatever best way possible we can."

**(Story continues below)**

**Subscribe to our daily newsletter**

Email*

First name*

Last name*

☐ CNA Subscriber

☐ I agree to receive other communications from EWTN

and consent to the terms of the Privacy Policy. *

protected by reCAPTCHA
Privacy - Terms

Get the CNA UPDATE!

He concluded: “We definitely won’t stay quiet about this because our parish, the majority, is Hispanic-Latino community. So you want to make sure that we’re listening to them and we’re attentive to what they’re going through.”

At the time of publication, the Archdiocese of Washington has not responded to requests for comment. The U.S. Conference of Catholic Bishops (USCCB) declined to comment.

Tags: **USCCB - United States Conference of Catholic Bishops**, **Catholic News**, **Archdiocese of Washington**, **Immigration and Customs Enforcement**, **Illegal Immigration**



Madalaine Elhabbal is a staff reporter for Catholic News Agency, based at the Washington, D.C. headquarters of EWTN News.

## Our mission is the truth. Join us!

Your monthly donation will help our team continue reporting the truth, with fairness, integrity, and fidelity to Jesus Christ and his Church.

Donate

## TRENDING

1 How to pray the St. Thérèse of Lisieux novena

2 Bishops ‘grateful,’ ‘relieved’ after pro-abortion Durbin declines Catholic award

3 At UN, archbishop faults nations for ‘turning a blind eye’ to persecution of Christians

4 Pope Leo XIV, Arnold Schwarzenegger promote care for the earth at climate conference

5 Pope Leo XIV on Trump’s Gaza peace plan: ‘A realistic proposal’

## YOU MAY ALSO LIKE



### Bishop Mark Brennan gives blistering critique of indiscriminate immigration enforcement

Aug 7, 2025




### Morality of Trump immigration, refugee policies sparks pitched debate

Apr 9, 2025

West Virginia Bishop Mark Brennan is criticizing the Trump administration's policy of deporting "as many immigrants as possible."

An array of policymakers, theologians, and representatives for Catholic aid organizations have shared their takes on immigration with CNA.




## Cardinal McElroy talks immigration in first public appearance since DC installation

Mar 25, 2025

Appealing to the teachings of Pope Francis, Cardinal Robert McElroy centered his remarks on the parable of the good Samaritan.

CNA is a service of EWTN News, Inc.

Contact us

EIN: 27-4581132

TOOLS

Subscribe to our newsletter

RSS Feed

Advertise with us

LEGAL

Privacy Policy

Cookie Policy

Terms and Conditions

Your Privacy Choices

Notice at Collection

© 2025 CNA | All rights reserved.

# Exhibit 28

*Democracy Dies in Darkness*

# They watched ICE detain their dad. Now D.C. neighbors escort them to school.

"Walking school buses" help kids get to class as an influx of federal immigration agents has mixed-status and undocumented families worrying about even their morning routines.

September 11, 2025



By Teo Armus

Kevin paced back and forth on the curb outside his D.C. apartment building, waiting for the "walking school bus" of neighbors that would shuttle him to elementary school.

The "bus" — a procession of parents strolling with coffee mugs and clutching the hands of backpack-clad students — was the newest feature of the 10-year-old's morning routine. As the Trump administration targets residents who've entered the country illegally, filling some D.C. neighborhoods with anxiety, it was meant to offer a sense of security for children of immigrants like him.

Last year, Kevin and his younger brother and sister would make the short walk to school in their quiet, hilly neighborhood of rowhouses with only their mom, Rossy.

But that was before federal immigration agents came up to their dad, who had a standing deportation order, put him in handcuffs and took him away in a gray truck — a scene last month that the three young siblings, all of whom were born in the United States, witnessed as their summer break was coming to a close.

A few days later, Kevin's uncle, who ICE officials say crossed the southern border illegally in 2023, left the apartment they shared to head to work and never came back. Rossy tearfully banged on the windows of their apartment out of grief, saying her brother had been taken to a U.S. Immigration and Customs Enforcement detention center despite having an open asylum application. (She spoke to The Washington Post on the condition that her full name not be used because she is also in the country illegally.)

Now, the walk to fifth grade — just up the hill and around the corner — suddenly seemed a lot more fraught, though Trump administration officials say that children are not being targeted by ICE agents.

"What if they come and take you too?" Kevin asked his mother while getting ready that morning, just before they headed down to the lobby. "Who will we stay with?"

Around the District, children and parents with different legal statuses were asking themselves those questions as they started a new school year.

President Donald Trump's moves to federalize D.C. police and dispatch federal law enforcement agents throughout the District have led to a flurry of immigration arrests. Trump said the overall effort was meant to re-establish law and order in the nation's capital and make Americans feel safe in the city.

But in this corner of Northwest Washington — home to families from El Salvador, Venezuela and Ethiopia — the news of arrest after arrest only seemed to create anxiety about heading outside. So families and their neighbors are working to create envelopes of safety.

In one neighborhood down the road, parents now take turns picking up day care employees at their homes and shuttling them to work. In Columbia Heights, U.S. citizens and visa holders have formed lookouts and apartment building group chats to alert their neighbors of ICE agents in the area — or just vehicles that look like federal law enforcement.

And then there are the walking buses at schools like Kevin's. That daily caravan is in part meant to boost attendance after several parents and their kids reported noticeably fewer students on the first day of classes, said Vanessa Rubio, a school parent and local community activist.

"We've always worked with law enforcement. We've always welcomed law enforcement to come into our buildings to talk to our students," said Rubio, who scrambled to coordinate the effort two days before classes started. "But right now, instead of making us feel safe, they're making us feel scared and intimidated."

Federal officials have reported more immigration-related arrests in D.C. since Trump's Aug. 11 crime emergency declaration than the three prior months combined, according to the University of California at Berkeley's Deportation Data Project. In many cases, those 786 arrests were made alongside D.C. police officers who have been ordered to help ICE.

Based on videos shared from neighbors and details in local chat groups, Rubio estimates that at least 20 people have been detained by federal immigration officers in the area zoned for Kevin's elementary school since Trump moved to federalize D.C. police.

Many of those arrests, she said, took place between 5 a.m. and 10 a.m., while many immigrants are heading to work and others are either getting their children ready for school or dropping them off. Federal agents were seen by one parent picking up a man outside a retirement home that sits less than 500 feet from the school, Rubio said.

Department of Homeland Security spokesperson Tricia McLaughlin said in a statement that ICE is not conducting enforcement operations at schools and is not going to schools to make arrests of children.

The agency "takes its responsibility to protect children seriously and will continue to work with federal law enforcement to ensure that children are safe and protected," the statement said.

### ICE increasingly targets undocumented migrants with no criminal record

The Trump administration is increasingly targeting unauthorized immigrants with no criminal record as it ramps up arrests, a Washington Post analysis of U.S. Immigration and Customs Enforcement data shows.

For Kevin, though, the agency's efforts meant something very different.

He had heard classmates talking about how federal agents, like those who took his dad, had been driving around the neighborhood. He had also seen footage of them in D.C. while watching Univision on the flat-screen TV hanging in their otherwise sparse living room.

And he knew they could detain his mom, who had arrived from El Salvador two decades ago by crossing the southern border illegally and who has not tried to get legal status.

As the procession of people on the walking school bus inched closer, Kevin spotted one mom's familiar knit unicorn hat. A sign held by other volunteers read: "WALKING BUS / BUS A PIE," a variation of the different ways used to announce the bus's presence in English and Spanish.

"There's a lot of kids here today," Kevin said.

Rubio, who was wearing bright pink to identify herself as the bus "conductor," waved at him and Rossy as the other parents and children gathered on their doorstep.

"Good morning!" she exclaimed. "Buenos días."

Rubio grinned at them, as if it was just another week at the same elementary school she had attended herself — even when she knew that was hardly the case.

They started walking.

As they made the steep climb up the tree-lined street, the memory of his father getting arrested by ICE agents in Maryland weighed heavy on Kevin's mind, he later said.

He and his two siblings were leaving their dad's apartment in Hyattsville, where they had stayed for the weekend, when it happened.

Saturdays and Sundays were spent with their dad, Florentin Uduber Cruz. On that weekend in August, Cruz, who had a final order of deportation issued against him in 2006, had taken the three children to shop for clothes and supplies before school started. His 5-year-old daughter got a sparkly pink backpack adorned with a cat's face, which she now insists on taking to every day of kindergarten.

The boys kicked around a soccer ball with Cruz and some friends; at night, they all gathered around a pink-frosted strawberry cake and watched the girl blow out the candles to celebrate what would be her fifth birthday the following day.

Cruz was preparing to drop them off with their mother in D.C. the next morning when, outside of his home, two men in uniform stepped out of a gray SUV and started barking orders.

"Put your hands on the car," Kevin remembers the men telling his dad.

They grabbed Cruz's wrists and fastened them into handcuffs.

His daughter started crying. Kevin's 7-year-old brother went running back inside to grab Cruz's girlfriend. Kevin stood there, motionless, as the officers asked if Cruz wanted to hug his children one more time.

He shook his head no.

"It's too late," Kevin remembers his dad saying.

McLaughlin, the DHS spokesperson, said in a statement that Cruz was "an illegal alien from El Salvador" who received a final order of deportation in 2006.

The statement added that his children "were never left without a guardian" because "their mother came outside and the children were left safely in her care" — though the family noted that the adult who came to grab them was Cruz's girlfriend, not Rossy.

As Cruz was shuttled between ICE detention centers and eventually deported back to El Salvador, Kevin started fretting at home about "the list" he heard news anchors talk about on TV.

Normally preoccupied with Feastables chocolate, dragon drawings and soccer star Cristiano Ronaldo, he started talking about wanting to move to El Salvador, a country he only knew through video calls on WhatsApp. On the phone with his grandmother, who still lived there, he wondered if his dad and uncle had been on ICE's list, too.

"They don't want us here," Kevin told his mother after one call with Cruz, who had showed off his family's house in the Salvadoran city of La Unión and introduced his children to their cousins.

**4.1 million migrants**

The Washington Post analyzed more than 4.1 million U.S. immigration court records from the past decade to find out where migrants come from and where they live once they arrive in the country.

The week before school started, Kevin started asking his mom if she had money for flights, she said.

One night at the dinner table, Kevin recalled how his dad had picked him up from soccer practice twice a week after school last year. He asked Rossy: Who was going to take care of that now?

And he brought up how her best friend, who lived with her children four floors below their apartment in the same building, had been detained during a check-in appointment with ICE. The woman's husband chose to move the whole family back to El Salvador instead of parenting solo in D.C.

Rossy was struggling to find an immigration lawyer to represent her brother, who had been detained in D.C. 10 days into Trump's takeover of the District. Headaches from the stress left her in bed for hours.

But as the start of school inched closer, she did her best to distract Kevin every time he asked about moving to join his dad.

It was enough to get all three children out the door to walk up the hilly street toward school with Rubio.

On this morning, they passed two women leaning by a rocky fence next to the sidewalk. Their pink shirts denoted they were also part of the walking bus. Rubio had planted people like them at intersections around the area to keep an eye on children and parents.

"Good morning everybody," one of them said, though Kevin seemed to pay little mind as he strutted past them and his brother around the corner.

They neared the school entrance, where Rossy broke off to leave her daughter with the other kindergartners in the cafeteria. Kevin hugged his mom and ran ahead, toward the main entrance.

They had made it to school without issue. He could head inside for another taste of fifth grade, where he would review division problems and play Kahoot with his classmates.

The next day, though, they'd have to walk the route all over again.

## What readers are saying

The comments reflect a deep concern for the impact of immigration enforcement on families and communities, particularly focusing on the fear and trauma experienced by children witnessing the deportation of their parents. The presence of "walking buses" is seen as a compassionate... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# Exhibit 29

# Federal surge has taken a toll on children of immigrants in Washington

**Politics** Sep 17, 2025 2:24 PM EDT

WASHINGTON (AP) — The last time she saw her husband, the father of her three children, was when he left their Washington apartment a month ago to buy milk and diapers. Before long he called to say he had been pulled over — but not to worry, because it was just local police. The next time she heard from him, he was at a detention center in Virginia.

Since that day, the 40-year-old mother of three has been too afraid to take her two sons to their nearby charter school. Like her husband, who has since been deported, she is an immigrant from Guatemala and has lived in the U.S. illegally for more than a decade. She spoke on the condition of anonymity out of fear she would be targeted by immigration authorities.

All three of the couple's children were born in the nation's capital, and the older two attend a local charter school. She planned to keep them home until a volunteer offered to drive them. Still, one of the boys was so upset over his father's absence he missed three days of school one week.

Schools in Washington reopened late last month against the backdrop of a law enforcement surge that brought masked Immigration and Customs Enforcement agents into normally quiet neighborhoods, scenes likely to be replicated elsewhere as President Donald Trump dispatches federal agents to the streets of other big cities.

In some Washington communities, the fear spread by the police presence has taken a toll on children. Some students have had parents swept up in the crackdown. Other students fear they or their family members could be next. Parents are grappling with how to explain the situation.

"In my community, the impact has been immense fear and terror that is threatening student safety getting to and from school every day," said Ben Williams, a high school social studies teacher who also serves on the District of Columbia State Board of Education. "It is really making everyone feel on edge every day as to whether someone, a community member or a parent or someone that is close or connected to the community, could be taken."

## Arrests instill fear

In northwest Washington's Mount Pleasant neighborhood, where million-dollar rowhouses and affordable apartments home to immigrant families share the same tree-lined blocks, federal agents became a common sight and neighbors documented several arrests.

Raul Cortez, an immigrant from El Salvador, said his 7-year-old son has grown deeply afraid of police.

"The children pay attention. They are very intelligent, and they know what is happening," Cortez said.

A few moments later, his son caught sight of an idling police car. His eyes widened.

**WATCH: Legal scholar analyzes key court rulings on Trump's immigration agenda**

Mindful that some parents were afraid of leaving the house, volunteers began organizing "walking buses" to accompany groups of children by foot from apartment buildings to schools. Outside Bancroft Elementary, which teaches students in English and Spanish, volunteers are stationed at street corners in orange vests, ready to blow a whistle if they see signs of immigration authorities.

## Immigration enforcement can lead to dips in school attendance

Research has linked immigration raids near schools to lower academic outcomes for Latino students, who are more likely to have family ties to immigrants.

Trump's immigration crackdown also has affected school attendance in other parts of the country. In the months following his January inauguration, districts across the country reported lower attendance as immigrant families kept their children home. In California's Central Valley, immigration raids in January and February coincided with a 22% spike in student absences compared with the previous two school years, according to a study from Stanford University economist Thomas Dee and Big Local News.

In Washington, deputy mayor for education Paul Kihn said at a news conference near the start of the school year that attendance had been about at the same level as last year. D.C. Public Schools, which educates about half of the district's students, said it could not provide data on school attendance during the federal intervention.

But Williams, who represents schools serving large immigrant communities, said attendance at some schools has taken a hit.

Around the country, educators have been on alert since Trump, a Republican, in January directed the Department of Homeland Security to rescind a memo that barred officers from entering schools and churches without a supervisor's approval. They replaced it with guidance that urges officers to use "discretion and a healthy dose of common sense" before setting foot on a school campus.

The country's largest teachers unions filed a lawsuit last week over the immigration crackdown, saying fear stirred by arrests near campuses has led some children to drop out of school.

In response, Homeland Security officials said ICE agents have not entered schools to make arrests. "ICE is not conducting enforcement operations at, or 'raiding,' schools. ICE is not going to schools to make arrests of children," Assistant Secretary Tricia McLaughlin said in a statement.

Emma Leheny, an education attorney who worked for the Education Department under President Joe Biden, a Democrat, said fear can be pervasive even if ICE agents don't enter a school.
"As ICE encircles our local schools or leaves us with the impression that they might, the effect is an immediate chill that extends beyond the school building into the neighborhood and the community," Leheny said.

## Many children of those targeted are US citizens

Across the United States, in 2023 there were 4.6 million U.S.-born children who lived with a parent who did not have authorization to be in the country, according to the Pew Research Center. Another 1.5 million children were without legal permission themselves.

For children separated from their parents, the toll is especially steep.

The mother of three from Guatemala said her sons now sleep in her bed and wake in the middle of the night crying. This week, her husband arrived in Guatemala. She is contemplating returning to her home country because without child care, and while she fears deportation, she cannot work.

"My dream was to give them the best education, the one I didn't have," she said.

Her eldest son wanted to be a doctor, and her middle child a police officer.

"That American dream," she said, "is gone."

A free press is a cornerstone of a healthy democracy.

Support trusted journalism and civil dialogue.

**Donate now →**

*By* — **Moriah Balingit, Associated Press**

# Exhibit 30

*Democracy Dies in Darkness*

# ICE is joining D.C. police patrols. Moped drivers are getting detained.

Before Trump's crusade against 'out of control' crime in D.C., most delivery drivers were let go after traffic stops. Now they are being sent to immigrant detention centers.

Updated August 21, 2025

By Teo Armus, Dan Rosenzweig-Ziff, Emily Davies, Jonathan Baran and Mariana Alfaro

A growing number of delivery drivers, most of them from Central or South America, are being detained by federal agents on D.C. streets and put into immigration detention in one of the most visible and high-profile effects of President Donald Trump federalizing the D.C. police force.

Many of these cases are the result of a new practice: Immigration and Customs Enforcement agents are accompanying D.C. police officers on moped traffic stops to determine the immigration status of those delivery drivers, and then detain and deport them if they are in the United States illegally, according to three police officers who spoke on the condition of anonymity because they were not authorized to speak publicly.

One D.C. police officer said ICE agents stand behind them while making traffic stops. As police ask for registration, license and proof of insurance to make sure someone can legally drive, the agents "are using that information to determine immigration status," the officer said.

Before last week, D.C. police's efforts to enforce moped laws — meant to address complaints about food delivery drivers speeding and weaving through traffic — resulted mostly in immediate releases.

But with ICE officials joining police officers on their patrols, more people are landing in detention. The arrests, filmed in public and posted to social media, have gone viral and have had a chilling effect among moped drivers, leaving many afraid to pick up orders and some of their busiest gathering spots deserted.

Podcast episode

One night under Trump's D.C. crackdown



Washington Post journalists head out for a tense night on one of D.C.'s busiest corridors during the first weekend of President Donald Trump's federal takeover.

Play now 28 min Follow on

The Washington Post reviewed nearly 100 videos and photos documenting federal and local law enforcement activity in D.C. since Aug. 11, when Trump announced he would place the D.C. police under federal control and deploy the National Guard on city streets to fight crime. The Post found 23 videos that showed ICE officers, who were identified by their uniforms, present for law enforcement stops. It's unclear from the footage whether the incidents were immigration-related.

At least 11 of the stops involved delivery drivers, and in each one, ICE was present.

DHS spokesperson Tricia McLaughlin said in a statement Thursday that "President Trump was clear: he will make DC safe and beautiful again. In less than a week, ICE and CBP arrested gang members, kidnappers, drug traffickers, and other violent thugs. We will support the re-establishment of law and order and public safety, so Americans can feel safe in our nation's capital."

D.C. police did not respond to a request for comment.

Asked to respond specifically to concerns that routine enforcement of traffic violations and registration issues with mopeds could allow ICE to detain more drivers, Mayor Muriel E. Bowser (D) said: "We are exploring any additional guidance that our officers need."

She also pointed to pending litigation over an order that U.S. Attorney General Pam Bondi issued last week seeking to compel the D.C. police to "fully cooperate" with federal immigration enforcement. The city sued the administration, but a judge signaled in court last week that she is likely to allow Bondi's order. Guidance for D.C. police on working with ICE has been unclear since then.

Violent crimes in the city have been declining since 2023. Thirty-one percent of District residents say crime is an "extremely" or "very" serious problem in the city, down from 50 percent in May and 65 percent in spring 2024, according to a Washington Post-Schar School poll.

D.C. advocacy groups, moped drivers, witnesses and lawyers have suggested that the Trump administration appeared to be using the police takeover to ramp up immigration enforcement within the District.

Nithya Nathan-Pineau, an attorney at the Immigrant Legal Resource Center, said that the moped drivers were especially easy targets for immigration enforcement. The drivers work in a largely unregulated industry known to be filled with immigrant workers and almost exclusively in public spaces, where it is easier to make a warrantless arrest.

That has also made many of those arrests visible to many bystanders, especially in the dense, affluent neighborhoods close to downtown D.C. In one of the earliest and highest-profile of these incidents — witnessed and filmed by a Post reporter on Saturday — federal officers tackled and detained Christian Carías Torres, a Venezuelan national, as passersby asked what agency the officials worked for. District officials have said no D.C. police officers were at the scene.

McLaughlin said in a statement Wednesday that ICE had placed Carías Torres into removal proceedings and called him a “suspected gang member,” an allegation the Trump administration has repeatedly used without providing evidence.

In the days since, many drivers have temporarily relocated to other cities, they told The Post. Some have tried to limit their orders to the Maryland suburbs or switched to bikes. Others have stopped working altogether. Only the few drivers with work permits and open asylum applications are going onto the streets, half a dozen said in interviews.

"You don't want to go outside," said Yonatan Colmenarez, an asylum seeker who arrived from Venezuela two years ago and who has driven a moped around D.C. since then. "It gives you a kind of emotional damage; you're not sure who they might be."

He said he has ventured out only twice since Trump's announcement.

Drivers like Colmenarez often work for DoorDash, UberEats or Grubhub, companies that immigrants without work authorization are drawn to because of lower barriers to entry, experts say. Food delivery workers are typically independent contractors, meaning they do not need to go through the verification hurdles required for direct employees of companies. In many cases, applicants need only provide a Social Security number and a valid driver's license.

In statements to The Post, spokespeople for DoorDash and Uber said their workers must complete background checks, among other requirements, to deliver food orders.

More than 15 states, as well as the District, allow undocumented immigrants to hold driver's licenses. Immigrants whose work authorization has been ended by the Trump administration may be continuing to work on gig economy apps if they have a valid driver's license, although companies are legally barred from contracting with workers they know to be unauthorized to work.

Gabriel Ravelo Torrealba, 22, never attained a work permit or a driver's license but nonetheless managed to deliver for DoorDash by registering as a biker, relatives said, after entering the United States from Venezuela through an appointment on the CBP One app in December 2023.

Last year he got into a crash on his moped, the victim of a hit-and-run that left him in the hospital for three months and in recovery for another two. After he recovered, he dipped into his savings to buy another scooter.

"I don't want to be a loser. I want to make you proud," his mother, Lorenza Torrealba Olivo, recalls him telling her.

In an incident that has since gone viral, Ravelo was driving his moped Tuesday morning when a D.C. police cruiser pulled up beside him, video shows. Soon after he was detained, an ambulance arrived at the scene. He told his family he was handcuffed and taken to the hospital after suffering injuries to his hand and leg in the arrest.

Ravelo was taken on Wednesday to a detention center in Virginia, he told family members after he arrived. His mother said Ravelo had received a deportation order.

ICE did not respond to a request for comment on his case.

Other cases have not been documented on video but have left family members in a similar spot.

Jose Peña, a Salvadoran man who arrived in Maryland nearly three years ago, recently lost his job in construction and bought a motorcycle last week, hoping to make up that income by delivering food on DoorDash, his brother Alexander said. He is in the country illegally and had previously been detained while attempting to cross the border.

Peña, who lives in New Carrollton with his 16-year-old son, was out for his first full day as a DoorDash delivery driver Saturday morning when he went missing, his brother said. By 2 p.m., nobody in the family could get in touch.

It was only after a missing-persons report was filed that a Howard County police officer investigating the case found the only record of Jose Peña's disappearance — a log made about noon Saturday in an ICE database. An officer from an unknown agency appears to have looked up Jose Peña's record, his family said the officer told them.

"My brother has gone missing. There's no other word for it," Alexander Peña said on Tuesday morning. "We don't know if he's been kidnapped, we don't know if he's been in an accident, we don't know if he's alive. At this time, we know nothing from him."

In a brief call Tuesday night, Jose Peña told his family what happened: He had been approached by police near a Walmart in the Fort Totten neighborhood and was told there was an issue with his motorcycle plates. When he was unable to produce documentation, the officials arrested him and turned him over to ICE, an agency within the Department of Homeland Security.

A senior DHS official in a statement Wednesday called him "a criminal illegal alien with suspected gang ties" and said he lied to law enforcement about his country of origin and had faced criminal charges in El Salvador — all charges that family members denied.

That afternoon, his location finally showed up in an ICE locator the family had been filling out all week: Peña was now in an immigration detention facility near Richmond.

*Lauren Kaori Gurley, Jenny Gathright, Olivia George and Warren Rojas contributed to this report.*

---

**Make the most of the DMV with our newsletter**

Make living in D.C. a little easier and more fun. Sign up for the Post Local newsletter to get local news, weather and expert advice — where to eat, where to drink and how to get around — every weekday.

(The Washington Post)

## What readers are saying

The comments reflect a divided opinion on the collaboration between ICE and D.C. police targeting moped delivery drivers for immigration enforcement. Some commenters express concern over the targeting of vulnerable workers and the potential for racial profiling, arguing that it... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# Exhibit 31

U.S. NEWS

# Detentions of D.C. delivery drivers leave immigrant communities on edge

A series of videos showing federal agents conducting operations in D.C. has sparked immigrant concerns as the Trump administration continues its federal takeover.



An Uber Eats delivery driver is arrested Saturday in Washington, D.C. Tyler DeSue

Aug. 19, 2025, 5:00 AM EDT

**By Didi Martinez**

Washington, D.C., resident Tyler DeSue woke up tired and craving breakfast Saturday morning, so he did what many people in that situation would do: He used Uber Eats to put in an order for burritos.

When his driver took longer than usual, DeSue checked the app and noticed something seemed wrong – the delivery driver's GPS location had stopped short of his address. He went outside to look for him.

"I stepped into the street, I looked down and see lights in the direction, like police lights, in the direction of where my driver was," DeSue said in an interview. "It was my driver by himself and, like, nine different officers all wearing different uniforms. ... Most of them had face coverings on."

Video shows masked law enforcement arresting man in Washington, D.C.

01:09



When DeSue went to investigate, the driver – whose name appeared on the food app as "Sidi" – was being questioned, first about his vehicle's registration and then about his immigration status, he said.

"You're gonna come with us, you're gonna come with us today," a masked agent can be heard telling Sidi in video that DeSue recorded and provided to NBC News.

"Can you tell me in Arabic, please?" Sidi says, adding that he did not understand what was being said and that he was nervous.

One of the agents, wearing a vest emblazoned "POLICE HSI" – short for Homeland Security Investigations, a part of Immigration and Customs Enforcement – replies that they do not have an Arabic translator. The men then cuff Sidi's hands, waist and feet before they put him in an unmarked car. DeSue said he has since reported the incident to Uber.

NBC News has not been able to verify the driver's full name, nationality or location, and Uber did not immediately respond to a request for comment.

The incident is one of several arrests of delivery drivers recorded by eyewitnesses across the Washington area that have gone viral since the Trump administration took over law enforcement in the nation's capital last week.

The videos, scattered across social media and shared among D.C. delivery driver chat groups, are having a chilling effect on the drivers themselves. Some of them have chosen to stop making deliveries in the city.

It has been "five days since working, looking at what to do. And, well, closed down here waiting for things to pass, because I don't know what to do," a D.C.-area delivery driver who did not want to be named told NBC News in a voice message in Spanish.

On Sunday afternoon, DeSue said, an area where 15 to 20 delivery drivers typically would be parked out front of his home looking at their phones for their next orders was an empty lot.

"I haven't seen a driver anywhere in the last two days," he said.

Some other D.C. residents have noticed the dwindling presence of delivery drivers, as well.

"The number of people who come to pick up orders has diminished," said Clarissa Vasquez, who works at a restaurant in the Columbia Heights neighborhood. "We are at 4% of the people who come to pick up food."

Last Thursday, Vasquez witnessed and recorded the arrest of a delivery driver named Josue Mercedes Franco Cerros, who she said would often come by the restaurant to pick up deliveries.

"He was in front of the restaurant when I see that there are two policemen and they have him," Vasquez said. "They didn't give a single explanation. The police would tell him to lift up his hair

because they wanted to take a photo. The guy was nervous, he was in shock, crying, of course, because he was working, and for the police to arrive all of a sudden, anyone would get nervous."

Cerros, a Honduran national, was eventually taken away by law enforcement. His bike was loaded on a truck with the logo of D.C.'s Metropolitan Police Department on it, according to Vasquez and video obtained by NBC News. Almost a day later, Cerros appeared on the ICE detainee locator database in ICE custody in Virginia, where he remained Monday evening.

Veronica Gonzalez, a friend of Cerros', said he had been living in the area for at least 10 years and had worked delivery during the day and at a local restaurant at night.

"He never thought that something would happen," Gonzalez said. "Because all that we saw in the news, I said, 'Son, you have to be careful.' And he would say, 'No, no, I don't think anything will happen.'"

The Department of Homeland Security did not immediately respond to a request for comment on the detentions of Cerros and Sidi or to a question about whether the detentions of delivery drivers like them are part of a coordinated effort to stop and check the immigration statuses of delivery drivers. The Metropolitan Police Department referred questions to the mayor's office, which did not immediately respond to request for comment.

Atenas Estrada, a deputy program director with the nonprofit Amica Center for Immigrant Rights in Washington, said that the center is also aware of similar reports about delivery drivers and that such instances can contribute to fear within both undocumented and documented immigrant communities.

"What I am seeing, personally, is widespread fear amongst community members. People, you know, making decisions or avoiding places that they perhaps would not otherwise avoid or leave," Estrada said.

As for Tyler DeSue, who has since made a series of TikTok videos about Sidi's arrest, he has decided to temporarily stop using delivery apps out of concern for the drivers.

"I made a video on it, about, you know, stopping using Uber Eats, DoorDash, and I know a lot of friends who stopped using it," he said.

---



Didi Martinez

Didi Martinez is a producer for NBC News' national security unit.

# Exhibit 32

EXCLUSIVE

NATIONAL SECURITY

# Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests

For years, officers were required to fill out "homework" before operations. But, one source noted, "it's hard to fill out a worksheet that just says, 'Meet in the Home Depot parking lot.'"

ICE scraps paperwork for officers before arrests

02:37

00:36 / 02:36

Get more news LIVE on NBC NEWS NOW.

Sept. 9, 2025, 5:00 AM EDT / Updated Sept. 9, 2025, 6:57 PM EDT

**By Julia Ainsley, Didi Martinez and Laura Strickler**

For more than 15 years, before they conducted any operation to arrest an immigrant in the United States, officers with Immigration and Customs Enforcement's Enforcement and Removal Operations division have been required to fill out a form with details about their target – name, appearance, known addresses and employment, immigration history, any criminal history and more – and give it to a supervisor for approval.

This year, in a sign of how the agency has moved from targeted enforcement to broad street sweeps under the Trump administration, that policy has been ended, six current and former officials and agents of ICE and the Department of Homeland Security told NBC News.

“It’s hard to fill out a worksheet that just says, ‘Meet in the Home Depot parking lot,’” one of the former ICE officials said.

The policy shift sheds light on the way ICE is now operating ahead of anticipated immigration crackdowns in Chicago and Boston, and it helps explain the seemingly spontaneous nature of recent arrests in Los Angeles and Washington, D.C.

Both Darius Reeves, the former director of ICE’s Baltimore field office, and two former officials with DHS, under which ICE falls, said the form, known as a field operations worksheet, had been required for nearly every arrest the division made. The only exceptions, they said, were instances in which ICE was called out to assist local law enforcement agencies.

The exact date of the change is unclear, but it happened before this summer. Reeves, who left ICE in May, said that he was made aware of it before he left and that it was communicated down from DHS leadership. The decision was made because of a perception that the worksheet is “a waste of time,” he said, but he said he believes it is actually “a very valuable necessity” now “bypassed … so they could keep constantly flooding the streets” with officers. Reeves said that, even though the worksheets are no longer mandatory, he knows some officers are still using them out of concern for future legal liability.




ICE and other federal agents take a delivery driver into custody at Union Station in Washington, D.C., on Aug. 16. Andrew Leyden / Getty Images file

Top Trump administration officials, like border "czar" Tom Homan, have said they are prioritizing detaining and deporting immigrants with criminal histories – people whom Homan calls "the worst of the worst." But that kind of focused work is at odds with President Donald Trump's promises to conduct the largest mass deportation in American history, sending "millions and millions" of people out of the country. As a result, ICE has been under immense pressure to quickly increase the number of immigrants it is arresting, with less regard for whether they have any criminal histories.

NBC News has reported that in a meeting in May, White House deputy chief of staff Stephen Miller berated ICE officials, threatening to fire the leaders of field offices that conducted the fewest arrests each month if the agency did not begin making at least 3,000 arrests a day.

Since then, ICE has moved toward conducting broad sweeps in places frequented by immigrants –for instance, Home Depot parking lots, where some undocumented people congregate hoping to be hired for construction and other work – and neighborhoods where they live. Social media

users capturing viral videos from around the country have alleged officers are profiling rather than specifically targeting individual immigrants.

ICE did not respond to requests for comment before this story was published.

After initial publication, however, DHS Assistant Secretary Tricia McLaughlin sent NBC News a statement in which she did not directly address whether the requirement that officers complete an FOW had been eliminated.

"ICE replaced this inefficient and outdated paperwork with a streamlined tech-based platform. This more efficient system cuts down on time and allows our law enforcement officers to spend more time out in the field," she said. "We still have the same information of who we are targeting well ahead of time-including name, appearance, known addresses, employment, immigration history, and criminal history. The only change is instead of manual paperwork-we now are using technology to make our officers more efficient."

Asked about this statement, Reeves said DHS leadership did not provide a new platform as an alternative when the policy mandating FOWs ended.

According to Reeves and two of the former officials as well as a former agent, the FOWs had already been completed electronically, not on paper, and using information taken from computerized databases.

## Targeted vs. profiling

Immigration enforcement is likely to ramp up soon in Chicago, where there are several predominantly Latino neighborhoods. DHS is building a staging area at a naval base north of the city and bringing in additional ICE and Border Patrol agents to conduct more immigration arrests this month, two federal law enforcement sources familiar with the plans said.

ICE officers are working on a list of "high-value" targets to arrest in Chicago, one of the current DHS officials said, such as immigrants who have committed crimes.

Scott Shuchart, who was ICE's assistant director for regulatory affairs and policy during the Biden administration, said the efforts in Los Angeles and Washington have also involved ICE's making more random arrests to boost numbers. He did not have knowledge of the policy change to discontinue the worksheets but said that, previously, they were used to show officers had done their "homework."

"There would be a reason that you go for Peter rather than Paul," he said. "They are now interested in numbers, and if you are interested in numbers, you do things like wandering around racially profiling people."

DHS and ICE have denied that they are racially profiling. Homeland Security Secretary Kristi Noem has told reporters that "every single operation" ICE conducts is based on "investigative work and on casework."




An Immigration and Customs Enforcement police SUV patrols the National Mall in Washington on Aug. 24. Jose Luis Magana / AP file

Acting ICE Director Todd Lyons recently told NBC News that the agency is not profiling, but rather conducting "targeted enforcement operations."

One of the former DHS officials said that terminology, though, does not mean ICE officers know in advance whom they are arresting.

Another of the former ICE officials said: "They're bending the definition of 'targeted' to conform with their operations. By 'targeted,' they might mean going to an area where they can find immigrants."

And in July, a federal judge in Los Angeles issued a temporary restraining order blocking ICE from conducting "roving patrols" and from relying on people's races or other factors, like their speaking Spanish, as reasons to detain them.




Federal agents block people protesting an ICE immigration raid at a nearby licensed cannabis farm near Camarillo, Calif., on July 10. Mario Tama / Getty Images

An analysis by David J. Bier, the director of immigration studies at the libertarian Cato Institute, found that ICE arrests in the Los Angeles area fell 66% after the judge's order. Data obtained through a Freedom of Information Act request by the Deportation Data Project, Bier noted, showed that ICE had made 756 arrests in the area in the week leading up to the judge's order. Two weeks later, the number was at 258.

On Monday, the Supreme Court voted 6-3 to lift the judge's order and the restrictions it had placed on stops in the Los Angeles area.

Similar operations appear to have been taking place in Washington. Raquel Sánchez told NBC News that she had been seeing federal officers around her neighborhood in August. Then, early one morning, she and her husband, Jesus Muñoz Colorado, were driving to work when they were stopped by a group including ICE officers. Seven unmarked cars surrounded their vehicle, blocking it from moving forward, she said, and then officers knocked on the car door and told the couple to roll down the windows or they would shatter them.

It is not clear whether Sánchez and Colorado were specifically targeted for arrest, but they were not outside of their home when they were stopped, and Sánchez said that as far as she could tell, the officers did not know their names. Video of the stop provided to NBC News shows them telling officers that they are going through the process of applying for U visas, which is given to victims of certain crimes and people who have information about those crimes and can be helpful to law enforcement, as well as their family members.



An ICE operation raid at Huntington Park in Los Angeles on June 13.
Department of Homeland Security / Anadolu via Getty Images

Sánchez and Colorado were handcuffed and taken to a local ICE facility. She spoke with NBC News after she was released; he is still in detention.

Their lawyer, Julia Toro, who has been practicing immigration law in Washington for 20 years, said that since the immigration crackdown there began, she has had eight clients without criminal backgrounds who have been arrested.

"The officers ask them, 'Do you have any documents and do you have any papers? Show me,'" she said. "It's not like they know who they are picking up. They are arbitrary stops."

In a statement provided to a reporter with Telemundo 44 in Washington, which is also part of the NBC News Group, an ICE spokesperson said, "Jesus Munoz-Colorado and his wife Raquel Noemi Sanchez-Monge, are illegal aliens with no lawful status to remain in the United States." The spokesperson also said that neither "have any pending visas to lawfully remain in the U.S."

## Liability for officers?

Several of the current and former ICE and DHS officials who told NBC News about the end of the policy mandating use of the field operations worksheets also said that the worksheets were not about just planning or establishing justification for arrests: They also protect the officers. For example, Reeves said that though the form does not include a section about it, officers would often write and attach another sheet with information about whether someone targeted in an operation could be armed, information that helps keep officers safe.

The form could also help protect officers legally, they all said.

"For a professional law enforcement agency, you don't just fly willy-nilly. Crossing your T's, dotting your I's, checking with OPLA," one of the former DHS officials said, referring to the agency's Office of the Principal Legal Advisor. "They [ICE officers] may not believe it, but it's truly protecting them to make sure they are actually operating within their legal bounds."

Paul Hunker, who previously was ICE's chief counsel in Dallas, said the worksheets officers filled out could be used to protect them in lawsuits. Officers could be sued for civil rights violations if they make arrests without probable cause, he said.

"What's critical is that ICE has to articulate probable cause to arrest, so the worksheet might be helpful for them if they get challenged on that," Hunker told NBC News.

---



Julia Ainsley

I am NBC News' Senior Homeland Security Correspondent.

---



Didi Martinez

Didi Martinez is a producer for NBC News' national security unit.

---

Laura Strickler

Laura Strickler is the senior investigative producer on the national security team where she produces television stories and writes for NBCNews.com.

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-3417 |

**DECLARATION OF JOSÉ ELISEO ESCOBAR MOLINA**

I, José Eliseo Escobar Molina, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is José Eliseo Escobar Molina. I was born in El Salvador in 1978, and I am currently 47 years old. I first came to the United States in 1998 and I have lived in the District of Columbia since approximately 2000. I have Temporary Protected Status (TPS), which I first applied for in 2001. I have continued to renew my TPS each time since then, including most recently in February of this year before the March application cutoff date. My renewal application from February is still pending, and my TPS is currently valid.

2. Since I first arrived in the U.S., I have traveled approximately three times on advanced parole to visit my family in El Salvador, including my parents and siblings who still reside there, and have returned to the U.S. without issue.

3. I live in an apartment in the Mount Pleasant neighborhood of DC. I live with my partner and two sons, and we have lived there for about eight years. My partner and I have been together for 21 years, and our two sons are both U.S. citizens because they were born here. My eldest son currently attends a university in DC, and my younger son, who is a

minor, goes to public school. I enjoy spending time with my sons and going with them to the local park when I am not working.

4. I work full-time in construction, specifically as a scaffolder. With my work in scaffolding, I travel throughout DC, Maryland, and Virginia to different job sites.

5. On August 21, 2025, at approximately 6:00 am, I left my apartment building dressed in my work clothes and was on my way to my work truck, which was parked across the street from the apartment building where I live. I had walked across the street and was about to get into the driver's seat of my truck when two Suburbans, one white and one black, drove up. Officers dressed in plainclothes got out of the vehicles. First, two of them grabbed me by the arms and immediately handcuffed me, and then the two officers from the other Suburban came over and grabbed me by the legs.

6. The officers weren't wearing uniforms or badges, and they did not identify themselves. I felt like I was being kidnapped. They called me "illegal" repeatedly, and I responded that I have papers. They said, "No you don't. You are illegal." They did not ask for my name or to see my identification, which I had with me in my wallet, before handcuffing me. After they handcuffed me, they took my wallet from my pocket but did not look at what was inside.

7. Pulling me by my limbs, they shoved me into the black Suburban. Once in the car, I told them again that I had papers. The driver of the car, who was one of the officers that handcuffed me, told me, "Shut up bitch! You're illegal." After he yelled at me, I stayed silent. I did not try to resist arrest or to flee.

8. None of the agents at any point ever identified themselves, presented a warrant, explained why they stopped me, or indicated that they knew my name prior to stopping me. Nor did any of them ask me any questions about my ties to the community, how long I've

been living and working in DC, my family here, or anything else about my circumstances.

9. Then the two officers drove me to a local police station about eight minutes from my home. There, the officers who arrested me waited to speak to a supervisor, but I couldn't hear their conversation. We were parked there for about 15 minutes.

10. Next, I was driven to a parking lot, which was near the Pentagon and about 15 minutes from the police station. Here, there were about four vans with two officers per vehicle, and the officers had badges and jackets that read "Department of Homeland Security." These officers were waiting to collect people who had been arrested in order to transport them to Chantilly, Virginia. I was taken out of the Suburban and put into a van. I was not asked any questions before being put in the van, not even my name. I saw other cars drive up and drop off other people who had been arrested; some were put into the same van as me.

11. At around 9:00 am, I arrived at Chantilly. I had to wait about four hours to be interviewed and processed, so I was kept in a holding cell with about 65 other people. The area was so crowded that it was impossible to lie down and sleep. I was fed one small bean burrito, something sweet, and a glass of water during my entire 23-hour stay at Chantilly. It was very expensive to make any calls at the facility but I had no other choice. I called my son to help me find a lawyer.

12. About four hours after my arrival, I was finally called into a small room where they took my fingerprints and asked me questions like my name, what country I am from, and my parents' names. An officer, whose shirt said "Homeland Security," asked me the questions in Spanish, and the process took about 40 minutes. During the interview, I saw the officer was holding my work permit in his hands. The work permit specifies that I

have TPS. I was hopeful that the officer knew I had TPS and would release me.

13. Once the process was done, I was sent back to the holding cell where I spent the night. I did not sleep. In the early morning, I was called out of the holding area and shackled again. I became concerned and told one of the officers I had TPS. He said, "That's not legal status. TPS doesn't count as being legal here." At around 8:00 am, I was transported to an office in Richmond, Virginia.

14. The drive to Richmond was about two hours, so we arrived around 10:30 am. As I entered the building, there was a supervising ICE officer with a paper in his hand. He asked for my name, and I responded. Shortly after this, the same officer approached me and said he did not know why I had been brought to Richmond and that the officers had made an error in arresting me because I have TPS. He said to me, "Sorry you had to live through this. These are new officers. They do not know what they are doing." He apologized to me three times and said I was free to go. He gave me a copy of my TPS approval notice and told me to carry it with me so I could show it if officers stopped me again. After waiting a few hours for my son to come pick me up, I left the Richmond office around 2:30 pm on August 22, the day after I was initially arrested.

15. I have not received any kind of representation that I will not be subject to arrest or detention by ICE or by law enforcement officials for immigration purposes in the future.

16. This is the first time I had been arrested by immigration officials or had any contact with ICE in my more than 20 years living in the United States.

17. I believe I was arrested solely because of my appearance and because I live in an area with a lot of immigrants. It was clear that the officers did not know who I was, did not have a warrant, and did not have a reason to arrest me.

18. I live and work in DC, and I am very scared that I may be arrested and detained again.

Recently, I saw a police car followed closely by a Suburban pass by my apartment building, and the Suburban looked a lot like the one driven by the officers who arrested me. And I have heard about many other people arrested by ICE in my area of D.C. I fear the same for my sons because even though they are U.S. citizens, they are Hispanic just like me. I told them to carry their U.S. passports with them at all times just to be safe.

19. After this arrest, I have not been physically or mentally well. I still have pain from when the officers grabbed me by my arms and legs and pushed me into their vehicle while I was handcuffed. I have nightmares where I relive my arrest or about being arrested again.

20. Although I am still working, I have changed my habits out of fear. I leave the house even earlier and will check outside two or three times before exiting my apartment building. I'm hesitant and worry that officers might be around the corner or following me. I used to go to the park with my sons in my free time, but now I do not go because I do not want to be arrested on the way or for my sons to see me being arrested, which would traumatize them. When I am not working, I rarely leave my house.

21. Since my arrest, my partner has stopped going to work often due to fear that she too will be detained, as she has to travel on the Metro to her job. Now, she can only go to work one or two days a week, normally on the weekends, and I have to drive her.

22. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to represent a class of people in D.C. who have been arrested without a warrant and without proper reasons.

23. If the Court recognizes this case as a class action, I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about

the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

24. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.

25. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.

26. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible for directing the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary. I understand that I may need to answer questions from the government's lawyers in writing or in person.

27. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

28. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American Civil Liberties Union, the National Immigration Project, the Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

29. This declaration was read to me in full in Spanish on September 21, 2025, by a lawyer leading this case, Ian Austin Rose. I confirm and completely understand the contents of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2025.

José Escobar Molina

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSE ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-3417 |

**DECLARATION OF B.S.R.**

I, B.S.R., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is B.S.R. I was born in Honduras in 1996, and I am currently 29 years old. From 2019 until very recently, I lived in the Fort Lincoln neighborhood of the District of Columbia with my family, including my mother, father, partner, and daughter who is 13 months old and is a U.S. citizen.

2. I entered the United States with a visa in 2019 and have lived here ever since. I have a pending asylum application. From 2019 until earlier this year, I had not been arrested by or had any contact with immigration officials.

3. On or about January 28, 2025, in the morning, I was arrested outside a Home Depot in Bowie, Maryland by a group of federal officers, including some from Homeland Security. I was riding as a passenger in my boss' car. We had left our workplace to pick up some supplies at Home Depot. As we turned into the entrance to Home Depot, a car crossed in front of us and suddenly stopped, and another vehicle pulled up and stopped behind us.

4. A group of officers got out of those two vehicles, approached the car that I was in, and started banging on the windows. Two of the officers were wearing jackets that said "HSI," but the rest were dressed in black jackets and plainclothes. I noticed they were armed. The officer who came to my window on the passenger side of the car showed me what seemed to be a Border Patrol badge.

5. My boss, who was in the driver's seat and is a U.S. citizen, refused to roll down the car windows and told the officers they did not have the right to search the car. The officers began to threaten to break the windows. Much of the exchange between my boss and the officers was in English. I was scared that I would be beaten by the officers as they continued to yell, so I decided to get out of the car and follow their orders.

6. As soon as I got out of the car, the officers made me stand up against the car and handcuffed me. One official grabbed me by the neck even though I was following their orders. The officers did not ask me for my name or my identification at this point. They asked me if I was "illegal," and I did not respond. I heard one officer say, "Well, we'll figure it out anyways if you are."

7. At that point, the officers did not ask me any questions about my ties to the community, how long I've been living or working in the area, or anything else about my circumstances. They also did not give me any papers or show me any warrant for my arrest.

8. They drove me to a nearby shopping center, and there, the officers had me get into an unmarked van with two other people who had been arrested. There appeared to be a team of officers making arrests and another group of officers responsible for transporting people who were arrested. In the van, they asked for my name, which I gave. A male

officer told me not to worry and that he would try to make it so I could be released the same day.

9. I was taken to an office in Chantilly, Virginia, where I was held overnight. I was fingerprinted when I got there. The next morning, an officer interviewed me about my situation. He gave me a paper saying I need to appear in immigration court. Then they said I would be released. My partner came and picked me up from the Chantilly office and drove me back to our home in the District of Columbia.

10. As a condition of my release, I had to start attending check-ins with ICE and agencies that work with them. The first appointment was in March 2025 at an office in Virginia, and the second was in May. During my second check-in, the officer who was assigned to my case that day told me that there was a new rule that everyone was to be given ankle monitors, and so I was given an ankle monitor at that appointment. I continue to wear the ankle monitor to this day. My next check-in is scheduled for December 2025.

11. After I was released, I did not return to work at the same job site, but I did continue to work in remodeling. I hired a lawyer who helped me file my asylum application in June, and I plan to attend my next immigration court hearing in December of next year.

12. On August 18, 2025, at around 7:45 in the morning, I was arrested for a second time–outside my home in the Fort Lincoln neighborhood of the District of Columbia. I walked out of my house with my father, and we got into the car to go to work. Once my father and I were in the car about to drive away, a group of officers approached us. They were dressed in plainclothes, wearing sneakers and jeans and had arrived in front of my home in two unmarked vehicles, a truck and a minivan. The officer who approached my

side of the car held up what seemed to be a Border Patrol badge to the window, but the others did not have a badge or anything that identified them.

13. The officers seemed to know who my father was because one of the first things they said after they approached our car was that my father had overstayed his visa. They asked for his ID, which he gave them. They said, "This is him." The officers started to question my father, but he responded that he would not answer their questions.

14. My father and I did not make any attempt to drive away, and we got out of the car following their orders. The officers handcuffed my dad. Then, to my surprise, they handcuffed me too. The officers handcuffed me without first asking me any questions. They did not ask my name or check my ID. Once I was in handcuffs, I told them I was already in an immigration process and had applied for asylum. I used my fingers to pull up my pant leg and show the officers my ankle monitor. They asked me when and where I was arrested, and I responded in January near Baltimore. But they said it did not matter and that once I was in custody, they would figure out if what I was saying about my status was true or not. During this process, I did not try to resist arrest or to flee.

15. At that point, the officers did not ask me any questions about my ties to the community, how long I've been living or working in DC, or anything else about my circumstances. They also did not give me any papers or show me any warrant for my arrest.

16. My partner came outside and started to explain to the officers that I was already in an immigration process and had previously been arrested. The officers responded by saying, "Sorry, we came for two people, so we have to arrest two people." I think they came for my mother and father, but since I was there, they took my father and me.

17. The officers then drove me to a nearby shopping center where there is a Costco. Once in the shopping center parking lot, which was about ten minutes after I was arrested, one of the officers started asking me questions. He asked why I stayed in this country and my legal status. The officer became angry with me, so I stopped responding. At this point, I still had not been given any documents or any explanation about my arrest. We waited in the shopping center parking lot for about 30 minutes, and while there, my shoulders and back began to ache from being shackled.

18. Around 9:00 am, the officers moved me into a different vehicle and drove me and my father to the office in Chantilly, Virginia, the same location I was taken to after my first arrest. We arrived at Chantilly around 10:00 am. When I walked into Chantilly, I was hit with an awful smell of body odor. Some people told me they had been detained there for five or six days and had not been able to shower or even brush their teeth. There were 50 to 60 people detained inside Chantilly when I arrived, and arrested individuals continued to arrive all day, groups of five or so people arriving every 40 minutes. It became so packed that people were forced to sleep on the floor and others had to stand for hours. Our only access to drinking water was out of the sink attached to the back of the toilet, and the water that came out tasted like bleach. While I was there, not everyone who was detained received food because there was not enough. I was only given food once during the time I was detained at Chantilly, at around 5 pm. It was a burrito and a bottle of water.

19. At around 8:00 or 9:00 pm at night, I decided to approach an official and show him my ankle monitor. It seemed that he was not from ICE but rather a custodian or jail guard. He escorted me out of the area where everyone who was arrested waits to be processed. He considered cutting off my ankle monitor, but I told him I was concerned that taking it off

could negatively impact my immigration case. He said, "Let me see what I can do," and left to speak with people from ICE. He returned and asked me for my A number, but because I did not know it by memory, I asked to call my partner who could find it in my paperwork at home. He said, "I'm not allowed to do that." I started to tear up, the officer left, and I waited for a while longer.

20. The officer eventually returned and told me I would be released. He did not give me any paperwork, only my belongings. I had to wait an extra hour or so before I could leave Chantilly because I insisted the officers return the battery for my ankle monitor and it took a while for the officers to bring it to me. I asked to use the phone to call my partner, so she could come pick me up.

21. Before I left Chantilly, I asked if I could go say goodbye to my father, who was detained in a separate area, because I did not know if I would ever see him again. The officer agreed, and I hugged my father. He was happy that I was being released, but it was one of the most horrible feelings I have ever experienced having to leave him behind. Thinking about that moment brings me to tears. As I walked out of Chantilly, the other arrested individuals clapped for me because I was one of the few people released that day.

22. Five days after our arrival at Chantilly, officers finally started "processing" my father, meaning taking his fingerprints and asking him questions. My father was detained at Chantilly for about six days without the opportunity to shower or brush his teeth, and he had to sleep sitting up because he did not have access to a bed. He witnessed a young man faint and ambulance workers come in and out of Chantilly several times because of several medical emergencies. Since his arrest, my father has been transferred to various immigration detention centers throughout the country.

23. I have not received any explanation as to why I was arrested. Nor have I received any kind of representation that I will not be subject to arrest and detention by ICE or by law enforcement officials for immigration purposes in the future.

24. I believe I was arrested solely because of my appearance and because ICE was trying to meet its arrest quotas. It was clear that the officers did not know who I was, did not present any warrant, and did not have a reason to arrest me.

25. Since the arrest, I have been scared that I may be arrested or detained again. Because of this, I moved to Landover, Maryland, just outside of the District of Columbia. For work, they send me to job sites in D.C., Maryland, and Virginia. Even if I am not working at a job site in D.C., I still have to drive through D.C. on my way to sites in Maryland or Virginia almost every day.

26. I am a plaintiff in this proposed class action lawsuit because I want to challenge the unjustified immigration arrests that are happening in Washington D.C.

27. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to represent a class of people in D.C. who have been arrested without a warrant and without proper reasons.

28. If the Court recognizes this case as a class action, I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

29. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.

30. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.

31. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible to direct the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary.

32. I understand that I may need to answer questions from the government's lawyers in writing or in person.

33. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

34. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American Civil Liberties Union, the National Immigration Project, the Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

35. This declaration was read to me in full in Spanish on September 21, 2025, by a lawyer leading this case, Ian Austin Rose. I confirm and completely understand the contents of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2025.

B[redacted] S[redacted] R[redacted]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, et al., *on behalf of themselves and others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>*Defendants*. | No. 1:25-cv-03417 |

**DECLARATION OF N.S.**

I, N.S., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is N.S. I was born in 1974, and I am 51 years old. I am from Venezuela. I entered the United States on or about October 13, 2022, and have lived in the United States ever since.

2. After I entered the United States, I turned myself in to Customs and Border Protection ("CBP") officers and was detained. I was released from custody with parole. I have a pending asylum application, which I filed in October 2023, and I am currently in removal proceedings with the immigration court. Based on my pending asylum application, I have a valid work permit. I also have Temporary Protected Status ("TPS") and have filed to renew my TPS. After I entered the country and was released from detention, I was required to start checking in with ICE. In November 2022, I attended my first appointment with ICE as well as additional appointments in November 2023 and November 2024. I never missed any of my ICE check-ins.

3. I work in construction and for a cleaning company, which has contracts to clean office buildings, warehouses, and public libraries throughout the District of Columbia. With my work in construction, I travel throughout D.C. and sometimes have work assignments in Maryland and Virginia. I have a valid driver's license from D.C.

4. I have lived in D.C. since 2024. Prior to living in the District, I lived right outside the city in Capitol Heights, Maryland, but traveled frequently into D.C. for work. Currently, I live in an apartment in the Fort Dupont neighborhood, where I live with my partner, who also has a pending asylum case, our 14-year-old child, my stepdaughter, and my grandchild. My other two sons live within ten minutes of me in the District. I plan to continue living here in D.C. to be close to my family.

5. On August 12, 2025, I was arrested around 7:20 am by immigration officers in the parking lot of the Home Depot located at 901 Rhode Island Ave NE in Washington, DC (zip code 20018). I woke up early that day and received some texts about a construction job. For my job, I was asked to go to Home Depot to buy materials for the job site. I left my house around 6:30 am, and it took me about 15 minutes to drive to Home Depot. After I finished purchasing the materials for the construction job, I walked out of the store with my cart of purchases when I saw people running and yelling, "ICE! ICE!" Because I was pushing the cart full of materials and I had my identification with me, I did not start running and instead walked to my car, a minivan, with my purchases. At that moment, I decided to call my family friend, who is an attorney and the person who helped me file my asylum application, to tell her ICE was there, and she encouraged me to stay calm.

6. I got into my car and turned it on. As I finished closing the car door and my hand was still on the door handle, an officer approached my car, opened the driver's side door, and

yelled at me, "Legal or illegal?" At this point, I was still on the phone with my family friend, who told me once more to remain calm. The officer was wearing a green vest that had the letters "DEA" on it, but he also wore a badge and a hat that said "ICE." His face was covered. After he quickly opened the car door, the officer grabbed my arm. I said "I am legal" and gave him my driver's license, my work permit, and a copy of my asylum application receipt that I keep in my wallet in my car. The officer had not yet asked me to get out of the car, and he seemed indecisive about what to do with me. I do not believe the officer knew who I was before he approached me because he did not show me any documents or a warrant and his question showed that he did not know my immigration background.

7. A second officer, who was dressed in plainclothes with a black vest that said ICE and had his face covered, walked up and joined the first officer. He said, "What's the deal?" The first officer handed him my identification documents. The second officer said, "No, no, no!," and said to arrest me. He told me I was an "illegal" and that "my papers are useless." The two officers pulled me out of the driver's seat, threw me up against the side of my car, and handcuffed me behind my back. At no point did I make any effort to resist arrest. Neither of the officers at any point ever identified themselves, presented a warrant, explained why they stopped me, or indicated that they knew me or my name prior to stopping me. The officers never asked me any questions about how long I have been living here, my family members, my work history, or anything else about my ties to the community.

8. Next, the two officers escorted me to an area of the Home Depot parking lot where several other handcuffed individuals were sitting on the ground. The officers demanded I

sit down too. I asked, "How can I sit down with my hands cuffed behind my back?" The officers pushed me down to the ground. A different officer came and moved my handcuffs to the front.

9. I asked the officers if they could escort me back to my car so I could turn it off and collect my phone, wallet, and keys. They agreed and took me back briefly and gave me a clear bag for my belongings, which the officers had me hold.

10. The scene outside the Home Depot was chaotic. There were about ten cars that belonged to the officers who were making the arrests and about 20 officers present. Some people were running out of fear, and one man who ran away from the officers was shot in the back with what I believe were rubber bullets. He fell to the ground and hit his head, and the officers tackled and arrested him. I later saw him at the Chantilly ICE office for a brief period of time, and he looked very beaten up.

11. I sat on the ground with about eight to ten other arrested people for about 20 minutes. In another area of the parking lot, there were about 15 other handcuffed individuals sitting down. While I was waiting, I asked to see a warrant, but I was told to be quiet. Then, I was put in the back of a van with another young man, who was also in handcuffs and crying. The young man was wearing his work uniform when he was arrested and had also been at Home Depot buying materials. There was only one immigration officer driving the van.

12. Leaving the Home Depot, we drove along Rhode Island Avenue for about ten minutes until we arrived at a parking lot that was next to a hospital. Several other cars pulled into the parking lot, and the officers got out of the vehicles, but I was not taken out of the van. The officers started speaking with each other, taking off their vests, and taking pictures

with each other. We were waiting there for about an hour. Once we left this parking lot, the officer drove us around the District of Columbia for a while, and we even returned to the Home Depot where I was arrested. I witnessed officers drive in front of a white work van, break into the van, and throw the man who they arrested on the ground, which was shocking to watch.

13. At around 2:00 pm, I arrived at the ICE office in Chantilly, Virginia. I was taken to a room that was full with about 40 other people. Here, I was able to make a collect call to my son who paid about $60 to speak to me for around five minutes. In the holding area, I began to speak to others about where they had been arrested. Some said Home Depot or in the street. If we tried to ask the officers questions, they yelled at us, "Gossiper! Motherfucker!" Meanwhile, some of the officers were chatting with each other about the arrests that they had made that day, showing each other videos while they smiled and laughed. "I got six!," yelled one officer. "No, I got five!" said another, as if it were a game to them.

14. I waited several hours in the holding area, until I was escorted out at around midnight. I still had not been interviewed, processed, or fingerprinted at this point. I was handcuffed and shackled at my feet and put on a large bus. I was really scared because I didn't know where they were taking me, and the handcuffs and shackles were so tight I could barely move. We were driven about two hours from the Chantilly office, and around 2:30 am on August 13, 2025, the bus arrived at a detention center. An officer escorted us off the bus and took us inside for processing, where I was fingerprinted, was asked some basic questions, and had my picture taken. I was given some bread, an apple, and a bottle of water. Having eaten next to nothing all day, this was one of the best-tasting apples I've

ever had. After processing–now around 4:00 am–they escorted a group of us into a large space that was like a gym where there were mattresses on the floor and told us this is where we would sleep. However, I only got a couple hours of sleep because at around 6:00 am, we were woken up to be handcuffed again and transported back to the Chantilly ICE office.

15. On August 13, 2025, I spent the entire day at Chantilly. I was not processed until 4:00 or 5:00 pm. During processing, the officer asked if I was there for entering the country illegally. I was confused by his question and said I have a pending asylum application and TPS. The officer took my fingerprints and my pictures, asked for my current address, and asked some other basic questions like how many children I have. The officer kept pressuring me to sign for voluntary departure or to accept deportation, but I refused to sign anything and asked that they treat me with respect. I asked for a free phone call, but a young ICE officer told me to shut up. Once processing was finished, the officer warned me that I would be transported again to a different detention center and gave me a court date for August 25, 2025.

16. At around midnight, a group of officers who are responsible for transporting people arrived with handcuffs and shackles in hand. Once I was shackled and put on a bus, I was driven to Caroline Detention Center about one and a half hours from Chantilly. I believe we arrived at Caroline in the early morning on August 14, 2025. After I arrived at Caroline, I was processed once more and gave my fingerprints again.

17. On August 25, 2025, I appeared for my first immigration court hearing through a video call. My attorney was present too. The immigration judge asked for my name and confirmed my preferred language is Spanish. The judge spoke to my attorney in English

for some time. I was given a continuance, and the immigration judge confirmed my bond hearing was scheduled for August 28, 2025.

18. On or about August 26, 2025, around midnight, I was taken out of the dormitory and spent the night in a holding cell. At 6:00 or 7:00 am, officers responsible for transporting us arrived and took us out to a bus. Once we were on the bus, we drove to an ICE office nearby to pick up some paperwork. Then, we were driven to an airport in Virginia and put on a plane that took us to Alexandria, Louisiana. I was handcuffed with my ankles shackled and a chain at my waist during the bus ride and flight to Louisiana.

19. I spent one night at the Alexandria detention center located next to the tarmac where the ICE flights come and go. My handcuffs and shackles were only taken off for the time I was in the detention center to sleep. The next morning, around 6:00 am, I was shackled again, but this time, I was put on a plane to Arizona. In Arizona, I was not taken to a detention center, but there was a staging center next to the airport. Then, I boarded another flight to Washington state. In Washington, I did not leave the airport and I was still handcuffed, shackled, and wearing the waist chain. Lastly, I was put on a flight from Washington state to California. Once we landed in California, I was put on a bus for a four-hour drive to the Otay Mesa Detention Center. I arrived at the Otay Mesa Detention Center at around 8:00 pm on Thursday, August 28, 2025.

20. I was fed very little during this transfer from Virginia to California and shackled throughout the entire ordeal, besides when I was held briefly overnight at Alexandria. At one point, I had to stand shackled for about three hours as we waited to board the plane. Some people were about to urinate on themselves, and the transport officers would tell us to go in the corner up against the wall to urinate because we had no access to a bathroom.

When I boarded the different planes, officers would buckle our seatbelts for us because we were handcuffed and shackled, and we weren't permitted to get up to even use the bathroom during the flights. If there were an emergency on the plane, I am not sure I would have survived because I was handcuffed and shackled.

21. Because of all the transfers, I did not get to attend my bond hearing with the immigration judge but my attorney was present. I later learned that the immigration judge denied me bond because she did not have jurisdiction because of the way I entered the country. I also missed a regular immigration court hearing in my case that same day but was told a change of court would be filed so my hearings could take place in California. When I was finally in processing in Otay Mesa, I asked about my court hearing that was scheduled, but the officer rudely said none of it mattered. Eventually, I was given a court date of September 15, 2025.

22. Once at Otay Mesa, I became very upset about the fact that I was detained and how I had been treated up to that point. I was not sure if I could survive detention. I tried to speak to my family as much as possible to stay calm and keep my spirits up. I even cried when I got a new lawyer who would help me fight for my release after my bond was denied.

23. I was released on my own recognizance from ICE custody on September 9, 2025, after 28 days detained in five states and D.C. I arrived home in D.C. on September 10, 2025. While I was being processed for release from ICE custody, I was given an ankle monitor and scheduled for a check-in on September 18, 2025, at the ICE office in Chantilly, Virginia. I was so happy and relieved to go home to my partner, children, and grandchildren. I attended the ICE check-in on September 18, 2025, and ICE directed me to go to the nearby ISAP office the same day, which I did. ISAP gave me a new

appointment for February 11, 2026.

24. Since I entered this country in October 2022, this is the first and only time I was arrested or detained by ICE. I have not had any issues with meeting deadlines or appearing at appointments in relation to my immigration case. Most recently, I attended my immigration court hearing virtually on September 15, 2025, which was still scheduled with the San Diego immigration court. The judge explained that my case would be transferred back to the court that covers the cases of people who live in D.C., so I am waiting for my next court date.

25. Although I was released, I am suffering the effects of my arrest and detention. My knee has been swollen after being shackled for several hours at a time and sitting for several long flights. Since my detention and now that I have an ankle monitor, I have had leg pain and am dealing with high blood pressure. During one of the medical exams that was done while I was detained, a nurse told me that I am pre-diabetic, which I did not know before my arrest. I need to work to pay my rent and my car insurance, but it is difficult to return to work under these conditions, especially with the ankle monitor.

26. The arrest affected me a lot psychologically. I am fearful and often stressed now. I am unable to sleep through the night. I am scared to walk outside or drive, so I have had my son drive me places since I returned home or told my family members to take an Uber, when I would normally drive them (even though I am paying for my car insurance and Ubers are expensive). I do not leave the house much and have stopped taking my grandchildren or my youngest son to school or their activities.

27. I am a plaintiff in this proposed class action lawsuit because I want to challenge the unjustified immigration arrests that are happening in Washington D.C.

28. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to become a class representative if the Court recognizes this case as a class action, and I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.
29. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.
30. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.
31. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible to direct the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary.
32. I understand that I may need to answer questions from the government's lawyers in writing or in person.
33. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

34. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American Civil Liberties Union, the National Immigration Project, Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

35. This declaration was read to me in full in Spanish on September 22, 2025 by Lily Hartmann, a legal assistant at the National Immigration Project. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2025.

N.S.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, et al., *on behalf of themselves and others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>*Defendants*. | No. 1:25-cv-03417 |

**DECLARATION OF R.S.M.**

I, R.S.M., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is R.S.M. I am 36 years old and I am from El Salvador. My husband is Mexican, and we have two children who are 16 and 18 years old. I entered the United States with my two children in 2017 and have lived in the United States ever since. My family currently has a pending U visa application after my son was assaulted and robbed by armed attackers in 2024, and I also have a pending asylum case. Since 2020, I have lived in the northeastern part of the District of Columbia and worked in the District in housekeeping.

2. On August 26, 2025, around 6:00 am, my husband was driving us to work, and I was in the passenger seat. My husband and I both have valid driver's licenses, my husband is the car owner, the license plates and registration were current, and my husband was driving within the speed limit. We were about one block from our home when a car turned on their lights and signaled for us to stop the car. In total, about seven cars pulled up and surrounded us. The officers got out of their vehicles and came up to our car. At this point,

there were officers standing on both the driver and passenger side, and they started banging on the car windows, demanding that we put the windows down. My husband lowered his window a little bit so we could speak with the officers but not all the way down.

3. Once the officers were standing on both sides of our car, they asked us in English for a REAL ID. We asked what was happening. The officers asked for a REAL ID again. The officers also asked if we have permission to live in the United States. They demanded to see our IDs, and we gave them our drivers licenses. We took out our papers, including a document that shows we have a pending U visa application and another paper that shows we have a lawyer, and we told the officers about our U visa application. They responded that our paperwork did not matter at all.

4. The officers demanded that we lower the car windows all the way down. The female officer was holding a device that she placed in front of my husband's face, while he was still in the car. From what I understand, she used the device to scan his face once a green light turned on. Then, the officer waited a moment for a result to appear on the device. The other officers said to her, "Is it him?" She responded, "No." For a moment, I was relieved and thought they would not arrest us, but one officer said it did not matter that my husband didn't match the person they were looking for, and the officer decided to arrest us anyway.

5. The officers directed us to open the car doors, but with the windows down, they reached inside our car and opened the doors before we could. Once we got out of our car, the officers pushed us up against the car and handcuffed us with our hands behind our backs and put us in their vehicle. I did not make any attempt to resist arrest.

6. Before the officers handcuffed us, they never asked me any questions about how long I have been living here, my family members, my work history, my ties to the community, or anything else about my circumstances. They never showed us any documents or a warrant, and they did not even seem to know our names when they stopped us.
7. Six of the seven officers that stopped and arrested us were not wearing any identification, were dressed in plainclothes, and had their faces covered. Only one officer was wearing a uniform and identified himself as a federal officer.
8. After we were arrested and put in the officer's car, the officer drove for about four minutes until he stopped next to the local police station. There, the officers moved our handcuffs so our hands were restrained in front of our bodies. The male officer who previously identified himself as a federal officer asked me, "Are you R- S-?" He also asked me in English what country I was from. The officer already had our drivers licenses because we handed them over when we were first asked for our IDs. Those were the only two questions I was asked while we were stopped near the police station. At this point, I started to cry, and the federal officer told me not to be scared. We stopped here for about ten minutes.
9. Then, my husband and I were driven to the immigration office in Chantilly, Virginia. We were driven together in the same car while two officers followed in two other cars. We arrived at Chantilly around 8:00 am. Once we arrived at Chantilly, they took away all our belongings and made us take off our belts and earrings. I asked for the officers to give me back my immigration papers, including the document that shows I have a lawyer, but the officers refused and said they'd keep our papers. I was sent to a separate holding cell

from my husband. I waited a while until I was finally called for an interview and to give my fingerprints.

10. A male officer was taking my fingerprints and basic information, but a female officer said to me, "Do you know why you are here?" I told her no but that I wanted to know. The female officer said I was there because I have a deportation order. I responded that was not true and that my case is pending. I also told her I had been living here for several years. She responded, "So you think because you are in a process that we can't deport you?" I felt the officer was becoming aggressive with me, so I decided to stay quiet.

11. I was sent back to the holding cell and after waiting a while longer, the officer called me again and said I needed to sign some documents. I asked them what they wanted me to sign. The officer said, "Hurry up. Your attorney is outside." While I am not fluent in English, I noticed the paperwork mentioned an ankle monitor, going to the ISAP office, and there was one document about immigration court. I asked for my husband and whether he would be released with me too. The officers asked me who my husband was, and I pointed him out. The officer responded by saying we didn't have the same case, so he would not be released. The officers at Chantilly did not give me the chance to say goodbye to my husband, even though I wasn't sure when I would see him again.

12. I was escorted to a different office where I was given an ankle monitor. I had already been forced to wear an ankle monitor for about fifteen months after I entered the country in 2017, but it was eventually removed. I was sad to have been given one again. I was released from Chantilly around 6:00 pm that same day.

13. Sadly, my husband remains detained by ICE, and he was denied bond by the immigration judge on September 10, 2025. He was first detained at the Farmville detention center but is now detained in Texas.
14. The week that I was arrested, I had seen unmarked cars patrolling the area where my family lives or parked on the street several days in a row. From what I recall, they were in my neighborhood from about August 26 until September 2, patrolling from 4:00 am to 10:00 pm each day. I saw a Durango patrolling the neighborhood again on September 17.
15. Since I entered the country and was released from detention at the border, this is the first time I have been arrested by immigration officers.
16. Ever since this arrest, I have felt panicked and scared to go outside and be arrested again so I have mostly stayed home. I have stopped going to work because my work uniform is a dress and I am embarrassed for others to see my ankle monitor while I am working, though with my husband detained, I am not sure how I will be able to support my children or keep our home running. I feel very hopeless because I cannot do anything for my husband and I have not been sleeping.
17. My children do not want to leave the house either after my arrest. My 16-year-old son can walk to and from school, and now I am always watching out the window to make sure he arrives safely. I have other family members here in the U.S., and like me, they are living in constant fear they will be arrested and detained by immigration.
18. I am a plaintiff in this proposed class action lawsuit because I want to challenge the unjustified immigration arrests that are happening in Washington, D.C.
19. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to become a class representative if the Court recognizes

this case as a class action, and I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

20. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.

21. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.

22. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible to direct the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary.

23. I understand that I may need to answer questions from the government's lawyers in writing or in person.

24. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

25. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American

Civil Liberties Union, the National Immigration Project, and Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

26. This declaration was read to me in full in Spanish on September 22, 2025, by Lily Hartmann, a legal assistant from the National Immigration Project. I confirm and completely understand the contents of this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge and belief.

Executed on September 30, 2025.

RSM

R.S.M.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF GEORGE ESCOBAR, CHIEF OF PROGRAMS AND SERVICES, CASA, INC.**

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Chief of Programs and Services of CASA, Inc. ("CASA"). CASA is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses.

2. I have worked at CASA for fourteen years. In my role, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs. I therefore speak frequently with community members and receive feedback from

my staff regarding CASA members' fears, concerns, and decisions.

3. I make this statement based upon personal knowledge, files, and documents of CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CASA whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CASA business.

**CASA's Mission and Activities**

4. A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns we work on and how CASA serves the community.

5. CASA membership is voluntary. In order to become a member, an individual must apply for membership, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community.

6. Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived for individuals who experience financial hardship or are otherwise unable to pay. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of our immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

7. CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities. From CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

8. In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and are integrated into our member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits. In addition, CASA provides our members with free remote legal assistance, including free legal consultations on immigration issues.

9. In the D.C. area, CASA's immigration legal services have historically focused on securing and stabilizing immigration status, both temporary and permanent status, for non-detained community members. For example, we have historically held a large portfolio of affirmative relief cases such as Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA), U Visas for survivors of crime, and naturalization, with the goal of securing status for individuals that allows them to live and work in the United States without fear of deportation.

10. This work typically begins with a legal consultation with the individual, during

which we obtain comprehensive information about the individual's background and history. Thereafter, we determine what immigration relief, if any, the individual might have, and then decide whether we can extend legal assistance (in the form of *pro se* assistance or representation) to the individual, to help them secure that immigration relief. Core components of this extended legal assistance include client interviews and meetings, preparation of applications and evidentiary filings, legal research and writing, appearances before adjudicative bodies, and other relevant duties as required for ethical and competent legal assistance.

11. Our Health and Human Services (HHS) program operates similarly in the D.C. area, in that the focus of the program is to increase community members' social stability. Our HHS staff assists eligible community members with public benefits enrollments, such as, SNAP, Care for Kids, emergency Medicaid, school enrollment, free and reduced lunch enrollment and more; as well as provides case management for a variety of needs, such as Social Security Administration disability and retirement, Medicare, Medicaid, and charitable financial assistance from hospitals. In sum, our HHS staff members provide essential health and social services to community members and families to keep them healthy and stabilized. Core components of these functions include comprehensive needs assessments; conversations with community members; application completion and submission; visits to schools, clinics, and other essential spaces; and conversations with various essential service providers, as required to secure benefits and protections for community members.

12. There are various ways through which community members can seek services from CASA, but one primary way is by calling one of our hotlines, operated by a third party call answering service. For example, callers seeking health services can call 301-270-8432; and callers seeking legal services can call 1-888-765-2272. The different numbers route through the same

third party call answering service, which bills CASA based on the amount of time that it spends receiving and fielding calls for us, under one account.

13. One of the hotlines that CASA operates through the call answering service is an ICE tip hotline, through which community members can report ICE enforcement actions that they have witnessed or experienced. The purpose of the ICE tip hotline is not to interrupt or obstruct active ICE enforcement actions, but rather, to provide support to individuals and families who have been impacted by those ICE enforcement actions. Accordingly, calls to our hotline are typically to report an ICE arrest that has recently occurred. After a report is submitted to CASA, CASA investigates the report and provides legal and humanitarian support to those who have been impacted. Since January 2025, community members have been able to reach CASA's ICE tip hotline by dialing 1-888-214-6016.

**Harm to CASA From ICE's Unlawful Stops and Seizures**

14. CASA's practice is to log every incident of ICE enforcement action that is reported to us, whether through our ICE tip hotline, or through other avenues. Among other data points, we collect and log the date, time, and location of the enforcement action as indicated by the reporter. Prior to August 2025, we received approximately two reports of D.C. ICE enforcement action incidents per month. Once ICE expanded its enforcement efforts in D.C. in August 2025, that number skyrocketed to approximately three to five detention reports per day. We logged approximately forty reports of ICE detentions in D.C. in the two-week period between August 14 and August 29, 2025, representing a forty-fold increase in detention reports.

15. Since ICE expanded its enforcement efforts in D.C., CASA's D.C.-facing work has increased drastically, due to responding to the forty-fold increase in D.C. ICE detentions reported to us. ICE's unlawful arrests have caused a significant disruption to our functions and activities,

pulling us away from our core focus of providing services that stabilize and protect CASA members to providing rapid, emergency response to unlawful ICE detentions affecting CASA members.

16. Families that are impacted by ICE detention are understandably immediately focused on receiving those services that can potentially reduce the harmful impacts of the detention. In other words, the detention is an impediment to our ability to provide our core services to these families. Community members are not engaging with us about benefits enrollment and other services that might lead to long-term stability when their immediate concern and need is on altering the detention status of their loved one. Without first addressing that immediate concern and need for which they sought our assistance, it is impossible to engage them on those longer-term, stabilizing strategies and services that are so critical to CASA's mission. We must meet our community members' immediate, detention-related needs through rapid, emergency response in an attempt to clear the path for them to receive other services for which they might be eligible.

17. The staff shift to emergency ICE detention response has impaired CASA's ability to carry out its core functions. Specifically, detention response now comprises a significant portion of work undertaken by CASA's Legal and HHS teams. This work is not fully compensated by these teams' budgets. The HHS team, for example, now expends approximately 25 percent of its workload—equivalent to over one-and-a-half full-time employees—on detention response and follow-up. Rather than focusing on their core missions and activities, these staff members must now triage calls and requests for detention-related assistance, conduct needs assessments for the families of those detained, and connect them to legal and social supports tied to the detention incident.

18. Similarly, instead of our immigration legal team being able to focus on securing

long-term status for individuals, the team spends a significant amount of time providing rapid legal response and referrals to the families of detained individuals. CASA legal clinics at which community members could receive consultations and assistance with immigration applications have now been replaced by rapid legal response phone calls every day to provide family members with post-arrest information and guidance. Naturalization and U Visa applications have been replaced with assistance locating detained loved ones and referrals to private attorneys. In effect, ICE's enforcement activities have impaired our legal team's ability to engage in stabilizing our community members through substantive, extended legal assistance, turning us into a brief legal advice and referral operation, instead of a legal representation operation.

19. CASA also faces increased costs due to ICE's unlawful seizures, especially in funding its hotline services. Since January 2025, including after ICE began its widespread seizures in D.C. resulting in a forty-fold increase in D.C.-detention calls to the ICE tip hotline—the average bill for this call answering service has increased. Our bill for the period covering July 27, 2025 to August 26, 2025, which includes two weeks of the D.C. ICE enforcement surge, reflected an increase of approximately 14% from the previous period of June 27, 2025 to July 26, 2025. Similarly, our bill for the period covering August 27, 2025 to September 26, 2025 reflected a further increase of 5% over the period before.

20. CASA's funding to provide services to our community is jeopardized as a consequence of shifting resources to respond to ICE's unlawful seizures. CASA's shift of human resources to detention response threatens our ability to comply with grant deliverables specified in existing grant contracts. For example, in September 2025, we were notified that one such county grant was reduced by 50% in part due to delayed progress on grant deliverables. Through this grant, our HHS team is to do significant work, including conducting needs assessments, that

directly contributes to the county's dedication to growing clean energy in low-income, working class neighborhoods. This work is directly tied to our goals of stabilizing and improving the quality of life of our community members. Yet, our HHS team cannot even conduct an intake for a community member under this grant when the community member is laser-focused on the fact that their loved one was unlawfully detained by ICE; the HHS team must first address the community member's immediate need and concern. Because of the need to divert HHS team's attention to respond to ICE's expanded, unlawful actions against our community, we risk continuing to lose such critical funding that supports our mission.

21. ICE's unlawful detentions have impaired CASA's core function of connecting community members to social services by chilling open communication between CASA and its members. Prior to the surge in ICE activity in D.C., CASA would regularly connect community members to vital social services through free consultations that help members navigate complex public benefits programs. However, CASA's ability to connect community members to social services depends on members' willingness to share personal information with staff. Since ICE increased its enforcement in D.C., community members have become increasingly reluctant to share personal information, fearful that their immigrant status will be weaponized against them. CASA has noticed a marked decrease in participation in public benefits programs by immigrant community members. Further, cases that CASA manages and services it delivers now take longer to carry out because of the additional time that CASA must invest in building trust and providing education to each community member in this environment.

22. ICE's unlawful detentions have contributed to the additional investment needed to build trust and complete needs assessments and public benefits applications for our members. For example, HHS staff members have had to adopt new protocols to build trust, such as always

displaying their CASA Staff ID badge while in the field, and also sharing pictures of their Staff ID via text when conducting intakes over the phone. It is now common for Community Resource Navigators and Community Health Workers on our HHS team to report that an activity or application that once took a single engagement to complete now requires two to three follow-ups with the individual, so that trust is assured and the community member feels safe providing confidential information.

**Harm to CASA's Members From ICE's Unlawful Stops and Seizures**

23. Because of the services that we provide our members, we are acutely aware of the harms that ICE's unlawful seizures will cause many of CASA's members. Specifically, as demonstrated by the individual circumstances described below, ICE's unlawful seizures irreparably harm the communities and members that CASA serves by separating and traumatizing families, jeopardizing livelihoods, and cutting off access to essential healthcare and services. Further, ICE's unlawful seizures have instilled so much fear in CASA's members, regardless of their immigration status, that many are deprived of the basic dignity of participating in public life in D.C., including taking kids to school, going to work and church, or riding the Metro.

24. Based on CASA's records, I am aware of several members who have been harmed by ICE's unlawful seizures:

25. **Elias** is a CASA member, who is 41 years old and identifies as Latino. Elias underwent open heart surgery in May 2024. Since the operation, his doctor has required him to go to a clinic in Washington, D.C., three times a week to receive dialysis treatment. On the morning of August 20, 2025, Elias was on his way to receive his treatment when he was in a car accident with an Amazon vehicle. Local police initially responded, but soon, ICE officers wearing vests that said "ICE" appeared as well. The ICE officers did not appear to know anything about Elias.

One of the ICE officers asked Elias where he was from and asked to see his Salvadoran identification card after Elias said he was from El Salvador. When Elias offered to show the officer his U.S.-issued driver's license, the officer said that wouldn't be necessary. Instead, the ICE officer simply looked at Elias's El Salvador ID, told Elias he was under arrest, and began handcuffing him. Prior to his arrest, the ICE officers never presented any document or warrant and never explained why Elias was being arrested. Also prior to his arrest, the ICE officers never asked Elias for his immigration status or ask any questions about his ties to the community, whether he had family members in the United States, where he lived or how long he had lived there, or anything else about his individual circumstances. The officers took Elias to the ICE office in Chantilly, Virginia, where he was detained for several hours before he was released around 6 p.m. The detention caused Elias to miss his dialysis appointment that day, making him feel very sick due to his blood pressure spiking. Elias has been unable to sleep because of the stress and fear the arrest injected into his life. Elias fears that he will be detained or deported to El Salvador, where he will be unable to access the life-saving medical care he requires.

26. **Luz** is a CASA member. She is 34 years old and lives in Hyattsville, Maryland. Prior to her 32-year old partner Daniel's arrest and detention, he also lived in Hyattsville with Luz. Both Luz and Daniel are from Venezuela, have pending asylum applications, and entered the United States through the CBP One process in December of 2024. On the morning of August 15, 2025, Luz and Daniel were working their Door Dash delivery jobs together when they were pulled over by a Metropolitan Police Department ("MPD") car on 14th Street N.W. After inquiry by the officer, Luz and Daniel provided their motorbike's registration, their Venezuelan IDs, and Luz's Venezuelan passport. The MPD officer reviewed the documents and did not say anything, but sent a text on his phone. Approximately five minutes later, two unmarked SUVs arrived with three

agents who announced they were from ICE. The ICE agents claimed that Luz and Daniel had entered the country illegally and that they were there to detain Luz and Daniel. In response, Luz and Daniel told the ICE agents that they had pending asylum applications, but the ICE agents ignored this information and said that Luz and Daniel were "illegal". Luz and Daniel were then handcuffed, placed in separate vehicles and driven to the ICE Detention Center in Chantilly, Virginia. Prior to Luz's and Daniels's arrest, the ICE agents never presented a warrant, explained why they stopped Luz and Daniel, or indicated that they knew Luz's and Daniels's names. The ICE agents also never asked any questions about Luz's and Daniel's ties to the community, how long they had lived and worked in DC, or their family in D.C. Luz was held at the Chantilly Detention Center all day until approximately 10:00 PM when she was released from her cell and was able to speak with officials about her immigration status. Luz was subsequently released from ICE custody and told that she would receive an immigration court date in December. Daniel was not released from ICE custody and was moved to the Caroline Detention Center in Virginia the following day, where he is currently detained. Daniel has experienced unhealthy and crowded conditions at the Caroline Detention Center, which has resulted in severe anxiety, insomnia, and other health issues. Luz has struggled to financially support herself during Daniel's detention and has experienced severe anxiety due to his absence.

27. **Juilo** and his wife are CASA members with pending asylum cases and work authorization. He has lived in the United States since 2003. Before his arrest, Julio lived with his wife and four children between the ages of four and 19. Julio relies on his work authorization to provide for his family as a plumber. On August 28, 2025, he and his nephew were on their way to work when six ICE agents stopped them a few blocks south of the Walmart on Georgia Ave. NW in Washington, D.C. The agents requested that they both show their documentation. Julio showed

his Real ID compliant driver's license, and his nephew showed his green card. The officers asked Julio to step out of the car. When he asked why, they threatened to break down the door. Julio felt terrified and complied. When he stepped out of the car, he saw even more ICE agents. Without asking him any other questions, they put him in handcuffs and grabbed his collar. After a brief discussion, the ICE officers decided Julio was not "fine" and put him in a van. As they drove him to the detention site in Chantilly, Julio heard the officers bragging and celebrating how easy it had been to arrest him. The officers did not show them any documents or warrants, nor did he ask Julio any questions about his ties to the community or his individual circumstances. ICE originally detained Julio in a freezing concrete room in Chantilly, before moving him to a detention center in Texas. He is still detained. The arrest has been traumatizing both for Julio and his family. His wife is scared to step outside. Their children cry and ask for their father.

28. **Angel** is the husband of a CASA member. He, his wife, and their six-year-old son are from El Salvador but fled persecution there, applying for asylum in the United States. Their applications are still pending. Angel, through his asylum application, was able to obtain his work authorization card and had a job as a mechanic in Washington D.C. On the morning of September 18, 2025, he was waiting for the owner of the shop at which he worked to open the building. While he and his coworkers were outside, several cars pulled into the parking lot. Men in uniforms got out of the cars and approached Angel and his colleagues. While the men were wearing different uniforms, all of them were wearing vests that said "ERO" and "Police." Angel knew the vests meant the men worked for ICE. Without asking Angel any questions about his legal status, his family, how long he had been in the U.S., or anything else about his personal circumstances, the officers placed him in handcuffs. When Angel tried to explain that he had an asylum application and work authorization, the officers said it didn't matter. Some of the officers placed Angel and

his coworker in a car and took them to the ICE office in Chantilly. During the drive, the men were bragging about the amount of money they earned as a bonus for arresting Angel. Angel is now in Caroline Detention Facility, where he is being denied medication for his cardiac arrhythmia. Angel's wife has been so traumatized by the arrest that she quit her job, even though the family needs her income to survive, because she is so scared that she will also be arrested.

29. **Mateo** is the husband of a CASA member who, before his arrest, lived in Hyattsville, Maryland, with his wife and seven-year-old son. Mateo and his family fled their home country of Venezuela and applied for asylum in the United States. Those applications are still pending. Mateo was able to obtain work authorization through this application and worked as a delivery driver for DoorDash in D.C. to support not only his wife and son in the U.S., but also his young children in Venezuela. On August 21, 2025, Mateo was on his parked electric bike in the parking lot of a McDonald's on Georgia Avenue, picking up a delivery. As he mounted the bike to leave, two unmarked cars pulled in on either side of Mateo. Four officers got out and surrounded him. The agents wore masks on their faces. They had on plain clothes but with vests and badges that said "ICE.". They asked Mateo if he could be in the country, so he explained he had a pending asylum application and work authorization, plus a Maryland issued driver's license. Mateo showed the officers these documents, but it did not matter. They told him he was under arrest. When he asked why, they said it was because he was not a permanent resident. They did not show him a warrant or any other document. They did not ask him any questions about his life in the U.S., his family, his ties to the community, or anything else about his circumstances. The officers first took Mateo to an area outside the Pentagon, where he and about ten other men were transported in a white van to an ICE office in Chantilly, Virginia. Two days later, ICE moved Mateo to the Farmville Detention Center in Virginia, where he stayed for about two weeks before being

transferred to the South Texas Detention Complex in Pearsall, Texas. He remains there a month later, despite his asylum application, work permit, lack of criminal history, and close ties to the community.

30. **Antony** is a CASA member who has been in the United States since 2005. Before his detention, he lived in Silver Spring, Maryland, right outside Washington, D.C., with his wife and six children. The morning of August 25, 2025, Antony was near the intersection of Mt. Pleasant St. N.W. and 16th St. N.W. in D.C. when had to slam on the breaks to avoid hitting a car and people that were blocking the street. After he stopped, another car arrived and several officers exited. Several officers wearing green uniforms and "Police" vests, as well as a Park Police officer, then approached Antony's vehicle. The officers asked Antony to step out of the car and informed him he was under arrest. The officers never asked for his name, identification, or provide any reason for his arrest. Antony asked why he was being detained and the officers responded "that's just the way the law is." Antony never received any documents or warrants explaining what happened, nor did the officers ask him any questions about his ties to the community or his individual circumstances. After his arrest, the officers took Antony to a Park Police station in the Rock Creek neighborhood of D.C., where he waited for three hours. It was only at this point that the officers asked Antony any questions about his immigration status. The agents eventually came back with a large group of people; other individuals who they had arrested. Antony recalls all the men were Latino, like himself. The agents moved Antony and the rest of the group to the ICE office in Chantilly, Virginia. ICE then transferred Antony to federal jail in Richmond, Virginia, where he was held for eight days. Antony was then transferred to the detention center near Pittsburgh, Pennsylvania, more than four hours away from his family, where he remains detained today. Since his arrest, Antony's family has suffered emotionally and financially. Antony

supported his family by working for a company that repaired and installed air conditioners. Without his income, there is not enough money to support his six children—all U.S. Citizens and the the youngest of whom is only 18 months old. The emotional toll is also great, as Antony's children have become so anxious following their father's arrest that it is impacting their performance in school.

31. **Javier** is a CASA member. Javier is 43 years old and identifies as Latino. Prior to Javier's arrest and deportation, he lived in Washington, D.C., with his wife and three children. Javier's oldest child is 18 years old, but he also has a four-year-old and a six-month-old baby, both of whom are U.S. citizens. Approximately three years ago, Javier's oldest daughter was the victim of a violent assault. Javier and his family subsequently applied for U-Visas and those applications are still pending. On September 10, 2025 around 6:00 a.m., Javier was on his way to work when four immigration officials wearing ICE uniforms approached him after he exited the Fort Totten Metro Stop in D.C. One of the ICE officials stopped Javier and showed him a photo of a person who looked Latino, asking Javier whether he knew the person in the photo. Javier answered in the negative, but the ICE agent then asked for Javier's immigration documents. Javier responded that he had a pending U-Visa application, but otherwise did not have any documentation on him. The ICE official left to speak to one of his colleagues and returned, telling Javier "I'm sorry sir, but I have to arrest you." Javier was then put in handcuffs, placed in the ICE officials' vehicle, and taken to the ICE detention center in Chantilly, Virginia. Prior to Javier's arrest, the ICE officials did not explain why he was being arrested nor did they ask him any questions about how long he had been in the United States, whether he had family in D.C., his ties to the community, nor anything else about his personal circumstances. Javier was held at the Chantilly detention center for a full day before being transferred to a jail facility in Richmond, Virginia, where he was held

for two days. Javier was then transferred to a detention center in Louisiana, where he was detained for several days until he was deported on September 26, 2025. Prior to Javier's deportation and while he was detained, he was asked by immigration officials to sign a document, which Javier understood would signify his consent for deportation. Javier told the immigration officials that he had a pending U-Visa application and that he wanted to see a judge, but the immigration officials said that Javier had to sign the document. Javier ultimately signed the document out of fear of what would happen to him if he chose not to sign. Javier's arrest and deportation has severely impacted his family, who were financially dependent on Javier's income. Javier's wife is afraid that she may also be arrested and his children have been traumatized by his arrest and deportation. Javier's youngest children have even asked police officers whether they know where their father is.

32. **Franco** is a CASA member. Franco is 21 years old and is originally from Venezuela, where he was tortured in prison by Venezuelan officials. Franco received Temporary Protected Status ("TPS") in June of 2023 and has lived in the Washington D.C. area since that time. Prior to his arrest, Franco lived with his wife and his eight-month old daughter, who is a U.S. citizen. On August 17, 2025, Franco was working his Uber delivery driver job in the Capitol Hill neighborhood of D.C. when he noticed several federal agents and police officers surrounded his motorcycle after he had completed a delivery. Franco was asked for his social security card, work permit, motorcycle title, and his driver's license, all of which he provided. While the agents did not ask for Franco's immigration status, he told them that he had TPS. The agents then handcuffed Franco and placed him into a nearby vehicle. At no time prior to Franco's arrest did the agents provide a warrant or explain why he was being stopped and arrested. The agents also did not ask Franco any questions about his family members, where he lived or how long he had

lived there, his work history, or anything else about his ties to the community. Following his arrest, Franco was transported to a facility in Chantilly, Virginia, where he was held for approximately four hours and asked identifying questions. Franco was then transferred to a facility in Farmville, Virginia, where he remains detained. Franco's arrest has been difficult for his family because his wife and 8-month old daughter are financially dependent on him. Franco's family has been forced to move because they can no longer afford the location where they were previously living. Franco's wife also had an accident and so is unable to work. She also has increased risk of suffering a stroke due to a low platelet count.

33. **Carlos** is a CASA member who lives in Washington, D.C., with his wife and three U.S. Citizen children. Carlos has lived in the United States since he arrived in 2004 as a 22-year-old. He maintained a job as a construction worker to care for his family. On his way to work on September 9, 2025, he was pulled over by a police car. But when he complied and the officers approached his car, he realised they were ICE officers, rather than local police. The three officers that approached him had vests that said "ICE." They asked Carlos to step out of his car. The officers asked to see his immigration documents. When Carlos told them he did not have any, they put him in handcuffs and told him he was under arrest. They did not explain why they were detaining him, nor did they give him any document or warrant for the arrest. They did not ask him any questions about his ties to the community or his individual circumstances. ICE officers took Carlos first to an area by the Pentagon, and then moved him to the ICE office in Chantilly, Virginia. Two days later he was moved to a jail in Richmond, and then to Winn Correctional Center in Louisiana. He remains in ICE detention, leaving both him and his family traumatized.

34. **Miguel** is a CASA member. The circumstances of Miguel's arrest and detention were reported to CASA by his family member, and so are included here upon information and

belief. Miguel is only 23 years old and lived in Washington, D.C., with his aunt. Miguel is a driven young man. He worked in a local restaurant to support both his family here, as well as his parents in El Salvador. He also attended school so he could assist his family even more in the future. On the night of August 18, 2025, Miguel was walking out of a grocery store in Washington, D.C., when he was approached by ICE officials. They asked Miguel if the car he was driving belonged to him. He responded that it was his brother's. The officials, however, did not believe him, and demanded he call his brother. Since it was late in the evening, Miguel's brother was asleep and did not answer the calls. In response, the ICE officials arrested and detained Miguel. They did not show him any document or warrant or ask him any questions about his ties to the community or his individual circumstances. The officers took Miguel to the ICE office in Chantilly, Virginia. The conditions there were dehumanizing and unhealthy—the officers failed to feed them at times. Miguel could not bear the weight of detention and "voluntarily" deported to El Salvador. ICE agents did not allow him to bring his personal possessions when he left the country.

35. **Gordon** is the husband of a CASA member. The circumstances of Gordon's arrest and detention were reported to CASA by his wife, and so are included here upon information and belief. Gordon worked as a delivery driver to support his wife and three children. His oldest child is only 12, with the other two being six and nine. On the morning of August 31, 2025, Gordon was waiting on his motorbike in the parking lot of a Denny's at 1250 Blandensburg Rd NE in Washington, D.C.. As he waited, a police officer approached him and asked to see Gordon's driver's license. When Gordon said he did not have one, the officer told him to wait. Soon after, ICE officers appeared. They asked Gordon again for his license. When he could not provide one, the agents arrested him. They did not show him any document or warrant or ask him any questions about his ties to the community or his individual circumstances. The ICE officers detained Gordon

in Farmville Detention Center, which is a three and a half hour driver from his family. He remains there today. Without his income, Gordon's family is struggling financially to survive. They are also suffering emotionally. His children are too young to understand what has happened and ask where their father is every day.

36. **Nerwin** is the husband of a CASA member. The circumstances of Nerwin's arrest and detention were reported to CASA by his wife, and so are included here upon information and belief. Nerwin is an approved beneficiary of his wife's approved I-130 family petition, and he is in the process of getting his green card. Nerwin has lived in the United States since 2013 and lived with his wife and two U.S. citizen children, who are five and six years old, prior to his detention. Nerwin was on his way to his job as a painter with a co-worker around 9:00 a.m. on August 28, 2025. Since Nerwin does not have a driver's license, he was in the passenger seat. A police officer signaled for the car to pull over around 295 N, Malcolm X Ave in Washington, D.C. When the pair did so, the officer informed them that the car had an expired registration and requested both men show documentation. Nerwin explained that he had an approved I-130 family petition but did not have the papers with him. The officer stepped away and soon after immigration officials arrived in a car. The cars were Department of Homeland Security vehicles. The immigration officials approached Nerwin and asked to see his papers. He explained again that he had an approved I-130 petition. The officers probed if he was married to a U.S. citizen, which Nerwin confirmed. Nerwin showed the agents his Real ID and passport. After looking up his name in the system, the agents returned, asked Nerwin to step out of the car, told him he was under arrest, and put him in handcuffs. The officer did not show Nerwin any document or warrant, or ask him any questions about his ties to the community or his individual circumstances. ICE originally detained him in the ICE office in Chantilly, Virginia, then moved him to a jail in Virginia for 11 days, and then

transferred him again to Farmville Detention Center in Virginia. He remains there now, while his children cry every day and ask where their father is.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 3, 2025

Respectfully submitted,

George Escobar

# DECLARATION OF ANA GRACIA

I, Ana Gracia, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Ana Gracia. I am an attorney at the firm Law Offices of Jezic & Moyse, LLC. Prior to being in private practice, I was an attorney at Catholic Charities of the Archdiocese of Washington. I have been practicing exclusively immigration law for nearly five years in the District of Columbia and Maryland. I have represented individuals before U.S immigration courts, the State Department, the Department of Homeland Security, Board of Immigration Appeals, and Maryland State Courts, including numerous individuals detained by Immigration and Customs Enforcement ("ICE").

2. Prior to August 2025, I represented several individuals, some of whom had been detained by ICE in the District of Columbia for various reasons, including criminal history and immigration status. In many cases, ICE focused on individuals it considered enforcement priorities, such as those with recent criminal convictions or prior deportation orders.

3. After August 2025, I have observed a significant shift in the way ICE is conducting enforcement and detaining individuals in the District of Columbia. ICE no longer focuses on a targeted approach, prioritizing individuals deemed enforcement priorities, such as those with serious criminal records or final orders of removal. ICE has increasingly adopted more aggressive enforcement tactics. These changes have led to the detention of individuals who, under previous guidelines, would not have been considered a priority for enforcement. People with no criminal history, pending immigration relief, or longstanding ties to the community are now being detained alongside those who meet traditional priority criteria.

4. Many of my clients have shared that ICE is increasingly targeting Latino individuals who live and work in the District of Columbia. They have described being fearful and anxious as they witness people being approached or detained at their workplaces and in public spaces. Several have expressed that they feel singled out because of the way they look or the language they speak, creating an environment of heightened fear and distrust within the community.

5. ICE officers are also arresting individuals who have pending applications before USCIS. I recently represented a client with a pending application for U Nonimmigrant Status. He had no criminal record, and his only immigration violation was the manner of his entry into the United States. Despite this, he was detained by ICE.

6. I represent an individual who was detained by ICE on August 16, 2025. My client, a Latino man with no criminal history, had been living in the United States for 11 years. On the morning of his arrest, he was with his uncle and employer, purchasing work materials at a Home Depot in the District of Columbia. After leaving the store, they noticed they were being followed. They stopped at a nearby McDonald's to get breakfast, and as soon as they parked, three immigration officers approached the vehicle. Without presenting a warrant, the officers opened my client's car door and demanded identification from both him and his uncle. My client handed his license and Guatemalan identification document. The officers told my client he was "illegal" and placed him under arrest on the spot. There was no resistance, no attempt to flee, and no indication that ICE conducted any individualized assessment of his immigration status, flight risk, or ties to the community. Despite this, ICE took my client into custody immediately. During transport, my client remained handcuffed in the back seat while the officers continued driving around for

approximately an hour, actively searching for additional individuals to detain. Eventually, they pursued another vehicle, resulting in a car chase with my client still unsecured and handcuffed in the back seat. During the chase, my client sustained multiple injuries, including a nosebleed and blunt trauma to his head, which caused dizziness and vomiting. Although he repeatedly asked for medical assistance, he was not given any attention for approximately 40 minutes after reporting his symptoms.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.



Ana Gracia

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-03417 |

**DECLARATION OF ANAMARIA DOE**

I, Anamaria Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Anamaria Doe, I am 42 years old, and until last week, I worked in a kitchen in a restaurant in Foggy Bottom. I have lived in the District of Columbia since 2004.

2. On the morning of September 24, 2025, I was working at my job in the kitchen of a restaurant in the Foggy Bottom neighborhood of Washington, D.C. I was working there for about four years.

3. At approximately 11:00 a.m., around twenty to twenty-five agents wearing the uniforms of several different federal agencies entered the restaurant and blocked the front and back exits. I saw that some of the agents had markings of ICE and others of DHS, and there was one that was wearing FBI insignia.

4. The agents announced that they were looking for people who did not have a work permit or who were in the country illegally. The agents had a list of individuals who worked in the restaurant, along with their names and photos. I was not on this list. The agents asked me

if I had a work permit, and I replied I did not. They asked me for my full name and if I had citizen children, and I replied that I have two citizen children who live here. They asked me where I was from and I said Guatemala. The agents did not ask me any other questions about my immigration status. The agents asked me if I had a criminal history, and I replied that I did not. They took a photo of me on their phone. They asked me if I had permission to be here and I didn't respond.

5. The agents never showed me any warrant for my arrest. The agents did not ask me where I lived in Washington, D.C., how long I had lived there, whether or not I had family in Washington, D.C. other than my children, or any questions about my connections to the city or my community.

6. Approximately an hour and a half after their arrival at the restaurant, the agents placed everyone who was on the list and me—even though I was not on any list—in handcuffs and transferred us into a vehicle. During this hour and a half, they asked us questions, took our data, and asked us to wait. I did not make any attempt to flee or resist arrest. We were then transported to a facility in Virginia, where we were kept until approximately 7:30 p.m. that evening.

7. At that point, I was released and told to return to the facility the next day, September 25, 2025, when I would be given an ankle monitor. On September 25, 2025, I returned to the facility and received an ankle monitor.

8. I have not received any explanation as to why I was arrested or released, nor has anyone provided me with information about why I need to wear an ankle monitor. I have not received any kind of representation that I will not be subject to arrest and/or detention by ICE or by law enforcement officials for immigration purposes in the future.

9. Since 2004, when I first entered this country, this is the first and only time I was stopped, arrested, or detained by law enforcement. I have not had any other interactions with law enforcement and I have never been convicted of any crime or offense.

10. As a consequence of my detention, I have not been able to return to work. I am the head of the household and have two children, both of whom are U.S. citizens, who rely on me. Since my arrest, I have suffered severe anxiety and have been unable to eat or sleep. Since leaving detention, I have seen ICE in the area where I live. There are a lot of them circling around the area. I have heard a lot from the community in D.C about the presence of ICE in the city, and have heard that in the mornings they are taking people from where I live and are taking people off the streets every day.

11. I am afraid of retaliation towards me and my family if my identity were to become public as a result of my participation in this lawsuit. I am afraid that my family members and I will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens online.

12. This declaration was read to me in full in Spanish on October 1, 2025, by Alexis Gorfine of Covington & Burling LLP. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.

Anamaria Doe
Signature

I, Alexis Gorfine, a Law Clerk at Covington & Burling LLP, affirm Anamaria Doe gave me permission to sign this declaration on her behalf. At 1:30 PM on October 1, 2025, I read the above Declaration back to Anamaria Doe word for word to confirm its accuracy, and she stated that it was accurate.

Executed on October 1, 2025.

Alexis R. Gorfine

Signature

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated,*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF ANDRÉS DOE**

I, Andrés Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Andrés Doe. I am 38 years old and have lived in the United States since 2015. I lived in Washington, D.C., with my domestic partner and six-year-old son. My son was born in the United States. I am originally from El Salvador.

2. On September 16, 2025, at 10:40am, I was returning from my job as a demolition worker and was going to park my car near 14th St. and Missouri St. NW. ICE agents stopped me, saying that they were looking for a specific person and thought I was that person. They told me I needed to present my ID, which I did.

3. The agents told me they checked their system, and I was not the person they were looking for. Even though I was not their target, they said their check showed them I did not have legal status, and they had to arrest me. They did not present any warrant or document to me prior to placing handcuffs on me and arresting me.

4. I told the agents before they put handcuffs on me that I have never had problems with anyone and have never committed a crime here. I told them I have a young son at home who was born in the United States. They told me this did not matter because I did not have papers, and they had to arrest me. I did not flee or resist arrest.

5. After telling me I was under arrest, placing handcuffs on me, and putting me in their car, the agents took me to a processing center where I stayed for a day, and then they moved me to another facility in Virginia where I stayed for three days. In this second center, they were supposed to let us go outside, but they never let us leave the prison.

6. At the second detention center, they also took from me $3,800 that I had withdrawn from the bank on the way home to pay the rent. They told me that if I signed the paperwork agreeing to be voluntarily deported, they would give me $1,000 to help me resettle in El Salvador. While ICE did return the $3,800 to my wife after five days, they never gave me the $1,000 to help me settle in El Salvador. I felt tricked into signing the paperwork, like I had no other choice.

7. They took me to Caroline Detention Facility in Virginia, where I was for four days. They sent me to Louisiana, where I stayed for two days until they put me on a plane and sent me to El Salvador. I was deported on Friday, September 26, 2025 to El Salvador.

8. My arrest and deportation has been traumatic for both me and my family. My wife no longer has my income to help pay rent and support our family, and she has to work while also taking care of our son. This has been most traumatic for my six-year-old son, who is terrified to go to school because he does not want to leave my wife. He is afraid my wife will disappear the same way I did. He will not eat and he often wakes up in the middle of the night to see if my wife is still there.

9. My wife is now trying her best to get the paperwork in order for my U.S. citizen son to return to El Salvador with her. There are many procedures she has to follow so that he can legally leave the country and so that our family can be reunited.
10. I wish to proceed pseudonymously because I am afraid of the retaliation me and my family may face if my identity were to become public as a result of my participation in this lawsuit.
11. This declaration was read to me in full in Spanish on October 2, 2025 by Alexis Gorfine. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2025.

Andrés Doe

Andrés Doe

I, Alexis Gorfine, Law Clerk at Covington & Burling LLP, affirm Andrés Doe gave me permission to sign this declaration on his behalf. At 1:55 pm on October 2, 2025, I read the above Declaration back to Andrés Doe word for word to confirm its accuracy and he stated that it was accurate.

Executed on October 2, 2025.

Alexis R. Gorfine

Alexis Gorfine

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF ANTONY DOE**

I, Antony Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Antony Doe. I am 52 years old. I am a CASA member, and I identify as Latino.
2. I have been in the United States since 2005. Before I was arrested, I lived in Silver Spring, Maryland, with my wife and six children.
3. The morning of August 25, 2025, I was driving down Mt. Pleasant St. NW in Washington, DC. When I got to the intersection of 16th Street and Mt. Pleasant St., I suddenly saw a car parked across the street without any lights on. The car and several people were blocking the street so I had to quickly brake so I wouldn't hit anyone. When I stopped, more officers arrived in a car and crossed the street towards me.
4. There were several police officers in the area, and they surrounded me. Some of them were wearing masks and hiding their faces. Most of them were wearing green uniforms with vests that said "Police," but there was also one that was a Park Police officer. They had two cars: one was a Suburban and the other was a Mustang.

5. They approached me, asked me to step out of the car, and told me I was under arrest. I complied with their instructions and I did not make any attempt to resist arrest. They did not ask to see any identification or even ask my name. I asked them why they were detaining me, and they said that's how the law is. They didn't explain any more than that. They did not show me any documents or warrant either.

6. Before they arrested me, the officers did not ask me any questions about my personal circumstances. They didn't ask about how long I have been in the United States, if I have family here, if I have a job, or anything else. They just said they had to arrest me because that's how the law is.

7. Fifteen minutes after they arrested me, the officers took me first to a Park Police station in the Rock Creek neighborhood of D.C. It was only after they had arrested me and taken me here that they asked me questions about my immigration status. There were about eight officers asking me questions.

8. I was at that police station for about three hours before they came back with a big group of people. I don't remember exactly how many people were there, but everyone they brought was Latino. They took all of us to a detention center in Chantilly, Virginia. It wasn't until about 2 am that I was finally able to call my wife and tell her what happened.

9. After that, the officers moved me to a federal jail in Richmond, Virginia. I was there for eight days, and they never let me use the phone to call my wife. After that, they moved me again to a detention center in Pittsburgh, Pennsylvania. I am still there now.

10. My arrest and detention has been too hard for my family to bear. Before they arrested me, I worked for a small company fixing and installing air conditioning units. I needed this job to support my wife and my six children. My children are so young— the youngest is

only 18 months old and the rest are 3, 5, 10, 11, and 18 years old. They are all U.S. citizens. Only my oldest is old enough to work. Because of that, my family depends greatly on my income to survive. Economically, it has been very bad.

11. But it has been even harder psychologically. My arrest and detention traumatized our entire family. This arrest will haunt us forever. It has been especially difficult for my children. They have so much anxiety that it is affecting their school. My 10-year old has been affected the most. She sees a school psychologist every day because she is so depressed about what happened. My 11-year old also sees a psychologist in school. My 5-year old does not understand what happened but asks for me every day. It has been hard for my wife to look after and comfort all our children while I have been gone.
12. When they arrested me, they dirtied my name and my dignity. All I want now is for my rights to be respected and to be returned to my family. I am asking the immigration judge in my case to release me on bond, and I am going to apply for status in front of the immigration judge. I just want the opportunity to stay here with my family.
13. I am using a pseudonym because I am afraid of harassment and retaliation for participating in this lawsuit if my real identity is revealed.
14. This declaration was read to me in full in Spanish on October 1, 2025 by Megan Steinheimer. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

I, Megan Steinheimer, CASA Representative, affirm Mr. Antony gave me permission to sign this declaration on his behalf because he is currently detained. At 9:00am on October 1, 2025, I read the above Declaration back to Mr. Antony to confirm its accuracy and Mr. Antony stated that it

was accurate.

Executed on October 1,2025.

Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants*.

No. 25-cv-3417

**DECLARATION OF B.R.G.**

I, B.R.G., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is B.R.G. I am 34 years old. I have lived in the United States since 2005 and D.C. for about 14 years. I am a Latino from Guatemala, and I have two brothers. One of them is a U.S. citizen. I own my own business working in construction and as a handyman. I attend Iglesias Nueva Vida church.
2. On August 28, 2025, at around 9:00 AM, I was driving with a co-worker in a construction van to Georgetown on Rock Creek Parkway in D.C., when I drove up to a police checkpoint. A D.C. police officer came to the van window and told me that I was not allowed to drive a commercial vehicle on this road, even though I had driven on this road since 2008 with no issues. The officer asked for my license and registration, which I handed to the officer, and he then asked for my immigration status. I asked him why he asked me that. The police officer then said he would go back to his car and come back.

3. Soon after, about six ICE agents wearing vests walked up to the van and asked me my immigration status and how long I've been in the United States. I told them since 2005 and that I did not have status. One of them said, "Turn off the engine, and get out of the car because we are going to arrest you." I got out of the van and did not make any attempt to resist arrest. The ICE agent then said that he was going to take me to the jail and that a judge would decide whether I get to stay in the United States. The agent also told me that if I try to run away they would shoot me. An ICE agent in a mask put handcuffs on me really tight and shoved me against the car.

4. None of the agents at any point identified themselves, presented a warrant, or indicated that they knew me or my name prior to the arrest. They also did not ask me any questions about my ties to the community, how long I've been living or working in D.C., or my family here.

5. The agents put me in a car and drove me to Chantilly, Virginia. I was there for only two hours, and they fingerprinted and interviewed me. They then took me to another facility, which I believe was in Farmville. The staff there were incredibly abusive to me and the others there. They put us in a room with 30-35 people with no beds. Everyone was sleeping on the floor with aluminum foil for a sheet. Everyone there called it the "freezer" because it was so cold. I asked for another sheet but the guard refused to give me one because there were others already. They were all wet and disgusting. They only fed us bean burritos that were impossible to keep down in my stomach.

6. After a few hours, I was transferred to a jail. I was there for 6 days. We only got one hour of time outside, and they kept the lights on 24 hours.

7. ICE then transferred me to Moshannon Valley, where I am currently housed. Conditions at Moshannon are better than the previous facilities, but I have nightmares nearly every night about getting re-arrested. The first weekend here I could barely sleep at all.
8. Since 2005, when I entered this country, this is the first and only time I was arrested/detained by law enforcement. I have not had any other interactions with law enforcement, I have never been convicted of any crime/offense, and I have not had any issues with meeting deadlines or appearing in court in relation to my immigration case.
9. I am deeply concerned and scared by this incident. I believe I was stopped and arrested solely because of the color of my skin and my appearance, as it was clear that the arresting officer did not know who I was and did not present any warrant. I live in D.C. and have taken this route to go to work many times before and am very scared that I may be arrested and detained again if I am released.
10. This experience has been traumatizing to me and my family, especially to my brother. He is very worried for me. If I am released, I am going to need a therapist to process the trauma of what has happened to me over the past month.
11. This declaration was read to me in full in Spanish on September 30, 2025, by Yahir Santillan-Guzman. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2025.

B.R.G

I, Yahir Santillan-Guzman, a paralegal at Covington & Burling LLP, affirm B.R.G. gave me permission to sign this declaration on his behalf because he is currently detained. At 10:45am on September 30, 2025, I read the above Declaration back to B.R.G. word for word to confirm its accuracy and he stated that it was accurate.

Executed on September 30, 2025.

Signature

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSE ESCOBAR MOLINA *et al.*, *individually and on behalf of all others similarly situated,*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-03417 |

**DECLARATION OF C.**

I, C., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am 43 years old and I am a landscape worker. I have lived in Gaithersburg, Maryland for twenty years and I often travel to D.C. for work. I am a naturalized U.S. citizen. I am Latino.

2. On August 20, 2025 at around 8 a.m., I was driving to work. My colleague was in the car with me in the front passenger seat. My colleague is Latino. I was driving a work truck with the name of my business in white lettering on both sides. The truck belongs to the business and had current license plates and registration. I was driving within the speed limit.

3. As I was driving in northwest D.C., a dark blue SUV marked Park Police turned on its

flashing lights and I pulled over and put the truck in park. My window was already down – the truck is old and does not have air conditioning – and I placed my hands where the officer could see them. A Black male officer approached my side of the car. He was wearing a dark Park Police uniform with a badge on his chest.

4. The officer did not present me with a warrant or identify himself. He did not appear to know my name or the name of my colleague in the passenger seat. I asked why I was stopped. He said that he had trouble seeing my car tags. He said he wanted to make sure my colleague and I were "all right" and wanted to see both of our IDs.

5. While the first officer was talking, another agent approached the car on the passenger side. He was a White man in plain clothes wearing a black vest that said "POLICE" in white letters. He started yelling "Where are you from?" He was very aggressive. I was trying to understand why I had been stopped and to get my ID out. The second agent opened the passenger-side door, grabbed my colleague, threw him on the ground, and got on top of him. My colleague had not said a word or moved from his seat the entire time. He did not try to run or exit the car. Neither officer appeared to know my colleague's name, and they did not show a warrant for him. They did not ask him any questions about his ties to the area or his individual circumstances before throwing him on the ground and restraining him.

6. The officer on my side of the car joined the agent who had arrested my colleague. At that point, I began filming them with my phone. I loudly said that my colleague has a right to a lawyer and that they had entered my car without my consent. I got out of the car and filmed as I walked around to the sidewalk where they were restraining my colleague. I kept repeating "this is an illegal detention."

7. As I came around the car, the first officer said something to me that I couldn't hear. I told him I didn't do anything wrong. He handcuffed me. I said that I am a U.S. citizen.

8. During the interaction, more cars began pulling up and other agents got out. Many of them had their faces covered and were wearing camouflage clothing. One came over and patted me down. He did not identify himself or state why I was being detained.

9. As this was going on, bystanders were slowing down to see what was happening, and several were filming. An agent arrested one person who was filming, but there were others.

10. My colleague was placed in an unmarked van.

11. I was in handcuffs for approximately 20 minutes. The first officer came back and said something along the lines of "You said you're a U.S. citizen, can I finally see your ID?" I told him my drivers' license was behind my credit card in my wallet. He took it away for a bit. Another agent to my right was aggressively asking "Where are you from?" I replied that I had already given my information to the first officer and I did not have to reply to him. Another agent said "He already said he's a" and used a term that I gathered means U.S. citizen; I believe it was something like "U.C." Another person yelled "So what are we going to do with this one?" and someone else said "We have to let him go." They took me over to the car and uncuffed me. The first officer gave me a "Notice of Infraction" for "obstructed tags."

12. To the best of my knowledge, my colleague was deported.

13. I am afraid of retaliation my family and I may face if my identity were to become public as a result of my participation in this lawsuit. I am particularly afraid that my family and I will be retaliated against and harassed by members of the public on social media given

recent reports about people harassing immigrants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.

C.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

## DECLARATION OF CAMILO DOE

I, Camilo Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Camilo Doe. I am 40 years old, and I am working in home improvement and renovation. I have lived in the Washington D.C. area since 2003 when I was 17 years old. I am a Latino from Guatemala. I have a pending 601-A unlawful presence waiver and an I-130 application that was approved in 2021. My wife is a U.S. citizen, and we each have one child. My stepdaughter is 11 years old, and my son is 17 years old. Both are U.S. citizens. I am a member of San Gabriel Catholic Church.
2. On September 9, 2025, at around 12:00 PM, I was driving in my work van on the way home from work on Rock Creek Parkway in D.C. The van is registered under my name, had current license plates and registration, and I was driving within the speed limit. After I pulled off of Rock Creek Parkway, I noticed a Park Police car following me for about 10 blocks, but it never put on its lights. I stopped my van to get water at Kansas St. and Taylor St. NW in the Petworth neighborhood in D.C. The Park Police car stopped behind me and

an agent got out of the car and walked up to my van.

3. The Park Police agent said that I was not allowed to drive my van on Rock Creek Parkway because it was a commercial vehicle. He said the problem was that it had a ladder on top. I have driven on this road nearly every day and previously had no problems. The agent asked for my license, registration, and insurance, which I handed over. After a few minutes, more cars arrived with agents from ICE or DHS.

4. They asked me to step out of the car, they told me I was under arrest, and they asked me if I had any weapons on me. I did not make any attempt to resist or run away. They handcuffed me. After they handcuffed me, I told them I had an approved I-130, and that I was in the process of having my 630-A approved. They told me that that doesn't give me any status here.

5. None of the agents at any point ever identified themselves, presented a warrant, or indicated that they knew me/knew my name prior to stopping me. They did not ask me any questions about my ties to the community, how long I've been living/working in DC, my family here, or anything else about my circumstances.

6. They put me quickly in the car and we drove away because there were many bystanders who were confronting them about my arrest. We parked in a parking lot about a three-minute drive away by a school, and I called my wife to let her know what had happened.

7. After, they drove me to a jail in Reston, Virginia, to take my fingerprints. I was there for 2 to 3 hours. I was taken after to Chantilly, where I was for about 6 hours. While I was there, I was put in a room made for 4 people with about 15 people in it. After leaving Chantilly, I went to a jail called Riverside for a day. It was not an immigration detention facility, but a normal jail. Over the course of these two days, all they gave me to eat was a

cold bean burrito and two ham sandwiches.

8. They brought me next to Caroline Detention Center. I was there for eight days. At Caroline, they took all of my belongings (keys, money, etc.) and still haven't returned them to my wife. They took me next to Louisiana, where I was for a night, and from there they took me to Ft. Isabel in Texas.

9. Since 2003 when I entered this country, I have never been convicted of any crime/offense, and I have not had any issues with meeting deadlines or appearing in court in relation to my immigration case.

10. I have difficulty even expressing how this has affected me personally. Being away from family has been a traumatic experience, and my arrest has been devastating for my family. I understand that my stepdaughter was very upset when she learned I had been arrested and cried for a long time. My son is anxious because he does not know where I am being held because I keep being moved around to new facilities. This prevents him from focusing on his schoolwork. I bring my stepdaughter to school so that my wife can get to work on time, and I am the economic provider for my son and only want to provide him with a good life.

11. I am deeply concerned and scared by this arrest. I believe I was stopped and arrested solely because of the color of my skin and my appearance, as it was clear that the arresting officer did not know who I was and did not present any warrant. I live in D.C. and have driven on this same route many times before and am very scared that I may be arrested and detained again if released.

12. This declaration was read to me in full in Spanish on October 1, 2025, by Alexis Gorfine. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.

CAMILO DOE
Camilo Doe

I, Alexis Gorfine, a Law Clerk at Covington & Burling LLP, affirm Camilo Doe gave me permission to sign this declaration on his behalf because he is currently detained. At 9:45 AM on October 1, 2025, I read the above Declaration back to Camilo Doe word for word to confirm its accuracy, and he stated that it was accurate.

Executed on October 1, 2025.

Alexis R. Gorfine
Alexis Gorfine

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

I, Cristina, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Cristina. I am 52 years old and have lived in the United States since 2022. I am a legal permanent resident, and I live in Brentwood, Maryland, with my son, Rodrigo. I make this declaration on my own personal knowledge, except as to facts relayed to me by my son in a telephone call concerning his arrest and detention by agents and except as to matters expressly stated to be upon information and belief, and as to these, I believe them to be true.

2. I am originally from Peru. I moved in with Rodrigo in May 2025 after separating from my ex-husband because he was emotionally abusive. I currently work in a restaurant as a server.

3. On the night of September 8, 2025, I received a call from my son, Rodrigo. He and his coworker were driving home after finishing their delivery shift when an unmarked vehicle hit my son's coworker's motorbike near Rhode Island Avenue and 18th Street in

Washington, D.C. My son stopped to help his coworker, and plain-clothed individuals that Rodrigo described as bounty hunters exited the vehicle that had struck the motorbike.

4. Rodrigo was grabbed by the collar of his shirt and thrown to the ground even though he had done nothing wrong and had done nothing to escalate the interaction. The individuals told him to stay silent and proceeded to handcuff him.

5. After Rodrigo was handcuffed, the individuals took Rodrigo and his coworker to a police station and dropped them off at the station.

6. He told me he was not shown any documents nor a warrant throughout the entire interaction with the police and the plain-clothed individuals. Rodrigo speaks English and told me that he asked to see documents and they did not provide any. He told me he was not asked for his name, his identification, what his immigration status was, how long he has lived in the United States, who his family members are and what his work history is, or anything else about his ties to the community or his circumstances.

7. After his arrest, Rodrigo was taken to an ICE detention center in Farmville, Virginia, and then he was transferred to El Paso, Texas. I can rarely contact him.

8. Rodrigo's arrest has severely threatened his health. He is diagnosed with hypertension, and he was provided with the wrong dosage medication at the detention center. Additionally, the detention center in El Paso is not providing his medication, which is further exacerbating his condition.

9. This has been very traumatic for me. The stress and anxiety from my son's detention have taken a toll on my physical well-being, and I am scared to leave the house out of fear of going through the same experience he endured. I am also scared of collapsing on the street out of panic and terror.

10. I am a legal permanent resident and still have this fear because it's clear to me from my son's experience that agents are arresting people just for their skin color.

11. Due to my abusive ex-husband, I fear for my safety if my identity is public. I am also afraid of retaliation me and my family may face if my identity were to become public as a result of my participation in this lawsuit. I am particularly afraid that me and my family members will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens and asylum seekers online.

12. This declaration was read to me in full in Spanish on September 30, 2025, by Yahir Santillan-Guzman. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2025.

Cristina

Cristina

# DECLARATION OF DANIELA ANELLO

I, Daniela Anello, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Daniela Anello. I am the Chief Executive Officer of DC Bilingual Public Charter School, located at 33 Riggs Rd NE, Washington, DC 20011. I hold a Master of Arts in Literacy Specialist from Teachers College, Columbia University, and a Bachelor of Arts in Elementary Education from the State University of New York at Geneseo.

2. I began my journey at DC Bilingual in 2009 as a Literacy Coach, advancing to Resident Principal and Interim Principal before the Board of Trustees appointed me as Head of School. This year marks my 16th year with the school. The DC Public Charter School Board ranks DC Bilingual among the highest performing elementary charter schools in the city, and The New Teacher Project places DC Bilingual in the top quartile of all DC charter schools for its strong instructional culture. Under my leadership, DC Bilingual received the U.S. Department of Education's prestigious National Blue Ribbon School Award for Educational Excellence in 2024, recognizing exemplary schools in the top 15% of all public schools on state assessments.

3. On September 25, 2025, at approximately 3:45 p.m. outside of DC Bilingual Public Charter School, at least nine officers from the Metropolitan Police Department (MPD), Homeland Security Investigations (HSI), Enforcement and Removal Operations (ERO), Customs and Border Patrol (CBP), and Federal Bureau of Investigation (FBI) were involved in the arrest of two young Latino men outside our school. The officers had three unmarked cars. This occurred during school dismissal, just steps from our school playground. The arrest was in plain view of dozens of parents and children at the playground and others watching from windows in the school. Many children began

crying and asking if they were going to be taken away. Students and teachers from other nearby schools also witnessed the incident.

4. Despite the fact that at least nine MPD and federal officers participated in the arrest, there was no sign that the young men were armed or posing any threat to those around them. Indeed, the officers did not follow typical protocol when there is a safety issue outside of our school (such as alerting the school to shelter in place). As shown in videos taken of the arrest, the men did not resist in any way. Officers searched their backpacks and did not appear to find anything of note. The detained men did not appear to resist or run away at any point, and appeared to cooperate with the officers' directions. At least one MPD officers spoke to the detained men in Spanish.

5. One of the MPD officers uncuffed one of the detained men, and handed him over to a masked ICE officer, who then re-cuffed him. The detained man was then placed into an unmarked car.

6. During the incident, I witnessed officers speak rudely and in a highly escalatory fashion to concerned neighbors, school staff, parents and caregivers who were simply asking for information about what was taking place. In a video I have in my possession, one bystander said, "Can you tell us what they're being arrested for?" An MPD officer responded, "It's none of your business." A bystander asked, "Do you have a warrant for their arrest?" The officer responded, "Go back to that line over there."

7. One MPD officer repeatedly threatened to arrest bystanders--including me--who were exercising their First Amendment right to record the arrest or who asked questions. Even though none of the bystanders were blocking officers or disrupting the arrests in any way, this MPD officer asserted that bystanders were not allowed to stand on the sidewalk or on

the street and demanded that they move farther away. A second officer remarked caustically to alarmed bystanders: "If you have such a problem with us, don't call 911 next time." When informed that children were watching the arrest and crying because they were concerned about being taken away by the officers, the first officer responded dismissively: "Make up the narrative. That's what you do anyway." Several officers turned their back on the people trying to speak to them.

8. Later that same day, on September 25, 2025, I submitted a letter to Mayor Bowser and Members of the DC Council reporting the incident via email. *See* Exhibit A.

9. As the leader of a school that serves a large Latino and immigrant population, I continue to seek clarity to assure our families that our campus remains a safe space. Our community has been directly impacted by ICE arrests and regularly witnesses ICE activity in the area surrounding our school. Already, our children carry fears about coming to school, and incidents like this deepen their anxiety and mistrust.

10. I'm also concerned about the impact that this arrest will have on our school community's trust in the MPD. At DC Bilingual, we've built a strong, positive relationship with MPD over many years. Officers have volunteered to speak to our students about safety, appeared at school events, represented the MPD at college and career classroom events, assisted when issues arise in the neighborhood, and supported safe arrival and dismissal. Our school's relationship of mutual trust and respect with MPD benefits our students, staff, families, and community. Unfortunately, incidents like these arrests threaten to erode that trust, which could lead to serious harm for our community.

11. Given my own experience and deep familiarity with schools across Washington, DC, I believe that DC Bilingual is not the only community impacted by actions by MPD and

federal immigration officials. Many other schools and neighborhoods across the city are also experiencing the consequences of these actions.

12. From my experience supporting the DC Bilingual community, I have seen firsthand the devastating impact of aggressive immigration enforcement activity in Washington, DC, including multiple arrests carried out near school. I'm aware of several incidents in which men who were the primary breadwinner of their families were taken into custody, leaving other family members struggling to pay rent, navigate daily life, or even feel safe leaving their homes.

13. The effects on children are especially heartbreaking. Students have carried fear and trauma of a parent, loved one, or neighbor being taken away, which directly impacts their emotional well-being and their ability to focus, learn, and regularly attend school.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2025.

Daniela S Anello

Daniela Anello

# EXHIBIT A

DC Bilingual Public Charter School

Daniela Anello <danello@dcbilingual.org>

# Incident Outside of DC Bilingual 9.25.25

12 messages

**Daniela Anello** <danello@dcbilingual.org> Thu, Sep 25, 2025 at 11:16 PM
To: pmendelson@dccouncil.gov, kmcduffie@dccouncil.gov, abonds@dccouncil.gov, rwhite@dccouncil.gov, chenderson@dccouncil.gov, bnadeau@dccouncil.gov, bpinto@dccouncil.gov, mfrumin@dccouncil.gov, "Lewis-George, Janeese (Council)" <jlewisgeorge@dccouncil.gov>, "Parker, Zachary (Council)" <zparker@dccouncil.gov>, callen@dccouncil.gov, wfelder@dccouncil.gov, twhite@dccouncil.gov, muriel.bowser@dc.gov, "Kihn, Paul (EOM)" <paul.kihn@dc.gov>, "Botstein, Clara (EOM)" <clara.botstein@dc.gov>
Bcc: DCB Executive Board <executiveboard@dcbilingual.org>, DCB Executive Leadership <leadership@dcbilingual.org>, PTA DC Bilingual <pta@dcbilingual.org>, Rebecca Jones <rebjon@gmail.com>, Natalia Banulescu-Bogdan <natalitza@gmail.com>, Valerie Baron <baron.valerie@gmail.com>, ELFS <dcelfs@googlegroups.com>, Ariel Johnson <ajohnson@dccharters.org>, Rachel Johnston and Tami Lewis <rjohnston@dccharters.org>, Tameria Lewis <tlewis@dccharters.org>, Agatha Schmaedick Tan <as863@law.georgetown.edu>

Dear Mayor Bowser and Members of the DC Council,

I am writing to request your urgent support in investigating and clarifying an incident that occurred today, September 25, 2025, outside of DC Bilingual Public Charter School at dismissal.

At approximately 3:45 p.m., at least nine officers from the Metropolitan Police Department (MPD), Homeland Security Investigations, Enforcement and Removal Operations, Customs and Border Patrol, and Federal Bureau of Investigation (FBI) were involved in the arrest of two young Latino men outside our school. The officers had three unmarked cars. This occurred during school dismissal, just steps from our school playground. The arrest was in plain view of dozens of parents and children--many of whom began crying and asking if they were going to be taken away. Students and teachers from other nearby schools also witnessed the incident. Based on what I observed, MPD carried out the majority of the actions on the scene, in the presence of federal agents.

Despite the fact that at least nine MPD and federal officers participated in the arrest, there was no sign that the detainees were armed or posing any threat to those around them--and indeed, the MPD did not follow typical protocol when there is a safety issue outside of our school (such as alerting the school to shelter in place).

During the incident, I witnessed MPD officers speak rudely and in a highly escalatory fashion to concerned neighbors, school staff, parents and caregivers who were simply asking for information about what was taking place. One MPD officer repeatedly threatened to arrest bystanders--including me--who were exercising their First Amendment right to record the arrest or who asked questions. The officer asserted that bystanders were not allowed to stand on the sidewalk or on the street and demanded that they move farther away. A second officer remarked caustically to alarmed bystanders: "If you have such a problem with us, don't call 911 next time." When informed that children were watching the arrest and crying because they were concerned about being taken away by the officers, the first officer responded dismissively: "Make up the narrative. That's what you do anyway." Several officers turned their back on the people trying to speak to them.

This incident raises serious questions about the role of MPD in aggressive ICE activities in our city, about MPD's disrespectful treatment of members of the community they are sworn to protect, and about the risks this conduct poses to our school community's safety and trust in law enforcement.

I'd appreciate responses to the following questions:

1. **Is MPD continuing to cooperate with ICE and participate in immigration enforcement related arrests?** Such actions appear to contradict the Mayor's statement on September 10 that "Immigration enforcement is not what MPD does. And with the end of the emergency, it won't be what MPD does in the future." If this incident was not an immigration arrest, can you explain what happened and confirm that the detained men were not sent to an ICE detention facility, but instead to an appropriate facility that ensures basic human rights and adheres to due process?
2. **Do you believe that it is appropriate for MPD, along with armed federal agents, to conduct aggressive immigration arrests just steps from a school playground during school dismissal?** If so, what is the justification for conducting immigration arrests at school playgrounds, given the potential harm this causes to children and families? Is this conduct consistent with current MPD policy, and will you commit to reviewing that policy?
3. **Is MPD committed to de-escalation, transparency, and respect for community members?** Did the officers' conduct during this incident meet the MPD's standards? Will this incident be reviewed, and will you share the results of that review? Will our community members receive an apology?

As the leader of a school that serves a large Latino and immigrant population, I urgently need clarity to assure our families that our campus remains a safe space. Our community has been directly impacted by ICE arrests and regularly witnesses ICE activity in the area surrounding our school. Already, our children carry fears about coming to school, and incidents like this deepen their anxiety and mistrust.

I'm also concerned about the impact that today's arrest will have on our school community's trust in the MPD. At DC Bilingual, we've built a strong, positive relationship with MPD over many years. Officers have volunteered to speak to our students about safety, appeared at school events, represented the MPD at college and career classroom events, assisted when issues arise in the neighborhood, and supported safe arrival and dismissal. Our school's relationship of mutual trust and respect with MPD benefits our students, staff, families, and community. Unfortunately, incidents like today's arrest threaten to erode that trust, which could lead to serious harm for our community.

**I respectfully request a clear statement regarding MPD's role in this arrest and continued immigration enforcement and concrete steps that will be taken to ensure that families in our community can trust DC law enforcement to protect DC residents, rather than act as an extension of federal immigration enforcement.**

Our students and families deserve to feel safe walking to and from school without fear of being targeted or traumatized by law enforcement encounters. I ask that you prioritize this matter and provide answers and accountability.

Thank you for your attention and leadership on this urgent concern.

Daniela Anello
**Daniela Anello | Chief Executive Officer (CEO) | Directora Ejecutiva (CEO)**

DC Bilingual Public Charter School I 33 Riggs Rd, NE I Washington, DC 20011

**Please make an appointment HERE to meet with me**

**Por favor haga clic aquí para hacer una cita conmigo**

W: 202.750.6674 I danello@dcbilingual.org I www.dcbilingual.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSE ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-3417 |

**DECLARATION OF DARWIN LOPEZ CASTAÑON**

I, Darwin Lopez Castañon, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Darwin Lopez Castañon. I am 31 years old. I lived in the District of Columbia from 2021 until I was deported last month.
2. On Thursday August 21, at around 7:30am, my brother and I left for work. We left from our home on Holmead Pl NW, which is close to Monroe St NW. My brother was driving us in his car. The car is registered under my brother's name and has current license plates and registration. My brother was driving within the speed limit.
3. Once we left, we turned onto Monroe St to head towards 13th St NW. As we were turning onto Monroe, we saw two unmarked vehicles that began to follow us. One vehicle immediately came in front of us to block the road, while the other remained behind. The cars flashed their lights at us to let us know we were getting stopped.
4. A masked agent approached my side, the passenger's side. He was wearing a red t-shirt and gray pants and had on a velcro vest that said "Police" across the front. I could not see a badge of any kind. He had a gun strapped to one of his legs. He was Latino. I pulled my window down slightly to be able to hear him speak. In Spanish he asked me for our documents, asked if we were American, and asked if we've had any trouble with the law. He did not tell me his name, tell me what agency he was with, or provide any credentials of any kind. The agent did not ask me any other questions. He never explained why in particular we got stopped.
5. I responded to his questions by telling him that I am an immigrant. I showed him my medical insurance but he told me that it was not a valid form of identification. I told him that I didn't have my physical ID (an ID from my country of origin, Guatemala) because it was stolen along with my wallet when I was assaulted on the street months ago, and told him that I was still waiting to get a new ID card. Instead, I showed him the digital copy of my ID on my phone. My brother provided his driver's license, which he had on hand.

6. After we showed the agent our IDs, two other agents gathered outside my brother's side. One appeared to be a white man, and the other was a female wearing a mask. They both had on the vests that said "Police" on them. Another agent wearing a t-shirt and jeans came to my side. He also had the same type of vest. They spent a few minutes talking amongst each other and checking our names.
7. The officer on my side asked me to get out of the car so that "we could do things the right way." I told them no, that "it is my right to not roll down the window completely, or open the door." I told them to look up our names again because they will find that we have no criminal record. The agents threatened us to break our windows if we did not get out. We were scared, and didn't know what to do.
8. After a few seconds of us still inside the car, the agents began to break our windows without any type of warning. There was one agent on each side of the car. Both the driver's and passenger's side windows were broken. At this time more agents came to both sides of the car. They tried to grab us and pull us out of the car from the window, but could not manage to do so. They then reached inside of the car, unlocked the doors, and opened them. The two agents on my brother's side pulled him out of his seat, threw him on the ground, grabbed his arms, and tied his hands to his back. I stood up before the agents on my side could fully grab me and held onto the car for stability so I wouldn't get thrown onto the pavement. The two agents standing next to me grabbed my arms and tied my hands together behind my back. I did not try to flee.
9. We were both put into the black car that had stopped behind us. We were not told where we were being taken and what would happen to us next. While we were riding off in the car I asked "Why are you doing this? We haven't done anything, the only thing we were trying to do is just go to work." The agent in the car driving ignored me and did not answer any of my questions.
10. The total duration of the stop in arrest in DC was about 20 minutes.
11. None of the agents at any point ever identified themselves, presented a warrant or other paperwork, explained why they stopped us, or indicated that they knew us/knew our names prior to stopping us. Nor did any of them ask us any questions about our ties to the community, how long we've been living/working in DC, our family here, or anything else about our circumstances.
12. I have lived in the DC area since 2021 and I have never experienced an encounter like this. I have never been arrested. I have never been convicted of any crime/offense. The same goes for my brother. We are victims of an assault that happened months ago. And what happened on August 21 felt like another assault.
13. Because of this arrest I have now been deported back to Guatemala. I went from the processing center in Chantilly, to Farmville, VA, to Louisiana, and then deported. I was asked to self-deport multiple times and each time, I refused. I was also lied to when taken to Louisiana because I was told I could continue my case there instead of being deported. My brother is currently in Farmville waiting for a court case. Our family in DC is struggling financially as my brother and I were the sole providers of income. My wife cannot work and has to take care of our two children. I am stuck in Guatemala not knowing what I can do.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19, 2025.

## CERTIFICATE OF INTERPRETATION

I, Alejandra Jolodosky, certify that I am fluent in Spanish and English and that I read this declaration in its entirety to D.L.C. Due to D.L.C.'s deportation, I have not been able to visit him in person or otherwise obtain his signature. I spoke with D.L.C. by phone, documented his statement, and drafted this declaration accordingly. At 2:10pm on 9/19/2025, I read the declaration back to D.L.C. word for word to confirm its accuracy. D.L.C. affirmed that it was accurate and authorized me to sign on his behalf.

[Alejandra Jolodosky]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF ELIAS DOE**

I, Elias Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Elias Doe. I am 41 years old. I am a CASA member, and I identify as Latino.
2. I live in Hyattsville, Maryland, right outside Washington, D.C. On the morning of August 20, 2025, I was driving through Washington, D.C. I was in the Northeast part of the city on my way to the doctor to receive my dialysis treatment, which I am required to do several times a week. Unfortunately, as I was driving, I was in a car accident with an Amazon vehicle.
3. After the accident, local police officers arrived, but then so did ICE officers. They arrived about 5 minutes after the local police. I knew that they were ICE officers because they were wearing vests that said "ICE". One of the agents came up to me and spoke to me in Spanish. He told me he was an ICE officer. He did not know my name and did not seem to know anything about me. He asked me where I was from, so I told him El Salvador. He then asked me for my Salvadoran I.D. card, which I showed him. I also explained that I had a U.S.-issued driver's license, but the ICE officer said that he didn't need that.

4. The officer did not take my I.D. or do anything with it when I showed it to him. He simply looked at my I.D., told me I was under arrest, and then started putting handcuffs on me. This was around 10 a.m. At no point before they arrested me did they ask me if I had immigration status or if I was a U.S. citizen, what my ties were to the community, whether I had family members in the U.S., where I live and how long I have lived there, my work history, if I had any criminal convictions, or anything else about my individual circumstances.

5. The officers did not explain why they were arresting me. They did not give me any documents or a warrant prior to arresting me. I did not attempt to resist arrest in any way.

6. After arresting me and placing me in their vehicle, the officers took me to Chantilly, Virginia and detained me in the center there. After several hours, the ICE officers said I could leave that evening because I was so sick after missing my dialysis treatment that day. This was around 6 pm.

7. Again, they did not give me any documents or papers at the time they released me. I still have not received any explanation as to why I was arrested or released. I also never received any kind of assurance that I will not be detained or arrested by ICE in the future.

8. My arrest and detention has had a horrible impact on me. In May 2024, I had open heart surgery. Now, as part of my recovery, I am required by my doctor to receive dialysis treatment three times a week at a clinic in Washington, D.C. When ICE arrested me, they forced me to miss my treatment. I had to scramble the next two days to receive the care I needed. My blood pressure has spiked, and I can’t sleep because of all the stress the arrest caused me.

9. I am also living in fear now. I am constantly under the threat of arrest and deportation. I cannot be deported to El Salvador. I would die there because I would not be able to receive the medical treatment I need to live after my surgery. I would also be separated from my mother, whom I depend on to live. Every day is terrifying because I have these threats hanging over me now.

10. I am using a pseudonym because I am afraid of harassment and retaliation for participating in this lawsuit if my real identity is revealed.

11. This declaration was read to me in full in Spanish on September 30, 2025 by Megan Steinheimer. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

I, Megan Steinheimer, CASA Representative, affirm Elias Doe gave me permission to sign this declaration on his behalf. At 11:00am on September 30, 2025, I read the above Declaration back to Elias Doe to confirm its accuracy and he stated that it was accurate.

Executed on October 1, 2025.

Signature

# DECLARATION OF FIONA LEWIS

I, Fiona Lewis, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Fiona Lewis. On September 22nd, 2025, one of my friends named Alex was walking down 2nd st NE DC in front of the Chick Fil A near the intersection of Riggs Rd at around 6:15 am. I make this declaration on my own personal knowledge, except as to facts relayed to me by Alex's partner concerning his arrest and detention by federal agents in a telephone call and except as to matters expressly stated to be upon information and belief, and as to these, I believe them to be true.

2. I understand from speaking to Alex's partner and mother of his two young children, that two plain-clothed people who were not wearing uniforms that he could remember, grabbed Alex from behind. The two men did not show Alex any identification, and they did not ask Alex to show any identification. They also did not ask anything about Alex's immigration status or ties to the community. The men immediately took Alex's phone and turned it off and took Alex's possessions. Alex did not make any attempt to resist arrest or run. Then, the men threw Alex into an unmarked van.

3. Alex said the men who took him then took two other Latino men walking down the street in the same way they took him.

4. The men took Alex and the other men somewhere and he did not even know where it was. And that's when actual officers spoke to Alex.

5. This blatant disregard for the law is just appalling and demonstrates a profound disregard for both federal immigration statutes and the fundamental rights of D.C. residents.

6. It's been very difficult communicating with Alex while he has been detained by ICE, even when he's been able to call from the jails he's been in. The phone was mostly

dropping out after only a few minutes, because he was getting moved a lot it was difficult to track his location, and find details regarding when his deportation was to take place. We still have no idea where he is. When I call the local DC ICE office all they can tell me is that he is in custody somewhere but they don't know where, and they tell me they cannot give me any further information about his location or deportation date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1st, 2025.

Fiona Lewis

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSE ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF FRANCO DOE**

I, Franco Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Franco Doe. I am 21 years old, and I am an Uber delivery driver. I am from Venezuela. I have lived in the DMV since June 2023, when I received Temporary Protected Status (TPS), which is active until 2026. I have a fear of harm and persecution from the Venezuelan government because I was tortured in prison after I was accused of committing a crime I did not commit. I live in an apartment with my wife and my eight-month-old daughter, who is a U.S. citizen. I am a member of a church in my community and am just trying to make money to support my family.

2. On August 17, 2025, I was working as an Uber delivery driver in Capitol Hill, driving my motorcycle to drop off a delivery order at an apartment complex. The moment I left the building after dropping off the order, I noticed that various federal agents had surrounded my motorcycle.

3. When I approached my motorcycle, there were multiple police officers and federal agents

waiting for me. They asked me for my social security, my work permit, my motorcycle title, and my driver's license. I was able to provide them with all of those documents. They didn't ask me my status, they only asked me for my paperwork. I told them that I had my TPS. At the time, my TPS had expired but I was applying for renovation, so I was still legally in the United States. After giving them my documents, the agents put handcuffs on me. I didn't understand why they were arresting me when I had all my paperwork in order and was able to show it to them. Immediately after handcuffing me, they put me in one of the five vehicles nearby. Bystanders around me were asking why I was being detained.

4. The agents never provided any reason and never presented me with a warrant or any order for my arrest. Before arresting me, the agents did not ask me any questions about my family members, where I live and how long I have lived there, my work history, or anything else about my ties to the community. I did not make any attempt to resist arrest or run away. My wife could not get in touch with me. I had no way of telling her that I had been arrested. When her calls and texts to me went unanswered, she looked to social media and found out about my arrest through a video on TikTok. My wife wasn't able to get my motorcycle back because they took the registration and title.

5. I went to Chantilly first, where they took my fingerprints and asked identifying questions. I was there for about four hours until they took me to Farmville. In Farmville, the conditions are difficult, but in order to survive, the other detainees and I must eat the horrific food available.

6. Since 2023 when I entered this country, this is the first and only time I have had interaction with law enforcement. I have never been convicted of any crime or offense, and I have not had any issues with meeting deadlines or appearing in court in relation to my immigration

case.

7. My wife and 8-month old baby depend on me economically. She and our baby have had to move because, as a result of my detention, they cannot pay the rent where they were living. My daughter is suffering from the absence of her father. My wife had an accident and is unable to work right now. She also has a low platelet count, meaning she is more likely to suffer from a stroke. I worry what will happen to her without me there and what will happen to our daughter if anything happens to my wife. I also economically support my disabled father in Venezuela, who relies on me for his daily life.

8. I am deeply concerned and scared by this incident. I believe I was stopped and arrested solely because of the color of my skin, my appearance, and my job. The officer did not present any warrant and did not say why I was stopped and/or why I was being arrested. If I am released, I fear that I will be arrested or detained again because I would continue to work in the same neighborhoods of D.C. where I was arrested.

9. Due to my pending TPS application, I fear I would face retaliation and grave danger if my persecutors in Venezuela were to learn of my TPS claims through this lawsuit. I am also afraid of retaliation towards me and my family may face if my identity were to become public as a result of my participation in this lawsuit. I am afraid that me and my family members will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens online.

10. This declaration was read to me in full in Spanish on September 30, 2025, by Alexis Gorfine. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2025.

Franco Doe

Franco Doe

I, Alexis Gorfine, Law Clerk at Covington & Burling LLP, affirm Franco Doe gave me permission to sign this declaration on his behalf because he is currently detained. At 3:45pm on September 30, 2025, I read the above Declaration back to Franco Doe word for word to confirm its accuracy and he stated that it was accurate.

Executed on September 30, 2025.

Alexis R. Gorfine

Alexis Gorfine

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants*.

No. 25-cv-3417

**DECLARATION OF JAVIER DOE**

I, Javier Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Javier. I am 43 years old. I am a CASA member, and I identify as Latino.
2. Before I was deported in September 2025, I lived in Washington D.C. with my wife and three children. The oldest child is 18, but I also have a four-year-old and a six-month-old baby. My two younger children are U.S. citizens.
3. About three years ago, my oldest daughter was the victim of a violent assault. Because of this, my family and I applied for U Visas. Those applications are still pending.
4. At around 6 am on September 10, 2025, I was at the Fort Totten Metro stop in D.C. on my way to work. I was the only person in my family that worked because my wife had to take care of our new baby. I would take the train to work because I didn't have a driver's license and I wanted to respect the driving laws, so I didn't drive to work.
5. As I was walking out of the metro station, I saw four immigration officials get out of a truck and start to approach me. I knew they were ICE officials immediately because they

were wearing ICE uniforms with the green vests. At first, one asked me to stop for a second and showed me a photo of a person who looked Latino. He asked if I knew the person and I said that I did not. But before I could leave, the officer then asked if he could see my immigration documents. I did not want to lie to them so I told them I didn't have any documentation, but that I did have a pending U Visa case.

6. The officer responded that he had to ask his supervisor something. When he came back he said "I'm sorry sir, but I have to arrest you." They put me in handcuffs and then in their car and that was it. They did not ask me any questions about how long I had been in the United States, if I had any family or ties to the community, or anything else about my personal circumstances. They did not explain why they had to arrest me. I did not make any attempt to flee or resist arrest.

7. They put me in a car and took me to the detention center in Chantilly, Virginia. I was there for a full day, and then was transferred to a jail in Richmond the following day. I was there for two days when they moved me again to a detention center in Louisiana. I was there until I was deported on September 26.

8. While I was detained, immigration officials handed me a piece of paper and told me that I had to sign it. I told them I didn't want to because I knew it meant I was accepting my deportation. I told them I had a pending U Visa case and wanted to see a judge. But the officials said I had to sign the document. I didn't know what was going to happen to me if I didn't sign it, so out of fear, I signed it.

9. My arrest and deportation has been hard for my family to bear. My family depended on my income to survive. My wife has had to assume all the responsibility after I was arrested. She is very scared that she also might be arrested, but she has to leave the house

every day and work just so my children can survive. Economically, it has been very tough for them.

10. It has been even harder emotionally. My arrest and detention traumatized our entire family because it ripped us apart. I miss my children so much. I don't have any family in my home county and feel so alone. I can talk with my oldest child, but my baby and younger daughter are too young. I want to be a part of their lives and hear about what they are learning in school, but that was taken away from me. My oldest tells me that my children sometimes go to the park and ask the police officers there if they know where their dad is. It is heartbreaking.

11. All I want now is to see my family. It feels so unjust that this happened to me. I respected all the laws, did my taxes, and worked to support my family. Yet all of this happened to me. It feels like the officials do not respect our rights.

12. I am afraid that I will be harassed and retaliated against for participating in this lawsuit if I reveal my true identity. This is why I am using a pseudonym.

13. This declaration was read to me in full in Spanish on October 1, 2025 by Megan Steinheimer. I completely understand the content of this declaration.

14. I declare under penalty of perjury that the foregoing is true and correct.

I, Megan Steinheimer, CASA Representative, affirm Javier Doe gave me permission to sign this declaration on his behalf because he is currently detained. At 9:00am on October 1, 2025, I read the above Declaration back to Javier Doe to confirm its accuracy and Javier Doe stated that it was accurate.

Executed on October 1, 2025.

Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF JULIO DOE**

I, Julio Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Julio Doe. I am 44 years old. My wife is a CASA member, and I identify as Latino. I have lived in the United States since 2003. Before my arrest, I lived in Jessup, Maryland, with my wife and four children. My oldest child is 19 years old, and my youngest child is four years old. My children are U.S. citizens. I am originally from Guatemala, and my wife and I have a pending asylum application. My nephew and I work as plumbers in our neighborhood to support our family. I have had a work permit since 2013, which I have renewed every year. Last year, I received a 5-year work permit. I am a CASA member, and I participate in a committee at Iglesia San Mateo Episcopal that does community work like building bathrooms in the church.

2. On August 28, 2025, my nephew and I were on our way to work. I don't have a driver's license, so I was in the passenger's seat of the car while my nephew drove. We were a few blocks south of Walmart on Georgia Ave NW in Washington, D.C., when we were stopped

by ICE agents. I could see six agents at first. First, they asked my nephew for his identification, and he showed his green card. Then, they asked for my ID, and I showed them my Real ID. They told me to get out of the car, and I asked why. The agent said if I didn't get out, they would break down the door.

3. When I got out of the car, I saw many more agents. I was so scared about what was happening to me. The agents immediately put handcuffs on me and grabbed me by the collar. I asked why because I hadn't done anything wrong. At no point did I resist or run away. They walked me over to their van. Afterward, they took my work permit, my license, and all of my things from me. One of the agents said that I was "fine." Another agent said that I wasn't, and they put me in the van. On the drive to Chantilly, the agents were bragging about getting "another one" and said, "that was easy." They were acting like they were celebrating having detained me.

4. Throughout the whole interaction, none of the agents at any point identified themselves, presented a warrant, or indicated that they knew me or my name prior to the arrest. They also did not ask me any questions about my ties to the community, how long I've been living or working in the D.C. area, or my family here.

5. They initially took me to an ICE detention facility in Chantilly, Virginia, for two nights and one day. I was fingerprinted and interviewed there. They put us in a cement room in horrible conditions. One night, they called me out of the room around midnight, and one of the agents told me that my work permit was fake, while the other said it was real. They laughed and said that they would review it more and that if it was real, I could leave.

6. After Chantilly, they moved me to Farmville Detention Center where I slept in a freezing cold room. In one room, there were no beds, so we were sleeping on the concrete floor. In another room with 100 people, we slept in bunk beds that were very close together.

7. From there, I was taken to Richmond in a two-hour car ride. We were all tied up so that we couldn't move, and they blasted the cold air even though we all asked them to stop. They then turned on the heat and played music at high volume. They then took us to a hidden part of the airport and made us get on the plane really fast with chains on our arms and legs. In the airplane, we were still tied up and couldn't even eat the small sandwich they gave us. We also couldn't use the bathroom because we were tied up.

8. This declaration was read to me in full in Spanish on October 1, 2025, by Alexis Gorfine. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.

Julio Doe

Julio Doe

I, Alexis Gorfine, a Law Clerk at Covington & Burling LLP, affirm Julio Doe gave me permission to sign this declaration on his behalf because he is currently detained. At 9:00 pm on October 1, 2025, I read the above Declaration back to Julio Doe word for word to confirm its accuracy and he stated that it was accurate.

Executed on October 1, 2025.

Alexis R. Gorfine

Signature

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al., individually and on behalf of all others similarly situated,*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF LUZ DOE**

I, Luz Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Luz Doe. I am 34 years old and I live in Hyattsville, Maryland. I am a CASA member. I make this declaration on my own personal knowledge, except as to facts relayed to me by my partner concerning his arrest and detention by federal agents in a telephone call and except as to matters expressly stated to be upon information and belief, and as to these, I believe them to be true.
2. My partner's name is Daniel. He is 32 years old. Daniel and I are originally from Venezuela but currently live in Hyattsville, MD. Daniel and I both work in DoorDash food delivery in Washington, D.C. We both entered the country legally through the CBP One process in December 2024. We also both have pending asylum applications.
3. On August 15 at approximately 10:15 AM, Daniel and I were pulled over and arrested in Washington, D.C. on 14th Street NW while making a food delivery on our motor bike.

Our motorbike is registered under my name and has current license plates and registration.

4. After we picked up the food, we were riding our bike to our destination when we were pulled over on 14th Street by a Washington, D.C. Metropolitan Police car. After we were stopped, we remained on our bike and did not make any attempt to drive away. The officer asked for the bike registration and our identification. We provided the registration for the motorbike and my Venezuelan passport. We also both gave the officer our Venezuelan IDs. After looking at our documents and my passport, the officer didn't say anything, but proceeded to send a text on his phone.

5. Approximately five minutes later, two unmarked SUVs pulled up. Three agents emerged from the vehicles and announced they were from Immigration and Customs Enforcement (ICE). They claimed that we had entered the country illegally and that they were there to detain us. At no point did we try to flee or resist arrest.

6. We tried to explain that we had pending asylum applications. However, the ICE officials dismissed this information and said that we were illegal. They threatened to handcuff me first, but after Daniel stood up for me, they handcuffed him instead. They handcuffed me shortly after.

7. Although they said they were from ICE, the officers did not present a warrant, explain why they stopped us, or indicate that they knew our names prior to stopping us. Nor did any of them ask us any questions about our ties to the community, how long we have been living or working in D.C., our family here, or anything else about our circumstances.

8. After the agents arrested us, they placed us inside two separate vehicles and drove us to the ICE Detention Center in Chantilly, Virginia. I was placed in a vehicle with two ICE officers, and Daniel was placed in a vehicle with three officers. During this initial car ride, the agents did not provide us with any additional information, a warrant, or other documentation related to our arrest. I tried to explain that we didn't enter illegally and had the correct documents to get into the country, but the officers did not respond.

9. When we arrived at the Chantilly, VA facility at approximately 12:00 PM, we were further restrained by being handcuffed at our hands, feet, and waists. No one talked to us, or provided any explanation as to why we were there or how long we would be there**.** Shortly after we arrived, they took everything from us, including our personal items and shoelaces. They put me in a cell by myself because I was the only female there at the time. They placed Daniel in a cell with several other men.

10. At approximately 10:00 PM, I was released from my cell and led to an office to talk with four immigration officers. I saw Daniel in his cell as I was walking to the office, and it appeared someone else had already spoken to him. Once in the office, I was again asked how I entered the country. I said I came with a CBP One document that President Biden provided, but they said that was not valid anymore. One officer spoke to another officer in English for a few minutes. They then decided to let me go, saying: "Thanks to God, it is your lucky day." Prior to releasing me, they took my fingerprints. They also told me that I would receive an immigration court date in December. But they did not provide me with any documents or the location of the court date.

11. Before I was released, I asked the officers about Daniel and whether they were going to let him go. The officers said that was not their responsibility and did not provide me with

any other information. I was told to make a phone call to have someone pick me up, so I called my nephew. After this, I was put back in my cell to wait until my nephew arrived. He arrived to pick me up around 11:30 PM.

12. Sadly, Daniel was not released. He was moved to Caroline Detention Center in Virginia the next day. It felt unfair what they were doing. We were working. We are not criminals, and that is how they treated us. It was a very traumatic experience.

13. Since December 2024 when Daniel and I entered this country, this is the first and only time he was arrested by law enforcement. He has not had any other interactions with law enforcement, he has never been convicted of any crime/offense, and he has not had any issues with meeting deadlines or appearing in court in relation to his immigration case.

14. While detained at Caroline Detention Center, Daniel has been suffering from severe anxiety and has had difficulty sleeping. He has had to see a psychologist multiple times because of his anxiety. He has also been to the doctor at the detention center multiple times because he has a rash over his body, which he thinks may be a fungus. During his detention, Daniel has been held in a small cell with five other people. The mattresses are not comfortable and the food is not good. He says it feels like a jail.

15. He has an upcoming court date on October 17 to defend his asylum case and seek to remain in the country.

16. As a result of Daniel's detention, I have been struggling as the main breadwinner. I have gone multiple times without eating because I could not afford to. I have also been struggling mentally because we have always been together. I only have one other family member here, my nephew, but he has his own family, so I feel alone.

17. Due to me and Daniel's pending asylum applications, I fear we will face retaliation and grave danger if our persecutors in Venezuela were to learn of our asylum claims through this lawsuit. I am also afraid of retaliation that my family and I may face if my identity were to become public as a result of my participation in this lawsuit. I am particularly afraid that my family members and I will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens and asylum seekers online.

18. This declaration was read to me in full in Spanish on Tuesday, September 30, 2025, by Patricia Zapata. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2025.

[redacted]

I, Patricia Zapata of CASA, Inc., affirm Luz Doe gave me permission to sign this declaration on her behalf. At 4:45 pm on September 30, 2025, I read the above declaration back to Luz word for word to confirm its accuracy and she stated that it was accurate.

Executed on September 30, 2025.

[redacted]

Signature

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al., individually and on behalf of all others similarly situated,*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF M.P.**

I, M.P., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is M.P. I am 41 years old and I live in Millersburg, Ohio. I make this declaration on my own personal knowledge, except as to facts relayed to me by my brother concerning his arrest and detention by federal agents in a telephone call and except as to matters expressly stated to be upon information and belief, and as to these, I believe them to be true.
2. My brother's name is M.A.P. He is 40 years old and has lived in the United States since 2007. M.A.P. is originally from Nicaragua, but currently lives in Laurel, Maryland. He owns a house and lives with his girlfriend and five-year-old son, who is a U.S. citizen. M.A.P. works in construction and operates his own construction company, which often involves work in Washington, D.C. He has a work permit authorization, a social security number, and a valid driver's license. He also has a pending asylum application.

3. On August 25, 2025, at approximately 10:30 AM, M.A.P. was departing a Lowes in Northeast D.C on his way to a construction site on 16th Street in Northeast D.C. where he was to work that day. His car is registered under his name and had current license plates and registration.

4. Two blocks before he reached his destination, M.A.P. noticed that multiple cars were following him. Suddenly, a car pulled in front of him and blocked his path, and he pulled over. Approximately 16 agents then surrounded his vehicle. The agents were plain clothed and were not wearing anything to indicate that they were law enforcement. The agents did not identify who they were or what agency they were with.

5. M.A.P. remained in his car and did not make any attempt to drive away. He was instructed to step out of his car but was not asked anything about his immigration status or for any form of identification. He told the agents that he would comply with their instructions, but implored them not to hurt him as he stepped out of his vehicle.

6. Upon exiting his vehicle, M.A.P. explained to the agents that he has a work permit authorization, a social security number, a valid driver's license, and an open asylum case. However, he was immediately handcuffed, and an agent told him that his documentation did not matter and was not valid to them.

7. None of the agents at any point ever identified themselves, presented a warrant, explained why they stopped M.A.P., or indicated that they knew his name prior to stopping him. Nor did any of them ask him any questions about his ties to the community, how long he has been living or working in D.C., his family here, or anything else about his circumstances. At no point did M.A.P. try to flee or resist arrest.

8. After arresting M.A.P. and placing him in a vehicle, he was taken to an area near the Pentagon in Virginia and held to wait in the car for approximately 45 minutes. Then he was taken to another unidentified location where he was also held in the car for approximately an hour. Because he was not allowed to use a restroom, he became highly uncomfortable and was forced to hold his bladder. During this time, the agents did not provide him with any additional information, a warrant, or other documentation related to his arrest.

9. M.A.P. was then taken to the ICE Washington, D.C. field office and detained for approximately 24 hours alongside other people who had been similarly detained. He was allowed to make a phone call to me early the following morning, August 26, around 4:00 AM, where he told me he was being transferred to Virginia.

10. That day, he was transferred to an ICE facility in Farmville, Virginia. During his detention in Farmville, he described that the detainees were held in cramped quarters with several other people. While M.A.P. was at Farmville, the officers refused to turn off the lights in his cell, forcing him and his cellmates to sleep with the lights on. He was provided with food, but was not allowed to bathe during this time.

11. After being detained at Farmville for approximately six days, M.A.P. was transferred to the Moshannon Valley Processing Center in Pennsylvania. He was finally able to shower at the Moshannon Valley Processing Center and was given new clothes and shoes. However, his shoes are not the proper size, causing pain and discomfort in his feet. He has been held at the Moshannon Valley Processing Center for about a month.

12. Since 2007 when M.A.P. entered this country, this is the first and only time he was arrested by law enforcement. He has not had any other interactions with law enforcement,

he has never been convicted of any crime or offense, and he has not had any issues with meeting deadlines or appearing in court in relation to his immigration case.

13. As a result of his detention, M.A.P. and his family have been deeply traumatized. He remains detained at the Moshannon Valley Processing Center in Pennsylvania. His son, who is a U.S. citizen, constantly asks where his father has been taken and when he will return. He waits every day by the window in hopes of M.A.P. returning. His girlfriend is struggling to make ends meet and pay their bills without his support, including their monthly car and house payments. I have been left to try and support his family, while also supporting my own family.

14. I believe M.A.P. was stopped and arrested solely because of the color of his skin and his appearance, as it was clear that the arresting officer did not know who he was, did not present any warrant, and did not say why he was stopped and/or why he was being arrested.

15. Due to M.A.P.'s pending asylum application, I fear he would face retaliation and grave danger if his persecutors in El Salvador were to learn of his asylum claims through this lawsuit. I am also afraid of retaliation me and my family may face if my identity were to become public as a result of my participation in this lawsuit. Although I have a green card through my marriage, I am particularly afraid that me and my family members will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens and asylum seekers online.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.

10/1/2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants*.

No. 25-cv-3417

**DECLARATION OF MATEO DOE**

I, Mateo Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Mateo Doe. I am 23 years old. My wife is a CASA member, and I identify as Latino.
2. Before my arrest, I lived in Hyattsville, Maryland, right outside Washington, D.C., with my seven-year-old son and my wife.
3. My wife and I are originally from Venezuela, but we cannot go back. We applied for asylum in this country because we are scared to return.
4. I obtained work authorization through my pending asylum application. I work as a delivery driver with DoorDash to support not just my family here, but also my parents in Venezuela. I work under my legal name and with all the proper documentation and legal work authorization.

5. I was working on August 21, 2025 when I was arrested. At the time, I was parked on my electric bike, waiting for a delivery order in a McDonald's parking lot on Georgia Avenue in D.C.

6. When I mounted my bike to leave, two unmarked cars pulled up—one in front of me and one on my side. They parked in a way that stopped me from leaving. Four officers wearing masks got out of the cars. They were wearing jeans and t-shirts, but green vests and badges that said "ICE." The four officers surrounded me, with two in front of me and two behind me.

7. They asked if I was allowed to be in this country, so I told them yes. I explained I had a pending asylum application and showed them my work authorization card and Maryland driver's license. After I showed them these two cards, they said I was under arrest. When I asked why, they said it was because I wasn't a permanent resident. That's the only reason they gave me. They did not ask me anything about my family members, where I live and how long I have lived there, my work history, or anything else about my personal circumstances or ties to the community. They did not hand me any documents or warrants.

8. Before the officer said I was under arrest, I was simply seated on my bike; I did not make any attempt to resist arrest.

9. They took me first to an area right outside the Pentagon. They kept me there for about 30 minutes. Then the officers came back with about ten other people and told us all to get into a white van. They drove us to the ICE center in Chantilly, Virginia. I was there for about two and a half days. Then they moved me to the Farmville Detention Center, which is more than three and a half hours away from my family. I was there for 13 or 14 days.

After that, they moved me to the South Texas Detention Complex in Pearsall, Texas. I am still detained there almost a month later. There are a lot of other people here. So many that our meals are very small and there are about 100 people in every dorm.

10. My arrest in D.C. was so traumatic for me, my wife, and our son. My son, who is only seven years old, asks my wife why his daddy isn't coming back. He cries so much, saying he misses me. Emotionally it has been devastating.

11. It has been difficult for them to survive without me, too. They depended on my income to get by. My parents in Venezuela, who are too old to work, also need my help.

12. All I want is to come home and for my rights to be respected. I was detained even though I have a pending asylum application, work authorization, and no criminal history, besides one ticket for driving without a license. I am not violent or dangerous—I am just trying to live a safe life in this country.

13. My lawyer is seeking a bond for me. I am afraid that even after I am released, ICE will once again target me and arrest me like they did in August.

14. Due to my and my wife's pending asylum applications, I fear we would face retaliation and grave danger if our persecutors in Venezuela were to learn of our asylum claims through this lawsuit.

15. This declaration was read to me in full in Spanish on September 29, 2025 by Megan Steinheimer. I completely understand the content of this declaration.

I, Megan Steinheimer, CASA Representative, affirm Mateo Doe gave me permission to sign this declaration on his behalf because he is currently detained. At 8:00am on September 29, 2025, I read the above Declaration back to Mateo Doe to confirm its accuracy and he stated that it was accurate.

Executed on September 30, 2025.

Signature

**DECLARATION OF PAOLA FLORES ROMAN**

I, Paola Flores Roman, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Paola Flores Roman. I am an attorney at the firm Murray Osorio PLLC, and I have been practicing exclusively immigration law for nearly three years in the District of Columbia, Maryland, and Virginia. I have represented individuals detained by Immigration and Customs Enforcement ("ICE") during that time. I focus on humanitarian relief and am part of my firm's detained removal defense team, and I represent clients in bond proceedings, credible and reasonable fear interviews, asylum, cancellation of removal, adjustment of status, and other forms of relief.
2. In my experience, before August 2025, ICE typically detained individuals in Washington, D.C. who were considered priorities for removal, such as those with criminal convictions or prior removal orders. Officers would complete the required paperwork and document how, when, where, and why the encounter with the individual and detention occurred including in Form I-213. In this form, there was typically a paragraph summary of the encounter. These encounters often arose from joint task force operations with law enforcement who were serving warrants on individuals with criminal backgrounds, or after an individual was detained by law enforcement and transferred to ICE custody.
3. Before August 2025, if ICE encountered an individual in D.C., ICE would sometimes ask for their information, but it would not always lead to detention. They would check their immigration and criminal history. If ICE saw that they had a pending case and had no criminal history, they would let them go and they would not be detained.
4. Things are starkly different now. The context of the encounter is largely absent from documentation. Today, the I-213 forms often contain only a line or two stating that the individual was encountered, without explaining how, why, or the reason behind the

encounter. The officers simply state that it was determined that the individual lacked immigration status, without any explanation of how that was determined. Now, there are no priorities for removal for ICE; everyone is a priority, regardless of whether the person has been here for 20+ years, paid taxes, has no criminal history, or has a pending application for immigration relief.

5. From the reports I have received from clients and their family members, most individuals detained by ICE are Latinos and are from neighborhoods in D.C. where predominantly Latinos live and work. There have been a few Afghan and Pakistani clients who were working for Uber or Lyft when they were also pulled over.

6. I have a Latino client who was walking to work in D.C. on August 21, 2025, when he was stopped and detained by plainclothed and masked ICE officers. He reported that ICE made no inquiry regarding his immigration status or individualized circumstances. My client had been in the U.S. for 23 years with no criminal history. Unfortunately, *Matter of Yahure* was issued just two days before his bond hearing, which impacted his case. He ultimately opted for voluntary departure. His Form I-213 only notes that he was arrested by an ICE officer, with the date, time, location, and that he was transported to Chantilly.

7. I also have a client who was working as an Uber driver and was waiting in a designated area for rides when he was pulled over by U.S. Park Police in D.C. on August 15, 2025. He presented his valid driver's license and asked them why he was being pulled over. They called HSI, and he showed them his Employment Authorization Document (EAD) and informed the officers that he had a pending asylum application with USCIS. His car was stopped. Despite having a pending asylum application, ICE handcuffed him with force and detained him. His only prior issue was a traffic infraction from 2024 for failure

to pay attention. He had entered the U.S. on a B1/B2 visa, and he has been previously released on bond. The I-213 simply states that he was encountered by HSI agents after being pulled over by U.S. Park Police.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2025.

Paola Flores Roman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF W. G. M.**

I, W. G. M., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is W.G.M. I am 20 years old. I have lived in Washington, DC since 2019.
2. On the morning of Sunday, September 7, 2025, I was walking toward my girlfriend's apartment building in the Fort Totten neighborhood of Washington, DC, when several officers randomly approached me. They got out of an unmarked Subaru car with Texas license plates. The officers were in plain clothes wearing vests, but I do not remember if there was any writing on their vests.
3. The officers called out to me to stop in English. They walked up to me and asked me to show them "documents". I showed them my DC driver's license. The officers started speaking in Spanish and said those are not "papers" and asked me for a green card. I told them that I do not have a green card but I have a work permit. The officers then told me to put my hands behind my back and they handcuffed me. I did not try to resist arrest or flee. They told me to get into their car and they would check my status. After I was handcuffed

and in the car, I tried to explain to the officers that I have Special Immigrant Juvenile Status, a work permit, and a social security card, but the officers said they did not care. One of them grabbed me by my shirt and another one grabbed me by my feet and they shuffled me into the car. The handcuffs were so tight they left marks on my wrists.

4. Once in the car, the officers told me that I am here "illegal" and I would be transported to a detention center. I asked them to allow me to make a call to my mother. Over the phone, my mother tried to explain to the officers that I have both Special Immigrant Juvenile Status and "deferred action," which means that ICE is not supposed to deport me. I also heard my mother asking the officer who they were and why I was arrested. The officers refused to answer her and just hung up the call.

5. The total duration of the interaction with the officers was less than ten minutes. One of the officers spoke Spanish, so most of the conversation I had with the officers was in Spanish.

6. None of the officers at any point ever identified themselves, presented a warrant or other paperwork, explained why they stopped me, or indicated that they knew me or my name prior to walking up to me. The officers never asked me about my ties to the community, how long I have been living or working in DC, if I had any family here, or anything else about my circumstances.

7. I have lived in DC since 2019, and I have never experienced an encounter like this before. I have never been convicted of any crime.

8. After I was taken by the officers on September 7, 2025, they brought me to the Chantilly ICE Office where I was detained for several days. I was then transferred to Riverside Regional Jail for another day and then transferred to Farmville Detention Center. I am currently at Farmville waiting for my next court date.

USCA Case #26-5045 Document #2203562 Filed: 11/16/2026 Page 552 of 562

9. With my lawyers' help, I am trying to get bond so that I can leave immigration detention. But I fear that even if I am released on bond, ICE will arrest me again like they did on September 7.

10. I am using my initials instead of my full name in this declaration because I am afraid that my family members and me would be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens online.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2025.

## CERTIFICATE OF INTERPRETATION

I, Martha Arzu, certify that I am fluent in Spanish and English and that I read this declaration in its entirety to W. G. M. Due to W. G. M.'s detention, I have not been able to visit him in person or otherwise obtain his signature. I spoke with W. G. M. via Zoom call on October 2, 2025 and read this declaration to W. G. M. word for word to confirm its accuracy. W. G. M. affirmed that it was accurate and authorized me to sign on his behalf.

Martha Arzu
Date 10/02/2025

USCA Case #26-5045 Document #2203562 Filed: 11/16/2026 Page 554 of 562

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417 |

**DECLARATION OF Y.R.M.**

I, Y.R.M., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Y.R.M. I am 21 years old, and I work in construction. I have lived in the United States for 4.5 years in Lanham, Maryland. I have five brothers in the United States.

2. On August 22, 2025, at 5:30 AM, I was a passenger in a company truck. As we were driving, two unmarked cars surrounded our truck on the road, and the driver pulled over. The truck was following all traffic regulations and going under the speed limit. There were three other unmarked cars that quickly arrived and about 15 agents that got out of the cars. I am not sure what agency they were from, but they were not Metropolitan D.C. Police. An agent took the driver's ID and came back to say that the driver had an arrest warrant in New York. The driver said that he had never been to New York, and I believe that the agent lied to get us to get out of the vehicle.

3. Once I got out of the car, they asked me for my ID, but I did not have one on me. They then put handcuffs on me. I did not make any attempt to resist arrest or run away. They

did not ask my immigration status. They put me in a car and drove away to a parking lot next to the Pentagon. They then transferred me to a van to go to Chantilly.

4. None of the agents at any point ever identified themselves, presented a warrant, explained why they arrested me, asked me any questions about my immigration status, indicated that they knew me/knew my name prior to arresting me. They did not ask me any questions about my ties to the community, how long I've been living/working in D.C., my family here, or anything else about my circumstances.

5. I spent about 5 days in Chantilly. When I arrived, they took my fingerprints. They fed me only one burrito per day, provided no hygiene products or toothbrushes, and told us repeatedly that we had "no right to anything." The burritos were hard to keep down, and we had to drink toilet water. Many people would pass out from dehydration or hunger. There were about 70 people in the room.

6. After leaving Chantilly, I was transferred to Richmond for 4 days before going to Louisiana by plane. I stayed on the plane and went to Ohio. We then flew back to Louisiana and flew to Detroit before driving the North Lake, where I am currently housed. During these flights we were handcuffed from the wrists to the waists to the ankles the entire time. They even kept us shackled while we used the bathroom.

7. Since I entered this country, this is the first and only time I was arrested by law enforcement for non-immigration purposes. I have not had any other interactions with law enforcement, I have never been convicted of any crime/offense, and I have not had any issues with meeting deadlines or appearing in court in relation to my immigration case.

8. Since my arrest, I have lost over 15 pounds because I cannot eat the food provided. I feel that I can pass out regularly because I do not have enough energy. We have the ability to

buy our own food, and I have started to feel better but only because I am buying my own food. Emotionally, it has been a traumatizing experience. I feel that I need to be tough to survive in the detention center. There are instances where the guards will hit detainees, and I have seen detainees hurt one another.

9. I am deeply concerned and scared by this incident. I believe I was stopped and arrested solely because of the color of my skin and my appearance, as it was clear that the arresting officer did not know who I was, did not present any warrant, and did not say why I was being arrested.

10. I am applying for a bond to be released. If I am released, I am afraid to go back into D.C., but I would do so in order to get work. I would need to go back into D.C. because I would need to get work to support myself. However, I am very scared that I will be arrested and detained again when I do so.

11. I am also afraid of retaliation towards me and my family may face if my identity were to become public as a result of my participation in this lawsuit. I am afraid that me and my family members will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens online.

12. This declaration was read to me in full in Spanish on October 1, 2025, by Yahir Santillan-Guzman. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.

Y.R.M

Y.R.M.

I, Yahir Santillan-Guzman, a paralegal at Covington & Burling LLP, affirm Y.R.M. gave me permission to sign this declaration on his behalf because he is currently detained. At 2:00 pm on October 1, 2025, I read the above Declaration back to Y.R.M. word for word to confirm its accuracy and he stated that it was accurate.

Executed on October 1, 2025.

Signature

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated,*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | No. 25-cv-3417-PLF |

**[PROPOSED] ORDER**

Upon consideration of Plaintiffs' Motion for a Preliminary Injunction, to Stay Agency Action, and for Provisional Class Certification ("Motion"), any opposition and reply, and the entire record herein,

The Court finding that Plaintiffs are likely to succeed on the merits of their Second Claim for Relief, that they will suffer irreparable injury if the requested relief is not issued, and that the balance of the equities and public interest favor the entry of such an order,

And the Court further finding that the proposed class satisfies the requirements of Fed. R. Civ. P. 23 in that the proposed class is sufficiently numerous and satisfies the commonality, typicality, and adequacy requirements; and that Plaintiffs' counsel are qualified to serve as class counsel for the provisionally certified class; and that the proposed class should therefore be provisionally certified for purposes of the preliminary injunction, it therefore is

**ORDERED** that Plaintiffs' Motion is **GRANTED**.

It is further **ORDERED** that the following class is provisionally certified:

**Warrantless Arrest Class**: All persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk.

It is further **ORDERED** that Plaintiffs' counsel from the Amica Center for Immigrant Rights, American Civil Liberties Union Foundation of the District of Columbia, American Civil Liberties Union Foundation, National Immigration Project, Washington Lawyers' Committee for Civil Rights and Urban Affairs, and Covington & Burling, LLP, are hereby provisionally appointed as counsel for the provisionally certified Plaintiff Classes.

It is further **ORDERED** that Defendants' policy and practice of making warrantless immigration arrests in this District without a pre-arrest individualized determination of probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained is stayed pursuant to 5 U.S.C. § 705.

It is further **ORDERED** that:

1. Defendants and their agents are enjoined from making warrantless immigration arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).
2. Any agent of Defendants who conducts a warrantless immigration arrest in this District **SHALL** comply with all requirements set forth in DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2).
3. Any Defendant or their agent who conducts a warrantless arrest in this District **SHALL**, as soon as practicable, document the facts and circumstances surrounding a warrantless immigration arrest in narrative form. This documentation shall include the specific, particularized facts that supported the agent's pre-arrest probable cause to

believe that the person is likely to escape before a warrant can be obtained, including the following facts that are required to be documented pursuant to DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2): "that the alien was arrested without a warrant"; "the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area"; "the alien's ties to the community, if known at the time of arrest, including family, home, or employment . . . "; and "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." The documentation **SHALL** include the date and time that the agent made the pre-arrest determination of probable cause, the date and time of the arrest, and the date and time the agent completed the documentation.

4. Any agent of Defendants **SHALL NOT** use boilerplate or copy-and-pasted language when describing the individualized assessment of flight risk in the documentation ordered above.

5. **Within 30 days and every 30 days thereafter** until this litigation is terminated or the Court rules otherwise, Defendants **SHALL** release to Plaintiffs' counsel the documentation describing Defendants' and their agents' warrantless immigration arrests within this District, or if requested by Plaintiffs' counsel concerning specific individual warrantless arrests, no later than seven days after the request.

It is further **ORDERED** that this injunction shall be effective upon service on the Defendants, and a bond in the amount of $1 shall be required.

**SO ORDERED.**

Date: ____________________________

____________________________________
PAUL L. FRIEDMAN
United States District Judge